ACCEPTED
14-15-00917-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
10/28/2015 4:42:22 PM
CHRISTOPHER PRINE
CLERK

NO. _____

IN THE _____ COURT OF APPEALS
HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
10/28/2015 4:42:22 PM
CHRISTOPHER A. PRINE
Clerk

## IN RE SHELBY LONGORIA

Original Proceeding from the
Probate Court Number One, Harris County,
Texas, Cause No. 414270

PETITION FOR WRIT OF MANDAMUS – **RECORD VOL 1, PART 2**

Johnny W. Carter
State Bar No. 00796312
jcarter@susmangodfrey.com
Richard W. Hess
State Bar No. 24046070
rhess@susmangodfrey.com
Kristen Schlemmer
State Bar No. 24075029
kschlemmer@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666

Robert S. MacIntyre Jr.
State Bar No. 12760700
macintyre@mmlawtexas.com
MacIntyre McCulloch
  Stanfield Young
2900 Weslayan, Suite 150
Houston, Texas 77027
Telephone: (713) 547-5400

**Attorneys for Shelby Longoria**

NUMBER 414270

| ESTATE OF | § | IN PROBATE COURT NO. ONE |
| | § | |
| DOROTHY LOUISE LONGORIA, | § | |
| | § | |
| DECEASED. | § | OF HARRIS COUNTY, TEXAS |

## INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS

TO THE HONORABLE JUDGE OF THIS COURT
AND TO ALL INTERESTED PARTIES:

COMES NOW James Thomas Dorsey, as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, and submits for filing this Inventory, Appraisement, and List of Claims in compliance with Section 250 of the Texas Probate Code.

Date of Death: April 6, 2012

Date of Qualification: October 9, 2012

The following is a full, true, and complete Inventory and Appraisement of all personal property and all real property situated in the State of Texas, together with a list of claims due and owing to this Estate as of the date of death, which have come into the possession or knowledge of the undersigned.

### REAL PROPERTY

To the knowledge of the Independent Executor, the Decedent owned no real property on the date of her death.[1]

---

[1] The Decedent may have owned a community property interest in real property owned by Eduardo Longoria on the date of his death. An investigation is being conducted to determine whether Eduardo Longoria owned any real property on the date of his death.

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 1

00716

## PERSONAL PROPERTY

To the knowledge of the Independent Executor, the Decedent owned the following personal property on the date of her death.

**Cash and Bank Accounts**

| | |
|---|---|
| Texas Community Bank, Account Number | 4,988 |
| Texas Community Bank, Account Number | 27,538 |
| Texas Community Bank, Account Number | 7,680 |
| Texas Community Bank, Certificate Number | 72,918 |
| Total Cash and Bank Accounts[2] | 113,124 |

**Stocks, Bonds, and Other Securities**

Direct ownership of, or right to constructive trust imposed on, undivided one-half interest in:
50 shares of Series "A" stock in Vertice Empressarial, S.A. de C.V.;
8,934 shares of Series "B" stock in Vertice Empressarial, S.A. de C.V.;
49,000 shares of Series "A" stock in Inmuebles y Terrenos, S.A. de C.V.; and
4,375,350 shares of Series "B" stock in Inmuebles y Terrenos, S.A. de C.V.

49,011,050

Total Stocks, Bonds, and Other Securities[3]          49,011,050

**Other Personal Property**

1.      Jewelry

    a.      Choker gold necklace                                400

---

[2] The Decedent may have owned additional accounts. Shelby Longoria is believed to be in possession of information regarding such accounts, if any, but to date he has refused to provide it.

[3] The Decedent may have owned additional stocks, bonds, or other securities. Shelby Longoria is believed to be in possession of information regarding such stocks, bonds, and other securities, if any, but to date he has refused to provide it.

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 2

00717

| | | |
|---|---|---:|
| b. | Small diamond necklace | 1,000 |
| c. | Silver and small diamond ring | 500 |
| d. | Small hoop gold and diamond earrings | 1,500 |
| e. | Peridot earrings | 250 |
| f. | Calsidney earrings | 250 |
| g. | Coral and diamond earrings | 1,000 |
| h. | Coral ring | 500 |
| i. | Elizabeth Showers earrings | 600 |
| j. | Watch | 2,000 |
| k. | Gump Peridot necklace | 150 |
| l. | Diamond ring | 1,500 |
| m. | Pearl necklace | 2,000 |
| n. | Pearl and diamond earrings | 1,000 |
| o. | Short strand of black pearls | 1,000 |
| p. | Pearl and smoky topaz bracelet | 350 |
| q. | Necklace from India with topaz peridot and amethyst beads | 250 |
| r. | Thirty-inch long string of pale green beads and matching earrings | 180 |
| s. | Two small gold chains | 120 |
| t. | Set of silver diamond loops and hanging blue stone | 100 |
| u. | Four silver rings | 120 |
| v. | Gold chain with small diamond | 120 |

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 3

00718

| | | |
|---|---|---:|
| w. | Five slides for loops | 260 |
| x. | Small faux diamond necklace | 250 |
| y. | Set of turquoise earrings with small diamond | 2,500 |
| z. | Gold chain with pink coral | 200 |
| aa. | Aqua ring and earring | 350 |
| bb. | Faux emerald earrings with briolette | 250 |
| cc. | Ring with cocktail diamonds | 5,000 |
| dd. | Ring with faux diamonds | 250 |
| ee. | Six strands of pearls (yellowed) | 300 |
| ff. | Set of loop earrings with hanging briolette | 4,000 |
| gg. | Miscellaneous costume jewelry and accessories (numerous pieces) | 500 |
| | Total Jewelry | 28,750 |
| 2. | Electric Wheelchair | 1,500 |
| 3. | Clothing | 5,000 |
| 4. | Miscellaneous Personal Effects | 1,000 |
| | Total of Other Personal Property | 36,250 |
| | TOTAL PERSONAL PROPERTY KNOWN TO EXECUTOR | 49,160,424 |
| | TOTAL ESTATE KNOWN TO EXECUTOR (NOT INCLUDING CLAIMS LISTED BELOW) | 49,160,424 |

The Decedent was predeceased by her husband and she never remarried, so no one owned a community-property interest in any property listed above.

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 4

00719

## LIST OF CLAIMS

To the knowledge of the Independent Executor, the Decedent owned the following claims on the date of her death.

| | | |
|---|---|---:|
| 1. | Claim against Adriana Longoria based on promissory note dated August 1, 2011, in the principal amount of $70,000 | 70,478 |
| 2. | Claim against Sylvia Dorsey for amounts loaned to her | 75,000 |
| 3. | Claim against Shelby Longoria based on August 9, 2011, agreement | 200,000 |
| 4. | Claim against Shelby Longoria for breach of fiduciary duty | 25,000,000 |
| 5. | Claim against Shelby Longoria for exemplary damages | 10,000,000 |
| | TOTAL CLAIMS[4] | 35,345,478 |

## RESERVATION OF RIGHT TO AMEND

The Independent Executor expressly reserves the right to amend this Inventory, Appraisement, and List of Claims.

---

[4] There may be additional claims against Shelby Longoria. He has withheld information that has formally been requested in this proceeding. Accordingly, this inventory may be amended when such information is obtained.

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 5

00720

I, James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, do solemnly swear that the above two pages, shown as the Inventory, Appraisement, and List of Claims, are a true, correct, full, and complete statement of the property and claims of the Estate that have come to my knowledge.

Respectfully submitted,

Signature of Independent Executor

/s/ James Austin Fisher

James Austin Fisher
State Bar of Texas Number 07051650
**FISHER & WELCH**
**A Professional Corporation**
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Telephone:  214.661.9400
Telecopier:  214.661.9404

**ATTORNEY FOR JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED**

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 6

00721

STATE OF TEXAS            §
                         §
COUNTY OF DALLAS         §

Sworn to and subscribed before me on August 27, 2013, by James Thomas Dorsey as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased.

_____
Notary Public in and for the State of Texas

_____
Printed Name of Notary Public

My Commission Expires:

_____



KATHERINE ALEXIS DAMIANOFF
NOTARY PUBLIC
State of Texas
Comm. Exp. 07-09-2016

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 7

00722

# CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2013, a true and correct copy of this document was served on the Defendant, through his attorneys of record named below, in the manner indicated and in compliance with Texas law.

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
3900 Essex Lane, Suite 220
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

/s/ *James Austin Fisher*
James Austin Fisher

00723

IN THE ESTATE OF           §    IN PROBATE COURT NUMBER ONE
DOROTHY LOUISE LONGORIA,    §
DECEASED                  §    HARRIS COUNTY, TEXAS

COUNTY CLERK
HARRIS COUNTY, TEXAS

## ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S AMENDED CONTEST OF 2010 WILL

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW James Thomas Dorsey in his capacity as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, as Counter-Plaintiff, and pleads the following counterclaims in response to Shelby Longoria's Amended Contest of 2010 Will, stating the following causes of action against Shelby Longoria, as Counter-Defendant.

### Discovery Level

1. Pursuant to TEX. R. CIV. P. 190, Counter-Plaintiff states that discovery in this case is intended to be conducted under Level 3 of that Rule.

### Overview

2. These counterclaims are brought by a citizen of Texas against another citizen of Texas. Counter-Plaintiff is the personal representative of an estate pending in this Court, and adjudication of these counterclaims is essential to administration of that estate. The Decedent lived in Texas for the last 25 years of her life. These counterclaims are based entirely on Texas law. None of them is based on any law of the United Mexican States.

00724

## The Parties

3.      Counter-Plaintiff James Thomas Dorsey is an individual who is bringing these counterclaims in his capacity as the duly appointed Independent Executor of the Estate of Dorothy Louise Longoria, Deceased.

4.      Counter-Defendant Shelby Longoria is an individual who resides in Hidalgo County, Texas. Counter-Defendant commenced this action and has appeared, through counsel, in this action, so this pleading may be served on him through his attorneys of record.

## Jurisdiction

5.      Pursuant to Sections 4A, 4B, and 4F of the Texas Probate Code, the Court has jurisdiction over the subject matter of this civil action. The Estate of Dorothy Louise Longoria is pending in this Court, and this Court is a statutory probate court. As explained more fully below, this action is brought by a personal representative on behalf of that estate and this action is related to that estate. In addition, the exercise of pendent or ancillary jurisdiction over this action is necessary to promote judicial efficiency and economy.

6.      The Court has *in personam* jurisdiction over Counter-Defendant Shelby Longoria by virtue of his filing of Shelby Longoria's Amended Contest of 2010 Will, in response to which these counterclaims are pleaded. In addition, general personal jurisdiction exists because the Counter-Defendant has had continuous and systematic contacts with the State of Texas, and specific personal jurisdiction exists because this action arises out of contacts by the Counter-Defendant with the State of Texas, as explained below.

00725

7.    Pursuant to Section 6A of the Texas Probate Code, the venue of this action is proper because the Estate of Dorothy Louise Longoria, Deceased, is pending in this Court and this action is related to that estate, as explained more fully below.

## Conditions Precedent

8.    All conditions precedent to Counter-Plaintiff's rights to plead and to prosecute these counterclaims, and to recover the relief requested herein, have occurred or been fulfilled.

## Facts Applicable to All Causes of Action[1]

9.    On July 3, 1942, Eduardo Longoria ("Eduardo") and Dorothy Louise Kowalski ("Dorothy") were married in the City of Laredo, in Webb County, Texas.

10.    When they were married, Dorothy was a citizen of the United States of America, and Eduardo was a citizen of the United Mexican States ("Mexico"), but he had been living in the United States and, after the wedding, the couple initially settled in McAllen, Texas.

11.    The marriage of Eduardo and Dorothy was subject to the laws of the State of Texas, including the law of community property.

---

[1]    This petition does not recite every fact on which the Counter-Plaintiff's claims are based. It is intended only to be "a short statement of the cause of action sufficient to give fair notice of the claim involved," as required by TEX. R. CIV. P. 47.

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED TO SHELBY LONGORIA'S AMENDED CONTEST OF 2010 WILL                Page 3

12. Eduardo and Dorothy had four children, all of whom are living. Their names are: Adriana Louise Longoria ("Adriana"), Eduardo Longoria, Jr., also known as Wayo Longoria ("Wayo"), Sylvia Rene Dorsey ("Sylvia"), and Shelby Longoria ("Shelby"). All of them reside in Texas.

13. Eduardo and Dorothy amassed considerable wealth through a variety of business activities and investments.

14. Over time, Shelby took control over the business and investments owned by Eduardo and Dorothy.

15. Shelby managed property and accounts owned by Dorothy and represented to her that he was doing so for her benefit.

16. In addition, Shelby expressly agreed to hold in trust, for the benefit of Dorothy, property that Shelby obtained from Eduardo. In a letter to Dorothy dated August 5, 1983, for example, Shelby and Wayo promised Dorothy that "the assets that Daddy has willed to us, as long as you live, we will hold them as if they were yours" and "[w]e will make the fruits available to you for your direction as to their use." These promises were made by Shelby while he was residing in Texas, and they were set forth in a letter that was sent to Dorothy from an address in Texas. Shelby breached these promises to Dorothy by failing to account for the property that was given to Shelby by Eduardo, by concealing from Dorothy material facts about that property (including its nature, extent, value, and profitability), by failing to hold and maintain that property as if it belonged to Dorothy, by paying himself income

00727

generated by the property, by failing to disclose to Dorothy that he had done so, and by failing generally to make the fruit of that property available to her for her use.

17. Likewise, in a letter dated October 9, 2007, which Shelby sent to Dorothy at her residence in Houston, Texas, Shelby made specific promises with respect to a large sum of money that Eduardo wished for Dorothy to have upon his death. Admitting that he held such funds in trust for Dorothy, and in recognition that Dorothy intended to leave her estate to her daughters, Shelby promised that, within thirty days after Dorothy died, he would pay $100,000 to Sylvia and $100,000 to Adriana. Upon Dorothy's death, Shelby repudiated and breached this promise to Dorothy. While he did tender a check for $100,000 to Sylvia and a check for $100,000 to Adriana, he printed on the checks language that, if the checks were negotiated, would have resulted in a release of their rights in Dorothy's estate and rights against Shelby – self-serving conditions which Shelby had no right to impose. The fact that Shelby arbitrarily demanded such releases for his benefit, as conditions on his performance of an unconditional duty to pay $100,000 to Sylvia and $100,000 to Adriana, proves that (a) Shelby knew that Dorothy owned valuable claims against him, (b) Shelby knew that Dorothy intended to leave her entire estate to Sylvia and Adriana, and (c) Shelby knew that Sylvia and Adriana themselves had valuable claims against him – all of which he now dishonestly denies.

18. Shelby owed a fiduciary duty to Dorothy (a) as an agent for Dorothy, (b) as a trustee of an express trust for the benefit of Dorothy, and, in addition or in the alternative, (c) pursuant to an informal fiduciary relationship with Dorothy.

00728

19.     In contravention of his fiduciary duty to Dorothy under Texas law, Shelby failed to advise Dorothy fully and fairly regarding the nature and extent of her property and his actions with respect to her property and the property he was holding in trust, supposedly for her benefit.

20.     In fact, Shelby managed for his own benefit Dorothy's property, as well as property he was holding in trust supposedly for her benefit. He caused income from the property to be paid to him or to others for his benefit, and failed to disclose to Dorothy that he had done so.

21.     Eduardo died on January 26, 2005, at the age of 91. (He was born on October 25, 1913.)

22.     When Eduardo died, all of the property in his estate was community property of which one-half was owned by Dorothy under Texas law.

23.     Eduardo died in Webb County, Texas, where he and Dorothy had lived for many years.

24.     After the death of Eduardo, Shelby continued to manage Dorothy's property and continued to represent to her that he was managing her property for her benefit, but he intentionally concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property.

25.     In fact, Shelby managed the property for his own benefit and engaged in self-dealing transactions that he failed to disclose to Dorothy.

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED
TO SHELBY LONGORIA'S AMENDED CONTEST OF 2010 WILL                Page 6

00729

26. Dorothy died in Harris County, Texas, on April 6, 2012, at the age of 92. (She was born on May 4, 1919.)

27. By order dated October 9, 2012, this Court admitted to probate Dorothy's Last Will and Testament, dated January 21, 2010, and appointed James Thomas Dorsey Independent Executor of the Estate of Dorothy.

28. Letters Testamentary were issued to James Thomas Dorsey on the same day, and such Letters Testamentary are currently in full force and effect, so he is fully authorized to bring this action.

29. Whenever it is alleged herein that Shelby acted or communicated in any fashion, then such allegation should be taken to mean:

    a. That the Shelby himself took such action or made such communication; or, in the alternative,

    b. That a duly authorized agent of Shelby took such action or made such communication on behalf of Shelby and in the course and scope of the agency; or, in the alternative,

    c. That such action or communication was by one having apparent authority to do so on behalf of Shelby; or, in the alternative,

    d. That Shelby ratified and adopted such action or communication as its own and thereby became legally responsible for it.

00730

## First Cause of Action
## Demand for Accounting

30. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

31. Pursuant to Section 489B of the Texas Probate Code, Section 113.151 of the Texas Trust Code, and the common law of the State of Texas, Counter-Plaintiff is entitled to, and hereby requests, that Shelby provide a full accounting of (1) all of his activities as an agent for Dorothy, (2) all transactions done or caused by him involving property owned, in whole or in part, by Dorothy, and (3) all transactions involving property held by him in trust for Dorothy.

32. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads, under Texas law, the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED
TO SHELBY LONGORIA'S AMENDED CONTEST OF 2010 WILL                    Page 8

00731

interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

33. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Section 113.151 of the Texas Trust Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

## Second Cause of Action
## Breaches of Fiduciary Duty

34. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

35. Under Texas law, Shelby breached his fiduciary duty to Dorothy by (a) failing to disclose to her, fully and fairly, all information that might affect her interests in property managed by him, including both her community property and property held by Shelby in trust for her; (b) failing to act with utmost good faith and fair dealing in the management of her property and property held in trust for her, and in his other activities affecting her interests; (c) failing to act with undivided loyalty to Dorothy in the management of her property and property held by him in trust for her, and in his other activities affecting her interests; and (d)

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED
TO SHELBY LONGORIA'S AMENDED CONTEST OF 2010 WILL                    Page 9

00732

engaging in self-dealing transactions that were detrimental to her and, in addition or in the alternative, improperly benefited him.

36. The breaches of fiduciary duty by Shelby proximately caused compensable harm to Dorothy and her estate. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law.

37. The breaches of fiduciary duty by Shelby constituted "fraud," "gross negligence," and "malice" as those terms are defined in Chapter 41 of the Texas Civil Practice and Remedies Code. Despite his fiduciary duty under Texas law to disclose to Dorothy all facts that might affect her interests, Shelby intentionally or, in the alternative, with reckless disregard for Dorothy's rights, concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for exemplary damages in an amount to be determined by the trier of fact in accordance with Texas law.

38. Shelby derived profits by means of the breaches of his fiduciary duty to Dorothy. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment decreeing that Shelby disgorge all profits received by him as a result of the breaches of his fiduciary duty to Dorothy.

39. Shelby acquired property by means of the breaches of his fiduciary duty to Dorothy. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED TO SHELBY LONGORIA'S AMENDED CONTEST OF 2010 WILL          Page 10

00733

judgment imposing a constructive trust on all property acquired by Shelby by means of the breaches of his fiduciary duty to Dorothy.

40. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads, under Texas law, the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

41. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Section 114.064 of the Texas Trust Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED
TO SHELBY LONGORIA'S AMENDED CONTEST OF 2010 WILL                    Page 11

00734

## Third Cause of Action
### Breach of Promise To Hold Property for Dorothy's Benefit

42. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

43. Shelby promised Dorothy that he would hold in trust for Dorothy all of the assets that Eduardo gave to Shelby and Wayo and that he would make the income from such property available to her for her direction as to their use. These promises were made by Shelby while he was residing in Texas. Shelby breached these promises to Dorothy by failing to account for the property that was given to Shelby and Wayo by Eduardo, by concealing from Dorothy material facts about that property (including its nature, extent, value, and profitability), by failing to hold and maintain that property as if it belonged to Dorothy, by paying himself income generated by the property, by failing to disclose to Dorothy that he had done so, and by failing generally to make the fruit of that property available to her for her use.

44. These breaches by Shelby proximately caused compensable harm to Dorothy and her estate. Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law.

00735

45. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads under Texas law the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

46. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED
TO SHELBY LONGORIA'S AMENDED CONTEST OF 2010 WILL          Page 13

00736

## Fourth Cause of Action
## Breach of Promise To Pay $100,000 to Adriana and $100,000 to Sylvia

47. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

48. Shelby promised Dorothy that, within thirty days of her death, he would pay $100,000 to Adriana and $100,000 to Sylvia. These promises were made by Shelby while he was residing in Texas, and they were directed to Dorothy at her residence in Houston, Texas. Shelby breached these promises to Dorothy by tendering to Adriana and Sylvia checks that they could not negotiate without waiving their rights in Dorothy's estate and their rights against Shelby – self-serving conditions which Shelby had no right to impose.

49. Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for $200,000 in accordance with Texas law.

50. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads under Texas law the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the

00737

property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

51.     It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

### Prayer for Relief

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiff James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, prays that upon due notice and trial by jury, or upon hearing on motion for entry of default judgment or motion for summary judgment, the Court render judgment for Counter-Plaintiff and against Counter-Defendant Shelby Longoria, awarding the following relief under Texas law:

(1)     a decree commanding Counter-Defendant Shelby Longoria to render an accounting of all property that was owned, in whole or in part, by Dorothy Louise Longoria

00738

and that was within his possession, custody, or control, and all transactions affecting her property, and an accounting of all actions taken by him as her agent or trustee;

(2) an award of actual damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law, but the maximum amount of actual damages currently sought by Counter-Plaintiff – while reserving his right under Texas law to amend this pleading to request a greater or lesser amount as more evidence is uncovered and the whole truth comes to light – is $25,200,000;

(3) an award of exemplary damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law, but the maximum amount of exemplary damages currently sought by Counter-Plaintiff – while reserving his right under Texas law to amend this pleading to request a greater or lesser amount as more evidence is uncovered and the whole truth comes to light – is $10,000,000;

(4) an award of attorney fees (including litigation expenses) reasonably and necessarily incurred by Counter-Plaintiff in connection with each of his causes of actions under Texas law;

(5) a decree commanding Counter-Defendant Shelby Longoria to disgorge all profits received by him, or by others for his benefit, as a result of a breach by him of his fiduciary duty to Dorothy Louise Longoria;

(6) a decree imposing a constructive trust on all property acquired by Counter-Defendant Shelby Longoria, or by others for his benefit, by means of a breach of fiduciary duty owed to Dorothy Louise Longoria;

00739

(7)     an award of prejudgment interest on all actual damages at the highest rate authorized by law to the date of judgment;

(8)     an award of all costs incurred by Counter-Plaintiff in the course of preparing and prosecuting this civil action;

(9)     an award of postjudgment interest on all monetary relief at the highest rate authorized by law from the date of judgment until paid;

(10)    all writs and processes necessary to collect the judgment; and

(11)    all other relief to which Counter-Plaintiff is entitled or which the Court may deem appropriate under the circumstances and the applicable law.

Any inconsistent allegations or prayers for relief are pleaded in the alternative, as expressly authorized by TEX. R. CIV. P. 47 and 48.

### Reservation of Rights To Amend and To Supplement This Pleading

Because Counter-Plaintiff presently does not know all of Counter-Defendant's acts and omissions that caused harm to Dorothy Louise Longoria or her estate, or all of the relevant circumstances surrounding such acts and omissions, Counter-Plaintiff anticipates that it may be necessary to plead additional causes of action after discovery is conducted. Accordingly, Counter-Plaintiff hereby reserves the rights to amend and to supplement this pleading.

00740

DATED:  September 26, 2013.

Respectfully submitted,

*/s/ James Austin Fisher*
James Austin Fisher
  State Bar of Texas Number 07051650
Shannon L.K. Welch
  State Bar of Texas Number 90001699
**FISHER & WELCH**
**A Professional Corporation**
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Telephone:  214.661.9400
Telecopier:  214.661.9404

T. Wesley Holmes
  State Bar of Texas Number 09908495
**THE HOLMES LAW FIRM**
10,000 North Central Expressway, Suite 400
Dallas, Texas 75231
Telephone:  214.890.9267

**ATTORNEYS FOR COUNTER-PLAINTIFF**
**JAMES THOMAS DORSEY,**
**INDEPENDENT EXECUTOR OF**
**THE ESTATE OF DOROTHY**
**LOUISE LONGORIA, DECEASED**

00741

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2013, a true and correct copy of this document was served on Shelby Longoria, through his attorneys of record named below, in the manner indicated and in compliance with Texas law.

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
3900 Essex Lane, Suite 220
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

/s/ *James Austin Fisher*
James Austin Fisher

00742

| IN THE ESTATE OF | § | IN PROBATE COURT NUMBER ONE |
|---|---|---|
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

## RESPONSE TO MOTION TO DISMISS OR TO ABATE COUNTERCLAIMS

TO THE HONORABLE JUDGE OF THIS COURT:

COME NOW Counter-Plaintiff James Thomas Dorsey, in his capacity as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, (the "Executor") and Third-Party Defendant Sylvia Dorsey, and respectfully submit this response to Counter-Defendant Shelby Longoria's Motion To Dismiss Counterclaims for Forum Non Conveniens, or Alternatively To Abate Pending Resolution of Will Contest and Mexican Litigation (the "Motion"). For the following reasons, the Motion should be denied.

| PARTIES RESIDING IN TEXAS | PARTIES RESIDING IN MEXICO |
|---|---|
| Shelby Longoria<br>James Thomas Dorsey, Executor<br>Sylvia Dorsey<br>Adriana Longoria | NONE |

The Motion seeks dismissal of counterclaims involving four parties. *All* of them – including the Movant, Shelby Longoria – live in Texas, yet his motion, brief, and affidavit all manage to avoid revealing the fact that *he lives here* – an obviously crucial fact in a *forum non conveniens* inquiry. This lack of candor permeates Movant's argument.

00743

Movant cites no case in which *every party* was an individual residing in the forum state, but which nevertheless was dismissed for *forum non conveniens*. The Motion is wholly unsupported by *apposite* precedent.

But the precedential poverty of the Motion is even more profound. Movant seeks dismissal of claims pleaded in a *probate court* by the executor of an estate pending in that court. There is a strong public interest in protecting the jurisdiction of probate courts over matters related to estates of deceased residents of the forum. Movant cites no case in which a probate court dismissed, for *forum non conveniens*, a claim of the personal representative of an estate in that court. The Motion is wholly unsupported in a *second* essential respect.

But it gets worse still. The Motion seeks dismissal of *counterclaims* – and not counterclaims unrelated to the subject matter of the plaintiff's claim, but counterclaims closely related to that subject matter: the estate planning of the Decedent, Dorothy Longoria, and the disposition of her estate. Shelby Longoria, the Counter-Defendant who both lives in this state and invoked the jurisdiction of this Court to contest the Decedent's will, now insists that this forum is so oppressively "inconvenient" that the counterclaims against him must be dismissed. But he cites no case in which a court has ever applied *forum non conveniens* to dismiss counterclaims that are directly related to the plaintiff's claims. The Motion is, then, wholly unsupported in a *third* essential respect.

As it relates to Movant's request for dismissal, this response has two parts. First, we show that the Motion depends on a grossly inaccurate statement of the law. Second, we show the the Motion depends on a grossly inaccurate statement of the facts – especially the

00744

nature and substance of the counterclaims pleaded by the Executor. The counterclaims are based entirely on acts and omissions of Movant *while he lived in Texas*. The counterclaims are based entirely on *Texas* law. The gravamen of the counterclaims is that Movant breached his fiduciary duty to his mother, Dorothy Longoria, the Decedent in this probate proceeding. The fiduciary duty arose both out of a documented, private-trust relationship and an informal fiduciary relationship. Both causes of action are recognized in Texas, but not in Mexico – so Mexico is not an adequate alternative forum. The Decedent lived in Texas for the last 25 years of her life, and Movant has lived here longer than that, so application of Texas law is no "stretch" – it is plainly appropriate. The Executor is *not* asking this Court to apply Mexican law or to set aside the judgment of a Mexican court. Movant's argument mischaracterizes the Executor's counterclaims. Only by doing so can Movant make a colorable argument for dismissal.

In the alternative, Movant requests abatement of the Executor's counterclaims until Movant's will contest is concluded and certain proceedings in Mexico are concluded. The request makes no sense. The counterclaims will be pursued regardless of the outcome of the will contest; even if the order admitting the will is set aside, there will be a personal representative who will be responsible to assert claims of the estate. Likewise, the Mexican case referenced by Movant cannot possibly obviate the litigation of the Executor's counterclaims. Abatement would accomplish nothing except delay and duplication of discovery – as discovery needed for the counterclaims overlaps with discovery needed for the will contest. Abatement of the counterclaims is a bad idea.

00745

## RESPONSE TO MOTION TO DISMISS FOR FORUM NON CONVENIENS

### I. Movant Fails To Identify – Let Alone Apply – the Correct Legal Standard

#### A. To Be Entitled To Dismissal, Movant Must Bear a "Heavy Burden" To "Clearly Show" Facts That "Strongly Favor" an Available and Adequate Alternative Forum, While Giving "Great Deference" To This Forum

Remarkably, Movant cites neither the most recent case in which the Supreme Court of Texas made a *forum non conveniens* determination nor the most recent case in which the United States Supreme Court did so.[1] Though ignored by Movant, both cases are instructive. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007); *Quixtar, Inc. v. Signature Mngmt. Team LLC*, 315 S.W.3d 28 (Tex. 2010).

In both cases, it was held that a defendant seeking dismissal for *forum non conveniens* "ordinarily bears a *heavy burden* in opposing the plaintiff's chosen forum." *Quixtar*, 315 S.W.3d 28, 31 (Tex. 2010) (quoting *Sinochem*, 549 U.S. at 430) (emphasis added).[2] In Movant's Brief, however, Movant never recognizes the "heavy burden" imposed on him by common law. Instead, Movant jumps ahead to address the adequacy and availability of a Mexican forum, and various factors of private and public interest. By considering those

---

[1] *See* COUNTER-DEFENDANT SHELBY LONGORIA'S BRIEF IN SUPPORT OF HIS MOTION TO DISMISS COUNTERCLAIMS FOR FORUM NON CONVENIENS, OR ALTERNATIVELY TO ABATE PENDING RESOLUTION OF WILL CONTEST AND MEXICAN LITIGATION (Aug.7, 2013) ("Movant's Brief").

[2] In making *forum non conveniens* determinations, the Texas Supreme Court has routinely applied the standards enunciated by the United States Supreme Court. *Quixtar*, 315 S.W.3d at 32 ("we regularly consider United States Supreme Court precedent in both our common law and statutory forum non conveniens cases"). Movant admits that "Texas takes its common-law forum non conveniens doctrine from the equivalent federal doctrine." Motion at 13. Yet Movant largely ignores the federal case law.

00746

criteria without reference to the controlling legal standard, Movant's argument wanders aimlessly – and never finds the truth.

In direct contradiction of Movant's argument,[3] both the U.S. Supreme Court and the Supreme Court of Texas, in their most recent decisions, declared that "substantially" greater deference must be paid to a plaintiff's choice of forum where – as here – the plaintiff lives within the forum. *Sinochem*, 549 U.S. at 430; *Quixtar*, 315 S.W.3d at 31 (citing *In re Pirelli Tire, L.L.C.,* 247 S.W.3d 670, 675 (Tex.2007) (plurality opinion)). This requirement of greater deference to the claimant's choice of forum is deeply rooted in the common law of *forum non conveniens*, dating at least to *Koster v. (American) Lumbermens Mutual Casualty Co.,* 330 U.S. 518 (1947), in which the Court wrote:

> Where there are only two parties to a dispute, there is good reason why it should be tried in the plaintiff's home forum if that has been his choice. He should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems.

330 U.S. at 524. The Supreme Court has repeatedly confirmed the continuing validity of this standard, *Sinochem,* 549 U.S. at 429; *American Dredging Co. v. Miller,* 510 U.S. 443, 447–448 (1994); *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 (1981), yet Movant never mentions it.

---

[3] *See* Movant's Brief at 13-14.

00747

Even where the plaintiff does *not* reside in the forum, a defendant seeking dismissal for *forum non conveniens* "must make a showing that the 'relevant public and private interests *strongly favor* a specific, adequate, and available alternative forum.'" *DiFederico v. Marriot Int'l, Inc.*, 714 F.3d 796, 802 (7th Cir. 2013) (quoting *Jiali Tang v. Synutra Int'l, Inc.*, 656 F.3d 242, 246 (4th Cir.2011)) (emphasis in original).[4] But when the plaintiff chooses his "home forum," the plaintiff's choice of forum is entitled to *even greater* deference. *DiFederico*, 714 F.3d at 802-03 (citing *Piper Aircraft*, 454 U.S. at 255-56). The forum in which the plaintiff is a citizen is "presumptively convenient," *Piper Aircraft*, 454 U.S. at 256, and should be overridden *only* when the defendant "establish[es] such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Koster*, 330 U.S. at 524. As long as there is a "real showing of convenience by a plaintiff who has sued in his home forum [it will] normally outweigh the inconvenience the defendant may have shown." *Id.*

"Overwhelming authority" stands for the proposition that courts *must* give substantially greater deference to the claimant's choice of forum when the claimant is a citizen of the forum. *DiFederico*, 714 F.3d at 803 (citing *Duha v. Agrium, Inc.*, 448 F.3d 867, 873 (6th Cir. 2006). *See also SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101 (11th Cir. 2004) (explaining that the "presumption in favor of the

---

[4] The Fourteenth District Court of Appeals in Houston agrees. "Unless the balance weighs heavily in favor of the defendant, a court should rarely disturb the plaintiff's choice of forum." *In re Old Rep. Nat. Title Ins. Co.*, No. 14–10–01219–CV, 2011 WL 345676, at *2 (Tex. App. – Houston [14th Dist.] Feb. 1, 2011, orig. proceeding) (citing *In re ENSCO Offshore Intern. Co.*, 311 S.W.3d 921, 928–29 (Tex. 2010)).

00748

plaintiff's initial forum choice ... is at its strongest when the plaintiffs are citizens, residents, or corporations of this country"); *Guidi v. Inter–Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000) (reversing because the district court did not recognize that the plaintiff is "entitled to greater deference" when choosing her home forum); *Reid–Walen v. Hansen*, 933 F.2d 1390, 1395 (8th Cir. 1991) ("[c]itizens should rarely be denied access to courts of the United States"); *Founding Church of Scientology of Washington, D.C. v. Verlag*, 536 F.2d 429, 435 (D.C. Cir. 1976) ("[c]ourts should require positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion to deny a citizen access to the courts of this country")).

In sum, the Supreme Court has admonished that "unless the balance is *strongly* in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed," *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) (emphasis added), and that jurisdiction is to be declined only in "exceptional circumstances." *Id.* at 504. "Forum non conveniens is an exceptional tool to be applied sparingly, not a doctrine that compels plaintiffs to choose the optimal forum for their claim." *Boston Telecommc'ns Group Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009) (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir.2002)).

None of these black-letter principles are acknowledged – or applied – in the Motion, yet they constitute the standard by which the private-interest factors and public-interest factors are to be judged. Because Movant considers those factors without reference to the overarching standard, Movant's analysis is meaningless.

00749

**B. Movant Relies on Cases Decided Under an Inapplicable Statute; Under the Common Law, the Standard for Dismissal Is Much More Stringent**

The argument presented by Movant contains another material error: it fails to distinguish cases governed by the common law from cases governed by the Texas *forum non conveniens* statute, TEX. CIV. PRAC. & REM. CODE ANN. § 71.051 (West 2005). The statute is applicable only to actions for personal injury or wrongful death, TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(i) (West 2005), so it has no bearing here. *Forum non conveniens* cases under the common law are "clearly distinguishable" from cases under the statute. *Liberty Mutual Ins. Co. v. Transit Mix Concrete and Materials Co.*, No. 06-12-00117-CV, 2013 WL 3329026, at *8 (Tex. App. – Texarkana June 28, 2013, no pet. h.). Movant cites several cases that were governed by the statute, not by the common law, but Movant fails to mention the statute or advise the Court of this important distinction.[5]

Movant had a powerful incentive to "gloss over" the distinction between statutory and common-law *forum non conveniens* analysis: as the Supreme Court of Texas has observed, in cases decided under the common law, the private-interest factors and public-interest factors must "strongly favor" the movant in order for dismissal to be warranted, but under the statute, a mere tipping of the balance in favor of the movant is all that is required. *In re Ensco Offshore International Co.*, 311 S.W.3d 921, 928-29 (Tex. 2010).

---

[5] *See* Motion at 14 (citing *In re Ensco Offshore International Co.*, 311 S.W.3d 921, 927-28 (Tex. 2010); *In re BPZ Resources, Inc.*, 359 S.W.3d 866, 869-70 (Tex. App. – Houston [14th Dist.] 2012)), 16 (citing *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677-78 (Tex. 2007); *Gomez de Hernandez v. Bridgestone/Firestone North American Tire, L.L.C.*, 204 S.W.3d 473, 483 (Tex. App. – Corpus Christi 2006, pet. denied)).

00750

## II.  When the Correct Standard Is Applied to the Relevant Facts, Dismissal Is Wholly Unwarranted

### A.  The Motion Must Be Denied Because Mexico Is Not an Adequate and Available Forum for this Case

In order to prevail on a motion to dismiss for *forum non conveniens*, the movant must first demonstrate that there is a "specific, adequate, and available alternative forum.'" *DiFederico*, 714 F.3d at 802 (quoting *Jiali Tang,* 656 F.3d at 246).  Movant fails to identify the specific forum advocated by him;  he asserts only that the Executor should pursue his claims in Mexico.  But Mexico has a federal system in which states enact and enforce their own laws, and laws vary from one Mexican state to another.  Neither the Motion nor Movant's Brief says where, exactly, Movant contends that the Executor should have asserted his claims.  Movant's expert witness, however, refers to the laws of the Mexican State of Tamaulipas, so we presume that Tamaulipas is the alternative forum proposed by Movant.

For three reasons, Tamaulipas is not an available and adequate forum for litigation of the Executor's claims:   first, the courts of Tamaulipas would not have jurisdiction over the Executor's claims against Movant or over Movant's third-party claims against Sylvia Dorsey and Adriana Longoria;   second, the legal theories underlying the Executor's claims are simply not recognized in Tamaulipas (or anywhere in Mexico), so no remedy is available there;   third, the Executor's claims would be barred by a one-year statute of limitations.  Each of these three points is, by itself, fatal to the Motion.

00751

### 1. The Courts of Tamaulipas Would Not Have Jurisdiction over the Executor's Claims Against Movant or His Third-Party Claims

Exhibit 1 to this response is the Declaration of Ilan Rosenberg, a highly qualified expert in Mexican law. Mr. Rosenberg testifies unequivocally that if the Executor were to file in Tamaulipas the claims that he has pleaded as counterclaims here, the court in Tamaulipas would "almost certainly" dismiss those claims *sua sponte* for lack of jurisdiction. Rosenberg Decl. at 9-10 (¶¶ 28-34). The Executor would face insurmountable problems of both subject-matter jurisdiction and personal jurisdiction – whether or not Movant purports to submit to the jurisdiction of a court in Tamaulipas. *Id.* at 10 (¶¶ 28-37). Consequently, the alternative forum proposed by Movant is unavailable, and the Motion must be denied.

It should also be noted that the same jurisdictional problems attend the third-party claims of Movant against Sylvia Dorsey and Adriana Longoria. Neither of the Third-Party Defendants will voluntarily submit to the jurisdiction of the courts of Tamaulipas, so there can be no argument that the third-party claims could be tried there. Contrary to Movant's assertions, the *amparo* proceeding filed by Sylvia Dorsey and Adriana Longoria in a federal court in Mexico does *not* subject them to the jurisdiction of any Mexican court in any other proceeding. Rosenberg Decl. at 12-14 (¶¶ 43-52). Movant's third-party claims against Sylvia and Adriana cannot be tried in Mexico.

The Supreme Court has held that "the inability to implead potential third-party defendants" has bearing on a *forum non conveniens* determination. *Piper Aircraft,* 454 U.S. at 259. In that case, the putative third-party defendants were citizens of the alternative forum, so their citizenship militated in favor of dismissal. *Id.* Here, on the other hand,

00752

Movant has pleaded third-party claims against two residents of Houston, Texas.[6] Neither of them is amenable to service of process in Tamaulipas or subject to the jurisdiction of the courts of that State. Rosenberg Decl. at 9-10.

But, it might be argued, Movant's third-party claims against his sisters may be pursued in Houston *after* litigation of the Executor's claims is concluded in Tamaulipas. Even if that is true, the inconvenience associated with having multiple proceedings is a factor to be weighed in the *forum non conveniens* analysis:

> It is true, of course, that if [the defendants] were found liable after a trial in the United States, they could institute an action for indemnity or contribution against these parties in Scotland. It would be far more convenient, however, to resolve all claims in one trial.

*Id.; see also Boston Telecommc'ns*, 588 F.3d at 1211 ("the inability to implead potential third-party defendants can be a factor "). So the existence of Movant's third-party claims cuts against his motion to dismiss.

### 2. Tamaulipas Is Not an Adequate Alternative Forum Because It Provides No Remedy for the Executor's Causes of Action

The Executor's causes of action for breach of fiduciary duty do not exist in Mexican law generally or the law of Tamaulipas in particular. Rosenberg Decl. at 11 (¶¶ 39-40). Unlike Texas, Mexico does not recognize or enforce fiduciary duties based on informal fiduciary relationships or private trusts. *Id.* In fact, Mexican law does not recognize the existence of private trusts at all. *Id.* Mexican law only recognizes trusts created through

---

[6] *See* Counter-Defendant Shelby Longoria's Third-Party Petition (Aug. 30, 2013) at 1 (¶¶ 2-3).

00753

federally-licensed financial institutions, subject to regulatory directive and oversight. *Id.* at 11 n.11. Mexico would provide *no* recourse or remedy, so as a matter of law no court in Mexico would be an adequate forum for litigation of the Executor's counterclaims.[7]

### 3. Tamaulipas Is Not an Available Alternative Forum Because the Claims Would Be Barred by Limitations There

The testimony of Ilan Rosenberg also establishes that, if the counterclaims were pleaded in Tamaulipas, they would be barred by a one-year statute of limitations. Rosenberg Decl. at 11-12 (¶¶ 41-42). This, too, dooms the Motion. As a matter of law, no adequate alternative forum is available if the statute of limitations has expired in the proposed alternative forum. *See, e.g., Bank of Credit and Commerce Int'l (OVERSEAS) Ltd. v. State Bank of Pakistan,* 273 F.3d 241, 246 (2d Cir. 2001); *Mercier v. Sheraton Int'l, Inc.,* 935 F.2d 419, 423-24 (1st Cir. 1991); *Kontoulas v. A.H. Robins, Co., Inc.,* 745 F.2d 312, 316 (4th Cir. 1984); *Vicknair v. Phelps Dodge Indus. Inc.,* 767 N.W.2d 171, 177-78 (N.D. 2009); *Delfosse v. C.A.C.I., Inc.-Federal,* 267 Cal. Rptr. 224, 227-29 (1990); *Sanwa Bank, Ltd. v. Kato,* 734 So.2d 557, 561 (Fla. Dist. Ct. App. 1999); *Jones v. Prince George's County,* 378 Md. 98, 835 A.2d 632, 646 (2003); *Kennecott Holdings Corp. v. Liberty Mut. Ins. Co.,* 578 N.W.2d 358, 361-62 (Minn. 1998); *Shewbrooks v. A.C. and S., Inc.,* 529 So.2d 557, 561-62 (Miss. 1988); *Varo v. Owens-Illinois, Inc.,* 948 A.2d 673, 680-81 (N.J. Super. 2008); *Marchman*

---

[7] The expert testimony proffered by Movant on this point is unavailing. Carlos Gabuardi testified to the general propositions that "Mexico allows claims for money damages" and "Mexico allows a party to seek contractual or extra-contractual damages." Affidavit of Dr. Carlos Gabuardi at 8 (¶¶ 29-30). He did not, however, state that Mexico recognizes a cause of action for breach of fiduciary duty arising out of an informal fiduciary relationship or a private trust. His testimony is too general to be of consequence.

RESPONSE TO MOTION TO DISMISS OR TO ABATE COUNTERCLAIMS        Page 12

00754

*v. NCNB Texas Nat. Bank,* 898 P.2d 709, 724 (N.M. 1995); *Binder v. Shepard's Inc.,* 133 P.3d 276, 278-80 (Okla. 2006); *Jessop v. ACF Indus., LLC,* 859 A.2d 801, 803 (Pa.Super. 2004); *Kedy v. A.W. Chesterton Co.,* 946 A.2d 1171, 1183-84 (R.I. 2008).

Thus, for three independent reasons, Tamaulipas is not an available and adequate forum for litigation of the Executor's claims against Movant.

**B.    The Motion Must Be Denied Because the Private-Interest Factors and Public-Interest Factors Do Not Favor Litigation of This Case in Mexico**

The Motion also must be denied because the relevant private-interest factors and public-interest factors do not "clearly show facts" which either "(1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems." *Koster,* 330 U.S. at 524.

In *Quixtar,* the Supreme Court of Texas identified the relevant factors, after noting that the "central focus of the *forum non conveniens* inquiry is convenience." 315 S.W.3d at 33 (quoting *Reyno,* 454 U.S. at 249). "The well-known *Gulf Oil* factors direct courts to consider both public and private interest considerations in forum non conveniens dismissals." 315 S.W.3d at 33 (citing *Gulf Oil,* 330 U.S. at 508–09). "Private considerations include: (1) the 'relative ease of access to sources of proof'; (2) the 'availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses'; (3) the 'possibility of view of premises, if view would be appropriate to the action'; (4) the

00755

'enforceability of a judgment' once obtained; and (5) 'all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Id.* (quoting *Gulf Oil*, 330 U.S. at 508).

"Public considerations include: (1) '[a]dministrative difficulties . . . for courts when litigation is piled up in congested centers instead of being handled at its origin'; (2) the burden of 'jury duty . . . that ought not to be imposed upon the people of a community which has no relation to the litigation'; (3) 'local interest in having localized controversies decided at home'; and (4) avoiding conflicts of law issues." *Quixtar*, 315 S.W.3d at 33-34 (quoting *Gulf Oil*, 330 U.S. at 508–09).

*None* of these factors militates in favor of the alternative forum proposed by Movant.

### 1. All of the Private-Interest Factors Point to This Forum or Are Neutral

#### a. Access to *Relevant* Evidence Is Far Greater in This Forum

The Executor lives in Houston, Texas, and derives his authority from an order of this Court. Movant lives in McAllen, Texas. The Third-Party Defendants – impleaded *by Movant* – live in Houston, Texas. Thus, three of the four parties to the litigation that is the subject of the Motion live in Houston, Texas, and all of them live in Texas.[8]

And many other key witnesses live in Texas as well. These include:

♦ Eduardo Longoria, Jr. (also known as "Wayo" Longoria), who is Dorothy's other child (the brother of Shelby, Sylvia, and Adriana), and who lives in Austin, Texas

♦ Adrian Hernandez, who served as the personal accountant of both Dorothy and Movant, and whose office is in Houston, Texas

---

[8] In addition to Exhibits 1 and 2 attached hereto, evidence supporting the facutal assertions in this response will be offered at the hearing on the Motion.

00756

- Pepe Treviño, a lawyer who provided estate-planning services to Dorothy and her husband and whose office is in Laredo, Texas

- Movant's wife, Tita Longoria, who lives in McAllen, Texas, and who has knowledge of Dorothy's relationship with Movant and transactions affecting the property of Dorothy

- Carolyn Beckett, a lawyer in Austin, Texas, who has represented Movant in various matters related to his parents' estates, including a dispute with Adriana Longoria over Movant's performance of the "Private Agreement" in 2010

- Attorneys, accountants, and appraisers involved in a 2007 transaction – negotiated and consummated in Texas – between Movant and his brother, Wayo Longoria, in which Wayo was paid about $24,000,000 for his forty percent interest in a trust containing stock formerly held in the names of Dorothy and her husband

- Dorothy's friends, physicians, and caregivers with whom she spoke about her property and about Movant and her other children during the last seven years of her life when she lived in Houston[9]

Against this array of witnesses, Movant claims that the following witnesses live in Mexico: the witnesses to execution of a will by Eduardo Longoria, Sr. (Dorothy's husband); the witnesses to execution of a trust agreement by Eduardo Longoria, Sr.; and Eduardo Longoria, Sr.'s "legal advisors, all of the Banca Afirme employees who managed the trust, and all of the employees of the Mexican Trust's Mexican businesses." Movant's Brief at 20. The supposed need for the testimony of these witnesses is contrived.

The Executor's counterclaims do *not* contest the will signed by Eduardo Longoria, Sr. – so no testimony from those who witnessed the signing of that will is required.[10] Likewise,

---

[9] These witnesses will be specifically identified at the hearing on the Motion.

[10] *See* ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY

00757

the counterclaims do *not* dispute that Eduardo Longoria, Sr. signed the trust agreement referenced in Movant's Brief – so the testimony of the witnesses to that signing is unnecessary. Movant does not explain why the testimony of unnamed legal advisors of Eduardo Longoria, Sr., or unnamed employees of Banco Afirme, or unnamed "employees of the Mexican Trust's Mexican businesses" would be necessary. Of course, since Movant controls those Mexican businesses, he easily can obtain from them whatever information might be needed. Thus, all of the witnesses who have been specifically identified to date, and whose testimony will be relevant to the counterclaims pleaded by the Executor, reside in Texas, and most of them reside in the vicinity of Houston, Texas. To state the obvious, the location of this Court is far more convenient for such witnesses than the location of any court in Nuevo Laredo, Tamaulipas, which is about 300 miles away.

But distance is not the only obstacle – or even the most daunting obstacle – to obtaining in Tamaulipas the testimony of witnesses residing in Texas. The United States Department of State has issued a "Travel Warning" about the security situation in Mexico. It was issued on July 12, 2013, and a copy is attached as Exhibit 2. It provides a chilling view of travel in the "border region" – which, of course, includes Tamaulipas.

> Gun battles between rival TCOs [Transnational Criminal Organizations] or with Mexican authorities have taken place in towns and cities in many parts of Mexico, *especially in the border region*. Gun battles have occurred in broad daylight on streets and in other public venues, such as restaurants and clubs.
> *
> *
> *

LONGORIA'S AMENDED CONTEST OF 2010 WILL (Sept. 26, 2013).

RESPONSE TO MOTION TO DISMISS OR TO ABATE COUNTERCLAIMS          Page 16

> The number of kidnappings and disappearances throughout Mexico is of particular concern. Both local and expatriate communities have been victimized. In addition, local police have been implicated in some of these incidents.
>
> \*
>
> \*
>
> \*
>
> Carjacking and highway robbery are serious problems *in many parts of the border region*, and U.S. citizens have been murdered in such incidents. . . . Incidents have occurred during the day and at night, and carjackers have used a variety of techniques, including bumping/moving vehicles to force them to stop and running vehicles off the road at high speeds.

Exhibit 2 at 1-2 (emphasis added). The situation in Tamaulipas is so bad, in fact, that employees of the United States Government have been directed to "defer non-essential travel to the state of Tamaulipas" and are "prohibited from personal travel on Tamaulipas highways outside of Matamoros and Nuevo Laredo due to the tenuous security situation." Ex. 2 at 7. "When travel for official purposes is essential, it is conducted with *extensive security precautions. Id.* at 2 (emphasis added). "While the general public is not forbidden from visiting places categories under 'defer non-essential travel,' USG personnel will not be able to respond quickly to an emergency situation in those areas due to security precautions that must be taken by USG personnel to travel to those areas." *Id.*

Movant himself admits that "[c]artel violence, street shoot-outs, kidnapping, and extortion" have been "persistent threats" along the Mexican border to this very day. Movant's Brief at 5. For Movant to claim that Tamaulipas is a "convenient" venue – in the face of these harsh realities – betrays again his lack of candor toward the Court.

00759

In light of the indisputable danger of travel in Tamaulipas, it is established beyond peradventure that, for the litigants themselves, and for many other witnesses whose testimony is definitely needed, Houston, Texas, is a far more convenient forum than Tamaulipas.

**b.      Compulsory Process for Attendance of Unwilling Witnesses Is Available in This Forum, But Not in Mexico, and the Cost of Obtaining Attendance of Willing Witnesses Is Much Less Here**

All of the witnesses who live in Texas can be compelled by this Court to testify, either in person or by deposition. *See* TEX. R. CIV. P. 176, 205. None of them can be compelled to give testimony in a Mexican proceeding. For those witnesses who – despite the grave danger described above – might be willing to travel voluntarily to Tamaulipas, the expense of security precautions is prohibitive. As Movant has identified no Mexican witnesses whose testimony is relevant to the Executor's counterclaims, this factor cuts against dismissal.

**c.      No View of Any Premises Will Be Needed**

There is no need for the trier of fact to view any premises, as Movant admits. Movant's Brief at 24.

**d.      A Judgment of This Court Would Be Fully Enforceable as to All Parties; a Judgment of a Mexican Court Would Not**

Movant ignores this factor, and the reason is obvious:   it undercuts his argument. Movant lives in Texas, and he filed in this Court the will contest which commenced this case. The Executor pleaded his counterclaims in response to Movant's will contest. Thus, if the counterclaims are allowed to proceed in this Court, the judgment of this Court will be fully enforceable against Movant and, of course, the Executor.

00760

In addition, a judgment entered by this Court on Movant's third-party claims against Sylvia Dorsey and Adriana Longoria would be fully enforceable. As both of them live in Houston, the Court unquestionably may exercise personal jurisdiction over them.

If, on the other hand, the counterclaims are dismissed as requested by Movant, he will not be able to pursue his third-party action, as no court in Tamaulipas as jurisdiction over the Third-party Defendants. Rosenberg Decl. at 9-10. The litigation will then become fragmented. Duplicative proceedings, and multiple judgments, will be required.

### e. The Practical Problems and Expense of Proceeding in Mexico Are Far Greater

Movant has not identified any specific problem that will arise from litigation of the Executor's counterclaims in this Court but will not arise if the Executor pursues his claims in a court in Tamaulipas. We, on the other hand, have identified significant problems with litigation in Tamaulipas. We have proven, and Movant has admitted, that Tamaulipas is an exceedingly dangerous place, so anyone traveling there must incur unreasonable risk and incur substantial expense for security. Ex. 2 at 2; Movant's Brief at 5. This factor, therefore, points away from Tamaulipas.

Movant argues that this case should be dismissed because documentary evidence regarding the Mexican businesses, in which Dorothy had owned interests, is kept in Mexico. Movant's Brief at 19. A similar situation was faced in *Boston Telecommunications Group, Inc. v. Wood*. Although it was foreseeable that documents located in Mexico would have to be obtained, the court noted that there are established legal processes – such as the HAGUE CONVENTION ON TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS, 23

00761

U.S.T. 2555 (1968) – by which this can be done, and a need to invoke those processes does not compel dismissal for *forum non conveniens*: "'Any court . . . will necessarily face some difficulty in securing evidence from abroad,' but these complications do not necessarily justify dismissal." 588 F.3d at 1288 (quoting *Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1181 (9th Cir. 2006)).

More importantly, Movant's position is disingenuous because *he* controls the entities that own the documents, and he lives in Texas. *Cf. Boston Telecommc'ns,* 588 F.3d at 1208 (finding it was "reasonable to assume" that documents which the movant represented to belong to foreign entities were in the possession of the chief executive officer, who resided in California and effectively managed the companies from there). Movant has presented no facts on which the Court could base a conclusion that production of the documents would be unduly inconvenient or expensive. The concern about access to documentary evidence is a red herring.

### 2. All of the Public-Interest Factors Point to This Forum

#### a. The Dispute Originated Here and There Are No Greater Administrative Difficulties Here Than in Tamaulipas

This dispute arose in Texas. Movant has lived in Texas since the 1970's. While living here, his fiduciary duty to Dorothy arose under Texas law and, the Executor contends, Movant breached his duty under Texas law. Dorothy Longoria lived in Texas for her last 25 years, and lived in Houston for her last seven years. The alleged acts and omissions of Movant, therefore, harmed a longstanding citizen of this forum. Dorothy's will was admitted to probate in this Court and her estate is pending in this Court. Movant himself commenced

00762

this legal proceeding by filing his will contest in this Court. This litigation originated in Texas and must be decided under Texas law.

Movant has not asserted, let alone proven, that this Court's docket is more congested than that of the courts of Tamaulipas. The Court has already issued a Docket Control Order setting the case for trial on May 19, 2014. In this Court, the Executor's counterclaims will be adjudicated promptly. There is no evidence that a Tamaulipas court would address the merits of the case more quickly than this Court, or that litigation in Tamaulipas would be administratively easier. Indeed, there is every reason to believe that the opposite is true.

### b. This Community Has the Strongest Relationship to the Litigation, So the Burden of Jury Duty Belongs Here

Both Movant – the alleged wrongdoer – and Dorothy – the alleged victim – resided in this forum for the last 25 years of Dorothy's life, so this forum has the strongest relationship to the litigation. Dorothy died in Houston, her will was probated here, and her estate is being administered here, all in accordance with Texas law. Imposing the burden of jury duty here is justified. Doing so in Mexico is not.

### c. The Dispute Arose in Texas, Between Texans, so This Forum Has the Stronger Interest in Deciding the Controversy

Because Dorothy lived and died in Texas, her estate is being administered in Texas, and her estate has claims based on a fiduciary duty owed to Dorothy by another resident of Texas, this State has an interest in deciding the claims – an interest far greater than any that could be articulated for the State of Tamaulipas. The Legislature of this State has enacted an array of statutes designed to ensure that probate courts may exercise jurisdiction over all

00763

matters related to estates pending in those courts. *See, e.g.,* TEX. PROB. CODE ANN. §§ 4A (providing that courts exercising original probate jurisdiction also have jurisdiction over all matters related to probate proceedings), 4B (defining "matter related to a probate proceeding" to include any claim by a personal representative on behalf of an estate), 4F (conferring on statutory probate courts exclusive jurisdiction over all probate proceedings), 5B (authorizing statutory probate courts to transfer *to themselves* actions pending in district or county courts if they are "related" to an estate pending in the probate court or if the personal representative of such an estate is a party). Underlying these statutes is a strong public policy in favor of consolidation, in the probate courts, of all matters related to the estates administered in those courts. The same public policy also stands in opposition to dismissal for *forum non conveniens* of an executor's claims pleaded, on behalf of an estate, in the probate court in which the estate is pending.

Movant cites one case supposedly "in the probate context": *Gallego v. Garcia*, No. 07-CV-1185, 2010 WL 2354585 (S.D. Cal. June 9, 2010). Motion at 17-18. While it is true that, in *Gallego*, the plaintiffs were personal representatives of an estate, it is *not* true that they brought their claims in the probate court presiding over the estate. Rather, they brought their claims in a federal district court, with jurisdiction based solely on diversity of citizenship. Moreover, the facts in *Gallego* are easily distinguished: the defendants were a Mexican corporation and citizens of Mexico. *Gallego* has no precedential value here.

00764

### d. Maintaining the Litigation Here Avoids an Issue of Conflicts of Law

The Executor's pleading states explicitly that it is founded entirely on Texas law. Movant asserts that Mexican law might supply the rule of decision but, in typical fashion, Movant fails to explain why that is so. We repeat: the Executor is *not*, in this proceeding, contesting a will signed by Eduardo Longoria, Sr.; the Executor is *not*, in this proceeding, contesting a trust agreement signed by Eduardo Longoria, Sr.; the Executor is *not*, in this proceeding, asserting a cause of action under Mexican law; the Executor is *not*, in this proceeding, seeking relief from any individual residing in Mexico or any Mexican business entity. There simply is no basis for Movant's assertion that the Executor's counterclaims are governed by Mexican law.

The counterclaims are based on a fiduciary duty undertaken, and breached, by Movant while he was a resident of Texas. The counterclaims also are based in part (but not entirely) on the Decedent's community-property rights under Texas law. Dorothy and Eduardo Longoria were married in Texas, which establishes that their marital estate was a community estate. They were living together in Texas when Eduardo died. The marriage began and ended in Texas. Under Texas law, all of their property at the time of Eduardo's death is presumed to have been community property. If Shelby Longoria contends that it was *not* community property, then it is his burden to prove so. And if he thinks that he can carry his burden by offering a contract supposedly made in Mexico, then he is free to try. But the issue remains one of Texas law.

00765

But even if it may happen that Mexican law comes into play, "the need to apply foreign law is not in itself reason to apply the doctrine of *forum non conveniens*." *Schexnider v. McDermott Int'l,* 817 F.2d 1159, 1163–64 (5th Cir.), *reh'g denied,* 824 F.2d 972 (5th Cir.1987), *cert. filed* (Oct. 13, 1987). *Accord Manu Int'l v. Avon Prod.,* 641 F.2d 62, 68 (2d Cir.1981) ("[w]e must guard against an excessive reluctance to undertake the task of deciding foreign law").

In sum, *no* factor militates in favor of Movant's position; and *every* factor militates strongly against it, with one exception, and the exception is a factor that points in neither direction. Movant has failed miserably to carry his "heavy burden" to show that this is one of the exceptional cases in which *forum non conveniens* should be applied to deprive a resident of this forum of his right to bring claims in this forum.

## RESPONSE TO MOTION FOR ABATEMENT

After 27 pages of fervent argument for outright *dismissal* of the Executor's counterclaims, Movant makes a half-hearted request, in the alternative, for *abatement* of them. Motion at 27-29. Movant asks the Court to abate the counterclaims until two things happen: (1) Movant's will contest is fully adjudicated; and (2) a certain proceeding in Mexico is fully adjudicated. Neither the will contest nor the Mexican case provides any justification for abating the counterclaims.

According to Movant, there are two reasons why the Court should allow his will contest to proceed to trial while the Executor's counterclaims are abated. First, Movant claims that the Executor, James Thomas Dorsey, has a "conflict of interest" which renders

00766

him incapable of performing his fiduciary duties. Motion at 28. The supposed conflict of interest is based on (a) Movant's wholly unsupported assertions that Mr. Dorsey's wife, Sylvia Dorsey, misappropriated funds belonging to Dorothy during her lifetime, and (b) Movant's wholly unsupported assertion that Mr. Dorsey's son, Wayo Dorsey, "stole" from Movant electronic files relating to Mexican businesses and a Mexican trust. Motion at 28. Sylvia and Wayo Dorsey categorically deny these accusations, but even if one assumes for the sake of argument that they are true, they provide no basis for abatement of the Executor's counterclaims against Movant.

Movant is *not* a beneficiary of the Estate of Dorothy Louise Longoria. The Decedent left nothing to him in her will, which this Court admitted to probate. Movant, therefore, has no standing to complain about the Executor's supposed failure to investigate alleged torts by Sylvia against her mother. As for the alleged theft of computer files by Wayo Dorsey, Movant offers no reason why the Executor would be responsible either to investigate that or to redress it. And even if Mr. Dorsey were removed as Executor based on these supposed "conflicts of interest," the Court certainly would appoint a successor, who would be equally responsible to pursue the estate's counterclaims against Movant. So there is no logical connection between the facts creating the supposed "conflicts of interest" and abating the counterclaims until the *will contest* is concluded. Movant's argument makes no sense.

The second reason why, according to Movant, the counterclaims should be abated until the conclusion of his will contest is that, "[i]f the will contest is successful, Tommy may lose his capacity to pursue a claim against [Movant]." Motion at 29. Once again, the

00767

conclusion does not follow from the premises. Even if the will contest is successful, there will be a personal representative of the Estate of Dorothy Louise Longoria, and that personal representative will have the same duty, and legal capacity, to marshal the assets of the estate. The most valuable assets are the claims against Movant Shelby Longoria. The will contest *cannot* "obviate the need to litigate any of [the counterclaims]." Movant's Brief at 3.

While abatement would serve no salutary purpose, it certainly would have undesirable consequences. To state the obvious, the requested abatement would cause a lengthy delay in the disposition of the counterclaims. Abatement also would cause an enormous waste of the resources of the Court and the litigants, because discovery needed for the will contest substantially overlaps with discovery needed for the counterclaims, as comparison of the pleadings demonstrates.[11] Both the will contest and the counterclaims require discovery of the estate planning of the Decedent, the property owned by her at various times in her adult life, her evolving relationships with her children, representations made to her by Movant, payments made to her by Movant, information withheld from her by Movant, her physical and mental condition at various times, and many other topics. If the counterclaims are abated, many of the witnesses who are deposed in the will contest will have to be deposed again. And, of course, a second trial will have to be conducted. Abatement would do no good and much harm.

---

[11] *Compare* SHELBY LONGORIA'S AMENDED CONTEST OF 2010 WILL (Aug. 30, 2013) *and* ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S AMENDED CONTEST OF 2010 WILL (Sept. 26, 2013).

00768

Movant cites *Develo-Cepts, Inc. v. City of Galveston*, 668 S.W.2d 790, 793 (Tex. App. — Houston [14th Dist.] 1984, no writ), for the proposition that "a case may be abated pending a determination of a plaintiff's standing or capacity to sue." Motion at 29. Here, the Court has already made that determination. By order dated October 9, 2012, the Court admitted to probate the Decedent's will dated January 21, 2010, and appointed James Thomas Dorsey to serve as Independent Executor of the Decedent's estate. Both the standing and the capacity of the Executor to bring the counterclaims are judicially established.[12]

Finally, Movant asserts that the counterclaims should be abated until a proceeding in Mexico is concluded. That proceeding involves the estate of Eduardo Longoria, Sr., who was the husband of Dorothy Louise Longoria and who died in 2005. The proceeding was initiated by a petition for *juicio de amaparo* in a federal court of Mexico. The petition is based on the fact that Shelby Longoria failed to provide the legally required notice of a proceeding, in a state court of Tamaulipas, in which a will of Eduardo Longoria, Sr. was probated. Movant presents no intelligible argument why litigation of the Executor's counterclaims in this Court should be deferred until the *amparo* proceeding is completed. Movant asserts that the Mexican case is "logically antecedent to this matter," Movant's Brief at 29, but offers no explanation whatsoever of why that is so. Movant's Brief does not even state what relief is requested in the *amparo* lawsuit. Having failed to do so, Movant fails to

---

[12] Movant presents no colorable argument that the Executor lacks *standing* to pursue the counterclaims against Movant. And Movant has failed to plead *lack of capacity* in the prescribed way, which is a verified plea in abatement. *See Develo-Cepts*, 668 S.W.2d at 793.

00769

show any reason why the Executor's counterclaims in this Court should be abated in deference to the *amparo* case in Mexico. The argument for abatement is meritless.

## CONCLUSION

Neither dismissal nor abatement is warranted. The Motion should be denied in its entirety. A proposed order is attached to this response.

DATED: September 30, 2013.

Respectfully submitted,

*/s/ James Austin Fisher*

James Austin Fisher
   State Bar of Texas Number 07051650
Shannon L.K. Welch
   State Bar of Texas Number 90001699
**FISHER & WELCH**
**A Professional Corporation**
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Telephone:  214.661.9400
Telecopier:  214.661.9404

T. Wesley Holmes
   State Bar of Texas Number 09908495
**THE HOLMES LAW FIRM**
10,000 North Central Expressway, Suite 400
Dallas, Texas 75231
Telephone:  214.890.9267

**ATTORNEYS FOR COUNTER-PLAINTIFF**
**JAMES THOMAS DORSEY,**
**INDEPENDENT EXECUTOR OF**
**THE ESTATE OF DOROTHY**
**LOUISE LONGORIA, DECEASED,**
**AND THIRD-PARTY DEFENDANT**
**SYLVIA DORSEY**

00770

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2013, a true and correct copy of this document was served on Shelby Longoria, through his attorneys of record named below, in the manner indicated and in compliance with Texas law.

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
3900 Essex Lane, Suite 220
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

*/s/ James Austin Fisher*
James Austin Fisher

## AFFIDAVIT OF ILAN ROSENBERG

I, Ilan Rosenberg, hereby declare and state as follows:

### PERSONAL BACKGROUND

1. I am over the age of 21, and competent to make this affidavit. I have drafted this affidavit based on my personal knowledge (unless otherwise stated), and having reviewed it, can attest that it is true and correct.

2. I hold a Bachelor of Laws degree (J.D. equivalent) awarded by the Escuela Libre de Derecho in Mexico City, Mexico, as well as Master of Laws (LL.M.) and Master of Comparative Laws (LL.C.M.) degrees from the University of Pennsylvania Law School.

3. I am an attorney licensed to practice law in every jurisdiction in Mexico, as well as in the Commonwealth of Pennsylvania. I am also licensed to practice before the Supreme Court of the United States, the United States Courts of Appeals for the Third and Federal Circuits, as well as the United States District Courts for the Eastern and Middle Districts of Pennsylvania, Northern District of Illinois, and the Eastern District of Wisconsin. A copy of my *Curriculum Vitae* is attached as Exhibit "A" to this affidavit.

4. In addition to my practice in the United States of America, I have actively and continuously practiced before Mexican state and federal courts for more than fifteen years.

5. I am a Partner of the law firm of Gordon & Rees, in Philadelphia, Pennsylvania.

6. I am also a Lecturer at Law at the University of Pennsylvania Law School.

7. I have been retained by James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased (the "Estate"), and asked to prepare this affidavit as an expert in the field of Mexican law.



**EXHIBIT**

1

## QUESTIONS PRESENTED

8.     The Estate has asked me to opine on the following questions under Mexican law:

    a)     How does the Mexican state of Tamaulipas regulate service of process on individual defendants?

    b)     Would a Tamaulipas court have jurisdiction over an action filed by the Estate against Shelby Longoria?

    c)     Does the law of Tamaulipas provide a remedy for a breach of fiduciary duty, or recognize private trusts and informal fiduciary relationships?

    d)     Does the filing of an Amparo lawsuit result in a general waiver of jurisdictional defenses in Mexico?

## MATERIALS REVIEWED

9.     In formulating the opinions below, I have relied on my review of Shelby Longoria's Amended Contest of 2010 Will, the Counterclaims thereto asserted by the Estate, Shelby Longoria's Motion to Dismiss Counterclaims for Forum Non Conveniens and its supporting Brief, the Affidavit of Dr. Carlos Gabuardi, an August 5, 1983 letter signed by Eduardo Longoria, Jr. and Shelby Luis Longoria to Dorothy Kowalski de Longoria, as well as my professional knowledge and experience, and my independent research of Mexican statutory and case law.

## OPINIONS

### I.     Preliminary Statement on Mexican Jurisdictional Determinations

10.     Mexico, like the United States, is a federal republic comprised of individual states that have autonomous governments – including state legislative, executive and judiciary branches.

11.     Thus, Mexico has separate state and federal bodies of laws.

-2-

00773

12. Pursuant to Article 104, Section II of the Mexican Constitution ("Constitucion Politica de los Estados Unidos Mexicanos") and Article 53, Section I of the Mexican Federal Judiciary Organization Law ("Ley Organica del Poder Judicial de la Federacion"), in civil cases, Mexican federal courts have subject matter jurisdiction only over claims that are governed by federal laws or international treaties to which Mexico is a party. These provisions state, in pertinent part, as follows:

> **Article 104.-** The Federal Courts shall adjudicate:
>
> ...
>
> **II.** All civil or commercial controversies that arise concerning compliance with or application of federal laws or international treaties executed by Mexico. The plaintiff may choose, when the interests at issue only affect private parties, that these disputes be heard by the judges and tribunals of the states.

> **Article 53.-** Federal district court judges shall adjudicate:
>
> ...
>
> **I.** Those civil controversies that arise concerning compliance with or application of federal laws or international treaties executed by Mexico. When those controversies only affect private interests they may be heard, at the option of the plaintiff, by the judges and tribunals of the states and the Federal District.

13. Insofar as it concerns civil disputes among private parties, Article 13 of the Mexican Federal Civil Code, "Codigo Civil Federal" (or "CC") sets forth whether they are to be resolved under Mexican federal or state civil law – and thus determines whether there is Mexican federal subject matter jurisdiction over a particular dispute.

14. Article 13, Section IV of the CC, sets forth choice of law rules relating to the formalities for the creation of legal rights. Specifically, Section IV provides that "[t]he formalities of legal acts will be governed by the laws of the place where they are created. However, they may be subject to the formalities set forth in this Code when the act is to have effects in the Federal District or throughout the Republic on federal matters [.]"

-3-

00774

15.     Furthermore, Article 13, Section V of the CC supplies the choice of law rules to determine the law that governs the legal effects of acts and contracts. Section V provides that "[s]ubject to the provisions of the foregoing sections, the legal effects of acts and contracts are to be governed by the laws of the place where they are to be performed, unless the parties have validly designated the application of different laws."

16.     Pursuant to Mexican choice of law rules, there is no Mexican federal interest at issue with respect to the disputes between the Estate and Shelby Longoria. Thus, this analysis is premised on the substantive and procedural laws of the State of Tamaulipas, where Shelby Longoria argues certain relevant facts took place.

## II.     Pursuant to the Laws of the Mexican State of Tamaulipas, Service of Process Must Be Effected Personally Upon an Individual Defendant at His Home

17.     The Mexican State of Tamaulipas, where Shelby Longoria claims to have business interests and contends is the more convenient venue for this action, has its own Civil Code, the "Codigo Civil para el Estado de Tamaulipas" (or "CCT"), as well as its own Code of Civil Procedure, the "Codigo de Procedimientos Civiles para el Estado de Tamaulipas" (or "CPCT").

18.     Tamaulipas law charges the courts, and not the litigants, with the obligation to effect service of process. Specifically, Articles 29 and 30 of the CPCT provide that only court personnel may serve a defendant with original process.

19.     Article 67, in Sections I and III, of the CPCT provides the rules for effecting original service of process on individuals by the courts of Tamaulipas. Those sections provide as follows:

> ARTICLE 67.- Original service of process must be effected in accordance with the following rules:
>
> II.     **If [the defendant] is an individual, [original service of process must be made] directly to that person,** unless the individual lacks procedural capacity, as then it must be effected upon his/her legal guardian. Original service of process upon an agent is only

-4-

00775

authorized when the agent resides within the seat of the court and the person intended to be served lives outside that place or is of unknown whereabouts, or if the agent lives outside the jurisdiction, but within the Republic and the person to be served lives abroad and has no known residence or the person's whereabouts are unknown. In this case the agent is required to have a general or special power of attorney with sufficient authority to answer the complaint and defend the action being served, pursuant to the provisions of Article 52 [dealing with the need to appoint duly licensed attorneys]. The agent can only refuse to intervene if he/she proves that he/she did not accept or has renounced the power of attorney;

III. ...

IV. **Original service of process must be effected in the place designated by the party so requesting, and** *must be precisely the home of the party to be served* **with** original process, if an individual, and if a corporation, in its corporate domicile, its principal offices or principal commercial establishment, except when dealing with branches with an individual agent authorized to appear in the action, when dealing with business transacted by the branches, or in which the branches have intervened. The serving officer must verify that all of this information is contained [in the complaint], and may be specially authorized to serve process on the individual defendant or agent at their place of regular employment or wherever they may be found within the jurisdiction; but in this case, [service may be effected only to] the specific individual at issue, and the server must note specifically, during the process, the means used to identify the individual, the verification of authority of an agent [through a power of attorney] and set forth all relevant information;

[...]

(Emphasis supplied).

20. The Mexican Federal Courts of Appeal have ruled, in binding precedent, that in order for original service of process to be effective, the court official must verify that the location where the defendant is served is in fact the defendant's home (Precedent No. 162858):

> ORIGINAL SERVICE OF PROCESS UPON INDIVIDUALS. IF THE COURT OFFICIAL SETS FORTH ONLY THAT THE ADDRESS OF THE DEFENDANT IS CORRECT BASED ON THE NAME OF THE STREETS, NUMBER, NEIGHBORHOOD AND CITY, HE FAILS TO SATISFY THE ESSENTIAL PROCEDURAL FORMALITIES, WHICH VIOLATES THE RULES THAT GOVERN IT. (LEGISLATION OF THE STATE OF TAMAULIPAS).

-5-

00776

Articule 67, section III, of the Code of Civil Procedure for the State orders that original service of process on individuals must be effected at the address designated by the party so requesting, *which must coincide with the place where the defendant* lives; therefore, the official, when effecting [original service of process] must verify that these circumstances are all met and include [the steps taken to so verify] in the respective certification. Therefore, if the official does not set forth in the certification that the location where the official appeared to serve original process is the defendant's home and, instead, only states that he verified that the address was correct based on his observation of the correct street names, number, neighborhood and city, such certification fails to satisfy the essential procedural formalities, because that information does not provide certainty that the address is where the defendant lives. Accordingly, that irregularity is a violation of the rules that govern the procedures for said action.

9th Session; Circuit Courts of Appeal; Federal Judiciary Reporter and its Gazette; Volume XXXIII, February of 2011; P. 2044.

(Emphasis added).[1]

21. Thus, the laws of Tamaulipas specifically require that original service of process upon an individual be made directly upon the defendant and at the defendant's home. Otherwise, original service of process will be ineffective.

22. Article 97 of the CPCT also provides that when official court action is to take place outside of the Mexico, the court will follow the procedures set forth in the international treaties to which Mexico is a party. In this respect, Mexico is a party to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters and the Inter-American Convention on Letters Rogatory. Therefore, in order to effect valid service of original process on an individual residing outside of Mexico in an action filed in Tamaulipas, service must be effected directly upon the individual at their home following the procedures set forth in the Hague or Inter-American Conventions.

23. Dr. Carlos Gabuardi, proffered by Shelby Longoria as an expert in Mexican law, admits (at ¶ 16) that the CPCT requires that original service of process be effected at the defendant's home (or "the place where they live"). Dr. Gabuardi opines, however, that the

---

[1] A true and correct copy of the precedent in its original Spanish is attached as Exhibit "B."

-6-

00777

provisions of the CPCT are irrelevant based on a Mexican Supreme Court opinion finding that service of process may be effected on a defendant at (a) his home, (b) his place of business, or (c) wherever he may be found, without regard to any particular order. What Dr. Gabuardi fails to point out is that the Supreme Court opinion at issue does not deal with Tamaulipas procedure at all, but rather with the provisions of the Codes of Civil Procedure of the Mexican states of Jalisco, Puebla, Chiapas as well as the Federal District (Mexico City), whose rules for service of original process are markedly different from those of Tamaulipas. Jalisco, Puebla, Chiapas and the Federal District all provide that original service of process may be effected at a defendant's "domicile," which their respective civil codes define as including not only the home, but also the place where a defendant transacts business or where the defendant may be located. The non-binding Seventh Circuit precedent referenced by Dr. Gabuardi (at ¶ 18) focuses on the Code of Civil Procedure of Veracruz, which also provides (in Article 82) that original service of process must take place at the defendant's domicile. Tamaulipas, in stark contrast to these other Mexican jurisdictions, refers specifically to the place where the individual defendant has his or her home. Therefore, while the precedent referenced by Dr. Gabuardi (at ¶¶ 16-17) may be binding on all courts applying provisions similar to those in Jalisco, Puebla, Chiapas and the Federal District, it is inapposite in the case of Tamaulipas. Similarly, the non-binding precedent from the Seventh Circuit (at ¶ 18) is of no import as Veracruz's requirements for effecting original service of process track those of Jalisco, Puebla, Chiapas and the Federal District, but not their sister state of Tamaulipas.

## III.    Jurisdiction of Tamaulipas Courts

24.    Pursuant to Article 172 of the CPCT, "[e]very complaint must be filed before a competent judge."[2]

---

[2]    Under Mexican law, "competence" is functionally synonymous with the United States' concept of jurisdiction (in Mexico, jurisdiction is generally used to refer to the geographic area where governmental actors have authority). Those terms are therefore used interchangeably herein.

00778

25. Under Mexican law, "competence" – a functional synonym of the United States' concept of jurisdiction – is determined by statute. In Tamaulipas, the CPCT provides (in Article 20, Section III), that "the jurisdiction of the courts is governed by the provisions of this code."[3]

26. Article 173 of the CPCT specifically provides that competence or jurisdiction will be determined by the amount, the subject matter, the appellate level and by the territory.[4]

27. Notwithstanding Dr. Gabuardi's opinion (at ¶ 13) that Shelby Longoria "maintains sufficient contacts with ... Tamaulipas," personal or territorial jurisdiction in Mexico is not determined by "contacts" but rather by specifically defined express statutory provisions. Contacts with a specific jurisdiction, standing alone, are of no import with respect to whether a Mexican court has jurisdiction. Indeed, Dr. Gabuardi himself has recognized as much in the article he references at ¶ 11. In that article, Dr. Gabuardi states that, in Mexico, the bases for asserting jurisdiction are limited to those established by law. *See* Gabuardi, Carlos A. "Entre la Jurisdicción, la Competencia y el Forum Non Conveniens," *Boletin Mexicano de Derecho Comparado*, nueva serie, año XLI, núm. 121, enero-abril de 2008, at p. 89. Thus, Dr. Gabuardi explains, Mexican law on competence establishes detailed rules to determine what types of cases can be heard by a particular court. *Id.* In Dr. Gabuardi's own words, "competence sets forth the specific rules which must be strictly observed from an operational standpoint to assign controversies as between the different courts of a country." *Id.* (Translation is ours). According to Dr. Gabuardi's own analysis, "contacts" are not a basis for asserting jurisdiction in Mexico. *Id.* at n. 48 (pointing out that the only bases to assert jurisdiction are those expressly listed in the operative Codes of Civil Procedure, which do not include "contacts").

---

[3] Notably, Article 2 of the CPCT provides that the rules of procedure are of public order and cannot be waived by stipulation of private parties.

[4] Territorial jurisdiction or competence is akin to personal jurisdiction in the United States.

00779

## IV. Tamaulipas Courts Do Not Have Original Jurisdiction Over Shelby Longoria, Adriana Longoria, or Sylvia Dorsey

28. The CPCT provides, in Article 195, Section IV, that the competent judge is the one located "in the domicile of the defendant, in actions involving movable property, or *in personam* or civil status actions, unless provided otherwise [in law]."[5]

29. Pursuant to Article 24 of the CCT, an individual's domicile is the place where he or she lives. If the individual's home address is unknown, but only then, the law will repute as a domicile the place where the individual principally conducts his or her business and, if this location is also unknown, then an individual's domicile is wherever he or she can be found. In other words, the Civil Code of Tamaulipas' reference to an individual's primary place of business or their actual physical location is intended to provide "alternative" domiciles only in those cases where an individual's actual place of residence is unknown.[6]

30. As explained in the foregoing sections, a plaintiff filing suit in Tamaulipas must identify the *home address* of the defendant in order to achieve valid original service of process.

31. According to Article 175 of the CPCT, "[n]o tribunal may refuse to entertain a case *unless it determines it lacks jurisdiction*. In such cases, it must set forth in the order the legal bases supporting its conclusion." (Emphasis supplied).

---

[5] As Dr. Gabuardi recognizes, the claims asserted by the Estate are *in personam* claims.

[6] In addition to referring to provisions that do not apply in Tamaulipas, the opinions cited by Dr. Gabuardi (in ¶¶ 16-18) are of no import to the question of "domicile" for purposes of asserting jurisdiction. Indeed, in the cases to which Dr. Gabuardi refers, the Mexican federal courts (including the Supreme Court) explained that their liberal construction of the term "domicile" was for purposes of service of process only, because the primary purpose of service of process is to put a defendant on notice of an action. The court opinions, however, made clear that the ruling on domicile for purposes of service of process is of no implication to substantive considerations associated with domicile, including the ability of the courts to exercise jurisdiction over a particular case. By way of analogy, consider that original process in a Texas action can be served on a Mexican individual domiciled in Mexico. The only implication of service is that the foreign citizen is on notice of the action. It does not mean the Texas court has jurisdiction over that individual.

32. Thus, in Tamaulipas, trial courts must review the complaint when filed and make a *sua sponte* determination as to whether they have jurisdiction.

33. There is no dispute that Shelby Longoria lives in Texas. Indeed, his Amended Contest of 2010 Will (at ¶ 2) avers that "Shelby Longoria (Shelby) is an individual domiciled in Hidalgo County, Texas."

34. Therefore, a Tamaulipas court lacks statutory jurisdiction over a tort case against Shelby Longoria, a foreign defendant, and will almost certainly dismiss any action filed against him *sua sponte*.[7] The same conclusion follows with respect to Adriana Longoria and Sylvia Dorsey, as both of them live in Houston, Texas.

35. Moreover, a court may dismiss the complaint for lack of *subject matter jurisdiction*.

36. A Tamaulipas court would have to recognize this Court's jurisdiction over the Estate's counterclaim (particularly where the counterclaim would predate any Tamaulipas action).[8] Indeed, Article 189 of the CPCT provides that the court before which the principal cause of action is pending has exclusive subject matter jurisdiction over related counterclaims.

37. Pursuant to Article 177 of the CPCT, "[a] court that expressly recognizes the jurisdiction of another [court] cannot assert jurisdiction."

## V. Tamaulipas Law Does Not Provide a Remedy for Breach of Fiduciary Duties

38. Article 1388 of the CCT provides as follows:

> When an act causes damages and losses to a person, and the law imposes upon the perpetrator of that act or on someone else the obligation to repair those damages and losses, there is civil liability.

---

[7] A Tamaulipas court may do so even if the plaintiff pleads that the defendant has waived a challenge to the court's territorial jurisdiction.

[8] I understand Shelby Longoria does not challenge this Court's jurisdiction.

-10-

00781

39. Mexican law generally, and Tamaulipas law specifically, do not impose or recognize a fiduciary duty[9] on the part of an adult child to manage business affairs of, or for the benefit of, a parent.[10]

40. Mexican law also does not recognize informal fiduciary relationships or, specifically, private trusts,[11] so the August 5, 1983 letter signed by Eduardo Longoria, Jr. and Shelby Luis Longoria to Dorothy Kowalski de Longoria – whereby they agree to hold, maintain and manage certain assets for the Decedent's benefit – does not create a fiduciary duty. Rather, the letter creates only a "moral" obligation or duty, which is unenforceable under Tamaulipas law (CCT Articles 1028 and 1370).

41. Even assuming, for the sake of argument only, that there were a basis to recover in tort for breach of fiduciary duty, any such claim is barred under Tamaulipas' one-year statute of limitations, pursuant to Article 1510, Section III of the CCT.

42. Because more than a year has elapsed since the death of Dorothy Longoria, any claim sounding in tort under Tamaulipas law is barred as a matter of law.

---

[9] Indeed, a cause of action for breach of fiduciary duty, regardless of its nature, would be impossible to plead and prove under Tamaulipas law, which requires plaintiffs to provide a detailed description of all facts and attach or list all the items of evidence that support a cause of action from the outset (Articles 247 to 249 of the CPCT). Amendments to pleadings are not allowed. Moreover, Article 330 of the CPCT precludes a party from inspecting an opponent's general accounting.

[10] We note that the only duty flowing from children to their parents is a statutory obligation (under Articles 277 and 282 of the CCT) to provide support for food, clothing, housing and medical care, when necessary.

[11] Mexican law only recognizes trusts created through federally-licensed financial institutions, subject to regulatory directive and oversight. The Mexican Supreme Court explained that United States-style trusts were "adopted partially by the Mexican [federal] legislature, according to our system, even though strictly speaking it structured an institution wholly different than the trust, and established it as an exclusive banking operation, due to the solvency of banks and the government's oversight over them." *See* Precedent No. 246296, **TRUSTS, NATURE OF.** 7th Session, Auxiliary Chamber, Supreme Court, Federal Judiciary Reporter, Volume 21, Seventh Section, p. 39.

00782

## VI. The Mexican Amparo Proceedings Do Not Imply a Wholesale Submission to the Jurisdiction of Mexican Courts

43. The United States concepts of "minimum contacts," "general jurisdiction," or "specific jurisdiction" do not exist under Mexican law. A Mexican court's authority to hear a particular case is determined on a case-by-case basis, as defined by statute – i.e., the codes of civil procedure. Therefore, the fact that a party has invoked the jurisdiction of a Mexican court in a particular case does not mean that it will be subject to that same Mexican court's jurisdiction in any and every future action.

44. Thus, the pursuit of an Amparo action in Mexico is inconsequential to whether a Mexican court can assert jurisdiction over Amparo claimants (or anyone else, for that matter) in future civil actions. A Mexican's court's ability to exercise jurisdiction will have to be assessed after the filing of every complaint.

45. More importantly, the filing of an Amparo action in Mexico cannot be described (as Dr. Gabuardi does at pp. 6-8) as an acknowledgement of "the adequacy, reliability and better convenience of the Mexican judicial system" for the purposes of adjudicating the private party matters pending before this Court.

46. In order to understand why the filing of an Amparo action implies none of what Dr. Gabuardi suggests, we must explain the nature of the "Juicio de Amparo."

47. An Amparo action, which arises under Articles 103 and 107 of the Mexican Constitution, is a proceeding by which any private person (individual or corporate) can challenge the constitutionality of the actions of a *state or federal government actor* – regardless of whether that actor is a member of the executive, legislative or judiciary branch. In other words, the only possible defendants in Amparo actions are Mexican government actors in their official capacities.[12]

---

[12] Insofar as the Amparo actions referenced by Dr. Gabuardi, the only defendant is a Tamaulipas court.

-12-

00783

48.     The Mexican Supreme Court has interpreted the constitutional guarantee of due process broadly to include the misapplication of any law, whether state or federal, within the scope of Amparo protection. Court rulings are included in the definition of official governmental acts, and therefore any court judgment (including judgments by state courts interpreting state laws) is reviewable by federal courts acting under their Amparo jurisdiction, because an erroneous application of a principle of federal or state law is deemed to be a violation of Constitutional due process.

49.     When a private person is aggrieved by the adjudication of his/her/its rights by a Mexican court without due process of law, Amparo proceedings provide the only means to seek redress for that constitutional violation.

50.     Amparo proceedings are far more circumscribed than "a federal proceeding by which the plaintiff seeks the protection of the federal justice system upon an argument that there has been infringement of the strict application of the Mexican Constitution, statutory law, due process of law, or other fundamental rights." (Gabuardi Affidavit at ¶ 26). Amparo proceedings provide the only remedy available to private party plaintiffs for constitutional violations on the part of the Mexican government defendants, including the Mexican courts. Amparo proceedings are not available to challenge actions on the part of private actors.

51.     The Mexican federal judiciary is the only court system with jurisdiction to hear Amparo cases, and ultimately adjudicate the (Mexican) constitutionality of an official Mexican governmental act. The relief available through an Amparo proceeding cannot be pursued in any other court.[13]

---

13     Notably, in the context of an Amparo, the Mexican courts have made clear that they lack jurisdiction to in any way compel action by, much less invalidate the acts of, a foreign tribunal. *See* Precedent No. 166416, DECLINATION OF JURISDICTION BY DECLINATION. THE ORDER THAT DECLARES IT BY FINDING THAT A FOREIGN COURT HAS JURISDICTION PUTS AN END TO THE ACTION, AND THEREFORE MAY BE CHALLENGED IN DIRECT AMPARO. (LEGISLATION OF THE FEDERAL DISTRICT).

00784

52. Consequently, Dr. Gabuardi's opinion that the filing of an Amparo proceeding is an acknowledgement of "the adequacy, reliability and better convenience of the Mexican judicial system" is incorrect.

## RESERVATION OF RIGHT TO ISSUE SUPPLEMENTAL OPINIONS

53. I understand this matter is in its early stages and additional facts may develop. I have been advised that the Estate may therefore require further opinions on Mexican law. Accordingly, I reserve the right to amend and/or supplement the opinions expressed herein, whether in writing or live testimony, as called upon to do so.

I declare under penalty of perjury, pursuant to the laws of the Commonwealth of Pennsylvania, that the foregoing statements are true and correct.

Executed in Philadelphia, Pennsylvania, this 30th day of September 2013.

By: _____
Ilan Rosenberg
1900 Market Street
Philadelphia, PA 19103
(215) 665-4621

SWORN and SUBSCRIBED before me in Philadelphia, Pennsylvania on this 30th day of September, 2013.

Lorraine S. Costro
Notary Public
My commission expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
LORRAINE S. COSTRO, Notary Public
City of Philadelphia, Phila. County
My Commission Expires April 22, 2016

9th Session; 1st Chamber, Supreme Court, Federal Judiciary Reporter and its Gazette, Volume XXX, September 2009; P. 120.

00785

# ILAN ROSENBERG
1123 Coventry Avenue
Cheltenham, PA 19012
Phone: 215-635-2005   Fax: 215-701-2021
Email: janeandilan@comcast.net

## PROFESSIONAL EXPERIENCE

**Gordon & Rees**, Philadelphia, PA.                                                June 2013-Present
**Partner:** Concentrating practice in complex insurance coverage and commercial litigation, and international commercial matters and dispute resolution with an emphasis on matters relating to Mexico and Latin America; outside legal advisor to the Mexican Ministry of Foreign Relations.

**Cozen O'Connor**, Philadelphia, PA.                                          September 2002-June 2013
**Member:** Concentrated practice in complex domestic and international insurance coverage, commercial and civil matters; Co-Chair of Latin American Subrogation Practice Group.

**Chevez, Ruiz, Zamarripa y Cia, S.C.**, Mexico City, Mexico.          September 1999-June 2001
**Associate:** Concentrated practice in tax planning and tax and civil rights litigation. Handled trial and appellate matters before Mexican state and federal courts, as well as the Mexican Federal Supreme Court.

**Mexican Federal Ministry of Finance**, Mexico City, Mexico.          January 1998-June 1999
**Supervisor of the Legal Consulting Department:** Advised various branches of the Mexican government concerning public finance and tax law and developed federal tax rules and regulations.

## EDUCATION

**University of Pennsylvania Law School**, Philadelphia, PA.
Master of Comparative Law (LL.C.M.)                                          September 2009-May 2011
Master of Laws (LL.M.) (recipient of merit-based scholarship)                July 2001-May 2002

**Escuela Libre de Derecho**, Mexico City, Mexico.                          August 1993-July 1998
Bachelor of Laws (J.D. Equivalent)

## LEADERSHIP POSITIONS

**America-Israel Chamber of Commerce:** Advisory Board Member.
**HIAS and Council Migration Service of Philadelphia:** Board Vice President; Chair – Policy Committee.

## HONORS/AWARDS

Pennsylvania Super Lawyer – Rising Star 2007, 2008 and 2013.
Recipient of the National Law Journal Pro Bono Award in 2008.

## BAR ADMISSIONS

**Mexico** (all jurisdictions)
**Pennsylvania**
**United States District Courts:** Eastern and Middle Districts of Pennsylvania, Eastern District of
        Wisconsin, Northern District of Illinois.
**United States Courts of Appeals:** Third and Federal Circuits.
**United States Supreme Court**



EXHIBIT

A

**00786**

## TEACHING/LECTURING EXPERIENCE

University of Pennsylvania Law School, Philadelphia, PA.      October 2012-Present
Lecturer in Law: Comparative law course entitled Common Law Contracts for Civil Lawyers.

Escuela Libre de Derecho (Law School), Mexico City.    September 1999-August 2000
Adjunct Professor: Tax Law and Administrative Procedure.

00787

| Tesis: XIX.1o. J/10 | Semanario Judicial de la Federación y su Gaceta | Novena Época | 162 858 |
|---|---|---|---|
| Tribunales Colegiados de Circuito | S.J.F. y su Gaceta | Pág. 2044 | Jurisprudencia (Civil) |

**Registro No. 162 858**

[J]; 9a. Época; T.C.C.; S.J.F. y su Gaceta; Tomo XXXIII, Febrero de 2011; Pág. 2044

**EMPLAZAMIENTO A PERSONAS FÍSICAS. SI EN LA RAZÓN DEL ACTUARIO SÓLO SEÑALA QUE EL DOMICILIO DEL DEMANDADO ES CORRECTO POR ADVERTIRLO DE LAS NOMENCLATURAS DE LAS CALLES, NÚMERO, COLONIA Y CIUDAD, ELLO NO COLMA LAS FORMALIDADES ESENCIALES DEL PROCEDIMIENTO, LO QUE CONSTITUYE UNA VIOLACIÓN A LAS REGLAS QUE LO RIGEN (LEGISLACIÓN DEL ESTADO DE TAMAULIPAS).**

El artículo 67, fracción III, del Código de Procedimientos Civiles para el Estado ordena que el emplazamiento a las personas físicas se realice en el domicilio señalado por la parte que lo pide, el cual debe corresponder con el lugar en donde habita el demandado; por tanto, el actuario, al realizarlo debe cerciorarse de que queden satisfechas esas circunstancias y asentarlo en el acta relativa. En esas condiciones, si en la razón del actuario no se señala que en el domicilio en el que se constituyó para practicar el emplazamiento habita el demandado y, en cambio, sólo refiere que se cercioró de que era correcto por así advertirlo de las nomenclaturas de las calles, número, colonia y ciudad correspondientes, con estas expresiones no se colman las formalidades esenciales del procedimiento, dado que esa información no brinda la seguridad



EXHIBIT B

de que ese domicilio sea el lugar donde habita el demandado. Consecuentemente, esa irregularidad constituye una violación a las reglas que rigen el procedimiento de dicha diligencia.

### PRIMER TRIBUNAL COLEGIADO DEL DÉCIMO NOVENO CIRCUITO.

Amparo en revisión 235/2008. **********. 15 de octubre de 2008. Unanimidad de votos. Ponente: Miguel Mendoza Montes. Secretaria: Piedad del Carmen Hernández Ávila. Amparo en revisión 37/2010. Guadalupe Luis de León Zamora. 25 de marzo de 2010. Unanimidad de votos. Ponente: Lucio Antonio Castillo González. Secretaria: Gina Estela Cecopieri Gómez. Amparo en revisión 127/2010. José Portilla Guerra. 29 de abril de 2010. Unanimidad de votos. Ponente: Héctor Gálvez Tánchez. Secretaria: Julia Soto Valdez. Amparo en revisión 192/2010. Pedro Hugo Salinas Bravo. 2 de julio de 2010. Unanimidad de votos. Ponente: Lucio Antonio Castillo González. Secretaria: Belén Alarcón Cortés. Amparo en revisión 281/2010. Juan Francisco Jiménez Chapa. 28 de octubre de 2010. Unanimidad de votos. Ponente: Lucio Antonio Castillo González. Secretario: Faustino Gutiérrez Pérez.

00789

# Travel Warning
# U.S. DEPARTMENT OF STATE
# Bureau of Consular Affairs

## Mexico

## July 12, 2013

The Department of State has issued this Travel Warning to inform U.S. citizens about the security situation in Mexico. General information on the overall security situation is provided immediately below. For information on security conditions in specific regions of Mexico, which can vary, travelers should reference the state-by-state assessments further below.

This Travel Warning supersedes the Travel Warning for Mexico dated November 20, 2012 to consolidate and update information about the security situation and to advise the public of additional restrictions on the travel of U.S. government (USG) personnel.

**General Conditions:**

Millions of U.S. citizens safely visit Mexico each year for study, tourism, and business, including more than 150,000 who cross the border every day. More than 20 million U.S. citizens visited Mexico in 2012. The Mexican government makes a considerable effort to protect U.S. citizens and other visitors to major tourist destinations, and there is no evidence that Transnational Criminal Organizations (TCOs) have targeted U.S. visitors and residents based on their nationality. Resort areas and tourist destinations in Mexico generally do not see the levels of drug-related violence and crime that is reported in the border region and in areas along major trafficking routes.

Nevertheless, U.S. travelers should be aware that the Mexican government has been engaged in an extensive effort to counter TCOs which engage in narcotics trafficking and other unlawful activities throughout Mexico. The TCOs themselves are engaged in a violent struggle to control drug trafficking routes and other criminal activity. Crime and violence are serious problems and can occur anywhere. U.S. citizens have fallen victim to criminal activity, including homicide, gun battles, kidnapping, carjacking and highway robbery. While most of those killed in narcotics-related violence have been members of TCOs, innocent persons have also been killed. The number of U.S. citizens reported to the Department of State as murdered in Mexico was 113 in 2011 and 71 in 2012.

Gun battles between rival TCOs or with Mexican authorities have taken place in towns and cities in many parts of Mexico, especially in the border region. Gun battles have occurred in broad daylight on streets and in other public venues, such as restaurants and clubs. During some of these incidents, U.S. citizens have been trapped and temporarily prevented from leaving the area. TCOs have used stolen cars, buses and trucks to create roadblocks on major thoroughfares, preventing the military and police from responding to criminal activity. The location and timing of future

**EXHIBIT**

**2**

**00790**

armed engagements is unpredictable. We recommend that you defer travel to the areas indicated in this Travel Warning and exercise extreme caution when traveling throughout the northern border region.

The number of kidnappings and disappearances throughout Mexico is of particular concern. Both local and expatriate communities have been victimized. In addition, local police have been implicated in some of these incidents. We strongly advise you to lower your profile and avoid displaying any evidence of wealth that might draw attention.

Carjacking and highway robbery are serious problems in many parts of the border region, and U.S. citizens have been murdered in such incidents. Most victims who complied with carjackers at these checkpoints have reported that they were not physically harmed. Carjackers have shot at vehicles that fail to stop at checkpoints. Incidents have occurred during the day and at night, and carjackers have used a variety of techniques, including bumping/moving vehicles to force them to stop and running vehicles off the road at high speeds. There are some indications that criminals have particularly targeted newer and larger vehicles, especially dark-colored SUVs. However, victims driving a variety of vehicles, from late model SUVs to old sedans have also been targeted. While violent incidents have occurred at all hours of the day and night on both modern toll highways ("cuotas") and on secondary roads, they have occurred most frequently at night and on isolated roads. To reduce risk, if absolutely necessary to travel by road, we strongly urge you to travel between cities throughout Mexico only during daylight hours, to avoid isolated roads, and to use toll roads whenever possible. The Mexican government has deployed federal police and military personnel throughout the country as part of its efforts to combat the TCOs. U.S. citizens traveling on Mexican roads and highways may encounter government checkpoints, which are often staffed by military personnel or law enforcement personnel. TCOs have erected their own unauthorized checkpoints, at times wearing police and military uniforms, and killed or abducted motorists who have failed to stop at them. You should cooperate at all checkpoints.

The U.S. Mission in Mexico imposes restrictions on U.S. government employees' (U.S. citizens working at the Embassy and the nine consulates throughout Mexico) travel that have been in place since July 15, 2010. USG employees and their families are not permitted to drive for personal reasons from the U.S.-Mexico border to or from the interior of Mexico or Central America. Personal travel by vehicle is permitted between Hermosillo and Nogales but is restricted to daylight hours and the Highway 15 toll road ("cuota").

USG personnel and their families are prohibited from personal travel to all areas to which it is advised to "defer non-essential travel". When travel for official purposes is essential, it is conducted with extensive security precautions. USG personnel and their families are allowed to travel for personal reasons to the areas where no advisory is in effect or where the advisory is to exercise caution. While the general public is not forbidden from visiting places categorized under "defer non-essential travel," USG personnel will not be able to respond quickly to an emergency situation in those areas due to security precautions that must be taken by USG personnel to travel to those areas.

For more information on road safety and crime along Mexico's roadways, see the Department of State's Country Specific Information.

**State-by-State Assessment:**

00791

Below is a state-by-state assessment of security conditions throughout Mexico. The accompanying map will help in identifying individual locations. Travelers should be mindful that even if no advisories are in effect for a given state, crime and violence can occur anywhere. For general information about travel and other conditions in Mexico, see our Country Specific Information.

**Aguascalientes:** You should exercise caution when traveling to the areas of the state that border the state of Zacatecas, as TCO activity in that region continues. There is no advisory in effect for daytime travel to the areas of the state that do not border Zacatecas; however, intercity travel at night is not recommended.

**Baja California (north): Tijuana, Ensenada and Mexicali are major cities/travel destinations in the state of Baja California** - see map to identify their exact locations: You should exercise caution in the northern state of Baja California, particularly at night. There were 278 homicides in Tijuana from January to June 2013. Mexicali's murder rate has climbed from 14.3 per 100,000 in 2011 to 15.8 per 100,000 in 2012. In the majority of these cases, the killings appeared to be targeted TCO assassinations. Turf battles between criminal groups resulted in some assassinations in areas of Tijuana and Mexicali frequented by U.S. citizens. Shooting incidents, in which innocent bystanders have been injured, have occurred during daylight hours.

**Baja California (South): Cabo San Lucas and La Paz are major cities/travel destinations in the state of Southern Baja California** - see map to identify its exact location: No advisory is in effect.

**Campeche:** No advisory is in effect.

**Chiapas: San Cristobal de las Casas is a major city/travel destination in Chiapas** - see map to identify its exact location: No advisory is in effect.

**Chihuahua: Ciudad Juarez, Chihuahua City, and Copper Canyon are major cities/travel destinations in Chihuahua** - see map to identify their exact locations: You should defer non-essential travel to the state of Chihuahua. In Ciudad Juarez, personal travel by USG employees outside the northeast portion of the city (the area near the Consulate General) is restricted. Although homicides have decreased markedly—from a high of 3,100 homicides in 3010 to 749 in 2012—Ciudad Juarez still has one of the highest homicide rates in Mexico. Crime and violence remain serious problems throughout the state of Chihuahua, particularly in the southern portion of the state and in the Sierra Mountains, including Copper Canyon. U.S. citizens do not, however, appear to be targeted based on their nationality.

**Coahuila:** You should defer non-essential travel to the state of Coahuila. The State of Coahuila continues to experience high rates of violent crimes and narcotics-related murders. TCOs continue to compete for territory and coveted border crossings to the United States. The cities of Torreón, Saltillo, Piedras Negras, and Ciudad Acuña have seen an increase of violent crimes within the last six months, including murder, kidnapping, and armed carjacking. Of particular safety concern are casinos, sportsbooks, or other gambling establishments and adult entertainment establishments, which USG personnel are not permitted to frequent.

**Colima: Manzanillo is a major city/travel destination in Colima** - see map to identify its exact location: You should defer non-essential travel to the areas of the state of Colima that

00792

border the state of Michoacán, including the city of Tecoman. You should also exercise caution when travelling to other parts of the state, including Colima City and Manzanillo. The security situation along the Michoacan border continues to be the most unstable in the state with gun battles occurring between rival criminal groups and with Mexican authorities. Homicides throughout the state rose sharply from 113 in 2011 to 179 in 2012, according to official Mexican government sources.

**Durango:** You should defer non-essential travel to the state of Durango, except the city of Durango where you should exercise caution. Cartel violence and highway lawlessness are a continuing security concern. Several areas in the state continue to experience high rates of violence and remain volatile and unpredictable. The Mexican government deployed troops in March 2013 to quell TCO violence in the La Laguna area, which is comprised of the cities of Gomez Palacio and Lerdo in the state of Durango and the city of Torreon in the state of Coahuila. Of particular safety concern are casinos, sportsbooks, or other gambling establishments and adult entertainment establishments, which USG personnel are not permitted to frequent. USG personnel may not travel outside the city of Durango and must abide by a curfew of 1 a.m. to 6 a.m. within a secured venue.

**Estado de Mexico: Toluca and Teotihuacan are major travel destinations in Estado de Mexico** - see map to identify exact locations: You should defer non-essential travel to the municipalities of Coacalco, Ecatepec, Nezahualcoyotl, La Paz, Valle del Chalco, Solidaridad, Chalco, and Ixtapaluca, which are eastern portions of the greater Mexico City metropolitan area, located just to the east of the Federal District of Mexico and Benito Juarez airport, unless traveling directly through the areas on major thoroughfares. These areas have seen high rates of crime and insecurity. You should also defer non-essential travel on any roads between Santa Marta in the southeast portion of the state and Huitzilac in the state of Morelos, including the Lagunas de Zempoala National Park and surrounding areas.

**Guanajuato: San Miguel de Allende and Leon are major cities/travel destinations in Guanajuato** - see map to identify their exact locations: No advisory is in effect.

**Guerrero: Acapulco, Ixtapa, Taxco and Zihuatanejo are major cities/travel destinations in Guerrero** - see map to identify their exact locations: You should defer non-essential travel to the northwestern and southern portions of the state (the area west and south of the town of Arcelia on the border with Estado de Mexico in the north and the town of Tlapa near the border with Oaxaca), except for the cities of Acapulco, Zihuatanejo, and Ixtapa. In those cities, you should exercise caution and stay within tourist areas. You should also exercise caution and travel only during daylight hours on toll highway ("cuota") 95D between Mexico City and Acapulco and highway 200 between Acapulco and Zihuatanejo/Ixtapa. In Acapulco, defer non-essential travel to areas further than 2 blocks inland of the Costera Miguel Aleman Boulevard, which parallels the popular beach areas. Lodging for USG personnel is limited to the "Hotel Zone" of Acapulco, beginning from the Hotel Avalon Excalibur Acapulco in the north and going south through Puerto Marquez including the Playa Diamante area. Any activity outside the Hotel Zone for USG personnel is limited to the coastal area from La Quebrada to the beginning of the Hotel Zone and only during daylight hours. In general, the popular tourist area of Diamante, just south of the city, has been less affected by violence. Flying into the coastal cities in southern Guerrero remains the preferred method of travel. You should defer non-essential travel by land between Acapulco and

00793

Zihuatanejo/Ixtapa, travel to Zihuatanejo/Ixtapa only by air, and exercise caution while in Zihuatanejo/Ixtapa. If travelling by automobile between Mexico City and Acapulco you should exercise caution and travel only during daylight hours on toll highway ("cuota") 95D, staying on the toll road towards the Playa Diamante area and avoiding the highway running through the city of Acapulco. You should also exercise caution in the northern region of Guerrero (the area north of the town of Arcelia on the border with Estado de Mexico in the north and the town of Tlapa near the border with Oaxaca). The state of Guerrero has seen an increase in violence among rival criminal organizations. Acapulco's murder rates increased dramatically since 2009; in response, in 2011 the Government of Mexico sent additional military and federal police to the state to assist State security forces in implementing ongoing operation "Guerrero Seguro" (Secure Guerrero) that focuses on combating organized crime and returning security to the environs of popular tourist areas. Self-defense groups operate independently of the government in the Costa Chica region of eastern Guerrero. Armed members of these groups frequently maintain roadblocks, and although not considered hostile to foreigners or tourists, are suspicious of outsiders and should be considered volatile and unpredictable.

**Hidalgo:** No advisory is in effect.

**Jalisco:** Guadalajara, Puerto Vallarta, and Lake Chapala are major cities/travel destinations in Jalisco - see map to identify their exact locations: You should defer non-essential travel to areas of the state that borders the state of Michoacán. The security situation along the Michoacán and Zacatecas borders continues to be unstable and gun battles between criminal groups and authorities occur. Concerns include roadblocks placed by individuals posing as police or military personnel and recent gun battles between rival TCOs involving automatic weapons. You should exercise caution in rural areas and when using secondary highways, particularly along the northern border of the state. Except for the areas of the state that border Michoacan, there is no advisory in effect for daytime travel within major population centers or major highways in the state of Jalisco. Intercity travel at night is not recommended. There is no recommendation against travel to Guadalajara and Puerto Vallarta. There is also no recommendation against travel on principal highways in Jalisco between Guadalajara including the portions that cross in to the southern portions of the state of Nayarit.

**Mexico City (also known as the Federal District):** No advisory is in effect. See also the discussion in the section on Estado de Mexico for areas within the greater Mexico City metropolitan area.

**Michoacán: Morelia is a major city/travel destination in Michoacán** - see map to identify exact locations: You should defer non-essential travel to the state of Michoacán except the cities of Morelia and Lázaro Cardenas where you should exercise caution. Flying into Morelia and Lázaro Cardenas is the recommended method of travel. Attacks on Mexican government officials, law enforcement and military personnel, and other incidents of TCO-related violence, have occurred throughout Michoacán. In the northwestern portion of the state, self-defense groups operate independently of the government. Armed members of the groups frequently maintain roadblocks, and although not considered hostile to foreigners or tourists, are suspicious of outsiders and should be considered volatile and unpredictable. Groups in Michoacan are reputed to be linked to TCOs.

00794

**Morelos: Cuernavaca is a major city/travel destination in Morelos** - see attached map to identify their exact locations: You should exercise caution in the state of Morelos due to the unpredictable nature of TCO violence. You should also defer non-essential travel on any roads between Huitzilac in the northwest corner of the state and Santa Marta in the state of Mexico, including the Lagunas de Zempoala National Park and surrounding areas. On August 24, 2012 two USG employees were injured after being fired upon by Federal Police officers on an isolated road north of Tres Marias, Morelos. Numerous incidents of narcotics-related violence have also occurred in the city of Cuernavaca.

**Nayarit:** You should defer non-essential travel to areas of the state of Nayarit that border the states of Sinaloa or Durango, as well as all rural areas and secondary highways. You should exercise caution when traveling to the cities of Tepic, Xalisco, or San Blas. There is no recommendation against travel to the Vallarta-Nayarit area in the southern portion of the state also known as the Riviera Nayarit or to principal highways in the southern portion of the state used to travel from Guadalajara to Puerto Vallarta.

**Nuevo Leon: Monterrey is a major city/travel destination in Nuevo Leon**- see map to identify its exact location: You should defer non-essential travel to the state of Nuevo Leon, except the metropolitan area of Monterrey where you should exercise caution. Although the level of TCO violence and general insecurity in Monterrey has decreased within the last 12 months, sporadic gun battles continue to occur in the greater Monterrey area. Adult entertainment establishments and casinos continue to be targets of TCO activity. TCOs have kidnapped, and in some cases murdered American citizens, even when ransom demands are met. TCOs have been known to attack local government facilities, prisons and police stations, and are engaged in public shootouts with the military and between themselves. TCOs have used vehicle-borne improvised explosive devices against military and law enforcement units as well as incendiary devices against several types of businesses. Pedestrians and innocent bystanders have been killed in these incidents. Local police and private patrols have limited capacity to deter criminal elements or respond effectively to security incidents. As a result of a Department of State assessment of the overall security situation, the Consulate General in Monterrey is a partially unaccompanied post with no minor dependents of USG personnel permitted. USG personnel serving at the U.S. Consulate General in Monterrey may not frequent casinos, sportsbooks, or other gambling establishments. USG personnel may not travel outside the San Pedro Garza Garcia municipal boundaries between 1 a.m. and 6 a.m., except for travel to the airport after 5 a.m.

**Oaxaca: Oaxaca, Huatulco and Puerto Escondido are major cities/travel destinations in Oaxaca** - see map to identify their exact locations: No advisory is in effect.

**Puebla:** No advisory is in effect.

**Queretaro:** No advisory is in effect.

**Quintana Roo: Cancun, Cozumel, Playa del Carmen, Riviera Maya and Tulum are major cities/travel destinations in Quintana Roo** - see attached map to identify their exact locations: No advisory is in effect.

**San Luis Potosi:** You should defer non-essential travel to the state of San Luis Potosi, except the city of San Luis Potosi where you should exercise caution. The entire stretch of highway 57D in

00795

San Luis Potosi and portions of the state east of highway 57D towards Tamaulipas are particularly dangerous. A USG employee was killed and another wounded when they were attacked in their U.S. government vehicle on Highway 57 near Santa Maria del Rio in 2011. Cartel violence and highway lawlessness are a continuing security concern. USG personnel may not frequent casinos, sportsbooks, or other gambling establishments and adult entertainment establishments. USG personnel may not travel outside the City of San Luis Potosi and must abide by a curfew of 1 a.m. to 6 a.m. within a secured venue.

**Sinaloa: Mazatlanis a major city/travel destination in Sinaloa** - see map to identify its exact location: You should defer non-essential travel to the state of Sinaloa except the city of Mazatlan where you should exercise caution, particularly late at night and in the early morning. One of Mexico's most powerful TCOs is based in the state of Sinaloa. With the exception of Ciudad Juarez, since 2006 more homicides have occurred in the state's capital city of Culiacan than in any other city in Mexico. Travel off the toll roads ("cuotas") in remote areas of Sinaloa is especially dangerous and should be avoided. We recommend that any travel in Mazatlan be limited to Zona Dorada and the historic town center, as well as direct routes to/from these locations and the airport.

**Sonora: Nogales, Puerto Peñasco, Hermosillo, and San Carlos are major cities/travel destinations in Sonora** - see map to identify their exact locations: U.S. citizens visiting Puerto Peñasco should exercise caution and use the Lukeville, Arizona/Sonoyta, Sonora border crossing, in order to limit driving through Mexico. You should defer non-essential travel between the city of Nogales and the cities of Sonoyta and Caborca (which area also includes the smaller cities of Saric, Tubutama, and Altar), defer non-essential travel to the eastern edge of the State of Sonora which borders the State of Chihuahua (all points along that border east of the northern city of Agua Prieta and the southern town of Alamos), and defer non-essential travel within the city of Ciudad Obregon and southward with the exception of travel to Alamos (traveling only during daylight hours and using only the Highway 15 toll road, or "cuota", and Sonora State Road 162). Sonora is a key region in the international drug and human trafficking trades, and can be extremely dangerous for travelers. The region west of Nogales, east of Sonoyta, and from Caborca north, including the towns of Saric, Tubutama and Altar, and the eastern edge of Sonora bordering Chihuahua, are known centers of illegal activity. Travelers throughout Sonora are encouraged to limit travel to main roads during daylight hours.

**Tabasco: Villahermosa is a major city/travel destination in Tabasco -see attached map to identify its exact location:** No advisory is in effect.

**Tamaulipas: Matamoros, Nuevo Laredo, Reynosa, and Tampico are major cities/travel destinations in Tamaulipas** - see map to identify their exact locations: You should defer non-essential travel to the state of Tamaulipas. All USG employees are prohibited from personal travel on Tamaulipas highways outside of Matamoros and Nuevo Laredo due to the tenuous security situation. In Matamoros, USG employees are subject to further movement restrictions between midnight and 6 a.m. USG employees may not frequent casinos and adult entertainment establishments. Matamoros, Reynosa, Nuevo Laredo, and Ciudad Victoria have experienced grenade attacks in the past year, as well as numerous reported gun battles. Nuevo Laredo has seen a marked increase in the number of murders, carjackings, and robberies in the past year. For example, the numbers of murders are up 92.5% over last year. These crimes occur in all parts of

**00796**

the city at all times of the day. The kidnapping rate for Tamaulipas, the highest for all states in Mexico, more than doubled in the past year. In February 2013, four masked and armed individuals attempted to kidnap a USG employee in Matamoros during daylight hours. All travelers should be aware of the risks posed by armed robbery and carjacking on state highways throughout Tamaulipas, particularly on highways and roads outside of urban areas along the northern border. Traveling outside of cities after dark is particularly dangerous. While no highway routes through Tamaulipas are considered safe, many of the crimes reported to the U.S. Consulate General in Matamoros have taken place along the Matamoros-Tampico highway.

**Tlaxcala:** No advisory is in effect.

**Veracruz:** You should exercise caution when traveling in the state of Veracruz. The state of Veracruz continues to experience violence among rival criminal organizations. Mexican federal security forces continue to assist state and local security forces in providing security and combating organized crime.

**Yucatan: Merida and Chichen Itza are major cities/travel destinations in Yucatan** -see map to identify its exact location: No advisory is in effect.

**Zacatecas:** You should defer non-essential travel within the state of Zacatecas to the area bordering the states of Aguascalientes, Coahuila, Durango, and Jalisco and exercise caution in the interior of the state including the city of Zacatecas. The regions of the state bordering Durango and Coahuila as well as the cities of Fresnillo and Fresnillo-Sombrete and surrounding area are particularly dangerous. The northwestern portion of the state of Zacatecas has become notably dangerous and insecure. Robberies and carjackings are occurring with increased frequency and both local authorities and residents have reported a surge in observed TCO activity. This area is remote, and local authorities are unable to regularly patrol it or quickly respond to incidents that occur there. Gun battles between criminal groups and authorities occur in the area of the state bordering the state of Jalisco. There have also been reports of roadblocks and false checkpoints on highways between the states of Zacatecas and Jalisco. The city of Fresnillo, the area extending northwest from Fresnillo along Highway 45 (Fresnillo-Sombrete) between Highways 44 and 49, and highway 49 northwards from Fresnillo through Durango and in to Chihuahua are considered dangerous. Extreme caution should be taken when traveling in the remainder of the state. Of particular safety concern are casinos, sportsbooks, or other gambling establishments and adult entertainment establishments, which USG personnel may not frequent. USG personnel may not travel outside the City of Zacatecas after dark and must abide by a curfew of 1 a.m to 6 a.m. within a secured venue.

**Further Information**

For more detailed information on staying safe in Mexico, please see the State Department's Country Specific Information for Mexico.

For the latest security information, U.S. citizens traveling abroad should regularly monitor the State Department's internet web site, where the current Worldwide Caution, Travel Warnings, and Travel Alerts can be found. Follow us on Twitter and the Bureau of Consular Affairs page on Facebook as well. Up-to-date information on security can also be obtained by calling 1-888-407-4747 toll free in the United States and Canada or, for callers outside the United States and

00797

Canada, a regular toll line at 001-202-501-4444. These numbers are available from 8:00 a.m. to 8:00 p.m. Eastern Time, Monday through Friday (except U.S. federal holidays). U.S. citizens traveling or residing overseas are encouraged to enroll with the State Department's Smart Traveler Enrollment Program. For any emergencies involving U.S. citizens in Mexico, please contact the U.S. Embassy or U.S. Consulate with responsibility for that person's location in Mexico. For information on the ten U.S. consular districts in Mexico, complete with links to Embassy and Consulate websites, please consult the Mexico U.S. Consular District map. The numbers provided below for the Embassy and Consulates are available around the clock. The U.S. Embassy is located in Mexico City at Paseo de la Reforma 305, Colonia Cuauhtemoc, telephone from the United States: 011-52-55-5080-2000; telephone within Mexico City: 5080-2000; telephone long distance within Mexico 01-55-5080-2000. U.S. citizens may also contact the Embassy by e-mail.

**Consulates (with consular districts):**

- Ciudad Juarez (Chihuahua): Paseo de la Victoria 3650, tel. (011)(52)(656) 227-3000.
- Guadalajara (Nayarit, Jalisco, Aguas Calientes, and Colima): Progreso 175, telephone (011)(52) (333) 268-2100.
- Hermosillo (Sinaloa and the southern part of the state of Sonora): Avenida Monterrey 141, telephone (011)(52)(662) 289-3500.
- Matamoros (the southern part of Tamaulipas with the exception of the city of Tampico): Avenida Primera 2002, telephone (011)(52)(868) 812-4402.
- Merida (Campeche, Yucatan, and Quintana Roo): Calle 60 no. 338-K x 29 y 31, Col. Alcala Martin, Merida, Yucatan, Mexico 97050, telephone (011)(52)(999) 942-5700 or 202-250-3711 (U.S. number).
- Monterrey (Nuevo Leon, Durango, Zacatecas, San Luis Potosi, and the southern part of Coahuila): Avenida Constitucion 411 Poniente, telephone (011)(52)(818) 047-3100.
- Nogales (the northern part of Sonora): Calle San Jose, Nogales, Sonora, telephone (011)(52) (631) 311-8150.
- Nuevo Laredo (the northern part of Coahuila and the northwestern part of Tamaulipas): Calle Allende 3330, col. Jardin, telephone (011)(52)(867) 714-0512.
- Tijuana (Baja California Norte and Baja California Sur): Paseo de Las Culturas s/n Mesa de Otay, telephone (011) (52) (664) 977-2000.

All other Mexican states, the Federal District of Mexico City, and the city of Tampico, Tamaulipas, are part of the Embassy's consular district.

**Consular Agencies:**

- Acapulco: Hotel Emporio, Costera Miguel Aleman 121 – Suite 14, telephone (011)(52)(744) 481 -0100 or (011)(52)(744) 484-0300.
- Cancún: Blvd. Kukulcan Km 13 ZH Torre La Europea, Despacho 301 Cancun, Quintana Roo, Mexico C.P. 77500; telephone (011)(52)(998) 883-0272.
- Cozumel: Plaza Villa Mar en el Centro, Plaza Principal, (Parque Juárez between Melgar and 5th Ave.) 2nd floor, locales #8 and 9, telephone (011)(52)(987) 872-4574 or, 202-459-4661 (a U.S. number).
- Ixtapa/Zihuatanejo: Hotel Fontan, Blvd. Ixtapa, telephone (011)(52)(755) 553-2100.

00798

- Los Cabos: Las Tiendas de Palmilla Local B221, Carretera Transpeninsular Km. 27.5, San José del Cabo, BCS, Mexico 23406 Telephone: (624) 143-3566 Fax: (624) 143-6750.
- Mazatlán: Playa Gaviotas #202, Zona Dorada, telephone (011)(52)(669) 916-5889.
- Oaxaca: Macedonio Alcalá no. 407, interior 20, telephone (011)(52)(951) 514-3054, (011) (52) (951) 516-2853.
- Piedras Negras: Abasolo #211, Zona Centro, Piedras Negras, Coah., Tel. (011)(52)(878) 782-5586.
- Playa del Carmen: "The Palapa," Calle 1 Sur, between Avenida 15 and Avenida 20, telephone (011)(52)(984) 873-0303 or 202-370-6708(a U.S. number).
- Puerto Vallarta: Paradise Plaza, Paseo de los Cocoteros #1, Local #4, Interior #17, Nuevo Vallarta, Nayarit, telephone (011)(52)(322) 222-0069.
- San Luis Potosí: Edificio "Las Terrazas", Avenida Venustiano Carranza 2076-41, Col. Polanco, telephone: (011)(52)(444) 811-7802/7803.
- San Miguel de Allende: Centro Comercial La Luciernaga, Libramiento Manuel Zavala (Pepe KBZON), telephone (011)(52)(415) 152-2357.

00799

IN THE ESTATE OF             §        IN PROBATE COURT NO. ONE
DOROTHY LOUISE LONGORIA,      §
DECEASED                    §        HARRIS COUNTY, TEXAS

## ORDER DENYING MOTION OF SHELBY LONGORIA
## TO DISMISS OR TO ABATE COUNTERCLAIMS

On October 3, 2013, the Court heard Counter-Defendant Shelby Longoria's Motion To Dismiss Counterclaims for Forum Non Conveniens, or Alternatively To Abate Pending Resolution of Will Contest and Mexican Litigation (the "Motion"). Having considered the Motion, the brief filed in support of the Motion, the response to the Motion, the evidence admitted during the hearing on the Motion, and the record of this case, the Court has concluded that the Motion should be denied.

IT IS THEREFORE ORDERED that Counter-Defendant Shelby Longoria's Motion To Dismiss Counterclaims for Forum Non Conveniens, or Alternatively To Abate Pending Resolution of Will Contest and Mexican Litigation be, and hereby is, DENIED.

SO ORDERED on this _____ day of _____, 2013.

_____
PRESIDING JUDGE
PROBATE COURT NUMBER ONE
HARRIS COUNTY, TEXAS

Case Number 414270

IN THE ESTATE OF                       §        IN THE PROBATE COURT NUMBER ONE
DOROTHY LOUISE LONGORIA,               §
DECEASED                               §
                                       §        HARRIS COUNTY, TEXAS

---

## Shelby Longoria's Reply in Further Support
## of Motion to Dismiss or Abate



2888738v1/013774

00801

# Table of Contents

I.    The Court Should Dismiss Tommy's Claim for Forum Non Conveniens...........................4

      A.    Mexico Is an Available and Adequate Alternative Forum. ...................................6

      B.    The Private Interest Factors Support Dismissal....................................................8

      C.    The Public Interest Factors Support Dismissal....................................................10

II.    Alternatively, the Court Should Abate Tommy's Claim .................................................11

2888738v1/013774

00802

## Table of Authorities

*Aguinda v. Texaco, Inc.*,
  142 F. Supp. 2d 534 (S.D.N.Y. 2001)................................................................. 8

*Del Istmo Assurance Corp. v. Platon*,
  2011 WL 5508641 (S.D. Fla. Nov. 9, 2011)....................................................... 8

*DTEX, LLC v. BBVA Bancomer, S.A.*,
  508 F.3d 785 (5th Cir. 2007) .............................................................................. 6

*Dunsby v. Transocean, Inc.*,
  329 F. Supp. 2d 890 (S.D. Tex. 2004)................................................................. 7

*Gallego v. Garcia*,
  2010 WL 2354585 (S.D. Cal. June 9, 2010)................................................... 5, 11

*Gomez de Hernandez v. Bridgestone / Firestone N. Am. Tire, L.L.C.*,
  204 S.W.3d 473 (Tex. App. – Corpus Christi 2006, pet. denied)......................... 6

*Ibarra v. Orica USA*,
  493 Fed. App'x 489 (5th Cir. 2012).................................................................... 6

*In re Air Crash Over the Mid-Atlantic on June 1, 2009*,
  792 F. Supp. 2d 1090 (N.D. Cal. 2011).............................................................. 7

*In re BPZ Resources, Inc.*,
  359 S.W.3d 866 (Tex. App. – Houston [14th Dist.] 2012, orig. proceeding)........ 9

*In re Ford Motor Co.*,
  591 F.3d 406 (5th Cir. 2009) .............................................................................. 6

*In re Mantle Oil & Gas, LLC*,
  2012 WL 5323584 (Tex. App. – Houston [1st Dist.] 2012, no pet.).................... 7

*In re Pirelli Tire, L.L.C.*,
  247 S.W.3d 670 (Tex. 2007)........................................................................... 6, 7

*In re Pittsburgh Corning Corp.*,
  2013 WL 2299620 (Bankr. W.D. Pa. May 24, 2013)........................................ 1

*Israel Discount Bank Ltd. v. Schnapp*,
  505 F. Supp. 2d 651 (C.D. Cal. 2007) ................................................................ 4

2888738v1/013774

00803

*ISTIL Group, Inc. v. Masood,*
2004 WL 948376 (D. Or. Apr. 30, 2004) ........................................................... 4

*Liberty Mutual Ins. Co. v. Transit Mix Concrete & Materials Co.,*
2013 WL 3329026 (Tex. App. – Texarkana June 28, 2013, pet. filed) ..................... 5

*Miralda v. Tidewater, Inc.,*
2012 WL 3637845 (E.D. La. Aug. 23, 2012) ...................................................... 9

*Morales v. Ford Motor Co.,*
313 F. Supp. 2d 672 (S.D. Tex. 2004) ........................................................... 8, 9

*Navarrete de Pedrero v. Schweizer Aircraft Corp.,*
635 F. Supp. 2d 251 (W.D.N.Y. 2009) ............................................................. 8

*Paolicelli v. Ford Motor Co.,*
289 Fed. App'x 387 (11th Cir. Aug. 20, 2008) .................................................. 9

*Paulownia Plantations de Panama Corp. v. Rajamannan,*
793 N.W.2d 128 (Minn. 2009) ..................................................................... 8

*Rustal Trading US, Inc. v. Makki,*
17 Fed. App'x 331 (6th Cir. Aug. 21, 2001) ................................................... 9

*S. Megga Telecommunications Ltd. v. Lucent Technologies, Inc.,*
1997 WL 86413 (D. Del. Feb. 14, 1997) ......................................................... 5

*Sonat Exploration Co. v. Cudd Pressure Control, Inc.,*
271 S.W.3d 228 (Tex. 2008) ...................................................................... 10

*Transunion Corp. v. Pepsico, Inc.,*
811 F.2d 127 (2d Cir. 1987) ...................................................................... 9

*United Bank for Africa PLC v. Coker,*
2003 WL 22741575 (S.D.N.Y. 2003) .............................................................. 4

*Vinmar Trade, Fin. Ltd. v. Utility Trailers de Mexico, S.A. de C.V.,*
336 S.W.3d 664 (Tex. App. – Houston [1st Dist.] 2010, no pet.) ..................... 6, 10

iii

00804

This case is beginning to resemble the old-time carnival game Whack-a-Mole.[1] A quick timeline shows Tommy Dorsey's repeated efforts, right up to the week before the hearing, to recast the estate's purported claims in some way that will avoid forum non conveniens dismissal:

- Tommy filed this case on May 3, 2013 seeking to do three things: (1) invalidate a Mexican judgment partitioning community property[2], (2) invalidate a Mexican trust[3], and (3) invalidate orders of a Mexican court probating Eduardo Longoria Sr.'s will.[4]

- Shelby answered the petition on June 17, 2013, and asserted forum non conveniens as a defense.[5] On June 18, 2013, Shelby filed a petition contesting the will pursuant to which Tommy was appointed as independent executor of Dorothy's estate.

- On July 18, 2013, after reviewing Shelby's answer asserting a forum non conveniens defense, Tommy nonsuited his claim and refiled it as a counterclaim to the will contest – a procedural subterfuge designed to support the fictions in Tommy's response brief that Shelby somehow initiated this litigation and that Tommy's claims somehow are intrinsically related to Shelby's will contest.[6]

- On September 26, 2013, having reviewed Shelby's motion to dismiss, Tommy filed another set of counterclaims which he completely rewrote to scrub the references to Mexico and accentuate the references to Texas.[7]

Tommy seeks to avoid forum non conveniens by completely rewriting his pleading right before the hearing and then claiming that Shelby is now attacking a straw man. Tommy asserts, contrary to his original petition and his original counterclaim, that he is *not* contesting the Mexican trust and *not* contesting the orders of the Mexican court probating Eduardo Sr.'s will. But the "Inventory, Appraisement, and List of Claims" that Tommy filed in this Court just five

---

[1] "The term 'Whac-a-Mole' (or 'Whack-a-mole') is used colloquially to denote a repetitious and futile task: each time an adversary is 'whacked' it only pops up again somewhere else." *In re Pittsburgh Corning Corp.*, 2013 WL 2299620 at *2 n.8 (Bankr. W.D. Pa. May 24, 2013).

[2] Plaintiff's Original Petition (May 3, 2013) at ¶ 11.

[3] *Id.* ¶¶ 21-24.

[4] *Id.* ¶¶ 27-29.

[5] Defendant Shelby Longoria's Answer to Plaintiff's Original Petition (June 17, 2013) at ¶ 5.

[6] *See* Non-Suit Without Prejudice (July 18, 2013) and Original Counterclaims of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased (July 18, 2013).

[7] Original Counterclaims of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, to Shelby Longoria's Amended Contest of 2010 Will (September 26, 2013).

00805

weeks ago tells a different story: He says that the estate has a claim for $ 49,011,050 for shares of stock in two Mexican companies formerly held by the Mexican trust.[8] This filing can be squared only with a claim that seeks to recover for the estate half of the assets that were held by the Mexican trust.

In order to prevail on such a claim, Tommy at a minimum would somehow have to persuade a court to invalidate the Mexican trust and to invalidate the orders of the Mexican court probating the will of Eduardo Sr. which provided for his property to be passed to Shelby and Eduardo Jr. through the Mexican trust. This Court must decide whether a Texas court (indeed a Harris County jury) or a Mexican court is a better forum for resolving these attacks on Mexican legal documents and court orders.

Tommy's response also tacitly admits that he somehow will have to overcome the agreed 1983 order of a Mexican court partitioning the property of Eduardo Sr. and Dorothy.[9] Tommy's pleadings and his briefs have all avoided expressly mentioning the Mexican court order of partition, but it will not go away just because Tommy pretends that it does not exist. It does exist, and its existence is an insurmountable barrier to the estate recovering based on a theory that it is entitled to a community property interest. Presumably Tommy has some undisclosed theory about why and how the estate can attack a 30-year-old Mexican court order. This court must decide whether a Texas court or a Mexican court is a better forum for resolving an attack on this Mexican court order.

In an effort to create the appearance that this case is not primarily about Mexican property, trusts, and court orders, Tommy added allegations to his new amended counterclaim about two letters sent to Dorothy in Texas. The merit of Shelby's motion is illustrated by the

---

[8] Exhibit 1 hereto at 2.
[9] Response to Motion to Dismiss or Abate Counterclaims, at 23.

00806

weakness of the new allegations which Tommy chose to highlight in an apparent attempt to demonstrate a Texas connection.

First, Tommy alleges Shelby promised Dorothy in 2007 that he would pay $100,000 each to Sylvia and Adriana upon Dorothy's death. Tommy admits that Shelby tendered this money to Sylvia and Adriana, but complains that Shelby requested them to release any claims against him in return for receiving this substantial gift. It is a mystery how these facts are supposed to support a claim *by the estate* against Shelby.[10]

Second, Tommy points to a letter that Eduardo Jr. sent to Dorothy more than thirty years ago, on August 5, 1983, over his and Shelby's signature.[11] The handwritten letter, which Tommy grandiosely characterizes as establishing a "private trust," states *in full*:

> Dearest Mom,
> Shelby and I are writing you this letter with a great deal of love and respect. We want you to know that the assets that Dad has willed to us, as long as you live, we will hold them as if they were yours. We will make the fruits available to you for your direction as to their use. This letter has value to only you because of our commitment to your well-being and happiness. More importantly than the worldly goods is our promise to <u>always</u> care for you and to provide for your spiritual needs. We hereby pledge to you our unending devotion.
>
> Your sons,
> Eduardo Longoria K.          Shelby Luis Longoria[12]

Make no mistake: Shelby always supported his mother to the end of her life. He always cared for her and provided for her needs. But the Court is not required to overlook the clear facts: It is absurd for Tommy to maintain that he is seeking to recover for the estate based on an obviously unenforceable 30-year-old pledge of devotion, while implausibly asserting that his case has nothing to do with the subsequent Mexican agreements and Mexican court orders that

---

[10] Original Counterclaims of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, to Shelby Longoria's Amended Contest of 2010 Will (September 26, 2013) at ¶ 17.
[11] *Id.* ¶ 16.
[12] Exhibit 2 hereto.

00807

actually governed the arrangements for disposition of the Mexican property that made up the bulk of the assets separately owned by Eduardo Sr. and Dorothy.

In his inventory of claims, Tommy told the Court what he is seeking in this lawsuit: recovery of half of the value of the businesses formerly held by the Mexican trust. Tommy's new far-fetched allegations are just a temporary fix to get him past the motion to dismiss hearing. If the Court were to deny Shelby's motion, Tommy would almost certainly pop back up. His extensive original discovery relating to the Mexican trust, court orders, and property would surface. The Court should end this game now and send the case to Mexico where it belongs.

## I.

## The Court Should Dismiss Tommy's Claim for Forum Non Conveniens

Recognizing that his case is in a hole, Tommy relies on artful repleading to argue against forum non conveniens dismissal. For example, after having first sued Shelby, Tommy non-suited his claim once Shelby subsequently filed a will contest. Tommy then refiled the same claims with which he initiated this litigation as counterclaims to the will contest, and now tries to argue that it was *Shelby* who first invoked the jurisdiction of this Court! Regardless, Tommy is flat-out wrong when he argues that the Court cannot dismiss Tommy's counterclaim while maintaining jurisdiction over Shelby's claim. *See Israel Discount Bank Ltd. v. Schnapp*, 505 F. Supp. 2d 651, 662 (C.D. Cal. 2007) (dismissing counterclaim for forum non conveniens in favor of an Israeli forum, while remanding the plaintiff's claim to California state court), *aff'd*, 321 Fed App'x 700 (9th Cir. 2009); *ISTIL Group, Inc. v. Masood*, 2004 WL 948376, at *6-*7 (D. Or. Apr. 30, 2004) (dismissing only the counterclaim because Channel Islands were a superior forum); *United Bank for Africa PLC v. Coker*, 2003 WL 22741575 *4–6 (S.D.N.Y. 2003) (dismissing employee's employment related counterclaims on grounds of forum non conveniens or judicial deference while permitting employer to pursue RICO and other claims related to defendant's former

00808

employment); *S. Megga Telecommunications Ltd. v. Lucent Technologies, Inc.*, 1997 WL 86413 (D. Del. Feb. 14, 1997) (dismissing for forum non conveniens counterclaims which "would unnecessarily burden the trial of plaintiffs' claims").

Similarly, Tommy tries to avoid the issues by devoting a whole section of his brief to the irrelevant distinction between statutory and common law forum non conveniens. But the very case on which he relies, *Liberty Mutual Ins. Co. v. Transit Mix Concrete & Materials Co.*, 2013 WL 3329026, at *8 (Tex. App. – Texarkana June 28, 2013, pet. filed), acknowledges that "there is a substantial overlap between statutory forum non conveniens caselaw and common law forum non conveniens case law," that "the statute has deep roots in the common law," and that courts rely on the same precedent in applying the forum non conveniens doctrine in both statutory and common-law cases.

Finally, Tommy seems intent on wrongly casting aspersions on Shelby. Let's clear this out of the way: Shelby told the Court that he has the burden of proof on the issue of forum non conveniens[13], that he maintains his home in Texas[14], and that some court opinions state that more deference should be paid to the venue choices of in-state plaintiffs[15]. Tommy suggests otherwise only to distract from the real issues.

As Shelby demonstrated on page 14 of his brief, courts have applied forum non conveniens to dismiss cases brought by Texas plaintiffs and brought against Texas defendants. And forum non conveniens dismissal was warranted for claims asserted by an estate of a resident of the forum state. *Gallego v. Garcia*, 2010 WL 2354585 (S.D. Cal. June 9, 2010). The

---

[13] Counter-Defendant Shelby Longoria's Brief in Support of His Motion to Dismiss Counterclaims for Forum Non Conveniens, or Alternatively to Abate Pending Resolution of Will Contest and Mexican Litigation (Aug. 7, 2013), at 13.

[14] Shelby Longoria's Amended Contest of 2010 Will (Aug. 30, 2013) at ¶ 2 ("Shelby Longoria ('Shelby') is an individual domiciled in Hidalgo County, Texas.").

[15] Counter-Defendant Shelby Longoria's Brief in Support of His Motion to Dismiss Counterclaims for Forum Non Conveniens, or Alternatively to Abate Pending Resolution of Will Contest and Mexican Litigation (Aug. 7, 2013), at 13.

00809

dispositive question is not the residency of the parties, but the availability and adequacy of a Mexican forum and the balance of the private and public interest factors. Shelby has demonstrated that the test for forum non conveniens dismissal is met in this case.

A.     Mexico Is an Available and Adequate Alternative Forum.

There is "a nearly airtight presumption that Mexico is an available forum." *In re Ford Motor Co.*, 591 F.3d 406, 413 (5th Cir. 2009). Numerous Texas and federal cases have found Mexico to be an adequate and available forum. *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 796 (5th Cir. 2007); *Ibarra v. Orica USA*, 493 Fed. App'x 489, 493 (5th Cir. 2012); *In re Ford Motor Co.*, 591 F.3d 406, 412 (5th Cir. 2009); *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677-78 (Tex. 2007); *Vinmar Trade Fin. Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 675 (Tex. App. – Houston [1st Dist.] 2010, no pet.); *Gomez de Hernandez v. Bridgestone / Firestone N. Am. Tire, L.L.C.*, 204 S.W.3d 473, 483 (Tex. App. – Corpus Christi 2006, pet. denied).

Tommy does not cite a single case finding that Mexico is not an available and adequate forum. And he offers no meaningful basis for this Court to be the first court to buck the "nearly airtight presumption" that Mexico is available and adequate.

Tommy argues that Shelby would not be subject to personal jurisdiction in Mexican courts. But Shelby has already subjected himself to personal jurisdiction in Tamaulipas, and the court there has acknowledged his submission and accepted his appearance.[16] This is sufficient to make Mexico an available forum. *In re Ford Motor Co.*, 591 F.3d 406, 413 (5th Cir. 2009).

Tommy argues that third-party defendants Adriana and Sylvia will not submit to the jurisdiction of the courts of Tamaulipas. But they already have submitted to the jurisdiction of those courts by filing lawsuits in those courts against Shelby. Moreover, both have agreed to

---

[16] Exhibit 3 hereto. Shelby will submit a certified translation of Exhibit 3 upon the Court's request.

00810

submit any disputes concerning the Mexican trust to resolution by Tamaulipan courts. Shelby is willing to assume the (very minimal) risk that Sylvia and Adriana would somehow be able to evade the jurisdiction of Tamaulipan courts over Shelby's claims against them. But regardless, Sylvia and Adriana – who are in league with and share counsel with Tommy – cannot defeat forum non conveniens by engaging in "practices deliberately designed to defeat jurisdiction in the foreign forum." *In re Air Crash Over the Mid-Atlantic on June 1, 2009*, 792 F. Supp. 2d 1090, 1097 (N.D. Cal. 2011).

Tommy argues that there is not a cause of action in Mexico for breach of "informal fiduciary relationships or private trusts." This is of no moment because, as shown in Dr. Gabuardi's affidavit, Mexican law permits actions in damages to redress purported injuries such as the one claimed by Tommy. The law is clear that Mexico is not an unavailable forum just because it does not recognize all causes of action that may be available in the United States. *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 678 (Tex. 2007).

Tommy argues that limitations has run on his claims in Mexico. To that extent, Mexico is not distinguishable from the United States. But in any event, if the Court believes that it is necessary, it can condition forum non conveniens dismissal on Shelby's agreement not to assert limitation defenses in Mexico. *In re Mantle Oil & Gas, LLC*, 2012 WL 5323584 (Tex. App. – Houston [1st Dist.] 2012, no pet.); *Dunsby v. Transocean, Inc.*, 329 F. Supp. 2d 890, 895-96 (S.D. Tex. 2004).

Finally, Tommy claims that Tamaulipan courts would not have subject-matter jurisdiction over his claims. His expert's affidavit makes clear that the only basis for this argument is a purported Tamaulipan statute which, the expert contends, would divest Tamaulipan courts of jurisdiction due to the prior filing in the United States. However, the

00811

concept of "preemptive jurisdiction" under Mexican law does not prevent a Mexican court from asserting subject-matter jurisdiction over a case dismissed from a court in the United States. *Navarrete de Pedrero v. Schweizer Aircraft Corp.*, 635 F. Supp. 2d 251, 261 (W.D.N.Y. 2009). And "courts, both state and federal, have refused to recognize foreign laws that purport to make the home forum unavailable because of a prior U.S. filing." *Del Istmo Assurance Corp. v. Platon*, 2011 WL 5508641 (S.D. Fla. Nov. 9, 2011); *see Morales v. Ford Motor Co.*, 313 F. Supp. 2d 672, 676 (S.D. Tex. 2004); *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 546 (S.D.N.Y. 2001); *Paulownia Plantations de Panama Corp. v. Rajamannan*, 793 N.W.2d 128, 134-35 (Minn. 2009).

B.    The Private Interest Factors Support Dismissal

In order to argue a position on the private-interest factors, Tommy relies heavily on his attempted refashioning of his claims. It simply is not credible for Tommy to argue that even though he seeks to recover half the value of the Mexican trust, he is not actually contesting Eduardo Sr.'s will or the trust agreement. Tommy correctly notes that there are some witnesses in the United States, but he does not controvert Shelby's showing that many key witnesses are in Mexico.

Tommy concedes that the relevant documents are in Mexico, but he argues that Shelby controls the documents. Shelby does not control all of the Mexican witnesses and entities at issue. To the extent that he has any control over relevant documents in Mexico, that does not tip the scales in favor of venue in the United States. In many of the cases discussed on pages 20-22 of Shelby's brief, a court dismissed in part because documents controlled by a defendant were located in a foreign forum.

Tommy's principal "private interest" argument is that Tamaulipas is dangerous. But, as a matter of law, dangerous or violent conditions in a foreign forum do not weigh against dismissal

00812

in favor of that forum unless those conditions have adversely impacted the judicial system. *See In re BPZ Resources, Inc.*, 359 S.W.3d 866, 879 (Tex. App. – Houston [14th Dist.] 2012, orig. proceeding) ("Allegations of political unrest have generally been unsuccessful in courts' determinations that a foreign forum is inconvenient."); *Transunion Corp. v. Pepsico, Inc.*, 811 F.2d 127, 129 (2d Cir. 1987) ("no showing was made that political unrest in the Philippines has had an adverse effect upon the judicial system there."); *Paolicelli v. Ford Motor Co.*, 289 Fed. App'x 387, 391 (11th Cir. Aug. 20, 2008) ("plaintiff Bonilla alleges that the political instability in Colombia poses safety risks for the parties, but absent evidence the political unrest has affected the Colombian judicial system or would affect litigation of this case, this fact is not sufficient to outweigh the other factors that weigh in favor of dismissal."); *Rustal Trading US, Inc. v. Makki*, 17 Fed. App'x 331, 337 (6th Cir. Aug. 21, 2001) (forum non conveniens dismissal was warranted, despite State Department travel advisory concerning hazards of travel in Sierra Leone, in the absence of "some credible evidence indicating that the conditions in Sierra Leone would prevent the parties from accessing the courts in Freetown."); *Miralda v. Tidewater, Inc.*, 2012 WL 3637845, at *4 (E.D. La. Aug. 23, 2012) ("several federal appellate courts have uniformly concluded that the political unrest of the alternative forum does not *per se* render this forum inadequate in the *forum non conveniens* context, absent some showing that this unrest negatively affects the judicial system of the country or the litigation at issue."); *Morales v. Ford Motor Co.*, 313 F. Supp. 2d 672, 682 (S.D. Tex. 2004) ("[A] (convincing) argument against *forum non conveniens* dismissal premised on delay due to political unrest and the like should involve 'exact evidence for the length of the delay and a delay of many years.' . . . Such evidence is lacking in this case.").

00813

Tommy cites only a State Department travel advisory which does not even hint that the judicial relief has been foreclosed due to conditions in Tamaulipas. Sylvia, Adriana, and Tommy all have been able to hire attorneys and file claims against Shelby in Tamaulipas in the last few months. They do not explain why their attorneys in Tamaulipas cannot continue to handle claims against Shelby in Tamaulipan courts.

C.    The Public Interest Factors Support Dismissal

Tommy has not distinguished the many cases discussed in Shelby's brief which strongly emphasize the importance of choice-of-law to the analysis of the public interest factors. Tommy addresses choice of law principally by arguing that he has not pled a cause of action under Mexican law. But choice of law is not a pleadings issue; instead, "choosing the applicable law is *obviously* a question of law." *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008).

The Court does not have to definitively resolve the choice of law in order to conclude that the public interest factors weigh in favor of a Mexican forum, since "even the *possibility* that foreign law applies to a dispute is sufficient to warrant dismissal on forum non conveniens grounds." *Vinmar Trade Fin. Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 679 (Tex. App. – Houston [1st Dist.] 2010, no pet.). Here, that possibility is very likely indeed.

Tommy has not even attempted to make a cogent argument that Texas law somehow could apply to a challenge to the order of the Mexican court partitioning community property, the Mexican trust agreement, and to orders of the Mexican court probating Eduardo Sr.'s will. Instead, he argues that Texas law would govern the question of whether there was a fiduciary duty relating to property and trusts located within Mexico, and that Texas law would govern whether the marital estate was community property despite an agreed order of a Mexican court

00814

that it was separate property. He does not, and cannot, cite a single case in support of these arguments, much less refute the "possibility" that foreign law applies to the dispute.

Tommy's principal argument is that Dorothy lived in Houston. But he cannot distinguish *Gallego v. Garcia*, 2010 WL 2354585 (S.D. Cal. June 9, 2010), a case almost directly on point in which the court dismissed for forum non conveniens an action brought by representatives of an estate appointed by a United States court to recover for fraud involving Mexican businesses which was directed at a decedent who resided in the United States. Tommy's only argument against application of *Gallego* is that it was a case brought in federal district court, not in probate court. But both sides liberally cite and discuss cases that were not brought in probate court, and there is no non-frivolous argument that an action in probate court is not subject to the same *forum non conveniens* rules as actions in other courts.

## II.

### Alternatively, the Court Should Abate Tommy's Claim

Tommy's arguments against abatement are likewise misguided. Tommy is highly unlikely to be able to continue as executor of this estate.

- On June 29, 2012, Tommy's wife Sylvia filed an application to probate Dorothy's 2010 will and to appoint Tommy as executor. She represented to the Court that the 2010 will was Dorothy's last will and testament and that it had never been revoked.[17] This representation was false. In 2011, Dorothy executed a new will and appointed a new executor.[18] Sylvia knew about this new will but chose not to mention it in her filing with this Court.[19] Tommy maintained the subterfuge when he filed this action against Shelby and himself represented that the 2010 will was Dorothy's last will and testament.[20]

- Tommy admits that the 2010 will purports to cut out Shelby as a beneficiary of Dorothy's estate, and he does not deny that Shelby was a

---

[17] Application for Probate of Will and Issuance of Letters Testamentary (June 28, 2012) at ¶ 5.
[18] Exhibit 4 hereto.
[19] Exhibit 5 hereto.
[20] Plaintiff's Original Petition and Demand for Trial by Jury (May 3, 2013) at ¶ 33.

00815

beneficiary and named executor in the wills which will govern Dorothy's estate in the event that the Court invalidates the wills that Dorothy purportedly executed in the last stages of her life. Tommy therefore cannot deny that Shelby has standing to pursue his will contest and removal of Tommy as executor.

- Tommy cannot effectively fulfill his role as executor because he will not investigate and pursue his own wife's theft of Dorothy's assets.

- Tommy of course denies his wife's malfeasance, but he provides no basis to conclude that he could continue as executor in the event that these allegations have merit (which they do).

- In an amended will contest filed more than a month ago, Shelby noted that Tommy's recent actions as executor had laid bare his conflicts of interest: "Prior to and after Dorothy passed away, Sylvia appropriated for her own use items which were owned by Dorothy. For example, Dorothy owned a very valuable painting by the renowned Mexican artist Leonora Carrington. This painting likely was the most valuable asset in Dorothy's estate. Yet Tommy Dorsey omitted it from the Inventory, Appraisement, and List of Claims filed with the Court on August 27, 2013 in order to cover up his wife's malfeasance. The Leonora Carrington painting is not the only valuable item which Tommy left out of the inventory. Dorothy owned a Steinway grand piano, tens of thousands of dollars worth of jewelry, and many other valuable items which Tommy did not include in the inventory."[21] Tommy does not even address these issues in his response to Shelby's motion.

- Tommy admitted in the inventory that his wife, Sylvia, and his co-conspirator, Adriana, owe substantial amounts of money to the estate for "loans" which were made by Dorothy in her weakened condition late in life. As noted by the amended will contest, Tommy cannot act in the interest of the estate to invalidate these loans because the loans are invalid for the same reasons that the 2010 will is invalid.[22] Tommy does not address this issue in his response to Shelby's motion.

It does a disservice to the estate, and lays bare his true motivations, that Tommy would argue for the parties to proceed all the way through discovery and possibly even trial of this matter *when the whole proceeding may be invalidated by removal of the executor*. It would be

_____

[21] Shelby Longoria's Amended Contest of 2010 Will (Aug. 30, 2013) at ¶¶ 45-46.
[22] *Id.* ¶¶ 47-49.

00816

extraordinarily inefficient to allow Tommy to pursue his claim in the capacity as executor when his position is under such a cloud.

Tommy's principal argument is that any successor executor would pursue the same claim against Shelby. There is no evidence of this. Tommy's say-so is no evidence that there actually is a claim for the estate to pursue against Shelby. This is one reason why the Court should appoint an <u>independent</u> executor: The estate needs someone who is not tained by a conflict to assess whether it makes sense for the estate to assert these claims.

If a new independent executor does choose to maintain these same claims, the estate will be much better off than if Tommy were pursuing them as the executor. As Shelby pointed out in his brief – and Tommy did not dispute in his response – Tommy's claims as executor will be subject to an "unclean hands" defense which Shelby would not have against a truly independent executor.

Finally, Tommy cannot explain why this Court should not also await the results of the lawsuits filed in Mexico by Sylvia and Adriana. As discussed above, the estate's claims are entirely dependent on invalidation of the orders of the Mexican court probating Eduardo Sr.'s will. That issue must be resolved by the Mexican courts, not this Court. Tommy does not explain how the estate can seek to recover for the purported conversion of Dorothy's community property into separate property held by her husband, so long as there is a valid judgment of the Mexican court, uncontested by Dorothy, repeatedly acknowledged by her and entered during her lifetime, approving the very distribution of her husband's assets which she now seeks to challenge.

00817

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: _____
     Johnny W. Carter
     State Bar No. 00796312
     Richard W. Hess
     State Bar No. 24046070
     Kristen Schlemmer
     State Bar No. 24075029
     1000 Louisiana Street, Suite 5100
     Houston, Texas 77002-5096
     Telephone: (713) 651-9366
     Fax: (713) 654-6666

     Robert S. MacIntyre Jr.
     State Bar No. 12760700
     MACINTYRE MCCULLOCH STANFIELD YOUNG
     3900 Essex Lane, Suite 220
     Houston, Texas 77027
     Telephone: (713) 547-5400
     *Attorneys for Shelby Longoria*

## CERTIFICATE OF SERVICE

This is to certify that on this the 2nd day of October, 2013, a true and correct copy of the above

and foregoing instrument was properly forwarded to the following counsel of record in

accordance with Rule 21 of the Texas Rules of Civil Procedure as indicated below:

James Austin Fisher                          *Via Electronic Mail*
FISHER & WELCH
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Email: jfisher@fisherwelch.com

00818

T. Wesley Holmes                                *Via Electronic Mail*
THE HOLMES LAW FIRM
1000 North Central Expressway, Suite 400
Dallas, Texas 75231
Email: wes@wesholmes.com
*Attorneys for James Thomas Dorsey, Sylvia Dorsey, and Adriana Longoria*

Johnny W. Carter

00819

Case Number 414270

| IN THE ESTATE OF | § | IN THE PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | |
| | § | HARRIS COUNTY, TEXAS |

---

### Affidavit of Johnny Carter in Support of
### Shelby Longoria's Reply in Further Support
### of Motion to Dismiss or Abate

---

I, Johnny W. Carter, declare as follows:

1.      My name is Johnny W. Carter. I am over the age of twenty-one (21) years, am competent to testify to the matters stated herein, have personal knowledge of the facts and statements in this declaration, and each of the facts and statements is true and correct.

2.      I am an attorney in the law firm of Susman Godfrey L.L.P. I am licensed to practice law in the state of Texas and before this Court. I am counsel of record for Shelby Longoria in the above-referenced litigation.

3.      Attached as Exhibit 1 is a true and correct copy of an Inventory, Appraisement, and List of Claims filed by James Thomas Dorsey on August 27, 2013.

4.      Attached as Exhibit 2 is a true and correct copy of a document produced by James Thomas Dorsey bates-labelled DORSEY 003596, consisting of a letter dated August 5, 1983.

5.      Attached as Exhibit 3 is a true and correct copy of a filing in court in Mexico and a Mexican court order relating to personal jurisdiction over Shelby Longoria.

6.      Attached as Exhibit 4 is a true and correct copy of a document produced by Adriana Longoria bates-labelled ADRIANA 00104-109, and a document produced by James

2889810v1/013774

00820

Thomas Dorsey bates-labelled DORSEY 005147-52, consisting of a will purportedly executed by Dorothy Longoria in 2011.

7.    Attached as Exhibit 5 is a true and correct copy of a document bates-labelled DORSEY 003906, consisting of emails dated July 31, 2011 concerning Dorothy Longoria's purported 2011 will.

FURTHER, AFFIANT SAITH NOT.

_____
Johnny W. Carter

SUBSCRIBED AND SWORN TO BEFORE ME, a Notary Public, by Johnny W. Carter, on this 2nd day of October, 2013, to certify which witness my official hand and seal of office.

_____
Notary Public in and for the State of Texas


CELIA HERNANDEZ
Notary Public, State of Texas
Commission Expires 11-10-2014

My Commission Expires:_____

00821

# EXHIBIT 1

00822

## NUMBER 414270

| | | |
|---|---|---|
| ESTATE OF | § | IN PROBATE COURT NO. ONE |
| | § | |
| DOROTHY LOUISE LONGORIA, | § | |
| | § | |
| DECEASED. | § | OF HARRIS COUNTY, TEXAS |

---

### INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS

---

TO THE HONORABLE JUDGE OF THIS COURT
AND TO ALL INTERESTED PARTIES:

COMES NOW James Thomas Dorsey, as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, and submits for filing this Inventory, Appraisement, and List of Claims in compliance with Section 250 of the Texas Probate Code.

Date of Death:   April 6, 2012

Date of Qualification:   October 9, 2012

The following is a full, true, and complete Inventory and Appraisement of all personal property and all real property situated in the State of Texas, together with a list of claims due and owing to this Estate as of the date of death, which have come into the possession or knowledge of the undersigned.

### REAL PROPERTY

To the knowledge of the Independent Executor, the Decedent owned no real property on the date of her death.[1]

---

[1] The Decedent may have owned a community property interest in real property owned by Eduardo Longoria on the date of his death. An investigation is being conducted to determine whether Eduardo Longoria owned any real property on the date of his death.

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 1

00823

# PERSONAL PROPERTY

To the knowledge of the Independent Executor, the Decedent owned the following personal property on the date of her death.

## Cash and Bank Accounts

| | |
|---|---:|
| Texas Community Bank, Account Number | 4,988 |
| Texas Community Bank, Account Number | 27,538 |
| Texas Community Bank, Account Number | 7,680 |
| Texas Community Bank, Certificate Number | 72,918 |
| Total Cash and Bank Accounts[2] | 113,124 |

## Stocks, Bonds, and Other Securities

Direct ownership of, or right to constructive trust imposed on, undivided one-half interest in:
  50 shares of Series "A" stock in Vertice Empressarial, S.A. de C.V.;
  8,934 shares of Series "B" stock in Vertice Empressarial, S.A. de C.V.;
  49,000 shares of Series "A" stock in Inmuebles y Terrenos, S.A. de C.V.; and
  4,375,350 shares of Series "B" stock in Inmuebles y Terrenos, S.A. de C.V.

49,011,050

| | |
|---|---:|
| Total Stocks, Bonds, and Other Securities[3] | 49,011,050 |

## Other Personal Property

1.  Jewelry

    a.  Choker gold necklace                 400

---

[2] The Decedent may have owned additional accounts. Shelby Longoria is believed to be in possession of information regarding such accounts, if any, but to date he has refused to provide it.

[3] The Decedent may have owned additional stocks, bonds, or other securities. Shelby Longoria is believed to be in possession of information regarding such stocks, bonds, and other securities, if any, but to date he has refused to provide it.

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 2

00824

| | | |
|---|---|---:|
| b. | Small diamond necklace | 1,000 |
| c. | Silver and small diamond ring | 500 |
| d. | Small hoop gold and diamond earrings | 1,500 |
| e. | Peridot earrings | 250 |
| f. | Calsidney earrings | 250 |
| g. | Coral and diamond earrings | 1,000 |
| h. | Coral ring | 500 |
| i. | Elizabeth Showers earrings | 600 |
| j. | Watch | 2,000 |
| k. | Gump Peridot necklace | 150 |
| l. | Diamond ring | 1,500 |
| m. | Pearl necklace | 2,000 |
| n. | Pearl and diamond earrings | 1,000 |
| o. | Short strand of black pearls | 1,000 |
| p. | Pearl and smoky topaz bracelet | 350 |
| q. | Necklace from India with topaz peridot and amethyst beads | 250 |
| r. | Thirty-inch long string of pale green beads and matching earrings | 180 |
| s. | Two small gold chains | 120 |
| t. | Set of silver diamond loops and hanging blue stone | 100 |
| u. | Four silver rings | 120 |
| v. | Gold chain with small diamond | 120 |

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 3

00825

| | | |
|---|---|---:|
| w. | Five slides for loops | 260 |
| x. | Small faux diamond necklace | 250 |
| y. | Set of turquoise earrings with small diamond | 2,500 |
| z. | Gold chain with pink coral | 200 |
| aa. | Aqua ring and earring | 350 |
| bb. | Faux emerald earrings with briolette | 250 |
| cc. | Ring with cocktail diamonds | 5,000 |
| dd. | Ring with faux diamonds | 250 |
| ee. | Six strands of pearls (yellowed) | 300 |
| ff. | Set of loop earrings with hanging briolette | 4,000 |
| gg. | Miscellaneous costume jewelry and accessories (numerous pieces) | 500 |
| | Total Jewelry | 28,750 |
| 2. | Electric Wheelchair | 1,500 |
| 3. | Clothing | 5,000 |
| 4. | Miscellaneous Personal Effects | 1,000 |
| | Total of Other Personal Property | 36,250 |
| | TOTAL PERSONAL PROPERTY KNOWN TO EXECUTOR | 49,160,424 |
| | TOTAL ESTATE KNOWN TO EXECUTOR (NOT INCLUDING CLAIMS LISTED BELOW) | 49,160,424 |

The Decedent was predeceased by her husband and she never remarried, so no one owned a community-property interest in any property listed above.

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 4

00826

## LIST OF CLAIMS

To the knowledge of the Independent Executor, the Decedent owned the following claims on the date of her death.

| | | |
|---|---|---:|
| 1. | Claim against Adriana Longoria based on promissory note dated August 1, 2011, in the principal amount of $70,000 | 70,478 |
| 2. | Claim against Sylvia Dorsey for amounts loaned to her | 75,000 |
| 3. | Claim against Shelby Longoria based on August 9, 2011, agreement | 200,000 |
| 4. | Claim against Shelby Longoria for breach of fiduciary duty | 25,000,000 |
| 5. | Claim against Shelby Longoria for exemplary damages | 10,000,000 |
| | TOTAL CLAIMS[4] | 35,345,478 |

## RESERVATION OF RIGHT TO AMEND

The Independent Executor expressly reserves the right to amend this Inventory, Appraisement, and List of Claims.

---

[4] There may be additional claims against Shelby Longoria. He has withheld information that has formally been requested in this proceeding. Accordingly, this inventory may be amended when such information is obtained.

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 5

00827

I, James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, do solemnly swear that the above two pages, shown as the Inventory, Appraisement, and List of Claims, are a true, correct, full, and complete statement of the property and claims of the Estate that have come to my knowledge.

Respectfully submitted,

Signature of Independent Executor

/s/ James Austin Fisher

James Austin Fisher
State Bar of Texas Number 07051650
**FISHER & WELCH**
**A Professional Corporation**
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Telephone:   214.661.9400
Telecopier:   214.661.9404

**ATTORNEY FOR JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED**

00828

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

Sworn to and subscribed before me on August 27, 2013, by James Thomas Dorsey as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased.



Notary Public in and for the State of Texas

__Katherine A. Damianoff__
Printed Name of Notary Public

My Commission Expires:

7-09-2016

KATHERINE ALEXIS DAMIANOFF
NOTARY PUBLIC
State of Texas
Comm. Exp. 07-09-2016

INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS – Page 7

00829

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2013, a true and correct copy of this document was served on the Defendant, through his attorneys of record named below, in the manner indicated and in compliance with Texas law.

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
3900 Essex Lane, Suite 220
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

*/s/ James Austin Fisher*
James Austin Fisher

00830

# EXHIBIT 2

00831

EDUARDO LONGORIA
P. O. BOX 1316          Apdo. Postal 100
Laredo, Texas 78040     N. Laredo, Tamps., México

To Dorothy Kowalski de Longoria               August 5, 1983

Dearest Mom,

Shelby and I are writing you this letter with a a great deal of love and respect. We want you to know that the assets that Dad has willed to us, as long as you live, we will hold them as if they were yours. We will make the fruits available to you for your direction as to their use. This letter has value to only you. because of our commitment to your well-being and happiness. More importantly than the worldly goods is our promise to always care for you and to provide for your spiritual needs. We hereby pledge to you our unending devotion. Your sons,

Eduardo Longoria, Jr.               Shelby Luis Longoria

DORSEY 003596

00832

# EXHIBIT 3

00833

KOWALSKI Y OTRA.
TERCERO INTERESADO: SHELBY LUIS
LONGORIA KOWALSKI.

C. JUEZ CUARTO DE DISTRITO EN EL ESTADO DEL DECIMONOVENO
CIRCUITO.-

P R E S E N T E.-

SHELBY LUIS LONGORIA KOWALSKI, bajo protesta de
decir verdad, manifiesto ser: mexicano, empresario, casado, de 61 años, con
domicilio en Carretera Monterrey – Reynosa número 210-C, Colonia San Miguel,
Código Postal 88710, Ciudad Reynosa, Tamaulipas, ante Usted, respetuosamente
comparezco para exponer:

He tenido conocimiento que se me está buscando y tratando de
emplazar como Tercero Interesado en el presente Juicio de Garantías promovido
por mis hermanas Adriana y Silvia Longoria Kowalski; por lo que pido que se me
tenga por legalmente notificado y se me haga entrega de las copias de traslado
por conducto de mis autorizados, que adelante designo.-

Como consecuencia de lo anterior, me someto a la Jurisdicción
de su Señoría como Tercero Interesado; señalando domicilio Convencional para
oír y recibir notificaciones el domicilio marcado con el número 3113 de la Calle
Dr. Mier entre la calle, Morelos y la Ave. Juárez, Código Postal 8800, de esta
ciudad, y por designando a los C.C. LICENCIADOS EN DERECHO, MARIO
ALFONSO GONZÁLEZ BASURTO, ELISEO LOPEZ GIL Y ALFONSO ARAMIS
SALAS PÉREZ, abogados del suscrito, facultándolos con todas la prerrogativas
que confiere el artículo 12 de la Nueva Ley de Amparo; profesionistas que se
encuentran debidamente registrados en ese H. Tribunal.-

Por otro lado, pido que se me expida copia certificada del
presente escrito, documentos adjuntos y del acuerdo que le recaiga.-

00834

Por lo anteriormente expuesto y con fundamento además en los artículos 1, 4, 5 y 27 y demás relativos a la citada Ley de Amparo, a Usted C. Juez, atentamente solicito:

PRIMERO: Tener al suscrito dándose por sabedor del presente Juicio de Garantías, ordenando la entrega de las copias de traslado de la demanda y anexos por conducto de mis autorizados.-

SEGUNDO: Tenerme por sometiendo a la jurisdicción de su Señoría.-

TERCERO: Hacer constar cuales son los domicilios del compareciente, para los efectos legales a que hubiere lugar.-

CUARTO: Expedir las copias certificadas que se mencionó en el presente ocurso.-

PROTESTO LO NECESARIO
CD. REYNOSA, TAMAULIPAS; A 12 DE SEPTIEMBRE DEL 2013.

SHELBY LUIS LONGORIA KOWALSKI

00835

El **veintiséis** de septiembre de dos mil trece, la Secretaria da cuenta al Juez con el escrito registrado con el número de orden **3726. Conste.**

**Nuevo Laredo Tamaulipas, a veintiséis de septiembre de dos mil trece.**

Téngase por recibido el escrito que signa **Shelby Luis Longoria Kowalski,** tercero interesado en el presente juicio de amparo; atento a su contenido, se tiene apersonándose al presente juicio de garantías en términos del artículo 5, fracción III, inciso a) de la Ley de Amparo; respecto a la entrega de las copias de traslado, las mismas quedan a su disposición en la Secretaría de este Juzgado de Distrito.

De igual forma, se tiene autorizados en términos del artículo 12 de la Ley de Amparo, a los licenciados **Mario Alfonso González Basurto** (cédula profesional 1692214), **Eliseo López Gil** (cédula profesional 1282324) y **Alfonso Aramis Salas Pérez** (cédula profesional 5382557), y domicilio para oír y recibir notificaciones el ubicado en calle **Doctor Mier 3113,** entre **Morelos y avenida Juárez, código postal 8800, en esta ciudad.**

Por otra parte, se tienen ofrecidas las pruebas documentales que anexa al ocurso de cuenta, las que conforme al artículo 119 de la Ley de Amparo, se tienen por ofrecidas, sin perjuicio de que se haga relación de ellas en la audiencia y se tengan como recibidas en ese acto, aunque no exista gestión expresa de parte interesada; dese vista a las partes.

00836



NOAL DE LA FEDERACIÓN

Por último, como lo solicita, con apoyo en el artículo 278 del Código Federal de Procedimientos Civiles de aplicación supletoria a la Ley de Amparo, de acuerdo a su numeral 2°, expídasele a su costa copia certificada de las constancias que refiere en su escrito de cuenta, previa identificación, razón y firma que por su recibo se deje en autos; se tienen autorizados para recibirlos a las personas que señala, previa identificación, razón de recibo y firma que para debida constancia obre en autos.

**Notifíquese.**

Así lo proveyó y firma el licenciado **Julio César Márquez Roldán**, Juez Cuarto de Distrito en el Estado de Tamaulipas, quien actúa con la licenciada **María Emma González González**, Secretaria que autoriza y da fe.

JCMR/MEGG/dpam

La licenciada **María Emma González González**, secretaria adscrita al Juzgado Cuarto de Distrito en el estado de Tamaulipas, en Nuevo Laredo, hace constar y CERTIFICA: Que las presentes copias fotostáticas, concuerda con las que obran en el juicio de amparo **170/2013**, promovido por **Adriana Luisa Longoria Kowalski ó Adrianne Louise Longoria ó Adriana Louise Longoria y Silvia René Longoria Kowalski ó Sylvia Rene Longoria**, las que se certifican para ser entregadas al autorizado del tercero perjudicado Shelby Luis Longoria Kowalski. Lo que se asienta para los efectos legales a que haya lugar. Nuevo Laredo, Tamaulipas, veintisiete de septiembre de dos mil trece. Doy Fe.

LIC. María Emma González González.

2

00837

# EXHIBIT 4

00838

# LAST WILL AND TESTAMENT
## OF
### DOROTHY LOUISE LONGORIA

I, DOROTHY LOUISE LONGORIA, being of sound and disposing mind and memory and over the age of eighteen years and not being actuated by any fraud, duress, menace, mistake or undue influence, hereby make, declare and publish this my Last Will and Testament, expressly revoking all Wills and Codicils heretofore made by me.

## I.

Upon my death, I request that my funeral services be limited to a graveside service and that I be buried in the Longoria Family Plot in Nuevo Laredo, Mexico. I further direct that all my funeral expenses be paid by my Executrix a soon as practical after my death.

## II.

I appoint my daughter, ADRIANA LONGORIA, as the Sole Independent Executrix of this my Will, to serve without bond. If she is unwilling or unable to act in that capacity, then I direct and appoint SYLVIA L. DORSEY, to serve as the Sole Independent Executrix.

No other action shall be had in any court in relation to the settlement of my estate other than the probating and recording of this Will and return of an Inventory, Appraisement and List of Claims of my Estate. My Independent Executrix, whether original, alternate, substitute or successor, is referred to as my "Executrix"

I direct that my Executrix shall not be entitled to compensation for her services. By way of illustration and not of limitation and in addition to any inherent, implied or

Page 1 of 6

ADRIANA 00104

00839

statutory powers granted to executrix generally, my Executrix is specifically authorized and empowered with respect to any property, real or personal, at any time held under any provision of my Will, to allot, allocate between principal and income, assign, borrow, buy, care for, collect, compromise claims, contract, continue any business of mine, invest, convey, convert, deal with, dispose of, exchange, hold, improve, incorporate any business of mine, invest, lease, manage, mortgage, take possession of, receive, release, repair, sell, sue for, and in general to exercise all powers in the management and settlement of my estate, upon such terms and conditions as my Executrix deems best, and to execute and deliver any and all instruments and to do all acts which, my Executrix may deem proper or necessary to carry out the purpose of this Will, without being limited to or in any way by the specific grants of power made and without the necessity of any court orders or court supervision.

### III.

It is my intention to dispose of all real, personal or mixed property which I have the right to dispose of by any Will.

### IV.

I direct that all my just debts, secured and unsecured, as well as, all estate, inheritance, succession, death or similar taxes, together with any interest and/or penalties thereon, payable as a result of my death and imposed with respect to any property, whether or not disposed of by this, my Last Will and Testament, shall be paid as soon as practical after my death but prior to the distribution of that portion of my estate responsible for such payment, and if not sufficient before distribution of any other part of my estate.

ADRIANA 00105

00840

## V.

I GIVE and BEQUEATH all of my InterContinental Bank of McAllen Stock; and all InterContinental Bank of McAllen Stock which I should inherit from my husband, Eduardo Longoria (deceased) and all other Savings and Personal Accounts both foreign and domestic owned by me or which I should inherit from my husband, Eduardo Longoria, (deceased) to my daughter, ADRIANA LONGORIA. In the event she should predecease me, I then GIVE AND BEQUEATH such stock to the children of such child of mine, who survives her in equal shares.

## VI.

All cash which I should inherit from my husband, Eduardo Longoria, (deceased), I GIVE and BEQUEATH to my daughter, ADRIANA LONGORIA. In the event she should predecease me, I then GIVE AND BEQUEATH such share to the children of such child of mine, who survives her in equal shares.

## VII.

I further GIVE and BEQUEATH unto my daughters, ADRIANA LONGORIA and SYLVIA L. DORSEY all of my right, title and interest in and to the homes found at 1 1011 Uptown Bank Blvd., Apt 152, Houston, Texas 77054 and all of the contents therein. In the event ADRIANA LONGORIA and SYLVIA L. DORSEY should predecease me, I then GIVE AND BEQUEATH such property to the children of such child of mine, who survives them in equal shares. However, I direct that my son, EDUARDO LONGORIA, JR. can continue to reside for a period of seven (7) years from the date of my death at the home at 110 Paragon Court in Lakeway Texas, rent free, provided that he pay the taxes, maintenance and upkeep of the home during this period of time.

ADRIANA 00106

00841

## VIII.

All of the rest and residue of the property which I may own at the time of my death, real, personal, mixed, tangible and intangible of whatsoever nature and wheresoever situated, including all property which I may acquire or become entitled to after the execution of this Will and not devised hereunder, including all lapsed legacies and devises, I give, devise and bequeath to my daughter ADRIANA LONGORIA. Should she predecease me, I give, devise and bequeath the share of such child of mine be distributed in equal shares to her then living children.

## IX.

If any person, whether or not related in any way be blood to me shall either directly or indirectly attempt to oppose or set aside the probate of this Will or to impair or invalidate any of the provisions hereof and such person shall establish a right to any part of my estate, I GIVE and BEQUEATH to such person the sum of One and No/100ths Dollars ($1.00) only and no further interest in my estate.

IN TESTIMONY WHEREOF, I have hereunto subscribed and signed these presents in Laredo, Webb County, Texas, in the presence of the witnesses whose names are affixed hereto as witnesses and in the presence of said witnesses I have declared and published the foregoing as my Last Will and Testament on this the _____ day of _____, 2009.

_____
DOROTHY LOUISE LONGORIA
Testatrix

ADRIANA 00107

00842

The foregoing instrument, consisting of this and four (4) preceding pages was signed, published and declared by DOROTHY LOUISE LONGORIA, Testator, to be her Last Will and Testament, in our presence, and we, at her request, and in her presence and in the presence of each other, have hereunto subscribed our names as witnesses this the 28 day of July, 2009.

_____
Witness

5806 Candlewood Ln
_____
Street Address

Houston, TX 77057
_____
City, State and Zip Code

_____
Witness

_____
Street Address

_____
City, State and Zip Code

ADRIANA 00108

00843

STATE OF TEXAS      §

COUNTY OF _____      §

         BEFORE ME, the undersigned authority, on this day personally appeared DOROTHY LOUISE LONGORIA, _____ and _____, known to me to be the Testator and witnesses, respectively, whose names are subscribed to the foregoing instrument in their respective capacities, and all of said persons being by me duly sworn, the said DOROTHY LOUISE LONGORIA, Testator, declared to me and to the said witnesses in my presence that said instrument is her Last Will and Testament, and that she had willingly made and executed it as her free act and deed for the purposes therein expressed, and that the said witnesses, each on his/her oath stated to me, in the presence and hearing of the said DOROTHY LOUISE LONGORIA, that the said DOROTHY LOUISE LONGORIA, Testator, had declared to them that said instrument is her Last Will and Testament and she executed same as such and wanted each of them to sign it as a witness; and upon their oaths, each witness stated further that he/she did sign the same as a witness in the presence of the said DOROTHY LOUISE LONGORIA, and at her request; that she was at that time nineteen years of age or over and was of sound mind; and that each of said witnesses was then at least fourteen years of age.


_____
DOROTHY LOUISE LONGORIA
Testator


_____
Witness


_____
Witness


         SUBSCRIBED AND ACKNOWLEDGED BEFORE ME by the said DOROTHY LOUISE LONGORIA, Testator, and SUBSCRIBED AND SWORN to before me by the said _____ and _____, Witnesses, this the _____ day of _____, 2009.


_____
Notary Public, State of Texas

ADRIANA 00109

# LAST WILL AND TESTAMENT
## OF
## DOROTHY LOUISE LONGORIA

I, DOROTHY LOUISE LONGORIA, being of sound and disposing mind and memory and over the age of eighteen years and not being actuated by any fraud, duress, menace, mistake or undue influence, hereby make, declare and publish this my Last Will and Testament, expressly revoking all Wills and Codicils heretofore made by me.

## I.

Upon my death, I request that my funeral services be limited to a graveside service and that I be buried in the Longoria Family Plot in Nuevo Laredo, Mexico. I further direct that all my funeral expenses be paid by my Executrix a soon as practical after my death.

## II.

I appoint my daughter, ADRIANA LONGORIA, as the Sole Independent Executrix of this my Will, to serve without bond. If she is unwilling or unable to act in that capacity, then I direct and appoint SYLVIA L. DORSEY, to serve as the Sole Independent Executrix.

No other action shall be had in any court in relation to the settlement of my estate other than the probating and recording of this Will and return of an Inventory, Appraisement and List of Claims of my Estate. My Independent Executrix, whether original, alternate, substitute or successor, is referred to as my "Executrix"

I direct that my Executrix shall not be entitled to compensation for her services. By way of illustration and not of limitation and in addition to any inherent, implied or

DORSEY 005147

00845

statutory powers granted to executrix generally, my Executrix is specifically authorized and empowered with respect to any property, real or personal, at any time held under any provision of my Will, to allot, allocate between principal and income, assign, borrow, buy, care for, collect, compromise claims, contract, continue any business of mine, invest, convey, convert, deal with, dispose of, exchange, hold, improve, incorporate any business of mine, invest, lease, manage, mortgage, take possession of, receive, release, repair, sell, sue for, and in general to exercise all powers in the management and settlement of my estate, upon such terms and conditions as my Executrix deems best, and to execute and deliver any and all instruments and to do all acts which, my Executrix may deem proper or necessary to carry out the purpose of this Will, without being limited to or in any way by the specific grants of power made and without the necessity of any court orders or court supervision.

## III.

It is my intention to dispose of all real, personal or mixed property which I have the right to dispose of by any Will.

## IV.

I direct that all my just debts, secured and unsecured, as well as, all estate, inheritance, succession, death or similar taxes, together with any interest and/or penalties thereon, payable as a result of my death and imposed with respect to any property, whether or not disposed of by this, my Last Will and Testament, shall be paid as soon as practical after my death but prior to the distribution of that portion of my estate responsible for such payment, and if not sufficient before distribution of any other part of my estate.

DORSEY 005148

00846

## V.

I GIVE and BEQUEATH all of my InterContinental Bank of McAllen Stock; and all InterContinental Bank of McAllen Stock which I should inherit from my husband, Eduardo Longoria (deceased) and all other Savings and Personal Accounts both foreign and domestic owned by me or which I should inherit from my husband, Eduardo Longoria, (deceased) to my daughter, ADRIANA LONGORIA. In the event she should predecease me, I then GIVE AND BEQUEATH such stock to the children of such child of mine, who survives her in equal shares.

## VI.

All cash which I should inherit from my husband, Eduardo Longoria, (deceased), I GIVE and BEQUEATH to my daughter, ADRIANA LONGORIA. In the event she should predecease me, I then GIVE AND BEQUEATH such share to the children of such child of mine, who survives her in equal shares.

## VII.

I further GIVE and BEQUEATH unto my daughters, ADRIANA LONGORIA and SYLVIA L. DORSEY all of my right, title and interest in and to the homes found at 110 Paragon Court, Lakeway, Texas 78734 and 1011 Uptown Bank Blvd., Apt 152, Houston, Texas 77054 and all of the contents therein. In the event ADRIANA LONGORIA and SYLVIA L. DORSEY should predecease me, I then GIVE AND BEQUEATH such property to the children of such child of mine, who survives them in equal shares. However, I direct that my son, EDUARDO LONGORIA, JR. can continue to reside for a period of seven (7) years from the date of my death at the home at 110 Paragon Court in Lakeway Texas, rent free, provided that he pay the taxes, maintenance and upkeep of the home during this period of time.

DORSEY 005149

00847

## VIII.

All of the rest and residue of the property which I may own at the time of my death, real, personal, mixed, tangible and intangible of whatsoever nature and wheresoever situated, including all property which I may acquire or become entitled to after the execution of this Will and not devised hereunder, including all lapsed legacies and devises, I give, devise and bequeath to my daughter ADRIANA LONGORIA. Should she predecease me, I give, devise and bequeath the share of such child of mine be distributed in equal shares to her then living children.

## IX.

If any person, whether or not related in any way be blood to me shall either directly or indirectly attempt to oppose or set aside the probate of this Will or to impair or invalidate any of the provisions hereof and such person shall establish a right to any part of my estate, I GIVE and BEQUEATH to such person the sum of One and No/100ths Dollars ($1.00) only and no further interest in my estate.

IN TESTIMONY WHEREOF, I have hereunto subscribed and signed these presents in Laredo, Webb County, Texas, in the presence of the witnesses whose names are affixed hereto as witnesses and in the presence of said witnesses I have declared and published the foregoing as my Last Will and Testament on this the _____ day of _____, 2009.

_____
DOROTHY LOUISE LONGORIA
Testatrix

Page 4 of 6

DORSEY 005150

00848

The foregoing instrument, consisting of this and four (4) preceding pages was signed, published and declared by DOROTHY LOUISE LONGORIA, Testator, to be her Last Will and Testament, in our presence, and we, at her request, and in her presence and in the presence of each other, have hereunto subscribed our names as witnesses this the _____ day of _____, 2009.

_Mullen_
Witness

_1100 Uptown Park Blvd._
Street Address

_Houston, TX 77056_
City, State and Zip Code

_[signature]_
Witness

_5806 Candlewood Ln._
Street Address

_Houston, TX 77057_
City, State and Zip Code

DORSEY 005151

00849

STATE OF TEXAS  §

COUNTY OF _____  §

BEFORE ME, the undersigned authority, on this day personally appeared DOROTHY LOUISE LONGORIA, _____ and _____, known to me to be the Testator and witnesses, respectively, whose names are subscribed to the foregoing instrument in their respective capacities, and all of said persons being by me duly sworn, the said DOROTHY LOUISE LONGORIA, Testator, declared to me and to the said witnesses in my presence that said instrument is her Last Will and Testament, and that she had willingly made and executed it as her free act and deed for the purposes therein expressed, and that the said witnesses, each on his/her oath stated to me, in the presence and hearing of the said DOROTHY LOUISE LONGORIA, that the said DOROTHY LOUISE LONGORIA, Testator, had declared to them that said instrument is her Last Will and Testament and she executed same as such and wanted each of them to sign it as a witness; and upon their oaths, each witness stated further that he/she did sign the same as a witness in the presence of the said DOROTHY LOUISE LONGORIA, and at her request; that she was at that time ninety-four years of age or over and was of sound mind; and that each of said witnesses was then at least fourteen years of age.

_____
DOROTHY LOUISE LONGORIA
(Testator)

_____
Witness

_____
Witness

SUBSCRIBED AND ACKNOWLEDGED BEFORE ME by the said DOROTHY LOUISE LONGORIA, Testator, and SUBSCRIBED AND SWORN to before me by the said _____ and _____, Witnesses, this the _____ day of _____, 2009.

_____
Notary Public, State of Texas

Page 6 of 6

DORSEY 005152

00850

# EXHIBIT 5

00851

**From:** Sylvia Dorsey <sldorsey001@aol.com>
**To:** sldorsey001@aol.com
**Subject:** Fwd: Dorothy Longoria's Will - Revised July 28, 2011
**Date:** Sun, Jul 31, 2011 9:24 pm
**Attachments:** Nona_Will_July_28_2011.pdf (3119K)

-----Original Message-----
From: Raymond Hart <raymond@raymondhart.com>
To: Sylvia Dorsey <sldorsey001@aol.com>
Sent: Sun, Jul 31, 2011 8:16 pm
Subject: FW: Dorothy Longoria's Will - Revised July 28, 2011

**From:** Raymond Hart <raymond@raymondhart.com>
**Date:** Sun, 31 Jul 2011 19:37:04 -0500
**To:** Sylvia Dorsey <Sylvia@longoriacollection.com>
**Cc:** Adriana Longoria <alongoria1943@gmail.com>, Tommy Dorsey <Tommy@dorseyhomes.net>
**Subject:** Dorothy Longoria's Will - Revised July 28, 2011

Sylvia,

As per our conversation, please find attached Nona's will which she newly executed last week.

I am troubled by your frustration as mistrust seems to be running ramped in the family which is the last thing we need between you and my mother during this crisis.

It is important to note that the changes that were just made were suggested many months ago and it just so happens that since we were going to Nona's to get the note signed, we decided to also get the corrections to the Will signed as well.

Again, it is important to point out that the purpose of the initial changes were to give my mother the benefit of any and all judgements in her behalf as it relates to her legal matter with Shelby and to leave everything else the same.

From my understanding of the current Will, specifically section VII, the house and all the contents are split 50/50 between you and my mother which I believe the last Will failed to capture and which was the point of contention.

As I mentioned on the phone, we are transparent and as George Shipley mentioned, if you and Tommy decided to participate in helping us remedy the misallocation of Nono's estate, we would have a fair and legal agreement outlining the arrangement before moving forward.

If you take issue with the Will in its current form, we are more then willing to sit down and come up a mutually agreeable one.

I am truly sorry for any misunderstandings and lack of communication.

DORSEY 003906

00852

Please let me know if you would like to discuss this in greater detail.

Monte

PS – You and Mom need to realize Nona likes to play everyone against each other to be the center of attention. I know that you both know this, but it's hard to ignore her as her words can plant seeds of doubt.

From: Adriana Banks <banks.adriana@gmail.com>
Date: Sun, 31 Jul 2011 19:14:11 -0400
To: Raymond Hart <raymond@raymondhart.com>
Subject: Nona's Will July 28 2011

--
Adriana Banks

Email: banks.adriana@gmail.com
Cell: (713) 898-6557

Yuma Companies
1177 West Loop South, Suite:1825
Houston, TX 77027
Phone #: (713) 968-7089

Tulane University
6823 St. Charles Ave.
New Orleans, LA 70118
Phone #: (504)865-5000

DORSEY 003907

00853

TRIAL COURT CAUSE NUMBER 414,270

IN THE ESTATE OF          *      IN THE PROBATE COURT OF

                     *

DOROTHY LOUISE LONGORIA,   *      HARRIS COUNTY, T E X A S

                     *

DECEASED                 *      COURT NUMBER (1) ONE

PRELIMINARY STATEMENTS BY COUNSEL AND THE COURT IN MOTION TO

DISMISS COUNTERCLAIMS AND MOTION TO COMPEL AND FOR SANCTIONS

AND RESPONSE AND OBJECTION TO MOTION TO QUASH HEARING

        Came to be heard on this the 3rd day of October, 2013, preliminary statements by counsel of record and the Court on the Motion to Dismiss Counterclaims and Motion to Compel and for Sanctions and Response and Objection to Motion to Quash Hearing, in the above-entitled and numbered cause, and all parties appeared in person and/or being represented by Counsel of Record, before the Honorable Loyd Wright, Judge Presiding.

VOLUME 1 OF 1

O R I G I N A L

APPEARANCES

Attorney for Plaintiff, Shelby Longoria:

Johnny Carter

State Bar No. 00796312

1000 Louisiana, Suite 5100

Houston, TX 77002-5100

Telephone:  713.651.9366

Attorney for Defendant, Counter-Plaintiff James Thomas

Dorsey, Independent Executor of the Estate of Dorothy

Louise Longoria, Deceased:

James Austin Fisher

State Bar No. 07051650

2800 Lincoln Plaza

500 North Akard Street

Dallas, Texas 75201

Telephone:  214.661.9400

00855

THE COURT: Do y'all want to argue from there? Whatever is most comfortable.

MR. CARTER: This is fine, Your Honor. My name is Johnny Carter. I'm one of the counsel for Shelby Longoria, along with Rick Hess and Cameron McCulloch.

THE COURT: Okay.

MR. CARTER: I think we need to start by telling you we may have resolved two of the motions.

THE COURT: All right.

MR. CARTER: We are working on a Rule 11 Agreement to resolve the issues surrounding the deposition of Adriana Longoria and the Motion to Quash and Motion to Compel relating to the subpoena of Dr. Mitchell Young. Therefore, we suggest that the Court pass those pending motions. Keep them live but I think we will have a Rule 11 Agreement to submit to you.

THE COURT: That was the easiest one. If that's good news, I'm glad you are working through it, but, yeah, you are just saying hold it, you think you are going to have a Rule 11 Agreement that resolves both of those deposition issues. Is that what it was?

MR. McCULLOCH: Keep it on the corner of the desk and don't send it to the clerk's office to disappear into never-ever land.

THE COURT: Are you saying that because they

couldn't find one of the documents?

MR. McCULLOCH: I'm not taking a shot at her.

THE COURT: Okay.

MR. CARTER: And the second, I guess, procedural issue about how we are going to proceed today, Your Honor, is these sorts of motions, forum non conveniens motions are typically ruled on on the papers. There is no particular requirements about and the civility or the form of the evidence is submitted in, and as I'm sure you're aware, we have submitted fairly substantial briefs and documents and affidavits related to it. So, you know, we are prepared to just argue the motions, you know, maybe present 15 minutes each of argument on that motion, however, counsel for the Estate has subpoenaed Shelby Longoria, and he is here, to testify today. So if it's -- and I believe that they also want to present three other witnesses, so if this is to be a hearing with witnesses testifying in live court, I think we would have a couple of witnesses, Mr. Longoria, an expert, they would have three, we would have rebuttal, so it would be a much more lengthy proceeding. Our suggestion is to just rule on the papers maybe with some legal argument, but I understand that counsel for the Estate disagrees with that.

MR. FISHER: Your Honor, I'm James Fisher. I represent the Executor, James Thomas Dorsey. I also represent third party defendant who is Sylvia Dorsey. This is my

colleague, Wes Holmes. We believe that a Motion to Dismiss for forum non conveniens is an evidentiary hearing and that we are entitled to call witnesses. It won't take a long time but I think we will have approximately one hour of live testimony. I would just ask. There is also no rule that says that says an affidavit is admissible in this kind of a hearing. Affidavits are hearsay. Here is a case we have cited on point that says affidavits are hearsay and not admissible in this kind of hearing.

THE COURT: Well, you know, you can certainly have your hearing and your evidence. Is there anything you are going to present that is different from what you're arguing in your response?

MR. FISHER: Well, you would not say different but augments it with more detail.

THE COURT: Okay. And I guess my point is that I'm going to, you know, obviously I read it all, and without really objecting, you know, I'm going to take it on its face as that what's being presented to me, and by each side, is each side's point of view as to this particular issue, but, you know, an hour is problematic because I have an 11 o'clock docket.

MR. CARTER: Your Honor, I might add, if they have three witnesses and we have two witnesses, actually, they have at least three, they told me they may call one or two

other folks, doesn't sound like an hour to me.

THE COURT: Why don't we get started and we will see where it goes and, you know, I may have to work in 11 o'clock docket matters, you know, as we come to that point in time, but it's your motion, right?

MR. CARTER: Right.

THE COURT: I have got that straight. Actually, I've been over this. So you want to take the lead and call your witnesses first and then they can be the respondents?

MR. FISHER: Right. Very good.

THE COURT: Frankly, you can argue your motion and then call your witnesses. You can summarize your point of view, etcetera, and then --

MR. McCULLOCH: Give an opening for lack of a better way to describe it.

MR. CARTER: That would be fine, Your Honor.

THE COURT: I mean, I have a pretty good understanding of what the issues are but, you know, I don't want to short circuit y'all's ability to frame the argument the way you want to.

MR. CARTER: Well, and it may streamline what we do with witnesses if we kind of put the issues out in front of the Court prior to that. If it please the Court, I will present and a little argument and then we will call Shelby Longoria and then we will call Professor Carlos Gabaurdi.

THE COURT: All right.

MR. CARTER: So the first I think question for the Court is what is this case really about, and I think that the Court can and should, in deciding the motion, get to the heart of the case, what is this case really about, and absolutely, Your Honor, there is a Texas connection in this case. All right? The Decedent was a Mexican citizen living in Texas at the time of her death. But the question opposed by the forum non conveniens doctrine is not whether there is any connection in Texas, the question is, on balance, whether this case should be tried in Mexico or should it be tried in Texas. And the fact that this case belongs in Mexico is illustrated by the long history of the marriage between Eduardo Longoria, Sr., and Dorothy Longoria. Eduardo and Dorothy were married in both Texas and Mexico. There is marriage certificates from the early 1940's on either side of the border. Eduardo, Sr., brought into the marriage and continued to manage and profit from throughout the course of the marriage businesses in Mexico. Going back as far as the 1960's, there were a series of Wills of both Eduardo and Dorothy dealing largely with property in Mexico.

In 1983, Dorothy and Eduardo, Sr., entered into an agreement to partition their community property. They entered into that agreement in Mexico. They sought an agreed judgment of a court in Mexico that would partition their

property. The Court in Mexico granted the Request for Partition of the Property. As a result of that partitioning, Dorothy owned considerable real estate in Mexico and shared in Mexican companies. She subsequently confirmed in Wills and other legal documents that her marriage was subject to a separate regime.

Later in life, in 2002, Eduardo, Sr., transferred all of his of his property into a Trust managed by a Mexican bank, Banca Afirme. The Trust Agreement and a Will that he executed at the same time provided for the Trust to continue managing the property for the benefit of their two sons, Shelby and Eduardo, Jr., upon the passing of Eduardo, Sr. There are also two daughters, Sylvia and Adriana, and the Agreements and the Wills, of which there are many over a period of many decades, made clear that the understanding and the intent of the parents was that the businesses would go to the sons and the cash would go to the daughters and that the cash would be paid to the daughters during the lifetime of the parents. For many -- for large portions of this period of time that cash consideration was actually more valuable than the interests and businesses that was going to pass to Shelby and Eduardo, Jr.

All of the children were aware of the Trust arrangements in 2002, and Dorothy was too. At the same time that the Trust was established, Eduardo, Sr., entered into what

were called Private Agreements. One with Sylvia, his daughter Sylvia, and one with his daughter Adriana. And those agreements say that you will be continued to be paid a sum certain in cash for a period of years and that if there are any disputes that you the daughters have concerning the Trust and all of these arrangements, those disputes will be governed by Mexican law and you will file suit in the courts of the State of Tamaulipas in the City of Reynosa, which is across the border from McAllen.

When Eduardo, Sr., died in 2005, Shelby Longoria, who was named as the Executor of Eduardo, Sr.'s Estate, probated his Will in Mexico, in Nuevo Laredo, across from Laredo, which is also in the State of Tamaulipas in Mexico. There were subsequently multiple orders of the courts of Nuevo Laredo probating Eduardo, Sr.'s Will.

After Eduardo, Sr., passed away, Dorothy moved to Houston and was supported for all of the remaining years of her life by Shelby. He arranged for about a quarter of a million dollars a year to be transferred from the businesses in Mexico, managed by the Mexican Trust, to Dorothy here in Houston so that she could continue to live in the manner she desired.

The Executor's efforts to deep six the fact that this case is all about Mexico are too little too late. There was an Amended Counterclaim filed by the Estate last Friday

which attempted to essentially go through their previous counterclaim and delete references to Mexico and add in references to Texas. But let's look at the procedural history here, all right. Mr. Dorsey, as Executor, filed his complaint in early May. He initiated this litigation in this court. He said that he was seeking to recover on behalf of the Estate a community property interest that Dorothy Longoria had lost somewhere along the way. He alleged that there was something fraudulent about the transaction creating the Mexican Trust and the execution. He alleged there was something fraudulent about the execution at the same time in Mexico of Eduardo, Sr.'s Will. All of this in 2002.

Mr. Dorsey, the Executor, alleged that there was something fraudulent about the manner in which Shelby probated Will in Nuevo Laredo, Mexico. Mr. Dorsey, the Executor for implicitly challenged the 1983 Agreement to partition the property of Eduardo and Dorothy because he alleged that there was a -- should have been community property that passed to Dorothy and that that was somehow lost along the way. So in order to prevail in that you would have to somehow invalidate the agreement to partition the property and to make the marriage into a separate property regime.

After Mr. Dorsey, the Executor, filed that case in this court, he as well as Adriana and Sylvia, and just for -- you may have seen this in papers, but Sylvia Dorsey, one of

the daughters of Eduardo and Dorothy, is the wife of Tommy Dorsey, the Executor of Dorothy's Estate. All right? And Adriana is her sister. So Mr. Dorsey as the Executor of the estate, Adriana and Sylvia, they filed lawsuits. After they filed this lawsuit they filed lawsuits in Nuevo Laredo in Mexico. And those lawsuits sought to set aside the probate of Eduardo, Sr.'s Will, which is essentially the same sort of allegation that had been made in the lawsuit that had been filed in this court. At least one of those proceedings, the one that was filed by the sisters, Sylvia and Adriana, and is still pending. Shelby Longoria has voluntarily appeared in that proceeding. He has absolutely stipulated that he will consent to personal jurisdiction in Mexico and lay his limitations defenses in Mexico with respect to that proceeding or in other proceedings in Mexico if this case were to be dismissed from this court.

After or around the time that he filed the lawsuits, around the time that the lawsuits were filed in Nuevo Laredo, Mr. Dorsey, the Executor, initiated discovery in this case. And the way he did it was, he served a set of 194 Requests for Production on Shelby Longoria, requesting documents relating to dozens of Mexican companies and not a single American company. He then, just five weeks ago, filed Inventory and List of Claims, that said that the main claim of the Estate, and he valued it at $49 million, was for shares in

00864

two Mexican companies formally held by the Mexican Trust. Those companies are Vertice Empresarial and one called Imuebles Interainios, SA, which the parties call ETSA, ET and SA. The only way the Estate recovers some share of those companies is if, at a minimum, it proves that the Mexican Partition Agreement isn't valid, Mexican Trust is invalid, and Eduardo, Sr's Mexican Will is invalid. And any such claim would, of course, be governed by Mexican law. It wasn't until they amended the petition last Friday that Mr. Dorsey did a search and replace to get out the allegations relating to Mexico. But since the whole locus of this marriage was in Mexico, the property was in Mexico, the agreements were in Mexico, I don't know what the Estate is after here in the United States, and my belief is that they are not after anything in the United States because there is nothing here. They are just looking to get past the hearing and then we will be right back attacking the Mexican Court Orders and Agreement, which they would have to defeat anyway in order to prevail on their claims, and they will be seeking discovery regarding the Mexican property as indicated in the Inventory, they are seeking to recover some portion of the value of the Mexican property. So per forum non, the standards are set out in the briefs, we have to show that Mexico isn't available in adequate forum and then the court balances the private interest and the public interest in order to assess where this case is most appropriately venued.

First off, available in adequate forum. That's not an issue that needs to detain the Court for very long. The Fifth Circuit has said that there is a nearly airtight presumption that Mexico is available in adequate forum. And there are multiple Fifth Circuit cases that follow that. There are multiple state court cases that follow that, and the Estate has not pointed to a single case which has gone the other way. Shelby Longoria has consented to personal jurisdiction and to no application of the statute of limitations in Mexico if this case is dismissed. That, as a matter of law, means that Mexico is available in adequate forum. And for that purpose you can look at a Texas Supreme Court case cited in our brief called In Re: Pirelli Tire, which was, in fact, a case involving Plaintiffs from Tamaulipas, and the court said that the consent to having no limitations and to waiver of personal jurisdiction issues in Tamaulipas rendered Mexico available in adequate forum.

With respect to the private interest factors, I mean, I think maybe the biggest issue is that the documents are overwhelmingly in Spanish. And depending on how far we get into the facts with these witnesses, you may see some of that today. Virtually everything having to do with this couple's properties, Dorothy and Eduardo, Sr, is in Spanish because the property was in Mexico, the Trust was in Mexico, the Partition Agreement was in Mexico.

There is an expense issue in translating the documents but there is also an issue of time and effort in trying to impart Spanish language concepts to the jury and to the Court.

With respect to the witnesses, if the case is in Mexico, the parties will all have the opportunity to testify there, just as -- or testify here for the case in Mexico just as if the case were here, or if another party wanted to testify, it could be the Mexican court could compel them to do so. The real issue is the non-parties. The people involved in the execution of the agreement to partition the property or who know about that, the people who managed the Trust, the attorneys who had drafted the Trust documents and Eduardo Longoria, Sr's Wills, the attorney who drafted Dorothy Longoria's Will, these folks are all in Mexico and out of reach of American service of process but within the reach of the Mexican courts.

The same thing with the documents. You have Mexican court files, Mexican attorney files, the files of the Mexican businesses, they are Mexico and they are in Spanish. We discuss a lot of cases in our brief. This is well-trodden grounds. A plaintiff can't defeat forum non conveniens by coming in and saying here are a few things about this dispute that relates to the United States. The court has to look at the entirety of the case to determine where a trial would be

most expeditious. The case that's cited in our brief, a First Court of Appeals case, Denmar Finance, where the court found that forum non conveniens was warranted because the defense witnesses and the defense documents were in Mexico and were written in Spanish. So that's the private interest factors.

Public interest factors. I think the most important issue is choice of law. And there are a lot of cases that say, in fact, that where there is a choice of law issue, that is the most important issue to look at with respect to public interest factors.

The Agreement Partition of Marital Property, that is governed by Mexican law. I don't see where there could be any argument that the validity of that agreement which was entered as an Order of the Court in Mexico, could be governed by any laws other than Mexico's. The Trust Agreement expressly says that it is governed by Mexican law and, in fact, Adriana and Sylvia agreed to the application of Mexican law with respect to any claims that they would have relating to the Trust.

The challenges to the court proceedings, those are all Mexican court proceedings, the proceedings around the separate property agreement, the proceedings around the probate of Eduardo, Sr's Will. The current proceedings now going on Nuevo Laredo, all of that is governed by Mexican law and it is a huge issue, as you will see here today, the parties have here

in the courtroom today experts in Mexican law to testify about Mexican law and Mexican procedure. And if this case goes forward in this court, there are probably going to be regular hearings for it whereas you would not have to do that if this case were in Mexico you would not have to have a lawyer come in and testify as to Mexican law in a court in Mexico.

The Plaintiff's primary argument is that Tamaulipas is dangerous, you know, there is drug gangs, there is a lot of murders in Tamaulipas and Nuevo Laredo and Reynosa, but the law is clear, this would weigh against dismissal only if violence in the alternative forum has greatly limited access to justice. And there is no evidence of that. Nuevo Laredo, Reynosa, other places in Tamaulipas have fully functioning court systems. In the cases we cite in our reply brief that we filed yesterday, there is dismissals in favor of Columbia, in favor of Venezuela, in favor of Sierra Leon. There is a Texas Supreme Court case just from a few years ago, the Pirelli Tire case that I mentioned, that dismisses the case in favor of a forum in Tamaulipas, Mexico. It is likely that Mr. Dorsey, if he does not want to, will even have to go to Mexico if he files this case in Mexico, because in Mexico most things are done on the papers. You have to basically compile your evidence and documents and file it along with the brief to the court and the court makes its decision. The party can, if asked by another party, can go into court and testify. Nonparties can go into

court and testify based on previously submitted written questions. But that would be a one time only thing. At the conclusion of all of that, the court would review what was submitted to it to make a decision and there wouldn't be such a thing as a multiple week trial in Mexico where everybody would have to be living in Nuevo Laredo for an extended period of time. So all of that is to say that it makes no sense for this case to be here in Houston and despite the efforts to replead the case at the last minute, this case is really is about Mexico.

The second part of our motion relates to a abatement for this case. This is an alternative argument. Abatement pending resolution of the Will contest that Shelby Longoria filed. Remember, the first party to file something in this matter was the Executor, Mr. Dorsey. He filed the lawsuit against Shelby Longoria. Subsequently, Mr. Longoria filed a Will contest and said that Dorothy lacked capacity and there was undue influence when she executed a Will 2010 at the end of her life when she was very sick and on a lot of psychotropic medications in which she appointed Mr. Dorsey as Executor. We have since found out, by the way, there were three Wills executed in 2009, one in 2010, one in 2011. It is a little bit like, Your Honor, the game where you pick sides in baseball where the kids would put one hand on top of the other, Adriana would go to Dorothy and say, here, sign this, and have her sign

over all of her Estate to her. But then Sylvia would find out about it and she would go to Dorothy and have her sign something. And then the last Will was one that apparently Adriana got her mother to sign in the last months of her life, just a few months after the 2010 Will that was admitted to probate. And so that 2011 Will in which Adriana is named as Executor is, in fact, the last document that is apparently signed by Dorothy Longoria that purports to be a Will. The whole sequence of events reeks of undue influence and lack of capacity. But I will also say, by the way, just parenthetically, the prior Will had -- were from the late 1980's, Shelby Longoria was named as Executor and he was an heir. So the obvious intent of the 2009, 2010 and 2011 Wills was to get Dorothy Longoria to sign something which had the affect of cutting Shelby out of the Will when clearly she didn't know what she was doing and signing what was put in front of her.

There is an additional issue too, which is that for reasons independent of that, Mr. Dorsey is a completely inappropriate executor for this estate. I mean, first of all, there was and we will show in this case misappropriation of money from Dorothy Longoria in the last years of her life by Sylvia Longoria. The way the children arranged the affairs was Dorothy Longoria was here in Houston, Sylvia Dorsey was helping to manage her day-to-day affairs but it was entirely funded by

Shelby from the Mexican businesses. Shelby lives in McAllen but he spends a substantial amount of his time in Reynosa managing businesses that are across the border and he would have those businesses extend about a quarter of a million dollars a year so that she could continue to maintain her life time. So there is misappropriation by the executor's wife. The misappropriation includes checks that are written to Tommy Dorsey, the Executor. There are improper loans to Sylvia and Adriana dating from around the same time as all these Wills. And the Executor won't or can't attempt to try to claw back those improper loans because it would undercut his argument about the validity of the Will. There was very valuable property taken from the Estate which Tommy Dorsey omitted from the Inventory and Claims in the property.

There is the whole issue, Your Honor, that Sylvia and Tommy have represented to this Court on multiple occasions that the 2010 Will was Dorothy's Last Will and Testament when they had in their files and knew that there was a 2011 Will. The 2010 Will was the basis of the appointment for Tommy but it wasn't the Will that was executed.

Now the Estate does not have a claim against Shelby, Your Honor, but if it did, I think it does a great disservice to the Estate to have this Executor pursue it. So the question is whether we want to get to the end of this case, go through all of the work involved on the claim asserted by

Tommy Dorsey against Shelby Longoria only to conclude that the Executor should be appointed.

I think it would be extremely inefficient and pose an undue burden on the parties. In an exercise to manage its own docket, the Court can deal with that problem by abating the Executor's claim against Shelby and trying the Will contest first. Thank you.

THE COURT: Okay. Just a question. Are you saying, since this is a forum non conveniens, the argument isn't that what could take place in his court might not have an affect on Mexican property, is it? I mean, the jurisdiction is okay in this Court, in other words?

MR. CARTER: We are not challenging jurisdiction, Your Honor.

THE COURT: And you're talking about all sorts of instruments that are really Mexican instruments in nature and the property is in Mexico. Is there a concern that whatever happens in this court would not be recognized or accepted by the Mexican authorities or is --

MR. CARTER: You know, I think that could be a concern. For example, you know, if the parties have to try issues involving the agreement to partition the property, right, and there is a decision in this court that kind of relates to or bears upon the validity of that. I don't know allow the Mexican courts would view that. I mean, you would

have a conflict between the court systems of two different nations at that point.

THE COURT: Okay. All right, and how long would your opening statement be, so to speak?

MR. FISHER: We can hold it down to less than ten minutes, Your Honor.

THE COURT: Okay. What I'm going to do is, you go forward with your response and then we are going to take a break and I'm going to try to address my 11 o'clock docket matters and then we will come back and keep going.

MR. FISHER: Okay.

THE COURT: If you want to take that time to get something to eat or anything else, that's fine. I don't want to just tell y'all to come back at two because I want to keep going. I've got to leave by four today so I want to make sure I address all of your issues and evidentiary matters before that. So that's what we will do, just, you will be allowed your response and we will take a break and come back and probably I would say we will start up again at noon unless my 11 o'clock throws me a few curve balls which has happened before, so go ahead.

MR. FISHER: With all due respect, Your Honor, the only way that the Movant can make a colorable argument under the US Supreme Court case law is by miscasting our case, misconstruing it. Let me say with perfect clarity, we are not

contesting the validity of any judgment of any Mexican court. We are not asking you to review or overturn any Mexican proceeding. We are not contesting any will that was signed in Mexico. And perhaps the biggest miscasting of our case is describing it as a fight between Shelby Longoria and his sisters. This is a case brought by an Executor who has a duty to marshal the assets of the Estate and those assets include very valuable claims against Shelby Longoria. There are claims under Texas law. Mr. Carter erroneously said that the locus of the marriage was in Mexico. That's not true. They moved to the United States in 1987 and lived in the United States for the rest of their lives. Mr. Longoria died in 2005, so he lived here for 17 years. Dorothy Longoria died in 2012. She lived here for almost 25 years. Throughout that period of time, Shelby Longoria had a fiduciary duty to her. And if you listen carefully to what Mr. Carter said, he admitted it. Shelby Longoria oversaw payments to Dorothy from the Mexican businesses for her benefit. And under Texas law, the theory of informal fiduciary relationship is well-settled, it exists. But I will note, it does not exist under Mexican law, and so Mr. Carter's statement that it is watertight, that Mexico is an adequate forum, none of those cases involve informal fiduciary relationship claims. And one of the things that our expert witness will testify in a compelling way, there is no recognition of fiduciary duty claims in Mexico. There is no

remedy. There is no recourse.

Now, much of their argument is devoted to the proposition that our case is lousy and going to lose. If that's true, why are they so desperate to move the case out of this court? Your Honor is fully capable of rendering of a Summary Judgment where a case is weak. But the truth is, it is not weak. Shelby Longoria acted in a fiduciary capacity towards his mother for decades and it's documented.

There was reference to these private agreements which contained choice of law provisions. These agreements were not agreements to which Dorothy Longoria was a party and so they are no way binding on the Executor of her Estate. She didn't sign it. Those agreements, she did not even mention in them. They have no bearing whatsoever over her estate. That's a red herring.

Now, there are two steps to the legal analysis that the Court is required to undertake. The first is whether Mexico is an adequate forum, adequate and available forum for the claims that we have pleaded. The second is, even if there is an adequate and available forum, has the movant carried its, quote, heavy burden to make a strong showing that the factors weigh heavily in favor of Mexico and all of those words are used in the United States Supreme Court authority. The common law of forum non conveniens is law that the US Supreme Court has weighed in on and the Texas Supreme Court has relied on, so

00876

it's entirely appropriate and indeed mandatory that we consider US Supreme Court authority. That Court has imposed a very heavy burden but as the Court has read our brief I won't burden you by going over all of those cases again.

Let me address the first part of the analysis. Is Mexico an available forum? Our expert witness will say that the Courts of Tamaulipas do not have subject matter jurisdiction over this case, and even if they did, they would provide no remedy because there is no cause of action for breach of fiduciary duty recognized there. Not only does that Mexican state not recognize informal fiduciary duties, it does not even recognize private trusts. So if a private individual is a settler and signs a trust agreement, which is common in the United States, that's not enforceable in Mexico. It's clear, there is no remedy and that's why they want to send us there, we can't win in Mexico.

Now, let's turn to the convenience factors. The witnesses that they say are in Mexico are the people who witnessed signing of Wills, signing of Trust Agreements, who advised Eduardo in connection with those transactions. We are not challenging those transactions. We are not saying those Wills are invalid in this case, so the witnesses to those Wills will not be testifying in this proceeding. Their testimony won't be relevant to anything. On the other hand, there are numerous witnesses in Texas, including Dorothy's accountant.

Lawyers who advised Shelby in proceedings involving Dorothy's property and transactions involving Dorothy's property. Some of them are named in our response.

And with regard to the documents relating to the Mexico businesses, Mr. Shelby Longoria has access to those and he lives in Texas. He runs those businesses from here. He rarely goes to Mexico. The best way to see the flaw in their analysis is to think of a simple example, imagine a trustee in Texas administering a trust for a beneficiary who is in Texas, so Chase Bank, for example, managing a trust for a resident of Houston, but the conference of the trust is a bank account in Switzerland, and supposedly that that Trustee, with malice a forethought, siphoned off money out of that Swiss bank account and flagrantly breaches the fiduciary duty to the Beneficiary. Does the Beneficiary have to sue the Trustee in Switzerland? Of course not. Just because the assets are in another nation does not mean that this is not at cause of action in a Texas Court under Texas law. And that's crystal clear. That's all that we are talking about here. Mr. Carter chided us for amending our pleading, but, I'm sorry, the law allows that. The law allows it. We amended our pleading to make it crystal clear, we are asserting only claims under Texas law and claims that arose in Texas. With regard to the community property issue, that affects part of our case but not all of it. It is beyond dispute that Dorothy and Eduardo Longoria were married

in Texas. They subsequently went through a marriage ritual in Mexico but that is a legal nullity. The marriage -- they became married in Texas and once you're married you can't get married again unless the marriage is annulled or terminated in some way. They had community property estate under Texas law. We have carried our burden to prove community property estate by proving they were married in Texas. So the burden shifts to Shelby Longoria to show that that community property estate was terminated. If he is relying on something that happened in Mexico, so be it. He is entitled to try to prove that. But it is his burden on his affirmative defense. His affirmative defense can't yank the whole case into Mexico.

My final point is the most important. There are four parties to this case that they are trying to terminate. There is the Executor, who filed counterclaims against Shelby Longoria, and then he, as a counter-defendant, filed third party claims against his sisters, Sylvia and Adriana. Of those four parties, how many live in Mexico? Zero. How many live in Texas? All of them. They cite not one case anywhere in the country where all of the parties were in the forum and the case was still transferred for forum non conveniens. It is unheard of, unprecedented.

If the Court granted this motion, it would be turning one case into three, because Will contest would stay here, we would have a proceeding in Mexico, which they say is

an adequate and available remedy for us, that there is a case down there that we can pursue, and then if we prevailed, there would be the third party litigation back here, because no Mexican court has jurisdiction over Sylvia and Adriana who live here in Houston. One case would be turned into three. That doesn't sound very convenient or judicial efficient. It's a case based on Texas law, arising in Texas between Texas citizens. The motion should be denied.

Very quickly on abatement. They say the case should be abated because they might win their Will contest and Tommy might be removed as Executor. Well, at this point they have offered no evidence to the Court that any of that is true. There is no evidence of misappropriation of assets by Sylvia and she categorically denies that, and there is no evidence of a subsequent Will. They haven't offered a subsequent Will. The 2011 document he mentioned is you facially unenforceable, not a valid Will at all. It was notarized and one of the people that signed it was an interested person, a legatee named in the Will. That's why we didn't offer you that one. This Will that we offered to probate and that was admitted to probate was written by a lawyer who met multiple times with Dorothy Longoria. It was witnessed by two other lawyers. Three officers of the Court will testify they saw her sign the Will and questioned her about it. The alleged undue influencers weren't even in the room. Weren't even in the

building. Dorothy Longoria, the Testatrix, wrote the check to pay the lawyer to prepare the Will. She was as sharp as can be. She wrote a lot of checks. Her handwriting was clear and clean. She used a computer. And a small army of doctors and caregivers are going to testify she was perfectly competent in January of 2010. So with all due respect, we do not agree that this will contest has any realistic chance of success. It was just a retaliatory move on the part Mr. Longoria.

With regard to the alleged misappropriation, Shelby Longoria has no standing to complain about that because he is not a beneficiary under the Will that was admitted to probate. So that's a red herring. I respectfully request that both motions be denied.

THE COURT: All right, thank you. And so we are going to take a break, as I said. Let's say we start up at 12:15. And one question, I noticed there are obviously there are affidavits attached to the response and the motion. Are the witnesses different from the people who have done the affidavits?

MR. CARTER: Your Honor, our witnesses are the same, which is Shelby Longoria and Carlos Gabaurdi. We also have the affidavit of the lawyer proving up some additional documents but, obviously, you wouldn't visit that.

THE COURT: And you have objected to the affidavits in some respects?

MR. FISHER: In some respects. I have withdrawn my objection to their expert's affidavit and I have agreed that certain exhibits can be admitted.

THE COURT: Okay. All right, and on your response, are you -- you have attached affidavits or an affidavit?

MR. FISHER: One affidavit of our expert. And he is here. I would like to present at least a few minutes of his testimony, Your Honor.

THE COURT: Sure. I will see y'all at 12:15.

C E R T I F I C A T E

COUNTY   OF   HARRIS   *
STATE    OF   TEXAS    *

        I, Donald G. Pylant, Official Court Reporter in and for Probate Court No. 1 of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occured in open court or in chambers and were reported by me.
        I further certify that this Reporter's Record truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence by the respective parties.
        I further certify that the total cost for the preparation of this Reporter's Record is $186.00 and will be paid by _Richard Hess_____.

        Given under my hand and seal of office this the 25 day of _October_, 2014.

Donald G. Pylant, C.S.R.
Official Court Reporter
in and for the County of
Harris and the State of
T E X A S.

Certification No. 668    Exp. Date: 12-31-2014
Probate Court No. One 201 Caroline Street, 6th fl.
Houston, Texas 77002 (713) 368-6692

TRIAL COURT CAUSE NUMBER 414,270

IN THE ESTATE OF            *        IN  THE PROBATE COURT OF

                           *

DOROTHY LOUISE LONGORIA,    *        HARRIS COUNTY, T E X A S

                           *

DECEASED                    *        COURT   NUMBER   (1)  ONE


MOTION TO DISMISS COUNTERCLAIMS AND MOTION TO COMPEL AND FOR

SANCTIONS AND RESPONSE AND OBJECTION TO MOTION TO QUASH HEARING


Came to be heard on this the 3rd day of October, 2013, Motion to Dismiss Counterclaims and Motion to Compel and for Sanctions and Response and Objection to Motion to Quash Hearing, in the above-entitled and numbered cause, and all parties appeared in person and/or being represented by Counsel of Record, before the Honorable Loyd Wright, Judge Presiding.


**VOLUME 1 OF 1**



**O R I G I N A L**

APPEARANCES

Attorney for Plaintiff, Shelby Longoria:

> Richard W. Hess
> State Bar No. 24046070
> 1000 Louisiana, Suite 5100
> Houston, TX 77002-5100
> Telephone:  713.651.9366

Attorney for Defendant, Counter-Plaintiff James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased:

> James Austin Fisher
> State Bar No. 07051650
> 2800 Lincoln Plaza
> 500 North Akard Street
> Dallas, Texas 75201
> Telephone:  214.661.9400

00885

CHRONOLOGICAL INDEX

Page

Court calls case............................ 9

Plaintiff to call witnesses.................. 9

Resolved objections......................... 9

No objections to exhibits................... 9

Exception to admission of exhibits.......... 10

Shelby Longoria Direct Examination.......... 13

P-1 offered into evidence................... 23

P-1 admitted into evidence.................. 24

Shelby Longoria cross examination........... 38

D-3 offered into evidence................... 39

D-3 admitted into evidence.................. 39

D-4 offered into evidence................... 46

D-4 admitted into evidence.................. 46

D-5 offered into evidence................... 47

D-5 admitted into evidence.................. 47

D-6 offered into evidence................... 51

D-6 admitted into evidence.................. 51

Mr. Hess offers Gabaurdi Affidavit.......... 52

Court admits Gabaurdi affidavit............. 53

Carlos Gabuardi Direct Examination.......... 53

Carlos Gabuardi Cross Examination........... 68

D-2 offered into evidence................... 72

D-2 admitted into evidence.................. 72

00886

4

CHRONOLOGICAL INDEX

(Continued)                                     Page

Carlos Gabuardi Redirect Examination........ 75

Carlos Gabaurdi Questions by Court.......... 76

Movant rests................................ 79

Fernando Calles Direct Examination.......... 79

Fernando Calles Cross Examination........... 84

Ilan Rosenberg Direct Examination........... 86

Mr. Fisher requests judicial notice......... 108

Mr. Hess requests judicial notice.......... 109

The Court takes judicial notice............ 110

Mr. Fisher will not voluntarily submit

Sylvia Longoria to jurisdiction

of Mexican court........................... 110

Mr. Fisher rests........................... 110

00887

WITNESS INDEX

Page

Shelby Longoria

Direct Examination by Mr. Hess.............. 13

Cross Examination by Mr. Fisher............ 38


CARLOS GABAURDI

Direct Examination by Mr. Hess.............. 53

Cross Examination by Mr. Fisher............ 68

Redirect Examination by Mr. Hess........... 75

Examination by the Court................... 76


FERNANDO CALLES

Direct Examination by Mr. Fisher........... 79

Cross Examination by Mr. Hess.............. 84

EXHIBIT INDEX

Page

Exhibit A

(Will of Dorothy Longoria dated 1-9-60)

Exhibit D

(Will of Dorothy Longoria dated 4-6-88)

Exhibit E

(Will of Dorothy Longoria dated 4-27-89)

Exhibit F

(Wish Letter of Eduardo Longoria, Sr.)

Exhibit H

(Trust dated 10-15-02)

Exhibit I

(Will of Eduardo Longoria Theriot dated 10-15-02)

Exhibit K

(Private Agreement of Sylvia dated 12-17-02)

Exhibit L

(Private Agreement of Adriana dated 12-17-02)

Exhibit M

(Page 1 & 2 of Release Agreement dated 12-29-06)

Offered by Agreement............    9

Agreed by Mr. Fisher............   10

EXHIBIT INDEX

(continued)                                              Page

Plaintiff's Exhibit No. 1

(Letter from Eduardo & Shelby to Dorothy)

     Offered.......................... 23

     Admitted......................... 24


Affidavit of Dr. Carlos Gabaurdi

     Offered.......................... 92

     Addmitted........................ 92


Defendant's Exhibit No. 1

(Affidavit of Ilan Rosenberg)

     Offered.......................... 91

     Admitted......................... 91


Defendant's Exhibit No. 2

(Travel Warning)

     Offered.......................... 72

     Admitted......................... 72


Defendant's Exhibit No. 3

(Shelby Longoria's Response to Request for Disclosure)

     Offered.......................... 39

     Admitted......................... 39

EXHIBIT INDEX

(continued)                                                    Page

Defendant's Exhibit No. 4

(Certificate of Marriage)

      Offered.......................... 46

      Admitted......................... 46


Defendant's Exhibit No. 5

(Letter to Dorothy Longoria dated 10-9-07)

      Offered.......................... 47

      Admitted......................... 47


Defendant's Exhibit No. 6

(Letter of Intent dated 3-29-07)

      Offered.......................... 51

      Admitted......................... 51

THE COURT: This is your motion, right?

MR. FISHER: Yes, sir.

THE COURT: And the only way there is a little confusion is, early on you were thinking that you weren't going to put on witnesses but now we know that witnesses are going to testify, and since it is your motion, I'm going to let you take the lead in terms of calling witnesses unless you want to defer to them first and just have an agreement that they will put on their witnesses and then you put on your witnesses.

MR. FISHER: We will call witnesses, Your Honor.

THE COURT: Okay.

MR. FISHER: We will call Shelby Longoria.

MR. HESS: Before Mr. Longoria takes the stand, I'm pleased to report that we have met with counsel for the Executor and resolved some objections as to the particular documents attached to Mr. Longoria's affidavit, so in the interest of streamlining Mr. Longoria's testimony. We will still hear from him, but I would like to go ahead and read for the record the exhibits to his affidavit which has already been filed to which there was no longer an objection.

THE COURT: Okay.

MR. HESS: We have -- these are the attachments to the Shelby Longoria affidavit filed with the Court on August 9th of this year. My understanding, from speaking with counsel for the Executor, there is no objection to Exhibits A, D, E and

I, all of which are previous Wills executed by Dorothy Longoria and Eduardo Longoria. There is no objection to Exhibit H to Mr. Longoria's affidavit, which is the 2002 Trust. There is no objection to the private agreements entered by Adriana Longoria and Sylvia Dorsey. That's Exhibit K and L. There is no objection to the letter as Exhibit F, and there is no objection to a portion of an Exhibit M, as in Mary, which is a settlement agreement. There is an objection to the portion that lists, at the end of the agreement, particular dollar figures, but I don't think that's going to be an issue. I'm not going to speak to that portion, and just to confirm with counsel, that's their understanding as well.

MR. FISHER: Your Honor, that is correct, with the clarification that this stipulation is solely for the purpose of this hearing. We reserve all rights to object to admission of those items in any future proceeding. But for the limited purpose of this hearing and the Motion to Dismiss to form and convenience, we stipulate to the admission of Exhibits A, D, E, I, H, K, L, F, and the first two pages of Exhibit M. Thank you.

THE COURT: And that was the D as in Dog?

MR. FISHER: Yes, sir. Sorry, I'm losing my voice.

THE COURT: No, that's all right. I just wanted to make sure I heard it correctly.

MR. HESS: There may be no objection to one additional exhibit attached to Mr. Longoria's affidavit based on the argument from Mr. Fisher early today, and that is Exhibit B, as in Boy. That is the 1983 Separate Property Agreement that's been entered as a judgment in a court in Mexico. I understand from the argument earlier today that the Executor is not challenging the validity of the Separate Property Agreement, Exhibit B, and so I assume based on that, there is no objection to its admissibility as an exhibit just for the purposes of this hearing.

MR. FISHER: That was incorrect. We do object to admission of Exhibit B, Your Honor.

THE COURT: Okay.

MR. FISHER: It's not because we have a claim that that judgment should be set aside, but I don't think that this is properly proven up. I don't believe the translation is properly verified, and I don't believe the testimony about it is accurate. It is described as an agreement and it is not an agreement at all. It's not signed by Dorothy Longoria.

THE COURT: Okay.

MR. HESS: Your Honor, if I may, simply to streamline the process, this is a translation that is certified by the translator. There is a signed statement at the end of the translation by the translator who is certified by the Supreme Court for the courts in Mexico to provide these

translations. And if there an objection to a translation, Texas Rule of Evidence 1009 provides a procedure of resolving that. It requires the objector to provide a specific -- you have to point out the specific inaccuracy or offer competing translation. That hasn't happened here and we are simply asking the Court to permit the admissibility of this particular document just for the purpose of this hearing.

MR. FISHER: Your Honor, that is true only if the translation has been properly certified and, unfortunately, this one was not.

THE COURT: Well, y'all have an agreement as to certain of the objections. I'm assuming this is -- these are your amended objections, correct?

MR. FISHER: Yes, Your Honor.

THE COURT: And they contain all the objections that you had to the attachments, correct?

MR. FISHER: Actually, this is an addition and I would say it is subsumed in the hearsay objection.

THE COURT: Okay. But my point is, that y'all have a certain agreement as to a part of the documents attached.

MR. FISHER: Yes.

THE COURT: And I'm still going to be in a position when I review all of this to go through your objections that are still there to see if they are valid.

MR. FISHER: Yes, Your Honor.

THE COURT: That's the process I will go through. And taking that into account, I will also determine the outcome of the motion itself and taking into account your response.

MR. HESS: Thank you.

THE COURT: So I'm glad y'all agree to some of it. But it is still my task to consider the objections and their validity as I go through the whole process of this.

MR. FISHER: Thank you.

MR. HESS: Thank you. Well, if there is nothing further, we will call to the stand Mr. Shelby Longoria.

THE COURT: Okay.

SHELBY LONGORIA

called as a witness, after first having been duly sworn, testified as follows:

DIRECT EXAMINATION

Questions By Mr. Hess:

Q. Mr. Longoria, could you please give us your full name for the benefit of the record and the court reporter?

A. Shelby Longoria.

Q. How old are you, Mr. Longoria?

A. Sixty-one.

Q. Where were you born?

A. In Laredo, Texas.

Q. What is your nationality?

A. I have dual citizenship in Mexico and the US.

Q. Why are you a dual citizen?

A. I was born of Mexican parents and grew up in Mexico but I was born in the US so that allowed me to have dual citizenship.

Q. Are you married?

A. Yes, sir.

Q. How long have you been married?

A. Thirty-four years.

Q. Is your spouse in the courtroom today?

A. Yes, she is.

Q. Who is your spouse?

A. Tita Longoria.

Q. Do you have any children?

A. Yes, I do.

Q. Who are they?

A. Adrian is my oldest daughter, 33 years old, Sarah, my middle daughter, she is 26, I mean, 30 years old, and my son, Shelby, is 27.

Q. Where do you and Tita live?

A. We live in McAllen, Texas.

Q. Why do you and Tita live in McAllen?

A. Tita is originally from Brownsville, I'm from Nuevo Laredo, and when we got married, I didn't want to live in Nuevo

Laredo and we just decided halfway it was a good place to live and it was also geographically in a good place as far as the business was concerned but our original idea was to live in Reynosa, Mexico, but we couldn't find a place to live in Reynosa.

Q. Where did you grow up?

A. In Nuevo Laredo.

Q. Did you go to school in Nuevo Laredo?

A. Yes, I did.

Q. Did you continue your education in the United States?

A. Yes, I went to high school in Austin, Texas.

Q. I know you have siblings. Can you tell us who they are and how old they are?

A. My oldest sibling is Deanna. I believe she is seventy. My next in line is my brother Wayo. I believe he is 67 or 68. Then Sylvia. I believe she is 66. Somewhere around there.

Q. And did you attend college?

A. Yes, I did.

Q. And where did you go?

A. Trinity University in San Antonio.

Q. And did you get a degree?

A. Yes, I did.

Q. What was your degree?

A. A business degree.

Q.   What did you do upon your graduation from Trinity University?

A.   I went to back to Nuevo Laredo to help out with my dad in the business.

Q.   Let's talk a little bit about the business that you worked in with your father.  Can you tell the Court a little bit about the family business and what it was like back in 1975?  What kind of businesses were you involved in?

A.   My father was involved with his four other brothers, so there were five brothers, and they would split up their tasks.  They were involved in different businesses, so my dad was involved with Chevrolet dealerships and I think a couple of ranches.

Q.   Did the business back in 1975 have other types of businesses it was involved in?

A.   Yes, the brothers were involved in -- their main business was the cotton business and the banking business.

Q.   How did the business change over time?

A.   Well, in 1976 was a very bad year for Mexico.  There was a big devaluation.  There hadn't been a devaluation in Mexico for approximately 20 years.  So when we get the exchange rate goes from twelve-fifty to double, so it's a one hundred percent devaluation, that creates economic chaos in Mexico, so it was a very difficult time.  And that happened subsequently every new president, every six years, so for 25 years Mexico

had a difficult economic time, so the businesses suffered.

Q. You were working in Mexico for or with your father, did your brother work with you as well?

A. Yes. When my brother got out of school, he went to work for the family in the cotton business in Baja, California, and I don't remember how long he was there. Two or three, four years. And then after that, he came back to Nuevo Laredo to help my dad.

Q. What were your sisters doing at this time?

A. I believe they were both married and they either lived in -- I think Sylvia lived in Houston when she got married and my sister Adriana lived in Laredo for a while and then later moved to Houston.

Q. Did your sisters have a role in helping with the family business?

A. No, they did not.

Q. And what is your sense as why your sisters were not involved in running the business?

A. I don't think they had any interest in being involved in the business and I don't think they had any interest in living on the border.

Q. Where did they work?

A. Well, I don't believe my sister Adriana has ever worked and I think Sylvia, when she moved to Houston, she opened up the store.

Q.   Was there a point in time where you took on most of the responsibility of running the Mexico businesses?

A.   Yes, I did.  When my brother decided to move to Austin.  And I believe that was around 1978 or 1979.

Q.   When you took over most of the responsibilities, what was your father doing?

A.   He was mostly retired.

Q.   What did he do in his retirement?

A.   My dad loved the ranch and he loved to play golf.

Q.   Where was your father's ranch located?

A.   It was in -- there is a town called Columbia which is in Mexico, maybe about 30 miles northwest of Nuevo Laredo, on the Mexico side.

Q.   Now let's, just to close and complete the picture, tell me about the Mexico businesses today.  What businesses are you in involved in today compared to 1975?

A.   Well, I guess if you could take a picture of 1975 with a picture today, there is absolutely no similarity.  The businesses have been able to grow and prosper.  Mexico as a country has done better.  So the businesses that were involved in then, they have grown to other areas.  For instance, the restaurant business and the finance business.

Q.   And where are all of these Mexican businesses located today?

A.   In various states in Mexico.

Q.   And who owns the Mexican businesses?

A.   The Mexican Trust.

Q.   What Mexican Trust?

A.   It's called the Afirme Trust.

Q.   When was that Trust executed?

A.   In 2002.

Q.   Were these Mexican businesses always successful over the last 40 years?

A.   No.

Q.   But today how are the businesses doing?

A.   Business is better.

Q.   How often are you in Mexico today for your work?

A.   I'm in Mexico quite a bit.  I travel throughout the area where the business is located, and it's just -- depends on what trips and what activities I have going on and when I'm in McAllen I frequently go to my office in Reynosa.

Q.   And when you say quite a bit, is that a couple of times a year or a couple of times a month?

A.   No, much more than that.  Like when I'm in McAllen, I go two, three, four times a week to Reynosa and to other areas.

Q.   It was suggested earlier today that you rarely go to Mexico and that you operate your business from Texas.  Is that true?

A.   That's not true.

Q.   What parts of Mexico do you travel to?

A.    On the border, I travel to Reynosa.  I travel to Matomoros, to Reo Bravo.  I travel to Miguel Aleman, Nuevo Laredo, Piedras Negras.  That's mostly on the border.  And when I travel into the interior, I travel to Mexico City, Monterrey, Tampico, various cities in Vera Cruz, Porto de la Cruz.  I travel to Costa Rica de la Cruz.  I travel to Casa Qualcos.  I travel to Carretica Puebla, to Dia maso Tabasco, Campeche, duce la Guitierrez and in Chiapas.  I travel to many areas.

Q.    Have you now named all the cities in Mexico?

A.    No, not quite.

Q.    When you travel to Mexico, how do you get there?

A.    On the border, I drive.  And once in the interior, I usually fly.

Q.    Do you travel with security guards when you go to cities in Mexico?

A.    No, I don't.

Q.    Isn't it dangerous for you to be driving around Mexican border towns?

A.    Well, I've been doing it all my life and I guess just like any situation, you use common sense and, just like in any city, at particular times maybe in the US could be dangerous, so I just use common sense and be careful.

Q.    And have you ever hired private security for your travels in Mexico?

A.    No, I have not.

Q. And I want to turn your focus to the subject that brings you here today, the lawsuit. At some point somebody filed a lawsuit. Did you initiate a lawsuit here in Houston Probate Court?

A. No, I did not.

Q. Who did?

A. Tommy Dorsey on behalf of my mom's estate.

Q. When did you first learn that you were going to get sued?

A. I received a call from my brother Wayo maybe a few before this happened and he informed me that he had spoken to my nephew, Raymond Hart, that they had made the decision to file the lawsuit, and he was very sorry that that was going to happen.

Q. And when did you actually get the lawsuit?

A. I don't remember specifically but it must have been a few days after his phone call I got served at my house.

Q. And your house today is where?

A. In McAllen, Texas.

Q. What was your reaction when your brother, Wayo let you know that you were going to be sued?

A. Well, I was devastated. I was very hurt by what they were, I mean, I didn't know exactly how it was going to happen and exactly who was going to file the lawsuit, so it was just very, very -- I was very disappointed.

Q. What did it mean to you that you were being sued by your mother's estate?

MR. FISHER: Objection, irrelevant to the issue before the Court, which is a Motion to Dismiss for forum non conveniens.

THE COURT: Sustained.

Q. (By Mr. Hess) Were you ever estranged from your mother?

A. Never.

Q. Did you know that the original lawsuit filed against you got dismissed by the person who filed it?

A. Yes.

Q. Did you know that the Executor then filed new Counterclaims in response to your Will Contest?

A. Yes.

MR. HESS: Your Honor, may I approach?

THE COURT: You may.

MR. HESS: I'm handing the Original Counterclaims of Shelby Longoria's Will Contest to opposing counsel. May I approach the witness?

THE COURT: You may.

Q. (By Mr. Hess) Now, do you have before you the Original Counterclaims to Shelby Longoria's Will Contest?

A. Yes.

Q. Would you look at paragraph 16, please?

A. Okay.

Q. You see paragraph 16 referencing a letter dated August 5, 1983?

A. Yes, I do.

MR. HESS: I have a document marked Dorsey 3595 I'm showing to opposing counsel. I would like to mark this for identification.

**(At which time the court reporter marked said instrument, for identification purposes only, as Plaintiff's Exhibit 1.)**

Q. (By Mr. Hess) Mr. Longoria, I'm handing you Plaintiff's Exhibit 1. Do you recognize Exhibit Plaintiff's 1?

A. Yes.

Q. What is Exhibit Plaintiff's 1?

A. It is a letter written to my mom and written by my brother, Wayo, dated August 5th, 1983.

Q. Do you recognize the handwriting on Plaintiff's 1?

A. Yes, I do.

Q. Whose is it?

A. My brother, Wayo.

Q. How are you familiar with your brother's handwriting?

A. I have seen his handwriting over the years.

MR. HESS: Move the admission of exhibit Plaintiff's 1.

THE COURT: Any objection?

MR. FISHER: No objection.

THE COURT: Plaintiff's Exhibit 1 is admitted.

Q. (By Mr. Hess) Mr. Longoria, is Plaintiff's Exhibit 1 the August 5, 1983 letter that appears to be referred to in the counter-claims of the Amended Will Contest in paragraph 16?

A. Yes, it is.

MR. HESS: Your Honor, may I approach?

THE COURT: Yes.

Q. (By Mr. Hess) This appears to be a letter addressed to Dorothy Longoria, correct?

A. Yes, it does.

Q. Did you sign this letter along with your brother, Wayo?

A. Yes.

Q. Where did your mother live in 1983 at the time that this letter was written?

A. Nuevo Laredo, Mexico.

Q. While this letter is addressed to a P O box in Laredo, Texas, right?

A. Yes, that's a common practice for people who live on the border in a Mexican town, they usually have a P O box on the US side if they are getting correspondence from the United States. It's going to get there a lot quicker than finding its way through the mail system in Mexico.

Q. If you look at the second page of Plaintiff's 1, it appears to be on a letterhead for someone?

A.    Yes.

Q.    And who is that?

A.    That's my dad's.

Q.    And the address underneath his name?

A.    Yes.

Q.    And what's his address?

A.    P O Box 1316 Laredo, Texas, and his P O Box in Mexico A pdo. Postal 100, N. Laredo, Tamps., Mexico.

Q.    And you can see that the address underneath his name in Laredo, Texas is the same as the address on the envelope?

A.    That is correct.

Q.    This letter is not too long.  Let's take a look at it each sentence.

A.    Okay.

Q.    In fact, why don't you read it?

A.    "To Dorothy Kowalski de Longoria Dear Mom, Shelby and I are writing you this letter with a great deal of love and respect."

Q.    So this document is written by whom?

A.    It's written by my brother.

Q.    All right, keep going.

A.    "We want you to know that the assets that Dad has willed to us, as long as you live, we will hold them as if they were yours."

Q.    Have you seen a portion of that sentence quoted in

the Executor's Amended Counter-Claims?

A. Yes.

Q. Was it accurate in the Amended Counter-Claims?

A. Well, no it says, "the assets that Daddy," I never called my father Daddy.

Q. Read the next sentence, please?

A. "We will make the fruits available to you for your direction as to their use."

Q. Did you honor your mother's wishes whenever she wanted money?

A. Yes.

Q. The sentence right before that one, the one that's quoted incorrectly in the counter-claim, were you and Wayo telling your mother in this letter that you are giving her the assets that Dad willed to you?

A. Absolutely not.

Q. What are you telling her?

A. Well, we can read it again together. I think it's very clear. "We want you to know that the assets that Dad has willed to us, as long as you live, we will hold them as if they were yours." I don't know what other clarification I may be able to provide.

Q. Will you read the next sentence after the next one?

A. "We will make the fruits able to you for your direction as to their use."

Q. And the next one?

A. "This letter has value to only you."

Q. Was this letter intended to give some rights to your sisters?

A. Absolutely not.

Q. And the next sentence, please, Mr. Longoria?

A. "Because of our commitment to your well-being and happiness, more importantly than the worldly goods is our promise to always care for your you and to provide for your spiritual needs."

Q. And the final sentence?

A. "We hereby pledge to you our unending devotion. Your sons."

Q. Did you mean that when you signed the letter stating that to your mother?

A. Well, I don't remember this letter and I hadn't seen it up until recently but, yes, I love my mom.

Q. How long ago was this letter written?

A. Over 30 years ago.

Q. Do you remember seeing exhibit Plaintiff's 1 at any time in the last 30 years before last week?

A. No.

Q. What can you tell the Court about why this letter was sent to your mother?

A. Well, reading it now, obviously, we loved our mother

very much and we obviously wanted to provide comfort to her.

Q. To your knowledge, did your parents have attorneys and advisers to assist them with their estate planning?

A. Yes.

Q. Is this August 5th, 1983 letter a document by which it intended to establish some kind of a trust to your mother 30 years ago?

A. Absolutely not.

Q. Have you ever heard anyone before last week ever claim that this 30-year-old letter created a private trust, expressed trust, or any kind of trust?

A. Never heard that.

Q. Were you, in fact, committed to your mother's well-being and happiness?

A. Yes, I was.

Q. And did you promise your mother to always care for her and to provide for her spiritual needs?

A. Yes, I did.

Q. Did you did you keep those promises her entire lifetime?

A. Yes, sir, I did.

Q. I want to step back now and ask you a few questions about your parents' estate planning. What is your understanding as to your parents' basic wishes as it relates to yours and your siblings inheritance?

A.   It's really very simple, their idea was for the boys to have the business and the girls to have cash.   The boys to take all the risk, take all the business risks, and he did not and my mom, they didn't want the girls to take the business risk and he wanted them to have cash.

Q.   What is your understanding of why your parents wanted to divide the assets that way?

A.   Well, I don't think my sisters had shown any interest to participate in Mexico in Mexican businesses and it was my parents wish that we would be the ones to carry that torch and to work on the Mexican businesses.

Q.   Did your parents inform you and your siblings about how they intended to divide their assets?

A.   It was talked about many times.

Q.   Did your sisters know just as well as you knew what your parents plans for them was?

A.   Absolutely.

Q.   And how do you know that?

A.   We talked about it and it was a common discussion.

Q.   Did your parents document these wishes in various written instruments over the years?

A.   Yes, they did.

Q.   And why would your sisters be receiving their inheritances while your parents were still alive?

MR. FISHER:   Objection, calls for speculation.

THE COURT: Overruled.

Q. (By Mr. Hess) Why would your parents, pardon me, why would your sisters receive their inheritances while your parents were still alive?

A. Very simple, they were always asking for money and they were always needing money.

Q. You mentioned a Trust earlier in your testimony that owned the Mexican businesses, when was this trust created?

A. In 2002.

Q. And who were the Beneficiaries of the Trust?

A. My father was the first Beneficiary and my brother and I were second Beneficiaries.

Q. Did your sisters know that your father had created the Trust?

A. Absolutely.

Q. How do you know that?

A. They signed the private agreement which spelled out the arrangement with the Trust and the arrangement with them as far as their inheritance derived from the wish letter. And if I may add, that agreement also specified that for jurisdiction purposes, it would be in Reynosa, Mexico, which they agreed to.

Q. Are you aware of a separate property agreement executed by your parents?

A. Yes, I am.

Q. What can you tell the Court about that agreement?

A.   It's -- the agreement was done in 1983 by my parents long-term attorney, Mario Gonzalez in Nuevo Laredo, Mexico. It's a very comprehensive agreement.  It was -- there were appraisers involved to make sure that there was an equitable distribution, and it was ratified by the Mexican court or there was a Judgment ratified by the Mexican court.

Q.   What did this agreement specify as to your mother's potential community property?

MR. FISHER:  Objection, violates the best evidence rule.  The agreement has to speak for itself.

THE COURT:  Overruled.

A.   Can you ask me again?

Q.   (By Mr. Hess)  Sure.  What did this separate property agreement from 1983 specify about your mother's community property interest, if any?

A.   It was going to be separated and from thereon they were subject to the separate property regime.

Q.   To the best of your knowledge, Mr. Longoria, did your mother have any community property after 1983?

A.   To the best of my knowledge, no.

Q.   How do you know that your parents executed an agreement partitioning their community property and subjecting their marriage to a separate property regime?

A.   Because I have seen the agreement and I have spoken to the attorney that drew it.

Q.   Have you seen that separate property agreement in the last few months?

A.   I saw it about two months ago, maybe.

Q.   Is a true and correct copy of it attached to your affidavit?

A.   Yes.

Q.   Have you seen references to the separate property agreement in other agreements executed by your mother?

A.   Yes, I have.

Q.   I want to talk a little bit about your parents connections to Mexico.  Where did your parents live for most of their marriage?

A.   In Mexico.

Q.   What part?

A.   In Nuevo Laredo.

Q.   But at some point didn't they move to the United States?

A.   Yes.

Q.   When was that?

A.   It was 1987, maybe '88.

Q.   And to where did they move?

A.   They moved to Laredo, Texas.

Q.   Where in Laredo?

A.   At the Laredo Country Club.

Q.   Why did they move to the Laredo Country Club?

A.  It was just being built and it had a golf course and he wanted to be by the golf course.

Q.  Was your dad much of a golfer?

A.  He was a golfer, yes.

Q.  Did your parents retain their Mexican citizenship when they moved to the United States?

A.  Yes, they did.

Q.  How close was your parents' house in Laredo to Mexico?

A.  Very close.  I mean, three miles maybe, four miles.

Q.  How often did your father return to Mexico when he was living in Laredo?

A.  When they first moved over there, very often.  He would go to the ranch on a regular basis.

Q.  Where was the ranch, again?

A.  It was maybe thirty minutes crossing the border on the Columbia Bridge on the Mexico side.  And he would always go to his office.  He retained an office in Nuevo Laredo.

Q.  And when your parents moved to Laredo, did your father change his legal domicile?

A.  No.

Q.  Where did he remain domiciled?

A.  In Mexico.

Q.  Why?

A.  Well, his intent was always to be in Mexico.  His

business relationships were in Mexico, and I guess most importantly, it allowed him to distribute gifts to his daughters tax free.

Q. What year did your father pass away?

A. 2005.

Q. Did he have any instructions about where he wanted to be buried?

A. Yes, he did.

Q. Where?

A. In Nuevo Laredo. He had already purchased the cemetery plot, the family cemetery plot.

Q. Were you there in Nuevo Laredo when he was buried?

A. Yes, I was there.

Q. After your father died, did your older sisters continue to receive payments of their inheritance under private agreements?

A. Yes, they did.

Q. I'm sorry?

A. Please reask the question, I'm sorry.

Q. Did your older sisters continue to receive payments under their agreements after your father died?

A. Yes, they did.

Q. How did they receive the payments?

A. It was deposited in their Mexican account.

Q. Who was responsible for making sure that that

happened?

A. People at the office.

Q. At some point, did one of your sisters ask if she could receive the rest of her inheritance faster than called for in her agreement?

A. Yes.

Q. What was that?

A. Well, Sylvia had requested that she wanted to get paid as quickly as possible, and that's the way she made the request.

Q. What did you do when you became aware of Sylvia's request?

A. Well, I spoke to people at the office and the attorney that set up the Trust and to see, first of all, if the business could do it, if they had sufficient cash flow to do what Sylvia wanted, and the other thing is I wanted to call my other sister, Adriana, because we definitely couldn't do both sisters, so I called Adriana to see if it was okay with her and she told me that it was okay with her.

Q. How much cash or properties did the sisters receive under their private agreements?

A. It specified $3 million each, but that doesn't count the money that they had received prior to that from my parents' money and properties.

Q. After your father passed way, did your mom move from

Laredo?

A. Yes.

Q. Where did she go?

A. To Houston.

Q. What did you do to take care of your mother after your dad passed way?

A. Well, I continued to do my part in supporting her.

Q. How would you support her?

A. The company would send the money that was required for her to live in the style that she was accustomed and to provide anything that she wanted.

Q. How would you learn how much money your mother required to live in the way she was accustomed?

A. My sister Sylvia would let us know and she had contact with people at the office or would let me know.

Q. How much money on average did you send to your mother's account every month?

A. I think if there was an average, around two hundred to two hundred and fifty thousand dollars a year.

Q. Where would that money get deposited?

A. It would eventually get deposited into my Mom's account in her bank in Houston.

Q. Did you have the rights to or signatory on that account?

A. No, I did not.

Q. Who did?

A. My mom and Sylvia.

Q. Did you learn at some point this summer that your sisters and an attorney on your mother's behalf or on behalf of her Estate had sued you in Mexico?

A. Yes.

Q. Have you submitted to the jurisdiction of the Mexican courts?

A. Yes, I have.

Q. If this Court were to condition a dismissal of the counterclaims against you on your willingness to waive the statute of limitations defense in Mexico, would you do it?

A. Yes, I would.

Q. If this Court were to condition a dismissal of the counterclaims on your willingness to submit to the jurisdictions of both federal and state courts in Mexico, would you do it?

A. Yes, I would.

Q. Thank you for your time.

MR. HESS: I pass the witness.

THE COURT: All right.

MR. FISHER: May I approach the witness, Your Honor?

THE COURT: You may.

MR. FISHER: Your Honor, I have marked some of

these just as Exhibit without Defendant or Respondent designation. Would the Court prefer a different way?

THE COURT: Say that again?

MR. FISHER: My exhibit stickers just say Exhibit 3, they don't say Respondent's Exhibit 3 or Defendant's Exhibit 3.

THE COURT: You can just put a D or an R just to sort of differentiate it.

CROSS-EXAMINATION

Questions By Mr. Fisher:

Q. Mr. Longoria, I'm handing you a document that's been marked Exhibit D-3. It's entitled Shelby Longoria's Response to Request for Disclosure. In the course of this lawsuit, have you helped gather information that needed to be provided?

A. I have tried to be as helpful as I can.

Q. And is one of the things that you did is gather names and addresses of people that might know something about the case?

A. Yes.

Q. And would you please turn to -- do you recognize this document as your response to a request that was submitted in the course of this case?

A. I have seen a lot of documents but I want to say, yes, I probably have.

Q. And please turn to page 2, if you would please look

at the bottom, request for disclose E asks for the name, address and telephone number of persons having knowledge of relevant facts and a brief statement of each identified person's connection with the case, and the first person you list is your sister Sylvia, right?

A.    Uh-huh, yes.

Q.    And you list her husband, Tommy Dorsey, right?

A.    Right.

Q.    You list your brother Wayo, right?

A.    Correct.

Q.    And you list your sister Adriana, right?

A.    Correct.

Q.    You list several more people?

A.    Right.

Q.    How many of the people you list live in Mexico?

A.    Well, I'm looking at the list.  Well, the ones that are here live in the US.

Q.    All of them?

A.    It appears to be.

MR. FISHER:  Your Honor, I move for the admission of D-3.

THE COURT:  Any objection?

MR. HESS:  No.

THE COURT:  Exhibit D, 36789, is admitted.  I will represent to the Court and can testify that this

disclosure has never been supplemented by the movant.

Q. Now, you testified that you live in McAllen. When did you first move to McAllen?

A. In 1979.

Q. Okay, and you lived there ever since?

A. Yes.

Q. You testified that in the mid '70's, you began helping your dad's with the family business?

A. Correct.

Q. And how old were you at that time?

A. I was born in 1952.

Q. Okay, so you were in your mid 20's?

A. Yes, sir.

Q. And how long was it before you were running the companies?

A. Well, again, when my brother left to live in Austin was around 1978 or 1979.

Q. So you were 26 or 27 years old when that happened?

A. However that works out.

Q. Okay.

A. As far as the age is concerned.

Q. Has Wayo lived in Austin ever since then?

A. Yes.

Q. And just so the record is clear, by Wayo I mean Eduardo Longoria, Jr., is that what you meant?

A.    Yes, correct.

Q.    All right, you gave testimony about a Mexican Trust and what was conveyed into that Trust was stock in two holding companies, is that correct?

A.    Yes.

Q.    And those companies were Inmuebles y Terranos and Vertice Empresarial?

A.    Correct.

Q.    And your father conveyed his stock in those companies into the Trust?

A.    Yes.

Q.    In 2002?

A.    Yes.

Q.    And how long had he owned that stock?

A.    I'm not sure.  I don't know.

Q.    Can you tell us approximately how long he had owned it?

A.    If I knew that, I would tell you, but I really don't know.

Q.    Have you ever owned it?

A.    I don't think I have owned Vertice and I probably did own Inmuebles y Terranos at some period of time.  That's my recollection.

Q.    So that stock was conveyed to you at some point and then conveyed to your father, is that right?

MR. HESS: Object to form.

THE COURT: Overruled.

A. I don't know the logistics of how the stock moved from.

Q. (By Mr. Fisher) Okay. Do you hold a title or position in those companies, a management position?

A. I would describe my role more as an advisory role to the management team.

Q. Are you on the management team?

A. Again, it's mostly advisory and, technically, I don't know. There is several companies and I haven't looked to see if I'm named as a manager or management.

Q. I'm asking about the holding company now.

A. Right.

Q. The two that we have named.

A. Correct.

Q. And are you the president, chief executive officer, or in some other management position?

A. I don't know. I could be the chairman.

Q. At least one of those companies, Inmuebles --

A. Right.

Q. -- made payments to your mother Dorothy, didn't it?

A. Yes.

Q. And it did so at your direction, didn't it?

A. Well, it was, again, I didn't own the companies, they

were owned by the Trust.

Q. So is it your testimony that there is someone else at Inmuebles that directed that company to pay your mother money?

A. No, we had accountants and we have a management team and we have attorneys that helped us set up the Trust, so I would always confer with them to make sure everything was being done properly.

Q. Okay. Well this is not a charitable company, is it?

A. No, sir.

Q. It's in business for profit?

A. Yes, sir.

Q. And she was receiving money because she was your mother, right?

A. Well, I was trying to do my part in being a good son, yes.

Q. Right. It wasn't that she had rendered services and was being compensated for her services, these were payments that you were making because you were her son and were taking care of her?

A. Again, it was -- I was trying to do my part to be a good son so she could live her life.

Q. Okay. Now, I'm just following along the direct examination, so if I jump around a little bit, I apologize.

A. Okay.

Q. You testified that you don't travel with security

guards in Mexico. Have you ever told anyone that the reason is because security guards can be bought and could give information to the bad guys?

A.   It sounds like something that I might have said.

Q.   So it wasn't because you don't feel the need for security, it's because you can't even trust the security guards, right?

A.   Well, not necessarily. That sounds like a comment that I could have made. But there is many people in Mexico that have security guards and they trust them, so it was just a comment.

Q.   And it was your judgment call that you were better off not having them?

A.   No, it was a comment.

Q.   Did you mean it when you said it?

A.   I just made a comment that sometimes that could happen.

Q.   Okay.

A.   It's within the realm of possibilities.

Q.   Okay. Now, you were asked about Plaintiff's Exhibit 1, which is the 1983 letter?

A.   Yes, sir.

Q.   And I just want to confirm that when this letter was sent to your mother you lived in the state of Texas, correct?

A.   In 1983, yes.

Q.   And your brother, Eduardo Longoria, Jr., also lived in the state of Texas?

A.   Yes, sir.

Q.   You testified about an agreement that your parents made that you say separated their marital estate from community property into separate property?

A.   Yes.

Q.   And correct me if I heard you wrong, did you say you saw that about two months ago?

A.   That's -- I think I saw it about two months ago, yes.

Q.   And is that the first time that you had ever seen it?

A.   Yes.

Q.   All right, and you testified about private agreements with -- one with Sylvia and one with Adriana, and payments were made to them under those agreements as you testified?

A.   Correct.

Q.   But my question is this, was your mother, Dorothy, a party to those agreements?

A.   I don't believe she was.

Q.   She didn't sign them, did she?

A.   No.

Q.   And they don't even mention her, do they?

A.   No.

Q.   Mr. Longoria, I'm showing you a certified copy of a marriage certificate reflecting a marriage of Eduardo Longoria

and Dorothy Louise Kowalski?

A.    Yes.

Q.    On July 3rd, 1942, in the State of Texas.  Do you see that, sir?

A.    I do see it.

Q.    And is it your understanding that your parents were married in the State of Texas in 1942?

A.    Yes.

MR. FISHER:  Your Honor, we offer Exhibit D-4.

THE COURT:  Any objection?

MR. HESS:  No objection.

THE COURT:  D-4 is admitted.

MR. FISHER:  Your Honor, to save time, may I have continuing permission to take exhibits to the witness?

THE COURT:  Yes.

MR. FISHER:  I promise not to hover over him.  I will return to my spot here.

THE COURT:  Yes.  And just to comment, I want to make sure we just stay on track, I'm deciding whether this counterclaim is supposed to be here or in Mexico.

MR. FISHER:  Yes, sir.

THE COURT:  And I don't want to try the case.

MR. FISHER:  Understood.

THE COURT:  I'm not really looking for, at least yet, I mean, who is a good guy or bad guy or who did what or

who didn't do what, I want it connected to the issue of whether this is the appropriate forum or I should defer to the counterclaims to Mexico in some fashion.

MR. FISHER: Yes, sir. I hear you loud and clear.

THE COURT: That's to both sides.

MR. HESS: Yes, sir.

Q. (By Mr. Fisher) Mr. Longoria, would you please look at Exhibit D-5?

A. Yes, sir.

Q. Is this a copy of a letter that you sent to your mother on or about October 9th, 2007?

A. Yes.

Q. Did she sign it?

A. Yes.

MR. FISHER: Your Honor, we offer Exhibit D-5.

MR. HESS: No objection.

THE COURT: Admitted.

Q. (By Mr. Fisher) Again, when you sent this you lived in McAllen, Texas?

A. Yes.

Q. And you sent it to your mother at her home address in Houston, Texas?

A. Yes.

Q. And I won't dwell on this, but in this letter you

make reference to your father's wishes for your mother to receive a sum of $450,000 upon his passing. Do you see that?

A. I see it.

Q. Okay. And what's interesting about that is, that wish was never provided for in any Will that you brought forward, was it?

A. Can you ask me that again?

Q. Yes, that was a clumsy question and I apologize. You haven't brought forward to this Court any Will in which your father said your mother was to get this $450,000?

A. Not that I know of.

Q. And so there were testamentary wishes that your parents had that weren't always put in the Wills, right?

A. Well, I can explain it if you would like me to explain it.

Q. Well, just answer my question first if you would, please? Sometimes your parents intended things to happen with their property and they didn't get it put down in Wills and this is an example of that?

A. No, that's not an example of that.

Q. Okay. Third paragraph says, and I quote, "Since Dad's wishes were for you to receive $450,000 upon his passing and your wishes are that Adriana and Sylvia receive this money from you, we have agreed that I will subtract --" blah, blah, blah?

A. Right.

Q. But you refer to your father's wishes --

A. I'm just going to explain it.

Q. All right, go ahead.

A. Well, it's just that my mom was insisting that my father hadn't left her anything and that she was despondent about that and she had said that my dad did want her to have some money, and really, again, this is similar to the other letter you showed me, in 1983, I was really wanting to make her feel good that my dad did really want her to have some money. That's the best way I can explain it.

Q. Okay. I appreciate that explanation.

A. All right.

Q. That's helpful. And you acknowledged in this letter that your mother wanted the money to go to her daughters, Sylvia and Adriana, in equal shares?

A. Yes.

Q. Would you please look at Exhibit D-6 which I am handing you now? Is this a copy of a letter of intent that you entered into with your brother Wayo Longoria, a First Amendment to that Letter of Intent and a Second Amendment to that Letter of Intent, all of which you signed?

A. Is there a question? I'm sorry.

Q. Is this a copy of a Letter of Intent that you and your brother Wayo Longoria signed?

A.    Yes, I see my signature.

Q.    And this is a First Amendment and a Second Amendment to it?

A.    Do you want me to check it?

Q.    Yes, sir.

A.    I see the First Amendment here.  And I see a Second Amendment.

Q.    Okay.  And the agreement embodies in these letters of intent was culminated and fulfilled later in 2007, correct?

A.    I don't recall exactly unless you want me to look at this and --

Q.    Well, let me ask you this, you have identified this?

A.    Yes, I see it here, the 29th day of March 2007.

Q.    Okay.  Later in 2007, was there a transaction in which your brother Wayo was paid about $24 million in return he gave up his interest in the Trust that your father created in 2002?

A.    What's the question?  I'm sorry.

Q.    Later in 2007, was there a transaction in which your brother Wayo was paid about $24 million and in return he gave up his 40 percent interest in the Trust that your father created back in 2002?

A.    Well, the way I understand it, the Trust split into two trusts and one Trust paid the other Trust.

Q.    Okay.

A. That's my general understanding.

Q. All right. And one Trust ended up with about $24 million in it and Wayo got that Trust?

A. I really don't remember specific figures. I would have to --

Q. Okay.

MR. FISHER: I offer Exhibit D-6, Your Honor.

MR. HESS: No objection.

THE COURT: Exhibit D-6 is admitted.

Q. (By Mr. Fisher) This Letter of Intent was negotiated between you and Wayo in the United States, wasn't it?

A. I don't remember, Mr. Fisher, where we were.

Q. You had the assistance of American counsel in this transaction?

A. Yes, I did. And also Mexican counsel.

Q. Was Carolyn Becket a lawyer that helped you with this?

A. Yes, sir, she is one of the attorneys.

Q. She is in Austin, Texas?

A. Yes.

Q. And in connection with that transaction, was an appraisal done of the stock in the two holding companies that you named earlier?

A. I don't recall.

Q. Do you recall an appraisal of that stock being at $98

million and change?

A.    No, I do not.

Q.    After your mother died in April of 2012, did you ever offer for probate through any Mexican court a Will that she signed?

A.    Did I offer?  Can you ask it again, please?

Q.    After your mother passed away in April of 2012, did you ever go to a Mexican court, either you or your lawyer, to offer Wills to probate?

A.    No.

MR. FISHER:  No further questions.

THE COURT:  All right.

MR. HESS:  Nothing from us, Your Honor.

THE COURT:  You may step down.

MR. LONGORIA:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. HESS:  Our next witness is Professor Carlos Gabuardi.

THE COURT:  Okay.

MR. HESS:  We submitted his affidavit with a briefing.  I understand the objections have been withdrawn to that affidavit so I request that it be admitted and considered for this proceeding.

MR. FISHER:  No objection.

THE COURT:  Okay.  And what is the witness's

name?

MR. HESS: It's Gabuardi, G-A-B-U-A-R-D-I.

THE COURT: Affidavit of Dr. Gabuardi is admitted. And it's attached to your motion?

MR. HESS: Right.

THE COURT: To Counter-Defendant, Shelby Longoria's Motion to Dismiss Counterclaim, etcetera?

MR. HESS: Right.

CARLOS ALBERTO ENRIQUE JOSE LORENZO GABUARDI ARREOLA, PhD called as a witness, after first having been duly sworn, testified as follows:

DIRECT EXAMINATION

Questions By Mr. Hess:

Q. Good afternoon, Professor.

A. Good afternoon.

Q. Could you introduce yourself to Judge Wright?

A. Sure. My name is Dr. Carlos Alberto Enrique Jose Lorenzo Gabaurdi Arreola. I was born in Monterrey, Mexico, in 1957. I studied the law in Monterrey, the University of Monterrey. I have been a practicing lawyer since I was a law student because under Mexico law you can do it to the extent you do it under the supervision of an attorney. I have worked both as corporate counsel, as a litigator, and as academician. Most of my life, with an exception of a time in which I lived in the United States, I have done both academic and

professional work. I also was a lawyer in the World Bank in Washington, DC. I had been -- I am a member of the National System of Legal Researchers in Mexico, which is a government institution that provides funds for academicians in order to retain Mexican talent to continue living in Mexico. And now I am ascribed as an honorary legal researcher to the Facultad Libre Lecho, which is an independent law school in Monterrey.

Q. When did you become a lawyer?

A. I finished law school in December '79, and I wrote my dissertation and finally got my degree in '81. But I forgot to say that I studied master of law in Tulane, which I received with distinction and also a PhD from Tulane University Law School.

Q. And you currently live in Monterrey?

A. Yes.

Q. And you currently practice law in Monterrey and other locations in Mexico?

A. Yes, my office is in Monterrey. But when my clients have needs or have the need of legal advice or legal counseling in other parts of Mexico, I go there.

Q. And what state of Mexico is Monterrey?

A. Nuevo Leon.

Q. And where is Nuevo Leon in comparison to Tamaulipas?

A. Okay, Nuevo Leon is to the west of the state of Tamaulipas, and has a small -- a piece of border, very small,

in Columbia, which was mentioned before by Mr. Longoria.

Q. And they are bordering -- they are states that border each other?

A. Yes, contiguous border.

Q. And have you practiced law at times in Tamaulipas?

A. Yes, I was a lawyer for Texas Bank in its affairs -- legal affairs in Mexico, which most of them were related to Tamaulipas, and I spent almost five years of my life practicing law there.

Q. When you practice law in Mexico, do you have to bring a bodyguard around with you wherever you go?

A. No.

Q. Why not?

A. Because I don't need it. I feel safe and comfortable wherever I go in Mexico.

Q. Do other lawyers have bodyguards and private security people who go with them to the courthouse?

A. At least not that I am aware of.

Q. The state of Tamaulipas, adjoining the state of Nuevo Leon, does it have a functioning judiciary?

A. Yes.

Q. Have problems with crime in Tamaulipas caused the court system to shut down?

A. No, never.

Q. Are you aware, in fact, of lawsuits filed in court in

Tamaulipas involving some of the parties to this case?

A. If I am aware, yes.

Q. And I believe that there was what reference earlier today to an amparo proceeding, A-M-P-A-R-O?

A. Yes.

Q. The lawsuits that you are familiar with, are those amparo lawsuits, amparo proceedings?

A. In this case, yes, I am aware of other matters which of course I can not disclose, but I have seen two amparo petitions concerning this matter filed one by the Estate of Dorothy Kowalski Longoria, and another petition for amparo filed on behalf of Mr. Longoria's two sisters, Adriana and Sylvia Longoria Kowalski.

Q. When you say, "other matters," you can't disclose, you are talking about involving people who are not parties in this case, other lawsuits that are totally unrelated to this?

A. Yes, totally unrelated to them but that I am familiar with.

Q. In other words, your testimony -- you described the matters in Tamaulipas that you are familiar with involving the parties to this case?

A. Yes, I am only making reference to the judicial matters of amparo related to this case.

Q. Can you tell me what an amparo proceeding is? What sort of litigation matter is that?

A. Sure. The juicio, the amparo, which is the official name of the institution, it's a legal proceeding by means of which a private individual or an entity may prepare a proceeding by means of which you ask the federal judiciary provide protection to you against an infringement or a violation that any governmental authority, either executive or the judiciary, or eventually the legislature, is committing against your fundamental human or constitutional rights.

Q. And what is the alleged infringement that is at issue in the two amparo proceedings, one which was filed by the Executor here and the one which was filed by Adriana and Sylvia?

A. Sure. Basically, they are claiming that their Constitutional right to due process of law was infringed to them because in the probate proceedings related to the testament of Mr. Eduardo Longoria Theriot, which is Mr. Longoria's father, they were -- they will argue that they were not called to a meeting which is set forth or provided by the Code, the Tamaulipas Code, by means of which the judge has to hold a meeting with the named heirs, either testamentary or not, and any other relatives which are ascendant or descendant.

Q. So if I'm understanding this correctly, are they going to the federal court in Tamaulipas in Nuevo Laredo and asking it to direct that the state court do something?

A. Yes, they are asking the federal judiciary, the

federal court in Nuevo Laredo to review what the state court, the state family court did to restitute them of their infringed rights therefore to call this meeting of heirs and relatives and consequently to vacate or live without anything that happened before that meeting, after that meeting, I am sorry.

Q. Have you heard of mandamus petitions or writs of habeas corpus in the United States?

A. I have heard of several names and several writs which are used in the United States and I am familiar with some original common law writs like the writs of trespass and so on and so forth but I do not know them in detail and I am -- I don't know their particularities on how to action them or something.

Q. In the proceeding like the amparo proceeding, what is the role of someone like Sylvia Longoria who is impacted by the relief that is being sought in the amparo?

A. Sure. The parties to the amparo procedure are basically conceptually three. One is the complainant, the person who actions the petition, who files a complaint, which in Spanish is call quejoso. Okay, then this counter-party to that is the authority who allegedly committed the violation of fundamental rights. And in judicial proceedings there is another party which is called the third interested party, to set up empresario (sic), which has the right to appear before the court and submit arguments supporting his own rights and

supporting the role of the authority in order to avoid -- in order to demonstrate that no infringement was committed, so it is a three-party litigation?

Q.    So the amparo is the third interested party?

A.    Yes.

Q.    Like a real party in interest?

A.    The third interested party is a real party in interest.  And that has been acknowledged by both, well, it has been acknowledged by statutory law, by case law, and scholarly writings.

Q.    Does it appear that Adriana and Sylvia and the Estate were able to find lawyers to assert this claim on their behalf in Court in Nuevo Laredo?

A.    Yes.

Q.    Would Adriana, Sylvia, or a representative of the Estate have been required to travel to Nuevo Laredo to assert this claim?

A.    As far as I understand from what I read, the petitions of amparo were filed by lawyers that received power of attorney from the Estate of Mrs. Dorothy Kowalski Longoria and the sisters, Sylvia and Adriana Longoria Kowalski, and this attorney signed and filed the petitions of amparo on behalf of them.  I assume that the lawyers were physically there in the office, the clerical office of the Court to submit the petitions themselves.

MR. FISHER: I object to the testimony about what he assumed. That's not proper and we respectfully move to strike it.

THE COURT: Overruled.

Q. (By Mr. Hess) Based on your review of the documents and your knowledge of Mexican law, would there have been any legal requirement for Adriana Longoria, Sylvia Dorsey, or a representative of the Estate to have gone to Nuevo Laredo to file this other than through their lawyers? In other words, for example, if I'm going to -- if my client is Shelby Longoria, if I file a petition here in the state courthouse on his behalf as his attorney, right, Shelby Longoria doesn't have to come down to the courthouse with me, and so I'm asking you whether if that's the case under Mexican law as well? If you have an attorney, do you have to go yourself?

A. If you have an attorney who has been vested with the power of attorney and therefore is your empowered agent, it is not necessary for the grantor of the power of attorney to be there.

Q. By filing an amparo proceeding, have the Estate of Dorothy Longoria, has Sylvia Dorsey or Adriana Longoria submitted themselves to the jurisdiction of the federal courts in Tamaulipas, Mexico?

A. Yes.

Q. By filing an amparo proceeding, have the Estate and

Sylvia and Adriana submitted themselves to the jurisdiction of the state courts in Tamaulipas, Mexico?

A. By filing that petition, they have shown that they are complaining from an infringement of the state court and that they want restitution of their violated rights and therefore they will enjoy the benefit of the final decision if it is favorable to them.

Q. Would it be unusual for someone to file an amparo but then take the position that the state court that is to be directed by the federal court does not have jurisdiction over them?

A. Well, I have never heard of a case -- a situation of that nature and it would be contrary in it's sense.

Q. And has Shelby Longoria submitted himself to the jurisdiction of the courts in Tamaulipas, Mexico, in connection with the amparo proceeding?

A. That's what I understand from the documents that have been shown to me.

Q. In fact, he made a written submission with respect to submitting himself to the jurisdiction of those courts, right?

A. Yes.

Q. And did the court acknowledge that written submission?

A. I was shown a court order having him appearing before the court and by means of which he submitted some additional

documents that were recorded by the court to be heard when the appropriate hearing comes and by means of which the court or provides that all documentation is -- all documentation concerning service of process be at the disposable of Mr. Longoria in the offices of the court so that he can go and have them for whatever purposes that might be necessary under the law.

Q.   There is a lot of back and forth in your affidavit and the affidavit of the estate expert, Ilan Rosenberg, concerning personal jurisdiction.  Regardless of the rules concerning of process and where the defendant lives or works in a Mexican state, can federal and state courts in Tamaulipas and also in Mexico assume jurisdiction over a matter in which the defendant has consented to personal jurisdiction?

A.   Yes.

Q.   Similarly, can a defendant in an action in Mexico such as Shelby Longoria, if he is sued there by the Estate, waive or just not assert a statute of limitations defense?

A.   These require clarification.  I have never heard of a situation like you are saying, waiving before the court. Usually, when you do not want to exercise the statute of limitations defense, you just do not file it.  But the court more appropriately, cannot assert any defense on behalf of the parties, because the litigation, private litigation is only or litigation of this nature is party-driven as opposed to

court-driven.

Q. So if the party that has the defense chooses not to assert it, then the defense is not part of the case, right?

A. Yes.

Q. Let's suppose that the claim that is asserted in this lawsuit in Harris County by the Estate is dismissed by the court here in Harris County so that it is no longer pending here in Harris County. All right, could the Estate then file a lawsuit asserting the same claims in Tamaulipas, Mexico, and have the court there assert subject matter jurisdiction over those claims?

A. Yes.

Q. What sort of causes of action might be available to an Estate which alleges that the Decedent's son somehow stole money from or defrauded the Decedent?

A. State elections?

Q. Yes.

A. Okay, it is an academic question but it might be actions for negligence, mismanagement, fraud, or whatever is thought to be illegal or inappropriate and you have the right to recover.

Q. So there are such causes of action in Mexico?

A. Yes.

Q. And if the Estate were to prove its claims in Mexico, could a Mexican court award damages to the Estate?

A.    Yes.

Q.    And could a Mexican court in enforce its damages?

A.    Yes.

Q.    Now, in a case in the United States, a plaintiff will file a petition, there will often be discovery, motion practice, the plaintiff might change the nature of its claims, but eventually, if the case is not dismissed or a summary judgment is not granted, the case will be tried in the courtroom to a court or the jury over a period of days or weeks or, God forbid, for a period of time.  So that's how things work in the United States.  Can you describe for the Court the natural progression of how a case proceeds in a court in Mexico?

A.    Sure.  May I write notes so that I can explain?

THE COURT:  Sure.  Any objection to him writing notes as he goes through to clarify his --

MR. FISHER:  No, Your Honor.

THE WITNESS:  Well, it is not notes, a graphic.

THE COURT:  Any objection to his explanation as to how it would transpire?

MR. FISHER:  No.

THE COURT:  To his explanation of how it would transpire.  But you are explaining it out there to them.  I'm listening but you don't have to look back at me, you can look out there.

A. Okay. Basically, the procedure, as I understand it in the United States, begins with a petition that's submitted by the plaintiff and an answer submitted by the defendant. As far as I understand, the petition of the plaintiff is brought and an answer from the defendant is also brought, usually a general denial.

Q. In other words, allegations tend to be often times fairly general in nature?

A. Yes. The point is that it is my understanding, it's how I interpret this, is, basically, the parties come before court and they agree that they have an actionable cause or a claim that's an actionable cause of action. Then there is a period that I understand, it's called discovery, in which really the parties are dancing strategically to find out what they really want in terms of what will be -- what are there, the issues in questions and what was the evidence they can obtain to support their case. It's called collaborative process as opposed to an antagonist process. And then when they finally think there is enough discovery, they agree on what are the issues in question here and at this point they lock the issues under litigation and then they have the hearing or the trial, the trial which is to try the evidence and their arguments. Well, this is -- and finally, after trial, there is adjudication. This is not what happens in Mexico. First, the main trial is not infrequently mistranslated. What we have in

Mexico is something that we call juicio, and it is basically a judicial proceeding. As it happens in the United States, everything begins with a petition and an answer from the defendants. But as opposed to what happens in the United States, the petition has a lot of formalities which require this detailed narration of all the facts, a citation of all the authorities upon which you are basing your claim and the type of action that you are submitting to the court both in statutory authorities and case law authorities, and you have make a detailed list of all the evidence that you want the court to hear. And in addition to that, you have to say what do you want to prove with the evidence that you are offering.

Q. And this is all at the beginning?

A. Yes. And the answer is as detailed. It has to address all the facts, all the authorities, all the evidence, everything. Once the petition is filed and the answer is filed, the issues in question are locked. So at this moment the issues in and questions are locked as opposed to what happens in the American version in which the issues are locked here. So during this period here (pointing to graphic), basically, the court will, what you will say, try all these issues and questions, hearing evidence and everything, the lawyers will argue whatever they think is appropriate to support their cause of action or their exceptions and defenses, and finally the court will adjudicate. In my opinion, the most

important differences are that we lack of discovery and the time in which the issues under litigation are locked.

Q. In court in Mexico, if you have a lawyer, can you go through that process by having your lawyer go to court without necessarily having to appear yourself?

A. Well, in almost all of the cases it is the lawyer that does the court appearing and all that stuff. The owners of the litigation, your clients, seldom go to court unless you call them for a purpose.

Q. Now, sometimes is there testimony in court in Mexico?

A. Well, in almost all cases testimony either of the parties or other parties is one of the evidence submitted unless you are relying totally on documentary evidence.

Q. When there is live testimony in court in Mexico, is that typically a one-time occurrence or does it sometimes happen that a witness has to go back to court over and over again to testify?

A. Usually, when someone submits his or her testimony is a one shot deal. They don't call you again and again. It is one way -- one shot deal even if it takes long hours.

Q. And is there a procedure in Mexico -- is there a procedure for a Mexican court to obtain evidence from witnesses who are in the United States?

A. Yes. Actually, yes.

Q. And can you describe that?

A. Well, there is the Hague Convention on getting evidence abroad which, I don't know, but I assume that the United States is a party, but the Codes themselves provides for a procedure. And interestingly, the practice is that American courts are very open to receive orders from countries and they always honor them.

Q. And in the event if you are trying to get the testimony of a party to the case, you can ask the court and the court has exercised personal jurisdiction over the party, you do not have to go through that, right?

A. Can you rephrase?

Q. If there a party to the case and the court has -- in Mexico and the court has exercised personal jurisdiction, you can also obtain testimony in that way, right?

A. Yes.

MR. HESS: Pass the witness.

CROSS EXAMINATION

Questions By Mr. Fisher:

Q. Sir, you testified that in Mexico actions for mismanagement, fraud and negligence are available, right?

A. Yes.

Q. But let me ask you what that means. What are the elements of an action for mismanagement? And let me ask you specifically about the state of Tamaulipas. Do you know?

A. I don't know the entire Code by heart. If you bring

me the law, the statute, and you ask me the specific questions you want me to answer, I will gladly give you an opinion here for what you are asking me.

Q.   Okay.  So you are not testifying today that Thomas Dorsey, as Executor of the Estate of Dorothy Longoria would have a cause of action against Shelby Longoria for negligence under the laws of the State of Tamaulipas?  You are not prepared to give that opinion, are you?

A.   No.

Q.   And similarly with regard to fraud, you are not prepared to testify that that would be available to the Executor in the State of Tamaulipas?

A.   Can I ask you exactly what you are asking me?  Are you asking me if a fraud action can be filed against Mr. Dorsey?

Q.   Let me try to be more specific.

A.   Yes, please.

Q.   Can you tell us What are the elements of an action for fraud in Tamaulipas?

A.   As I told you before, I need to see the Code.  I don't know the Code by heart.  Whenever in my practice we have to assess or submit an action, we look to the Code, a scholarly interpretation of the Code, and we review case law so that we can be fully sure, diligently sure that our cause of action will prosper, because, as I mentioned, and that I have all the

elements, because, as I mentioned to you, filing a lawsuit is a one shot deal. If you do it wrong, you are risking the whole case.

Q. All right, I appreciate the candor about that. As a general proposition, would you agree that to bring any kind of tort case in Mexico there has to be a duty owed?

A. Well, first let me tell that tort is a common law concept and Mexico is a civil law country, a tort is a procedural concept that does not exist in Mexico. If your question is, if there might be causes of action for illegal acts or negligence acts, the answer is yes.

Q. Okay. But you are not testifying to this court that the allegations of Thomas Dorsey fulfill all of the elements of any of those kinds of causes of action?

A. I am quite confused about what is the nature of the allegations of the Estate because from all the documents I have reviewed, my impression is that at some point the estate argues one thing and the other thing I don't know. I do not have a clear idea or picture in my mind of what kind of thing is that is being actionable? I suppose that this is because of the nature of the Anglo-American common law style of the legal proceedings. I don't know.

Q. Have you read case law in the State of Texas on the tort of breaching an informal fiduciary relationship?

A. Not that I remember.

Q.    Okay, so that's not a claim you are familiar with, is it?

A.    If you are asking me if I have a general knowledge of the English language in what you are saying, I assume, but I have not read case law in that sense that I recollect.

Q.    Okay.  And it's true, isn't it, that in Mexico private trust relationships are not recognized?

A.    Well, I have been a comparative law lawyer most of my life both --

Q.    Please answer my question, sir?  Are private trust relationships recognized in Mexico?

A.    That's a leading question.  It's inappropriate, you are making the question in a manner that I can not respond in the manner in which you are making the question.

Q.    All right, well, let me try again.  If two private citizens, neither of which is a registered trust company, agree between themselves to have a trust relationship --

A.    Trust meaning what?

Q.    One party is holding property for the benefit of another?

A.    There can be the functional equivalent to a trust, yes, in the manner that your describing it.

Q.    And it's your testimony that there are cases enforcing those relationship?  Not a contract.

A.    I am not aware of case law for that specific

question. I don't know.

Q. Now, you have said you feel safe when you travel in Tamaulipas. Are you aware that the United States Department of State has issued a travel advisory?

A. It is my understanding that there was in the past a travel advisory.

Q. Well, in fact, there wasn't one in the past, there is one, in fact, right now, did you not know that?

A. No.

MR. FISHER: May I approach the witness?

THE COURT: You may.

Q. (By Mr. Fisher) Would you please look at Exhibit D-2?

A. Sure.

MR. FISHER: Your Honor, since this is a governmental publication I'm going to offer it into evidence.

MR. HESS: No objection.

THE COURT: Admitted.

A. Should I read it?

Q. (By Mr. Fisher) I will point you to certain parts. Turn to page 7 if you would, please? At the bottom of that page there is a section specifically related to Tamaulipas?

A. Uh-huh.

Q. And it says, among other things, and I quote, "You should defer non-essential travel to the State of Tamaulipas. All USG employees," and I will represent to you that's United

States Government.

A. Okay.

Q. "-- employees are prohibited from personal travel on Tamaulipas highways outside of Matomoros and Nuevo Laredo due to the tenuous security situation." Were you aware of that?

A. No, I was not aware of that.

Q. And so employees of the United States government are forbidden to travel on those highways?

A. That's what you are showing me.

Q. And if you will turn back to page 2, in the next to last paragraph, this government publication says, "United States government personnel and their families are prohibited from personal travel to all areas to which it is advised to defer non-essential travel. When travel for official purposes is essential, it is conducted with extensive security precautions. United States government personnel and their families are allowed to travel for personal reasons to the areas where no advisory is in effect or the advisory is to exercise caution. And with regard to the general public, it says, and I quote, "While the general public it says, and I quote, "While the general public is not forbidden from visiting places categorized under defer non-essential travel, United States government personnel will not be able to respond quickly to an emergency situation in those areas due to security precautions that must be taken by United States government

personnel to travel in those areas." Does that sound like a safe place to go to you?

A. Should I respond candidly?

Q. Yes.

A. Okay.

Q. Please do.

A. My clients, a lot of the work that I do is represent American clients doing business in Mexico and they frequently travel between Monterrey and Laredo and also between Monterrey and Reynosa for the purpose of doing business, and because they want to buy American goods or something, and they are seldom in agreement with this kind of circular and they travel. I have -- none of my clients have ever paid too much attention. In my opinion, you are trying to magnify a problem that we have in Mexico.

Q. When you say "you," you mean the government of the United States?

A. No, I mean you.

Q. Well, I only read what this says, sir?

A. But you are asking my opinion. You asked for my opinion and I requested your permission to speak candidly and I am giving my opinion about what you are saying.

Q. Okay. And it's understandable that people trying to do business in this region would resent a publication like this because it would hurt their business, wouldn't it?

A.    Well, you can go to the public records of the amount of trucks that cross every day between the two Laredos, between Reynosa and McAllen, and you would be impressed, and I assume that if those trucks cross the border, it's because they didn't have an incident.

MR. FISHER:  No further questions, Your Honor.

THE COURT:  Okay.

MR. HESS:  Just a few, Your Honor.

REDIRECT EXAMINATION

Questions By Mr. Hess:

Q.    If a person goes and files a lawsuit in Nuevo Laredo, when asked the question, a hypothetical question, if a person in Houston files a lawsuit in Nuevo Laredo, in court, in Mexican Court, right, and let's say they even want to go and attend in court themselves for the proceedings in that lawsuit, right, could they get there by flying to the Laredo International Airport in the American side and how far would they have to drive to the courthouse in Nuevo Laredo?

A.    For the federal court?

Q.    Federal court, right.

A.    It's a few blocks from the old bridge.

Q.    So a few blocks into Mexico?

A.    Yes.  And the state court you will have to drive through one of the main roads to something which is called. Palacio de justicia is where all the state courts are.

00958

Q. Would that require the person coming from Houston who actually decides to go to court, even if they don't have to in Nuevo Laredo, to travel on these highways between Laredo and Monterrey?

A. No, because courts are within city limits.

Q. And the city is right next to the United States?

A. Right. Actually, they touch the river.

Q. Right, Nuevo Laredo goes right up to the river, right?

A. And Reynosa, too.

Q. In Reynosa, too. And in fact, Sylvia Dorsey and the Estate have, in fact, already filed a lawsuit in federal court in Nuevo Laredo, Tamaulipas, right?

A. That is shown by the documents I have reviewed.

Q. Thank you.

MR. HESS: Your Honor, I have nothing further.

THE COURT: All right. Let me clarify one thing. The lawsuits that are currently pending in Mexico, do they relate to Eduardo Longoria's Estate?

THE WITNESS: They challenge the Eduardo, something is at the court in Eduardo Longoria's probate Estate.

THE COURT: Okay. To your knowledge, is there anything pending there that relates Dorothy Longoria's Estate?

THE WITNESS: No.

THE COURT: Okay. Thank you. Anything further?

THE WITNESS: I am sorry, I am sorry, can I clarify?

THE COURT: Sure. I asked you, yeah, you can clarify. I opened that door.

THE WITNESS: The petitions were made by the Estate of Dorothy Longoria in that sense. One of the petitions was filed by the Estate of Dorothy Longoria challenging the probate procedure of her husband. The other petition was filed by the sisters, Sylvia and Adriana Longoria Kowalski, challenging the probate procedures of his father Eduardo Longoria, Sr.

THE COURT: Okay.

THE WITNESS: They say in the petitions that they claim for the protection of the federal judiciary because that's the only remedy they have to obtain restoration of their rights.

THE COURT: Okay, and in your affidavit, do you feel like you have made that clear as to the different litigation that is ongoing in Mexico? I scanned your affidavit, but the points you are making to me now, are they in your affidavit as to the nature of proceedings going on in Mexico?

THE WITNESS: Yes. I made reference to the amparo proceeding. I highlight this kind of protection they are asking for. I highlighted that they affirmed that that is

the only remedy they have and that's why they are going to the Court. But I didn't make this explanation or explain the nature of the juicio or amparo.

THE COURT: All right, thank you. You may step down.

THE WITNESS: Thank you.

MR. FISHER: Professor Gabaurdi was our second and final witness for our side.

THE COURT: Thank you. I guess at some point I have to be definitive. I mean, I'm going to -- whatever is going on, I think 3:30 is the latest I want to hear things further. I'm not trying to short circuit it or I guess I am trying to short circuit it, but I have got all sorts of paperwork in front of me. I have heard the gist of the different aspects of the argument for which forum the counterclaims should be in and there is three or four key things that I have to think through to be presented but with that being said you can present your evidence and I just like to shoot for a 3:30 conclusion to all this.

MR. FISHER: Yes, sir.

THE COURT: Given that you told me that this was going to take an hour.

MR. FISHER: That was our case.

THE COURT: I always double or triple what attorneys tell me. My feeble attempt at humor.

MR. FISHER: If you can give us a five minute break, that may streamline things.

THE COURT: Okay, five minutes.

**(At which time the Court took a short recess.)**

THE COURT: All right, you are going to call your witness now?

MR. FISHER: Yes, Your Honor. It's my understanding that the Movant has rested. I just want to clarify that.

MR. HESS: Yes.

MR. FISHER: Your Honor, we call Mr. Fernando Elias-Calles.

### FERNANDO ELIAS-CALLES ROMO

called as a witness, after first having been duly sworn, testified as follows:

### DIRECT EXAMINATION

Questions By Mr. Fisher:

Q. Would you please state your name, sir?

A. Fernando Elias-Calles Romo.

Q. Where do you live, sir?

A. I live in Mexico City.

Q. What do you do for a living?

A. I'm a petitioner lawyer.

Q. How long have you practiced law?

A. Since I graduated law school in '98.

Q. Where did you go to law school?

A. In Mexico, I went to law school at Escuela Libre de Derecho, and then I obtained a master's degree at the University of Chicago Law School.

Q. And in what areas do you practice?

A. I do civil and commercial litigation and also corporate work.

Q. Let me get the right to the point of your testimony. Do you know Sylvia Dorsey and Adriana Longoria?

A. Yes, I do.

Q. And are they clients of yours?

A. Yes.

Q. In what matter or matters do you represent them?

A. I am representing them in an amparo proceeding in Nuevo Laredo.

Q. Have you ever represented James Thomas Dorsey as the Executor of the Estate of Dorothy Longoria?

A. Yes, I have.

Q. In what sort of proceeding?

A. We filed a amparo proceeding but that amparo proceeding is not pending anymore because we decided to concentrate our efforts in the Sylvia and Adriana personal amparo proceeding.

Q. Okay. So there is one amparo proceeding pending at this time?

A.   Yes, sir, this is.

Q.   And what relief is being sought in that case?

A.   The only relief is we have requested the constitutional judge to grant us protection and relief and order the state court to respect the due process of rights, so the only effect would be to order the judge to give notice, due notice to Sylvia and Adriana as descendents of Eduardo Longoria Theriot and give them access to that probate matter.

Q.   So this is the case involving the probate of Eduardo Longoria's Will?

A.   Yes.

Q.   It does not involve probating any Will of Dorothy Longoria, is that right?

A.   Yes.

Q.   Now, who is the defendant in that case?

A.   The defendant is the court, the family court from Nuevo Laredo.

Q.   So this petition you filed on behalf of Sylvia and Adriana, was it filed in a state court or a federal court?

A.   Federal court.

Q.   So it is not in a state court of Tamaulipas?

A.   No, it is not.

Q.   But it relates to a case in state court?

A.   Yes.

Q.   And that case involved the probating of Eduardo's

Will?

A. Yes.

Q. Now, in connection with the petition you filed, was it necessary to have notice served on Shelby Longoria?

A. When we filed the complaint, which is named per the amparo statute, which is named at that moment, the defendant as we would he adequate the authority, and once the court of Nuevo Laredo informed and gave us access to the probate file, we identified as third parties or third interest parties, Mr. Shelby Longoria and Mr. Eduardo Longoria, Jr., and we then named them as the third interested parties.

Q. Okay. And under the procedures applicable to this kind of a case, who effects service of process? Is it the lawyer or the court or someone else?

A. An official from the court.

Q. And tell this court what happened when the Mexican court, the Mexican federal court attempted to serve Mr. Longoria?

A. Well, the Mexican official of the court first tried to serve Mr. Shelby and Mr. Eduardo Longoria, Jr., at an address in Ciudad Reynosa, Tamaulipas. And that address was obtained because in the probate court file of Eduardo Longoria Theriot, when Mr. Shelby Longoria appeared, he named or designated his address with an ID stating that his address was in Ciudad Victoria. When the official from the court went to

that address, it appeared to be a commercial building that was unoccupied and there was a sign for lease. All this in the court file. After that, the Court ordered that Mr. Shelby Longoria and Mr. Eduardo Longoria, Jr., be served at the procedural address that they had designated in the probate proceeding of Eduardo Longoria Theriot. Then the official from the court proceeded to go to that address, and it's a notary public's office, I think if I recall correctly, Notary Public No. 97 in Nuevo Laredo. And they did not accept service on behalf of Shelby Longoria and Eduardo Longoria, Jr., stating that even though that they had handled some business for them, that they had concluded that and that they thought that they resided in the United States. After that, we requested the court per the Mexican statutes that Mr. Shelby Longoria and Mr. Eduardo Longoria, Jr., be served through rogatory letters which is the way a Mexican court can request the aid of a foreign authority to do the service of process and we had designated their home addresses so they can be served and the due process right is duly respected on their behalf. And those letters rogatory are in process of being delivered.

Q. When did you file this petition to start the amparo case?

A. We filed it at the beginning of June, I think on the 6th of June, 2013.

Q. So June, July, August and September passed and you

weren't able to get Shelby Longoria served?

A.   No.

Q.   And to this day has he appeared in the case?

A.   He has filed an appearance.  I think this happened just last week.  But that's the only thing that has happened.

Q.   Do you anticipate that it will be necessary for Sylvia Dorsey and Adriana Longoria or either of them to travel to Tamaulipas in order for you to proceed with the case that you filed there?

A.   No.

MR. FISHER:  Nothing further, Your Honor.

THE COURT:  All right.

CROSS-EXAMINATION

Questions By Mr. Hess:

Q.   Mr. Calle?

A.   Yes.

Q.   So Mr. Longoria has appeared in the case?

A.   He has filed an appearance.

Q.   Right.  He has submitted to the personal jurisdiction of the court?

A.   To the jurisdiction?  I don't know whether or not the term personal jurisdiction, we don't use it, but to the jurisdiction of the constitutional court, yes, he has.

Q.   And he filed the case because you believe that that court could exercise jurisdiction over Shelby Longoria in this

cause of action, right?

A. No. Can I clarify?

Q. Sure.

A. In Mexico we filed that amparo proceeding to question the acts of an authority. If you would equate the procedure as Mr. Gabaurdi has already stated. The defendants in that case or the plaintiffs in the case would be Adriana and Sylvia Longoria and the defendant is the court as an authority. So that's why we filed there. So Mexican law the jurisdiction in that case isn't in Nuevo Laredo because that's what the amparo statute states and we are, basically, you could say that we are suing a judge and we are requesting constitutional protection.

Q. You are suing a judge because you're challenging actions of a court in Tamaulipas?

A. Yes.

Q. Right. And it is your belief that the courts of Tamaulipas should have jurisdiction to address challenges to actions -- try again. It's your opinion that the federal courts of Tamaulipas should have jurisdiction to address such a challenge to an action of the state court of Tamaulipas?

MR. FISHER: Objection, vague. Federal courts of Tamaulipas is a contradiction of terms.

MR. HESS: Federal courts in Tamaulipas.

Q. (By Mr. Hess) It's your belief that the federal courts in Tamaulipas have jurisdiction to entertain or to hear

a challenge to the actions of a state court of the state of Tamaulipas?

A.    I would say, yes, with a clarification.  Federal courts in Mexico have two kinds or they address two wishes. One is federal matters and others are just constitutional matters.  In this case we are just speaking as to the constitutionality process of amparo, so I would say, yes, just in this case, just in the amparo proceeding.

Q.    And for that purpose you felt it was necessary to service Sylvia Longoria, right?

A.    Uh-huh.

Q.    And you have heard been here all day, right?

A.    Yes.

Q.    And you heard this morning that he consented to personal jurisdiction in Mexico?

A.    I heard, yes.

Q.    And you are aware that, in fact, he has filed a paper appearing in the amparo proceeding in Nuevo Laredo?

A.    Yes.

Q.    Thank you.

MR. HESS:  Nothing further.

MR. FISHER:  Nothing further from here.

THE COURT:  Thank you.  You may step down.

MR. FISHER:  We call Mr. Ilan Rosenberg.

**ILAN ROSENBERG**

called as a witness, after first having been duly sworn, testified as follows:

DIRECT EXAMINATION

Questions By Mr. Fisher:

Q.    What is your full name?

A.    Ilan Rosenberg.

Q.    How old you are you, sir?

A.    I am 39 years old.

Q.    Where do you live?

A.    I live in Philadelphia, Pennsylvania.

Q.    What do you do for a living?

A.    I am an attorney.

Q.    How long?

A.    Practiced law for about fifteen years.

Q.    When did you become licensed to practice law first?

A.    I originally became licensed to practice law in Mexico and then became licensed to practice law in the Commonwealth of Pennsylvania.

Q.    Where did you go to law school?

A.    I went to law school at the Escuela Libre de Derecho in Mexico City.

Q.    And what degree did you obtain?

A.    The degree is formerly called Abogado, A-B-O-G-A-D-O. It's a bachelor's of law.

Q.    Is it comparable to a juris doctorate degree in the

United States?

A. Correct.

Q. And have you earned any other degrees?

A. I have. I have earned a Master of Laws from the University of Pennsylvania Law School and a Master of Comparative Laws from the University of Pennsylvania Law School.

Q. Are you licensed to practice law in all courts in the nation of Mexico?

A. Correct.

Q. In what courts of the United States are you licensed to practice law?

A. I am licensed to practice law in the Commonwealth -- all courts of the Commonwealth of Pennsylvania, as well as the Eastern Middle Districts of Pennsylvania, the Eastern District of Wisconsin, the Northern District of Illinois, the Third Circuit Court of Appeals, the Third Circuit US Court of Appeals, the Federal Court of Appeals, and the United States Supreme Court.

Q. For how much of your professional career have you been involved in litigation in the United Mexican states?

A. I've been engaged in litigation in Mexico since I graduated law school, uninterrupted.

Q. For the entire fifteen years or so?

A. Correct.

Q. And have you ever handled litigation in the state of Tamaulipas?

A. About a dozen times.

Q. Were any of those cases tort cases?

A. Every single one of them.

Q. And have you handled cases in the United States which involved the law of Tamaulipas?

A. Yes.

Q. And were any of those tort cases?

A. About seventy.

Q. Seventy?

A. Seven zero.

Q. Okay. Are you fluent in Spanish?

A. Yes, I am.

Q. Have you ever been recognized and accepted as an expert in Mexican law by any court in the United States?

A. I have. I've been accepted as an expert in Mexican law by the 190 District Court of Harris County. I believe that's the proper name. And I've been accepted as an expert in Mexican law by the Northern District of Texas, Dallas Division, and I've been accepted as an expert in Mexican law by the Central District of California, US District Courts of the Central District of California.

Q. Were you engaged by me as counsel for James Thomas Dorsey, Independent Executor of the Estate of Dorothy Longoria,

to opine on some issues of Mexican law?

A. I was.

Q. And have you formed some opinions relating to this case?

A. I have.

Q. Did you write an affidavit setting forth your opinions?

A. I did.

MR. FISHER: May I approach the witness, Your Honor?

THE COURT: You may.

Q. (By Mr. Fisher) Is Exhibit D-1 a copy of your affidavit?

A. I believe it's actually the original, but no exhibits.

Q. No exhibit?

A. Correct.

MR. FISHER: Your Honor, may I substitute a copy with the exhibits attached?

THE COURT: Any objection?

MR. HESS: No, Your Honor.

MR. FISHER: Thank you.

Q. (By Mr. Fisher) Please identify Exhibit D-1?

A. That's the affidavit I executed, I believe, on September 30th of this year.

Q. Did you write this affidavit?

A. I did.

Q. The affidavit has two exhibits. Can you identify those, please?

A. Certainly. The first of the exhibits is my CV. The second of the exhibits is the Spanish language version of a court opinion that I transcribed or I translated into English in the body of the affidavit.

Q. Now, Exhibit A, your curriculum vitae, does it accurately set forth the facts therein? Is it true and correct?

A. I believe that it's correct, yes.

Q. And is this affidavit true and correct in so far as it relates facts?

A. To the best of my knowledge, yes.

Q. Okay.

MR. FISHER: And Your Honor, we offer Exhibit D-1.

MR. HESS: No objections.

THE COURT: Exhibit D-1 is admitted.

Q. (By Mr. Fisher) Let's talk about claims for breach of fiduciary duty.

A. Certainly.

Q. If Mr. Dorsey, as an Executor of the Estate of Dorothy Longoria, were to try to bring his claims in a court in

Tamaulipas, would those claims be recognized?

A. Are we talking substantively?

Q. Yes.

A. There is no cause of action for breach of fiduciary duty under the laws of Tamaulipas.

Q. So if he were to file there the claims that he has filed in this Court, would any remedy be afforded?

A. None.

Q. Is an informal fiduciary relationship recognized under the laws of State of Tamaulipas?

A. Neither formal or informal are recognized.

Q. Were you present when Dr. Gabaurdi testified?

A. I was.

Q. And did you agree with what he said about private trusts being enforced in Mexico?

A. Well, private trusts, the Mexican Supreme Court has expressly said that Mexico does not recognize private trusts. It recognizes statutory trusts, statutorily based relationships where the trustee is also a financial institution, which are the Supreme Court has explained is viable in Mexico due to regulatory and legislative oversight of banking activities.

Q. Is there any tort that's recognized in Tamaulipas that could apply to the claims that the Executor has asserted in this Court?

A. The only thing that would remotely be actionable is

perhaps an unjust enrichment claim.

Q. Would that claim be available to the Executor in this case?

A. Not in this case, no.

Q. Why not?

A. Because that action is time barred.

Q. By statute of limitations?

A. And by statute of repose.

Q. What was the difference?

A. The statute of limitations is a waivable, it's simply the amount of time -- under Mexican law it's not called the statute of limitations, it's called prescription, and it's the loss of a right by the mere passage of time.

Q. And what is the statute of repose?

A. The statute of repose, which is actually in Spanish called Caducidad, C-A-D-U-C-I-D-A-D, is essentially the -- a provision of the law that is created as a matter of public policy that will bar any future actions.

Q. Can that be waived?

A. It can not.

Q. And how long is the period of the statute of repose?

A. The statute of repose is five years and the statute of limitations is one year.

Q. Just so I'm clear, it is your testimony that the statute of repose is non-waivable?

A.    That's correct.

Q.    In addition to the simple fact that the cause of action isn't recognized in Mexican law, would the law of Tamaulipas recognize any obstacle to anyone trying to bring a claim of breach of fiduciary duty?

A.    Well, there is certainly a lot of procedural obstacles, more than anything else, as Dr. Gabaurdi explained earlier, perhaps the biggest problem is that a complaint, as we know that in Mexico, is functionally a summary judgment motion. You have to have all of the information that could be available to you on the day you file a complaint because you are not really allowed to amend pleadings or introduce evidence that has not been identified at the outside. So I guess maybe adding to that is the fact that there is no discovery and there is no ability to inspect accounts, so, no, it could not be brought in Mexico.

Q.    I will represent to you that under Texas law if a fiduciary duty is owed, the fiduciary has an affirmative duty of disclosure and claims can be brought for a failure to disclose. Is there anything like that recognized in Mexican law?

A.    No.

Q.    Would a court in the state of Tamaulipas have jurisdiction or Shelby Longoria if the Executor of the Estate of Dorothy Longoria were to sue him on the theories presented

here?

A. The Court in Mexico would not have original jurisdiction because the, I guess, Mr. Longoria, Shelby, is admittedly a resident of the United States and causes of action in personam are -- the jurisdiction of Mexican courts and the courts of Tamaulipas specifically in per some actions is dependent upon the residence of the defendant. So if the defendant does not reside within, I won't call it jurisdiction, but within the territorial circumscription of the Court, then, no, there is no original jurisdiction.

Q. You have heard it -- have you been present throughout the hearing today?

A. I have.

Q. All right. You have heard it said that Shelby Longoria is voluntarily submitting to the jurisdiction of the courts in Tamaulipas?

A. In federal court, the amparo court.

Q. All.

A. I'm sorry, I just want to clarify.

Q. All?

A. All.

MR. HESS: I want to make it clear, all courts in Tamaulipas either federal or state.

A. Understood.

Q. (By Mr. Fisher) Is it your testimony that a court in

Tamaulipas would dismiss a case against Shelby even if he voluntarily purported to submit to its jurisdiction?

A. There is two aspects to the jurisdictional argument, one is the personal jurisdiction. There is a very distinct likelihood I would say almost certainly a court that receives a complaint, that sees a complaint that's filed with the court, has a duty to ascertain ab initio to whether it has jurisdiction. That's the first thing the Court must do. If the court sees that the defendant is not a resident of Mexico, the common practice among Mexican courts is that those cases get dismissed. So the defendant is never given notice and the action is never admitted to process by the court.

Q. Sua sponte dismissal, correct?

A. That is a sua sponte dismissal, correct. There is a separate issue as well with respect to what I would call subject matter jurisdiction and that there is a claim pending in the United States and the action which purportedly might be brought in Mexico is a cross-claim to that action. Now, I understand, based on the representations that were made today, that there is no challenge to this court's jurisdiction over the Estate or over the claims that Shelby Longoria has asserted. The problem is that the claims that Shelby Longoria has asserted are essentially standing claims. If an action were filed in Mexico, there is no question that the Court could not even ascertain whether the plaintiff has standing to file

that suit. So it could not entertain the substance of the dispute if it can't even entertain the predicate of the fundamentals which are does the party have standing to bring the suit.

Q. You are talking about the standing of James Thomas Dorsey as Executor?

A. Correct. My understanding is that Mr. Longoria is challenging Mr. Dorsey's appointment as the representative of the Estate, Executor of the Estate, excuse me.

Q. Now, with regard to the third party claims that Shelby Longoria has filed against Sylvia Dorsey and Adriana Longoria.

A. Yes.

Q. If Shelby were sued in Mexico, and let's just assume hypothetically, in spite of everything that you have said, the court took the case, exercised jurisdiction over it and proceeded, could the Court proceed to adjudicate those third party claims?

A. My understanding is that Adriana and Sylvia Longoria have not stipulated to the jurisdiction of Mexican courts for those purposes, because they are foreign residents there is no way that the court could adjudicate those claims, that a Mexican court in Tamaulipas could adjudicate those claims.

Q. You understand that Sylvia Dorsey and Adriana Longoria have filed an amparo action in federal court?

A.   I do.

Q.   What is an amparo action?

A.   An amparo action is an action that seeks constitutional redress from the Mexican federal judiciary acting as a constitutional court as against the acts of authorities or individuals, certain very limited categories of individuals acting under color of state law.

Q.   Dr. Gabaurdi testified in his affidavit that the filing of the amparo action was an acknowledgement of the adequacies, reliability and better convenience than the Mexican judicial system.  Is that true?

A.   Well, let me put it this way, what it is an amparo action is the only remedy that exists as far as I know in the world to obtain Mexican constitutional redress against a Mexican governmental entity, so I can't really speak to the convenience.  I don't know that it's a question of convenience, it's a question of it being the exclusive court that can adjudicate the constitutional violations by Mexican government authorities.

Q.   So an amparo case could not have been brought in any other courts?

A.   No.

Q.   And is the filing of an amparo case some sort of agreement to submit to the jurisdiction of the Mexican courts?

A.   Well, it's an agreement to submit to that court for

the purposes of that proceeding.

Q. But nothing more than that?

A. Nothing more than that or at large, correct.

Q. Does the concept of minimum contacts exist in Mexican law --

A. No.

Q. -- as to personal jurisdiction?

A. I'm sorry for not letting you finish. No, it does not.

Q. What about the concepts of specific jurisdiction and general jurisdiction?

A. The concepts themselves don't exist but what the way I would articulate it is, and I will use the terms jurisdiction and competence, which is the term of art in Mexico, interchangably just because they are functioning synonyms, I forgot where I was. The -- can you restate the question, Mr. Fisher?

Q. Specific and general jurisdiction.

A. Yes. The most akin way to explain it if I were talking about US law is that Mexico recognizes essentially something similar to specific jurisdiction. So jurisdiction is assessed on a case by case basis. There is no general jurisdiction of a particular court. It must be assessed on a case by case basis.

Q. Now, have you read Dr. Gabaurdi's affidavit?

A.    I have.

Q.    And do you recall he makes reference to a Supreme Court decision regarding service of process?

A.    I do.

Q.    Do you agree or disagree with his opinion concerning the significance of that case?

A.    I agree with the significance of that case except it has no application in Tamaulipas.

Q.    Why not?

A.    Well, let me distinguish.  Insofar as it pertains to the exercise of jurisdiction, I don't agree that that case speaks to jurisdiction.  It does not.  It speaks to service of process.  To the extent that it speaks to service of process, I agree that the case says what it says but it deals with provisions that are very different from those that exist in Tamaulipas vis-a-vis service of process, original service of process.

Q.    And what's the significance of that difference as it relates to this case?

A.    Insofar as it pertains to this case, in that the plaintiff, if a plaintiff were to file an action against Mr. Longoria in Mexico, in Tamaulipas specifically, they would have to identify his home address as the place where he lives and the place where he must be served with process.  That requires, obviously, that the court will immediately see, what the court

will immediately see is that the defendant is a foreign defendant and, as I mentioned earlier, more likely than not, highly more likely than not, will dismiss it sua sponte.

Q. Finally, in his opening statement, Mr. Carter said that a Mexican court might not recognize a judgment of this court. Do you agree or disagree with that assertion?

A. That's -- pardon me, that's wholeheartedly wrong. Mexican courts regularly enforce foreign judgments, particularly US judgments. Mexico is the US's their largest trading partner, the US is Mexico's first largest trading partner or largest trading partner as they are also known. If there were no way for their reciprocal judgments to be enforced between nations, that simply wouldn't be the case.

Q. Is there any or opinion concerning Dr. Gabaurdi's affidavit that you were prepared to express that I didn't ask you about?

A. Not that I can remember.

MR. FISHER: Nothing further, Your Honor.

THE COURT: All right.

CROSS-EXAMINATION

Questions By Mr. Hess:

Q. Mr. Rosenberg you are not admitted to practice law in Texas, right?

A. That is correct.

Q. You are not an expert in Texas law, right?

A.   Nor do I hold myself out to be.

Q.   Right.  You are not purporting to offer any greater knowledge or expertise in Texas law than the court or Texas lawyers in this room, right?

A.   No.

Q.   You are not offering any opinions about whether the allegations that have been made in this case by the Executor of the Estate meet any of the elements of any cause of action under Texas either, are you?

A.   That's correct.

Q.   You are not offering any opinions about the legal significance on a forum non conveniens consideration by a Texas court of the unavailability of a particular cause of action in Mexico, right?

A.   Only to the extent that Texas adopts federal standards for forum non conveniens which I am very familiar with.  I am licensed to practice in federal court too.

Q.   Right.  And I have handled a lot of forum non conveniens cases at the courthouse as well.  You are not offering yourself as an expert with greater knowledge and opinions that are being offered to this court on American legal standards on forum non conveniens?

A.   No, I believe that's the job of the Court.

Q.   Right.  And so you are not offering any opinions on the legal significance in a forum non conveniens -- in making a

forum non conveniens ruling in Texas or federal court of the unavailability of a cause of action in Mexico?

A.   No.   What I was asked to offer an opinion on is whether there is any cause of action under Mexican law under the laws of Tamaulipas for the claims asserted or for the facts as relayed in the counterclaim in this case.   And that's the scope of my opinion, that there is none.

Q.   And you are offering no opinions in the legal significance in the United States or specifically in Texas with respect to a forum non conveniens inquiry of the expiration of statute of limitation or statutes of repose, right?

A.   I'm sorry, that is a little long.

Q.   Right, that was a little long.   You are not offering any legal opinions about the Court in applying American forum non conveniens law the significance of expiration of statutes of limitation and statutes of repose, right?

A.   Once again, I'm not offering a single opinion on US law or Texas law.   That, my understanding, is the role of the court.

Q.   And you are offering an opinion that the statute of repose has expired in Mexico?

A.   Correct.

Q.   And statute of repose for these claims would be five years, right?

A.   Correct.

Q. And so these claims accrued more than five years ago, right?

A. That's my understanding. My understanding is that Mr. Longoria, Sr., Eduardo Longoria, Sr., passed way more than five years ago. And my understanding is that the affairs at issue and that the claims at issue, which my understanding is, and again, I don't purport to offer any opinion on US law, but the argument is arose at least as of 1983, any claims that arose thereon are barred by the statute of repose, yes, under Mexican law.

Q. Because they accrued more than five years ago, right?

A. Well, any unjust enrichment that accrued more than five years ago, regardless of whether it was discovered yesterday or discovered three and a half years ago, no, I'm not purporting to offer any further opinion on that.

Q. Right. And were you aware that the statute of limitations in Texas for breach of fiduciary is four years?

A. No. As I said, I'm not a Texas lawyer nor am I licensed to practice in Texas or familiar with statute of limitations or breach of fiduciary duty in Texas.

Q. Okay. Now, you testified that in Mexican court the standing of the Executor would have to be resolved first?

A. Well, it's a threshold issue in every case.

Q. So it's your testimony that a court would want to know whether the executor is the proper executor before it

reaches the substantive issues in the case?

A. No. What I am saying is that unless Mr. Longoria were to concede that Tommy Dorsey is the legitimate representative of the Estate, then the court would not enter, would not begin to study the case in Mexico at all. I would it not entertain the case at all.

Q. Right. The Court would not entertain the allegations being made by Mr. Dorsey if Shelby Longoria challenged Mr. Dorsey as Executor? The court would wait for that challenge to be resolved first?

A. No, they would dismiss the case. There is no stay of actions in Mexico. The case would be dismissed in its entirety. There is no cause of action in Mexico is essentially where I'm trying to get overall, because the court could never assert subject matter jurisdiction.

Q. And you are not offering any -- you're aware, I know you are not offering opinions in the US law, but you are aware that there are cases that address in the US the legal significance of a foreign court's. For example, in some countries there are statutes that say, we will reject subject matter jurisdiction if the case was first filed in the United States? Are you aware of that?

A. Yes, I am aware of that.

Q. And you are not offering any opinions of the legal significance of that rejection of subject matter jurisdiction

in the foreign forum?

A. No. And I'm not talking about the statutory basis, I'm talking about a court action. I'm assuming you are talking about the assertion of jurisdiction, right?

Q. Right.

A. By a second Mexican court in this case?

Q. Right.

A. Right. No, that's not what I'm saying at all. And I'm not offering opinion on that. I'm just saying the court can assess the standing of the parties, then it certainly cannot entertain the substance of a dispute.

Q. In any event, if the Will Contest and the challenge to the Executor were to proceed in this court and get to the end of that proceeding and it was found that the Executor is the proper Executor, there is no more challenge to it, that issue would go away in Mexico?

A. Well, certainly, and there would still be no claims to be asserted in Mexico.

Q. The Mexican Supreme Court interpreting the provisions of both the Mexican, federal and states Code of Civil Procedure --

A. What state, I'm sorry?

Q. Federal and many states Codes of Civil Procedure?

A. Which ones, sir?

Q. Okay. The Mexican Supreme Court, interpreting the

provisions of Mexican federal civil procedure, has long held the position that parties may agree or stipulate to submitting their disputes to a specific court even when that court can not ordinarily exercise territorial jurisdiction?

A. Yes, the Mexican Supreme Court has also explained that in those provisions it's speaking to choice of forum clauses in contracts.

Q. Individuals and entities are fully empowered to relinquish the benefit of their home forum and submit to the jurisdiction of a particular Mexican court, right?

A. Correct, provided they are afforded the process and the action is allowed to proceed.

Q. In order to do so, the parties must execute a written agreement which meets the two basic requirements described by the codes in the Supreme Court of Mexico, right, which are --

A. Well, the Mexican Supreme Court has actually --

Q. -- which are unquestionable, as you might be able to tell, I'm reading from an affidavit.

A. I know exactly what you are talking about.

Q. Unquestionable relinquishment of the domestic form and precise designation of the selected court?

A. That's correct.

Q. In other words, the parties can execute a document or what have you where they agree to jurisdiction in Mexico?

A. Yes. And after issuing those opinions, the Mexican

Supreme Court explained that when it was speaking in those terms it was talking about choice of forum clause.

Q. The parties could enter into a choice of forum?

A. As far as I understand, and I leave it at that, this is not a contract issue. They are talking about choice of forum provisions in contracts, so they are pre -- they are preselected choice of forum clauses that the Supreme Court has been talking about. And I do have to clarify that because the Supreme Court thereafter -- after I prepared that affidavit explained that it is talking about choice of forum clauses in commercial and civil contracts.

Q. Mexican courts recognize the ability of private parties to determine the court's jurisdiction by mutual consent, for instance, by including a choice of judicial forum clause in an agreement or by otherwise contractually submitting a dispute to the dispute to the jurisdiction of the court or arbitrable tribunal?

A. Correct.

MR. HESS: Thank you, no further questions.

MR. FISHER: Nothing further, Your Honor.

THE COURT: Thank you.

THE WITNESS: Thank you very much, Your Honor.

MR. FISHER: Your Honor, my last evidence is just to request judicial notice of the timing and contents of the pleadings in the case. I can quickly run through what they

are.

THE COURT: All right.

MR. FISHER: It is Shelby Longoria's Contest of 2010 Will filed on, I believe, on June 18th, 2013; the Original Counterclaims of James Thomas Dorsey as Independent Executor filed on July 18th, 2013; Shelby Longoria's Amended Will Contest of 2010 Will, they amended their pleading too, on August 30th, 2013; Shelby Longoria's Third Party Petition filed on August 30th, 2013; and James Thomas Dorsey, Independent Executor's Original Counterclaims to Shelby Longoria's Amended Contest of 2010 Will, and those Counterclaims were filed on September 26th, 2013.

THE COURT: All right.

MR. HESS: Your Honor, I would add one, which is the first thing filed in this case, which is Plaintiff's Original Petition and Demand for Trial by Jury, the Plaintiff there being Mr. Dorsey, as Executor, on May 3rd, 2013.

MR. FISHER: I don't object to the Court taking notice of it but that was not this case. That was a separate -- docketed as a separate case and not a part of this case.

THE COURT: But in this court?

MR. FISHER: In this court, yes, sir. And I don't object to you taking judicial notice of his contest.

THE COURT: So no objection as to -- between the parties as to all these documents or all these pleadings that

were just stated by both attorneys?

MR. HESS: Correct.

THE COURT: The Court takes judicial notice of those pleadings and their documents filed of record.

MR. FISHER: Your Honor, we want to declare on the record that our client, Sylvia Longoria will not voluntarily submit to the jurisdiction of the Mexican courts as a general proposition and we are resting. We just renew our request that the Court sustain the Objections, the Amended Objections that were filed last Thursday, September 26th, 2013. Those were objections to the affidavit of Shelby Longoria and to the affidavit of Kristen Schlemmer. And with that request, we rest, Your Honor.

THE COURT: All right.

MR. FISHER: Thank you.

MR. HESS: Your Honor, a lot of the objections listed in the Executor's written objections from last week have now been withdrawn and we would like the opportunity to file a response to the ones pending.

THE COURT: All right. I will allow that. I hate to open the door for a flurry of responses and sir responses and sir replies and stuff like that.

MR. FISHER: Your Honor, they filed a long reply brief yesterday. I don't understand why they couldn't address --

THE COURT: I will give you until Friday at five to supplement or further object to something and then I will give you until Tuesday to respond, if necessary. My point is, I'm going to rule by the end of next week on this. I want to give it its due consideration given all the work that's been done and all the testimony that has been heard, I want to think it through one last time. But I think y'all have covered it. Let me put it that way. Now, let me -- as to, now, objections to affidavits, etcetera, that's all I'm really opening the door to is to clarify that, to clarify what's still being objected to. I have the notes as to what is not objected to anymore. So as I go through your Amended Objections, I will take that into account. And then I suppose you want to have one last shot at responding to those objections?

MR. FISHER: Yes, Your Honor. I think that a lot of them relate to the affidavit of the attorney in our office who that kind of, you know, sent them through as summary judgment motions and attached a bunch of documents and we are a little concerned about, not about the affidavit itself, but the admissibility of the documents.

THE COURT: Correct.

MR. HESS: And for what it's worth, some of these documents were offered by the Executor today.

THE COURT: Okay.

MR. FISHER: We might be able to submit

something that's not a brief but that actually just clarifies and tells ultimately what we believe to be the lay of the land.

THE COURT: That's fine. I will read it. I mean, the bottom line is, as you know, on this one I'm the decision maker so I will be reading things. I'll be taking into account what's been objected to and what might not be admissible, obviously, but I get the big picture of what I have got to decide and what to take into consideration, so I thank y'all. Anything further?

MR. FISHER: No, Your Honor.

MR. HESS: No, Judge.

THE COURT: Thank y'all very much.

C E R T I F I C A T E

COUNTY    OF    HARRIS    *
STATE    OF    TEXAS    *

        I, Donald G. Pylant, Official Court Reporter in and for Probate Court No. 1 of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.
        I further certify that this Reporter's Record truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence by the respective parties.
        I further certify that the total cost for the preparation of this Reporter's Record is _____ and will be paid by _____.

        Given under my hand and seal of office this the _____ day of _____, 2013.


                            _____
                            Donald G. Pylant, C.S.R.
                            Official Court Reporter
                            in and for the County of
                            Harris and the State of
                                 T E X A S

Certification No. 668    Exp. Date: 12-31-2014
Probate Court No. One 201 Caroline Street, 6th fl.
Houston, Texas 77002 (713) 368-6692

| IN THE ESTATE OF | § | IN PROBATE COURT NO. ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

## ORDER DENYING MOTION OF SHELBY LONGORIA TO DISMISS OR TO ABATE COUNTERCLAIMS

On October 3, 2013, the Court heard Counter-Defendant Shelby Longoria's Motion To Dismiss Counterclaims for Forum Non Conveniens, or Alternatively To Abate Pending Resolution of Will Contest and Mexican Litigation (the "Motion"). Having considered the Motion, the brief filed in support of the Motion, the response to the Motion, the evidence admitted during the hearing on the Motion, and the record of this case, the Court has concluded that the Motion should be denied.

IT IS THEREFORE ORDERED that Counter-Defendant Shelby Longoria's Motion To Dismiss Counterclaims for Forum Non Conveniens, or Alternatively To Abate Pending Resolution of Will Contest and Mexican Litigation be, and hereby is, DENIED.

SO ORDERED on this 11th day of ___October___, 2013.

_____
PRESIDING JUDGE
PROBATE COURT NUMBER ONE
HARRIS COUNTY, TEXAS

ORDER DENYING MOTION OF SHELBY LONGORIA
TO DISMISS OR TO ABATE COUNTERCLAIMS                    Solo Page

00997

# JUDGE LOYD WRIGHT

Harris County Probate Court No. 1
201 Caroline, 6th Floor
Houston, Texas   77002
Phone 713-368-6700   Fax 713-368-7300

**FROM:**

Judge Loyd Wright        Kimberly Hightower        Susie Rowley

Ruth Ann Stiles          Hilda Riley               Cres Machicek

Betty Hazlewood          Paige Compton             Don Pylant

Anthi Pavlicek           Pam Speer

**To:**  James Fisher   214/661-9404
Richard Hess   7/654-6666
Bob MacInlyer   7/572-2902

**Date :**  10/11/13

**RE:**  Sangoria  414 270

**Comments:**

PAGE  1  OF  2

CONFIDENTIALITY NOTICE: THE DOCUMENTS ACCOMPANYING THIS TELECOPY TRANSMISSION CONTAINS CONFIDENTIAL INFORMATION WHICH IS LEGALLY PROVILEDGED. THE INFORMATION IS INTENDED ONLY FOR THE USE OF THE RECEIPIENT NAMED ABOVE, IF YOU HAVE RECEIVED THIS TELECOPY IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE TO ARRANGE FOR RETURN OF THE ORIGINAL DOCUMENTS TO US AND YOU ARE HEREBY NOTIFIED THAT ANY DISCLOSURE COPYING, DISTRIBUTION OR THE TAKING OF ANY ACTION IN RELIANCE ON THE CONTENTS OF THIS TELECOPIEDS INFORMATION IS STRICTLY PROHIBITED.
j:winword\misc\fax01

00998

ACCEPTED
234EFJ017816390
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
13 November 12 A9:27
Christopher Prine
CLERK

# 14-13-00996-CV

NO. _____

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
11/12/2013 9:27:06 AM
CHRISTOPHER A. PRINE
Clerk

IN THE _____ COURT OF APPEALS
HOUSTON, TEXAS

---

## IN RE SHELBY LONGORIA

Original Proceeding from the
Probate Court Number One, Harris County,
Texas, Cause No. 414270

---

## PETITION FOR WRIT OF MANDAMUS

---

Johnny W. Carter
State Bar No. 00796312
jcarter@susmangodfrey.com
Richard W. Hess
State Bar No. 24046070
rhess@susmangodfrey.com
Kristen Schlemmer
State Bar No. 24075029
kschlemmer@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Robert S. MacIntyre Jr.
State Bar No. 12760700
macintyre@mmlawtexas.com
MACINTYRE MCCULLOCH STANFIELD YOUNG
3900 Essex Lane, Suite 220
Houston, Texas 77027
Telephone: (713) 547-5400

**Attorneys for Shelby Longoria**

2927935v1/013774

**00999**

# IDENTITY OF PARTIES AND COUNSEL

**Relator:**

Shelby Longoria

**Represented by:**

Johnny W. Carter
State Bar No. 00796312
jcarter@susmangodfrey.com
Richard W. Hess
State Bar No. 24046070
rhess@susmangodfrey.com
Kristen Schlemmer
State Bar No. 24075029
kchlemmer@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone (713) 651-9366
Facsimile (713) 654-6666

Robert S. MacIntyre Jr.
State Bar No. 12760700
macintyre@mmlawtexas.com
MACINTYRE MCCULLOCH STANFIELD YOUNG
3900 Essex Lane, Suite 220
Houston, Texas 77002
Telephone (713) 547-5400

**Respondent:**

Hon. Loyd Wright, Probate Court No. 1, Harris County, Texas

**Real Party in Interest:**

James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased

i

01000

**Represented by:**

James Austin Fisher
State Bar of Texas Number 07051650
jfisher@fisherwelch.com
Shannon L.K. Welch
State Bar of Texas Number 90001699
swelch@fisherwelch.com
FISHER & WELCH
A Professional Corporation
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Telephone: 214.661.9400
Telecopier: 214.661.9404

T. Wesley Holmes
State Bar of Texas Number 09908495
wes@wesholmes.com
THE HOLMES LAW FIRM
1000 North Central Expressway, Suite 400
Dallas, Texas 75231
Telephone: 214.890.9267

**Third-Party Defendants:**

Sylvia Longoria Dorsey
Adriana Longoria

**Represented by:**

James Austin Fisher
State Bar of Texas Number 07051650
jfisher@fisherwelch.com
Shannon L.K. Welch
State Bar of Texas Number 90001699
swelch@fisherwelch.com

ii

FISHER & WELCH
A Professional Corporation
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Telephone: 214.661.9400
Telecopier: 214.661.9404

T. Wesley Holmes
State Bar of Texas Number 09908495
wes@wesholmes.com
THE HOLMES LAW FIRM
1000 North Central Expressway, Suite 400
Dallas, Texas 75231
Telephone: 214.890.9267

01002

# TABLE OF CONTENTS

STATEMENT OF THE CASE........................................................................................ ix

STATEMENT OF JURISDICTION.............................................................................. x

ISSUES PRESENTED..................................................................................................... xi

STATEMENT OF FACTS .............................................................................................. 1

    I.    Dorothy and Eduardo Sr. Plan Their Estates and Partition Their Property. ....................................................................................................... 1

    II.    Shelby Manages the Mexican Businesses and Sylvia and Adriana Receive Money. ................................................................................................. 2

    III.    Eduardo Sr. Puts His Assets in Trust and Enters into Private Agreements with Sylvia and Adriana................................................... 3

    IV.    Shelby Supports His Mother and Sisters............................................ 4

    V.    Sylvia and Adriana Procure New Wills from Dorothy ......................... 5

    VI.    Tommy Brings This Suit to Recover Money for His Wife from Shelby. ..................................................................................................... 6

    VII.    Tommy, Sylvia, and Adriana Sue Shelby in Mexico........................... 7

    VIII.    Tommy Repeatedly Repleads in Order to Avoid Dismissal................ 7

ARGUMENT ................................................................................................................... 9

    I.    The Trial Court Abused Its Discretion by Denying Dismissal............ 9

        A.    Tommy's Case Is About Mexican Property, Agreements, and Court Orders.................................................................................. 10

        B.    Tommy Relies on Procedural Smoke and Mirrors. .................. 13

        C.    Mexico is an Available and Adequate Alternative Forum. ...... 14

            1.    Mexico is an Available Forum. .......................................... 15

01003

  2.  Mexico is an Adequate Forum........................................ 17

 D.  The Private Interest Factors Weigh in Favor of Mexico. ........ 21

  1.  Access to Evidence is Much Greater in Mexico. .......... 22

  2.  The Availability of Compulsory Process Supports Trial in Mexico. ................................................................... 23

  3.  Costs Will be Less in Mexico. ...................................... 24

  4.  There Is No Need for a View of Any Premises............. 25

  5.  Trial Will Be More Expeditious and Inexpensive in Mexico. .................................................................... 25

  6.  Tommy's Arguments Are Meritless. ............................. 25

 E.  The Public Interest Factors Weigh in Favor of Mexico........... 28

II.  The Trial Court Abused Its Discretion by Denying Abatement. ....... 32

PRAYER ...................................................................................... 34

CERTIFICATE OF SERVICE ........................................................ 35

CERTIFICATE OF COMPLIANCE WITH APPELLATE RULE 52.3(j)........... 36

CERTIFICATE OF COMPLIANCE WITH APPELLATE RULE 9.4(i)............. 37

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 4(e)(6) ................... 38

v

# INDEX OF AUTHORITIES

**Cases**

*Aguinda v. Texaco, Inc.,*
    142 F. Supp. 2d 534 (S.D.N.Y. 2001) ................................................................. 20

*Benz Group v. Barreto,*
    404 S.W.3d 92 (Tex. App. – Houston [1st Dist.] 2013, no pet.) ......... 9, 22, 25, 26

*Del Istmo Assurance Corp. v. Platon,*
    2011 WL 5508641 (S.D. Fla. Nov. 9, 2011) ....................................................... 20

*Develo-Cepts, Inc. v. City of Galveston,*
    668 S.W.2d 790 (Tex. App. – Houston [14th Dist.] 1984, no writ) ................... 33

*DTEX, LLC v. BBVA Bancomer, S.A.,*
    508 F.3d 785 (5th Cir. 2007) ................................................... 15, 19, 22, 23, 25, 32

*Dunsby v. Transocean, Inc.,*
    329 F. Supp. 2d 890 (S.D. Tex. 2004) ................................................................ 20

*Gallego v. Garcia,*
    2010 WL 2354585 (S.D. Cal. June 9, 2010) ....................................... 18, 22, 30, 31

*Givens v. Ward,*
    272 S.W.3d 63 (Tex. App. – Waco 2008, no pet.) ............................................. 33

*Gomez de Hernandez v. Bridgestone / Firestone N. Am. Tire, L.L.C.,*
    204 S.W.3d 473 (Tex. App. – Corpus Christi 2006, pet. denied) ...................... 15

*Ibarra v. Orica USA,*
    493 Fed. App'x 489 (5th Cir. 2012) .............................................................. 15, 26

*In re Air Crash Over the Mid-Atlantic on June 1, 2009,*
    792 F. Supp. 2d 1090 (N.D. Cal. 2011) ........................................................ 16, 17

*In re BPZ Resources, Inc.,*
    359 S.W.3d 866 (Tex. App. – Houston [14th Dist.]
    2012, orig. proceeding) ................................................... 15, 23, 24, 26, 29

01005

*In re Ensco Offshore Int'l Co.,*
311 S.W.3d 921 (Tex. 2010) .................................................................. 9, 17, 23, 26

*In re Ford Motor Co.,*
591 F.3d 406 (5th Cir. 2009) .................................................................. 15, 16

*In re General Elec. Co.,*
271 S.W.3d 681 (Tex. 2008) .................................................................. 24

*In re Mantle Oil & Gas, LLC,*
2012 WL 5323584 (Tex. App. – Houston [1st Dist.] 2012, no pet.) .................. 20

*In re Pirelli Tire, L.L.C.,*
247 S.W.3d 670 (Tex. 2007) .................................................................. 15, 16, 18, 19, 23

*In re Prudential Ins. Co. of America,*
148 S.W.3d 124 (Tex. 2004) .................................................................. 9

*In re SXP Analytics, LLC,*
2012 WL 1357696 (Tex. App. – Houston [14th Dist.] Apr. 13, 2002, orig.
proceeding) .................................................................................... 22, 29, 31

*Israel Discount Bank Ltd. v. Schnapp,*
505 F. Supp. 2d 651 (C.D. Cal. 2007) ...................................................... 14

*ISTIL Group, Inc. v. Masood,*
2004 WL 948376 (D. Or. 2004) ............................................................... 14

*Koster v. (Am.) Lumbermen Mut. Cas. Co.,*
330 U.S. 518 (1947) ............................................................................. 31

*Miralda v. Tidewater, Inc.,*
2012 WL 3637845 (E.D. La. Aug. 23, 2012) ............................................... 27

*Morales v. Ford Motor Co.,*
313 F. Supp. 2d 672 (S.D. Tex. 2004) ...................................................... 20, 27

*Navarrete de Pedrero v. Schweizer Aircraft Corp.,*
635 F. Supp. 2d 251 (W.D.N.Y. 2009) ...................................................... 20

*Paolicelli v. Ford Motor Co.,*
289 Fed. App'x 387 (11th Cir. Aug. 20, 2008) ........................................... 27

01006

*Paulownia Plantations de Panama Corp. v. Rajamannan,*
    793 N.W.2d 128 (Minn. 2009) ............................................................ 20

*Perry v. Del Rio,*
    66 S.W.3d 239 (Tex. 2001) ................................................................ 33

*Rustal Trading US, Inc. v. Makki,*
    17 Fed. App'x 331 (6th Cir. Aug. 21, 2001) ...................................... 27

*S. Megga Telecommunications Ltd. v. Lucent Technologies, Inc.,*
    1997 WL 86413 (D. Del. 1997) ......................................................... 14

*Seguros Comercial America, S.A. de C.V. v. American President Lines, Ltd.,*
    966 S.W.2d 652 (Tex. App. – San Antonio 1998, no pet.) ............... 23

*SES Prods., Inc. v. Aroma Classique, LLC,*
    2013 WL 2456797 (Tex. App. – Houston [1st Dist.] June 6, 2013, no pet.) ...... 26

*Sonat Exploration Co. v. Cudd Pressure Control, Inc.,*
    271 S.W.3d 228 (Tex. 2008) .............................................................. 30

*Transunion Corp. v. Pepsico, Inc.,*
    811 F.2d 127 (2d Cir. 1987) .............................................................. 26

*United Bank for Africa PLC v. Coker,*
    2003 WL 22741575 (S.D.N.Y. 2003) ................................................ 14

*Vinmar Trade Fin., Ltd. v. Utility Trailers de Mexico, S.A. de C.V.,*
    336 S.W.3d 664 (Tex. App. – Houston [1st Dist.] 2010, no pet.).... 10, 15, 18, 22, 23, 24, 25, 26, 28, 29, 30

*Wasson Interests, Ltd. v. Adams,*
    405 S.W.3d 971 (Tex. App. – Tyler 2013, no pet.)............................ 21

*Yoroshii Invs. (Mauritius) Pte. Ltd. v. BP Int'l Ltd.,*
    179 S.W.3d 639 (Tex. App. – El Paso 2005, pet. denied) ................ 29

**Statutes**
Texas Gov't Code § 22.221(b) ................................................................. x

Texas Probate Code § 149C .................................................................. 33

01007

## STATEMENT OF THE CASE

James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, filed an action against Shelby Longoria in Harris County Probate Court Number One, Hon. Loyd Wright presiding. The executor alleged breach of fiduciary duty and sought an accounting.

Shelby Longoria then filed a will contest in the same court, alleging that the executor's wife Sylvia Longoria Dorsey, together with her sister Adriana Longoria, exercised undue influence in order to procure Dorothy Longoria's will, and that Dorothy Longoria lacked capacity to execute the will. Shelby Longoria also sought removal of James Thomas Dorsey as executor. The executor then nonsuited his claim and refiled it as a counterclaim to Shelby Longoria's will contest.

On August 7, 2013, Shelby Longoria filed a motion seeking either to dismiss the counterclaim for forum non conveniens, or to abate the counterclaim pending resolution of the will contest. On October 3, 2013, the trial court held an evidentiary hearing on the motion. On October 11, 2013, the trial court denied the motion without explanation.

01008

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this Petition for Writ of Mandamus under Section 22.221(b) of the Texas Government Code.

x

## ISSUES PRESENTED

1.    Did the probate court abuse its discretion by refusing to dismiss in favor of a Mexican forum a lawsuit brought by the estate of a Mexican citizen which seeks to recover half the value of Mexican businesses by challenging the validity of a trust holding those businesses, as well as the validity of Mexican probate proceedings and a Mexican separate property agreement which was entered as a judgment of a Mexican court?

2.    Did the probate court abuse its discretion by refusing to abate the estate's claims pending a resolution of whether the executor could properly assert those claims?

01010

## STATEMENT OF FACTS

This case concerns the long marriage of the decedent Dorothy Longoria ("Dorothy") to her husband Eduardo Longoria Sr. ("Eduardo Sr.") and the attempt by Dorothy's and Eduardo Sr.'s daughters – Adriana Longoria ("Adriana") and Sylvia Dorsey ("Sylvia") – to use Dorothy's estate to recover money from their brother, Shelby Longoria ("Shelby").

I.      Dorothy and Eduardo Sr. Plan Their Estates and Partition Their Property.

In the early 1940s, Eduardo Longoria Sr. married Dorothy Kowalski; they obtained marriage certificates in both Texas and Mexico.[1] Eduardo Sr. came from a prominent family in northern Mexico that had considerable success in business. Dorothy was from Ft. Worth, but she later became a Mexican citizen.[2] Over the course of their 62-year marriage, Dorothy and Eduardo Sr. lived in Nuevo Laredo, Mexico, and later, in Laredo, Texas.[3]

In 1983, Eduardo Sr. and Dorothy decided to partition their community property and have Mexico's separate-property regime govern their marital property.[4] Dorothy and Eduardo Sr. formalized this Spanish-language agreement by applying to a court in Tamaulipas, Mexico for entry of a judgment partitioning

---

[1] Record 00313, 00315, 00317, 01160.
[2] Record 00320-24, 00854.
[3] Record 00894, at ¶¶ 5-6, 10; 00853-54.
[4] Record 00094, at ¶ 8.

1

their property.[5] The Mexican court entered the requested judgment, and the couple's marriage certificate was amended to reflect their election of the separate-property regime.[6] Less than two years later, Dorothy executed a Spanish-language Mexican will in which she expressly declared that "she is married . . . under a Separate Property Regime."[7] Dorothy repeatedly acknowledged the couple's agreement to maintain separate property in various documents she executed over the next decades.[8]

II. Shelby Manages the Mexican Businesses and Sylvia and Adriana Receive Money.

Of Eduardo Sr. and Dorothy's four children, only one – Shelby, the youngest – expressed any real continuing interest in living and working along the Mexican border to help his father manage the businesses there on a day-to-day basis.[9] After graduating from college in 1975, Shelby moved to Nuevo Laredo to assist his father.[10] It was hard work. The companies struggled through devaluations of the Mexican peso in 1976, 1982, 1988, and 1994.[11]

---

[5] Record 00103-48.
[6] Record 00103-48.
[7] Record 00335.
[8] Record 00094, at ¶ 9; Record 00150-56.
[9] Record 00838-39.
[10] Record 00094, at ¶ 7; 00861.
[11] Record 00837-38.

2

01012

Eduardo Sr. consistently made clear that his sons – Shelby and Eduardo Jr. – would inherit interests in the nearly-insolvent Mexican businesses.[12] In contrast, his daughters – Sylvia and Adriana –would receive money during his lifetime.[13] In 1992, Eduardo Sr. signed a Spanish-language "Carta de Voluntad" ("Wish Letter"), which granted each daughter $3,000,000 in cash and properties to be distributed over time.[14] Despite the Wish Letter, Sylvia and Adriana continued to ask for even more money. Dorothy and Eduardo Sr. pleaded with them to become self-sufficient, to no avail.[15]

III.    Eduardo Sr. Puts His Assets in Trust and Enters into Private Agreements with Sylvia and Adriana.

In October 2002, Eduardo Sr. transferred the shares of his two Mexican holding companies to a trust administered by a Mexican bank pursuant to Mexican law.[16] He designated Shelby and Eduardo Jr. to be beneficiaries upon his death.[17]

Eduardo Sr. also executed a new Spanish-language Mexican will in October 2002.[18] The will affirmed the Spanish-language trust agreement and appointed Shelby as executor of Eduardo Sr.'s estate.[19]

---

[12] Record 00094, at ¶ 6; 00096, at ¶ 17; 00849-50.
[13] Record 00851.
[14] Record 00095, at ¶ 12; 00178-83.
[15] Record 00185-88.
[16] Record 00095, at ¶ 14; 00190-252.
[17] Record 00851, 01010-11.
[18] Record 00095-96, at ¶ 15; 00254-68.
[19] Record 01039-53.

3

01013

Two months later, Eduardo Sr. entered into Spanish-language "Acuerdos Privados" ("Private Agreements") with Sylvia and Adriana.[20] The Private Agreements stated that payments of $150,000 a year would be made to Sylvia and Adriana from the Mexican companies held in the Mexican trust until the full $3 million was paid.[21] Both Sylvia and Adriana acknowledged the validity of the Mexican Trust, agreed to application of Mexican law, and subjected themselves to venue in "the courts of the city of Reynosa, Tamaulipas, Mexico."[22]

## IV.   Shelby Supports His Mother and Sisters.

Eduardo Sr. died in 2005.[23] Dorothy then moved to Houston, and Sylvia took over managing her financial affairs. Sylvia obtained signatory rights to Dorothy's American bank accounts, which were funded by transfers arranged by Shelby from the Mexican businesses through Dorothy's accounts in Mexico.[24]

Following Eduardo Sr.'s death, the Mexican companies held by the trust continued to pay Sylvia and Adriana.[25] Around 2006, Sylvia asked for the acceleration of her payments.[26] Shelby arranged for all remaining amounts to be

---

[20] Record 00096, at ¶ 16; 00272-87.
[21] Record 00277, at ¶ 2; 00285.
[22] Record 00277, at ¶ 1; 278, at ¶ 4; 00285-86.
[23] Record 00096, at ¶ 17; 00370.
[24] Record 00097, at ¶¶ 20-21; 00857-58.
[25] Record 00096-97, at ¶ 18; 00855.
[26] Record 00097, at ¶ 19; 856.

4

01014

paid to Sylvia ahead of schedule.[27] In return, Sylvia acknowledged signed an agreement releasing all claims against Shelby or Eduardo's estate.[28]

V.    Sylvia and Adriana Procure New Wills from Dorothy

Meanwhile, Shelby was reviving the Mexican businesses and making them profitable.[29] At the same time, Adriana and Sylvia had run through their money and wanted more. A Mexican court had probated Eduardo Sr.'s will, found it to be valid, appointed Shelby as executor, and entered a final judgment.[30] Therefore, Sylvia and Adriana focused on their mother's estate.

Dorothy had two wills – a 1989 will for her Mexican property and a 1988 will for her U.S. property. Shelby was a beneficiary under both wills. The Spanish-language Mexican will designated Shelby as executor, and the U.S. will designated Shelby and Eduardo Jr. as co-executors.[31]

In December 2009, when Dorothy was ninety years old, Adriana had Dorothy sign a will which left all of Dorothy's remaining estate to Adriana.[32] When Sylvia found out, she had Dorothy execute a new will in January 2010 that divided Dorothy's estate equally between Adriana and Sylvia.[33] The January 2010

---

[27] Record 00097, at ¶ 19.
[28] Record 00289, at ¶¶ 1, 3.
[29] Record 00096, at ¶17; 00839.
[30] Record 00095, at ¶ 11; 00164-76; 00373-99; 00954-66.
[31] Record 00095, at ¶ 11; 00157-62; 00947-52.
[32] Record 00401-06.
[33] Record 00409.

5

01015

will named Sylvia's husband Tommy as executor, and thus opened the door for Tommy to sue Shelby after Dorothy's death.[34]

Tommy now purports to act as executor pursuant to the January 2010 will, which both he and Sylvia represented to the probate court as Dorothy's last will and testament.[35] But Dorothy executed her last will in July 2011. This will left most of her estate to Adriana and designated Adriana to be executor.[36]

## VI.    Tommy Brings This Suit to Recover Money for His Wife from Shelby.

Dorothy passed away on April 26, 2012. Two months later, Sylvia applied to probate the January 2010 will.[37] On October 9, 2012, the trial court admitted the 2010 will to probate and granted letters testamentary to Tommy as its executor.[38]

On May 6, 2013, Tommy filed a lawsuit against Shelby.[39] He alleged that Dorothy was somehow deprived of a community property interest over the course of her marriage to Eduardo Sr.[40] Tommy alleged that this resulted from the influence supposedly exercised on Eduardo Sr. by Shelby.[41] Tommy challenged the validity of the 1983 separate property agreement which was entered as an order of

---

[34] Record 00409.
[35] Record 00002, at ¶ 5; 00010, at ¶ 33.
[36] Record 00777-88.
[37] Record 00001.
[38] Record 01208-09.
[39] Record 00004.
[40] Record 00008, at ¶ 21.
[41] Record 00007, at ¶ 20; 00008, at ¶ 21

6

the Mexican court, the validity of the Mexican trust, and the validity of the Mexican probate proceedings relating to Eduardo Sr.'s estate.[42]

## VII. Tommy, Sylvia, and Adriana Sue Shelby in Mexico.

Tommy, Sylvia, and Adriana also sued Shelby in Mexican federal court.[43] In June 2013, they filed *amparo* proceedings, alleging that they had been denied their rights because, they said, they had not received notice of the probate of Eduardo Sr.'s will in state court in Tamaulipas.[44] Tommy has not pursued his *amparo*, but Sylvia's and Adriana's *amparo* is still pending in Mexican court.[45] Shelby has appeared and consented to personal jurisdiction in that proceeding.[46]

## VIII. Tommy Repeatedly Repleads in Order to Avoid Dismissal.

Shelby answered Tommy's probate court petition on June 17, 2013, and asserted forum non conveniens as a defense.[47] On June 18, 2013, Shelby filed a petition contesting the will pursuant to which Tommy was appointed as independent executor of Dorothy's estate.[48]

---

[42] Record 00006, at ¶ 11; 00008, at ¶¶ 22-23; 00009, at ¶¶ 24, 28-29.
[43] Record 00310, 00416-75, 00477-81.
[44] Record 00877-80, 00902.
[45] Record 00901-02.
[46] Record 00858, 00905, 00907.
[47] Record 01211.
[48] Record 00020.

7

01017

On July 18, 2013, after reviewing Shelby's answer asserting a forum non conveniens defense, Tommy nonsuited his claims and refiled them as counterclaims to the will contest.[49]

On August 30, 2013, Shelby filed a third-party petition seeking contribution from Sylvia and Adriana.[50]

On September 26, 2013, one week before the forum non conveniens hearing, Tommy filed another set of counterclaims which were rewritten to minimize the references to Mexico and accentuate the references to Texas.[51]

The probate court conducted an evidentiary hearing on Shelby's motion on October 3, 2013, and denied the motion on October 11, 2013.

---

[49] Record 00033, 00036.
[50] Record 00649-54.
[51] Record 00655-73.

8

01018

## ARGUMENT

The trial court abused its discretion in denying dismissal and in denying abatement.

### I.    The Trial Court Abused Its Discretion by Denying Dismissal.

"An appeal is not adequate when a motion to dismiss on forum non conveniens grounds is erroneously denied, so mandamus relief is available, if it is otherwise warranted." *In re Ensco Offshore Int'l Co.*, 311 S.W.3d 921, 923 (Tex. 2010).

There is a very well-developed body of case law concerning the standards for forum non conveniens dismissal, especially in cases brought in Texas concerning Mexican transactions. Tommy's arguments against dismissal are squarely contrary to that law. "A trial court has no 'discretion' in determining what the law is or applying the law to the facts." *In re Prudential Ins. Co. of America*, 148 S.W.3d 124, 135 (Tex. 2004).

Texas takes its common-law forum non conveniens doctrine from the equivalent federal doctrine. *Benz Group v. Barreto*, 404 S.W.3d 92, 96 (Tex. App. – Houston [1st Dist.] 2013, no pet.).

> First, "the court must determine whether there exists an alternative forum." *Piper Aircraft*, 454 U.S. at 255 n.22, 102 S. Ct. at 265. The court considers the amenability of the defendant to service of process and availability of an adequate remedy in the alternative forum. . . . Second, the court must determine which forum is best suited to the

9

01019

litigation. . . . In performing this second step, a court must consider whether certain private and public interest factors weigh in favor of dismissal.

*Vinmar Trade Fin., Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 672 (Tex. App. – Houston [1st Dist.] 2010, no pet.).

### A. Tommy's Case Is About Mexican Property, Agreements, and Court Orders.

Tommy alleges breaches of fiduciary duty against Shelby and seeks an accounting of business dealings which took place in Mexico. Until the eve of the motion to dismiss hearing, Tommy expressly made three broad allegations.

- Tommy challenged Eduardo Sr. and Dorothy's 1983 Agreement to Partition Community Property, alleging that "Eduardo and Dorothy did not enter into any legally valid agreement that modified Dorothy's community-property rights under Texas law."[52]

- Tommy alleged that Shelby induced Eduardo Sr. to enter into the 2002 Mexican trust agreement and execute his 2002 will "to divest Dorothy of her community-property interests and divert the marital estate to Shelby, to Wayo [Eduardo Jr.], and to one or more trusts for their benefit."[53]

- Tommy alleged that Shelby initiated and pursued the probate of his father's will in Mexico in order somehow to cheat his mother out of a community property interest.[54]

Tommy sought to avoid dismissal by completely rewriting his pleadings right before the hearing. Tommy asserted, contrary to his original petition and his

---

[52] Record 00006, at ¶ 11.
[53] Record 00008, at ¶¶ 21-23; 00009, at ¶¶ 24.
[54] Record 00009, at ¶¶ 26-29.

10

01020

original counterclaim, that he was not contesting Eduardo Sr.'s Mexican will or the fact that Eduardo Sr. signed the Mexican trust agreement.[55] But Tommy's counsel at the motion to dismiss hearing made clear that Tommy was *not* abandoning his effort to invalidate the Mexican trust agreement: When he cross-examined Shelby, many of his questions related to the trust and its Mexican businesses.[56]

Just five weeks before the hearing, Tommy filed an "Inventory, Appraisement, and List of Claims" asserting that the estate has a claim for $49,011,050 for shares of stock in the two Mexican companies which Eduardo Sr. conveyed to the Mexican trust.[57] The inventory is the only live pleading which clearly describes what the estate is after in this case.

Tommy's amended counterclaim is not a substantive change at all: He is still attacking Mexican agreements and Mexican court orders, but now he is trying to do it *sub silentio*. In order to prevail, Tommy still will have to persuade a court to invalidate the trust holding the Mexican businesses and to invalidate the orders of the Mexican court probating the will of Eduardo Sr. which provided for his property to be passed to Shelby and Eduardo Jr. through the trust.

Tommy also will have to overcome the agreed 1983 order of a Mexican court partitioning the property of Eduardo Sr. and Dorothy. Tommy attacked this

---

[55] Record 00688-89.
[56] Record 00862-64, 00870-73.
[57] Record 00626.

11

foreign judgment at the hearing and in a post-hearing filing in which he argued that it was somehow invalid because it purportedly was not signed by the parties.[58]

In an effort to create the appearance that this case is not primarily about Mexican property, trusts, and court orders, Tommy added allegations to his new amended counterclaim about two letters sent to Dorothy in Texas. The merit of Shelby's motion is illustrated by the weakness of Tommy's new allegations.

First, Tommy alleged Shelby promised Dorothy in 2007 that he would pay $100,000 each to Sylvia and Adriana upon Dorothy's death.[59] Tommy admits that Shelby tendered this money to Sylvia and Adriana, but complains that Shelby requested them to release any claims against him in return for receiving this substantial gift.[60] It is a mystery how these facts are supposed to support a claim *by the estate* against Shelby.

Second, Tommy pointed to a letter that Eduardo Jr. sent to Dorothy more than thirty years ago, on August 5, 1983, over his and Shelby's signature.[61] The handwritten letter, which Tommy grandiosely characterizes as establishing a "private trust," states *in full*:

> Dearest Mom,
> Shelby and I are writing you this letter with a great deal of love and respect. We want you to know that the assets that Dad has willed to

---

[58] Record 00696, 00832-33, 01203.
[59] Record 00659, at ¶ 17; 01162.
[60] Record 00659, at ¶ 17.
[61] Record 00658, at ¶ 16.

12

01022

us, as long as you live, we will hold them as if they were yours. We will make the fruits available to you for your direction as to their use. This letter has value to only you because of our commitment to your well-being and happiness. More importantly than the worldly goods is our promise to always care for you and to provide for your spiritual needs. We hereby pledge to you our unending devotion.

Your sons,
Eduardo Longoria K.   Shelby Luis Longoria[62]

It is absurd for Tommy to maintain that he is seeking to recover for the estate based on an obviously unenforceable 30-year-old pledge of devotion, while implausibly asserting that his case has nothing to do with the subsequent Mexican agreements and Mexican court orders that actually governed the arrangements for disposition of the Mexican property that made up the bulk of the assets separately owned by Eduardo Sr. and Dorothy.

In his inventory of claims, Tommy told the trial court what he is seeking: recovery of half of the value of the businesses transferred to the Mexican trust. Tommy's new allegations did not change the substance of his claims and were transparently designed just to get him past the motion to dismiss.

B. Tommy Relies on Procedural Smoke and Mirrors.

Tommy also relied on artful repleading by nonsuiting his claim and repositioning it as a counterclaim. Tommy made this a centerpiece of his argument against dismissal. He asserted, without support, that the court could not dismiss his

---

[62] Record 00770.

13

01023

counterclaim while maintaining jurisdiction over Shelby's claim.[63] This argument was wrong as a matter of law. *See Israel Discount Bank Ltd. v. Schnapp*, 505 F. Supp. 2d 651, 662 (C.D. Cal. 2007) (dismissing counterclaim for forum non conveniens in favor of an Israeli forum, while remanding the plaintiff's claim to California state court), *aff'd*, 321 Fed App'x 700 (9th Cir. 2009); *ISTIL Group, Inc. v. Masood*, 2004 WL 948376, at *6-*7 (D. Or. 2004) (dismissing only the counterclaim because Channel Islands were a superior forum), *report and recommendation adopted*, 2004 WL 1173134 (D. Or. May 26, 2004); *United Bank for Africa PLC v. Coker*, 2003 WL 22741575, at *4–6 (S.D.N.Y. 2003) (dismissing employee's employment related counterclaims on grounds of forum non conveniens or judicial deference while permitting employer to pursue RICO and other claims related to defendant's former employment); *S. Megga Telecommunications Ltd. v. Lucent Technologies, Inc.*, 1997 WL 86413 (D. Del. 1997) (dismissing for forum non conveniens counterclaims which "would unnecessarily burden the trial of plaintiffs' claims").

C.     Mexico is an Available and Adequate Alternative Forum.

Tommy, Sylvia, and Adriana have already conceded the availability and adequacy of Mexico as an alternative forum by suing Shelby there on some of the same factual issues they raise in this case.   Nevertheless, Tommy apparently

---

[63] Record 00675.

14

01024

convinced the trial court to deny dismissal based upon arguments which have uniformly been rejected in the case law.

### 1. Mexico is an Available Forum.

There is "a nearly airtight presumption that Mexico is an available forum." *In re Ford Motor Co.*, 591 F.3d 406, 413 (5th Cir. 2009). Numerous Texas and federal cases have found Mexico to be an adequate and available forum. *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 796 (5th Cir. 2007); *Ibarra v. Orica USA*, 493 Fed. App'x 489, 493 (5th Cir. 2012); *In re Ford Motor Co.*, 591 F.3d 406, 412 (5th Cir. 2009); *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677-78 (Tex. 2007); *Vinmar Trade Fin. Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 675 (Tex. App. – Houston [1st Dist.] 2010, no pet.); *Gomez de Hernandez v. Bridgestone / Firestone N. Am. Tire, L.L.C.*, 204 S.W.3d 473, 483 (Tex. App. – Corpus Christi 2006, pet. denied).

Tommy argued that Shelby would not be subject to personal jurisdiction in Mexican courts. But Shelby has agreed to submit himself to personal jurisdiction in Mexico in connection with this matter.[64] "If a defendant submits to jurisdiction, there is a presumption of forum availability." *In re Ford Motor Co.*, 591 F.3d 406, 413 (5th Cir. 2009); *see also In re BPZ Resources, Inc.*, 359 S.W.3d 866, 873 (Tex. App. – Houston [14th Dist.] 2012, orig. proceeding) ("We conclude that Peru is an

---

[64] Record 00097, at ¶ 23; 00804; 00858.

01025

alternate forum in which this action may be tried based upon relators' agreement to submit to personal jurisdiction in Peru.").

Shelby has already subjected himself to personal jurisdiction in the *amparo* proceeding. The Tamaulipas court has acknowledged Shelby's submission and accepted his appearance.[65] For this reason, too, Mexico is an available forum as a matter of law. *In re Ford Motor Co.*, 591 F.3d 406, 413 (5th Cir. 2009).

Tommy's Mexican law expert Ilan Rosenberg opined that a Mexican court might dismiss *sua sponte* for lack of personal jurisdiction upon seeing Shelby's U.S. address in Tommy's Mexican court filings.[66] But he had to agree on cross-examination that "Mexican courts recognize the ability of private parties to determine the court's jurisdiction by mutual consent."[67] The probate court should have conditioned dismissal on Shelby giving that consent. Tommy could not then defeat forum non conveniens dismissal in the United States by engineering a *sua sponte* dismissal in Mexico as suggested by his expert. *In re Air Crash Over the Mid-Atlantic on June 1, 2009*, 792 F. Supp. 2d 1090, 1097 (N.D. Cal. 2011) (a plaintiff cannot avoid forum non conveniens by engaging in "practices deliberately designed to defeat jurisdiction in the foreign forum"); *see In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677 (Tex. 2007) ("the contingency that a Mexican court might

---

[65] Record 00772-75, 00858, 00882-83.
[66] Record 00920-21.
[67] Record 00929.

16

01026

not accept Pirelli's waiver does not overcome the important public and private interests supporting dismissal.").

Finally, Tommy argued that Mexico was unavailable because his wife and sister-in-law, who are third-party defendants, purportedly will refuse to submit to the jurisdiction of the courts of Tamaulipas. But they already have submitted to the jurisdiction of those courts by filing lawsuits against Shelby there.[68] Moreover, both have agreed to submit any disputes concerning the Mexican trust to resolution by Tamaulipan courts.[69] Shelby told the trial court that he is willing to assume the (very minimal) risk that Sylvia and Adriana would somehow be able to evade the jurisdiction of Tamaulipan courts over his third-party claims.[70] But regardless, Sylvia and Adriana – who are in league with and share counsel with Tommy – cannot defeat forum non conveniens by engaging in "practices deliberately designed to defeat jurisdiction in the foreign forum." *In re Air Crash Over the Mid-Atlantic on June 1, 2009*, 792 F. Supp. 2d 1090, 1097 (N.D. Cal. 2011).

### 2. Mexico is an Adequate Forum.

A forum is inadequate if the remedies it offers are so unsatisfactory they really comprise no remedy at all." *In re Ensco Offshore Int'l Co.*, 311 S.W.3d 921, 924 (Tex. 2010). "The substantive law of the foreign forum is presumed to be

---

[68] Record 00537-38, 00881-82.
[69] Record 00278, at ¶ 14; 00286.
[70] Record 00749.

17

adequate unless the plaintiff makes some showing to the contrary, or unless conditions in the foreign forum made known to the court, plainly demonstrate that the plaintiff is highly unlikely to obtain basic justice there." *Vinmar Trade Fin. Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 674 (Tex. App. – Houston [1st Dist.] 2010, no pet).

Tommy argues that there is not a cause of action in Mexico for breach of "informal fiduciary relationships or private trusts."[71] But as a matter of law, Mexico is not an unavailable forum just because it does not recognize all causes of action that may be available in the United States. *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 678 (Tex. 2007). Mexican law permits actions in damages to redress purported injuries such as the one claimed by Tommy.[72]

An illustrative case is *Gallego v. Garcia*, 2010 WL 2354585 (S.D. Cal. June 9, 2010). *Gallego* involved the estate of Francisco Jose Gallego Garcia, Sr. ("Francisco Sr."), who died in San Diego, California in 1995. The personal representatives of his estate were Francisco Sr.'s wife ("Rosa Eugenia") and one of his sons ("Francisco Jr."). They sued Francisco Sr.'s other son, Hector Manuel Gallego Garcia ("Hector Manuel"), alleging that he engaged in a series of

---

[71] Record 00684-85, 00813-15.
[72] Record 00539-40, 00884-85, 00913-14.

18

**01028**

fraudulent transfers involving Mexican corporations before Francisco Sr.'s death to deprive Rosa Eugenia and Francisco Jr. of their inheritance rights. *Id.* at *1.

Hector Manuel moved to dismiss for forum non conveniens. The court concluded that Mexico was an available and adequate alternative forum for Rosa Eugenia and Francisco Jr. to assert their claims on behalf of Francisco Sr.'s estate. Hector Manuel demonstrated that "legal representatives of the Estate . . . could initiate a legal action in Mexico asserting claims similar to those asserted here," that Mexican courts "regularly hear disputes over ownership of assets within Mexico, including but not limited to real property, business interests and stock ownership," and that if plaintiffs were successful, a Mexican court could "award damages to the extent they have been deprived of the profits due to them, if any, from the operation of those businesses." *Id.* at *2.

*Gallego*, together with Texas Supreme Court and Fifth Circuit precedent, demonstrate that Mexican courts are available and adequate. *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 678 (Tex. 2007); *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 796 (5th Cir. 2007). These claims do not belong in a United States court.

Tommy asserts that Mexico is inadequate because limitations has run on his claims in Mexico. But the trial court could have conditioned forum non conveniens dismissal on Shelby's agreement not to assert limitation defenses in

19

Mexico. *In re Mantle Oil & Gas, LLC,* 2012 WL 5323584 (Tex. App. – Houston

[1st Dist.] 2012, no pet.); *Dunsby v. Transocean, Inc.,* 329 F. Supp. 2d 890, 895-96

(S.D. Tex. 2004). Shelby has assented to this agreement.[73]

Tommy's Mexican law expert, Ilan Rosenberg, opined that Tamaulipan

courts would not have subject-matter jurisdiction over Tommy's claims because of

a purported Tamaulipan statute which supposedly would divest Tamaulipan courts

of jurisdiction due to the prior filing in the United States.[74] However, the concept

of "preemptive jurisdiction" under Mexican law does not prevent a Mexican court

from asserting subject-matter jurisdiction over a case dismissed from a court in the

United States. *Navarrete de Pedrero v. Schweizer Aircraft Corp.,* 635 F. Supp. 2d

251, 261 (W.D.N.Y. 2009). And "courts, both state and federal, have refused to

recognize foreign laws that purport to make the home forum unavailable because

of a prior U.S. filing." *Del Istmo Assurance Corp. v. Platon,* 2011 WL 5508641

(S.D. Fla. Nov. 9, 2011); *see Morales v. Ford Motor Co.,* 313 F. Supp. 2d 672, 676

(S.D. Tex. 2004); *Aguinda v. Texaco, Inc.,* 142 F. Supp. 2d 534, 546 (S.D.N.Y.

2001), *aff'd,* 303 F.3d 470 (2d Cir. 2002); *Paulownia Plantations de Panama*

*Corp. v. Rajamannan,* 793 N.W.2d 128, 134-35 (Minn. 2009).

---

[73] Record 00804, 00858.
[74] Record 00712.

01030

Mr. Rosenberg abandoned his subject-matter jurisdiction opinion while on the stand at the motion to dismiss hearing.[75] In its place, he substituted a new argument – that a Mexican court would decline to address the merits while Tommy's standing as executor was unclear due to the will contest.[76] On this score, Mexican law is the same as Texas law. *See Wasson Interests, Ltd. v. Adams*, 405 S.W.3d 971, 973 (Tex. App. – Tyler 2013, no pet.) ("standing is a threshold question. When the issue is raised, it should be addressed first."). Mr. Rosenberg's argument supports either outright dismissal for forum non conveniens or abatement of the counterclaim pending resolution of the will contest.

D.    The Private Interest Factors Weigh in Favor of Mexico.

The private interest factors strongly support dismissal in favor of a trial in Mexico. "The factors pertaining to the private interests of the litigants include the following: (1) the ease of access to evidence; (2) the availability of compulsory process for the attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) the possibility of a view of the premises, if appropriate; and (5) any other practical factors that make trial expeditious and inexpensive." *Vinmar Trade Fin. Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 676 (Tex. App. – Houston [1st Dist.] 2010, no pet.).

---

[75] Record 00926-27.
[76] Record 00916-18, 00926-27.

21

01031

1.    Access to Evidence is Much Greater in Mexico.

Dismissal is warranted where, as here, most of the documents and witnesses are located in another jurisdiction. *Vinmar Trade Fin., Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 677 (Tex. App. – Houston [1st Dist.] 2010, no pet.); *Benz Group v. Barreto*, 404 S.W.3d 92, 98 (Tex. App. – Houston [1st Dist.] 2013, no pet.); *In re SXP Analytics, LLC*, 2012 WL 1357696; at *3 (Tex. App. – Houston [14th Dist.] Apr. 13, 2002, orig. proceeding); *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 798 (5th Cir. 2007); *Gallego v. Garcia*, 2010 WL 2354585, at *4 (S.D. Cal. June 9, 2010).

On June 21, 2013, Tommy served 194 requests for production of documents on Shelby, and in July, he served 248 requests. Both sets of requests make clear that the documentary evidence in this case is overwhelmingly in Mexico. He seeks documents related to Mexican businesses, Mexican bank accounts, and the Mexican trust.[77] Not only are these documents in Mexico, but Mexico is also the location of all court files for, and lawyer files relating to, the Mexican judgments challenged by Tommy in this case, such as the 1983 Agreement to Partition Community Property and the 2010 judgment approving the probate of Eduardo Sr.'s will and distribution of his estate.

---

[77] Record 00483-528.

22

01032

The vast majority of witnesses are in Mexico. The witnesses to Eduardo Sr.'s will and the execution of the trust agreement reside in Mexico. So do Eduardo Sr.'s legal advisors, the Banca Afirme employees who managed the trust, and the employees of the trust's Mexican businesses.[78]

2. The Availability of Compulsory Process Supports Trial in Mexico.

Witnesses in Mexico cannot be compelled to testify in a case in Texas. *In re Ensco Offshore Int'l Co.*, 311 S.W.3d 921, 926 (Tex. 2010); *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 678 (Tex. 2007); *In re BPZ Resources, Inc.*, 359 S.W.3d 866, 879 (Tex. App. – Houston [14th Dist.] 2012, orig. proceeding); *Seguros Comercial America, S.A. de C.V. v. American President Lines, Ltd.*, 966 S.W.2d 652, 656 (Tex. App. – San Antonio 1998, no pet.). But they can be compelled to testify in Mexico, where the Dorseys' recently-filed lawsuit is pending.

"The lack of compulsory process in Texas for reaching the great majority of witnesses would be substantially unjust." *In re BPZ Resources, Inc*, 359 S.W.3d 866, 875 (Tex. App. – Houston [14th Dist.] 2012, orig. proceeding). "To fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition is to create a condition not satisfactory to litigants." *DTEX, LLC v. Bancomer, S.A.*, 508 F.3d 785, 799 (5th Cir. 2007). "The

---

[78] Record 00093-97, 00103-48, 00190-252, 00254-67.

23

01033

supreme court has determined that 'requiring parties to litigate a case . . . in Texas until it becomes clear that it is 'impossible' to defend the case due to the unavailability of evidence and fact witnesses because they are beyond the reach of compulsory process is a waste of private and public resources." *In re BPZ Resources, Inc.*, 359 S.W.3d at 875 (quoting *In re General Elec. Co.*, 271 S.W.3d 681, 689 (Tex. 2008)).

### 3. Costs Will be Less in Mexico.

"Because the majority of the pertinent evidence and witnesses are in Mexico, it follows that the expense of litigating in Texas will be greater than it would be to litigate in Mexico." *Vinmar Trade Fin., Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 644, 677 (Tex. App. – Houston [1st Dist.] 2010, no pet.). "For those witnesses who are willing to testify in Texas, and who can obtain the necessary visas to do so, there will be costs in bringing them to Houston to testify, and housing and feeding them while here." *In re BPZ Resources, Inc.*, 359 S.W.3d 866, 879 (Tex. App. – Houston [1st Dist.] 2010, no pet.).

Continuing Tommy's lawsuit in the United States will mean both sides will incur significant costs in translating Spanish-language documents and interpreting testimony of Spanish-speaking witnesses. In contrast, the costs of translation and interpretation in Mexico will be minimal. The great majority of the relevant documents are in Spanish, and most of the witnesses speak Spanish (including both

24

Sylvia and Shelby, as well as their siblings Adriana and Eduardo Jr.).[79] For many courts, the need to translate documents and interpret witness testimony has been a significant consideration in concluding that the private interest factors weigh in favor of dismissal. *See Benz Group v. Barreto*, 404 S.W.3d 92, 98 (Tex. App. – Houston [1st Dist.] 2013, no pet.); *Vinmar Trade Fin., Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 678 (Tex. App. – Houston [1st Dist.] 2010, no pet.); *Dtex, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 799 (5th Cir. 2007).

### 4. There Is No Need for a View of Any Premises.

"The possibility of a view of the premises" is irrelevant in this case.

### 5. Trial Will Be More Expeditious and Inexpensive in Mexico.

All practical factors overwhelmingly favor trial in Mexico. The witnesses, documents, contracts, and court proceedings at issue are largely based in Mexico. It makes no sense to try this case in the United States.

### 6. Tommy's Arguments Are Meritless.

Tommy argues that the parties reside in Texas. But the deference afforded to a resident plaintiff's forum choice is not absolute:

> Citizens or residents deserve somewhat more deference than foreign plaintiffs, but dismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum

---

[79] Record 00103-24, 00150-69, 00178-79, 00185, 00190-221, 00254-60, 00272-75, 00281-83, 00313, 00326-32, 00342-67.

25

would be unnecessarily burdensome for the defendant or the court, dismissal is proper.

*Vinmar Trade Fin.Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 673 (Tex. App. – Houston [1st Dist.] 2010, no pet.). Texas courts have dismissed claims for forum non conveniens even where:

- Texas residents have been plaintiffs. *Benz Group*, 404 S.W.3d 92, 99-100 (Tex. App. – Houston [1st Dist.] 2013, no pet); *Vinmar Trade Fin. Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 668 (Tex. App. – Houston [1st Dist.] 2010, no pet.).

- Texas residents have been defendants. *In re Ensco Offshore Int'l Co.*, 311 S.W.3d 921, 927-28 (Tex. 2010); *In re BPZ Resources, Inc.*, 359 S.W.3d 866, 869-70 (Tex. App. – Houston [14th Dist.] 2012, orig. proceeding).

- Both plaintiffs and defendants have included Texas residents. *Ibarra v. Orica USA*, 493 F. App'x 489, 491 (5th Cir. 2012); *SES Prods., Inc. v. Aroma Classique, LLC*, 2013 WL 2456797, at *1, *5 (Tex. App. – Houston [1st Dist.] June 6, 2013, no pet.).

Tommy's second "private interest" argument is that Tamaulipas is dangerous. But, as a matter of law, dangerous or violent conditions in a foreign forum do not weigh against dismissal in favor of that forum unless those conditions have adversely impacted the judicial system. *See In re BPZ Resources, Inc.*, 359 S.W.3d 866, 879 (Tex. App. – Houston [14th Dist.] 2012, orig. proceeding) ("Allegations of political unrest have generally been unsuccessful in courts' determinations that a foreign forum is inconvenient."); *Transunion Corp. v. Pepsico, Inc.*, 811 F.2d 127, 129 (2d Cir. 1987) ("no showing was made that

26

01036

political unrest in the Philippines has had an adverse effect upon the judicial system there."); *Paolicelli v. Ford Motor Co.*, 289 Fed. App'x 387, 391 (11th Cir. Aug. 20, 2008) ("plaintiff Bonilla alleges that the political instability in Colombia poses safety risks for the parties, but absent evidence the political unrest has affected the Colombian judicial system or would affect litigation of this case, this fact is not sufficient to outweigh the other factors that weigh in favor of dismissal."); *Rustal Trading US, Inc. v. Makki*, 17 Fed. App'x 331, 337 (6th Cir. Aug. 21, 2001) (forum non conveniens dismissal was warranted, despite State Department travel advisory concerning hazards of travel in Sierra Leone, in the absence of "some credible evidence indicating that the conditions in Sierra Leone would prevent the parties from accessing the courts in Freetown"); *Miralda v. Tidewater, Inc.*, 2012 WL 3637845, at *4 (E.D. La. Aug. 23, 2012) ("several federal appellate courts have uniformly concluded that the political unrest of the alternative forum does not *per se* render this forum inadequate in the *forum non conveniens* context, absent some showing that this unrest negatively affects the judicial system of the country or the litigation at issue."); *Morales v. Ford Motor Co.*, 313 F. Supp. 2d 672, 682 (S.D. Tex. 2004) ("[A] (convincing) argument against *forum non conveniens* dismissal premised on delay due to political unrest and the like should involve 'exact evidence for the length of the delay and a delay of many years.' . . . Such evidence is lacking in this case.").

27

01037

Tommy relies only on a State Department travel advisory which does not even hint that judicial relief has been foreclosed due to conditions in Tamaulipas.[80] Sylvia, Adriana, and Tommy all have been able to hire attorneys and file claims against Shelby in Tamaulipas in the last few months.[81] It is undisputed that Tamaulipas has a fully functioning judicial system.[82] Tommy's own expert witness has handled a dozen tort cases in the courts of Tamaulipas.[83]

E.    The Public Interest Factors Weigh in Favor of Mexico.

The public interest factors easily support trial of this matter in Mexico. A Harris County court and jurors should not be burdened with resolving a dispute over Mexican court proceedings, contracts, and business transactions.

"The relevant public interest factors are as follows: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies decided at home; (3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty." *Vinmar Trade Fin., Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 678 (Tex. App. – Houston [1st Dist.] 2010, no pet.)

---

[80] Record 00689-90, 00721-30.
[81] Record 00876-77, 00880.
[82] Record 00876.
[83] Record 00910.

28

01038

"Within the public interest factors, litigating the suit in the forum that is at home with the governing law is an important consideration." *In re BPZ Resources, Inc.*, 359 S.W.3d 866, 876 (Tex. App. – Houston [14th Dist.] 2012, orig. proceeding). "An action generally should be tried in a court familiar with the law governing the case." *Yoroshii Invs. (Mauritius) Pte. Ltd. v. BP Int'l Ltd.*, 179 S.W.3d 639, 646 (Tex. App. – El Paso 2005, pet. denied); *see also In re SXP Analytics, LLC*, 2012 WL 1357696, at *5 (Tex. App. – Houston [14th Dist.] Apr. 13, 2002, orig. proceeding) ("There is a strong interest in having localized controversies decided at home in a forum that is familiar with the state law that must govern the case."). ***"Even the possibility that foreign law applies to a dispute is sufficient to warrant dismissal on forum non conveniens grounds."*** *Vinmar Trade Fin., Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 678 (Tex. App. – Houston [1st Dist.] 2010, no pet.). Further, Mexico has a strong interest "in regulating Mexican companies conducting business and allegedly perpetrating fraud within its boundaries." *Id.* at 679. As a result, Mexican law is applicable, even when a Texas resident alleges that he was the target of a fraud, when the fraud "occurred in the context of . . . Mexican business transactions with Mexican companies." *Id.*

Tommy addresses choice of law principally by arguing that he has not pled a cause of action under Mexican law. But choice of law is not a pleadings issue;

29

instead, "choosing the applicable law is *obviously* a question of law." *Sonat Exploration Co. v. Cudd Pressure Control, Inc.*, 271 S.W.3d 228, 231 (Tex. 2008).

Tommy has not even attempted to make a cogent argument that Texas law somehow could apply to a challenge to the order of the Mexican court partitioning community property, the Mexican trust agreement, and to orders of the Mexican court probating Eduardo Sr.'s will. Instead, he argues that Texas law would govern whether there was a fiduciary duty relating to property and trusts located in Mexico, and that Texas law would govern whether the marital estate was community property despite an agreed order of a Mexican court that it was not. He does not, and cannot, cite a single case in support of these arguments, much less refute the "possibility" that foreign law applies to the dispute.

Tommy's principal public-interest argument is that Dorothy lived in Houston. But he cannot distinguish *Gallego v. Garcia*, 2010 WL 2354585 (S.D. Cal. June 9, 2010), a case almost directly on point in which the court dismissed for forum non conveniens an action brought by representatives of an estate appointed by a United States court to recover for fraud involving Mexican businesses which was directed at a decedent who resided in the United States:

> The only basis for San Diego's interest in this litigation is the fact that the Decedent's Estate is being probated here as a result of the fact that Decedent died here. It is undisputed, however, that Decedent himself had a significant connection to Mexico, that the Defendants are from

30

01040

Mexico, that the assets in dispute are in Mexico, and most if not all of the evidence and witnesses are located in Mexico.

*Gallego*, 2010 WL 2354585, at *6.

This case is also similar to *In re SXP Analytics, LLC*, 2012 WL 1357696 (Tex. App. – Houston [14th Dist.] Apr. 13, 2002, orig. proceeding), in which the Court of Appeals held that the district court abused its discretion in failing to dismiss a case in favor of a Wisconsin forum. That case centered on plaintiffs' allegations that the defendant had mismanaged and breached fiduciary duties in connection with a Wisconsin corporation. Just like the trial court in this matter will have to apply foreign law to issues relating to the trust, the trial court in *SXP* would have been required to apply "Wisconsin's statutory scheme for regulating limited liability companies." *Id.* at *5. This fact was enough to warrant dismissal for forum non conveniens:

> [J]urisdiction should normally be declined "where a determination of the rights of the litigants involves regulation and management of the internal affairs of the corporation dependent upon the laws of the foreign State . . . or where the relief sought may be more appropriately adjudicated in the courts of the State or country to which the corporation owes its existence."

*Id.* (quoting *Koster v. (Am.) Lumbermen Mut. Cas. Co.*, 330 U.S. 518, 530-31 (1947)).

Mexico's interest in this matter is particularly strong because Tommy alleges that Shelby defrauded the Mexican court system through his probate of

31

01041

Eduardo Sr.'s will in Mexico and challenges the validity of the 1983 Mexican court order partitioning Eduardo Sr.'s and Dorothy's community property. In *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785 (5th Cir. 2007), allegations concerning Mexican judicial proceedings led the Fifth Circuit to conclude that dismissing on forum non conveniens grounds favored the public interest. DTEX, the plaintiff, alleged that defendant Bancomer "filed allegedly unlawful lawsuits in Mexican courts." *Id.* at 802. DTEX and Bancomer disagreed over "whether the Mexican courts' previous decisions are binding." *Id.* at 803. Concluding that "Mexican law likely will apply to this case, or, at a minimum, be critical," the Fifth Circuit dismissed for forum non conveniens. The court explained that:

> Mexican courts have a greater interest than an American court in deciding whether Mexico's court system was systematically abused or manipulated to frustrate and delay DTEX's ability to take possession of property purchased in Mexico in an auction arranged by the Mexican government.

*Id.* at 802.

This is a Mexican dispute over Mexican agreements, property, and businesses, all relating to a Mexican man whose Mexican estate was probated in Mexico. Mexico is an adequate and available alternative forum, and the private and public interest factors favor dismissal. The trial court abused its discretion by denying dismissal.

## II. The Trial Court Abused Its Discretion by Denying Abatement.

32

01042

The trial court abused its discretion by refusing to abate its consideration of Tommy Dorsey's counterclaims while it resolves the will contest and while the proceedings in Mexico remain pending. There could be nothing more wasteful or disorderly than proceeding to litigate a case which the plaintiff may be divested of his authority to pursue because of the outcome of a parallel proceeding. *Givens v. Ward*, 272 S.W.3d 63, 73 (Tex. App. – Waco 2008, no pet.) (quoting *Perry v. Del Rio*, 66 S.W.3d 239, 252 (Tex. 2001)) ("The obvious reasons for abatement . . . are the conservation of judicial resources, avoidance of delay, 'comity, convenience, and the necessity for an orderly procedure in the trial of contested issues.'").

Shelby's contest of the 2010 will raises issues antecedent to Tommy's claims. The will contest asks the trial court to remove Tommy as executor because (i) Tommy was appointed pursuant to an invalid will and (ii) he has a "material conflict of interest" which makes him "incapable of properly performing the independent executor's fiduciary duties" pursuant to Texas Probate Code § 149C.[84]

It is well-established that a case should be abated pending a determination of a plaintiff's standing or capacity to sue. *Develo-Cepts, Inc. v. City of Galveston*, 668 S.W.2d 790, 793 (Tex. App. – Houston [14th Dist.] 1984, no writ). If the will contest is successful, Tommy would lose his capacity to pursue a claim against

---

[84] Record 00633-48.

33

Shelby. Further, resolution of the Mexican lawsuits against the Dorseys would foreclose any right to the relief they seek through their counterclaims.

## PRAYER

The Court should grant the writ of mandamus and compel the dismissal or abatement of the counterclaims asserted by James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased.

Respectfully submitted,

SUSMAN GODFREY L.L.P.


By: _/s/ Johnny W. Carter_
    Johnny W. Carter
    State Bar No. 00796312
    jcarter@susmangodfrey.com
    Richard W. Hess
    State Bar No. 24046070
    rhess@susmangodfrey.com
    Kristen Schlemmer
    State Bar No. 24075029
    kschlemmer@susmangodfrey.com
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002-5096
    Telephone: (713) 651-9366
    Fax: (713) 654-6666

34

01044

Robert S. MacIntyre Jr.
State Bar No. 12760700
macintyre@mmlawtexas.com
MACINTYRE MCCULLOCH STANFIELD
YOUNG
3900 Essex Lane, Suite 220
Houston, Texas 77027
Telephone: (713) 547-5400
*Attorneys for Shelby Longoria*

## CERTIFICATE OF SERVICE

This is to certify that on this the 12th day of November, 2013, a true and correct copy of the above and foregoing instrument was properly forwarded to the following counsel of record in accordance with Rule 21 of the Texas Rules of Civil Procedure as indicated below:

James Austin Fisher                    *Via Electronic Mail*
FISHER & WELCH
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Email: jfisher@fisherwelch.com

T. Wesley Holmes
THE HOLMES LAW FIRM
1000 North Central Expressway, Suite 400
Dallas, Texas 75231
Email: wes@wesholmes.com
*Attorneys for James Thomas Dorsey, Sylvia Dorsey, and Adriana Longoria*

/s/ Johnny W. Carter
Johnny W. Carter

35

01045

## CERTIFICATE OF COMPLIANCE WITH APPELLATE RULE 52.3(j)

This certifies that the undersigned has reviewed this Petition and concluded that every factual statement in it is supported by competent evidence included in the Appendix or record, as required by Appellate Rule 52.3(j).

_/s/ Johnny W. Carter_
Johnny W. Carter

36

01046

## CERTIFICATE OF COMPLIANCE WITH APPELLATE RULE 9.4(i)

I certify that this document contains 7,515 words, as indicated by the word-count function of the computer program used to prepare it, and excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and index, as provided by Appellate Rule 9.4(i).

/s/ Johnny W. Carter
Johnny W. Carter

01047

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 4(e)(6)

This certifies that this document has been checked for viruses and malware.

_/s/ Johnny W. Carter_
Johnny W. Carter

38

01048

NO. _____

IN THE _____ COURT OF APPEALS
HOUSTON, TEXAS

---

**IN RE SHELBY LONGORIA**

Original Proceeding from the
Probate Court Number One, Harris County,
Texas, Cause No. 414270

---

APPENDIX TO PETITION FOR WRIT OF MANDAMUS

---

Johnny W. Carter
State Bar No. 00796312
Richard W. Hess
State Bar No. 24046070
Kristen Schlemmer
State Bar No. 24075029
**SUSMAN GODFREY L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone 713 651-9366
Facsimile 713 654-6666

Robert S. MacIntyre Jr.
State Bar No. 12760700
**MACINTYRE MCCULLOCH STANFIELD YOUNG**
3900 Essex Lane, Suite 220
Houston, Texas 77002
Telephone 713 547-5400

**Attorneys for Shelby Longoria**

01049

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN PROBATE COURT NO. ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

## ORDER DENYING MOTION OF SHELBY LONGORIA
## TO DISMISS OR TO ABATE COUNTERCLAIMS

On October 3, 2013, the Court heard Counter-Defendant Shelby Longoria's Motion To Dismiss Counterclaims for Forum Non Conveniens, or Alternatively To Abate Pending Resolution of Will Contest and Mexican Litigation (the "Motion"). Having considered the Motion, the brief filed in support of the Motion, the response to the Motion, the evidence admitted during the hearing on the Motion, and the record of this case, the Court has concluded that the Motion should be denied.

IT IS THEREFORE ORDERED that Counter-Defendant Shelby Longoria's Motion To Dismiss Counterclaims for Forum Non Conveniens, or Alternatively To Abate Pending Resolution of Will Contest and Mexican Litigation be, and hereby is, DENIED.

SO ORDERED on this _11th_ day of _October_, 2013.

_____
PRESIDING JUDGE
PROBATE COURT NUMBER ONE
HARRIS COUNTY, TEXAS

ORDER DENYING MOTION OF SHELBY LONGORIA
TO DISMISS OR TO ABATE COUNTERCLAIMS                    Solo Page

01050

CASE NUMBER 14-13-00996-CV

IN THE FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS

**IN RE SHELBY LONGORIA**

Original Proceeding
Arising from Cause Number 414270 in
Probate Court Number One, Harris County, Texas

**RESPONSE TO PETITION FOR WRIT OF MANDAMUS**

James Austin Fisher
State Bar of Texas Number 07051650
Shannon L.K. Welch
State Bar of Texas Number 90001699
**FISHER & WELCH**
**A Professional Corporation**
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Telephone: 214.661.9400
Facsimile: 214.661.9404

T. Wesley Holmes
State Bar of Texas Number 09908495
**THE HOLMES LAW FIRM**
10,000 North Central Expressway
Suite 400
Dallas, Texas 75231
Telephone: 214.890.9266
Facsmile: 214.890.9295

**ATTORNEYS FOR RESPONDENTS**
**JAMES THOMAS DORSEY,**
**INDEPENDENT EXECUTOR OF THE ESTATE OF**
**DOROTHY LOUISE LONGORIA, DECEASED,**
**AND SYLVIA DORSEY**

01051

# TABLE OF CONTENTS

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Objections to Petitioner's Statement of Facts. . . . . . . . . . . . . . . . . . . . . . 1

    Respondents' Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I.    The Trial Court Did Not Abuse Its Discretion by
Declining To Dismiss the Executor's Counterclaims. . . . . . . . . . . . . . . . 13

    A.    To Show Himself Entitled To Dismissal, Shelby
Was Required to Bear a "Heavy Burden" To
"Clearly Show" Facts That "Strongly Favor" a
"Specific, Available, and Adequate" Alternative Forum,
While Giving "Substantial Deference" To This Forum. . . . . . . . . . 13

    B.    The Standard for Dismissal Under the Common Law
Is More Stringent Than the Standard Under the Forum
Non Conveniens Statute, Which Is Inapplicable Here. . . . . . . . . . 18

    C.    Shelby's Argument Depends Entirely on Documents
That Were Not Admitted into Evidence and Testimony
That the Trial Court Was Not Obliged to Accept. . . . . . . . . . . . . 19

        1.    The Petition Relies on Affidavits and Exhibits That
Were Not Admitted Below and Are Inadmissible. . . . . . . . . 19

        2.    The Petition Relies on Testimony That the
Trial Court Was Not Required To Believe. . . . . . . . . . . . . 23

i

**01052**

D.    Shelby Failed To Prove That Any State in Mexico
      Is an Adequate and Available Forum for *This* Case.. . . . . . . . . . . . 25

      1.    The Courts of Tamaulipas Would Not Have
            Jurisdiction over the Executor's Claims
            Against Shelby or His Third-Party Claims. . . . . . . . . . . . . 26

      2.    Tamaulipas Is Not an Adequate Alternative
            Forum Because It Provides No Remedy
            for the Executor's Causes of Action. . . . . . . . . . . . . . . . 29

      3.    Tamaulipas Is Not an Available Alternative Forum
            Because the Executor's Claims Against Shelby Would
            Be Barred by an Unwaivable Statute of Repose There. . . . . . 30

E.    Shelby Failed To Prove That the Private-Interest
      Factors and Public-Interest Factors Favor Litigation
      of the Executor's Claims in Any Other Forum.. . . . . . . . . . . . . . 32

      1.    All of the Private-Interest Factors
            Point to This Forum or Are Neutral.. . . . . . . . . . . . . . . . 33

            a.    Access to *Relevant* Evidence
                  Is Far Better in This Forum. . . . . . . . . . . . . . . . . 33

            b.    Compulsory Process for Attendance of Unwilling
                  Witnesses Is Available in This Forum, But Not in
                  Mexico, and the Cost of Obtaining Attendance
                  of Willing Witnesses Is Less Here.. . . . . . . . . . . . . 40

            c.    No View of Any Premises Will Be Needed.. . . . . . . . 40

            d.    A Judgment of The Trial Court Would Be
                  Fully Enforceable as to All Parties, But a
                  Judgment of a Mexican Court Would Not.. . . . . . . . . 41

ii

01053

  e. The Practical Problems and Expense of
    Proceeding in Mexico Are Far Greater. . . . . . . . . . . . 42

 2. All of the Public-Interest Factors Point to This Forum. . . . . . 44

  a. The Dispute Originated Here and
    There Are No Greater Administrative
    Difficulties Here Than in Tamaulipas. . . . . . . . . . . . . 44

  b. This Community Has the Strongest
    Relationship to the Litigation, So the
    Burden of Jury Duty Belongs Here. . . . . . . . . . . . . . 45

  c. The Dispute Arose in Texas, Between Texans,
    So This Forum Has the Stronger Interest
    in Deciding the Controversy. . . . . . . . . . . . . . . . . . 45

  d. Maintaining the Litigation Here
    Avoids an Issue of Conflicts of Law. . . . . . . . . . . . . 48

II. The Trial Court Did Not Abuse Its Discretion by
  Declining To Abate the Executor's Counterclaims. . . . . . . . . . . . . . . . . . 50

CONCLUSION AND PRAYER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

SIGNATURE OF ATTORNEY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CERTIFICATE UNDER TEX. R. APP. P. 9.4(i). . . . . . . . . . . . . . . . . . . . . 60

CERTIFICATE UNDER TEX. R. APP. P. 52.3(j) and 52.4. . . . . . . . . . . . . . . 61

CERTIFICATE OF SERVICE UNDER TEX. R. APP. P. 9.5(e). . . . . . . . . . . . 62

iii

01054

## INDEX OF AUTHORITIES

*Adams v. Merck & Company Inc.,*
353 Fed. App'x 960 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Alpine View Company Ltd. v. Atlas Copco AB,*
205 F.3d 208 (5th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . 27

*American Dredging Company v. Miller,*
510 U.S. 443 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Bank of Credit and Commerce International (OVERSEAS) Ltd. v.*
*State Bank of Pakistan,*
273 F.3d 241 (2d Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . 31

*Benz Group v. Barreto,*
404 S.W.3d 92 (Tex. App. – Houston [1st Dist.] 2013, no pet.). . . . . . . . . 14 n.54

*Binder v. Shepard's Inc.,*
133 P.3d 276 (Okla. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Boston Telecommc'ns Group Inc. v. Wood,*
588 F.3d 1201 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . 17, 29, 42, 43

*Brady v. Fourteenth Court of Appeals,*
795 S.W.2d 712 (Tex.1990). . . . . . . . . . . . . . . . . . . . . . . . . . 23

*City of Keller v. Wilson,*
168 S.W.3d 802 (Tex. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Continental Oil Co. v. P.P.G. Industries,*
504 S.W.2d 616 (Tex. Civ. App. – Houston [1st Dist.] 1974,
writ ref'd n.r.e.), *disapproved on other grounds,*
*In re Smith Barney, Inc.,* 975 S.W.2d 593 (Tex. 1998). . . . . . . . . . . . . 2 n.6, 20

*Delfosse v. C.A.C.I., Inc.-Federal,*
267 Cal. Rptr. 224, 227-29 (1990). . . . . . . . . . . . . . . . . . . . . . . 31

iv

01055

*Develo-Cepts, Inc. v. City of Galveston,*
　668 S.W.2d 790 (Tex. App. – Houston [14th Dist.] 1984, no writ). . . . . . 50, 51,
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　52 & n.117

*DiFederico v. Marriot International, Inc.,*
　714 F.3d 796 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25

*Dole Food Company, Inc. v. Watts,*
　303 F.3d 1104 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Duha v. Agrium, Inc.,*
　448 F.3d 867 (6th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Fasules v. DDB Needham Worldwide, Inc.,*
　No. 89 C 1078, 1989 WL 55373 (N.D. Ill. 1987). . . . . . . . . . . . . . . . 36

*Founding Church of Scientology of Washington, D.C. v. Verlag,*
　536 F.2d 429 (D.C. Cir. 1976). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Gallego v. Garcia,*
　No. 07-CV-1185, 2010 WL 2354585 (S.D. Cal. June 9, 2010). . . . . . . . . . 46, 47

*Gomez de Hernandez v.*
*Bridgestone/Firestone North American Tire, L.L.C.,*
　204 S.W.3d 473 (Tex. App. – Corpus Christi 2006, pet. denied). . . . . . . . 19 n.55

*Guidi v. Inter–Continental Hotels Corp.,*
　224 F.3d 142 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gulf Oil Corp. v. Gilbert,*
　330 U.S. 501 (1947). . . . . . . . . . . . . . . . . . . . . . 17, 18, 32, 33, 36

*Howeth Investments, Inc. v. City of Hedwig Village,*
　259 S.W.3d 877 (Tex. App. – Houston [1st Dist.] 2008). . . . . . . . . . . . 23

01056

*In re Angelini,*
    186 S.W.3d 558 (Tex. 2006, orig. proceeding). . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re BPZ Resources, Inc.,*
    359 S.W.3d 866 (Tex. App. – Houston [14th Dist.] 2012). . . . . . . . . . . . . . 19 n.55

*In re ENSCO Offshore International Company,*
    311 S.W.3d 921 (Tex. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19 n.55

*In re Old Republic National Title Insurance Co.,*
    No. 14–10–01219–CV, 2011 WL 345676
    (Tex. App. – Houston [14th Dist.] Feb. 1, 2011, orig. proceeding). . . . . . . . . . 17

*In re Pirelli Tire, L.L.C.,*
    247 S.W.3d 670 (Tex. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19 n.55

*In re Smith Barney, Inc.,*
    975 S.W.2d 593 (Tex. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 n.6, 20

*Jessop v. ACF Industries, LLC,*
    859 A.2d 801 (Pa. Super. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Jiali Tang v. Synutra International, Inc.,*
    656 F.3d 242 (4th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 25

*Jones v. Prince George's County,*
    378 Md. 98, 835 A.2d 632 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kedy v. A.W. Chesterton Co.,*
    946 A.2d 1171 (R.I. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kennecott Holdings Corp. v. Liberty Mutual Insurance Company,*
    578 N.W.2d 358 (Minn. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Kontoulas v. A.H. Robins, Company, Inc.,*
    745 F.2d 312 (4th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

01057

*Koster v. (American) Lumbermens Mutual Casualty Company,*
  330 U.S. 518 (1947). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 32

*Liberty Mutual Insurance Company v.*
*Transit Mix Concrete and Materials Company,*
  No. 06-12-00117-CV, 2013 WL 3329026
  (Tex. App. – Texarkana June 28, 2013, pet. denied). . . . . . . . . . . . . . . . . 18

*Manu International, S.A. v. Avon Products, Inc.,*
  641 F.2d 62 (2d Cir.1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Marchman v. NCNB Texas National Bank,*
  898 P.2d 709 (N.M. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Mercier v. Sheraton International, Inc.,*
  935 F.2d 419 (1st Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Mowrey v. Johnson & Johnson,*
  524 F.Supp. 771 (W.D. Pa. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Omni Hotels Management Corp. v. Round Hill Developments Ltd.,*
  675 F.Supp. 745 (D.N.H. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Piper Aircraft Company v. Reyno,*
  454 U.S. 235 (1981). . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 28, 29, 32, 40

*Quixtar, Inc. v. Signature Management Team LLC,*
  315 S.W.3d 28 (Tex. 2010). . . . . . . . . . . . . . . . . . . 14, 15, 18, 32, 33, 40

*Reid–Walen v. Hansen,*
  933 F.2d 1390 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Sanwa Bank, Ltd. v. Kato,*
  734 So.2d 557 (Fla. Dist. Ct. App. 1999). . . . . . . . . . . . . . . . . . . . . . . . 31

01058

*Schexnider v. McDermott International, Inc.,*
817 F.2d 1159 (5th Cir.),
*reh'g denied,* 824 F.2d 972 (5th Cir.),
*cert. denied,* 484 U.S. 977 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*SES Products, Inc. v. Aroma Classique, LLC,*
No. 01-12-00219-CV, 2013 WL 2456797
(Tex. App. – Houston [1st Dist.] June 6, 2013). . . . . . . . . . . . . . . . . . 18, 33, 50

*Shewbrooks v. A.C. and S., Inc.,*
529 So.2d 557 (Miss. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Sinochem International Company Ltd. v.*
*Malaysia International Shipping Corp.,*
549 U.S. 422 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 18

*SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.,*
382 F.3d 1097 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Texas Custom Pools, Inc. v. Clayton,*
293 S.W.3d 299 (Tex. App. – El Paso 2009, orig. proceeding). . . . . . . . . . . . . 24

*Tuazon v. R.J. Reynolds Tobacco Company,*
433 F.3d 1163 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Varo v. Owens-Illinois, Inc.,*
948 A.2d 673 (N.J. Super. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Vicknair v. Phelps Dodge Industries. Inc.,*
767 N.W.2d 171 (N.D. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

01059

**Statutes**

TEX. CIV. PRAC. & REM. CODE ANN. § 71.051 (West 2005). . . . . . . . . . . . . . . . . 18

TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(i) (West 2005). . . . . . . . . . . . . . 18

TEX. PROB. CODE ANN. § 4A (West 2013 Supp.). . . . . . . . . . . . . . . . . . . . . . . . 46

TEX. PROB. CODE ANN. § 4B (West 2013 Supp.). . . . . . . . . . . . . . . . . . . . . . . . 46

TEX. PROB. CODE ANN. § 4F (West 2013 Supp.). . . . . . . . . . . . . . . . . . . . . . . . 46

TEX. PROB. CODE ANN. § 5B (West 2013 Supp.). . . . . . . . . . . . . . . . . . . . . . . . 46

**Rules**

TEX. R. APP. P. 9.4(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

TEX. R. APP. P. 52.3(j). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

TEX. R. APP. 52.4(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

TEX. R. APP. 52.4(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TEX. R. CIV. P. 176. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

TEX. R. CIV. P. 205. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

TEX. R. EVID. 802. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2 n.6, 20

**Miscellaneous Authorities**

HAGUE CONVENTION ON TAKING OF EVIDENCE
ABROAD IN CIVIL OR COMMERCIAL MATTERS,
23 U.S.T. 2555 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

01060

# ISSUES PRESENTED

1. Was it an abuse of discretion for a statutory probate court in Harris County, Texas, to deny a motion to dismiss certain claims for *forum non conveniens*, based on the contention that a court in Tamaulipas, Mexico, would be a more convenient venue for litigation of those claims, where:

> the claims involve four parties, none of whom resides anywhere in Mexico, all of whom reside in Texas, and three of whom reside in Harris County, Texas;

> the claims were pleaded by the duly appointed executor of an estate pending in the same probate court;

> the claims were pleaded as counterclaims in a will contest pending in the same probate court and presenting common issues of fact;

> the claims seek relief only from a party who has lived in Texas for 34 years and who commenced the proceeding, in the same probate court, in which the counterclaims were pleaded;

> the claims are based on the rights, under Texas law, of a decedent who lived in Texas for the last 25 years of her life, lived in Harris County, Texas, for the last seven years of her life, and died in Harris County, Texas;

> the claims are expressly based on causes of action that are recognized in Texas law but unrecognized in Mexican law;

> the counter-defendant pleaded third-party claims against two individuals who are not subject to the jurisdiction of the courts in Tamaulipas; and

> the party seeking dismissal had failed to identify, in response to a formal request for disclosure, a single witness who resides in Mexico?

x

01061

2. Was it an abuse of discretion for a statutory probate court in Harris County, Texas, to deny a motion to abate certain claims where:

> the claims were pleaded by the duly appointed executor of an estate pending in the same probate court;

> the claims were pleaded as counterclaims in a will contest pending in the same probate court and presenting common issues of fact;

> the party seeking abatement had not filed a verified plea in abatement;

> the first asserted ground for abatement was the claimant's supposed lack of capacity to serve as executor of the estate, but the Trial Court had already made a finding of capacity in the manner prescribed by the Texas Probate Code;

> the second asserted ground for abatement was a supposed conflict of interest that would disqualify the claimant from serving as executor, but no evidence proving the existence of a conflict was offered; and

> the third asserted ground for abatement was a supposed need to await the outcome of proceedings in Mexico, but the movant offered no evidence proving that those proceedings, which involved a different decedent's estate, would affect the outcome of the executor's counterclaims or any other reason why the litigation in Mexico should be given priority over the litigation here?

01062

# RESPONSE TO PETITION FOR WRIT OF MANDAMUS

TO THE HONORABLE COURT OF APPEALS:

Respondents James Thomas Dorsey, as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, (the "Executor") and Sylvia Dorsey ("Sylvia"), through counsel, respectfully submit this response to the Petition for Writ of Mandamus (the "Petition") filed herein by Shelby Longoria ("Shelby").

## STATEMENT OF FACTS

### Objections to Petitioner's Statement of Facts

While we would prefer not to burden the Court with competing statements of facts, we are compelled to do so by the impropriety of the statement submitted by Shelby. It includes over 35 citations to documents that were not admitted into evidence below. These improper references to extraneous materials include citations to inadmissible affidavits[1] and citations to exhibits that were attached to the affidavits but not separately offered and admitted into evidence.[2] Respondents timely objected

---

[1] *See* Petition at 1 n.4; 2 nn.8,10,12,14,16,18; 4 nn.20,23-26; 5 nn. 27,29-31; 7 n.43; 15 n.64; 23 n.78; 7 n.43. These are citations to affidavit testimony of Shelby and affidavit testimony of one of his attorneys, Kristen Schlemmer.

[2] *See* Petition at 1 n.2 (citing Exhibits 3.1 and 3.2 to the Affidavit of Shelby Longoria); 2 n.5 (citing Exhibits B.1 and B.2 to the Affidavit of Shelby Longoria); 2 n.6 (same); 2 n.7 (citing Exhibit 4.2 to the Affidavit of Kristen Schlemmer); 2 n.8 (citing Exhibits C.1 and C.2 to the Affidavit of Shelby Longoria); 5 n.30 (citing Exhibit 5.2 to the Affidavit of Kristen Schlemmer); 5 n.32 (citing Exhibit 6 to the

1

01063

to the affidavits and their attached exhibits,[3] and none of them was admitted into evidence, save a few exhibits to which Respondents withdrew their objections during the hearing.[4] Shelby presented in the lower court, and he presents in his Petition, no argument or authority in response to Respondents' objections, except as to a single exhibit (Exhibit B) which, despite Shelby's arguments, was not admitted.[5] Respondents' objections are valid and it would have been harmful error to consider the affidavit testimony and associated exhibits cited in the Petition.[6]

---

Affidavit of Kristen Schlemmer); 5 n.33 (citing Exhibit 7 to the Affidavit of Kristen Schlemmer); 5 n.34 (same); 23 n. 78 (citing Exhibits B.1 and B.2); 25 n.79 (citing Exhibits B.1, B.2, C.1, and C.2 to the Affidavit of Shelby Longoria and Exhibits 4.1 and 5.1 to the Affidavit of Kristen Schlemmer).

[3] Record 00732-38.

[4] Record 00830-31. The exhibits that were attached to affidavits and admitted into evidence by agreement were Exhibits A, D, E, F, H, I, K, L, and M, which can be found at Record 00943-1073.

[5] *See* Record 01183-1201 (Shelby Longoria's Response to Executor's Amended Objections to a Single Exhibit to the Affidavit of Shelby Longoria (Oct. 4, 2013)); 01202-05 (Reply Brief in Support of Objections to Exhibit B to Affidavit of Shelby Longoria (Oct. 7, 2013)).

[6] The affidavit testimony is inadmissible on several grounds, including hearsay. *See* TEX. R. EVID. 802; *Continental Oil Co. v. P.P.G. Indus.*, 504 S.W.2d 616, 622 (Tex. Civ. App. – Houston [1st Dist.] 1974, writ ref'd n.r.e.), *disapproved on other grounds, In re Smith Barney, Inc.*, 975 S.W.2d 593, 597-98 (Tex. 1998) (affidavits inadmissible as hearsay in proceedings on motion to dismiss for *forum non conveniens*).

2

01064

Another reason why Respondents are justifiably dissatisfied with Shelby's statement of the facts is that it is highly argumentative and filled with assertions that have no relevance to the issues before the Court, but are transparent attempts to cast Respondents in a bad light. Notable examples are Shelby's assertions that the Decedent, Dorothy Louise Longoria ("Dorothy"), was induced by her daughters to sign wills in 2009, 2010, and 2011.[7] Neither the wills in question, nor evidence that the Decedent was induced to sign them, was admitted below. Shelby's assertions of undue influence are gratuitous slurs – and irrelevant to the issues before this Court.

Also irrelevant are wills supposedly signed by Dorothy's husband, Eduardo Longoria, Sr. ("Eduardo"), a "Wish Letter" signed by him, and so-called "Private Agreements" between him and his daughters.[8] None of these documents purports to be signed by Dorothy, and none of them purports to affect her property or her rights.[9] She is not even mentioned in the "Wish Letter" or in the "Private Agreements."[10] But this case involves *her* estate, not that of her husband. The wills, "Wish Letter," and

---

[7] Petition at 5-6.

[8] Petition at 3-4.

[9] Record 00967-73 (Ex. F.1, F.2); 01038-53 (Exs. I.1, I.2); 01054-62 (Exs. K.1, K.2); 01063-70 (Exs. L.1, L.2).

[10] Record 00967-73 (Ex. F.1, F.2); 01054-62 (Exs. K.1, K.2); 01063-70 (Exs. L.1, L.2).

3

01065

"Private Agreements" of Eduardo Longoria, Sr. have no relevance to the issues *sub judice.*

Finally, Respondents are dissatisfied with Shelby's statement of facts because it persistently misrepresents the content of the counterclaims which Shelby seeks to have dismissed. For example, Shelby discusses the formation of a Mexican trust by Eduardo Longoria Sr. and repeatedly asserts that the counterclaims contest the validity of the trust.[11] To the contrary, the counterclaims do not seek a decree setting aside the trust.[12]

For these reasons, Respondents exercise their prerogative under TEX. R. APP. P. 52.4(b) to submit a statement of facts in lieu of that submitted by Shelby.

## Respondents' Statement of Facts

**Procedural Posture of the Litigation.** This original proceeding arises from a will contest that was filed by Shelby on June 18, 2013, in a statutory probate court, Probate Court Number One, Harris County, Texas (the "Trial Court").[13] Shelby is

---

[11] Petition at 3-4, 11, 30.

[12] The Executor contends that Dorothy owned a community-property interest in shares of stock that were placed in the trust, and he contends that Shelby breached his fiduciary duty to Dorothy in the course of his management of the companies that issued the shares, but the Executor does not seek a decree setting aside the trust.

[13] Record 00020-32 (Shelby Longoria's Contest of 2010 Will (June 18, 2013)).

4

01066

contesting the validity of a will signed by his mother, Dorothy, on January 21, 2010, over two years before she died on April 6, 2012.[14] Dorothy's estate is pending in the Trial Court because she was a resident of Harris County at the time of her death, she died in Harris County, and her will was admitted to probate in Harris County.[15]

Respondent James Thomas Dorsey (the "Executor") is the duly appointed Independent Executor of Dorothy's estate.[16] In that capacity, he pleaded on July 18, 2013, a set of counterclaims against Shelby, the gravamen of which is that Shelby had breached fiduciary duties owed by him to Dorothy.[17] On August 30, 2013, Shelby, as Counter-Defendant, pleaded third-party claims against his sisters, Adriana Longoria ("Adriana") and Sylvia Dorsey ("Sylvia").[18] On the same day, Shelby amended his will contest, and thereafter, on September 26, 2013, the Executor

---

[14] Record 00022, 00025.

[15] Record 00001-3 (Application for Probate of Will and Issuance of Letters Testamentary (June 28, 2012)); 01208-09 (Order Admitting Will to Probate and Authorizing Letters Testamentary (Oct. 9, 2012)).

[16] Record 01208-09 (Order Admitting Will to Probate and Authorizing Letter's Testamentary (Oct. 9, 2012)).

[17] Record 00036-48 (Original Counterclaims of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased (July 18, 2013)).

[18] Record 00649-54 (Counter-Defendant Shelby Longoria's Third-Party Petition (Aug. 30, 2013)).

5

01067

amended his counterclaims against Shelby.[19] Those counterclaims against Shelby, and the related third-party claims of Shelby against Sylvia and Adriana, are the subject of this original proceeding.

Shelby filed in the Trial Court a motion to dismiss the Executor's counterclaims based on the doctrine of *forum non conveniens*.[20] The counterclaims, said Shelby, would more conveniently be litigated in the United Mexican States ("Mexico"). The motion did not identify a particular Mexican state that supposedly would be a more convenient forum than Harris County, Texas, but an accompanying affidavit suggested that the Mexican State of Tamaulipas was where, according to Shelby, the Executor should be required to pursue the claims against Shelby.[21] As an alternative to the remedy of dismissal, Shelby asked the Trial Court to abate the Executor's counterclaims until Shelby's will contest was "fully adjudicated" and until a case that Adriana and Sylvia had filed in Mexican federal court was concluded.[22]

---

[19] Record 00633-00648 (Shelby Longoria's Amended Contest of 2010 Will (Aug. 30, 2013)); Record 00655-73 (Original Counterclaims of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, to Shelby Longoria's Amended Contest of 2010 Will (Sept. 26, 2013)).

[20] Record 00049-57.

[21] Record 01080, 01083-85.

[22] Record 00053-54.

01068

An evidentiary hearing on the motion to dismiss or to abate was convened on October 3, 2013.[23] On October 10, 2013, the Trial Court issued an order denying the motion in its entirety.[24]

On November 12, 2013, Shelby commenced this original proceeding. Shelby urges this Court to issue a writ of mandamus, commanding the Trial Court to dismiss the Executor's counterclaims against Shelby for *forum non conveniens*. In the alternative, Shelby seeks a writ compelling the Trial Court to abate the counterclaims pending the outcome of his will contest and the case in Mexico.[25]

**Residence of the Parties.** Shelby – the party insisting that, for the sake of convenience, the Executor's counterclaims against him must be brought in Mexico – does not live in Mexico. He lives in McAllen, Texas, and has lived there for 34 years.[26]

The Executor, who is the Counter-Plaintiff who is asserting the claims which Shelby seeks to have dismissed, lives in Harris County, Texas.[27]

---

[23] Record 00792-933.

[24] Record 01206-07.

[25] Petition at 34.

[26] Record 00861.

[27] Record 00633-34. The address has been redacted but appears in the original pleading filed by Shelby in the Trial Court.

01069

Sylvia, whom Shelby named as a Third-Party Defendant with respect to the Executor's counterclaims, lives in Harris County, Texas.[28]

Adriana, whom Shelby named as a Third-Party Defendant with respect the Executor's counterclaims, lives in Harris County, Texas.[29]

Thus, every party to the litigation which Shelby insists must take place in Mexico lives in Texas, and three of the four parties live in Harris County, Texas.

**Residence of Witnesses.** In response to a formal request for disclosure, Shelby did not identify a single potential witness who lives anywhere in Mexico.[30] Nor did he name one in his testimony during the hearing on his motion to dismiss.[31] He did, however, identify in his disclosures twelve potential witnesses who live in Texas.[32]

Those identified by Shelby as potential witnesses include his brother Eduardo Longoria, Jr., also known as Wayo Longoria ("Wayo"), who is another of Dorothy's

---

[28] Record 00649. The address has been redacted but appears in the original pleading filed by Shelby in the Trial Court.

[29] Record 00649. The address has been redacted but appears in the original pleading filed by Shelby in the Trial Court.

[30] Record 00859-60; 01153-59 (Ex. D-3).

[31] Record 00834-73.

[32] Record 01154-56 (Ex. D-3).

8

children. Wayo lives in Austin, Texas, and has lived there for about 35 years.[33] He is an important witness because, in 1983, Wayo and Shelby – both of whom were residing in Texas – sent to Dorothy a letter in which they promised to hold certain assets "as they were [Dorothy's]" and promised to "make the fruits available to [Dorothy] for [her] direction as to their use."[34] In his counterclaims, the Executor avers that this letter evidences a fiduciary relationship between Shelby and Dorothy, and that Shelby breached his fiduciary duty to his mother.[35]

Another example of a fact demonstrating Wayo's importance as a witness, is a transaction between him and Shelby in 2007. Following negotiations in the United States, with the assistance of American counsel, they agreed to redemption of shares of stock in two Mexican holding companies in which, the Executor claims, Dorothy owned community property rights. Wayo and Shelby agreed that, to redeem a forty-percent interest in the shares, one of the companies would pay $24,000,000 (in currency of the United States) into a trust for Wayo's benefit.[36]

---

[33] Record 00861.

[34] Record 00844-45; 01074-75 (Ex. P-1).

[35] Record 00658-59.

[36] Record 00862, 00870-72, 01163-81 (Ex. D-6).

9

01071

Respondents identified many other potential witnesses who live in Texas, although Shelby failed to identify them in his disclosures.[37] They include Shelby's wife, Tita, who lives with Shelby in McAllen, Texas.[38]

**Residence of the Decedent.** Dorothy lived in Texas for the last 25 years of her life. She and her husband, Eduardo, were married in Laredo, Texas, initially lived in McAllen, Texas, later moved to Nuevo Laredo, Tamaulipas, Mexico, and finally settled in Laredo, Texas, in 1986 or 1987.[39] When Eduardo died in 2005, Dorothy moved to Houston, where she lived until her death in 2012.[40]

**Nature of the Counterclaims Against Shelby.** The Executor's counterclaims begin with this overview[41]:

> These counterclaims are brought by a citizen of Texas against another citizen of Texas. Counter-Plaintiff is the personal representative of an estate pending in this Court, and adjudication of these counterclaims is essential to administration of that estate. The Decedent lived in Texas for the last 25 years of her life. These counterclaims are based entirely on Texas law. None of them is based on any law of the United Mexican States.

---

[37] Record 00687-88.

[38] Record 00835.

[39] Record 00853, 01160-61 (Ex. D-4).

[40] Record 00855-57.

[41] Record 00655.

10

01072

Thereafter, the Executor repeatedly avers that his causes of action are based on Texas law, and *only* on Texas law.[42] In addition, he makes numerous averments of specific facts occurring in Texas.[43]

The Executor pleads that a fiduciary relationship existed between Shelby and Dorothy, and it arose both out of an informal confidential relationship and by express agreement.[44] Two letters evidencing that relationship and agreement, and signed by Shelby in Texas, are specifically identified by the Executor.[45] Both letters were admitted into evidence during the hearing on Shelby's motion to dismiss.[46] The second of them is dated October 9, 2007, when both Shelby and Dorothy indisputably lived in Texas, and it dealt specifically with a large sum of money, $450,000 in currency of the United States, that Shelby was, by his own admission, holding for the benefit of Dorothy.[47] The Executor avers (and proved at the hearing) that Dorothy

---

[42] Record 00660 (¶¶ 19, 22), 00663 (¶¶ 33, 35), 00664 (¶¶ 36-39), 00666 (¶ 44), 00668 (¶¶ 48-49), 00669-70 (Prayer for Relief).

[43] Record 00655 (¶ 2), 00657 (¶¶ 9-10), 00658 (¶¶ 12, 16), 00659 (¶ 17), 00660 (¶¶ 19-20, 23-25), 00661 (¶¶26-28).

[44] Record 00658 (¶¶ 15-16), 00659 (¶ 18), 00660 (¶ 24).

[45] Record 00658 (¶ 16), 00659 (¶ 17).

[46] Record 00844-45, 01074-75 (Ex. P-1), 00868, 01162 (Ex. D-5).

[47] Record 01162 (Ex. D-5).

11

01073

and Eduardo were married in Texas, so *all* of their property was presumptively community property,[48] but the Executor also avers that property that was held (or should have been held) by Shelby in trust for Dorothy included not only property that was (or had been) her community property, but other property as well.[49] It is therefore inaccurate to say, as Shelby does, that the Executor's case depends entirely on the existence of community property; the Executor avers that Shelby breached his fiduciary duty with respect to Dorothy's separate property as well.[50] One example, specifically identified by the Executor, is the $450,000 referenced in the letter of October 9, 2007.[51] Finally, the Executor avers that Shelby breached, in a multitude of ways, his fiduciary duty to Dorothy and his express agreements with her.[52]

---

[48] Record 00657 (¶ 9), 00660 (¶ 22), 01160-61 (Ex. D-4).

[49] Record 00657 (¶¶ 9-11), 00658 (¶¶ 13-15), 00660 (¶¶ 19-24), 00663 (¶ 35).

[50] Record 00663 (¶ 35).

[51] Record 00659 (¶ 17).

[52] Record 00660 (¶¶ 19-20, 24-25), 00663 (¶ 35), 00666 (¶ 43), 00668 (¶ 48).

12

01074

## ARGUMENT

### I. The Trial Court Did Not Abuse Its Discretion by Declining To Dismiss the Executor's Counterclaims

#### A. To Show Himself Entitled To Dismissal, Shelby Was Required to Bear a "Heavy Burden" To "Clearly Show" Facts That "Strongly Favor" a "Specific, Available, and Adequate" Alternative Forum, While Giving "Substantial Deference" To This Forum

In this proceeding, Shelby argues that the Trial Court was *required as a matter of law* to dismiss the Executor's counterclaims against Shelby based on *forum non conveniens* – even though Shelby lives in Texas, the Executor lives in Texas, the third-party defendants live in Texas, the Decedent who was the victim of Shelby's torts lived in Texas for the last 25 years of her life, and the Decedent's estate is being administered in Texas. Even in the face of these facts, Shelby insists that the Trial Court had *no discretion* to deny his motion to dismiss, that dismissal was *absolutely mandatory*, even though he concedes, as he must, that the Trial Court has jurisdiction over the subject matter and all of the parties.[53]

In making this rather remarkable argument, Shelby never mentions – let alone applies – the correct legal standard. Shelby cites neither the most recent case in which the Supreme Court of Texas made a *forum non conveniens* determination nor the most recent case in which the Supreme Court of the United States did so. Though

---

[53] Record 00811.

13

01075

ignored by Shelby, both cases are instructive here. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007); *Quixtar, Inc. v. Signature Mngmt. Team LLC*, 315 S.W.3d 28 (Tex. 2010).

In both cases, it was held that a defendant seeking dismissal for *forum non conveniens* "ordinarily bears a *heavy burden* in opposing the plaintiff's chosen forum." *Quixtar*, 315 S.W.3d 28, 31 (Tex. 2010) (quoting *Sinochem,* 549 U.S. at 430) (emphasis added).[54] But Shelby never acknowledges the "heavy burden" imposed on him by common law. Instead, Shelby jumps ahead to address the adequacy and availability of a Mexican forum, and various factors of private and public interest. By considering those criteria without reference to the controlling legal standard, Shelby's argument wanders aimlessly – and leads to a manifestly unjust conclusion.

In direct contradiction of entire thrust of Shelby's argument, both the U.S. Supreme Court and the Supreme Court of Texas, in their most recent decisions, declared that "substantially" greater deference must be paid to a claimant's choice of

---

[54] In making *forum non conveniens* determinations, the Texas Supreme Court has routinely applied the standards enunciated by the United States Supreme Court. *Quixtar*, 315 S.W.3d at 32 ("we regularly consider United States Supreme Court precedent in both our common law and statutory forum non conveniens cases"). Shelby admits that "Texas takes its common-law forum non conveniens doctrine from the equivalent federal doctrine," Petition at 9 (citing *Benz Group v. Barreto*, 404 S.W.3d 92, 96 (Tex. App. – Houston [1st Dist.] 2013, no pet.)), yet Shelby largely ignores the federal case law in his presentation to this Court.

14

forum where – as here – the claimant lives within the forum. *Sinochem*, 549 U.S. at 430; *Quixtar*, 315 S.W.3d at 31. This requirement of greater deference to the claimant's choice of his own place of residence as the venue of the litigation is deeply rooted in the common law of *forum non conveniens*, dating at least to *Koster v. (American) Lumbermens Mutual Casualty Co.,* 330 U.S. 518 (1947), in which the Court wrote:

> Where there are only two parties to a dispute, there is good reason why it should be tried in the plaintiff's home forum if that has been his choice. He should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems.

330 U.S. at 524. The Supreme Court has repeatedly confirmed the continuing validity of this standard. *Sinochem*, 549 U.S. at 429; *American Dredging Co. v. Miller,* 510 U.S. 443, 447–448 (1994); *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 (1981). Yet Shelby never mentions it.

Even where the plaintiff does *not* reside in the forum, a defendant seeking dismissal for *forum non conveniens* "must make a showing that the 'relevant public and private interests *strongly favor* a specific, adequate, and available alternative

15

01077

forum.'" *DiFederico v. Marriot Int'l, Inc.*, 714 F.3d 796, 802 (7th Cir. 2013) (quoting *Jiali Tang v. Synutra Int'l, Inc.*, 656 F.3d 242, 246 (4th Cir.2011)) (emphasis in original). But when the plaintiff chooses his "home forum," the plaintiff's choice of forum is entitled to *even greater* deference. *DiFederico*, 714 F.3d at 802-03 (citing *Piper Aircraft*, 454 U.S. at 255-56). The forum in which the plaintiff is a citizen is "presumptively convenient," *Piper Aircraft*, 454 U.S. at 256, and should be overridden *only* when the defendant "establish[es] such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent." *Koster*, 330 U.S. at 524. As long as there is a "real showing of convenience by a plaintiff who has sued in his home forum [it will] normally outweigh the inconvenience the defendant may have shown." *Id.*

"Overwhelming authority" stands for the proposition that courts *must* give substantially greater deference to the claimant's choice of forum when the claimant is a citizen of the forum. *DiFederico*, 714 F.3d at 803 (citing *Duha v. Agrium, Inc.*, 448 F.3d 867, 873 (6th Cir. 2006). *See also SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101 (11th Cir. 2004) (explaining that the "presumption in favor of the plaintiff's initial forum choice . . . is at its strongest when the plaintiffs are citizens, residents, or corporations of this country"); *Guidi v. Inter–Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000) (reversing because

16

the district court did not recognize that the plaintiff is "entitled to greater deference" when choosing her home forum); *Reid–Walen v. Hansen,* 933 F.2d 1390, 1395 (8th Cir. 1991) ("[c]itizens should rarely be denied access to courts of the United States"); *Founding Church of Scientology of Washington, D.C. v. Verlag,* 536 F.2d 429, 435 (D.C. Cir. 1976) ("[c]ourts should require positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion to deny a citizen access to the courts of this country")).

In sum, the Supreme Court has admonished that "unless the balance is *strongly* in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed," *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947) (emphasis added), and that jurisdiction is to be declined only in "exceptional circumstances." *Id.* at 504. "Forum non conveniens is an exceptional tool to be applied sparingly, not a doctrine that compels plaintiffs to choose the optimal forum for their claim." *Boston Telecomms. Group Inc. v. Wood,* 588 F.3d 1201, 1206 (9th Cir. 2009) (quoting *Dole Food Co., Inc. v. Watts,* 303 F.3d 1104, 1118 (9th Cir.2002)).

This Court has acknowledged these well-established principles: "Unless the balance weighs heavily in favor of the defendant, a court should rarely disturb the plaintiff's choice of forum." *In re Old Rep. Nat. Title Ins. Co.,* No. 14-10-01219–CV,

17

01079

2011 WL 345676, at *2 (Tex. App. – Houston [14th Dist.] Feb. 1, 2011, orig. proceeding) (citing *In re ENSCO Offshore Intern. Co.*, 311 S.W.3d 921, 928–29 (Tex. 2010)). *Accord SES Prods., Inc. v. Aroma Classique, LLC*, No. 01-12-00219-CV, 2013 WL 2456797, at *3 (Tex. App. – Houston [1st Dist.] June 6, 2013) (citing *Sinochem*, 549 U.S. at 430; *Gulf Oil*, 330 U.S. at 508; *Quixtar*, 315 S.W.3d at 31)).

These black-letter principles are ignored in the Petition, yet they constitute the overarching standard by which courts are to evaluate the various factors relevant to *forum non conveniens* determinations. Because Shelby considers those factors without reference to the controlling standard, Shelby's analysis is meaningless.

**B. The Standard for Dismissal Under the Common Law Is More Stringent Than the Standard Under the Forum Non Conveniens Statute, Which Is Inapplicable Here**

The argument presented by Shelby contains another material error: it fails to distinguish cases governed by the common law from cases governed by the Texas *forum non conveniens* statute, TEX. CIV. PRAC. & REM. CODE ANN. § 71.051 (West 2005). The statute is applicable only to actions for personal injury or wrongful death, TEX. CIV. PRAC. & REM. CODE ANN. § 71.051(i) (West 2005), so it has no bearing here. *Forum non conveniens* cases under the common law are "clearly distinguishable" from cases under the statute. *Liberty Mutual Ins. Co. v. Transit Mix Concrete and Materials Co.*, No. 06-12-00117-CV, 2013 WL 3329026, at *8 (Tex.

18

App. – Texarkana June 28, 2013, no pet. h.). Shelby cites several cases that were governed by the statute, not by the common law, but Shelby fails to mention the statute or advise the Court of this important distinction.[55]

Shelby had a powerful incentive to "gloss over" the distinction between statutory and common-law *forum non conveniens* analysis: as the Supreme Court of Texas has observed, in cases decided under the common law, the private-interest factors and public-interest factors must "strongly favor" the movant in order for dismissal to be warranted, but under the statute, a mere tipping of the balance in favor of the movant is all that is required. *In re ENSCO Offshore International Co.*, 311 S.W.3d 921, 928-29 (Tex. 2010).

## C. Shelby's Argument Depends Entirely on Documents That Were Not Admitted into Evidence and Testimony That the Trial Court Was Not Obliged to Accept

### 1. The Petition Relies on Affidavits and Exhibits That Were Not Admitted Below and Are Inadmissible

The Petition contains numerous citations to evidence that was not admitted during the hearing on Shelby's motion to dismiss, and that is indeed facially

---

[55] *See* Petition at 9, 17, 23, 26 (citing *In re ENSCO Offshore International Co.*, 311 S.W.3d 921, 927-28 (Tex. 2010)); 15, 23, 24, 26, 29 (citing *In re BPZ Resources, Inc.*, 359 S.W.3d 866, 869-70 (Tex. App. – Houston [14th Dist.] 2012); 15, 16, 18, 19, 23 (citing *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677-78 (Tex. 2007)); 15 (citing *Gomez de Hernandez v. Bridgestone/Firestone North American Tire, L.L.C.*, 204 S.W.3d 473, 483 (Tex. App. – Corpus Christi 2006, pet. denied)).

19

01081

inadmissible. There are, for example, at least *18 instances* of improper citations to the Affidavit of Shelby Longoria.[56] Several days before the hearing, the Executor filed written objections to this affidavit.[57] It was not admitted – or even offered – into evidence during the hearing on Shelby's motion to dismiss, and with good reason: no statute or rule authorizes consideration of affidavits in support of a motion to dismiss for *forum non conveniens*, and such affidavits are, therefore, inadmissible hearsay. *See* TEX. R. EVID. 802 ("[h]earsay is not admissible except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority"); *Continental Oil Co. v. P.P.G. Indus.*, 504 S.W.2d 616, 622 (Tex. Civ. App. – Houston [1st Dist.] 1974, writ ref'd n.r.e.), *disapproved on other grounds, In re Smith Barney, Inc.*, 975 S.W.2d 593, 597-98 (Tex. 1998) (affidavits inadmissible as hearsay in proceedings on motion to dismiss for *forum non conveniens*). The Affidavit of Shelby Longoria was objectionable on other valid grounds as well.[58]

---

[56] *See* Petition at 1 n.4; 2 nn.8,10,12,14,16,18; 4 nn.20,23-26; 5 nn. 27,29-31; 15 n.64; 23 n.78 (all citing affidavit testimony of Shelby Longoria).

[57] Record 00732-35.

[58] *Id.*

20

The Petition also contains improper citations to the Affidavit of Kristen Schlemmer, who is an attorney for Shelby, and exhibits attached to her affidavit.[59] The Executor timely filed written objections to this affidavit and some of the attached exhibits.[60] They were neither offered nor admitted into evidence during the hearing on Shelby's motion to dismiss the Executor's counterclaims.

All told, the Petition cites at least ten exhibits that were not admitted into evidence.[61] The Executor timely objected to admission of these exhibits.[62]

Stripped of the assertions that are based on inadmissible affidavits and exhibits that were not admitted into evidence, Shelby's statement of facts is reduced to a few,

---

[59] *See, e.g.,* Petition 2 n.7 (citing Exhibit 4.2); 5 n.32 (citing Exhibit 6); 5 n.33 (citing Exhibit 7); 5 n.34 (same); 7 n.43 (citing testimony of Kristen Schlemmer); 25 n.79 (citing Exhibits 4.1 and 5.1).

[60] Record 00735-36.

[61] *See* Petition at 1 n.2 (citing Exhibits 3.1 and 3.2 to the Affidavit of Shelby Longoria); 2 n.5 (citing Exhibits B.1 and B.2 to the Affidavit of Shelby Longoria); 2 n.6 (same); 2 n.7 (citing Exhibit 4.2 to the Affidavit of Kristen Schlemmer); 2 n.8 (citing Exhibits C.1 and C.2 to the Affidavit of Shelby Longoria); 5 n.30 (citing Exhibit 5.2 to the Affidavit of Kristen Schlemmer); 5 n.32 (citing Exhibit 6 to the Affidavit of Kristen Schlemmer); 5 n.33 (citing Exhibit 7 to the Affidavit of Kristen Schlemmer); 5 n.34 (same); 23 n. 78 (citing Exhibits B.1 and B.2); 25 n.79 (citing Exhibits B.1, B.2, C.1, and C.2 to the Affidavit of Shelby Longoria and Exhibits 4.1 and 5.1 to the Affidavit of Kristen Schlemmer).

[62] Record 00734-36.

21

01083

disconnected points and his entire argument falls apart.[63] One important example is Shelby's oft-repeated argument that Dorothy entered into an agreement with her husband, Eduardo Longoria Sr., to divide their community property into separate estates, and that a court in Mexico entered a judgment partitioning the community property.[64] Neither the alleged agreement nor the alleged judgment was admitted into evidence by the Trial Court, so the argument is baseless in this original proceeding.[65]

Well over half of Shelby's citations to evidence are improper references to affidavits or exhibits that were not admitted into evidence. The Petition does *not* assert that it was error to exclude such materials, nor does it present any argument or authority for the proposition that the Executor's objections were invalid. Needless to say, Shelby has no right to mandamus relief based on evidence that was neither offered nor admitted in the Trial Court. Riddled with inappropriate citations, the Petition is plainly defective and should be denied.

---

[63] The few assertions of fact that *are* supported by admitted evidence rely almost exclusively on the testimony of Shelby himself or that of his expert witness. Of course, the Trial Court had no obligation to believe that testimony. *See* text *infra* at 23.

[64] Petition at 1-2, 11-13, 22, 30, 32.

[65] Interestingly, Shelby testified at the hearing on October 3 that the alleged agreement partitioning his parents' community property was seen by him *for the first time* only two months ago. Record 00866.

22

## 2. The Petition Relies on Testimony That the Trial Court Was Not Required To Believe

During the hearing on Shelby's motion to dismiss, Shelby called two witnesses: himself and an expert witness by the name of Carlos Alberto Enrique Jose Lorenzo Gabuardi Arreola (hereinafter referred to as "Carlos"). The Petition frequently cites their testimony, incorrectly assuming that the Trial Court was obliged to accept it as true. But a trial judge who is charged with resolving issues of fact is empowered to make credibility determinations, and may choose to believe one witness over another, while a reviewing court may not impose its own opinion to the contrary. *Howeth Investments, Inc. v. City of Hedwig Village*, 259 S.W.3d 877, 894 (Tex. App. – Houston [1st Dist.] 2008) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005)). It is not necessary to have testimony from both parties before the trier of fact may disbelieve either; the trier of fact may disregard even uncontradicted and unimpeached testimony from disinterested witnesses. *City of Keller*, 168 S.W.3d at 819. It is axiomatic that the trier of fact is the sole judge of the credibility of the witnesses, and appellate courts have no authority to make credibility determinations. These principles, of course, apply in mandamus proceedings. *In re Angelini*, 186 S.W.3d 558, 560 (Tex. 2006) (citing *Brady v. Fourteenth Court of Appeals*, 795

23

01085

S.W.2d 712, 714 (Tex.1990)); *Texas Custom Pools, Inc. v. Clayton*, 293 S.W.3d 299, 306 (Tex. App. – El Paso 2009, orig. proceeding).

The Petition relies heavily on the testimony of Shelby and Carlos. It contains at least eleven citations to testimony given by Shelby during the hearing,[66] and at least seven citations to testimony of Carlos.[67] *The Trial Court was not legally required to believe any of this testimony.* Shelby, of course, is the Counter-Defendant who is seeking dismissal of the counterclaims against him, so he is a highly interested witness whose testimony is inherently suspect. Carlos is a retained expert witness whose testimony was both impeached on cross-examination[68] and refuted by the testimony of Ilan Rosenberg, the expert called by the Executor.[69] The Trial Court had ample reason to disbelieve the testimony of Shelby and Carlos.

That testimony, and the inadmissible affidavits and exhibits identified in the preceding section of this response, constitute virtually all of the evidence on which the Petition depends. The insurmountable problem for Shelby in this mandamus

---

[66] *See* Petition at 2 & nn.9-10; 3 & nn.12-13,17; 4 & n.25; 5 & nn.27,29; 7 & n.46; 11 & n.56; 16 & n.65.

[67] *See* Petition at 1 & n.3; 7 & n.44; 16 & n.65; 17 & n.68; 18 & n. 72; 28 & nn.81-82.

[68] Record 00889-93.

[69] Record 00907-22; 01125-42 (Ex. D-1).

24

01086

proceeding is the lack of *conclusive* evidence supporting his position on any of the criteria for *forum non conveniens*, in a case in which he bears the burden of proof with respect to every criterion. The Trial Court was not required to believe the testimony of Shelby and Carlos and, without their testimony, Shelby has no colorable argument that he carried his heavy burden to prove facts that would have required the Trial Court to dismiss the Executor's counterclaims for *forum non conveniens* in the face of the substantial deference to be afforded this forum.

**D.  Shelby Failed To Prove That Any State in Mexico Is an Adequate and Available Forum for *This* Case**

In order to prevail on a motion to dismiss for *forum non conveniens*, the movant must first demonstrate that there is a "specific, adequate, and available alternative forum.'" *DiFederico*, 714 F.3d at 802 (quoting *Jiali Tang*, 656 F.3d at 246). In his motion to the Trial Court, as in his Petition to this Court, Shelby failed to identify the specific forum advocated by him; he asserted only that the Executor must pursue his claims somewhere in Mexico. But Mexico has a federal system in which states enact and enforce their own laws, and laws vary from one Mexican state to another.[70] Shelby's motion and brief to the Trial Court did not say where, exactly,

---

[70] Record 01126.

25

01087

Shelby contended that the Executor should have asserted his claims[71] – a deficiency that was fatal in itself, in light of the movant's burden to demonstrate that a *specific* alternative forum is available and adequate. Shelby's expert witness, however, made reference to the laws of the Mexican State of Tamaulipas,[72] so we will assume for the sake of argument that Tamaulipas is the alternative forum advocated by Shelby.

For three reasons, Tamaulipas is not an available and adequate forum for litigation of the Executor's claims: first, the courts of Tamaulipas would not have jurisdiction over the Executor's claims against Shelby or over Shelby's third-party claims against Sylvia and Adriana; second, the causes of action pleaded by the Executor are not recognized in Tamaulipas (or anywhere in Mexico), so no remedy is available there; third, the Executor's claims would almost entirely be time-barred by an unwaivable statute of repose. Each of these three points precludes the relief sought by Shelby.

### 1. The Courts of Tamaulipas Would Not Have Jurisdiction over the Executor's Claims Against Shelby or His Third-Party Claims

"A foreign forum is available when the *entire* case and *all* parties can come within the jurisdiction of that forum." *Adams v. Merck & Co. Inc.,* 353 Fed. App'x

---

[71] Record 00049-57; 00058-92.

[72] Record 01080, 01083-85.

26

01088

960, 962 (2009) (quoting *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 221 (5th Cir. 2000) (emphasis added)).

During the hearing, the Court received into evidence (without objection by Shelby) the affidavit of Ilan Rosenberg, a highly qualified expert in Mexican law. [73] Mr. Rosenberg also testified in person during the hearing.[74] Mr. Rosenberg testified that if the Executor were to file in Tamaulipas the claims that he has pleaded as counterclaims here, the court in Tamaulipas would "almost certainly" dismiss those claims *sua sponte* for lack of jurisdiction.[75] The Executor would face insurmountable problems of both subject-matter jurisdiction and personal jurisdiction – whether or not Shelby purports to submit to the jurisdiction of a court in Tamaulipas.[76] Consequently, the alternative forum proposed by Shelby is unavailable, and the Petition must be denied.

Even greater jurisdictional problems attend the third-party claims of Shelby against Sylvia and Adriana. The Third-Party Defendants (who are represented by the undersigned attorney) will not voluntarily submit to the jurisdiction of the courts of

---

[73] Record 00911-12; 01125-42 (Ex. D-1).

[74] Record 00908-22.

[75] Record 01133-34 (¶¶ 28-34).

[76] Record 01134 (¶¶ 28-37).

27

01089

Tamaulipas, so there can be no argument that the third-party claims could be tried there. Contrary to Shelby's assertions, the *amparo* proceeding filed by Sylvia Dorsey and Adriana Longoria in a federal court in Mexico does *not* subject them to the jurisdiction of any Mexican court in any other proceeding.[77] Shelby's third-party claims against Sylvia and Adriana cannot be tried in Mexico.[78]

The Supreme Court has held that "the inability to implead potential third-party defendants" has bearing on a *forum non conveniens* determination. *Piper Aircraft*, 454 U.S. at 259. In that case, the putative third-party defendants were citizens of the alternative forum, so their citizenship militated in favor of dismissal. *Id.* Here, on the other hand, Shelby has pleaded third-party claims against two residents of Houston, Texas.[79] Neither of them is amenable to service of process in Tamaulipas or subject to the jurisdiction of the courts of that State.[80]

But, it might be argued, Shelby's third-party claims against his sisters may be pursued in Houston *after* litigation of the Executor's claims is concluded in

---

[77] Record 01136-38 (¶¶ 43-52).

[78] Record 01134 (¶ 34).

[79] *See* Record 00649 (Counter-Defendant Shelby Longoria's Third-Party Petition (Aug. 30, 2013) at 1 (¶¶ 2-3)).

[80] Record 01133-34.

28

Tamaulipas. Even if that is true, the inconvenience associated with having multiple proceedings is a factor to be weighed in the *forum non conveniens* analysis:

> It is true, of course, that if [the defendants] were found liable after a trial in the United States, they could institute an action for indemnity or contribution against these parties in Scotland. It would be far more convenient, however, to resolve all claims in one trial.

*Id.; see also Boston Telecomms.*, 588 F.3d at 1211 ("the inability to implead potential third-party defendants can be a factor"). So the existence of Shelby's third-party claims cut against his motion to dismiss and provided a valid basis for the Trial Court's denial of his motion.

### 2. Tamaulipas Is Not an Adequate Alternative Forum Because It Provides No Remedy for the Executor's Causes of Action

The Executor's causes of action for breach of fiduciary duty do not exist in Mexican law generally or the law of Tamaulipas in particular.[81] Unlike Texas, Mexico does not recognize or enforce fiduciary duties based on informal fiduciary relationships or private trusts. In fact, Mexican law does not recognize the existence of private trusts at all. Mexican law only recognizes trusts created through federally-licensed financial institutions, subject to regulatory directive and oversight. Mexico

---

[81] Record 01135 (¶¶ 39-40).

29

would provide *no* recourse or remedy, so as a matter of law no court in Mexico would be an adequate forum for litigation of the Executor's counterclaims.[82]

Shelby cites several cases in which Mexico was held to be an adequate alternative forum,[83] but in none of them was the cause of action one for breach of fiduciary duty arising out of either an informal fiduciary relationship or a private trust agreement – actions wholly unrecognized in Mexican law – so those cases are inapposite. Mexico provides no remedy for the Executor's causes of action, so Mexico is not an adequate forum for litigation of the Executor's counterclaims.

### 3. Tamaulipas Is Not an Available Alternative Forum Because the Executor's Claims Against Shelby Would Be Barred by an Unwaivable Statute of Repose There

The testimony of Ilan Rosenberg also establishes that, if the counterclaims were pleaded in Tamaulipas, they would be barred by a statute of repose.[84] The

---

[82] *Id.* The expert testimony proffered by Shelby on this point is unavailing. Carlos testified to the general propositions that "Mexico allows claims for money damages" and "Mexico allows a party to seek contractual or extra-contractual damages." Record 01083 (¶¶ 29-30). He did not, however, state that Mexico recognizes a cause of action for breach of fiduciary duty arising out of an informal fiduciary relationship or a private trust. His testimony is too general to be of consequence. Furthermore, his testimony was effectively neutralized on cross-examination. Record 00889-93. The Trial Court, of course, was free to disregard it.

[83] Petition at 17-19.

[84] Record 00913-14.

01092

statute of repose is unwaivable, so Shelby's agreement to waive any limitations defense is meaningless. This, too, dooms the Petition. As a matter of law, no adequate alternative forum is available if the claim would be time-barred in the proposed alternative forum. *See, e.g., Bank of Credit and Commerce Int'l (OVERSEAS) Ltd. v. State Bank of Pakistan,* 273 F.3d 241, 246 (2d Cir. 2001); *Mercier v. Sheraton Int'l, Inc.,* 935 F.2d 419, 423-24 (1st Cir. 1991); *Kontoulas v. A.H. Robins, Co., Inc.,* 745 F.2d 312, 316 (4th Cir. 1984); *Vicknair v. Phelps Dodge Indus. Inc.,* 767 N.W.2d 171, 177-78 (N.D. 2009); *Delfosse v. C.A.C.I., Inc.-Federal,* 267 Cal. Rptr. 224, 227-29 (1990); *Sanwa Bank, Ltd. v. Kato,* 734 So.2d 557, 561 (Fla. Dist. Ct. App. 1999); *Jones v. Prince George's County,* 378 Md. 98, 835 A.2d 632, 646 (2003); *Kennecott Holdings Corp. v. Liberty Mut. Ins. Co.,* 578 N.W.2d 358, 361-62 (Minn. 1998); *Shewbrooks v. A.C. and S., Inc.,* 529 So.2d 557, 561-62 (Miss. 1988); *Varo v. Owens-Illinois, Inc.,* 948 A.2d 673, 680-81 (N.J. Super. 2008); *Marchman v. NCNB Texas Nat. Bank,* 898 P.2d 709, 724 (N.M. 1995); *Binder v. Shepard's Inc.,* 133 P.3d 276, 278-80 (Okla. 2006); *Jessop v. ACF Indus., LLC,* 859 A.2d 801, 803 (Pa.Super. 2004); *Kedy v. A.W. Chesterton Co.,* 946 A.2d 1171, 1183-84 (R.I. 2008).

Thus, for three independent reasons, Tamaulipas is not an available and adequate forum for litigation of the Executor's counterclaims against Shelby.

31

01093

E.  **Shelby Failed To Prove That The Private-Interest Factors and Public-Interest Factors Favor Litigation of the Executor's Claims in Any Other Forum**

The Petition also must be denied because the relevant private-interest factors and public-interest factors do not "clearly show facts" which either "(1) establish such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience, which may be shown to be slight or nonexistent, or (2) make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems." *Koster*, 330 U.S. at 524.

In *Quixtar*, the Supreme Court of Texas identified the relevant factors, after noting that the "central focus of the *forum non conveniens* inquiry is convenience." 315 S.W.3d at 33 (quoting *Piper Aircraft*, 454 U.S. at 249). "The well-known *Gulf Oil* factors direct courts to consider both public and private interest considerations in forum non conveniens dismissals." 315 S.W.3d at 33 (citing *Gulf Oil*, 330 U.S. at 508–09). "Private considerations include: (1) the 'relative ease of access to sources of proof'; (2) the 'availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses'; (3) the 'possibility of view of premises, if view would be appropriate to the action'; (4) the 'enforceability of a judgment' once obtained; and (5) 'all other practical problems that make trial of a case easy, expeditious and inexpensive.'" *Id.* (quoting *Gulf Oil*, 330 U.S. at 508).

32

01094

"Public considerations include: (1) '[a]dministrative difficulties . . . for courts when litigation is piled up in congested centers instead of being handled at its origin'; (2) the burden of 'jury duty . . . that ought not to be imposed upon the people of a community which has no relation to the litigation'; (3) 'local interest in having localized controversies decided at home'; and (4) avoiding conflicts of law issues." *Quixtar*, 315 S.W.3d at 33-34 (quoting *Gulf Oil*, 330 U.S. at 508–09).

Based on the evidence admitted by the Trial Court, the Trial Court easily could have found that *none* of the relevant factors militates in favor of the alternative forum proposed by Shelby.[85]  And Shelby had the burden of proof as to every factor. *SES Prods.*, 2013 WL 2456797, at *3.

### 1.    All of the Private-Interest Factors Point to This Forum or Are Neutral

#### a.    Access to *Relevant* Evidence Is Far Better in This Forum

The Executor lives in Houston, Texas.  Shelby lives in McAllen, Texas.  The Third-Party Defendants – impleaded *by Shelby* – live in Houston, Texas.  Thus, three of the four parties live in Houston, Texas, and all of them live in Texas.[86]  Shelby

---

[85] In his Petition to this Court, Shelby does not assert that the Trial Court erred by excluding any evidence.

[86] Record 00633-34, 00649, 00861.

33

01095

cites no case, and we have found none, in which *every* party was a resident of the forum where the case was filed and it was nevertheless dismissed for *forum non conveniens*.

Here, in addition to the parties, many other key witnesses live in Texas. The Executor advised the Trial Court of the following witnesses:

- ◆ Eduardo Longoria, Jr. (also known as "Wayo" Longoria), who is Dorothy's other child (the brother of Shelby, Sylvia, and Adriana), and who lives in Austin, Texas

- ◆ Adrian Hernandez, who served as the personal accountant of both Dorothy and Shelby, and whose office is in Houston, Texas

- ◆ Pepe Treviño, a lawyer who provided estate-planning services to Dorothy and her husband and whose office is in Laredo, Texas

- ◆ Shelby's wife, Tita Longoria, who lives in McAllen, Texas, and who has knowledge of Dorothy's relationship with Shelby and transactions affecting the property of Dorothy

- ◆ Carolyn Beckett, a lawyer in Austin, Texas, who has represented Shelby in various matters related to his parents' estates, including a dispute with Adriana Longoria over Shelby's performance of the "Private Agreement" in 2010

- ◆ Attorneys, accountants, and appraisers involved in a 2007 transaction – negotiated and consummated in Texas – between Shelby and his brother, Wayo Longoria, in which Wayo was paid about $24,000,000 for his forty percent interest in a trust containing stock formerly held in the names of Dorothy and her husband

34

01096

◆ Dorothy's friends, physicians, and caregivers with whom she spoke about her property and about Shelby and her other children during the last seven years of her life when she lived in Houston

Against this array of witnesses, Shelby claimed in his brief – *but never proved* – that the following witnesses live in Mexico: the witnesses to execution of a will by Eduardo; the witnesses to execution of a trust agreement by Eduardo; and Eduardo's "legal advisors, all of the Banca Afirme employees who managed the trust, and all of the employees of the Mexican Trust's Mexican businesses."[87] The supposed need for the testimony of these persons is contrived.

The Executor's counterclaims do *not* contest the will signed by Eduardo – so no testimony from those who witnessed the signing of that will is required.[88] Likewise, the counterclaims do *not* dispute that Eduardo signed the trust agreement referenced in the Petition – so the testimony of the witnesses to that signing is unnecessary. Shelby offered no evidence of the identities, whereabouts, or supposedly relevant knowledge of the unnamed legal advisors of Eduardo, or the unnamed employees of Banco Afirme, or the unnamed "employees of the Mexican Trust's Mexican businesses." *Shelby proved neither that such persons have knowledge of relevant facts nor that they are located in the State of Tamaulipas.*

---

[87] Record 00081.

[88] Record 00655-73.

01097

Indeed, he admitted that the Mexican businesses are in "various states in Mexico" – not only in Tamaulipas – so he provided to the Trial Court no evidentiary basis on which the Trial Court could base a finding as to the number of witnesses in Tamaulipas or the significance of their testimony.[89] "Conclusory allegations of need as to unnamed witnesses and unspecified evidentiary materials are insufficient to establish the clear showing mandated by Gulf Oil Corp. that a balancing of conveniences strongly favors forum non conveniens dismissal." *Omni Hotels Mgmt. Corp. v. Round Hill Devs. Ltd.*, 675 F.Supp. 745, 752 (D.N.H. 1987) (citing *Gulf Oil*, 330 U.S. at 510-11). *Accord Fasules v. DDB Needham Worldwide, Inc.*, No. 89 C 1078, 1989 WL 55373, at *3 (N.D. Ill. 1987); *Mowrey v. Johnson & Johnson*, 524 F.Supp. 771, 777 (W.D. Pa. 1981).

Moreover, since Shelby controls the Mexican businesses,[90] the Trial Court reasonably could infer that Shelby already has, or easily can obtain, whatever information might be needed in connection with the Executor's counterclaims.

The bottom line is this: all of the potential witnesses who were specifically identified in the proceedings below reside in Texas, and most of them reside in the Houston, Texas. To state the obvious, the location of the Trial Court is far more

---

[89] Record 00839.

[90] Record 00839-41; 00861; 00863-64.

36

convenient for such witnesses than the location of any court in Tamaulipas, which is about 300 miles away and requires an international border-crossing to visit.

But distance is not the only obstacle – or even the most daunting obstacle – to obtaining in Tamaulipas the testimony of the many witnesses who live in Texas. On July 12, 2013, the United States Department of State issued a "Travel Warning" about the security situation in Mexico.[91] A copy was admitted into evidence without objection.[92] It provides a chilling view of travel in the "border region" – which, of course, includes Tamaulipas[93]:

> Gun battles between rival TCOs [Transnational Criminal Organizations] or with Mexican authorities have taken place in towns and cities in many parts of Mexico, *especially in the border region.* Gun battles have occurred in broad daylight on streets and in other public venues, such as restaurants and clubs.
> *
> *
> *
> The number of kidnappings and disappearances throughout Mexico is of particular concern. Both local and expatriate communities have been victimized. In addition, local police have been implicated in some of these incidents.

---

[91] Record 01143-52.

[92] Record 00893.

[93] Record 01144 (emphasis added).

01099

> \*
> \*
> \*
> Carjacking and highway robbery are serious problems *in many parts of the border region*, and U.S. citizens have been murdered in such incidents. . . . Incidents have occurred during the day and at night, and carjackers have used a variety of techniques, including bumping/moving vehicles to force them to stop and running vehicles off the road at high speeds.

The situation in Tamaulipas is so bad, in fact, that employees of the United States Government have been directed to "defer non-essential travel to the state of Tamaulipas" and are "prohibited from personal travel on Tamaulipas highways outside of Matamoros and Nuevo Laredo due to the tenuous security situation."[94] "When travel for official purposes is essential, it is conducted with *extensive security precautions*."[95] "While the general public is not forbidden from visiting places categorized under 'defer non-essential travel,' USG personnel will not be able to respond quickly to an emergency situation in those areas due to security precautions that must be taken by USG personnel to travel to those areas."[96]

---

[94] Record 01149.

[95] Record 01144 (emphasis added).

[96] *Id.*

38

01100

Shelby himself admits that "[c]artel violence, street shoot-outs, kidnapping, and extortion" have been "persistent threats" along the Mexican border to this very day.[97] For Shelby to claim that Tamaulipas is a "convenient" venue – in the face of these harsh realities – betrays again a lack of candor to the Court.

In light of the indisputable danger of travel in Tamaulipas, it is established beyond peradventure that, for the litigants themselves, and for many other witnesses whose testimony is definitely needed, Houston, Texas, is a far more convenient forum than Tamaulipas.

Although this is obvious true, Shelby insists that it is legally inconsequential. Based on carefully selected language in the opinions from various cases, Shelby argues that the danger of travel in Tamaulipas could not be given *any* weight by the Trial Court in the absence of highly specific evidence as to the effect of the danger on the legal system there.[98] We respectfully disagree. In each of those cases the holding was that dismissal was *within the discretion* of the trial court notwithstanding evidence of political unrest or violence, and such evidence did not, *by itself*, preclude dismissal. None of those cases held that evidence of danger in the proposed alternative forum could not be considered by a trial court as affecting the convenience

---

[97] Record 00066.

[98] Petition at 26-27.

39

of the parties and witnesses. The "central focus of the *forum non conveniens* inquiry is convenience," *Quixtar*, 315 S.W.3d at 33 (quoting *Piper Aircraft,* 454 U.S. at 249), and the recent warning of the State Department certainly establishes that travel in Tamaulipas is "inconvenient" – to say the least. Since even Shelby admits that many witnesses – including *all* of the litigants – live in Texas, the Trial Court could reasonably have found that some or all of the most imporant witnesses would be detered from traveling to Tamaulipas in order to testify there.

### b. Compulsory Process for Attendance of Unwilling Witnesses Is Available in This Forum, But Not in Mexico, and the Cost of Obtaining Attendance of Willing Witnesses Is Less Here

All of the witnesses who live in Texas can be compelled by the Trial Court to testify, either in person or by deposition. *See* TEX. R. CIV. P. 176, 205. None of them can be compelled to give testimony in a Mexican proceeding. For those witnesses who – despite the grave danger described above – might be willing to travel voluntarily to Tamaulipas, the expense of security precautions is prohibitive. As Shelby has identified no Mexican witnesses whose testimony is relevant to the Executor's counterclaims, this factor cuts against dismissal.

### c. No View of Any Premises Will Be Needed

There is no need for the trier of fact to view any premises, as Shelby admits.[99]

---

[99] Petition at 25.

40

01102

### d. A Judgment of The Trial Court Would Be Fully Enforceable as to All Parties, a Judgment of a Mexican Court Would Not

Shelby ignores this factor, and the reason is obvious: it undercuts his argument. Shelby lives in Texas, and he filed the will contest which commenced this litigation. The Executor pleaded his counterclaims in response to Shelby's will contest. Thus, if the counterclaims are allowed to proceed in the Trial Court, the judgment of the Trial Court will be fully enforceable against Shelby and, of course, the Executor.

In addition, a judgment entered by the Trial Court on Shelby's third-party claims against Sylvia and Adriana would be fully enforceable. As both of them live in Houston, the Trial Court unquestionably may exercise personal jurisdiction over them, as Shelby admits.[100]

If, on the other hand, the counterclaims are dismissed as demanded by Shelby, he will not be able to pursue his third-party action, as no court in Tamaulipas has jurisdiction over the Third-party Defendants.[101] The litigation will become fragmented. Duplicative proceedings, and multiple judgments, will be required to achieve a final resolution.

---

[100] Record 00811.

[101] Record 01133-34.

41

01103

### e. The Practical Problems and Expense of Proceeding in Mexico Are Far Greater

Shelby has not identified any specific problem that will arise from litigation of the Executor's counterclaims in the Trial Court but will not arise if the Executor pursues his claims in a court in Tamaulipas. Respondents, on the other hand, have identified significant problems with litigation in Tamaulipas. Respondents have proven, and Shelby has admitted, that Tamaulipas is an exceedingly dangerous place, so anyone traveling there must incur unreasonable risk and incur substantial expense for security.[102] This factor, therefore, points away from Tamaulipas.

Shelby argues that the Executor's counterclaims against him should be dismissed because documentary evidence regarding the Mexican businesses, in which Dorothy had owned interests, is kept in Mexico.[103] A similar situation was faced in *Boston Telecommunications Group, Inc. v. Wood*. Although it was foreseeable that documents located in Mexico would have to be obtained, the court noted that there are established legal processes – such as the HAGUE CONVENTION ON TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS, 23 U.S.T. 2555 (1968) – by which this can be done, and a need to invoke those processes does not compel

---

[102] Record 00066, 01144, 01149.

[103] Petition at 22.

42

dismissal for *forum non conveniens*: "'Any court . . . will necessarily face some difficulty in securing evidence from abroad,' but these complications do not necessarily justify dismissal." 588 F.3d at 1288 (quoting *Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1181 (9th Cir. 2006)).

More importantly, Shelby's position is disingenuous because *he* controls the entities that own the documents,[104] and he lives in Texas. *Cf. Boston Telecomms.,* 588 F.3d at 1208 (finding it was "reasonable to assume" that documents which the movant represented to belong to foreign entities were in the possession of the chief executive officer, who resided in California and effectively managed the companies from there). During the hearing on his motion to dismiss, Shelby was evasive about his position in the Mexican holding companies, and even professed ignorance as to whether he is a corporate officer, but eventually he conceded that he may be "Chairman" and that he had directed the companies to pay hundreds of thousands of dollars to his mother.[105] And Shelby presented no *evidence* of facts on which the Trial Court could have based a finding that production of the documents would be unduly inconvenient or expensive. His concern about access to documentary evidence is a red herring.

---

[104] Record 00839-41; 00861; 00863-64.

[105] Record 00863-64.

43

## 2. All of the Public-Interest Factors Point to This Forum

### a. The Dispute Originated Here and There Are No Greater Administrative Difficulties Here Than in Tamaulipas

This dispute arose in Texas. Shelby has lived in Texas since the 1970's. While living here, his fiduciary duty to Dorothy arose under Texas law and, the Executor contends, Shelby breached his duty under Texas law. Dorothy Longoria lived in Texas for her last 25 years, and lived in Houston for her last seven years. The alleged acts and omissions of Shelby, therefore, harmed a longstanding citizen of this forum. Dorothy's will was admitted to probate in this forum and her estate is pending in this forum. Shelby himself commenced this legal proceeding by filing his will contest in this forum. This litigation originated in Texas and must be decided under Texas law.

Shelby has not asserted, let alone proven, that the Trial Court's docket is more congested than that of the courts of Tamaulipas. As noted in the proceedings below, the Trial Court has issued a Docket Control Order setting the case for trial on May 19, 2014.[106] There is, therefore, a concrete reason to believe that the Trial Court will adjudicate the Executor's counterclaims promptly. Shelby offered no evidence that a court in Tamaulipas (or anywhere else) would address the merits of the case more quickly than the Trial Court, or that litigation in Tamaulipas would be

---

[106] Record 00694.

44

01106

administratively easier. Indeed, there is every reason to believe that the opposite is true.

> ### b. This Community Has the Strongest Relationship to the Litigation, So the Burden of Jury Duty Belongs Here

Both Shelby – the alleged wrongdoer – and Dorothy – the alleged victim – resided in this forum for the last 25 years of Dorothy's life, so this forum has the strongest relationship to the litigation. Dorothy died in Houston, her will was probated here, and her estate is being administered here by an executor who was empowered here, all in accordance with Texas law. Imposing the burden of jury duty here is justified. Doing so in Mexico is not.

> ### c. The Dispute Arose in Texas, Between Texans, So This Forum Has the Stronger Interest in Deciding the Controversy

Because Dorothy lived and died in Texas, her estate is being administered in Texas, and the Executor of her estate has claims based on a fiduciary duty owed to Dorothy by another resident of Texas, this State has an interest in deciding the claims – an interest far greater than any that could be articulated for the State of Tamaulipas. The Legislature of this State has enacted an array of statutes designed to ensure that probate courts may exercise jurisdiction over all matters related to estates pending in those courts. *See, e.g.,* TEX. PROB. CODE ANN. §§ 4A (providing that courts

45

exercising original probate jurisdiction also have jurisdiction over all matters related to probate proceedings), 4B (defining "matter related to a probate proceeding" to include any claim by a personal representative on behalf of an estate), 4F (conferring on statutory probate courts exclusive jurisdiction over all probate proceedings), 5B (authorizing statutory probate courts to transfer *to themselves* actions pending in district or county courts if they are "related" to an estate pending in the probate court or if the personal representative of such an estate is a party). Underlying these statutes is a strong public policy in favor of consolidation, in the probate courts, of all matters related to the estates administered in those courts. The same public policy stands in opposition to dismissal for *forum non conveniens* of an executor's claims pleaded, on behalf of an estate, in the probate court in which the estate is pending.

Shelby does not deny the existence or the importance of this public policy, but he attempts to counter it by citing one case, which he claims is "almost directly on point" because it involved claims by the personal representatives of an estate: *Gallego v. Garcia*, No. 07-CV-1185, 2010 WL 2354585 (S.D. Cal. June 9, 2010).[107] While it is true that, in *Gallego*, the plaintiffs were personal representatives of an estate, it is *not* true that they brought their claims in the probate court presiding over the estate. Rather, they brought their claims in a federal district court, with

---

[107] Petition at 30.

46

01108

jurisdiction based solely on diversity of citizenship, so the policy in favor of consolidated administration of estates was not implicated. Moreover, the facts in *Gallego* are easily distinguished: the defendants were a Mexican corporation and citizens of Mexico. Here, the defendant (Shelby) is a citizen of this forum, and no claim is asserted against any resident of Mexico. *Gallego* in no way refutes the proposition that the third public-interest factor cuts against dismissal.

And there is still another public policy of the State of Texas that stands against dismissal of the Executor's counterclaims: the policy against piecemeal litigation of related controversies. The Executor's claims are *counterclaims*. There is substantial overlap between the subject matter of Shelby's will contest and the Executor's counterclaims: both involve inquiry into Dorothy's property, mental condition, and testamentary intent at various times during her adult life.[108] We do not contend that counterclaims may *never* be dismissed for *forum non conveniens*; Shelby's attribution of that contention to us is untrue (and an outstanding example of a "straw man" argument).[109] What we *do* contend is that dismissal of counterclaims that are

---

[108] In his will contest, Shelby makes allegations concerning Dorothy's property and her wills dating back to the 1980's. Record 00635 (¶¶ 8-10).

[109] *See* Petition at 13-14 (Shelby falsely represents that, as the "centerpiece of his argument against dismissal," the Executor asserted that the Trial Court "could not dismiss his counterclaim while maintaining jurisdiction over Shelby's claim").

47

01109

*closely related* to the plaintiff's claims undercuts the public policy against fragmented litigation, and therefore that public policy is a "public-interest factor" that the Trial Court could, quite properly, have taken into account, even if it might not have been dispositive by itself. No case holds otherwise.

### d. Maintaining the Litigation Here Avoids an Issue of Conflicts of Law

The Executor's pleading states explicitly that it is founded entirely on Texas law,[110] and includes numerous allegations of facts occurring in Texas.[111] Shelby asserts that Mexican law might supply the rule of decision but, in typical fashion, Shelby fails to explain why that is so or to identify specifically any Mexican law that would be controlling. We repeat: by his counterclaims against Shelby, the Executor is *not* contesting a will signed by Eduardo; the Executor is *not* contesting a trust agreement signed by Eduardo; the Executor is *not* asserting a cause of action under Mexican law; and the Executor is *not* seeking relief from any individual residing in Mexico or any Mexican business entity. There simply is no basis for Shelby's assertion that the Executor's counterclaims are governed by Mexican law.

---

[110] Record 00655 (¶ 2), 00660 (¶¶ 19, 22), 00663 (¶¶ 33, 35), 00664 (¶¶ 36-39), 666 (¶ 44), 668 (¶¶ 48-49), 00669-70 (Prayer for Relief).

[111] Record 00655 (¶ 2), 00657 (¶¶ 9-10), 658 (¶¶ 12, 16), 659 (¶ 17), 660 (¶¶ 19-20, 23-25), 661 (¶¶26-28).

48

01110

The counterclaims are based on a fiduciary duty undertaken, and breached, by Shelby while he was a resident of Texas. The counterclaims also are based in part (but not entirely) on Dorothy's community-property rights under Texas law. Dorothy and Eduardo Longoria were married in Texas, which establishes that their marital estate was a community estate.[112] They were living together in Texas when Eduardo died.[113] The marriage began and ended in Texas. Under Texas law, all of their property at the time of Eduardo's death is presumed to have been community property. If Shelby contends that it was *not* community property, then it is his burden to prove so. And if he thinks that he can carry his burden by offering a contract supposedly made in Mexico, then he is free to try. But the issue remains one of Texas law.

Furthermore, even if it may happen that Mexican law comes into play, "the need to apply foreign law is not in itself reason to apply the doctrine of *forum non conveniens*." *Schexnider v. McDermott Int'l, Inc.*, 817 F.2d 1159, 1163–64 (5th Cir.), *reh'g denied*, 824 F.2d 972 (5th Cir.), *cert. denied*, 484 U.S. 977 (1987). *Accord Manu Int'l, S.A. v. Avon Prods, Inc.*, 641 F.2d 62, 68 (2d Cir.1981) ("[w]e must guard against an excessive reluctance to undertake the task of deciding foreign law").

---

[112] Record 00867; 01160-61 (Ex. D-4).

[113] Record 00853, 856-57.

49

01111

In sum, *no* factor militates in favor of Shelby's position; and *every* factor militates strongly against it, with one exception, and the exception is a factor that points in neither direction. Shelby failed miserably to carry his burden to prove "all elements of the forum non conveniens analysis" and to "establish that the balance of factors strongly weighs in favor of dismissal." *SES*, 2013 WL 2456797, at *3.

## II. The Trial Court Did Not Abuse Its Discretion by Declining To Abate the Executor's Counterclaims

After 24 pages of fervent argument that the Trial Court was absolutely required to *dismiss* the Executor's counterclaims, and had no discretion to do otherwise, Shelby curiously presents a half-hearted, one-page argument why the Trial Court was absolutely required to *abate* the counterclaims, and had no discretion to do otherwise.[114] Shelby asks the Court to issue a writ of mandamus compelling the Trial Court to abate the counterclaims until two things happen: (1) Shelby's will contest is fully adjudicated; and (2) the *amparo* proceeding involving the estate of Eduardo is fully adjudicated.

Shelby cites only one case in support of his argument that abatement of the counterclaims was mandatory: *Develo-Cepts, Inc. v. City of Galveston*, 668 S.W.2d

---

[114] Petition at 32-34.

50

01112

790, 793 (Tex. App. – Houston [14th Dist.] 1984, no writ).[115] This single case is cited for the proposition that "[i]t is well-established that a case should be abated pending a determination of a plaintiff's standing or capacity to sue."[116] The citation of *Develo-Cepts* for this proposition was improper. The Court will search the opinion in vain for any support for the proposition in Shelby's Petition or, more broadly, any support for the argument that the Trial Court abused its discretion by denying his motion to abate the Executor's counterclaims.

The facts in *Develo-Cepts* were as follows. Develo-Cepts, Inc. was a for-profit company that wished to construct, on a certain tract of land in Galveston, a facility for the care and housing of mentally challenged individuals. The company did not own the land, but hoped to lease it from a couple named Wirth. The Wirths did not own the land either, but were trying to purchase it from persons referred to as "the Matthews." Ultimately, the Wirths' efforts to purchase the land were unsuccessful, so Develo-Cepts never acquired any interest in the land. While a sale to the Wirths was under consideration, however, the Matthews filed an application for a special-use permit allowing operation of the facility contemplated by Develo-Cepts. The City of Galveston denied the application. Develo-Cepts filed suit against the City, seeking

---

[115] Petition at 33.

[116] *Id.*

51

declaratory and injunctive relief as well as money damages allegedly caused by the denial of the permit. 668 S.W.2d at 792.

The City of Galveston moved for dismissal or, in the alternative, abatement. The district court dismissed the case. On appeal, this Court affirmed the dismissal, holding that Develo-Cepts lacked standing because it had never owned an interest in the land for which a permit was denied. 668 S.W.2d at 795. Thus, *Develo-Cepts* was not even an abatement case, and its facts bear no resemblence whatsoever to those at bar. Nothing about the holding in *Develo-Cepts* suggests, even remotely, that the Trial Court was legally obligated to grant Shelby's motion for abatement. And *Develo-Cepts* is the only authority cited by Shelby for the proposition that abatement of the counterclaims is absolutely required as a matter of law.

Neither the will contest nor the *amparo* case necessitates abatement of the Executor's counterclaims. The Trial Court has already determined that the Executor had standing and capacity to file suit. By order dated October 9, 2012, the Court admitted to probate Dorothy's will dated January 21, 2010, and appointed James Thomas Dorsey to serve as Independent Executor of her estate. Both the standing and the capacity of the Executor to bring the counterclaims are judicially established.[117]

---

[117] Shelby presents no colorable argument that the Executor lacks *standing* to pursue the counterclaims against Shelby. And Shelby failed to plead *lack of capacity* in the prescribed way, which is a verified plea in abatement. *See Develo-Cepts*, 668

52

01114

According to Shelby, there are two reasons why the Trial Court supposedly was *required* to abate the Executor's counterclaims while allowing Shelby's will contest to proceed to trial. First, Shelby claims that "Tommy was appointed pursuant to an invalid will." Petition at 33. But the counterclaims were not pleaded by Tommy in his individual capacity. They were pleaded by the duly appointed executor of the Estate of Dorothy Louise Longoria, and Tommy was named as executor in a will that was duly admitted to probate. Even if the will contest is successful, there will be a successor personal representative of that estate, and the successor personal representative will have the same duty, and legal capacity, to marshal the assets of the estate. The most valuable assets are the claims against Shelby. The will contest cannot obviate litigation of the counterclaims.

The second reason why, according to Shelby, the Executor's counterclaims should be abated until the conclusion of Shelby's will contest is the claim that the Executor has a "conflict of interest" which renders him incapable of performing his fiduciary duties. Petition at 33. But Shelby's Petition to this Court does not identify, let alone identify evidence of, the supposed conflict of interest. In the Trial Court Shelby asserted that a conflict of interest exists based solely on (a) Shelby's self-serving and wholly unsupported assertions that Mr. Dorsey's wife, Sylvia Dorsey,

S.W.2d at 793.

53

misappropriated funds belonging to Dorothy during her lifetime, and (b) Shelby's self-serving and wholly unsupported assertion that Mr. Dorsey's son, Wayo Dorsey, "stole" from Shelby electronic files relating to Mexican businesses and a Mexican trust.[118] These accusations are irresponsible, unproven, and categorically denied, but even if one assumes for the sake of argument that they are true, they provide no basis for abatement of the Executor's counterclaims against Shelby.

Shelby is *not* a beneficiary of the Estate of Dorothy Louise Longoria. Dorothy left nothing to him in her will, which the Trial Court admitted to probate. Shelby, therefore, has no standing to complain about the Executor's supposed failure to investigate alleged torts by Sylvia against her mother. As for the alleged theft of computer files by Wayo Dorsey, Shelby offers no reason why the Executor would be responsible either to investigate that or to redress it. And even if Mr. Dorsey were removed as Executor based on these supposed "conflicts of interest," the Trial Court certainly would appoint a successor, who would be equally responsible to marshal the assets of the estate, including the claims against Shelby. There is no logical connection between the facts creating the supposed "conflicts of interest" and abatement of the counterclaims until the *will contest* is concluded. Shelby's argument makes no sense.

---

[118] Record 00089.

54

While abatement would serve no salutary purpose, it certainly would have undesirable consequences. To state the obvious, the requested abatement would cause a lengthy delay in the disposition of the counterclaims. Abatement also would cause an enormous waste of the resources of the Trial Court and the litigants, because discovery needed for the will contest substantially overlaps with discovery needed for the counterclaims, as comparison of the pleadings demonstrates.[119] Both the will contest and the counterclaims require discovery of the estate planning of the Decedent, the property owned by her at various times in her adult life, her evolving relationships with her children, representations made to her by Shelby, payments made to her by Shelby, information withheld from her by Shelby, her physical and mental condition at various times, and many other topics. If the counterclaims are abated, many of the witnesses who are deposed in the will contest will have to be deposed again. And, of course, a second trial will have to be conducted. The Trial Court certainly had a rational basis for declining to abate the counterclaims. Shelby's argument that it was an abuse of discretion to deny his motion to abate the counterclaims pending resolution of the will contest is spurious.

---

[119] *Compare* Record 00633-00648 (Shelby Longoria's Amended Contest of 2010 Will (Aug. 30, 2013)) *and* Record 00655-73 (Original Counterclaims of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, to Shelby Longoria's Amended Contest of 2010 Will (Sept. 26, 2013)).

55

01117

Finally, Shelby asserts that the Trial Court abused its discretion by refusing to abate the Executor's counterclaims until the *amparo* case filed by Adriana and Sylvia is concluded. His argument on this point consists of *one sentence*: "Further, resolution of the Mexican lawsuits [*sic*] against the Dorseys [*sic*] would foreclose any right to the relief they [*sic*] seek through their [*sic*] counterclaims."[120] Shelby offers no explanation whatsoever of how an unfavorable decision in the *amparo* proceeding would foreclose any relief sought by the Executor by his counterclaims in the Trial Court. The Petition does not even state what relief is requested in the *amparo* lawsuit. Thus, the Petition fails to present a proper argument for mandamus relief.[121]

The *amparo* proceeding involves the estate of Eduardo Longoria, Sr., not the estate of Dorothy Louise Longoria. It was initiated by Sylvia and Adriana, and it is essentially a civil-rights action, seeking relief known as *juicio de amaparo*, from a federal court of Mexico. The action is based on the fact that a state court of Tamaulipas did not give Sylvia and Adriana legally required notice of a proceeding in which a will of Eduardo Longoria, Sr. was probated. The relief sought is an order

---

[120] Petition at 34.

[121] Neither Respondents nor the Court should have to guess what Shelby is contending. And it would be improper for Shelby to explain his position for the first time in a reply brief.

56

compelling the state court to issue the notice required by Mexican law.[122] Contrary to Shelby's unsupported assertion, an unfavorable outcome in the *amparo* case cannot possibly affect the counterclaims pleaded by the Executor in the Trial Court, as the counterclaims are brought on behalf of the estate of Dorothy, not the estate of Eduardo.

Having failed to demonstrate that the outcome of the *amparo* proceeding in Mexico might affect the adjudication of the Executor's counterclaims in the Trial Court, Shelby has wholly failed to show that the Trial Court was legally required to abate the Executor's counterclaims in deference to the *amparo* case. Shelby's argument for abatement is meritless.

## CONCLUSION AND PRAYER

The Trial Court was entitled to disbelieve the testimony of Shelby and his expert witness, and to disregard the affidavits and exhibits that Shelby filed with his motion but never offered into evidence. Shelby failed to conclusively prove facts that left the Trial Court no discretion to deny his motion to dismiss the Executor's counterclaims, but legally required the Trial Court to dismiss them for *forum non conveniens*, in spite of the facts that (1) every one of the four parties lives in Texas and three of them reside in Harris County, Texas, (2) the Decedent whose estate is at

---

[122] Record 00901-02.

57

issue lived her last seven years in Harris County, Texas, and her estate is being administered there, (3) Shelby failed to identify, in the manner required by law, a single witness who lives in Mexico, (4) the Executor's counterclaims are based entirely on Texas law and he is asserting no rights under Mexican law, and (5) the Executor's causes of action are not recognized in Mexican law, and are barred by an unwaivable statute of repose, so no remedy is available there. Shelby likewise failed to conclusively prove facts that left the Trial Court no discretion to deny his motion to abate the Executor's counterclaims, but legally required the Trial Court to abate them. The record demonstrates that neither dismissal nor abatement was warranted. Accordingly, Respondents respectfully request that the Petition be denied.

58

01120

DATED:   December 30, 2013.

Respectfully submitted,

*/s/ James Austin Fisher*
James Austin Fisher
   State Bar of Texas Number 07051650
Shannon L.K. Welch
   State Bar of Texas Number 90001699
**FISHER & WELCH**
**A Professional Corporation**
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Telephone:  214.661.9400
Facsimile:  214.661.9404

T. Wesley Holmes
   State Bar of Texas Number 09908495
**THE HOLMES LAW FIRM**
10,000 North Central Expressway, Suite 400
Dallas, Texas 75231
Telephone:  214.890.9266
Facsmile:   214.890.9295

**ATTORNEYS FOR RESPONDENTS**
**JAMES THOMAS DORSEY,**
**INDEPENDENT EXECUTOR OF**
**THE ESTATE OF DOROTHY**
**LOUISE LONGORIA, DECEASED,**
**AND SYLVIA DORSEY**

59

01121

## CERTIFICATE UNDER TEX. R. APP. P. 9.4(i)

I hereby certify that this document contains 13,214 words, according to computer program used to prepare it, excluding the caption, table of contents, index of authorities, statement of issues presented, signature, proof of service, certification, certficate of compliance, and index, as provided in TEX. R. APP. P. 9.4(i).

*/s/ James Austin Fisher*
James Austin Fisher

01122

## CERTIFICATE UNDER TEX. R. APP. P. 52.3(j) and 52.4

I hereby certify that I have reviewed this response and concluded that every factual statement in this response is supported by competent evidence included in the appendix or record.

/s/ *James Austin Fisher*
James Austin Fisher

01123

# CERTIFICATE OF SERVICE UNDER TEX. R. APP. P. 9.5(e)

I hereby certify that on December 30, 2013, a true and correct copy of this document was served on Shelby Longoria, through his attorneys of record named below, in the manner indicated and in compliance with Rule 9.5 of the Texas Rules of Appellate Procedure. (By agreement of the parties, email is an acceptable manner of service.)

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
3900 Essex Lane, Suite 220
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

/s/ *James Austin Fisher*
James Austin Fisher

01124

ACCEPTED
2013-00996
FOURTEENTH COURT OF APPEAL:
HOUSTON, TEXAS
1/13/2014 7:26:48 PM
CHRISTOPHER PRINI
CLERK

NO. 2013-00996

# IN THE FOURTEENTH COURT OF APPEALS
## HOUSTON, TEXAS

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
1/13/2014 7:26:48 PM
CHRISTOPHER A. PRINE
Clerk

## IN RE SHELBY LONGORIA

Original Proceeding from the
Probate Court Number One, Harris County,
Texas, Cause No. 414270

## Shelby Longoria's Reply in Further Support of Petition for Writ of Mandamus

Johnny W. Carter
State Bar No. 00796312
jcarter@susmangodfrey.com
Richard W. Hess
State Bar No. 24046070
rhess@susmangodfrey.com
Kristen Schlemmer
State Bar No. 24075029
kschlemmer@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Robert S. MacIntyre Jr.
State Bar No. 12760700
macintyre@mmlawtexas.com
MacIntyre McCulloch Stanfield Young
2900 Weslayan, Suite 150
Houston, Texas 77027
Telephone: (713) 547-5400

**Attorneys for Shelby Longoria**

3009942v1/013774

01125

# Table of Contents

I.      The Complete Record Was Properly Before the Court. ...................3

II.     Mexico Is an Available and Adequate Forum. ...............................9

III.    The Private Interest Factors Weigh in Favor of Mexico. ...........13

IV.     The Public Interest Factors Weigh in Favor of Mexico. .............15

V.      The Trial Court Abused Its Discretion by Denying Abatement....................17

VI.     Conclusion. ......................................................................................19

CERTIFICATE OF SERVICE .....................................................................20

CERTIFICATE OF COMPLIANCE WITH APPELLATE RULE 9.4(i)..............21

01126

# Table of Authorities

Cases

*Aguinda v. Texaco, Inc.*,
142 F. Supp. 2d 534 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470
(2d Cir. 2002).................................................................................. 11

*American Dredging Co. v. Miller*,
510 U.S. 443, 114 S. Ct. 981 (1994)........................................... 16

*Chang v. Baxter Healthcare Corp.*,
599 F.3d 728 (7th Cir. 2010) ...................................................... 13

*Continental Oil Co. v. P.P.G. Indus.*,
504 S.W.2d 616 (Tex. App. – Houston [1st Dist.] 1973, writ ref'd
n.r.e.) ......................................................................................... 8, 9

*Crisman v. Cooper Indus.*,
748 S.W.2d 273 (Tex. App. – Dallas 1988, writ denied).............. 13

*Del Istmo Assurance Corp. v. Platon*,
2011 WL 5508641 (S.D. Fla. Nov. 9, 2011) ............................... 11

*Develo-Cepts, Inc. v. City of Galveston*,
668 S.W.2d 790 (Tex. App. – Houston [14th Dist.] 1984, no writ)............. 18

*Dolcefino v. Randolph*,
19 S.W.3d 906 (Tex. App. – Houston [14th Dist.] 2000, pet
denied)........................................................................................ 7

*DTEX, LLC v. BBVA Bancomer, S.A.*,
508 F.3d 785 (5th Cir. 2007) ................................................. 9, 10

*Dunmore v. Chicago Title Ins. Co.*,
400 S.W.3d 635 (Tex. App. – Dallas 2013, no pet.) .................... 12

*Duran v. Henderson*,
71 S.W.3d 833 (Tex. App. – Texarkana 2002, pet. denied)........... 12

*Gomez de Hernandez v. Bridgestone / Firestone N. Am. Tire, L.L.C.*,
204 S.W.3d 473 (Tex. App. – Corpus Christi 2006, pet. denied) ............... 10

01127

*H. Rouw Co. v. Railway Express Agency,*
    154 S.W.2d 143 (Tex. Civ. App. – El Paso 1941, writ ref'd) ...................... 9

*Ibarra v. Orica USA,*
    493 Fed. App'x 489 (5th Cir. 2012) .......................................... 10

*In re Ford Motor Co.,*
    591 F.3d 406 (5th Cir. 2009) ............................................. 9, 10

*In re Pirelli Tire, L.L.C.,*
    247 S.W.3d 670 (Tex. 2007) ........................................ 9, 10, 12

*In re Smith Barney, Inc.,*
    975 S.W.2d 593 (Tex. 1998) ................................................ 9

*Morales v. Ford Motor Co.,*
    313 F. Supp. 2d 672 (S.D. Tex. 2004) ...................................... 11

*Navarrete de Pedrero v. Schweizer Aircraft Corp.,*
    635 F. Supp. 2d 251 (W.D.N.Y. 2009) ...................................... 11

*Nexen Inc. v. Gulf Interstate Eng'g Co.,*
    224 S.W.3d 412 (Tex. App. – Houston [1st Dist.] 2006, no pet.) ............... 12

*Paulownia Plantations de Panama Corp. v. Rajamannan,*
    793 N.W.2d 128 (Minn. 2009) ............................................. 11

*Piper Aircraft Co. v. Reyno,*
    454 U.S. 235, 102 S. Ct. 252 (1981) ..................................... 7, 8, 14

*Quixtar Inc. v. Signature Mgm't Team, LLC,*
    315 S.W.3d 28 (Tex. 2010) ................................................. 8

*Sico North America, Inc. v. Willis,*
    2009 WL 3365856 (Tex. App. – Houston [14th Dist.] Sep. 10,
    2009, no pet.) ........................................................... 12

*Vinmar Trade Fin., Ltd.v. Utility Trailers de Mexico, S.A. de C.V.,*
    336 S.W.3d 664 (Tex. App. – Houston [1st Dist.] 2010, no pet.) 8, 10, 15, 16

01128

Statutes

Tex. Prob. Code § 10............................................................................17

Texas Civil Practice & Remedies Code § 36.005.....................................4

Rules

Tex. R. App. P. 52.7(a) ........................................................................6

Tex. R. Evid. 1009(b)............................................................................4

01129

Tommy's strategy is to deny, repeatedly and vociferously, that he is doing

what he obviously is doing. He told the trial court:

> Let me say with perfect clarity, we are not contesting the validity of any judgment of any Mexican court. We are not asking you to review or overturn any Mexican proceeding. We are not contesting any will that was signed in Mexico.[1]

Tommy continues in the same vein in his mandamus response by, for example,

denying that he is challenging the validity of the Mexican trust.[2]

But actions speak louder than words:

- Tommy's operative statement of claims asserts that Dorothy's estate is entitled to receive $49,011,050. Tommy says this is the value of 50% of the stock in two Mexican companies – Vertice Empresarial, S.A. de C.V. and Inmeubles y Terrenos, S.A. de C.V. – which Dorothy's husband, Eduardo Sr., transferred in 2002 to a Mexican trust managed by a Mexican bank.[3]

- Tommy served voluminous document requests, seeking production of documents relating to the trust and Mexican businesses.[4]

- At the hearing, Tommy's counsel questioned Shelby extensively about the trust and Mexican businesses held by the trust.[5]

- Tommy admitted in his mandamus response that he "contends that Dorothy owned a community-property interest in shares of stock that were placed in the trust,"[6] and that "the counterclaims also are based in part (but not entirely) on Dorothy's community-property rights under Texas law."[7] Although Tommy hedged these

---

[1] Record 00812-13.
[2] Mandamus Response at 4.
[3] Record 00626.
[4] Record 00482-00528.
[5] Record 00862-64, 00871-73.
[6] Mandamus Response at 4.
[7] Mandamus Response at 49.

01130

admissions by suggesting that he had some other theory that did not involve proving the existence of community property, he was unable to articulate this theory in any coherent way.[8]

- After defeating Shelby's motion to dismiss, Tommy filed a motion seeking to compel production of the Mexican documents sought in his requests for production.[9]

What would Tommy have to prove in order to recover the value of a 50% interest in the Mexican businesses which Eduardo Sr. transferred in 2002 to the Mexican trust managed by Banca Afirme?

- First, Tommy would have to prove that the Mexican separate property agreement was invalid. If Dorothy and Eduardo Sr. agreed in 1983 to divide their property, Dorothy would have no basis to recover half of Eduardo Sr.'s property. Since the Mexican separate property agreement was entered as an order of a Mexican court, Tommy somehow would have to invalidate that order.

- Second, Tommy would have to invalidate the trust. If Eduardo Sr. validly and properly transferred the shares of the Mexican businesses to the Mexican trust, then Tommy has no basis to claim that Dorothy can somehow reach those shares. Tommy does not, and cannot, explain how he can pierce the trust through an action in Texas probate court. He cannot even explain how he can obtain discovery from the trust through an action in Texas probate court.

- Third, Tommy would have to invalidate the Mexican court orders probating Eduardo Sr.'s 2002 will. In his will, Eduardo Sr. recited in Spanish that he "transmitted in Trust to the abovementioned Trustee [Banca Afirme] the property of all his shares corresponding to the capital stock of the corporations called 'VERTICE EMPRESARIAL' . . . and 'INMUEBLES Y TERRENOS'"[10] – the same shares of which Tommy seeks to

---

[8] Mandamus Response at 12.
[9] Supplemental Record.
[10] Record 00263.

01131

recover half for Dorothy's estate. Eduardo Sr. also "integrally ratifies all the other stipulations contained in the referred Trust, for it is his will that the terms of the Irrevocable Trust Agreement abovementioned be fully respected and performed."[11] After Eduardo Sr.'s death, Shelby probated this will in Mexican court; the Mexican court declared the will to be valid; and Shelby and his brother inherited the entirety of Eduardo Sr.'s estate as a result of the Mexican probate orders.[12] Even if Tommy somehow were able to invalidate the Mexican partition order and pierce the trust, he still could not recover half of Eduardo Sr.'s estate without also somehow invalidating the Mexican probate orders which expressly validate Eduardo Sr.'s 2002 will ratifying the terms of the trust.

These are the ineluctable facts, and they compel dismissal or abatement.

Shelby will show below that:

- the complete record was properly before the trial court;

- Mexico is an available and adequate alternative forum;

- the private interest factors strongly support venue in Mexico;

- the public interest factors strongly support venue in Mexico; and

- alternatively, Tommy's counterclaims should be abated pending resolution of the will contest or the Mexican court proceedings.

I.     The Complete Record Was Properly Before the Court.

The importance of the Mexican separate property agreement is highlighted by Tommy's argument that Judge Wright did not or could not consider the entire record presented to him. Tommy initially objected to everything filed by Shelby.[13]

---

[11] Record 00264.
[12] Record 00383.
[13] Record 01186-93.

01132

But at the hearing, he withdrew his objections except to the Mexican court order partitioning property and a few relatively unimportant documents.[14] While Tommy was withdrawing his objections to most of the documents, he doubled down and asserted even more objections to the Mexican partition order.[15] He did this because he knows that a Texas court cannot properly hear a case which challenges a Mexican court order like the one which memorializes the Mexican separate property agreement.

Tommy's objections to the Mexican partition order underscore the need to dismiss this case for forum non conveniens.

- Tommy objects to the authenticity of the partition order.[16] This objection easily could be resolved in Tamaulipas by the Tamaulipas attorney who attested to the facts contained in the Order, or by the Tamaulipas Clerk of the Court who certified it, or by a judge of the Fourth Judicial District of Tamaulipas who signed it.

- Tommy objected to the translation of the Mexican partition order[17], although he identified no "specific inaccuracy" as required by Tex. R. Evid. 1009(b). This objection would vanish if this case were dismissed and refiled in Mexico. The order is in Spanish, and would need no translation in a Tamaulipas court.

- Because the Mexican partition order is admissible, the trial court will be required to recognize the judgment unless Tommy can prove one of the grounds for non-recognition in Texas Civil Practice & Remedies Code § 36.005. This additional mini-trial

---

[14] Record 00830-31.
[15] Record 00832-33.
[16] Record 00832-33.
[17] Record 00832-33.

01133

over a satellite dispute would, of course, be unnecessary in Mexico.

Tommy also objected to the Mexican partition order and other documents because Shelby submitted them as exhibits to affidavits. Tommy argued that "no statute or rule authorizes admission of affidavits in support of a motion to dismiss for forum non conveniens, and such affidavits are, therefore, inadmissible hearsay."[18] Judge Wright did not sustain this objection; to the contrary, he repeatedly told the parties that he would consider the whole record presented to him.

At the hearing, Tommy's counsel argued that Judge Wright could not rule on the papers but instead had to hold an evidentiary hearing. Judge Wright responded that "you can certainly have your hearing and your evidence," but also explained that he was going to consider everything that had been submitted to him:

> And I guess my point is that *I'm going to, you know, obviously I read it all*, and without really objecting, you know, I'm going to take it on its face as that what's being presented to me, and by each side, is each side's point of view as to this particular issue . . . .[19]

After opening arguments, Tommy's counsel withdrew his objections to many of the documents attached to the affidavits and asserted his new authenticity

---

[18] Record 1187, 1189, 1190.
[19] Record 00796.

01134

and translation objections to the Mexican partition order.[20] Judge Wright responded that he would take everything into account when making a ruling:

> And I'm still going to be in a position when I review all of this to go through your objections that are still there to see if they are valid. . . . That's the process I will go through. And taking that into account, I will also determine the outcome of the motion itself and taking into account your response. . . . So I'm glad y'all agree to some of it. But it is still my task to consider the objections and their validity as I go through the whole process of this.[21]

After hearing testimony from several witnesses, Judge Wright reiterated this approach in his remarks at the conclusion of the hearing:

> I mean, the bottom line is, as you know, on this one I'm the decision maker so I will be reading things. I'll be taking into account what's been objected to and what might not be admissible, obviously, but I get the big picture of what I have got to decide and what to take into consideration, so I thank y'all.[22]

Finally, as he had promised, Judge Wright in his order denying dismissal stated that he considered the briefing, "the evidence admitted during the hearing on the Motion, *and the record of this case.*"[23]

The record on mandamus consists of "*every* document that is material to the relator's claim for relief and that was filed in any underlying proceeding." Tex. R. App. P. 52.7(a). The documents challenged by Tommy were part of the trial court record, are part of the appellate record, were considered by Judge Wright, and

---

[20] Record 00830-33.
[21] Record 00833-34.
[22] Record 00933.
[23] Record 01206.

01135

should be considered by the Court of Appeals. Because Tommy did not obtain a ruling on his objections, he has waived any right to assert them in this mandamus proceeding. *See Dolcefino v. Randolph*, 19 S.W.3d 906, 925-27 (Tex. App. – Houston [14th Dist.] 2000, pet denied) (holding that a hearsay objection could not be urged on appeal because the trial court ruled on summary-judgment motion without disclosing its rulings on the objection).

Tommy's position – that a trial court cannot consider affidavits and other documents filed with the briefs – is directly contrary to the law. In *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 102 S. Ct. 252 (1981), the United States Supreme Court held that a defendant is not required even to submit affidavits in order to obtain forum non conveniens dismissal:

> Such detail is not necessary. . . . Requiring extensive investigation would defeat the purpose of their motion.

*Piper*, 454 U.S. at 258, 102 S. Ct. at 267. The Supreme Court noted that "the United States Court of Appeals for the Second Circuit has expressly rejected such a requirement [to provide affidavits]. . . . In other cases, dismissals have been affirmed despite the failure to provide detailed affidavits." *Id.*, 454 U.S. at 258 n.2, 102 S. Ct. at 267 n.2.

Even though affidavits were not required, the defendants in *Piper* did submit them, and based on the affidavits, the Supreme Court held that the district court properly dismissed for forum non conveniens. *Id.*, 454 U.S. at 258-59, 102 S. Ct. at

01136

267 ("Our examination of the record convinces us that sufficient information was provided here. Both Piper and Hartzell submitted affidavits describing the evidentiary problems they would face if the trial were held in the United States.").

The Texas Supreme Court agrees with the United States Supreme Court: "Requiring an 'extensive investigation' to produce evidence for the dismissal hearing 'would defeat the purpose of the request for this type of dismissal altogether.'" *Quixtar Inc. v. Signature Mgm't Team, LLC*, 315 S.W.3d 28, 34 (Tex. 2010) (quoting *Piper*, 454 U.S. at 258, 102 S. Ct. at 267). "A forum non conveniens movant must provide enough information to enable the trial court to balance the parties' interests . . . [but] the evidence need not be overly detailed." *Vinmar Trade Fin., Ltd.v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 676 (Tex. App. – Houston [1st Dist.] 2010, no pet.).

In opposition to the clear United States and Texas Supreme Court precedent, Tommy offers only one 40-year-old pre-*Piper* case. In *Continental Oil Co. v. P.P.G. Indus.*, 504 S.W.2d 616, 622 (Tex. App. – Houston [1st Dist.] 1973, writ ref'd n.r.e.), the court of appeals stated that "the defendant in this case had the burden of alleging and proving facts which would authorize the dismissal of this case on the theory of forum non conveniens. *Had the evidence raised issues of fact, such issues properly could have been submitted to a jury.* Under such conditions the required proof cannot be supplied by affidavit."

01137

The procedure that the court described in *Continental Oil* – holding a jury trial when a forum non conveniens motion raises issues of fact – does not resemble anything authorized by Texas law today, and is in fact directly contrary to the Texas Supreme Court's statement in *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 687 (Tex. 2007), that the "trial court" should weigh "competing affidavits and evidence" when deciding a forum non conveniens motion. No court has ever applied, or even cited, *Continental Oil* for the proposition advanced by Tommy.

The court in *Continental Oil* did not apply, or even reference, the controlling *Gulf Oil* factors. Instead, it applied forum non conveniens principles laid out in a case called *H. Rouw Co. v. Railway Express Agency*, 154 S.W.2d 143 (Tex. Civ. App. – El Paso 1941, writ ref'd). The Texas Supreme Court has now overruled the *Rouw* decision on which the court based its analysis in *Continental Oil*. *In re Smith Barney, Inc.*, 975 S.W.2d 593, 598 (Tex. 1998). In doing so, the Court expressly disapproved of *Continental Oil*. *Id.*

II.    Mexico Is an Available and Adequate Forum.

Tommy has done nothing to rebut the "nearly airtight presumption that Mexico is an available forum." *In re Ford Motor Co.*, 591 F.3d 406, 413 (5th Cir. 2009). He has not pointed to a single case finding Mexico to be unavailable or inadequate. He has not distinguished the numerous Texas and federal cases that have found Mexico to be an adequate and available forum. *DTEX, LLC v. BBVA*

01138

*Bancomer, S.A.*, 508 F.3d 785, 796 (5th Cir. 2007); *Ibarra v. Orica USA*, 493 Fed. App'x 489, 493 (5th Cir. 2012); *In re Ford Motor Co.*, 591 F.3d 406, 412 (5th Cir. 2009); *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 677-78 (Tex. 2007); *Vinmar Trade Fin. Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 675 (Tex. App. – Houston [1st Dist.] 2010, no pet.); *Gomez de Hernandez v. Bridgestone / Firestone N. Am. Tire, L.L.C.*, 204 S.W.3d 473, 483 (Tex. App. – Corpus Christi 2006, pet. denied).

Tommy now makes five spurious arguments regarding the availability and adequacy of Mexico as an alternative forum.

First, Tommy says that a Mexican court would dismiss a case for lack of personal jurisdiction over Shelby.[24] But, as explained in the mandamus petition, Shelby has already subjected himself to personal jurisdiction in the *amparo* proceeding, and the court in Mexico has accepted jurisdiction over him.[25]

Second, Tommy says that a Mexican court would not exercise personal jurisdiction over Shelby's third-party claims against Sylvia and Adriana.[26] But Sylvia and Adriana already have availed themselves of the jurisdiction of Mexican courts. They cannot now defeat forum non conveniens by changing their minds about their willingness to go to court in Mexico. In any event, Shelby is willing to

---

[24] Mandamus Response at 27.
[25] Mandamus Petition at 15-16.
[26] Mandamus Response at 27-28.

01139

accept the minimal risk that Sylvia and Adriana are somehow able to avoid personal jurisdiction in the same court system in which they already have asserted claims.

Third, Tommy says that a Mexican court would dismiss for lack of subject-matter jurisdiction.[27] But the only basis for this argument is a purported Tamaulipas statute which, according to Tommy's expert, would divest Tamaulipas courts of jurisdiction due to the prior filing in the United States.[28] However, the concept of "preemptive jurisdiction" under Mexican law does not prevent a Mexican court from asserting subject-matter jurisdiction over a case dismissed from a court in the United States. *Navarrete de Pedrero v. Schweizer Aircraft Corp.*, 635 F. Supp. 2d 251, 261 (W.D.N.Y. 2009). And "courts, both state and federal, have refused to recognize foreign laws that purport to make the home forum unavailable because of a prior U.S. filing." *Del Istmo Assurance Corp. v. Platon*, 2011 WL 5508641 (S.D. Fla. Nov. 9, 2011); *see Morales v. Ford Motor Co.*, 313 F. Supp. 2d 672, 676 (S.D. Tex. 2004); *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 546 (S.D.N.Y. 2001), *aff'd*, 303 F.3d 470 (2d Cir. 2002); *Paulownia Plantations de Panama Corp. v. Rajamannan*, 793 N.W.2d 128, 134-35 (Minn. 2009).

---

[27] Mandamus Response at 27.
[28] Record 00712.

01140

Fourth, Tommy complains that Mexico does not recognize a cause of action for breach of fiduciary duty in the specific circumstances of this case.[29] But as a matter of law, this well-worn argument does not render Mexico inadequate or unavailable. *In re Pirelli Tire, L.L.C.*, 247 S.W.3d 670, 678 (Tex. 2007).

Finally, Tommy notes that his expert witness, Ilan Rosenberg, testified that the estate's claims accrued in 1983 and so are barred in Mexico by a non-waivable five-year statute of repose.[30] This argument is unavailing for at least two reasons. First, Tommy's argument demonstrates that his case is subject to dismissal on the basis of limitations in Texas, and therefore he has no claim to lose if the case is transferred to Mexico. *See Dunmore v. Chicago Title Ins. Co.*, 400 S.W.3d 635, 640 (Tex. App. – Dallas 2013, no pet.) (four-year statute of limitations for breach of fiduciary duty claim). Second, unlike a statute of limitations, which is a "procedural device," a statute of repose is a "substantive right." *Duran v. Henderson*, 71 S.W.3d 833, 837 (Tex. App. – Texarkana 2002, pet. denied). Therefore, a Texas court will not automatically apply the Texas statute of repose; instead, the court must employ choice-of-law principles to determine which jurisdiction's statute of repose to apply. *Nexen Inc. v. Gulf Interstate Eng'g Co.*, 224 S.W.3d 412, 421-22 (Tex. App. – Houston [1st Dist.] 2006, no pet.); *Sico North America, Inc. v. Willis*, 2009 WL 3365856, at *4 - *6 (Tex. App. – Houston

---

[29] Mandamus Response at 29-30.
[30] Mandamus Response at 30-31; Record 00924-25.

01141

[14th Dist.] Sep. 10, 2009, no pet.); *Crisman v. Cooper Indus.*, 748 S.W.2d 273, 275-80 (Tex. App. – Dallas 1988, writ denied). As a result, Dorsey loses no substantive or procedural rights due to transfer to Mexico. *See Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 733-37 (7th Cir. 2010) (affirming forum non conveniens dismissal, despite plaintiffs' argument that her claims are barred by Taiwanese statute of repose, because California courts also would apply the Taiwanese statute of repose to her claims).

III. The Private Interest Factors Weigh in Favor of Mexico.

Tommy's primary private-interest argument continues to be that the parties live in Texas. But as Shelby showed in his mandamus petition, that is merely one factor to be given some weight, and Texas courts increasingly have been willing to dismiss even when both plaintiffs and defendants reside in Texas.[31]

Tommy argues that Wayo Longoria is a key witness living in Texas.[32] Tommy neglects to inform the Court of Appeals that Dorothy's estate already has sued Wayo *in Mexico*.[33] He also neglects to inform the Court of Appeals that Wayo Longoria has already been deposed, on December 12, 2013 in Austin.

As Shelby explained to the trial court, most of the witnesses will be in Mexico: The drafters, witnesses to, and witnesses with knowledge of Eduardo Sr.'s

---

[31] Mandamus Petition at 25-26.
[32] Mandamus Response at 8-9.
[33] Record 00462.

01142

will executed in Nuevo Laredo in 2002; the drafters of the Afirme Trust; Eduardo Sr.'s advisors relating to the Afirme Trust; Banca Afirme personnel responsible for the trust; and attorneys, friends, court personnel, and others with knowledge of the separate property agreement and partition order entered into in Nuevo Laredo in 1983.[34] Tommy already is seeking extensive documents from Mexican companies – documents which belong to the companies, not to Shelby.[35] Tommy likely will also seek testimony from executives or employees of these same companies.

A defendant does not have to provide detailed information concerning each foreign witness. The posture of this case makes clear that most of the witnesses will be in Mexico. According to the United States Supreme Court, that is sufficient for the court to determine that this factor points in favor of trial in Mexico.

> The Court of Appeals found that the problems of proof could not be given any weight because Piper and Hartzell failed to describe with specificity the evidence they would not be able to obtain if trial were held in the United States. It suggested that defendants seeking *forum non conveniens* dismissal must submit affidavits identifying the witnesses they would call and the testimony these witnesses would provide if the trial were held in the alternative forum. Such detail is not necessary. Piper and Hartzell have moved for dismissal precisely because many crucial witnesses are located beyond the reach of compulsory process, and thus are difficult to identify or interview. Requiring extensive investigation would defeat the purpose of their motion.

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 258, 102 S. Ct. 252, 267 (1981).

---

[34] Record 00080-81.
[35] Record 00482-528.

01143

Tommy also continues to argue that Tamaulipas is a dangerous place to bring a lawsuit. But Tommy, as well as Adriana and Sylvia, has already sued in Mexico. They already have a Mexican lawyer. In fact, their Mexican lawyer testified at the forum non conveniens hearing![36]

Tommy, Adriana, and Sylvia would not have to travel to Mexico to pursue the estate's lawsuit there.[37] If they did travel to Mexico, the courthouse is located a few blocks from the United States border, and can be reached without traversing any of the highways as to which there is a State Department travel advisory.[38]

Tommy has not distinguished the many cases which hold that generalized allegations about danger in an alternative forum do not weight against forum non conveniens dismissal.[39] He has not cited a single case in support of his position.[40] He has not offered a shred of evidence that violence in Tamaulipas has negatively impacted the Tamaulipas judiciary. In fact, he presented the testimony of an expert witness who claims to have handled a dozen tort claims in court in Tamaulipas.[41]

IV.    The Public Interest Factors Weigh in Favor of Mexico.

Tommy does not even attempt to show that Texas law will apply to his claims, or to rebut the *possibility* that foreign law applies." *Vinmar Trade Fin.,*

---

[36] Record 00900-07.
[37] Record 00886-88.
[38] Record 00896-97.
[39] Mandamus Petition at 26-27.
[40] Mandamus Response at 37-39.
[41] Record 00910.

01144

*Ltd. v. Utility Trailers de Mexico, S.A. de C.V.*, 336 S.W.3d 664, 678 (Tex. App. –
Houston [1st Dist.] 2010, no pet.). He again asserts that he is attempting to *plead* a
claim under Texas law[42], but he does not even attempt to distinguish cases like
*Vinmar*, *Gallego*, *SXP*, and *DTEX* which demonstrate clearly that Mexican law
will apply.[43]

Tommy cannot explain why Texas has a stronger interest than Mexico in
adjudicating issues relating to the Mexican separate property agreement, Mexican
partition order, Mexican trust, and Mexican probate of Eduardo Sr.'s will.

Tommy does not address the fact that most of the relevant documents –
wills, contracts, court orders, correspondence, etc. – are in Spanish.

Tommy points out that the probate court has jurisdiction, but forum non
conveniens is a venue doctrine, not a jurisdictional doctrine.[44] *American Dredging
Co. v. Miller*, 510 U.S. 443, 453, 114 S. Ct. 981, 988 (1994).

Finally, Tommy claims that there will be piecemeal litigation if his claim is
dismissed in favor of Mexico. But there *already* is piecemeal litigation, because
Sylvia, Adriana, and Dorothy's estate already have sued Shelby in Mexico. If
Tommy wanted to avoid piecemeal litigation, he would have asserted Dorothy's

---

[42] Mandamus Response at 48.
[43] Mandamus Petition at 29-32.
[44] Mandamus Response at 45-47.

01145

right to a community property interest in the same court which partitioned her property thirty years ago.

## V. The Trial Court Abused Its Discretion by Denying Abatement.

Shelby has standing to challenge the invalid January 2010 will because, among other things, he is a beneficiary to Dorothy Longoria's last valid wills.[45] Tex. Prob. Code § 10. Shelby challenges the actions of Tommy's wife and sister-in-law in taking advantage of Dorothy over the last two and a half years of her life.[46] Shelby seeks the removal of Tommy as executor not only because he was appointed pursuant to an invalid will, but because he will not properly represent the estate by investigating and pursuing claims that the estate has against Sylvia and Adriana.[47]

It does a disservice to the estate, and lays bare his true motivations, that Tommy would argue for the parties to proceed all the way through discovery and possibly even trial of this matter *when the whole proceeding may be invalidated by removal of the executor*. It would be extraordinarily inefficient to allow Tommy to pursue his claim in the capacity as executor when his position is under such a cloud.

---

[45] Record 00158-59, 00172.
[46] Record 00636-43.
[47] Record 00643-45.

01146

Tommy argues that any successor executor would pursue the same claim against Shelby. There is no evidence of this. Tommy's say-so is no evidence that there actually is a claim for the estate to pursue against Shelby.

Tommy argues that the *Develo-Cepts* case cited by Shelby "was not even an abatement case." In fact, the court of appeals in *Develo-Cepts* overruled a point of error challenging abatement of the case. *Develo-Cepts, Inc. v. City of Galveston*, 668 S.W.2d 790, 792-93 (Tex. App. – Houston [14th Dist.] 1984, no writ). The case establishes that abatement is a proper remedy when the plaintiff allegedly lacks standing or capacity to sue. *Id.* That is analogous to our case, in which Tommy seeks to go through a trial which may be rendered a nullity after-the-fact if he is removed as executor due to the success of Shelby's will contest.

Tommy cannot explain why the probate court should not await the results of the lawsuits filed in Mexico by Sylvia and Adriana. The estate's claims are dependent on invalidation of the orders of the Mexican court probating Eduardo Sr.'s will. That issue must be resolved by the Mexican courts, not the Texas probate court. Tommy does not explain how the estate can seek to recover for the purported conversion of Dorothy's community property into separate property held by her husband, so long as there is a valid judgment of the Mexican court, uncontested by Dorothy, repeatedly acknowledged by her and entered during her

01147

lifetime, approving the very distribution of her husband's assets which she now seeks to challenge.

VI. Conclusion.

For the reasons set forth in the mandamus petition and in this reply brief, the Court of Appeals should grant the writ of mandamus and compel the dismissal or abatement of the counterclaims asserted by James Thomas Dorsey, Independent Executor of the Estate of Dorothy Longoria, Deceased.

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: /s/ Johnny W. Carter
    Johnny W. Carter
    State Bar No. 00796312
    jcarter@susmangodfrey.com
    Richard W. Hess
    State Bar No. 24046070
    rhess@susmangodfrey.com
    Kristen Schlemmer
    State Bar No. 24075029
    kschlemmer@susmangodfrey.com
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002-5096
    Telephone: (713) 651-9366
    Fax: (713) 654-6666

01148

Robert S. MacIntyre Jr.
State Bar No. 12760700
macintyre@mmlawtexas.com
MACINTYRE MCCULLOCH STANFIELD
YOUNG
2900 Weslayan, Suite 150
Houston, Texas 77027
Telephone: (713) 547-5400
*Attorneys for Shelby Longoria*

## CERTIFICATE OF SERVICE

This is to certify that on this the 13th day of January, 2014, a true and correct copy of the above and foregoing instrument was properly forwarded to the following counsel of record in accordance with Rule 21 of the Texas Rules of Civil Procedure as indicated below:

| | |
|---|---|
| James Austin Fisher | *Via E-Service and Electronic Mail* |
| FISHER & WELCH | |
| 2800 Lincoln Plaza | |
| 500 North Akard Street | |
| Dallas, Texas 75201 | |
| Email: jfisher@fisherwelch.com | |

T. Wesley Holmes                          *Via E-Service and Electronic Mail*
THE HOLMES LAW FIRM
1000 North Central Expressway, Suite 400
Dallas, Texas 75231
Email: wes@wesholmes.com
*Attorneys for James Thomas Dorsey, Sylvia Dorsey, and Adriana Longoria*

_/s/ Johnny W. Carter_
Johnny W. Carter

01149

## CERTIFICATE OF COMPLIANCE WITH APPELLATE RULE 9.4(i)

I certify that this document contains 4,468 words, as indicated by the word-count function of the computer program used to prepare it, and excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of issues presented, statement of jurisdiction, statement of procedural history, signature, proof of service, certification, certificate of compliance, and index, as provided by Appellate Rule 9.4(i).

_/s/ Johnny W. Carter_
Johnny W. Carter

01150

Petition for Writ of Mandamus Denied and Memorandum Opinion filed March 4, 2014.



In The

## Fourteenth Court of Appeals

### NO. 14-13-00996-CV

### IN RE SHELBY LONGORIA, Relator

ORIGINAL PROCEEDING
WRIT OF MANDAMUS
Probate Court No 1
Harris County, Texas
Trial Court Cause No. 414270

### MEMORANDUM OPINION

On November 12, 2013, relator Shelby Longoria filed a petition for writ of mandamus in this Court. *See* Tex. Gov't Code Ann. § 22.221; *see also* Tex. R. App. P. 52. In the petition, relator asks this Court to compel the Honorable Loyd Wright, presiding judge of Probate Court No 1 of Harris County, to set aside his October 11, 2013 order denying relator's motion to dismiss counterclaims for

forum non conveniens, or alternatively, to abate pending resolution of the will contest and the Mexican litigation, and grant the same.

Relator has not shown his entitlement to mandamus relief. Accordingly, we deny relator's petition for writ of mandamus. We also lift our stay granted on February 3, 2014.

PER CURIAM

Panel consists of Justices Christopher, Donovan, and Brown.

2

01152

DV

**PROBATE COURT 1**

Case Number 414270

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

### Shelby Longoria's Motion to Dismiss Adriana Longoria's Claims

3488503v1/013774

**01153**

Table of Contents

I.    The Private Agreement Should be Construed as a Whole ..................................................2

      A.    Preamble ..........................................................................................................2

      B.    Declarations ......................................................................................................2

      C.    Clauses ..............................................................................................................3

      D.    Signature Block ................................................................................................5

II.   Adriana's Claims Fall Within the Scope of the Forum-Selection Clause .......................5

      A.    The Court Must Determine Whether Adriana's Claims Fall Within the
            Scope of the Forum-Selection Clause ..............................................................5

      B.    The Plain Language of the Forum-Selection Clause Encompasses
            Adriana's Claims. .............................................................................................6

      C.    The Parties Reinforced Their Forum Selection by Making Clear that
            They Could Not Sue Outside Mexico. ..............................................................8

      D.    Adriana's Tort Claim Falls Within the Scope of the Forum-Selection
            Clause ................................................................................................................9

      E.    Shelby Can Enforce the Forum-Selection Clause ..........................................11

      F.    The Result Is the Same Under Mexican Law ..................................................12

III.  The Court Must Enforce the Forum-Selection Clause ...................................................13

IV.   Dismissal Is the Proper Remedy ...................................................................................16

V.    Conclusion .....................................................................................................................18

Certificate of Service ...............................................................................................................19

01154

Table of Authorities

*Albemarle Corp. v. AstraZeneca UK Ltd.,*
    628 F.3d 643, 651 (4th Cir. 2010) ................................................................................................. 12

*AutoNation USA Corp. v. Leroy,*
    105 S.W.3d 190 (Tex. App. – Houston [14th Dist.] 2003, orig. proceeding)........................ 17

*Clark v. Power Marketing Direct, Inc.,*
    192 S.W.3d 796 (Tex. App. – Houston [1st Dist.] 2006, no pet.) .............................. 10, 14, 15

*Dean Witter Reynolds, Inc. v. Byrd,*
    470 U.S. 213, 105 S.Ct. 1238 (1985)....................................................................................... 17

*Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.,*
    234 S.W.3d 679 (Tex. App. – Houston [14th Dist.] 2007, pet. denied) ...................... 5, 13, 16

*Dixon v. TSE International Inc.,*
    330 F.3d 396 (5th Cir. 2003) ...................................................................................................... 9

*Export-Import Bank of the United States v. Hi-Films S.A. de C.V.,*
    2010 WL 3743826 (S.D.N.Y. Sep. 24, 2010)............................................................................ 9

*Fort Worth Indep. Sch. Dist. v. City of Fort Worth,*
    22 S.W.3d 831 (Tex. 2000)......................................................................................................... 7

*Hooks Indus., Inc. v. Fairmont Supply Co.,*
    2001 WL 395341 (Tex. App. – Houston [14th Dist.] Apr. 19, 2001, no pet.) ...................... 12

*In re ADM Investor Svcs., Inc.,*
    304 S.W.3d 371 (Tex. 2010)............................................................................................... 13, 18

*In re AIU Ins. Co.,*
    148 S.W.3d 109 (Tex. 2004)....................................................................................................... 6

*In re Automated Collection Technologies, Inc.,*
    156 S.W.3d 557 (Tex. 2004)....................................................................................................... 6

*In re Boehme,*
    256 S.W.3d 878 (Tex. App. – Houston [14th Dist.] 2008, orig. proceeding)..................... 6, 13

*In re Emex Holdings L.L.C.,*
    2013 WL 1683614 (Tex. App. – Corpus Christi Apr. 18, 2013, orig. proceeding)...... 9, 16, 17

*In re Fisher,*
    433 S.W.3d 523 (Tex. 2014)....................................................................................................... 9

3488503v1/013774

**01155**

*In re Harris Corp.,*
2013 WL 2631700 (Tex. App. – Austin June 4, 2013, orig. proceeding) .............................. 7

*In re International Profit Assocs.,*
274 S.W.3d 672 (Tex. 2009) ..................................................................... 6, 10, 15, 17

*In re International Profit Assocs.,*
286 S.W.3d 921 (Tex. 2009) ..................................................................................... 15

*In re Laibe Corp.,*
307 S.W.3d 314 (Tex. 2010) ........................................................................... 7, 13, 14

*In re Lisa Laser USA, Inc.,*
310 S.W.3d 880 (Tex. 2010) ................................................................................. 5, 11

*In re Lyon Fin. Servs.,*
257 S.W.3d 228 (Tex. 2008) ............................................................................... 14, 15

*In re Weekley Homes, L.P.,*
180 S.W.3d 127 (Tex. 2005) ..................................................................................... 11

*In re Zotec Partners, LLC,*
353 S.W.3d 533 (Tex. App. – San Antonio 2011, orig. proceeding) .......................... 13

*Martinez v. Bloomberg LP,*
740 F.3d 211 (2d Cir. 2014) ..................................................................................... 12

*Phillips v. Audio Active Ltd.,*
494 F.3d 378 (2d Cir. 2007) ............................................................................... 17, 18

*Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.,*
177 S.W.3d 605 (Tex. App. – Houston [1st Dist.] 2005, no pet.) ............................... 6

*SEECO, Inc. v. K.T. Rock, LLC,*
416 S.W.3d 664 (Tex. App. – Houston [14th Dist.] 2013, pet. denied) ...................... 2

*Smith v. Kenda Capital, LLC,*
2014 WL 5783581 (Tex. App. – Houston [14th Dist.] Oct. 21, 2014, no pet. h.) ........ 7, 11, 13

*Southwest Intelecom, Inc. v. Hotel Networks Corp.,*
997 S.W.2d 322 (Tex. App. – Austin 1999, pet. denied) ............................................ 6

*TMI, Inc. v. Brooks,*
225 S.W.3d 783 (Tex. App. – Houston [14th Dist.] 2007, pet. denied) ...................... 15

*Yavuz v. 61 MM, Ltd.,*
465 F.3d 418 (10th Cir. 2006) .................................................................................. 12

iii

**01156**

The Court should dismiss Adriana Longoria's claims because she agreed to bring them in Mexico.

Adriana claims that she is owed additional money pursuant to a Spanish-language "Private Agreement" she entered into in December 2002. In the Private Agreement, Adriana's father, Eduardo Longoria Sr., reiterated his wish that Adriana receive an *inter vivos* gift of $3 million. A copy of the Private Agreement is attached as **Exhibit 2** to this motion, and a translation is attached as **Exhibit 2A**. The Agreement unambiguously provides that claims will be brought in Mexico.

Adriana has sued her brother, Shelby Longoria, even though Shelby is not a party to the Private Agreement. Adriana claims that Eduardo Sr. made Shelby a trustee over the money promised to her, and that Shelby breached his fiduciary duty to her. But Eduardo Sr. could not create a trust for Adriana's benefit because he had already transferred his assets into a trust for which Shelby and his brother Eduardo Jr. ("Wayo") were the beneficiaries. The trust was administered by a Mexican bank, Banca Afirme. Adriana acknowledged the validity of the Afirme Trust in the Private Agreement. The Afirme Trust Agreement is attached as **Exhibit 3** to this motion, and an English translation is attached as **Exhibit 3A**. Attached as **Exhibit 1** is an affidavit of Shelby Longoria explaining his father's estate plan.

Adriana asserts that Shelby's influence caused Eduardo Sr. to promise "only" $3 million to her in the Private Agreement. She alleges that "Shelby . . . manipulated his parents with respect to their estate planning and he induced them to enter into various transactions," i.e., the Afirme Trust Agreement, "to increase his own share."[1] She claims that she should receive as damages some unspecified payment of more than $3 million from the proceeds of the businesses held by the Afirme Trust.

---

[1] Exh. 5 (First Amended Counterclaims of Adriana Longoria) at ¶ 14.

1

01157

In Part I below, Shelby describes the parts of the Private Agreement. Part II shows that Adriana's claims fall squarely within the scope of the exclusive forum-selection clause in the Private Agreement. In Part III, Shelby shows that the forum-selection clause must be enforced. Part IV addresses the proper remedy – dismissal of all of Adriana's claims relating to the Private Agreement and Afirme Trust.

I.

**The Private Agreement Should be Construed as a Whole**

The Private Agreement is divided into four parts – a Preamble, Declarations, Clauses, and Signature Block. The Court should examine each of these parts of the Agreement so that it can be construed as a whole. *SEECO, Inc. v. K.T. Rock, LLC*, 416 S.W.3d 664, 674 (Tex. App. – Houston [14th Dist.] 2013, pet. denied) ("contracts are to be construed as a whole in an effort to harmonize and give effect to all provisions of the contract.").

A.      Preamble

The Preamble recites that the Private Agreement was executed for two purposes: to recognize the Afirme Trust and to recognize Eduardo Sr.'s wish to pay Adriana:

> EXECUTED BY EDUARDO LONGORIA THERIOT AND ADRIANA LONGORIA KOWALSKI REGARDING THE ACKNOWLEDGMENT AND ACCEPTANCE OF THE TERMS AND CONDITIONS OF TRUST NO. 194-2, MADE IN BANCA AFIRME, S.A., INSTITUCION DE BANCA MULTIPLE, AND ACKNOWLEDGMENT OF PAYMENT OBLIGATION IN FAVOR OF ADRIANA LONGORIA KOWALSKI . . . .[2]

B.      Declarations

Eduardo Sr. and Adriana then make three "declarations." First, that Eduardo Sr. entered into the Afirme Trust Agreement on October 15, 2002. Second, that Shelby and Wayo were the

---

[2] Exh. 2A, 1st page, Preamble.

2

01158

designated beneficiaries of the shares of the Mexican companies which were contributed to the

Afirme Trust. Finally:

> that just as it is the will of their father that EDUARDO and SHELBY LUIS LONGORIA KOWALSKI shall receive the ownership of the shares of all companies; it is also the will of her father that ADRIANA LONGORIA KOWALSKI shall receive the quantity specified in this Agreement under the conditions indicated herein.[3]

C.    Clauses

Four "clauses" are at the heart of the Private Agreement.

In the first clause, Adriana and Eduardo Sr. recognized the Afirme Trust.

> The parties recognize the validity and scope of the "TRUST," and in this regard they are in agreement with all its terms and conditions, and therefore declare that the agreement is the final and definitive will of the parties, and therefore, they comply with all terms and agree that the shares contributed to it are to be transferred to the designated beneficiaries.[4]

In the second clause, Adriana and Eduardo Sr. describe the payment terms and make

clear that payments to Adriana will be made "from the operating cash flow generated by the

companies represented by the shares contributed to" the Afirme Trust.

> It is the will of her father that the amount of $3,000,000 (three million U.S. dollars) be delivered to his daughter ADRIANA LONGORIA KOWALSKI, from the operating cash flow generated by the companies represented by the shares contributed to the "TRUST," or by their subsidiaries, and therefore it is the obligation of EDUARDO AND SHELBY LUIS LONGORIA KOWALSKI . . .[5]

The clause then states that Adriana will receive $12,500 per month.

In the third clause, Adriana and Eduardo Sr. state "that this Agreement is the final and

definitive will of the parties," and they make clear that the Afirme Trust is responsible for

payments to be made to Adriana:

---

[3] Exh. 2A, 1st page, Declaration c.
[4] Exh. 2A, 1st page, first clause.
[5] Exh. 2A, 1st page, second clause.

3488503v1/013774

01159

THE TRUST's obligation to deliver the mentioned quantitites to ADRIANA LONGORIA KOWALSKI, in the terms set forth herein, shall continue in effect until full payment, acknowledging that, after payment of the amounts referred to in this Agreement, ADRIANA LONGORIA KOWALSKI shall be satisfied in relation to any present or future obligation charged to the "TRUST" assets or to those of Messrs. EDUARDO and SHELBY LUIS LONGORIA KOWALSKI.[6]

The fourth clause is titled "Jurisdiction and Mexican Law." Adriana and Eduardo Sr. selected application of Mexican law and Reynosa as a forum to resolve any disputes.

> This Agreement is established under the jurisdiction and laws of the United Mexican States. Therefore, the parties exclusively submit to the laws of Mexico, thus they expressly waive the application of any law, regulation, provision or rule of any jurisdiction other than Mexico, which might correspond to them due to their residence, paternity, citizenship, domicile, kinship or commercial relationship. Therefore, in the event of any interpretation, dispute, or any aspect related to this Trust, they expressly submit to the courts of the city of Reynosa, Tamaulipas, Mexico.[7]

Adriana and Eduardo Sr. then agreed that in *all cases* Mexican jurisdiction will be applicable and that *any act* performed by a party outside Mexico seeking to affect the rights set forth in the Agreement based on law other than Mexican law "will not be applicable."

> Likewise, the issuance of any law, regulations or provisions in jurisdictions outside the Republic of Mexico, or *any act performed outside the national territory by any party seeking to* (i) impose restrictions on this Agreement or to *impose the performance of acts different from the purposes for which it is authorized*; (ii) impose taxes, duties, or tax burdens other than those under Mexican Law; (iii) expropriate, limit, confiscate, seize, dispose of, freeze, or otherwise *affect the rights of the Agreement based on federal, state, or municipal laws, outside the jurisdiction of the Republic of Mexico, shall not apply to this Agreement, in all cases the jurisdiction and laws of the Republic of the United Mexican States being applicable* under the terms of the previous paragraph.[8]

---

[6] Exh. 2A, 2d page, third clause.
[7] Exh. 2A, 2d page, fourth clause.
[8] Exh. 2A, 2d and 3d page, fourth clause.

4

01160

D.    Signature Block

After the choice-of-law and forum-selection clauses, the Private Agreement recites that it was signed by Eduardo Sr. and Adriana on December 17, 2002 – only two months after execution of the Afirme Trust Agreement.[9]

II.

Adriana's Claims Fall Within the Scope of the Forum-Selection Clause

The Court must determine whether Adriana's claims fall within the scope of the forum-selection clause. The forum-selection clause clearly encompasses Adriana's claims relating to the Private Agreement and the Afirme Trust. The Private Agreement reinforces the selection of a Mexican forum by expressing the parties' intent to nullify lawsuits outside Mexico. The forum-selection clause is broad enough to encompass Adriana's tort claim for recovery of more than $3 million. Shelby can enforce the forum-selection clause even though he is not a party to the Private Agreement. And the result is the same when, as is necessary, the Court applies Mexican law to determine the scope of the forum-selection clause.

A.    The Court Must Determine Whether Adriana's Claims Fall
Within the Scope of the Forum-Selection Clause

"When a party seeks to enforce a mandatory forum-selection clause, a court must determine whether the claims in question fall within the scope of that clause. . . . The court bases this determination on the language of the clause and the nature of the claims that are allegedly subject to the clause." *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.*, 234 S.W.3d 679, 687-88 (Tex. App. – Houston [14th Dist.] 2007, pet. denied). This requires a "common-sense examination of the claims and the forum-selection clause to determine if the clause covers the claims." *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 884 (Tex. 2010).

---

[9] Exh. 2A, 3d page.

5

01161

When addressing the scope and enforceability of a forum-selection clause, a court should consider (1) Texas state case law, (2) the federal case law on which Texas law is based, and (3) cases pertaining to arbitration clauses, which the Texas Supreme Court has characterized as being a type of forum-selection clause. *In re AIU Ins. Co.*, 148 S.W.3d 109, 115, 116 (Tex. 2004); *In re International Profit Assocs.*, 274 S.W.3d 672, 677 (Tex. 2009); *In re Boehme*, 256 S.W.3d 878, 881 (Tex. App. – Houston [14th Dist.] 2008, orig. proceeding).

"In construing a forum-selection clause, 'our primary goal is to give effect to the written expression of the parties' agreement.' . . . 'We must read the provision in its entirety, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative.'" *Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 615 (Tex. App. – Houston [1st Dist.] 2005, no pet.) (quoting *Southwest Intelecom, Inc. v. Hotel Networks Corp.*, 997 S.W.2d 322, 324 (Tex. App. – Austin 1999, pet. denied)).

B.    The Plain Language of the Forum-Selection Clause Encompasses Adriana's Claims.

The second paragraph of the forum-selection clause provides that "in *all cases* the jurisdiction and laws of the Republic of the United Mexican States" is "applicable under the terms of the previous paragraph."[10] By agreeing that "in all cases the jurisdiction . . . of the Republic of the United Mexican States" is "applicable," the parties established Mexico as the *exclusive forum* for resolution of disputes. *See In re Automated Collection Technologies, Inc.*, 156 S.W.3d 557, 558 (Tex. 2004) (directing dismissal of a Texas case where the parties had consented "to the exclusive jurisdiction of the courts of Montgomery County, Pennsylvania.").

The second paragraph refers back to first paragraph of the forum-selection clause, which states that "in the event of any interpretation, controversy or any aspect *related to this Trust*, they

---

[10] Exh. 2A., 2d and 3d page, 4th clause.

3488503v1/013774

01162

expressly submit to the courts of the city of Reynosa, Tamaulipas, Mexico."[11] As a result, the forum-selection clause encompasses Adriana's claims pertaining to the Afirme Trust, including her claims that Shelby fraudulently induced Eduardo Sr. to enter into the Afirme Trust.

The forum-selection clause of course also encompasses claims relating to the Private Agreement in which it is found. The first paragraph makes that clear: "*This Agreement* is established under the jurisdiction and laws of the United Mexican States."[12]

The Afirme Trust Agreement contains a similar forum-selection clause to the Private Agreement. Moreover, a copy of The Afirme Trust Agreement was attached to the Private Agreement.[13] By applying the forum-selection clause to Adriana's claims based on both the Private Agreement and Afirme Trust, the Court will effectuate the Texas Supreme Court's directive that when applying a forum-selection clause, "documents 'pertaining to the same transaction may be read together,' even if they are executed at different times and do not reference each other, and 'courts may construe all the documents as if they were part of a single, unified instrument.'" *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (quoting *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000)); *see In re Harris Corp.*, 2013 WL 2631700 (Tex. App. – Austin June 4, 2013, orig. proceeding); *Smith v. Kenda Capital, LLC*, 2014 WL 5783581 (Tex. App. – Houston [14th Dist.] Oct. 21, 2014, no pet. h.) (both applying a forum selection clause because a plaintiff's claim relates to the contract which contains the clause, even though the plaintiff disclaimed an intent to recover pursuant to the contract).

---

[11] Exh. 2A, 2d page, 4th clause.
[12] Exh. 2A, 2d page, 4th clause.
[13] Exh. 2A, 1st page, Declaration 1(a).

3488503v1/013774

01163

C. The Parties Reinforced Their Forum Selection
by Making Clear that They Could Not Sue Outside Mexico.

Adriana has run afoul of the forum-selection clause merely by filing this lawsuit seeking to recover under Texas law. The Private Agreement provides that "any act performed outside" Mexico – such as filing this lawsuit – "shall not apply to this Agreement" – i.e., will be a nullity – if it seeks to "affect the rights of the Agreement based on federal, state, or municipal laws, outside the jurisdiction of the Republic of Mexico."[14]

Adriana makes no secret of the fact that she is seeking to affect the rights of the Agreement *based on Texas law*:

- "*Under Texas law*, Adriana is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact *in accordance with Texas law*."[15]

- "*Under Texas law*, Adriana is entitled to, and hereby requests, entry of judgment against Shelby for exemplary damages in an amount to be determined by the trier of fact *in accordance with Texas law*."[16]

- "*Under Texas law*, Shelby breached his fiduciary duty to Adriana . . . ."[17]

The Private Agreement's forum-selection clause thus backs up the choice of exclusive forum by *preemptively nullifying* a lawsuit, such as this one, which seeks to apply non-Mexican law in a non-Mexican forum. Moreover, the parties used very broad language to provide that "*any* . . . provisions in jurisdictions outside" Mexico – such as any judgment in this case – also "shall not apply to this Agreement."[18] This works hand-in-glove with Adriana's agreement to "expressly waive the application of *any* law, regulation, *provision* or rule *of any jurisdiction*

---

[14] Exh. 2A, 2d page, 4th clause.
[15] Exh. 5 at ¶¶ 39, 44, 50, 56.
[16] *Id.* ¶¶ 40, 45, 51.
[17] *Id.* ¶ 43.
[18] Exh. 2A, 2d page, 4th clause.

8

01164

*other* than Mexico."[19] It is hard to imagine how the parties could have expressed more strongly their intent that any lawsuits be brought in Mexico.

Where, as here, the parties agree to submit to venue in one jurisdiction, while waiving venue in other locations, they have made a selection of an exclusive forum for resolving claims. *In re Fisher*, 433 S.W.3d 523, 532 (Tex. 2014) (finding that a forum-selection clause was mandatory, even when the selected jurisdiction was "non-exclusive," when the contract stated that a party "agrees not to bring any proceeding arising out of or relating to this Agreement in any other court"); *In re Emex Holdings L.L.C.*, 2013 WL 1683614, at *1 (Tex. App. – Corpus Christi Apr. 18, 2013, orig. proceeding) (finding that the following clause was enforceable and exclusive: "The parties agree that for the construction and compliance herewith, they expressly submit themselves to the Jurisdiction and Competence of the Common Affairs Laws and Courts seated in Mexico, *waiving to any other that may correspond to them due to their present or future domiciles*"); *Dixon v. TSE International Inc.*, 330 F.3d 396, 397 (5th Cir. 2003) (finding that the following clause was enforceable and exclusive: "The Courts of Texas, U.S.A., shall have jurisdiction over all controversies with respect to the execution, interpretation or performance of this Agreement, *and the parties waive any other venue to which they may be entitled by virtue of domicile or otherwise*"); *Export-Import Bank of the United States v. Hi-Films S.A. de C.V.*, 2010 WL 3743826, at *7 (S.D.N.Y. Sep. 24, 2010) (forum selection clauses are mandatory, even though they do not expressly use the word "exclusive," because the parties waived other jurisdictions).

D.    Adriana's Tort Claim Falls Within the Scope of the Forum-Selection Clause

The Agreement is particularly clear with respect to Adriana's tort claim by which she seeks to recover more than $3 million from the cash flow of the companies which were conveyed

---

[19] Exh. 2A, 2d page, 4th clause.

01165

into the Trust. The Agreement preemptively nullifies "any act performed outside" Mexico "by any party, seeking to . . . impose the performance of acts different from the purposes for which it is authorized."[20] This lawsuit is an "act performed outside" Mexico seeking to "impose the performance of" payments other than those which the Agreement authorizes.

Adriana also seeks to vitiate entirely the first "clause" in the Private Agreement by which she "recognizes[s] the validity and scope of the TRUST," "agree[s] with all its terms and conditions," "declare[s] that the agreement is the final and definitive will of the parties," and "compl[ies] with all terms and agree[s] that the shares contributed to it are to be transferred to the designated beneficiaries."[21] Adriana now claims through this lawsuit that the Trust is invalid and that the shares contributed to the Trust should be held, at least in part, for her benefit and not the benefit of the designated beneficiaries. She therefore is seeking to "impose restrictions on this Agreement" and "limit . . . the rights of the Agreement" based on non-Mexican law – an act which also is a nullity pursuant to the forum-selection clause.[22]

A party cannot avoid application of a forum-selection clause by "artful pleading" of its claims as tort claims instead of contract claims. *In re International Profit Assocs.*, 274 S.W.3d 672, 677 (Tex. 2009). Adriana's claims arise from the Private Agreement, not any general tort duty owed by Eduardo or Shelby independent of the contract; therefore, all of these claims are within the scope of the Private Agreement's forum-selection clause. *Id.* at 677-78 (if a claim seeks a benefit which is found in a contract, instead of "general obligations imposed by law," the claim arises under the contract, even if it is pled in tort). In particular, a forum-selection clause can encompass a claim of tortious conduct relating to the contract in which it is found, even if the plaintiff is challenging conduct which predates the contract. *See Clark v. Power Marketing*

---

[20] Exh. 2A, 2d page, 4th clause.
[21] Exh. 2A, 1st page, 1st clause.
[22] Exh. 2A, 2d page, 4th clause.

10

01166

*Direct, Inc.*, 192 S.W.3d 796, 799, 800 (Tex. App. – Houston [1st Dist.] 2006, no pet.) (agreeing with the Dallas Court of Appeals' rejection of "the argument that a forum-selection clause cannot encompass pre-contractual tort claims").

E.    Shelby Can Enforce the Forum-Selection Clause

Since Adriana relies on the Private Agreement and seeks to hold Shelby to its terms, Shelby can enforce its forum-selection clause against her, even though he is not a party to it.

In *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880 (Tex. 2010), the Texas Supreme Court rejected plaintiff HealthTronics' attempt to avoid the application of the forum-selection clause to its claims against non-signatory Lisa Germany: "A plaintiff 'cannot both have his contract and defeat it too.' . . . In other words, HealthTronics cannot claim that Lisa Germany has obligations to HealthTronics under the Distribution Agreement and simultaneously claim that the forum-selection clause does not apply to those claims." *In re Lisa Laser*, 310 S.W.3d at 886 (quoting *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 135 (Tex. 2005)).

"A person who has agreed to resolve disputes with one party in a particular forum may be required in some circumstances to resolve related disputes with other parties in the same forum." *Smith v. Kenda Capital, LLC*, 2014 WL 5783581, at *4 (Tex. App. – Houston [14th Dist.] Oct. 21, 2014, no pet. h.). "One circumstance allowing enforcement by a nonsignatory against a signatory involves direct benefits estoppel." *Id.* at *5. "This species of estoppel applies when a signatory's claim against a nonsignatory 'references or presumes the existence of the written agreement' containing the clause." *Id.* (quoting *In re Trammell*, 246 S.W.3d 815, 821 (Tex. App. – Dallas 2008, no pet.).

"Direct benefits estoppel analysis focuses on whether a contract containing the clause at issue also includes other terms on which the signatory plaintiff must rely to prosecute its claims."

11

01167

*Id.* at *6. For example, in *Smith*, the plaintiff was estopped from arguing that the forum selection clause was inapplicable to its claims against the non-signatory defendant, because the agreement containing the clause "does indeed include other terms on which Smith must rely to pursue his claim." *Id.* Similarly, here, Adriana is estopped from arguing that the forum selection clause is inapplicable, because the Private Agreement containing the clause includes the payment terms on which she relies to pursue her claim.

F.    The Result Is the Same Under Mexican Law

All of this is clear when read in English with reference to American law. But it is doubly clear when read in Spanish with reference to Mexican law. When a contract contains a choice-of-law clause, the Court must apply the law chosen by the parties to determine the scope of the forum-selection clause. *Hooks Indus., Inc. v. Fairmont Supply Co.*, 2001 WL 395341, at *2 (Tex. App. – Houston [14th Dist.] Apr. 19, 2001, no pet.); *Martinez v. Bloomberg LP*, 740 F.3d 211, 224 (2d Cir. 2014); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 651 (4th Cir. 2010); *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 428 (10th Cir. 2006).

Here, the parties chose the application of Mexican law. Attached as **Exhibit 4** to this motion is the Affidavit of Carlos Gabuardi, a respected Mexican lawyer and academic. Professor Gabuardi explains that Mexican law recognizes forum-selection clauses,[23] that the forum-selection clause here is written to express the parties' intent that *all* lawsuits concerning the Private Agreement and Trust will be brought in Mexico,[24] that Adriana agreed that a lawsuit outside Mexico can have no effect on her rights under the Private Agreement[25], and that Shelby can enforce the forum-selection clause.[26]

---

[23] Exh. 4 at ¶¶ 15-18.
[24] *Id.* at ¶¶ 11-14.
[25] *Id.*
[26] *Id.* at ¶ 19.

3488503v1/013774

01168

III.

## The Court Must Enforce the Forum-Selection Clause

"A trial court *must* presume that a mandatory forum-selection clause is valid and enforceable." *In re Boehme*, 256 S.W.3d 878, 881 (Tex. App. – Houston [14th Dist.] 2008, orig. proceeding) (emphasis in original). "The trial court gives full effect to a forum selection clause 'absent a strong showing by the resisting party that the court should set aside the clause because (1) the clause is invalid based on reasons such as fraud, undue influence, or overweening bargaining power; or (2) enforcement would be unreasonable and unjust.'" *Smith v. Kenda Capital, LLC*, 2014 WL 5783581, at *4 (Tex. App. – Houston [14th Dist.] Oct. 21, 2014, no pet. h.) (quoting *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Production, Inc.*, 234 S.W.3d 679, 692 (Tex. App. – Houston [14th Dist.] 2007, pet. denied)). Enforcement can be avoided only in "extreme circumstances that courts cannot presently anticipate or foresee." *In re ADM Investor Svcs., Inc.*, 304 S.W.3d 371, 376 (Tex. 2010).

It does not matter if Adriana views Reynosa as inconvenient. "Inconvenience to witnesses is not sufficient to overcome a forum selection clause." *In re Zotec Partners, LLC*, 353 S.W.3d 533, 537 (Tex. App. – San Antonio 2011, orig. proceeding). For example, a choice-of-forum clause was enforced over objection even when the plaintiff, who lived in east Texas, would be forced to litigate in Illinois, was nearing 80 years old, suffered chronic health problems including fibromyalgia and heart problems, often had difficulty walking, and had been hospitalized several times in recent months. *In re ADM Investor Svcs., Inc.*, 304 S.W.3d 371, 375 (Tex. 2010).

In *In re Laibe*, 307 S.W.3d 314 (Tex. 2010), the manager of a small business which sought to avoid trial in Indiana testified that "daily operations would basically cease if it were

13

01169

required to pursue a lawsuit in Indiana. *Laibe*, 307 S.W.3d at 317-18. The Texas Supreme Court rejected this out of hand: "If merely stating that financial and logistical difficulties will preclude litigation in another state suffices to avoid a forum-selection clause, the clauses are practically useless." *Id.* at 318 (quoting *In re Lyon Fin. Servs.*, 257 S.W.3d 228, 234 (Tex. 2008)). "Financial difficulties on behalf of one party or the other are typically part of the reason litigation begins." *In re Lyon Fin. Svcs., Inc.*, 257 S.W.3d 228, 234 (Tex. 2008).

"By entering into an agreement with a forum-selection clause, the parties effectively represent to each other that the agreed forum is not so inconvenient that enforcing the clause will deprive either party of its day in court, whether for cost or other reasons." *In re Lyon Fin. Svcs., Inc.*, 257 S.W.3d 228, 234 (Tex. 2008). Adriana should be held to her representation that litigation in Reynosa will not be so inconvenient as to deprive her of her day in court.

It also does not matter if Adriana claims that she was unsophisticated or lacking counsel at the time she signed the Agreement giving her $3 million. In *In re Lyon Fin. Svcs., Inc.*, 257 S.W.3d 228 (Tex. 2008), the plaintiff tried to avoid a forum-selection clause by claiming "that he was not able to obtain any legal advice, he does not have formal business school training, he was unaware of the 'contract provision when [he] signed it,' and that 'the documents' were presented to him on a 'take-it-or-leave-it-basis.'" *Lyon*, 257 S.W.3d at 233. The Texas Supreme Court rejected these pleas: "A bargain is not negated because one party may have been in a more advantageous bargaining position." *Id.* The forum selection clause was obvious in the agreement, and the plaintiff had an obligation to protect himself by reading what he signed. *Id.*

Any claim of fraud by Adriana is also unavailing. "Simply alleging fraud in the inducement of a contract is not sufficient to make a forum-selection clause unenforceable." *Clark v. Power Marketing Direct, Inc.*, 192 S.W.3d 796, 799 (Tex. App. – Houston [1st Dist.] 2006, no

14

01170

pet.). "A court determining whether or not to enforce a forum-selection clause will not inquire into the enforceability of the contract in which that clause is found." *Id.* at 800. "Fraudulent inducement to sign an agreement containing a dispute resolution agreement such as an arbitration clause or forum-selection clause will not bar enforcement of the clause unless the *specific clause* was the product of fraud or coercion." *In re Lyon Fin. Svcs., Inc.*, 257 S.W.3d 228, 232 (Tex. 2008). Adriana has not claimed, nor could she claim, that the forum-selection clause itself was the product of fraud or coercion.

Adriana claims that she "was not able to read" the Private Agreement "before she signed it," and that she "did not know what was written on these pages."[27] But it is also unavailing for Adriana to claim ignorance of the document she signed. "It is presumed" that a signatory to a contract "understood and agreed to the contents." *In re International Profit Assocs.*, 274 S.W.3d 672, 679 (Tex. 2009). "Parties to a contract have an obligation to protect themselves by reading what they sign and, absent a showing of fraud, cannot excuse themselves from the consequences of failing to meet that obligation." *In re International Profit Assocs.*, 286 S.W.3d 921, 924 (Tex. 2009). A party "must exercise reasonable diligence for the protection of his or her own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *TMI, Inc. v. Brooks*, 225 S.W.3d 783, 795 (Tex. App. – Houston [14th Dist.] 2007, pet. denied).

There was nothing hidden about the forum-selection clause. It was found right above the signature block and was printed in the same font as every other paragraph of the three-page Private Agreement. In *In re International Profit Assocs., Inc.*, 274 S.W.3d 672, 679 (Tex. 2009), the Texas Supreme Court found that a forum-selection clause was not procured through fraud or overreaching, because among other things "the clauses were part of agreements that were each

---

[27] Exh. 6 (Adriana Longoria deposition) at 200:9 – 201:9, 202:20 – 203:3.

15

01171

two pages in length, were located in close proximity to the signature elements, and were in the same font style and size as all other provisions."

Adriana denied in the Private Agreement itself that there was any "mistake, fraud, bad faith or any defect of will that might affect their understanding or decision regarding the content."[28] In her deposition, she reiterated that she was not claiming the Private Agreement (pursuant to which she has received over one million dollars of payments) was invalid.[29] In *In re Emex Holdings L.L.C.*, 2013 WL 1683614, at *8 (Tex. App. – Corpus Christi 2013, orig. proceeding), the parties' agreement that there was "no fraud, bad faith, injury or any other cause of nullity established by the Law" helped to rebut a challenge to a Mexican forum-selection clause found in the parties' contract.

## IV.

### Dismissal Is the Proper Remedy

"A motion to dismiss is the proper procedural mechanism for enforcing a forum-selection clause that a party to the agreement has violated in filing suit." *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Production, Inc.*, 234 S.W.3d 679, 687 (Tex. App. – Houston [14th Dist] 2007, pet. denied).

Adriana has only one claim which is potentially unaffected by dismissal. Specifically, she seeks to recover $100,000 which Shelby purportedly told Dorothy he would give to Adriana after Dorothy's death.[30] As Shelby will show in a forthcoming summary judgment motion, he did give Adriana the money, but she refused it. Nevertheless, this claim – and this one alone – arguably does not relate to the Private Agreement or Afirme Trust.

---

[28] Exhibit 2A, 2d page, third clause.
[29] Exh. 6 (Adriana Longoria deposition) at 202:8-19.
[30] Exh. 5 at ¶¶ 29-33.

16

01172

It is immaterial that application of the forum-selection clause may result in Adriana pursuing one claim in Houston and her other claims in Reynosa. "The fact that the challenger might have to pursue two lawsuits – one in Mexico and one in Texas – does not meet the standard for avoiding the forum-selection provision." *In re Emex Holdings L.C.*, 2013 WL 1683614, at *6 (Tex. App. – Corpus Christi 2013, orig. proceeding).

An argument "that if the clauses are enforced," the plaintiff "will have to pursue two suits" is "not the type of unusual and special circumstances that show litigating the contracted-for forum will be so gravely difficult and inconvenient" that the plaintiff "will be deprived of its day in court." *In re International Profit Assocs., Inc.*, 274 S.W.3d 672, 680 (Tex. 2009).

A forum selection clause is like an arbitration clause: "Piecemeal" litigation is "required" when some claims fall within the scope of an arbitration clause and others do not. *AutoNation USA Corp. v. Leroy*, 105 S.W.3d 190, 201 (Tex. App. – Houston [14th Dist.] 2003, orig. proceeding). Arbitrable claims must be arbitrated even if it may result in "the possibly inefficient maintenance of separate proceedings in different forums." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217, 105 S.Ct. 1238, 1241 (1985).

The Second Circuit Court of Appeals addressed this situation in *Phillips v. Audio Active Ltd.*, 494 F.3d 378 (2d Cir. 2007). In that case, plaintiff Phillips asserted some claims which were subject to an English forum-selection clause, and other claims which were not. The only choice was to dismiss some claims in favor of an English forum, while retaining the other claims in the United States.

> We are aware that the commencement of separate proceedings in two countries is a likely inconvenience to the parties . . . . We have considered that the parties' intent and continued interests may lie in treating Phillips' five claims uniformly, but our twin commitments to upholding forum selection clauses where these are found to apply and deferring to a plaintiff's proper choice of forum constrain us in the present context to treat Phillips' claims separately.

17

3488503v1/013774

01173

*Phillips*, 494 F.3d at 393.

It is similarly immaterial that Sylvia Longoria and the Estate of Dorothy Longoria are unaffected by this motion. The presence of other parties does not defeat the application of the forum-selection clause. *See ADM Investor Svcs., Inc.*, 304 S.W.3d 371, 375 (Tex. 2010) (enforcing a forum selection clause against the affected parties, even though one defendant was not subject to it, because "the mere existence of another defendant does not compel joint litigation, even if the claims arise out of the same nucleus of facts").

V.

Conclusion

The Court should enter the proposed order submitted with this motion, dismissing all of Adriana Longoria's claims relating to the Private Agreement or Afirme Trust.

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: */s/ Johnny W. Carter*
    Johnny W. Carter
    State Bar No. 00796312
    jcarter@susmangodfrey.com
    Richard W. Hess
    State Bar No. 24046070
    rhess@susmangodfrey.com
    Kristen Schlemmer
    State Bar No. 24075029
    kschlemmer@susmangodfrey.com
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002-5096
    Telephone: (713) 651-9366
    Fax: (713) 654-6666

18

01174

Robert S. MacIntyre Jr.
State Bar No. 12760700
macintyre@mmlawtexas.com
MACINTYRE MCCULLOCH STANFIELD YOUNG
2900 Weslayan, Suite 150
Houston, Texas 77027
Telephone: (713) 547-5400
*Attorneys for Shelby Longoria*

## CERTIFICATE OF CONFERENCE

Johnny Carter, counsel for Shelby Longoria, conferred with James Fisher, counsel for Adriana Longoria, on January 13, 2015. Mr. Fisher stated that Ms. Longoria is opposed to this motion.

*/s/ Johnny W. Carter*
Johnny W. Carter

## CERTIFICATE OF SERVICE

This is to certify that on this the 14th day of January, 2015, a true and correct copy of the above and foregoing instrument was properly forwarded to the following counsel of record in accordance with Rule 21 of the Texas Rules of Civil Procedure as indicated below:

James Austin Fisher              *Via E-Service*
FISHER & WELCH
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Email: jfisher@fisherwelch.com

T. Wesley Holmes               *Via E-Service*
THE HOLMES LAW FIRM
1000 North Central Expressway, Suite 400
Dallas, Texas 75231
Email: wes@wesholmes.com
*Attorneys for James Thomas Dorsey, Sylvia Dorsey, and Adriana Longoria*

*/s/ Johnny W. Carter*
Johnny W. Carter

19

3488503v1/013774

01175

# EXHIBIT 1

01176

Case Number 414270

IN THE ESTATE OF            §        IN THE PROBATE COURT
DOROTHY LOUISE LONGORIA,    §        NUMBER ONE
DECEASED                    §        HARRIS COUNTY, TEXAS
                           §

**Affidavit of Shelby Longoria**
**in Support of Motion to Dismiss Adriana Longoria's Claims**

STATE OF *Ca*            §
                         §
COUNTY OF *Sonoma*       §

BEFORE ME, the undersigned authority, on this day personally Shelby Longoria, who, being by me first duly sworn, stated the following:

1.      My name is Shelby Longoria. I am over twenty-one years of age, of sound mind, and qualified to make this affidavit. I have personal knowledge of the facts stated herein and am competent to testify thereto.

2.      I am one of four children of Eduardo and Dorothy Longoria. My parents were Mexican citizens and lived most of their married lives in Mexico. My father was a member of a prominent family of Mexican businessmen. Through a series of transactions in the 1970's and 1980's, my father split up the businesses that he and his brothers had jointly owned. Around the same time, I assumed greater responsibilities for helping my father to manage these businesses.

3.      My father always expressed the desire that his sons – my brother Wayo and me – would receive the Mexican businesses, including all of the risk associated with those businesses. He often stated that he wanted his daughters, Adriana and Sylvia, to receive cash in their lifetimes. For example, he executed a Wish Letter in 1992 describing his wish that Adriana and Sylvia each receive $3 million during their lifetimes. The total to be received by my sisters – $6 million between them – likely exceeded the value of the businesses at that time.

1

01177

4. Over time, the businesses were consolidated under two Mexican holding companies – Vertice Empresarial and Inmuebles y Terrenos, S.A. ("ITSA"). In 2002, my father decided to transfer the shares of these companies to a trust held by a Mexican bank called Banca Afirme. Consistent with my father's consistently-expressed wishes, the shares would be held in that trust for the benefit of Wayo and me and our families. On October 15, 2002, the same day that the Afirme Trust became effective, my father executed a will recognizing the Afirme Trust Agreement.

5. Two months after entering into the Afirme Trust Agreement, my father executed a Private Agreement with Adriana. Consistent with the wishes previously expressed by my father, the Private Agreement provided for Adriana to receive $3 million over time.

6. My father passed away in January 2005.

FURTHER AFFIANT SAYETH NOT.

_____
Shelby Longoria

SUBSCRIBED AND SWORN TO BEFORE ME this _____ day of January, 2015, to certify which witness my hand and seal of office.

_____
Notary Public - State of _____

Printed Name: _____

My Commission Expires: _____

PLEASE SEE ATTACHED
CALIFORNIA JURAT FORM

2

01178

# California Jurat Certificate

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**State of California**

**County of** *Sonoma*                                    S.S.

Subscribed and sworn to (or affirmed) before me on this _____ JAN 1 3 2015 day of _____,
Month

20 ___, by *Shelby Longoria* _____ and
Name of Signer (1)

_____, proved to me on the basis of
Name of Signer (2)

satisfactory evidence to be the person(s) who appeared before me.

*Robert N Foster*
Signature of Notary Public

ROBERT N. FOSTER
COMM. #1973463
NOTARY PUBLIC - CALIFORNIA
SONOMA COUNTY
My Comm. Expires April 25, 2016

Seal

For other required information (Notary Name, Commission No. etc.)

---
## OPTIONAL INFORMATION
---

*Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this jurat to an unauthorized document and may prove useful to persons relying on the attached document.*

### Description of Attached Document

The certificate is attached to a document titled/for the purpose of

*Affidavit of Shelby Longoria*

containing __2__ pages, and dated ___JAN 1 3 2015___

**Additional Information**

Method of Affiant Identification

Proved to me on the basis of satisfactory evidence:
☒ form(s) of identification  ○ credible witness(es)

Notarial event is detailed in notary journal on:
*Book 17*
Page # *43*  Entry # *4*

Notary contact: *Robert Foster*

Other

☐ Affiant(s) Thumbprint(s)  ☐ Describe: _____

© 2009-2015 Notary Learning Center - All Rights Reserved     You can purchase copies of this form from our web site at www.TheNotarysStore.com

**01179**

# EXHIBIT 2

01180

ACUERDO PRIVADO

QUE CELEBRAN EDUARDO LONGORIA THERIOT Y ADRIANA LONGORIA KOWALSKI RESPECTO DEL RECONOCIMIENTO Y ACEPTACIÓN DE LOS TERMINOS Y CONDICIONES DEL FIDEICOMISO NO. 194-2, CONSTITUIDO EN BANCA AFIRME, S.A. INSTITUCIÓN DE BANCA MULTIPLE, Y DEL RECONOCIMIENTO DE LA OBLIGACIÓN DE PAGO A FAVOR DE LA SEÑORA ADRIANA LONGORIA KOWALSKI, DE ACUERDO A LO SIGUIENTE:

DECLARACIONES

I.     Declaran las partes:

a) Que en fecha octubre 15 del presente año se celebró un contrato de fideicomiso donde actuó como Fideicomitente el señor Eduardo Longoria Theriot, como fideicomisarios las señores Eduardo y Shelby Luis Longoria Kowalski y como fiduciaria la institución de crédito Banca Afirme, S.A., Institución de Banca Múltiple, el cual se registro con el número 194-2 y del cual se anexa una copia al presente Acuerdo (en lo sucesivo el "FIDEICOMISO").

b) Que en dicho "FIDEICOMISO" se designaron como beneficiarios a los señores EDUARDO Y SHELBY LUIS LONGORIA KOWALSKI respecto de la propiedad de las acciones aportadas al mismo.

c) Que de igual manera que es la voluntad de su padre que EDUARDO Y SHELBY LUIS LONGORIA KOWALSKI reciban la propiedad de las acciones de la totalidad de las empresas, es voluntad de su padre que ADRIANA LONGORIA KOWALSKI reciba la cantidad que se establece en este Acuerdo en las condiciones aquí indicadas.

CLAUSULAS

Primera. Del "FIDEICOMISO".- Las partes reconocen la validez y alcance del "FIDEICOMISO" y en tal sentido están de acuerdo en todos sus términos y condiciones y por lo tanto manifiestan que dicho contrato es la voluntad final y definitiva de las partes, por lo que están conformes en todos sus términos y están conformes que las acciones a él aportadas se transmitan a favor de los beneficiarios designados.

**ADRIANA 00119**

**01181**

Segunda. Pago a ADRIANA LONGORIA KOWALSKI.- Es voluntad de su padre que se le entregue la cantidad de US$3,000,000.00 (tres millones de dólares americanos) a su hija ADRIANA LONGORIA KOWALSKI, a cargo de los flujos de operación que generan las empresas que representan las acciones aportadas en el "FIDEICOMISO", o sus subsidiarias, por lo que es obligación de EDUARDO Y SHELBY LUIS LONGORIA KOWALSKI, en los términos que se mencionan a continuación:

A la fecha de firma del presente Acuerdo el saldo por entregar a ADRIANA LONGORIA KOWALSKI en términos del párrafo anterior, asciende a la cantidad de US$2,069,100.00 (dos millones sesenta y nueve mil cien dólares americanos) según estado de cuenta que se anexa a la presente.

En virtud de lo anterior, se le entregará a ADRIANA LONGORIA KOWALSKI una cantidad anual de US$150,000.00 (ciento cincuenta mil dólares americanos) de capital e intereses, en mensualidades de US$12,500.00 (doce mil quinientos dólares americanos) hasta la completa liquidación del saldo que se refiere el párrafo anterior. De igual manera, el saldo por pagar causará un interés normal del 75% (setenta y cinco por ciento) del "prime rate" publicado por el Wall Street Journal.

Se establece que podrán hacerse pagos en bienes, en cuyo caso se acordarán los importes por ambas partes.

Las cantidades serán entregadas en estricto apego a las disposiciones legales y fiscales aplicables al momento de pago.


Tercera. Condición Determinante de la Voluntad.- Las partes manifiestan que el presente Acuerdo es la voluntad final y definitiva de las partes, por lo que están conformes en todos sus términos, manifestando además que no existe error, dolo, mala fe o cualquier vicio de la voluntad que pudiere afectar su entendimiento o decisión respecto al contenido del mismo.

La obligación entregar las cantidades mencionadas en favor de ADRIANA LONGORIA KOWALSKI y a cargo del "FIDEICOMISO" en los términos aquí señalados, continuará vigente hasta su completa liquidación, en la inteligencia que una vez liquidadas las cantidades a que se refieren el presente Acuerdo, ADRIANA LONGORIA KOWALSKI se dará por satisfecha respecto de cualquier obligación presente o futura a cargo del patrimonio del "FIDEICOMISO" o de los señores EDUARDO y SHELBY LUIS LONGORIA KOWALSKI.

ADRIANA 00120

01182

Cuarta. Jurisdicción y Legislación Mexicana.- El presente Acuerdo se establece bajo la jurisdicción y leyes de los Estados Unidos Mexicanos. Por tal motivo, las partes se someten exclusivamente a las leyes de México, por lo que renuncian expresamente a la aplicación de cualquier Ley, reglamento, disposición o norma de otra jurisdicción diferente a la mexicana, que pudiere corresponderle por motivo de su residencia, paternidad, ciudadanía, domicilio, parentesco o relación comercial, por lo que en caso de interpretación, controversia o cualquier aspecto relacionado con el presente Fideicomiso, se someten expresamente a los tribunales de la ciudad de Reynosa, Tamaulipas, México.

De igual manera, la emisión de cualquier Ley, reglamento o disposiciones en jurisdicciones fuera de la República Mexicana, o cualquier acto realizado fuera del territorio nacional por cualquiera de las partes que pretenda (i) imponer restricciones al presente Acuerdo o imponer la realización de actos diversos a los fines para los que está autorizado; (ii) que pretenda imponer impuestos, derechos o cargas tributarias diferentes a las previstas en la Legislación Mexicana; (iii) que pretenda expropiar, limitar, confiscar, embargar, disponer, congelar o de cualquier forma afectar los derechos del Acuerdo en base a disposiciones legales, tanto federales, estatales o municipales, fuera de la jurisdicción de la República Mexicana, no es ni será aplicable al presente Acuerdo, debiendo en todo caso aplicarse la jurisdicción y legislación de la República de los Estados Unidos Mexicanos en términos del párrafo anterior.

Visto y leído lo anterior, lo firman las partes en la ciudad de Reynosa Tamaulipas el día 17 de DICIEMBRE del 2002.


_____
Eduardo Longoria Theriot


_____
Adriana Longoria Kowalski


*Pág 3 de 3*

ADRIANA 00121

01183

# EXHIBIT 2A

01184



**PARK**
IP TRANSLATIONS
welocalize ○

January 12, 2015

Certification

**Park IP Translations**

This is to certify that the attached translations are, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the Irrevocable Trust Agreement.

Sarah Dunham

Project Manager

Project Number: SUGO_1501_003



SABRINA T SMITH
Notary Public, State of New York
No. 01SM6306989
Qualified in Kings County
Commission Expires June 30, 20__18

15 W. 37th Street 8th Floor
New York, NY 10018
212.581.8870
ParkIP.com

# PRIVATE AGREEMENT

EXECUTED BY EDUARDO LONGORIA THERIOT AND ADRIANA LONGORIA KOWALSKI REGARDING THE ACKNOWLEDGMENT AND ACCEPTANCE OF THE TERMS AND CONDITIONS OF TRUST No. 194-2, MADE IN BANCA AFIRME S.A., INSTITUCION DE BANCA MULTIPLE, AND ACKNOWLEDGMENT OF PAYMENT OBLIGATION IN FAVOR OF ADRIANA LONGORIA KOWALSKI, ACCORDING TO THE FOLLOWING:

## DECLARATIONS

I.      The parties declare:

   a)      On October 15th of this year, a trust agreement was executed with Mr. Eduardo Longoria Theriot acting as Trustor, Messrs. Eduardo  and Shelby Luis Longoria Kowalski as trust beneficiaries, and Banca Afirme S.A., Institucion de Banca Multiple, acting as trust credit institution, which was registered with  number 194-2, a copy of which is attached to this Agreement (hereinafter the "TRUST").

   b)      That in such "TRUST" Messrs. EDUARDO and SHELBY LUIS LONGORIA KOWALSKI were designated as beneficiaries regarding the ownership of the shares contributed to it.

   c)      That just as it is the will of their father that EDUARDO and SHELBY LUIS LONGORIA KOWALSKI shall receive ownership of the shares of all companies; it is also the will of her father that ADRIANA LONGORIA KOWALSKI shall receive the quantity specified in this Agreement under the conditions set forth herein.

## CLAUSES

**First. Regarding "THE TRUST."** The parties recognize the validity and scope of the "TRUST", and in this regard they are in agreement with all its terms and conditions, and therefore declare that the agreement is the final and definitive will of the parties, and therefore, they comply with all terms and agree that the shares contributed to it are to be transferred to the designated beneficiaries.

**Second. Payment to ADRIANA LONGORIA KOWALSKI.** It is the will of her father that the amount of $ 3,000,000.00 (three million U.S. dollars) be delivered to his daughter ADRIANA LONGORIA KOWALSKI, from the operating cash flow generated by the companies represented by the shares contributed to the "TRUST", or by their subsidiaries, and therefore it is the obligation of EDUARDO AND SHELBY LUIS LONGORIA KOWALSKI, in the terms mentioned below:

01186

On the date this Agreement is signed, the balance to be delivered to ADRIANA LONGORIA KOWALSKI, in terms of the preceding paragraph, amounts to the sum of USD $ 2,069,100.00 (two million sixty-nine thousand one hundred U.S. dollars), according to the statement of account that is attached hereto.

By virtue of the foregoing, an annual amount of $ 150,000.00 (one hundred fifty thousand U.S. dollars) of principal and interest will be given to ADRIANA LONGORIA KOWALSKI, in monthly installments of $ 12,500,00 (twelve thousand five hundred U.S. dollars) until the complete payment of the balance referred to above. In addition, the balance payable shall earn a normal interest rate of 75% (seventy-five percent) of the "prime rate" published by the Wall Street Journal.

It is hereby established that payments may be made in the form of goods, in which case both parties shall agree to the amount.

The amounts will be delivered in strict compliance with applicable tax and legal provisions when they are due.

**Third. Final and Definitive Will of the Parties.** The parties state that this Agreement is the final and definitive will of the parties; therefore, they are in agreement with all its terms, further stating that there is no mistake, fraud, bad faith or any defect of will that might affect their understanding or decision regarding the content.

The TRUST's obligation to deliver the mentioned quantities to ADRIANA LONGORIA KOWALSKI, in the terms set forth herein, shall continue in effect until full payment, acknowledging that, after payment of the amounts referred to in this Agreement, ADRIANA LONGORIA KOWALSKI shall be satisfied in relation to any present or future obligation charged to the "TRUST" assets or to those of Messrs. EDUARDO and SHELBY LUIS LONGORIA KOWALSKI.

**Fourth. Jurisdiction and Mexican Law.** This Agreement is established under the jurisdiction and laws of the United Mexican States. Therefore, the parties exclusively submit to the laws of Mexico, thus they expressly waive the application of any law, regulation, provision or rule of any jurisdiction other than Mexico, which might correspond to them due to their residence, paternity, citizenship, domicile, kinship or commercial relationship. Therefore, in the event of any interpretation, dispute, or any aspect related to this Trust, they expressly submit to the courts of the city of Reynosa, Tamaulipas, Mexico.

Likewise, the issuance of any law, regulation or provisions in jurisdictions outside the Republic of Mexico, or any act performed outside the national territory by any party seeking to (i) impose restrictions on this Agreement or to impose the performance of acts different from the purposes for which it is authorized, (ii) impose taxes, duties or tax burdens other than those under Mexican Law; (iii) expropriate, limit, confiscate, seize, dispose of, freeze or otherwise affect the rights of the Agreement based on federal, state or municipal laws, outside the jurisdiction of the Republic of Mexico, shall not apply to this Agreement, in all cases the

jurisdiction and laws of the Republic of the United Mexican States being applicable under the terms of the previous paragraph.

Having seen and read the foregoing, the parties sign it in the city of Reynosa, Tamaulipas, on DECEMBER 17th, 2002.


*E Longoria*
Eduardo Longoria Theriot


*A Longoria Kowalski*
Adriana Longoria Kowalski

Error! Unknown document property name.

# EXHIBIT 3

01189

**B A N C A**
**AFIRME**

CONTRATO DE FIDEICOMISO IRREVOCABLE DE ADMINISTRACIÓN PATRIMONIAL QUE CELEBRAN POR UNA PARTE COMO **FIDEICOMITENTE** EL SEÑOR EDUARDO LONGORIA THERIOT, A QUIEN EN LO SUCESIVO SE LE DENOMINARÁ COMO EL "**FIDEICOMITENTE**"; COMO FIDUCIARIO BANCA AFIRME, S.A., INSTITUCIÓN DE BANCA MÚLTIPLE, AFIRME GRUPO FINANCIERÓ, DIVISIÓN FIDUCIARIA, A QUIEN EN LO SUCESIVO SE LE DENOMINARÁ COMÓ EL "**FIDUCIARIO**", REPRESENTADO EN ESTE ACTO POR SUS DELEGADOS FIDUCIARIOS LOS LICENCIADOS ADRIAN JORGE LOZANO LOZANO Y MARTHA BEATRIZ GARZA LONGORIA; ACTO JURÍDICO QUE SUJETAN AL TENOR DE LAS SIGUIENTES DECLARACIONES Y CLÁUSULAS:

## D E C L A R A C I O N E S

I.- Declara el Sr. Eduardo Longoria Theriot, en su calidad de **FIDEICOMITENTE** que:

a) Es una persona física, de nacionalidad mexicana, con capacidad suficiente para celebrar el presente contrato.

b) Que está casado con su esposa la señora Dorothy Kowalski de Longoria, habiéndose celebrado su matrimonio en la ciudad de Nuevo Laredo, Tamaulipas, habiéndose casado bajo el régimen de separación de bienes.

c) Que en su matrimonio con su esposa procreó 4 hijos, Adriana, Eduardo, Silvia y Shelby Luis, todos de apellido Longoria Kowalski y que ellos son su única descendencia.

d) Es legítimo propietario de las ACCIONES que se describen a continuación emitidas por las sociedades igualmente descritas, (en lo sucesivo identificadas en su totalidad como las ACCIONES):

| Emisora | ACCIONES | | |
|---|---|---|---|
| | SERIE A | SERIE B | Total |
| Vértice Empresarial, S.A. de C.V. | 50 | 684 | 734 |
| Inmuebles y Terrenos, S.A. de C.V. | 49,000 | 4,375,350 | 4,424,350 |

2.



1

**CONFIDENTIAL**

**SLONGORIA 000172**

**01190**



Para efectos del presente contrato, se identificarán a las sociedades emisoras de las ACCIONES, indistintamente en su conjunto como las "EMPRESAS".

e) Obran en su poder los títulos representativos de las ACCIONES referidas en el inciso que precede, mismas que se encuentran libres de todo gravamen.

f) Es su voluntad el afectar en fideicomiso las ACCIONES, con el propósito de que el FIDUCIARIO, en los términos que se señalan en este contrato, las conserve en propiedad fiduciaria y que el FIDUCIARIO disponga de ellas conforme a lo dispuesto en este contrato.

g) El FIDUCIARIO le ha explicado, en forma inequívoca, el valor y consecuencias legales del precepto legal contenido en el inciso b) de la fracción XIX (diecinueve romano) del artículo 106 (ciento seis) de la Ley de Instituciones de Crédito, así como del alcance y contenido de este contrato.

II.- Declara el FIDUCIARIO, por conducto de sus Delegados Fiduciarios, que:

a) Su representada es una sociedad legalmente constituida conforme a las leyes mexicanas y que está debidamente autorizada para celebrar operaciones fiduciarias.

b) Está de acuerdo en actuar como Institución fiduciaria en el presente contrato.

c) Son Delegados Fiduciarios de Banca Afirme, S.A., Institución de Banca Múltiple, Afirme Grupo Financiero, División Fiduciaria, con facultades suficientes para llevar a cabo la firma de este contrato, las cuales no les han sido revocadas ni modificadas en forma alguna.

d) De conformidad con lo establecido en el inciso b) de la fracción XIX (diecinueve romano) del artículo 106 (ciento seis) de la Ley de Instituciones de Crédito declara que ha explicado en forma inequívoca a las demás partes, el valor y consecuencias legales de dicha fracción que a la letra dice:

2

CONFIDENTIAL

SLONGORIA 000173

01191



L MENDOZA
No. 97
lo. Tam.

"Artículo 106. A las Instituciones de Crédito les estará prohibido:
XIX...

b) Responder a los fideicomitentes, mandantes o comitentes, del incumplimiento de los deudores, por los créditos que se otorguen o de los emisores, por los valores que se adquieran, salvo que sea por su culpa, según lo dispuesto en la parte final del artículo 356 (ahora 391) de la Ley General de Títulos y Operaciones de Crédito, o garantizar la percepción de rendimientos por los fondos cuya inversión se les encomiende.

Si al término del fideicomiso, mandato o comisión constituidos para el otorgamiento de créditos, éstos no hubieren sido liquidados por los deudores, la institución deberá transferirlos al fideicomitente o fideicomisario, según el caso, o al mandante o comitente, absteniéndose de cubrir su importe.

Cualquier pacto contrario a lo dispuesto en los dos párrafos anteriores, no producirá efecto legal alguno.

En los contratos de fideicomiso, mandato o comisión, se insertarán en forma notoria los párrafos anteriores de este inciso y una declaración de la fiduciaria en el sentido de que hizo saber inequívocamente su contenido a las personas de quienes haya recibido bienes para su inversión".

Visto lo anterior, las partes manifiestan que tienen conocimiento de las declaraciones anteriores, que todas ellas son ciertas, por lo que es su voluntad celebrar el presente contrato de fideicomiso conforme a las siguientes:

## C L Á U S U L A S

PRIMERA.- CONSTITUCIÓN DEL FIDEICOMISO.- El Sr. Eduardo Longoria Theriot en su calidad de FIDEICOMITENTE, en este acto, transmite en fideicomiso al FIDUCIARIO, la propiedad de las ACCIONES detalladas en el inciso d) de la Declaración I del presente contrato.

3

CONFIDENTIAL

SLONGORIA 000174

01192


B A N C A
AFIRME

El FIDEICOMITENTE en este acto, hace entrega física al FIDUCIARIO de los títulos que amparan las ACCIONES fideicomitidas, debidamente endosados en favor de éste último.

En los términos del artículo 129 de la Ley General de Sociedades Mercantiles, el FIDEICOMITENTE se compromete a notificar al Administrador Único o al Secretario del Consejo de Administración en su caso, de las EMPRESAS emisoras, respecto de la transmisión de las ACCIONES al presente contrato de Fideicomiso, a fin de que se realice la inscripción correspondiente en el Registro de Accionistas de dichas EMPRESAS, remitiendo al FIDUCIARIO la certificación correspondiente, dentro de un plazo de 30 (treinta) días hábiles contados a partir de la celebración del presente contrato. En caso de que no se reciba la certificación del Secretario del Consejo, el FIDUCIARIO podrá solicitarla directamente.

El FIDUCIARIO recibe en este acto, los títulos que amparan las ACCIONES, debidamente endosadas, sin asumir responsabilidad alguna por la autenticidad y legitimidad de dichos títulos, o por los vicios que soporten, y consecuentemente será el FIDEICOMITENTE quien deberá responder de la autenticidad de los títulos y del saneamiento para el caso de evicción. Asimismo, el FIDUCIARIO, por medio del presente contrato, otorga al FIDEICOMITENTE el recibo más amplio que en derecho proceda.

El FIDUCIARIO en este acto manifiesta la aceptación de su cargo, protestando su fiel y legal desempeño.

SEGUNDA. PARTES DEL FIDEICOMISO.- Son partes en el presente Contrato de Fideicomiso las siguientes:

FIDEICOMITENTE:        Señor Eduardo Longoria Theriot.
FIDUCIARIO:            Banca Afirme, S.A., Institución de Banca Múltiple, Afirme Grupo Financiero, División Fiduciaria.

Designación de FIDEICOMISARIOS. En este acto el FIDEICOMITENTE designa como FIDEICOMISARIOS EN PRIMER LUGAR o sustitutos para el caso de su fallecimiento a:

FIDEICOMISARIOS       Eduardo y Shelby Luis, ambos de apellidos
EN PRIMER LUGAR:      Longoria Kowalski, en las siguientes

4

CONFIDENTIAL                                    SLONGORIA 000175

01193



**BANCA AFIRME**

proporciones: (i) Shelby Luis Longoria Kowalski en un 60% (sesenta por ciento) de los derechos de fideicomisario derivados del presente Fideicomiso y; (ii) Eduardo Longoria Kowalski en un 40% (cuarenta por ciento) de los derechos de fideicomisario derivados de este Fideicomiso.

Asimismo, para el caso de fallecimiento de los **FIDEICOMISARIOS EN PRIMER LUGAR** o cualquiera de ellos simultáneamente o antes de recibir los beneficios que le correspondieran del presente Fideicomiso, el **FIDEICOMITENTE** designa como **FIDEICOMISARIOS EN SEGUNDO LUGAR** a:

| | |
|---|---|
| **FIDEICOMISARIOS EN SEGUNDO LUGAR:** | Los hijos y esposa en su caso, de los **FIDEICOMISARIOS EN PRIMER LUGAR** en caso de que ocurra el deceso de alguno de ellos, cuyos nombres se mencionan en la Cláusula Quinta incisos g) e i), cláusula Sexta y cláusula Séptima. |

Los Fideicomisarios podrán ser referidos en el presente contrato como **FIDEICOMISARIOS** refiriéndose a todos los designados como fideicomisarios en conjunto, o en particular, refiriéndose a cada parte designada.

El **FIDUCIARIO** llevará registro contable que acredite a los **FIDEICOMISARIOS EN PRIMER LUGAR** como beneficiarios del patrimonio del Fideicomiso en la proporción que para cada uno se señala en la presente cláusula, mediante la apertura de una subcuenta para cada uno de ellos. El registro de los **FIDEICOMISARIOS EN SEGUNDO LUGAR** se realizará dentro de la subcuenta que a cada uno de ellos corresponda.

**TERCERA. PATRIMONIO DEL FIDEICOMISO.-** Constituirá la materia del presente contrato:

a. Las ACCIONES descritas en el inciso d) de la Declaración I del presente contrato.

b. Las futuras ACCIONES que, por cualquier causa, llegaren a ser parte del patrimonio de este contrato, ya sea por compra, emisión de nuevas ACCIONES o por el ejercicio de los derechos

5

**CONFIDENTIAL**

**SLONGORIA 000176**

01194



patrimoniales derivado de las propias ACCIONES, así como los títulos que pudieran recibirse a cambio en virtud de ocurrir la fusión, escisión o transformación de cualquiera de las emisoras de las ACCIONES, que conformen el patrimonio del presente, así como el incremento que el FIDEICOMITENTE podrá hacer respecto a ACCIONES representativas del capital social de otras sociedades, siempre que las emisoras sean sociedades mexicanas.

c. Cualquier otro tipo de valor o títulos de crédito o partes sociales o bienes que, por cualquier forma, se aporten al Fideicomiso, para quedar afectas a los fines de este contrato. En este supuesto, en ningún caso se afectará al patrimonio del presente, valores que se negocien en mercados de valores extranjeros, ya que siempre serán valores que se negocien en el mercado de valores mexicano.

d. También formarán parte de la materia del presente fideicomiso los dividendos pagados, en efectivo, en ACCIONES o en otros bienes muebles o inmuebles, de las ACCIONES aportadas.

e. Los rendimientos que generen las inversiones efectuadas por el FIDUCIARIO, con los recursos en dinero que formen parte del patrimonio del Fideicomiso.

f. Cualquier aportación adicional que en el futuro realice el FIDEICOMITENTE de cualquier clase, ya sea efectivo, especie o derechos.

g. Cualquier otra aportación en efectivo, especie o derechos que adquiera el propio Fideicomiso en el cumplimiento de sus fines.

CUARTA. OBJETO DEL FIDEICOMISO.- El presente Fideicomiso tiene por objeto que el FIDUCIARIO conserve la propiedad de las ACCIONES en los términos del propio contrato, a efecto de que posteriormente, al fallecimiento del FIDEICOMITENTE, y en los términos y condiciones pactados en el presente contrato, transmita la propiedad de las ACCIONES a favor de los FIDEICOMISARIOS.

QUINTA. FINES DEL FIDEICOMISO.- Son fines del presente contrato de fideicomiso que:

6

SLONGORIA 000177

01195



**BANCA**
**AFIRME**

a. El FIDUCIARIO reciba y mantenga la titularidad de las ACCIONES fideicomitidas.

b. El FIDUCIARIO invierta los recursos en efectivo que se encuentren dentro del patrimonio fideicomitido, conforme a lo establecido en la Cláusula Décima Tercera del presente contrato.

c. El FIDUCIARIO ejerza los derechos corporativos y patrimoniales de las ACCIONES, señalándose en forma enunciativa, más no limitativa los siguientes: el de voto, el de recibir acciones capitalizadas o como dividendos, el de suscripción de acciones, el de pagar y recibir nuevas acciones en ejercicio del derecho de preferencia, el de reembolso total o parcial de dichas acciones, el de cobro de dividendos en efectivo, etcétera, siguiendo en todo caso las instrucciones que por escrito reciba del Comité Técnico.

Para el ejercicio de los derechos corporativos y patrimoniales inherentes a las ACCIONES, se observarán las siguientes disposiciones:

1. El FIDUCIARIO otorgará los poderes que sean necesarios en favor de la(s) persona(s) que designe el Comité Técnico, para el ejercicio de los derechos antes mencionados. En ausencia de instrucciones, el FIDUCIARIO estará facultado podrá solicitar las instrucciones correspondientes al Comité Técnico para el ejercicio de los derechos corporativos y patrimoniales de las ACCIONES, debiendo obrar siempre como buen padre de familia, protegiendo en todo caso el patrimonio fideicomitido.

2. En caso de aumentos de capital de la emisora de las ACCIONES fideicomitidas, el FIDUCIARIO llevará a cabo la suscripción correspondiente, previa aportación de los fondos suficientes para tal efecto, quedando establecido que de existir recursos suficientes para ello dentro del patrimonio fideicomitido, el FIDEICOMITENTE o el Comité Técnico podrá instruir al FIDUCIARIO para que la suscripción del aumento de capital correspondiente se realice con cargo al patrimonio fideicomitido.

Asimismo, queda establecido que los reembolsos de capital parcial o total de las ACCIONES, así como los pagos de

7

CONFIDENTIAL

SLONGORIA 000178

01196



dividendos en efectivo o especie que en su caso decreten las emisoras de las ACCIONES incrementarán el patrimonio del presente fideicomiso, para su posterior aplicación a los fines del mismo.

d. El FIDUCIARIO, conforme a instrucciones escritas que le expida el Comité Técnico, enajene, afecte, grave o por cualquier medio permitido por Ley, transmita las ACCIONES o parte de ellas a la persona que designe el Comité Técnico, en cuyo caso la contraprestación que corresponda a dicha transmisión la recibirá el FIDEICOMITENTE o en su caso los FIDEICOMISARIOS. Se conviene expresamente en que el establecimiento de las condiciones de enajenación será facultad exclusiva del Comité Técnico y se dará a conocer a detalle y por escrito al FIDUCIARIO.

Previo a la formalización de la enajenación, también corresponderá al Comité Técnico verificar que la enajenación de las ACCIONES en su caso, cumpla con las reglas corporativas y derechos de otros socios establecidos en los estatutos de la emisora y de la Ley, obligándose a acreditarlos al FIDUCIARIO cuando éste lo solicite.

En caso de venta de las ACCIONES en los términos expuestos, el FIDEICOMITENTE deberá cumplir con las obligaciones fiscales aplicables a su cargo, o bien, en caso de fallecimiento de éste, las personas a quien le corresponda de acuerdo a las disposiciones aplicables en su caso.

e. El FIDUCIARIO, conforme a instrucciones que reciba del Comité Técnico, entregará las cantidades de dinero que le instruyan al propio FIDEICOMITENTE o a los FIDEICOMISARIOS, siempre que hubiere fondos suficientes en el fideicomiso.

f. En caso de fallecimiento del FIDEICOMITENTE, lo que deberá ser acreditado al FIDUCIARIO con la exhibición del acta de defunción correspondiente, el presente fideicomiso continuará vigente y el derecho de los FIDEICOMISARIOS a recibir los beneficios, estará subordinado hasta en tanto el Comité Técnico instruya al FIDUCIARIO para que entregue a los FIDEICOMISARIOS los recursos existentes en el patrimonio del Fideicomiso y las ACCIONES fideicomitidas en las proporciones señaladas para cada uno de ellos, según se indica en la Cláusula Segunda, extinguiéndose en ese momento el fideicomiso.

8

CONFIDENTIAL



En tanto los **FIDEICOMISARIOS** reciben las **ACCIONES** fideicomitidas, o los recursos existentes en el fideicomiso o producto de la venta de las **ACCIONES** en su caso, el presente Fideicomiso continuará vigente y el **FIDUCIARIO** ejercitará los derechos corporativos y patrimoniales de las **ACCIONES**, conforme se lo instruya el Comité Técnico.

g. En caso de que ocurra el deceso del Fideicomisario Eduardo Longoria Kowalski, los derechos que le correspondían en el presente Fideicomiso serán para los (4) cuatro **FIDEICOMISARIOS EN SEGUNDO LUGAR** de nombres Alejandra Michelle, Bernardo y Eduardo, todos de apellidos Longoria Hernández, y Sophia Longoria Zygmont en las proporciones y bajo los términos y condiciones a que se refiere la cláusula Séptima.

h. En el supuesto de fallecimiento de los **FIDEICOMISARIOS EN SEGUNDO LUGAR** Bernardo y Eduardo Longoria Hernández o Sofía Longoria Zygmont mencionados en el inciso anterior, en cualquier tiempo durante la vigencia del presente Fideicomiso, la participación que les correspondía será distribuida entre todos los demás **FIDEICOMISARIOS EN SEGUNDO LUGAR** que queden en vida a que se refiere el inciso anterior, incrementando por lo tanto su participación en el presente Fideicomiso. En el supuesto de fallecimiento de Alejandra Michelle Longoria Hernández en cualquier tiempo durante la vigencia del presente Fideicomiso, la participación que le correspondía será distribuida en partes iguales entre sus hijos Alfonso Illán y Alejandro Diego ambos de apellido Arguindegui Longoria.

i. En caso de que ocurra el deceso del Fideicomisario Shelby Luis Longoria Kowalski, los derechos que le correspondían del presente fideicomiso serán para los cuatro (4) **FIDEICOMISARIOS EN SEGUNDO LUGAR** de nombre Enriqueta Chapa de Longoria, Shelby, Sarah Louise y Adriana Dorothy de apellidos Longoria Chapa en partes iguales, bajo los términos y condiciones a que se refiere la cláusula Sexta.

j. En el supuesto de fallecimiento de alguno de los cuatro (4) **FIDEICOMISARIOS EN SEGUNDO LUGAR** mencionados en el inciso anterior, en cualquier tiempo durante la vigencia del presente Fideicomiso, la participación que le correspondía será distribuida entre los **FIDEICOMISARIOS EN SEGUNDO LUGAR** que queden en vida, incrementando por lo tanto su participación en el presente Fideicomiso.

9

CONFIDENTIAL

SLONGORIA 000180

01198



### B A N C A
## AFIRME

SEXTA. DISPOSICIONES ESPECIALES EN CASO DE FALLECIMIENTO DE SHELBY LUIS LONGORIA KOWALSKI.- En caso de fallecimiento del señor Shelby Luis Longoria Kowalski en cualquier tiempo durante la vigencia del presente fideicomiso, se estará a lo dispuesto por esta cláusula:

1. FIDEICOMISARIOS EN SEGUNDO LUGAR.- Como se establece en la cláusula Segunda los FIDEICOMISARIOS EN SEGUNDO LUGAR designados para el caso de fallecimiento del FIDEICOMISARIO EN PRIMER LUGAR Shelby Luis Longoria Kowalski serán su esposa Enriqueta Chapa Farias de Longoria y sus hijos Adriana, Sarah y Shelby, todos de apellido Longoria Chapa, en partes iguales.

2. En caso de fallecimiento de cualquiera de los FIDEICOMISARIOS EN SEGUNDO LUGAR en cualquier tiempo durante la vigencia del presente Fideicomiso, la participación que le correspondía será distribuida entre los FIDEICOMISARIOS EN SEGUNDO LUGAR que queden en vida, incrementando por lo tanto su participación en el presente Fideicomiso.

3. En caso de los FIDEICOMISARIOS EN SEGUNDO LUGAR menores de edad, éstos serán representados por sus tutores o representantes designados de acuerdo a las disposiciones civiles aplicables.

SÉPTIMA. DISPOSICIONES ESPECIALES EN CASO DE FALLECIMIENTO DE EDUARDO LONGORIA KOWALSKI.- En caso de fallecimiento del señor Eduardo Longoria Kowalski en cualquier tiempo durante la vigencia del presente fideicomiso, se estará a lo dispuesto por esta cláusula:

1. FIDEICOMISARIOS EN SEGUNDO LUGAR.- Como se establece en la cláusula Segunda los FIDEICOMISARIOS EN SEGUNDO LUGAR designados para el caso de fallecimiento del FIDEICOMISARIO EN PRIMER LUGAR Eduardo Longoria Kowalski serán sus (4) cuatro hijos Eduardo, Alejandra, Bernardo, todos de apellido Longoria Hernández y Sophia Longoria Zygmont en las siguientes proporciones:

| FIDEICOMISARIO EN SEGUNDO LUGAR | PORCENTAJES |
|---|---|
| EDUARDO LONGORIA HERNÁNDEZ | 37.5% |
| BERNARDO LONGORIA HERNÁNDEZ | 37.5% |
| ALEJANDRA LONGORIA HERNÁNDEZ | 12.5% |
| SOPHIA LONGORIA ZYGMONT | 12.5% |
| Total | 100% |

10

CONFIDENTIAL

SLONGORIA 000181

01199





2'. En el supuesto de fallecimiento de los FIDEICOMISARIOS EN SEGUNDO LUGAR Bernardo y Eduardo Longoria Hernández o Sophia Longoria Zygmont antes mencionados, en cualquier tiempo durante la vigencia del presente Fideicomiso, la participación que les correspondía será distribuida entre todos los demás FIDEICOMISARIOS EN SEGUNDO LUGAR que queden en vida, incrementando por lo tanto su participación en el presente Fideicomiso. En el supuesto de fallecimiento de Alejandra Michelle Longoria Hernández en cualquier tiempo durante la vigencia del presente Fideicomiso, la participación que le correspondía será distribuida en partes iguales entre sus hijos Alfonso Illán y Alejandro Diego ambos de apellido Arguindegui Longoria.

3. DISPOSICIONES ESPECIALES PARA LOS FIDEICOMISARIOS EN SEGUNDO LUGAR.- Desde este momento quedan designados los FIDEICOMISARIOS EN SEGUNDO LUGAR a que se refiere el inciso anterior en los porcentajes indicados, sin embargo, los FIDEICOMISARIOS EN SEGUNDO LUGAR, Eduardo y Bernardo Longoria Hernández tendrán la opción de disponer en su calidad de FIDEICOMISARIOS EN SEGUNDO LUGAR, del 25% (veinticinco porciento) que le correspondería a Alejandra Michelle Longoria Hernández y Sophia Longoria Zygmont, contra la entrega en efectivo de dicho 25% en su favor, de acuerdo al valor de las EMPRESAS calculado en términos de la cláusula Décima Primera. Dicha opción será ejercida de la siguiente manera:

a). La opción de los FIDEICOMISARIOS EN SEGUNDO LUGAR, Eduardo y Bernardo Longoria Kowalski para recibir del presente fideicomiso el 25% (veinticinco porciento) que le correspondería a Alejandra Michelle Longoria Hernández y Sophia Longoria Zygmont, es otorgada en forma automática y solo podrán ejercerla a más tardar dentro del primer año calendario siguiente al del fallecimiento de Eduardo Longoria Kowalski. En caso de no querer ejercerla, deberán de notificar por escrito de tal intención tanto al FIDUCIARIO como a Alejandra Michelle Longoria Hernández y Sophia Longoria Zygmont, en cuyo caso éstas tendrán derecho a su 25% (veinticinco porciento) de las ACCIONES, esto último también ocurrirá tanto en caso de que notifiquen su intención de no ejercitar dicha opción, así como en el caso de que no ejerciten la opción dentro del plazo antes señalado.

11

CONFIDENTIAL

SLONGORIA 000182

01200





ALEZ MENDOZA
No. 97
edo, Tam.

b). La determinación del valor del 25% (veinticinco porciento) que les corresponda a Alejandra Michelle Longoria Hernández y Sophia Longoria Zygmont se efectuará a la fecha de fallecimiento del **FIDEICOMISARIO EN PRIMER LUGAR**, Eduardo Longoria Kowalski, de acuerdo al procedimiento de valuación establecido en la cláusula Décima Primera.

c). Una vez determinado el valor del 25% (veinticinco porciento) en términos del inciso anterior, Eduardo y Bernardo Longoria Kowalski entregarán dicho valor a Alejandra Michelle Longoria Hernández y Sophia Longoria Zygmont en un plazo de 10 (diez) años con un interés del 7% (siete) porciento anual, en dólares de los Estados Unidos de América.

d). El primer pago deberá ser a más tardar en el primer aniversario del fallecimiento del **FIDEICOMISARIO EN PRIMER LUGAR**, Eduardo Longoria Kowalski y así sucesivamente cada año hasta cubrir totalmente la cantidad establecida en el plazo de 10 (diez) años.

e). Conforme se vaya realizando cada pago, se entenderá liberadas las **ACCIONES** correspondientes a favor de Eduardo y Bernardo Longoria Hernández en partes iguales.

f). En tanto se esté cumpliendo con las entregas a favor de Alejandra Michelle Longoria Hernández y Sophia Longoria Zygmont en los términos apuntados en los incisos anteriores, el ejercicio de los derechos patrimoniales y corporativos de las **ACCIONES** que les corresponden a éstas (25%), serán ejercidos en su totalidad por Eduardo y Bernardo Longoria Hernández en partes iguales en su calidad de **FIDEICOMISARIOS EN SEGUNDO LUGAR**. En caso de incumplimiento en más de 2 (dos) pagos consecutivos a Alejandra Michelle Longoria Hernández y Sophia Longoria Zygmont, éstas tendrán derecho al remanente de las **ACCIONES** no cubiertas y podrán por lo tanto ejercer sus derechos patrimoniales y corporativos derivados de dichas **ACCIONES**, en los términos previstos en este contrato.

g) Queda expresamente establecida la obligación de notificar al **FIDUCIARIO** del ejercicio de la opción establecida en el punto 2 anterior, o bien, de la decisión de no ejercicio de

12

CONFIDENTIAL

SLONGORIA 000183

01201



la misma; así como del incumplimiento en cualquiera de los pagos a cargo de Eduardo y Bernardo Longoria Hernández o bien, del cumplimiento total de la obligación de pago, a fin de que el FIDUCIARIO esté en posibilidad de reasignar los derechos de Fideicomisario de acuerdo a lo previsto en este punto. Salvo acuerdo expreso entre las partes interesadas, en caso de que por cualquier causa no se ejerza la opción dentro del primer año calendario siguiente al del fallecimiento de Eduardo Longoria Kowalski, la opción se tendrá por no ejercida y el FIDUCIARIO asignará definitivamente a Alejandra Michelle Longoria Hernández y Sophia Longoria Zygmont, el porcentaje de participación de los derechos de Fideicomisario de conformidad con lo establecido en el punto 1-uno de esta misma cláusula.

3. OBLIGACIONES A CARGO DE LOS FIDEICOMISARIOS EN SEGUNDO LUGAR.- Solamente en el caso de que los FIDEICOMISARIOS EN SEGUNDO LUGAR, Eduardo y Bernardo Longoria Hernández, no ejerzan la opción de recibir el 25% (veinticinco porciento) de las ACCIONES de Alejandra Michelle Longoria Hernández y Sophia Longoria Zygmont, lo cual deberán hacer del conocimiento del FIDUCIARIO, los FIDEICOMISARIOS EN SEGUNDO LUGAR deberán entregar directamente y sin intervención del FIDUCIARIO, la cantidad de US$100,000.00 (cien mil dólares de los Estados Unidos de América) a Sophia Longoria Zygmont a efecto de que ésta realice sus estudios universitarios. Dicha cantidad será entregada a su madre Colette Zygmont, para que ella la administre en beneficio de Sophia Longoria Zygmont.

El FIDUCIARIO podrá con la autorización expresa del Comité Técnico y con cargo al patrimonio líquido del Fideicomiso y hasta donde el mismo alcance, y una vez que le sea notificado el no ejercicio de la opción por parte de los FIDEICOMISARIOS EN SEGUNDO LUGAR o bien, en caso de que la opción se tuviera por no ejercida por haber transcurrido el plazo para ello, entregar la cantidad antes indicada, en la forma y términos establecidos en el párrafo anterior, sin responsabilidad alguna por el destino real que se le llegue a dar a dicha cantidad. El FIDUCIARIO no asume responsabilidad alguna por la imposibilidad de cumplir con este fin en razón de no existir fondos líquidos para cubrir la cantidad o bien, en caso de que éstos fueran insuficientes, en cuyo caso podrá hacer pago parcial.

13

CONFIDENTIAL

SLONGORIA 000184

01202



OCTAVA. ADMINISTRACIÓN DE LAS EMPRESAS.- Las ACCIONES que forman parte del patrimonio del presente Fideicomiso corresponden a EMPRESAS que se encuentran operando diversos negocios mercantiles e inmobiliarios de diversa índole, ya sea directamente o través dé empresas subsidiarias. La administración de dichos negocios a la fecha la ha llevado Shelby Luis Longoria Kowalski, quien continuará haciéndolo durante la vigencia del presente Fideicomiso, o en los términos y condiciones que las asambleas de accionistas lo acuerde. En este sentido, Shelby Luis Longoria Kowalski fungirá como Administrador Único o Presidente del Consejo de las EMPRESAS y sus subsidiarias.

En caso de fallecimiento o incapacidad de cualquiera de los dos FIDEICOMISARIOS EN PRIMER LUGAR, Eduardo o Shelby Luis Longoria Kowalski, la administración de las EMPRESAS y sus subsidiarias pasará a manos de un Comité Ejecutivo en términos de la cláusula siguiente, el cual entrará en funciones temporalmente hasta que se determine la administración definitiva de las EMPRESAS y sus subsidiarias, o en su caso, la separación de los socios, en términos de las cláusulas Novena y Décima.

En el evento de fallecimiento o incapacidad de Eduardo o Shelby Luis Longoria Kowalski, el Comité Técnico instruirá lo conducente a fin de llamar inmediatamente a una asamblea de accionistas de las EMPRESAS y sus subsidiaria cuyas acciones son materia del presente Fideicomiso, a efecto de llevar a cabo la integración del Comité Ejecutivo a que se refiere la cláusula siguiente, y en su caso de así considerarlo necesario, se les otorgue poderes de administración suficientes llevar a cabo su función.

El fallecimiento de Eduardo o Shelby Luis Longoria Kowalski se acreditará mediante el acta de defunción correspondiente. En caso de incapacidad, ésta será determinada por el Comité Técnico con el voto unánime de sus miembros, tomando como base la opinión por escrito de 3-tres médicos particulares que así lo determine. Los 3-tres médicos antes mencionados serán elegidos por el propio Comité Técnico sin intervención ni responsabilidad alguna para el FIDUCIARIO, quien solo tendrá la obligación de recibir la comunicación escrita por parte del Comité Técnico en la que se determine la incapacidad. Cuando el FIDUCIARIO obre de acuerdo a las instrucciones del Comité Técnico no incurrirá en responsabilidad alguna de conformidad con lo establecido en el artículo 80 de la ley de Instituciones de Crédito.

14

CONFIDENTIAL

SLONGORIA 000185

01203



B A N C A
AFIRME

**NOVENA. ADMINISTRACIÓN DE LAS EMPRESAS A TRAVÉS DE UN COMITÉ EJECUTIVO.-** En caso de fallecimiento o incapacidad de Eduardo o Shelby Luis Longoria Kowalski, la administración de las EMPRESAS pasará a manos de un Comité Ejecutivo de acuerdo a lo siguiente:

(i) El Comité Ejecutivo estará integrado por seis (6) miembros con sus respectivos suplentes. Cada miembro del Comité Ejecutivo será responsable de una de las áreas de negocio del grupo de EMPRESAS. En este acto el FIDEICOMITENTE designa a los siguientes miembros del Comité Ejecutivo:

| Titular | Suplentes | Area de Negocio |
|---|---|---|
| Eduardo Longoria Kowalski | Eduardo Longoria Hernández | Dirección General |
| Shelby Luis Longoria Kowalski | Enriqueta Chapa de Longoria | Dirección General |
| Rafael de Jesús Carbajal Galindo | Marta B. Montelongo Garza | Inmobiliario |
| Saúl Garza Molina | Néstor E. Sánchez | Automotriz |
| Edilio Luis Madrigal Cepeda | Marco Antonio Torres Garza | Industrial |
| Raúl Jesús Ramírez Vela | Hugo R. Jiménez Vázquez | Restaurantes |

Se designa como Presidente del Comité Ejecutivo en caso de fallecimiento o incapacidad de Eduardo Longoria Kowalski, a Shelby Luis Longoria Kowalski. En caso de fallecimiento o incapacidad de Shelby Luis Longoria Kowalski, fungirá como Presidente del Comité Ejecutivo Eduardo Longoria Kowalski.

En caso de renuncia, incapacidad o fallecimiento del presidente designado en los términos del párrafo anterior, fungirá como presidente su respectivo suplente.

(ii) El Presidente del Comité Ejecutivo tendrá voto de calidad en caso de empate.

(iii) El Comité Ejecutivo se encargará de las operaciones de las EMPRESAS y sus subsidiarias y deberá rendir cuentas al Comité Técnico del presente Fideicomiso.

(iv) El Comité Ejecutivo sólo podrá celebrar actos de administración sin que pueda disponer de bienes, activos o

15

CONFIDENTIAL

SLONGORIA 000186

01204



**B A N C A**
**AFIRME**

derechos de las EMPRESAS o sus subsidiarias, a menos que se lo indique el Comité Técnico.

(v) El Comité Ejecutivo deberá continuar las operaciones normales de las EMPRESAS y sus subsidiarias tal y como se venían operando con anterioridad, procurando en todo momento no poner en riesgo a las mismas y cumpliendo con las disposiciones legales aplicables a cada una de ellas.

MENDOZA (vi) El Comité Ejecutivo se reunirá cada lunes a efecto de tomar
No. 97 decisiones en conjunto respecto a cada asunto por tratar.
Tam. Cada miembro responsable de un área de negocio presentará el plan de trabajo a seguir por la semana, el cual será aprobado por el resto de los integrantes del Comité Ejecutivo. De cada reunión se levantará una minuta que será firmada por los asistentes. A cada junta del Comité Ejecutivo podrán asistir los FIDEICOMISARIOS, o sus representantes, quienes tendrán derecho a opinar, más no a votar.

(vii) El Comité Ejecutivo presentará un informe mensual al Comité Técnico de las operaciones de las EMPRESAS y sus subsidiarias, anexando las minutas de cada junta. Dicho informe se presentará en una junta convocada para tal efecto dentro de los primeros 15 -quince- días de cada mes. A cada junta podrán asistir los FIDEICOMISARIOS, o sus representantes, quienes tendrán derecho a opinar, más no a votar.

(viii) El informe a que se refiere el punto anterior deberá contener cuando menos un desglose de los ingresos y egresos de cada una de las EMPRESAS y sus subsidiarias, balance general, estado de pérdidas y ganancias, estado de origen y aplicación de recursos y flujo de efectivo.

(ix) El Comité Ejecutivo podrá apoyarse en asesores externos para la toma de decisiones. Igualmente, dichos asesores podrán asistir a las juntas que el propio Comité estime convenientes.

(x) El Comité Técnico podrá libremente remover a los miembros del Comité Ejecutivo en caso de considerarlo necesario bajo los términos establecidos en la cláusula Décima Tercera.

16

**CONFIDENTIAL**

**SLONGORIA 000187**

**01205**



Igualmente en caso de considerarlo necesario, podrá designar un auditor externo que audite a las EMPRESAS.

Queda expresamente establecido y consentido por las partes que en este contrato que intervienen, que el FIDUCIARIO adquiere la titularidad de las ACCIONES objeto del presente Fideicomiso y solo estará obligada a otorgar los poderes que resulten necesarios para el ejercicio de los derechos inherentes a las mismas, a favor de la o las personas que al efecto determine el Comité Técnico, así como cumplir con las instrucciones que en su caso le dicte el Comité Técnico en este sentido, por lo que las partes expresamente y sin reserva alguna, desde este momento, relevan al FIDUCIARIO de cualquier responsabilidad u obligación de ejercer por sí los derechos corporativos inherentes a las ACCIONES, así como de la forma, sentido y términos en que el apoderado que se designe represente y vote las ACCIONES en asambleas, así como en el caso de que los términos y condiciones que el FIDEICOMITENTE establece en esta cláusula así como en la cláusula octava anterior y décima de este Fideicomiso no se llevaran a cabo total o parcialmente.

Los lineamientos establecidos en la cláusula octava así como en la presente cláusula se realizan por el FIDEICOMITENTE para ser observados exclusivamente por los integrantes del Comité Técnico, sin intervención, responsabilidad u obligación alguna para el FIDUCIARIO, en la inteligencia de que el acuerdo que aquí se establece deberá ser observado también, en su momento, por los FIDEICOMISARIOS.

DÉCIMA. SEPARACIÓN DE LOS SOCIOS.- Al fallecer o encontrarse en estado de incapacidad cualquiera de los FIDEICOMISARIOS EN PRIMER LUGAR, el FIDEICOMISARIO EN PRIMER LUGAR que sobreviva, juntamente con los FIDEICOMISARIOS EN SEGUNDO LUGAR, o sus representantes, tendrán la opción de continuar con la sociedad en las EMPRESAS o separarse como socios, quedándose cada uno de ellos con diferentes EMPRESAS en base a su valor calculado de acuerdo a la cláusula Décima Primera siguiente. El acuerdo de separación se llevará conforme a lo siguiente:

(i) Para efectos de la separación se consideran dos grupos, uno por cada familia de los FIDEICOMISARIOS EN PRIMER LUGAR.

(ii) En caso de fallecimiento de Shelby Luis Longoria Kowalski, y toda vez que los FIDEICOMISARIOS EN SEGUNDO LUGAR designados

17

CONFIDENTIAL

SLONGORIA 000188

01206



en su lugar (esposa e hijos), no participan en la administración de los negocios operando, ni gozan de la experiencia para manejarlos, para efectos de 'la presente cláusula los FIDEICOMISARIOS EN SEGUNDO LUGAR de Shelby Luis Longoria Kowalski tendrán preferencia sobre los negocios inmobiliarios en el proceso de separación.

(iii) En todo caso se buscará que la separación de los socios se lleve con justicia y equidad en cuanto al valor de las EMPRESAS. El valor de las empresas será determinado de acuerdo al proceso indicado en la cláusula siguiente.

Los lineamientos establecidos en esta cláusula se realizan por el FIDEICOMITENTE para ser observados exclusivamente por los integrantes del Comité Técnico, sin intervención; responsabilidad u obligación alguna para el FIDUCIARIO, en la inteligencia de que el acuerdo que aquí se establece deberá ser observado también, en su momento, por los FIDEICOMISARIOS.

DÉCIMA PRIMERA. VALUACIÓN DE LAS EMPRESAS.- Para efectos de determinar el valor de las EMPRESAS y sus subsidiarias, estas serán valuadas por 2 (dos) peritos valuadores expertos en la materia, independientes y externos de las partes que a efecto determine y elija el Comité Técnico. Los peritos valuaran a cada EMPRESA y sus subsidiarias utilizando el mismo método de valuación. En caso de existir una diferencia menor del 10% (diez) en los valores presentados por los peritos, se tomará como valor real, el promedio de las dos valuaciones. En caso de existir diferencias de más del 10% (diez porciento) en los valores presentados por los peritos, se designará un tercer perito valuador, quien practicará un tercer avalúo. De los tres avalúos practicados, se tomará como valor el promedio de los dos avalúos más cercanos.

El resultado de la valuación efectuada será notificado al FIDUCIARIO a través del Comité Técnico.

DÉCIMA SEGUNDA. FORMA DE INVERSIÓN.- Los recursos en numerario que integren el patrimonio de este fideicomiso se invertirán por el FIDUCIARIO conforme a las instrucciones que por escrito le remita el Comité Técnico, en el entendido que a falta de las instrucciones correspondientes, el FIDUCIARIO invertirá, administrará y custodiará en forma discrecional el patrimonio.

18

SLONGORIA 000189

01207



fideicomitido en cualquiera de los instrumentos, títulos, valores o documentos que a continuación se indican:

a). Instrumentos de deuda o instrumentos del mercado de dinero.
b). Sociedades de Inversión en instrumentos de deuda.
c). En cualquier otro instrumento, título o documento, que durante la vigencia de este contrato y posterior a la firma del mismo, aparezcan en el mercado con las características mencionadas anteriormente.

Los instrumentos, títulos, valores o documentos en que se realice la inversión podrán estar inscritos o no en el Registro Nacional de Valores e Intermediarios, no debiendo adquirirse papel comercial sin aval bancario.

El FIDEICOMITENTE libera de toda responsabilidad en este acto al FIDUCIARIO por cualquier menoscabo que pudieren derivar de la minusvalía o suspensión de la cotización de los valores, títulos o documentos adquiridos al amparo del contrato de inversión cuya celebración se realice para la inversión del patrimonio fideicomitido; y que en su caso genere daños y perjuicios o que sean consecuencia de la suspensión de pagos, quiebra o incumplimiento del (los) emisor (es), así como por el tipo de operación realizada conforme al contrato de inversión y su Política de Inversión, cualesquiera que ésta sea, así como del tipo de valores, títulos o documentos asignados.

Asimismo el FIDEICOMITENTE no se reserva acción o derecho, presente o futuro que ejercitar en contra de Banca Afirme, S.A., Institución de Banca Múltiple, Afirme Grupo Financiero, por la celebración del referido contrato de inversión.

El FIDUCIARIO no será responsable de los menoscabos cuando actúe de conformidad con lo que establece el artículo 391 de la Ley General de Títulos y Operaciones de Crédito.

DÉCIMA TERCERA. COMITÉ TÉCNICO.- De conformidad con el artículo 80 de la Ley de Instituciones de Crédito, el FIDEICOMITENTE constituya un Comité Técnico y dará al FIDUCIARIO las instrucciones que procedan en los casos previstos en este Fideicomiso.

19

CONFIDENTIAL

SLONGORIA 000190

01208



El Comité Técnico estará integrado por -tres- (3) miembros propietarios con sus respectivos suplentes, quienes son designados en este acto por el FIDEICOMITENTE de la siguiente manera:

| Miembros Propietarios | Miembros Suplentes |
|---|---|
| Shelby Luis Longoria Kowalski | Marta Beatriz Montelongo Garza |
| Enriqueta Chapa Farias | Rebeca Ortiz |
| Eduardo Longoria Kowalski | Eduardo Longoria Hernández |

1. En la toma de sus decisiones de acuerdo a las facultades a que se refiere la presente cláusula, el Comité Técnico deberá en todo momento respetar y cumplir los derechos de los FIDEICOMISARIOS en términos del presente Fideicomiso, asimismo deberá observar en lo que le corresponda, lo establecido en las cláusulas octava, novena y décima de este Fideicomiso, so pena de incurrir en responsabilidad personal.

2. La designación de miembros del Comité Técnico que en este acto realiza el FIDEICOMITENTE se efectúa con base en lo siguiente: en todo momento el Comité Técnico deberá estar integrado por dos (2) miembros y sus respectivos suplentes correspondiente al FIDEICOMISARIO EN PRIMER LUGAR Shelby Luis Longoria Kowalski, designándose en consecuencia a Shelby Luis Longoria Kowalski, y su respectivo suplente, y Enriqueta Chapa Farías de Longoria, y su respectivo suplente. Asimismo, el Comité Técnico deberá estar integrado por un (1) miembro y su respectivo suplente, correspondiente al FIDEICOMISARIO EN PRIMER LUGAR Eduardo Longoria Kowalski, designándose en consecuencia a Eduardo Longoria Kowalski, y su respectivo suplente.

3. En ausencia definitiva o incapacidad del FIDEICOMITENTE, los FIDEICOMISARIOS EN PRIMER LUGAR, o en su caso sus respectivos FIDEICOMISARIOS EN SEGUNDO LUGAR, podrán designar, revocar o cambiar a los miembros del Comité Técnico que le correspondan de acuerdo al punto anterior, mediante comunicado que por escrito dirijan al FIDUCIARIO en la que se haga constar el nombre y firma de los integrantes del Comité Técnico, así como la aceptación del cargo que se les confiere.

4. El Comité Técnico sesionará válidamente al reunirse la mayoría de sus miembros propietarios o sus respectivos suplentes y sus decisiones se tomarán y serán válidas únicamente por mayoría de votos.

*20*

CONFIDENTIAL

SLONGORIA 000191

01209



**BANCA AFIRME**

ZALEZ MENDOZA
olico No. 97
Tam.

5. El nombramiento de los miembros del Comité Técnico es de carácter honorífico, por lo que no tendrán derecho a percibir retribución alguna por su desempeño.

6. En caso de ausencia, incapacidad, muerte o renuncia de alguno de los miembros del Comité Técnico, éste será sustituido por la persona que designe el FIDEICOMISARIO EN PRIMER LUGAR que corresponda.

7. El Comité Técnico deberá reunirse cada vez que se requiera y de dichas reuniones se deberá levantar un acta en la que se consignen los acuerdos tomados. Las reuniones del Comité Técnico deberán ser en la ciudad de Reynosa, Tamaulipas, pudiendo reunirse en otro lugar en México o en el extranjero si así lo acuerdan por mayoría.

8. Las convocatorias para las reuniones del Comité Técnico podrán ser realizadas por cualquiera de sus integrantes, mediante carta con acuse de recibo, telegrama dirigido al resto de los miembros propietarios y suplentes del Comité Técnico, por correo electrónico debiendo confirmar el receptor su recepción o cualquier otra forma que acredite fehacientemente que los miembros han sido notificados, con una anticipación de por lo menos 5-cinco días naturales a la fecha de la reunión convocada, adjuntando la orden del día que sea objeto de la reunión. Las reuniones del Comité Técnico se efectuarán en la fecha, hora y domicilio señalado en la propia convocatoria. En caso de que cualquiera de los miembros del Comité no asista a la reunión y por tal motivo no se pueda tomar una decisión al respecto, se llevará a cabo una segunda convocatoria para reunirse a los 3 (tres) días hábiles siguientes; en caso de inasistencia se llevará a cabo una tercer convocatoria para reunirse el día hábil siguiente. En cualquiera de los casos anteriores, se requerirá de la mayoría los miembros del Comité Técnico para la toma de decisiones.

9. En el caso de encontrarse reunidos la mayoría de los miembros propietarios o sus respectivos suplentes del Comité Técnico podrá sesionar y sus acuerdos serán válidos, sin necesidad de convocatoria alguna.

10. El Comité Técnico tendrá las facultades que se establecen en este Contrato, inclusive la de modificar o dar por terminado el

21

**CONFIDENTIAL**

**SLONGORIA 000192**

**01210**



MENDOZA
o No. 97
), Tam.

presente Fideicomiso, facultades que en este acto el FIDEICOMITENTE le confiere expresamente.

11. En cada reunión del Comité Técnico podrá comparecer un representante del FIDUCIARIO, quien participará con voz pero sin voto.

12. El FIDUCIARIO quedará libre de toda responsabilidad, cuando actúe ajustándose a las instrucciones o acuerdos adoptados por el Comité Técnico.

13. El Comité Técnico se reunirá cuando lo considere necesario, mediante la convocatoria realizada de acuerdo a los puntos 7. y 8. anteriores.

14. En caso de que estuviere en operaciones el Comité Ejecutivo, El Comité Técnico se reunirá mensualmente dentro de los primeros 15 (quince) días de cada mes, para revisar y discutir el informe que presentará el Comité Ejecutivo.

DECIMA CUARTA. POLÍTICAS Y REGLAS DE COMPORTAMIENTO PARA EL COMITÉ TÉCNICO Y COMITÉ EJECUTIVO.- Los integrantes del Comité Técnico y del Comité Ejecutivo deberán actuar en todo momento tomando en consideración que ambos FIDEICOMISARIOS EN PRIMER LUGAR, y en su caso sus respectivos FIDEICOMISARIOS EN SEGUNDO LUGAR, reciban en todo momento trato justo y equitativo entre ellos, ya que el objetivo del presente instrumento es que cada quien tenga derecho o sea titular de los bienes fideicomitidos en las proporciones establecidas. Por tal motivo en caso de alguna duda, controversia o cualquier decisión que tengan que tomar, se deberá hacer tomando en cuenta siempre en primer lugar bajo el citado principio de equidad e igualdad.

De igual manera, cualquier acción que tome el Comité Técnico deberá ser siempre en beneficio de los FIDEICOMISARIOS.

Los Comités mencionados podrán apoyarse en la opinión de expertos asesores para la toma de decisiones.

DECIMA QUINTA. JURISDICCIÓN Y LEGISLACIÓN MEXICANA.- El presente Fideicomiso se establece bajo la jurisdicción de los Estados Unidos Mexicanos, participando en él ciudadanos mexicanos, sobre

22

SLONGORIA 000193

01211



bienes ubicados dentro del territorio nacional. Por tal motivo, el presente Fideicomiso, el **FIDEICOMITENTE** y los **FIDEICOMISARIOS** se someten exclusivamente a las leyes de México, por lo que las partes renuncian expresamente a la aplicación de cualquier Ley, reglamento, disposición o norma de otra jurisdicción diferente a la mexicana, que pudiere corresponderle. por motivo de su residencia, paternidad, ciudadanía, domicilio, parentesco o relación comercial, presente o futura por lo que en caso de interpretación, controversia o cualquier aspecto relacionado con el presente Fideicomiso, se someten expresamente a los tribunales de la ciudad de Reynosa, Tamaulipas, México.

De igual manera, la emisión de cualquier Ley, reglamento o disposiciones en jurisdicciones fuera de la República Mexicana, o cualquier acto realizado fuera del territorio nacional ya sea por el **FIDEICOMITENTE**, **FIDEICOMISARIOS**, o cualquier persona relacionada o que tenga relación con el Fideicomiso, o miembros del Comité Técnico, o Comité Ejecutivo, que pretenda (i) imponer restricciones al presente Fideicomiso, imponer la realización de actos diversos a los fines para los que está autorizado, o pretenda cambiar o afectar el control del Fideicomiso por parte del **FIDEICOMITENTE**, **FIDEICOMISARIOS** o del Comité Técnico; (ii) que pretenda imponer impuestos, derechos o cargas tributarias diferentes a las previstas en la Legislación Mexicana; (iii) que pretenda expropiar, limitar, confiscar, embargar, disponer, congelar o de cualquier forma afectar el patrimonio del Fideicomiso en base a disposiciones legales, tanto federales, estatales o municipales, fuera de la jurisdicción de la República Mexicana, no es ni será aplicable al presente Fideicomiso, debiendo en todo caso aplicarse la jurisdicción y legislación de la República de los Estados Unidos Mexicanos en términos del párrafo anterior.

**DECIMA SEXTA.** MANIFESTACIÓN DEFINITIVA DE LA VOLUNTAD.- Tanto el **FIDEICOMITENTE** como los **FIDEICOMISARIOS** del presente Fideicomiso manifiestan que el presente contrato es la voluntad final y definitiva de las partes, por lo que están conformes en todos sus términos, manifestando además que no existe error, dolo, mala fe o cualquier vicio de la voluntad que pudiere afectar su entendimiento o decisión respecto al contenido del mismo.

23

CONFIDENTIAL

SLONGORIA 000194

01212



**DÉCIMA SÉPTIMA. MODIFICACIONES DEL FIDEICOMISO.-** El presente contrato podrá darse por terminado o modificarse únicamente previo acuerdo e instrucción del Comité Técnico y el FIDUCIARIO, mediante la suscripción del convenio correspondiente.

**DECIMA OCTAVA. CLÁUSULA DE NO AFECTACION.-** Para todos los efectos legales a que hubiere lugar, y en base a la propia naturaleza del presente Fideicomiso, ningún FIDEICOMISARIO o beneficiario del mismo, tendrá derecho alguno sobre parte o la totalidad del patrimonio del presente Fideicomiso, hasta en tanto se haya distribuido el patrimonio del Fideicomiso, mediante su ejecución parcial o total a favor del FIDEICOMISARIO correspondiente. En ningún caso, ningún FIDEICOMISARIO o beneficiario del fideicomiso tendrá el derecho de transferir, asignar, gravar, hipotecar, o afectar sus derechos o intereses aquí contenidos, ya sean presentes o futuros; de igual manera, no será el presente Fideicomiso, ni los intereses o derechos de cualquier FIDEICOMISARIO o beneficiario, sujeto a reclamos o demandas de sus acreedores o de los acreedores del FIDEICOMITENTE, ni serán sujetos a gravamen, embargo, ejecución de ningún proceso de Ley.

Tanto los ingresos generados como el patrimonio mismo del Fideicomiso, no podrán ser sujetos a prenda, embargo, garantía, transferencia o venta, o de cualquier manera ser comprometidos o afectados por cualquier FIDEICOMISARIO o beneficiario; ni será el patrimonio ni cualquier ingreso derivado del presente Fideicomiso en cualquier manera sujeto o afectado por actos, deudas, contratos o cualquier otro acto de cualquier FIDEICOMISARIO o beneficiario o del FIDEICOMITENTE o por cualquier reclamo de alimentos o manutención de cualquier FIDEICOMISARIO o beneficiario, o del propio FIDEICOMITENTE, o derivado de cualquier acuerdo de separación, ni será sujeto a cualquier cesión u otro acto voluntario o involuntario de disposición o afectación derivado de un proceso legal, previo a la distribución del patrimonio de Fideicomiso mediante la ejecución de parcial o total del Fideicomiso a favor del FIDEICOMISARIO correspondiente.

En los casos de que a algún FIDEICOMISARIO o beneficiario se le haya otorgado algún derecho bajo el amparo del presente Fideicomiso, y mientras tanto no se haya ejecutado parcialmente el presente el mismo en su favor, el FIDUCIARIO continuará conservando la propiedad del patrimonio de dicho FIDEICOMISARIO o beneficiario.

24

SLONGORIA 000195

01213



DÉCIMA NOVENA. VALIDEZ DE LOS TÍTULOS DE PROPIEDAD.- El FIDUCIARIO adquiere la propiedad de los bienes y derechos que integran el patrimonio fideicomitido, en base a los títulos representativos de las ACCIONES que en este acto le son entregados por el FIDEICOMITENTE, y consecuentemente no será responsable en forma alguna ni frente a los FIDEICOMISARIOS ni frente a terceros, incluyendo aquéllos en cuyo favor se llegue a transmitir parte o la totalidad del patrimonio fideicomitido, por defectos o vicios del título de propiedad correspondiente o por las impugnaciones que se hicieran a los derechos que amparen los mismos, responsabilidad que en todo caso asume el FIDEICOMITENTE.

VIGÉSIMA. SANEAMIENTO PARA EL CASO DE EVICCIÓN.- El FIDEICOMITENTE se obliga al saneamiento para el caso de evicción en términos de ley respecto a los bienes y derechos que hubiere aportado al patrimonio de este fideicomiso.

Cuando el FIDUCIARIO en cumplimiento a los fines de este contrato transmita parte o la totalidad del patrimonio fideicomitido, el FIDEICOMITENTE responderá al saneamiento para el caso de evicción en términos de ley, facultando en este acto al FIDUCIARIO para obligarlo en dichos términos ante las personas físicas o morales a quienes conforme a este contrato se les trasmita parte o la totalidad del patrimonio fideicomitido.

VIGÉSIMA PRIMERA. RESPONSABILIDAD DEL FIDUCIARIO.- Cuando el FIDUCIARIO actúa en cumplimiento a las instrucciones del Comité Técnico, estará libre de toda responsabilidad en los términos de lo dispuesto en el artículo 80 (ochenta) de la Ley de Instituciones de Crédito.

El FIDUCIARIO no es responsable de hechos, actos, ni observancias u omisiones de las partes contratantes, o de terceras personas o autoridades, anteriores o posteriores a esta fecha, ni de actos jurídicos en los que no haya intervenido directamente o interpretaciones de autoridades o cambios en torno a la legislación vigente, que dificulten contraríen, impidan o sancionen el cumplimiento de sus funciones o la validez del presente Fideicomiso, siendo a cargo del FIDEICOMITENTE todas las consecuencias legales de lo anterior, no siendo responsable asimismo el FIDUCIARIO del destino final que se le de a las

25

CONFIDENTIAL

SLONGORIA 000196

01214



cantidades que entregue, ni a la entrega material de los bienes fideicomitidos que lleve a cabo en cumplimiento de las instrucciones giradas por el Comité Técnico.

El FIDUCIARIO no responde con su patrimonio en ningún evento y, sin excepción, de cualquier reclamación relacionada con el presente Fideicomiso proveniente de Autoridades o de terceros, será en última instancia con cargo al patrimonio fideicomitido, manifestando las partes su conformidad al respecto. El FIDUCIARIO no tiene a su cargo más obligaciones que las expresamente pactadas en este contrato o en la ley, dentro de las cuales no quedan incluidas las fiscales o laborales de ninguna índole.

El FIDUCIARIO no está obligado a ejercer por sí los derechos inherentes a las ACCIONES fideicomitidas, sólo estará obligada a expedir los poderes que resulten necesarios a favor de la o las personas que al efecto le indique el Comité Técnico, sin asumir responsabilidad alguna por el sentido, la forma y términos en que se voten las ACCIONES, ni por las consecuencias de haber ejercido el voto. Cuando el FIDUCIARIO no reciba instrucciones para otorgar los poderes en los términos de este párrafo, quedará liberada de cualquier responsabilidad que se derivara del inejercicio del derecho de voto.

El FIDUCIARIO no tendrá obligación ni responsabilidad de incidir, verificar o en forma alguna intervenir en las decisiones de administración de las EMPRESAS emisoras de las ACCIONES fideicomitidas.

*Al ser requerida, el FIDUCIARIO rendirá cuentas al tenor del artículo 84 (ochenta y cuatro) de la Ley de Instituciones de Crédito.*

VIGÉSIMA SEGUNDA. <u>OBLIGACIONES DEL FIDEICOMITENTE</u>.- El FIDEICOMITENTE y en su caso los FIDEICOMISARIOS EN PRIMER LUGAR y en SEGUNDO LUGAR se obligan a sacar en paz y a salvo y a restituir al FIDUCIARIO las cantidades que esta última hubiere erogado por concepto de acciones judiciales o extrajudiciales iniciadas por el FIDEICOMITENTE, y/o por terceros en contra de el FIDUCIARIO que pudieren afectar al FIDUCIARIO o a sus funcionarios, con motivo del presente contrato de fideicomiso.

26

CONFIDENTIAL

SLONGORIA 000197

01215

B A N C A
AFIRME

VIGÉSIMA TERCERA. FACULTADES DEL FIDUCIARIO.- El FIDUCIARIO administrará el patrimonio fideicomitido con las facultades y deberes que establecen los artículos 391 (trescientos noventa y uno) y demás relativos de la Ley General de Títulos y Operaciones de Crédito, y 84 (ochenta y cuatro) y demás aplicables de la Ley de Instituciones de Crédito.

VIGÉSIMA CUARTA. DEFENSA DEL PATRIMONIO FIDEICOMITIDO.- Cuando el FIDUCIARIO reciba alguna notificación de cualquier demanda judicial, requerimientos de alguna autoridad y en general cualquier aviso relacionado con el patrimonio del presente contrato, lo notificará por escrito al FIDEICOMITENTE o en su caso al Comité Técnico, a más tardar al día siguiente hábil de aquél en que hubiere recibido la notificación correspondiente.

El FIDEICOMITENTE o en su caso el Comité Técnico deberá instruir por escrito al FIDUCIARIO a más tardar al día siguiente hábil de aquél en que hubiere recibido la notificación a que se refiere el párrafo inmediato anterior de la presente cláusula, para que ésta otorgue el o los poderes necesarios a la persona o personas que al efecto hubiere designado el FIDEICOMITENTE o por el Comité Técnico, a efecto de que se aboquen al cuidado, conservación o defensa legal del patrimonio de este contrato.

El FIDUCIARIO no será responsable de las gestiones del apoderado, ni del pago de honorarios, gastos o costas que se deriven de los juicios respectivos, los cuales en todo caso serán con cargo al patrimonio fideicomitido. El FIDEICOMITENTE o en su caso el Comité Técnico podrá instruir al FIDUCIARIO para que con cargo al patrimonio fideicomitido se paguen los honorarios, gastos y en general cualesquier expensa derivada del cuidado, conservación o defensa del patrimonio de este contrato.

En todos los poderes para pleitos y cobranzas que se expidan por el FIDUCIARIO en los términos del presente fideicomiso, se deberá transcribir el contenido del párrafo inmediato anterior de la presente cláusula.

VIGÉSIMA QUINTA. INFORMES DEL FIDUCIARIO.- El FIDUCIARIO rendirá en forma mensual al FIDEICOMITENTE o en su caso al Comité Técnico, un informe respecto a las operaciones realizadas con el patrimonio fideicomitido.

27

CONFIDENTIAL

SLONGORIA 000198

01216





El **FIDEICOMITENTE** o en su caso el Comité Técnico gozará de un plazo de 15 quince días naturales contados a partir de la fecha de expedición del citado informe para realizar las observaciones o solicitar las aclaraciones que juzgue pertinentes, quedando establecido que en caso de que el **FIDEICOMITENTE** no realice observaciones o solicite aclaraciones dentro del plazo antes citado se entenderá que ha aprobado tácitamente el informe correspondiente.

**VIGÉSIMA SEXTA. DE LA RENUNCIA O SUSTITUCIÓN FIDUCIARIA.-** El **FIDUCIARIO** podrá renunciar al cargo conferido en el presente contrato por causas graves a juicio de un juez de primera instancia del lugar de su domicilio, conforme lo establece el artículo 391 de la Ley General de Títulos y Operaciones de Crédito.

EL **FIDEICOMITENTE** podrá en cualquier tiempo sustituir al **FIDUCIARIO**, pasando un aviso a ésta con veinte días hábiles de anticipación a la fecha en que se pretenda llevar a cabo dicha sustitución, a efecto de que prepare lo conducente para la formalización de la misma. Dicha sustitución del **FIDUCIARIO** podrá realizarse con otra u otras instituciones nacionales o extranjeras, siempre que tengan la capacidad legal para desempeñar el cargo. El **FIDUCIARIO** procederá a la sustitución fiduciaria previo el pago a su satisfacción de los gastos u honorarios que de conformidad a este contrato tenga derecho a percibir.

**VIGÉSIMA SÉPTIMA. IMPUESTOS.-** El **FIDUCIARIO** estará facultada en cualquier tiempo para cargar al patrimonio fideicomitido los impuestos que graven las operaciones que se realicen por medio de este fideicomiso, de tal forma que no se ponga en riesgo el cumplimiento de las obligaciones fiscales correspondientes.

Para el caso de que en cumplimiento a los fines de este contrato se realice la transmisión total o parcial de las ACCIONES que integran el patrimonio de este fideicomiso, se estará a lo dispuesto por la legislación fiscal aplicable.

**VIGÉSIMA OCTAVA. GASTOS Y HONORARIOS DE TERCEROS.-** Los gastos que se originen en cumplimiento de los fines de este contrato serán con cargo al patrimonio fideicomitido. EL **FIDUCIARIO** cargará al patrimonio fideicomitido los honorarios de terceros que hubiere contratado conforme a lo que establece el presente contrato y que

28

**SLONGORIA 000199**

01217



sean necesarios para el cuidado, conservación o defensa del patrimonio fideicomitido.

VIGÉSIMA NOVENA. DURACIÓN DEL FIDEICOMISO.- La duración de este fideicomiso, será la necesaria para la realización de sus fines y terminará por cualquiera de los supuestos previstos en el artículo 392 (trescientos noventa y dos) de la Ley General de Títulos y Operaciones de Crédito, que sean compatibles con la naturaleza y fines de este contrato, con excepción de la causal establecida en la fracción VI por no reservarse el FIDEICOMITENTE en forma expresa el derecho de revocar el presente Fideicomiso.

TRIGÉSIMA. HONORARIOS DEL FIDUCIARIO.- El FIDUCIARIO cobrará al FIDEICOMITENTE por el desempeño del cargo que aquí se le confiere, los siguientes honorarios:

a).- Por aceptación del cargo, estudio y elaboración del contrato de fideicomiso, la cantidad de $20,000.00 (veinte mil pesos 00/100 moneda nacional) pagaderos por única ocasión al momento de firma del contrato de fideicomiso.

b).- Por administración del fideicomiso la cantidad mensual de $5,000.00 (cinco mil pesos 00/100 M.N.) pagaderos por trimestres anticipados, y una vez ocurrido el evento de fallecimiento del FIDEICOMITENTE los honorarios vigentes a esa fecha por administración del fideicomiso se incrementarán en un 40% (cuarenta por ciento)

c).- Por firma de Convenios Modificatorios al Contrato de Fideicomiso, la cantidad de $6,000.00 (seis mil pesos 00/100 M.N.) pagaderos al momento de firma del Convenio correspondiente.

d).- Por otorgamiento de poderes y celebración de cualquier otro acto necesario para la consecución de los fines del fideicomiso, la cantidad de $3,000.00 (tres mil pesos 00/100 M.N.) pagaderos al momento de firma del instrumento correspondiente.

Los honorarios antes mencionados causas el Impuesto al Valor Agregado, de acuerdo a la ley de la materia, y se ajustarán en el mes de enero de cada año, de acuerdo al porcentaje de inflación verificado en el año anterior al ajuste y determinado por el Banco de México o el organismo que lo supla.

29

CONFIDENTIAL

SLONGORIA 000200

01218



BANCA
AFIRME

**ALEZ MENDOZA**
**Lic. No. 97**
**Tam.**

'TRIGÉSIMA PRIMERA. DOMICILIOS.- Las partes señalan como sus domicilios para cualquier aviso, notificación y en general para los efectos del presente fideicomiso los siguientes:

El FIDEICOMITENTE: Oaxaca No. 620, Col. Rodríguez. CP 88630. Reynosa, Tamaulipas, México.

El FIDUCIARIO: Avenida Hidalgo número 234 Poniente, Zona Centro. Monterrey, N.L. C.P. 64000 México.

El COMITÉ TÉCNICO: Oaxaca No. 620, Col. Rodríguez, CP 88630, Reynosa, Tamaulipas, México.

Cualquier cambio de domicilio deberá ser comunicado por escrito al FIDUCIARIO, en la inteligencia de que toda comunicación que esté dirigida al último domicilio señalado por las partes surtirá todos los efectos legales.

TRIGÉSIMA SEGUNDA. GASTOS, HONORARIOS, DERECHOS E IMPUESTOS.- Todos los gastos, honorarios, derechos e impuestos que se causen en cumplimiento de los fines de este fideicomiso, serán a cargo del FIDEICOMITENTE.

TRIGÉSIMA TERCERA. MANIFESTACIÓN DEFINITIVA DE LA VOLUNTAD.- Tanto el FIDEICOMITENTE como los FIDEICOMISARIOS del presente Fideicomiso manifiestan que el presente contrato es la voluntad final y definitiva de las partes, por lo que están conformes en todos sus términos, manifestando además que no existe error, dolo, mala fe o cualquier vicio de la voluntad que pudiere afectar su entendimiento o decisión respecto al contenido del mismo.

TRIGÉSIMA CUARTA. INDEMNIZACIÓN. El FIDEICOMITENTE y los FIDEICOMISARIOS EN PRIMER LUGAR se obligan a defender solidariamente y a sacar en paz y a salvo al FIDUCIARIO así como a sus consejeros, delegados fiduciarios, funcionarios, empleados, apoderados o asesores de toda y cualquier responsabilidad, daño, obligación, demanda, sentencia, transacción, requerimiento, gastos y/o costas de cualquier naturaleza, incluyendo los honorarios de abogados, que directa o indirectamente se hagan valer contra, como

30

SLONGORIA 000201

01219





EZ MENDOZA
No. 97
cia, Tams.

resultado de, impuesta sobre, o incurrida por, con motivo o como consecuencia de, actos realizados por el FIDUCIARIO para el cumplimiento de los fines consignados en este contrato de fideicomiso y la defensa del patrimonio fideicomitido o por reclamaciones, multas, penas y cualquier otro adeudo de cualquier naturaleza en relación con el patrimonio fideicomitido o con este contrato de fideicomiso, ya sea ante autoridades administrativas, judiciales, tribunales arbitrales o cualquier otra instancia, tanto de carácter local o federal así como de la República Mexicana o extranjeras.

En el caso que se genere cualquier situación de hecho o acto de autoridad, o consecuencia de índole legal, que produzca responsabilidades pecuniarias o sobre el Fideicomiso y/o el patrimonio del Fiduciario, que hubieren sido generados por actos u omisiones de las partes de este contrato de fideicomiso, por el FIDUCIARIO en cumplimiento de los fines del presente contrato o por terceros, incluyendo erogaciones relacionadas con los actos y conceptos que se mencionan el párrafo anterior, el pago derivado de dichas responsabilidades pecuniarias correrá solidariamente a cargo del FIDEICOMITENTE y en su caso de los FIDEICOMISARIOS EN PRIMER LUGAR, comprometiéndose a responder ilimitadamente con su propio patrimonio del pago que se hubiere efectuado o vaya a efectuar el FIDUCIARIO, renunciando a beneficios de orden o exclusión que pudieran corresponderles conforme a la ley. Asimismo, el FIDEICOMITENTE en este acto autoriza al FIDUCIARIO para que de las cantidades que integren el patrimonio fideicomitido, realice las aplicaciones para cumplir las obligaciones de pago derivadas de obligaciones pecuniarias que se le hubieren impuesto derivadas de los conceptos que se mencionan en el contenido de los dos párrafos de esta cláusula, en la inteligencia de que dichas aplicaciones por ningún motivo podrán ser equiparadas o asimiladas a los honorarios del Fiduciario que se establecen en este contrato.

La sola aceptación tácita o expresa de los derechos de FIDEICOMISARIO, implicarán la aceptación de las obligaciones que en esta cláusula se establecen para las partes.

TRIGÉSIMA QUINTA. JURISDICCIÓN.- Para la interpretación, cumplimiento y ejecución del presente contrato, las partes se someten expresamente a los tribunales competentes de la ciudad de Reynosa, Tamaulipas renunciando a cualquier otra jurisdicción,

31

CONFIDENTIAL

SLONGORIA 000202

01220



**B A N C A**
**AFIRME**

fuero o competencia que pudiera corresponderles en razón de su domicilio presente o futuro.

Se firma el presente instrumento en 3 (tres) tantos en original, el día de hoy 15 (quince) de octubre del 2002 (dos mil dos), ante la presencia de dos testigos, en la ciudad de Nuevo Laredo, Tamaulipas.

'NDOZA

_____
SR. EDUARDO LONGORIA THERIOT
FIDEICOMITENTE

FIDUCIARIA
BANCA AFIRME, S.A.
INSTITUCIÓN DE BANCA MÚLTIPLE,
AFIRME GRUPO FINANCIERO.
"División Fiduciaria"
Representada por:

_____        _____
LIC. ADRIAN JORGE LOZANO LOZANO          LIC. MARTHA BEATRIZ GARZA
DELEGADO FIDUCIARIO                                      LONGORIA
                                                                          DELEGADO FIDUCIARIO

_____        _____
TESTIGO                                                          TESTIGO
MARTA B. MONTELONGO GARZA                 PEDRO RAMÍREZ DE ALBA ALDAPE

32

CONFIDENTIAL

SLONGORIA 000203

01221

# EXHIBIT 3A

01222

[LOGO]: Banca Afirme

IRREVOCABLE TRUST AGREEMENT FOR ASSET MANAGEMENT ENTERED INTO BY MR. EDUARDO LONGORIA THERIOT, ACTING AS TRUSTOR, HEREINAFTER REFERRED TO AS "THE TRUSTOR"; AND BANCA AFIRME, S. A., A FULL-SERVICE BANKING INSTITUTION, AFIRME FINANCIAL GROUP, FIDUCIARY DIVISION, ACTING AS TRUSTEE, HEREINAFTER REFERRED TO AS "THE TRUSTEE" AND REPRESENTED BY ITS FIDUCIARY DELEGATES: LIC. ADRIAN JORGE LOZANO LOZANO AND LIC. MARTHA BEATRIZ GARZA LONGORIA. THIS LEGAL ACT IS SUBJECT TO THE FOLLOWING REPRESENTATIONS AND CLAUSES:

## REPRESENTATIONS

I. - Mr. Eduardo Longoria Theriot, acting in his capacity of TRUSTOR, represents that:

a) He is an individual, of Mexican nationality and with legal capacity to enter into this agreement.

b) He married to Ms. Dorothy Kowalski de Longoria, with whom he entered into matrimony in the city of Nuevo Laredo, Tamaulipas under a separate property system.

c) During his marriage to his wife, he fathered four children: Adriana, Eduardo, Silvia and Shelby Luis, all surnamed Longoria Kowalski. They are their only descendants.

d) He is the legitimate owner of the SHARES described hereinafter, issued by the companies also described hereinafter (hereinafter collectively referred to as the SHARES):

## SHARES

| Issuing entity | SERIES A | SERIES B | TOTAL |
|---|---|---|---|
| Vértice Empresarial, S. A. de C. V. | 50 | 684 | 734 |
| Inmuebles y Terrenos, S. A. de C. V. | 49.000 | 4.375.350 | 4.424.350 |

For purposes of this agreement, the companies that issued the SHARES will be referred to interchangeably as the "COMPANIES".

e) He has in his possession the certificates of the SHARES mentioned above, which are free of liens and encumbrances.

[LOGO]: Banca Afirme

f) It is his will to place all SHARES in trust, so that the TRUSTEE, pursuant to the terms of this agreement, may hold them in fiduciary ownership and use them in accordance with the stipulations of this agreement.

g) The TRUSTEE has unequivocally explained to him the value and legal consequences of the legal provision included in item b) of section XIX (nineteen in Roman numbers) of article 106 (one hundred and six) of the Credit Institutions Act, as well as the scope and content of this agreement.

II. - The TRUSTEE, through its Fiduciary Delegates, represents that:

a) They represent a legally established company, formed in accordance with Mexican laws, which is duly authorized to enter into fiduciary transactions.

b) It agrees to act as a fiduciary institution under the terms of this agreement.

c) They are the Fiduciary Delegates of Banca Afirme, S. A., a Full-Service Banking Institution, Afirme Financial Group, Fiduciary Division, and they have sufficient authority to sign this agreement, which has not been revoked nor modified in any way.

d) Pursuant to the provisions of item b) of section XIX (nineteen in Roman numbers) of article 106 (one hundred and six) of the Credit Institutions Law, the other parties have been provided with an unequivocal explanation of the value and legal consequences of that section, which states:

"Article 106. Credit Institutions may not:
XIX...

*b) Respond on behalf of trustors, principals or consignors for breach by debtors, for the credits granted or for the issuers, for the acquired values, unless as a result of wrongful acts, pursuant to the provisions of the final part of article 356 (now 391) of the Securities and Credit Transactions Law, or guarantee receipt of revenue on the invested funds.*

*If upon termination of the trust, mandate or commission established for granting credits, these have not been liquidated by the debtors, the institution will be required to transfer them to the trustor or trustee, as appropriate, or to the principal or consignor, refraining from covering the amount.*

*Any agreement contrary to the provisions of the previous two paragraphs will be null and void.*

*In trust, mandate or commission agreements, the above paragraphs of this section will be clearly inserted, together with a statement by the trustee, stating that he or she has*

[LOGO]: Banca Afirme

*unequivocally communicated its content to the person from whom he or she received assets to invest. "*

After reviewing the above provisions, the parties acknowledge that they are aware of the previous representations and hold all of them to be true. Therefore, it is their will to enter into this trust agreement, pursuant to the following:

CLAUSES

1. CREATION OF THE TRUST. - Mr. Eduardo Longoria Theriot, in his capacity of TRUSTOR, hereby transfers in trust to the TRUSTEE the ownership of the SHARES listed in item d) of Representation I of this agreement.

The TRUSTOR hereby physically gives the TRUSTEE the certificates of the SHARES held in trust, duly endorsed in favor of the TRUSTEE.

According to the terms of article 129 of the Law of Business Corporations, the TRUSTOR agrees to notify the Sole Director or the Secretary of the Board of Directors, as appropriate, of the issuing COMPANIES, regarding the transfer of SHARES to the Trust agreement described herein, in order to carry out the corresponding inscription in the Stock Ledger of such COMPANIES, sending the TRUSTEE the corresponding certificate within 30 (thirty) business days from the date of execution of this agreement. If the certification is not received from the Secretary of the Board, the TRUSTEE may request it directly.

At this time, the TRUSTEE receives the certificates covering the SHARES, duly endorsed, without assuming any liability for the authenticity and legitimacy of such certificates, or for any defect they may have. Consequently, the TRUSTOR is liable for the authenticity of the certificates and for the corresponding remedies in the case of dispossession. Moreover, the TRUSTEE hereby grants to the TRUSTOR the broadest receipt allowed by law.

The TRUSTEE hereby acknowledges acceptance of its position and agrees that it will faithfully and diligently perform its duties in accordance with the law.

2. PARTIES TO THE TRUST.- The parties to this Trust Agreement are the following:

| | |
|---|---|
| TRUSTOR: | Mr. Eduardo Longoria Theriot. |
| TRUSTEE: | Banca Afirme, S. A., A Full-Service Banking Institution, Afirme Financial Group, Fiduciary Division. |

Designation of BENEFICIARIES. The TRUSTOR hereby names the following persons as PRIMARY BENEFICIARIES, or alternates in the event of their death:

PRIMARY BENEFICIARIES:     Eduardo and Shelby Luis, both surnamed Longoria Kowalski, in the following proportions: (i) Shelby

[LOGO]: Banca Afirme

> Luis Longoria Kowalski with 60% (sixty percent) of the beneficiary rights derived from this Trust; and (ii) Eduardo Longoria Kowalski with 40% (forty percent) of the beneficiary rights derived from this Trust.

Likewise, if any of the PRIMARY BENEFICIARIES die at the time of or before receiving the benefits derived from this Agreement, the TRUSTOR appoints the following persons as SECONDARY BENEFICIARIES:

SECONDARY BENEFICIARIES: In the event of the death of either of the above, the children and spouses, as applicable, of the PRIMARY BENEFICIARIES, whose names are specified in Clause Five, items g) and i), Clause Six and Clause Seven.

For purposes of this agreement, Beneficiaries shall be referred to as BENEFICIARIES when referring to all beneficiaries in general; in specific cases, each beneficiary shall be named individually.

The TRUSTEE will keep an accounting record to accredit all PRIMARY BENEFICIARIES as beneficiaries of the Trust assets in the proportion corresponding to each beneficiary as specified in this clause. A sub-account will be opened for each party. The accounting record of SECONDARY BENEFICIARIES will be recorded in the sub-account corresponding to each of them.

3. TRUST ASSETS.– The following items constitute the material object of this agreement:

a. All SHARES described in item d) of Representation I of this agreement.

b. All future SHARES that may be added to the trust assets because they are purchased, because new SHARES have been issued or because of the exercise of ownership rights derived from the same SHARES; also all certificates received under the terms of a merger, demerger or transformation of any of the issuing entities that make up the patrimony of this agreement; and all SHARES purchased by the TRUSTOR representing the capital stock of other companies, if and when those issuing entities are Mexican companies.

c. Any other type of security or credit deed or company shares or properties that for any reason are added to the TRUST, to be covered by this agreement. In such case, under no circumstance shall the current assets be modified since the assets must always consist of securities traded on the Mexican stock exchange.

d. All dividends paid in cash, in SHARES or in other personal or real properties, from the contributed SHARES will also be incorporated into the trust assets.

e. All profits obtained from investments made by the TRUSTEE using cash resources included in the Trust assets.

f. Any additional contribution that the TRUSTOR may make in the future, either in cash, in kind, or in rights.

g. Any other contribution in cash, in kind or in rights, acquired by the Trust to achieve its stated purposes.

4. OBJECT OF THE TRUST.– This object of this Trust is to guarantee that the TRUSTEE will hold the ownership of all its SHARES under the terms of this agreement, so that subsequently, upon the death of the TRUSTOR, these SHARES may be inherited by the BENEFICIARIES under the terms and conditions set forth in this agreement.

5. PURPOSES OF THE TRUST.– The purposes of this Trust agreement include the following:

a. Guarantee that the TRUSTEE receives and holds ownership of all SHARES incorporated into this trust.

b. Guarantee that the TRUSTEE invests all cash resources incorporated into the trust assets, according to the stipulations of Clause Thirteen of this agreement.

c. Guarantee that the TRUSTEE exercises all corporate and ownership rights corresponding to the SHARES, including but not limited to the following: right to vote, to receive capitalized shares or dividends, to subscribe shares, to pay and receive new shares in exercise of rights of first refusal, to receive total or partial reimbursement for such shares, and to collect dividends in cash, among others. In all cases, the written instructions received by the Technical Committee should be followed.

To exercise corporate and ownership rights of these SHARES, the following provisions must be complied with:

1. The TRUSTEE will grant powers of attorney to all persons appointed by the Technical Committee so they may exert all rights mentioned above. If no instructions are provided, the TRUSTEE will have the right to ask the Technical Committee to provide these instructions to exercise all corporate and ownership rights related to the SHARES, always acting with all reasonable care and diligence to protect the trust assets in all situations.

2. If the capital stock of the issuing entity of trust SHARES increases, the TRUSTEE will execute the corresponding subscription, once sufficient funds are contributed for that purpose. If sufficient resources are available in the trust assets, the TRUSTOR or the Technical Committee shall inform the TRUSTEE that the subscription of the corresponding increased capital shall be covered using trust assets.

[LOGO]: Banca Afirme

Likewise, it is hereby agreed that all partial or total reimbursements of SHARES, as well as dividend payments in cash or in kind that issuing entities of SHARES decree, will increase the trust assets, which will then be used for the purposes of the trust as stated herein.

d. If the TRUSTEE, based on the written instructions of the Technical Committee, conveys, offers as collateral, encumbers or transfers by any means allowed by the Law, all or part of the SHARES to another party appointed by the Technical Committee, the consideration from such transfer will be received by the TRUSTOR or, when appropriate, by the BENEFICIARIES. It is expressly agreed that the Technical Committee will be exclusively authorized to establish the conditions for the conveyance, and that a detailed, written report in that regard will be sent to the TRUSTEE.

Before the conveyance is formalized, the Technical Committee shall also verify that the conveyance of the SHARES complies with all corporate regulations and the rights of other shareholders as stated in the regulations of the issuing entity and the Law, and shall accredit compliance to the TRUSTEE upon request.

If SHARES are sold under the terms mentioned above, the TRUSTOR must comply with all corresponding tax obligations. If the TRUSTOR dies, this obligation must be complied with by the parties responsible to comply with those obligations under applicable law.

e. Based on the instructions received from the Technical Committee, the TRUSTEE will transfer the amount of money it is instructed to transfer by the TRUSTOR or the BENEFICIARIES, if sufficient funds are available in the trust for that purpose.

f. If the TRUSTOR dies, this will be accredited to the TRUSTEE through submission of the corresponding death certificate so that this trust may remain valid. The right of BENEFICIARIES to receive benefits will remain subordinated until the Technical Committee asks the TRUSTEE to deliver to the BENEFICIARIES all existing resources from the trust assets and trust SHARES in the proportions stated for each party in Clause Two, at which time the trust will be terminated.

Until such time as the BENEFICIARIES receive the trust SHARES, or until the existing resources in the trust or the proceeds from the sale of the SHARES are distributed, as applicable in each case, this Trust shall continue to be valid and the TRUSTEE shall exercise the corporate and asset rights corresponding to the SHARES, pursuant to the instructions of the Technical Committee.

g. In the event of the death of Beneficiary Eduardo Longoria Kowalski, the rights corresponding in this Trust shall be transferred to the (4) four SECONDARY BENEFICIARIES, named Alejandra Michelle, Bernardo and Eduardo, all surnamed

[LOGO]: Banca Afirme

Longoria Hernandez, and Sofia Longoria Zygmont, in the proportions and under the terms and conditions described in clause Seven.

h. In the event of the death of the SECONDARY BENEFICIARIES Bernardo and Eduardo Longoria Hernandez, or Sofia Longoria Zygmont mentioned in the previous section, at any time during the validity of this Trust, the share that corresponded to them shall be distributed among the other surviving SECONDARY BENEFICIARIES to which the previous section refers, thereby increasing their share in this Trust. In the event of the death of Alejandra Michelle Longoria Hernandez at any time during the term of this Trust, the share that corresponded to her shall be distributed in equal parts to her children Alfonso Illan and Alejandro Diego, both surnamed Arguindegui Longoria.

i. In the event of the death of the Beneficiary Shelby Luis Longoria Kowalski, the rights corresponding to this trust shall be transferred to the four (4) SECONDARY BENEFICIARIES, named Enriqueta Chapa de Longoria, Shelby Sarah Louise and Adriana Dorothy, all surnamed Longoria Chapa, in equal parts, under the terms and conditions described in clause Six.

j. In the event of the death of any of the four (4) SECONDARY BENEFICIARIES named in the previous section, at any time during the term of this Trust, the shares that corresponded to them shall be distributed to the surviving SECONDARY BENEFICIARIES, thereby increasing their share in this Trust.

SIXTH. SPECIAL PROVISIONS IN THE EVENT OF THE DEATH OF SHELBY LUIS LONGORIA KOWALSKI. In the event of the death of Mr. Shelby Luis Longoria Kowalski at any time during the term of this trust, the stipulations of this clause will apply:

1. SECONDARY BENEFICIARIES.- As established in clause Two, the SECONDARY BENEFICIARIES named in the event of the death of the PRIMARY BENEFICIARY Shelby Luis Longoria Kowalski will be his wife Enriqueta Chapa Farias de Longoria and his children Adriana, Sarah and Shelby, all surnamed Longoria Chapa, in equal parts.

2. In the event of the death of any of the SECONDARY BENEFICIARIES at any time during the term of this Trust, the share that corresponded to him/ her shall be distributed to the surviving SECONDARY BENEFICIARIES, thereby increasing their share in this Trust.

3. Minor SECONDARY BENEFICIARIES shall be represented by their legal guardians or representatives appointed pursuant to the applicable civil provisions.

SEVENTH. SPECIAL PROVISIONS IN THE EVENT OF THE DEATH OF EDUARDO LONGORIA KOWALSKI. In the event of the death of Mr. Eduardo Longoria Kowalski at any time during the term of this trust, the stipulations of this clause will apply:

1. SECONDARY BENEFICIARIES.- As established in clause Two, the SECONDARY BENEFICIARIES named in the event of the death of the PRIMARY BENEFICIARY Eduardo Longoria Kowalski will be his four (4) children Eduardo, Alejandra, Bernardo, all surnamed Longoria Hernandez, and Sophia Longoria Zygmont, in the following proportions:

| SECONDARY BENEFICIARY | PERCENTAGES |
|---|---|
| EDUARDO LONGORIA HERNANDEZ | 37.5% |
| BERNARDO LONGORIA HERNANDEZ | 37.5% |
| ALEJANDRA LONGORIA HERNANDEZ | 12.5% |
| SOPHIA LONGORIA ZYGMONT | 12.5% |
| Total | 100% |

2. In the event of the death of the abovementioned SECONDARY BENEFICIARIES Bernardo and Eduardo Longoria Hernandez or Sophia Longoria Zygmont, at any time during the term of this Trust, the share that corresponded to him/ her shall be distributed to all other surviving SECONDARY BENEFICIARIES, thereby increasing their share in this Trust. In the event of the death of Alejandra Michelle Longoria Hernandez, at any time during the term of this Trust, the share that

corresponded to her shall be distributed in equal parts to her children Alfonso Illan and Alejandro Diego, both surnamed Arguindegui Longoria.

3. SPECIAL PROVISIONS FOR THE SECONDARY BENEFICIARIES. From this time forward, the SECONDARY BENEFICIARIES to which the previous section refers are designated in the percentages indicated; however, the SECONDARY BENEFICIARIES Eduardo and Bernardo Longoria Hernandez shall have the option of deciding upon the disposition of the 25% (twenty five percent) that would correspond to Alejandra Michelle Longoria Hernandez and Sophia Longoria Zygmont in their capacity as SECONDARY BENEFICIARIES, against the delivery in cash of said 25% in their favor, pursuant to the value of the COMPANIES calculated in accordance with the stipulations of clause Eleven. Said option shall be exercised in the following manner:

a) The option of the SECONDARY BENEFICIARIES, Eduardo and Bernardo Longoria Kowalski to receive from this Trust the 25% (twenty five percent) that would correspond to Alejandra Michelle Longoria Hernandez and Sophia Longoria Zygmont, is granted automatically and they may only exercise it within the first calendar year after the death of Eduardo Longoria Kowalski. If they do not wish to exercise this right, they shall give written notice of their intent both to the TRUSTEE as well as to Alejandra Michelle Longoria Hernandez and Sophia Longoria Zygmont, in which case they will have the right to their 25% (twenty five percent) of the SHARES; this shall also occur if they give notice of their intent to not exercise the option, as well as if they do not exercise the option within the abovementioned term.

b) The calculation of the value of the 25% (twenty five percent) that corresponds to Alejandra Michelle Longoria Hernandez and Sophia Longoria Zygmont shall be performed on the date of the death of the PRIMARY BENEFICIARY, Eduardo Longoria Kowalski, pursuant to the valuation procedure established in clause Eleven.

01231

c) Once the value of the 25% (twenty five percent) has been calculated in accordance with the previous section, Eduardo and Bernardo Longoria Kowalski will deliver said amount to Alejandra Michelle Longoria Hernandez and Sophia Longoria Zygmont within a term of ten (10) years with an interest of 7 (seven) percent annually, in United States dollars.

d) The first payment shall be made not later than the first anniversary of the death of the PRIMARY BENEFICIARY, Eduardo Longoria Kowalski and so on successively each year until the amount established is totally covered within the 10 (ten) year term.

e) As each payment is made, the corresponding SHARES in favor of Eduardo and Bernardo Longoria Hernandez shall be understood to have been released in equal parts.

f) As long as the deliveries in favor of Alejandra Michelle Longoria Hernandez and Sophia Hernandez Zygmont are being complied with under the terms indicated in the previous sections, the exercise of the equity and corporate rights of the SHARES corresponding to this (25%) shall be exercised completely by Eduardo and Bernardo Longoria Hernandez in equal parts in their capacity as SECONDARY BENEFICIARIES. In case of nonpayment of more than 2 (two) consecutive payments to Alejandra Michelle Longoria Hernandez and Sophia Longoria Zygmont, they shall be entitled to the remainder of the unpaid shares and may therefore exercise their equity and corporate rights derived from said SHARES, under the terms provided by this contract.

g ) The obligation to notify the TRUSTEE of the exercise of the option established in the previous point number 2 is expressly established, or else, the decision to not exercise that option; as well as the nonpayment of any of the payments Eduardo and Bernardo Longoria Hernandez are obligated to make, or else, full compliance with the payment obligation, so that the TRUSTEE may be able to reallocate the rights of the Beneficiary pursuant to the provisions of this paragraph. Unless the interested

01232

[LOGO]: Banca Afirme

parties expressly agree otherwise, and if for any reason the option is not exercised within the first calendar year after the death of Eduardo Longoria Kowalski, the option will be considered to have not been exercised and the TRUSTEE will definitely allocate to Alejandra Michelle Longoria Hernández and Sophia Longoria Zygmont, the percentage of participation in the Trust rights that has been agreed in item 1 (one) of this same clause.

3. OBLIGATIONS OF SECONDARY BENEFICIARIES.- Only if SECONDARY BENEFICIARIES Eduardo and Bernardo Longoria Hernández do not exercise the option of receiving 25% (twenty-five percent) of the SHARES of Alejandra Michelle Longoria Hernández and Sophia Longoria Zygmont, which should be reported to the TRUSTEE, the SECONDARY BENEFICIARIES should directly, and without the intervention of the TRUSTEE, deliver the amount of US$ 100,000.00 (one hundred thousand US dollars) to Sophia Longoria Zygmont, so that she may receive her university education. This sum will be delivered to her mother Colette Zygmont, who will be responsible to administer the funds for the benefit of Sophia Longoria Zygmont.

With the express authorization of the Technical Committee and charged to the net Trust assets, the TRUSTEE, after being notified of the non-exercise of the option by SECONDARY BENEFICIARIES, or if the option has been considered non-exercised because the deadline for exercising the option has expired, the TRUSTEE may deliver the amount of money mentioned above, in the manner and under the terms agreed in the previous paragraph, without being liable for the actual use of the funds. The TRUSTEE assumes no liability for the impossibility of complying with this purpose if there are insufficient liquid assets to cover the amount; in such case, a partial payment may be made.

8. ADMINISTRATION OF COMPANIES.- The SHARES that are incorporated into the Trust assets correspond to COMPANIES that are operating various commercial and real estate ventures either directly or through subsidiaries. To date, the administration of such businesses has been the responsibility of Shelby Luis Longoria Kowalski, who will continue to perform those duties during the term of this Trust, or under the terms and conditions agreed upon in shareholders' meetings. In that regard, Shelby Luis Longoria Kowalski will serve as Sole Director or Chairman of the Board of the COMPANIES and their subsidiaries.

In the event of the death or incapacity of either of the PRIMARY BENEFICIARIES, Eduardo or Shelby Luis Longoria Kowalski, the administration of the COMPANIES and their subsidiaries will become the responsibility of an Executive Committee under the terms of the following clause. This Committee will perform its duties provisionally until the definitive administration of the COMPANIES and their subsidiaries is determined, or until the separation of the shareholders occurs, under the terms of clauses Nine and Ten.

[LOGO]: Banca Afirme

In the event of the death or incapacity of Eduardo or Shelby Luis Longoria Kowalski, the Technical Committee will take the necessary measures required to immediately call a meeting of the shareholders of the COMPANIES and their subsidiaries, whose shares are the subject matter of this Trust, in order to form the Executive Committee referred to in the following clause and, if necessary, grant them sufficient authority to perform their duties.

The death of Eduardo or Shelby Luis Longoria Kowalski will be accredited by the corresponding death certificate. In the case of incapacity, this will be determined by the Technical Committee with the unanimous vote of the members, based on the written opinion of three private physicians confirming the incapacity. These three physicians will be chosen by the Technical Committee itself, without the participation of or liability attributable to the TRUSTEE, whose only obligation will be to receive the written notification from the Technical Committee, reporting the incapacity. When the TRUSTEE acts in accordance with the instructions of the Technical Committee, it will incur no liability, pursuant to the provisions of article 80 of the Credit Institutions Law.

9. ADMINISTRATION OF COMPANIES THROUGH AN EXECUTIVE COMMITTEE.- In the event of the death or incapacity of Eduardo or Shelby Luis Longoria Kowalski, the administration of the COMPANIES will become the responsibility of an Executive Committee, pursuant to the following:

(i) The Executive Committee will be composed of six (6) members with their respective alternates. Each member of the Executive Committee will be responsible for one of the business areas of the group of COMPANIES. The TRUSTOR hereby appoints the following persons as members of the Executive Committee:

| Member | Alternate | Business Area |
|---|---|---|
| Eduardo Longoria Kowalski | Eduardo Longoria Hernández | General Directorate |
| Shelby Luis Longoria Kowalski | Enriqueta Chapa de Longoria | General Directorate |
| Rafael de Jesús Carbajal Galindo | Marta B. Montelongo Garza | Real Estate |
| Saúl Garza Molina | Néstor E. Sánchez | Automotive |
| Edilio Luis Madrigal Cepeda | Marco Antonio Torres Garza | Industrial |
| Raúl Jesús Ramírez Vela | Hugo R. Jiménez Vázquez | Restaurants |

In the event of the death or incapacity of Eduardo Longoria Kowalski, the Chairman of the Executive Committee will be Shelby Luis Longoria Kowalski. In the event of

the death or incapacity of Shelby Luis Longoria Kowalski, the Chairman of the Executive Committee will be Eduardo Longoria Kowalski.

In the event of the resignation, incapacity or death of the chairman appointed under the terms of the previous paragraph, the corresponding alternate will serve in that capacity.

(ii) The Chairman of the Executive Committee will cast the deciding vote in the event of a tie.

(iii) The Executive Committee will be responsible for the operations of the COMPANIES and their subsidiaries, and will be required to render accounts to the Technical Committee of this Trust.

(iv) The Executive Committee shall only perform administration acts without the authority to convey property, assets or rights of the COMPANIES or their subsidiaries, unless the Technical Committee indicates otherwise.

(v) The Executive Committee shall continue the normal operations of the COMPANIES and their subsidiaries in the same way they were operated previously, always ensuring that COMPANIES are not at risk and that they are operating in compliance with the legal provisions applicable in each case.

(vi) The Executive Committee will meet every Monday, in order to make decisions together regarding each issue. Each member responsible for a business area will present the work plan for that week, which should be approved by the rest of the members of the Executive Committee. Minutes will be prepared of each meeting, to be signed by all attendees. BENEFICIARIES, or their representatives, may attend each meeting of the Executive Committee, and they will be entitled to offer their opinions, but not to vote.

(vii) The Executive Committee will submit a monthly report to the Technical Committee about the operations of the COMPANIES and their subsidiaries, attaching the minutes of each meeting. Such report will be presented during a meeting called for that purpose within the first 15 –fifteen- days of each month. BENEFICIARIES, or their representatives, may attend each meeting and they will be entitled to offer their opinions, but not to vote.

(viii) The report referred to in the previous paragraph shall include at least an itemization of the income and expenditures of all COMPANIES and their subsidiaries, a balance sheet, a profit and loss statement, a statement of changes in financial position, and a cash flow statement.

01235

[LOGO]: Banca Afirme

(ix) The Executive Committee may rely on external advisors in making decisions. Similarly, such external advisors may attend meetings if the Committee believes it is appropriate for them to do so.

(x) The Executive Committee may freely remove the members of the Executive Committee, if it considers it necessary according to the stipulations of Clause Thirteen.

Likewise, if the Committee believes it is necessary, it may appoint an external auditor to audit the COMPANIES.

The parties to this agreement expressly establish and agree that the TRUSTEE acquires the ownership of the SHARES which are the subject of this Trust and will only be bound to grant the powers of attorney that may be required in order to exercise the rights inherent to the same, to the person or persons that the Technical Committee designates for that purpose, as well as complying with the instructions that in its case the Technical Committee issues in that regard, and for that reason the parties expressly, and with no reservation whatsoever, from this moment, release the TRUSTEE from any responsibility or liability to exercise on his own the corporate rights inherent to the SHARES, as well as the form, manner and terms in which the agent that is appointed to represent and exercise voting rights corresponding to the SHARES in meetings of shareholders, as well as in the case that the terms and conditions that the TRUSTOR establishes in this clause as well as in clause Eight and Ten of this Trust were not fully or partially complied with.

The guidelines established in clause Eight, as well as in this clause are established by the TRUSTOR and will be strictly complied with by the members of the Technical Committee, without any intervention, responsibility or liability whatsoever for the TRUSTEE, with the understanding that the agreement established herein shall also be complied with by the BENEFICIARIES at the appropriate time.

TEN. SEPARATION OF THE SHAREHOLDERS. Upon the death or incapacity of any of the PRIMARY BENEFICIARIES, the surviving PRIMARY BENEFICIARY, along with the SECONDARY BENEFICIARIES, or their representatives shall have the option to remain shareholders of the COMPANIES or to separate, each one of them remaining with

[LOGO]: Banca Afirme

different COMPANIES based on their value calculated pursuant to clause Eleven below. The separation agreement shall be carried out pursuant to the following:

(i)    For purposes of the separation, two groups are considered; one per each family of the PRIMARY BENEFICIARIES.

(ii)    In the event of the death of Shelby Luis Longoria Kowalski, and provided that the SECONDARY BENEFICIARIES designated to assume his place (wife and children) are not involved in the administration of the businesses in operation or do not have the experience required to manage those businesses, for purposes of this clause, the SECONDARY BENEFICIARIES of Shelby Luis Longoria Kowalski shall have the right of first refusal to receive the real estate businesses during the separation process.

(iii)    In all cases, the parties will seek to conduct the separation based on principles of fairness and equality regarding the value of the COMPANIES. The value of the companies shall be calculated using the process described in the following clause.

The guidelines established in this clause are provided by the TRUSTOR to be complied with exclusively by the members of the Technical Committee, without the intervention, responsibility or liability whatsoever for the TRUSTEE, with the understanding that the agreement established herein shall also be complied with by the BENEFICIARIES at the appropriate time.

ELEVEN. VALUATION OF THE COMPANIES. For purposes of determining the value of the COMPANIES and their subsidiaries, these shall be appraised by 2 (two) external appraisal experts who are independent of the parties that the Technical Committee determines and chooses for that purpose. The experts shall appraise each COMPANY and its subsidiaries using the same appraisal method. If there is a difference of less than 10% (ten) in the values presented by the experts, the average of both appraisals shall be taken as the real value. If there are differences of more than 10% (ten percent) in the values presented by the experts, a third appraisal expert shall be appointed, who will conduct a third appraisal. Of the three appraisals, the average of the two closest appraisals shall be taken as the value.

[LOGO]: Banca Afirme

The results of the appraisal shall be reported to the TRUSTEE through the Technical Committee.

TWELVE. INVESTMENT METHOD. The cash resources that make up the assets of this trust shall be invested by the TRUSTEE pursuant to the instructions that the Technical Committee sends in writing, with the understanding that if no such instructions are provided, at its discretion, the TRUSTEE shall invest, manage and safeguard the trust assets using any of the instruments, bonds, securities or documents indicated below:

a) Debt instruments or currency market instruments.

b) Investment Companies in debt instruments.

c) Any other instrument, bond or document, which during the term of this contract and after the signature of the same, become available on the market with the previously mentioned characteristics.

The instruments, bonds, securities or documents in which the investment may be made, may or may not be registered with the National Securities and Brokers Registry, and no commercial paper will be acquired without a bank endorsement.

The TRUSTOR hereby releases the TRUSTEE from any liability for damages derived from the depreciation or suspension of the trading of securities, bonds or documents acquired under the protection of the investment contract signed for the investment on the trust property; and which may result in damages or are a consequence of the payment suspension, bankruptcy or breach of the issuer(s), as well as for the types of transactions conducted under the terms of the investment contract and its Investment Policy, as the case may be, as well as the type of bonds, securities or assigned documents.

Likewise, the TRUSTOR reserves no present or future action or right to act against Banca Afirme S.A., Institucion de Banca Multiple, Afirme Grupo Financiero, based on the signature of the aforementioned investment contract.

The TRUSTEE shall not be liable for diminishment of the value of the assets, when it acts in accordance with the provisions of article 391 of the Securities and Credit Transactions Law.

THIRTEENTH. TECHNICAL COMMITTEE.- Pursuant to article 80 of the Credit Institutions Law, the TRUSTOR hereby forms a Technical Committee and agrees to provide the TRUSTEE with the applicable instructions regarding the scenarios described in this Trust.

The Technical Committee shall be made up of –three- (3) regular members with their respective alternates, who are hereby appointed by the TRUSTOR as follows:

| Regular Members | Alternate Members |
| --- | --- |
| Shelby Luis Longoria Kowalski | Marta Beatriz Montelongo Garza |
| Enriqueta Chapa Farias | Rebeca Ortiz |
| Eduardo Longoria Kowalski | Eduardo Longoria Hernandez |

1. In making decisions in accordance with the authority referred to in this clause, the Technical Committee must at all times respect and honor the rights of the BENEFICIARIES under the terms of this Trust, also, in matters for which it is responsible, it will comply with the provisions of clauses eight, nine, and ten of this Trust, under penalty of incurring personal liability.

2. The appointment by the TRUSTOR of the members of the Technical Committee by means of this act is based on the following: at all times the Technical Committee shall be composed of two (2) members and their respective alternates corresponding to the PRIMARY BENEFICIARY Shelby Luis Longoria Kowalski, consequently appointing Shelby Luis Longoria Kowalski, and his respective alternate, and Enriqueta Chapa Farias de Longoria, and her respective alternate. Likewise, the Technical Committee shall be composed of one (1) member and his respective alternate, corresponding to the PRIMARY BENEFICIARY Eduardo Longoria

[LOGO]: Banca Afirme

Kowalski, consequently appointing Eduardo Longoria Kowalski, and his respective alternate.

3. In event of the definitive absence or disability of the TRUSTOR, the PRIMARY BENEFICIARIES or their respective SECONDARY BENEFICIARIES, as applicable in each case, may appoint, revoke or change the members of the Technical Committee as applicable in accordance with the previous section, through a written notification sent to the TRUSTEE reporting the name and signature of the members of the Technical Committee, as well as the acceptance by the member in question of the position conferred.

4. The Technical Committee will hold a valid meeting when the majority of its regular members or their respective alternates are in attendance, and decisions will be made by majority vote.

5. The appointment of the members of the Technical Committee is honorific in nature, and they will therefore not be entitled to receive any remuneration for their services.

6. In the event of the absence, disability, death or resignation of any of the members of the Technical Committee, the member shall be replaced by the person appointed by the corresponding PRIMARY BENEFICIARY.

7. The Technical Committee shall meet every time it is required to do so, and minutes will be prepared of each meeting setting forth the decisions made. The meetings of the Technical Committee are to be held in the city of Reynosa, Tamaulipas, however the members may meet at another location in Mexico or abroad if the majority of the members agree.

[LOGO]: Banca Afirme

8. Invitations to the meetings of the Technical Committee may be sent by any of its members, through a letter with confirmation of receipt, a telegram sent to the rest of the regular members and the alternates of the Technical Committee, who will be required to confirm receipt through an e-mail or by any other means by which it can reliably be verified that the members have been notified ahead of time, at least 5-five calendar days before the date of the meeting in question, enclosing the agenda points for the meeting. The meetings of the Technical Committee will be held on the date, at the time and at the address indicated on the invitation. If any member of the Committee fails to attend the meeting and if for that reason a decision cannot be made regarding a matter on the agenda, a second invitation will be issued so that a meeting may be held 3 (three) business days after the date of the original meeting; in case of an absence, a third invitation will be issued to a meeting to be held on the next business day. In any of the previous cases, the majority of the members of the Technical Committee will be required for the decision making.

9. If the majority of the regular members or their respective alternates on the Technical Committee are gathered, they may hold a meeting, and their agreements shall be valid, and no prior invitation will be required in this case.

10. The Technical Committee shall have the powers established in this Contract, including the authority to amend or terminate this Trust, powers that the TRUSTOR hereby expressly grants to them.

11. In each meeting of the Technical Committee, a representative of the TRUSTEE may appear who shall participate with a voice but without a vote.

12. The TRUSTEE will be released from all liability when it acts in accordance with the instructions or resolutions adopted by the Technical Committee.

13. The Technical Committee shall gather when deemed necessary, through invitations issued in accordance with the previous points 7 and 8.

14. If the Executive Committee is in operation, the Technical Committee shall gather monthly within the first 15 (fifteen) days of each month, so as to review and discuss the report that the Executive Committee shall present.

FOURTEENTH. BEHAVIOR RULES AND POLICIES FOR THE TECHNICAL AND EXECUTIVE COMMITTEE. The members of the Technical Committee and the Executive Committee shall act at all times taking into consideration that both PRIMARY BENEFICIARIES, and their corresponding SECONDARY BENEFICIARIES, as applicable in each case, will at all times receive fair and equal treatment, since the purpose of this instrument is to ensure that each of them has the right or is the holder of the trust property in the proportions established. For this reason, in the event of any dispute, controversy or if any decision is to be made, the above principle of equality and equity will always be the basis for any such decisions.

Likewise, any action taken by the Technical Committee should always be made to benefit the BENEFICIARIES.

The abovementioned Committees may be supported by the opinions of expert consultants in their decision-making.

FIFTEENTH. MEXICAN JURISDICTION AND LEGISLATION. This Trust is established under the jurisdiction of the United Mexican States, its parties are Mexican citizens, and its assets are located within the national territory. Therefore, this Trust, the TRUSTOR and the BENEFICIARIES are exclusively subject to the laws of Mexico, thus the parties expressly waive the application of any Law, regulation, provision or rule of any jurisdiction other than Mexico to which they may be entitled due to their present or future residence, paternity, citizenship, domicile, kinship or commercial relationships, therefore

[LOGO]: Banca Afirme

any interpretation, dispute or any aspect related to this Trust, will be expressly subject to the courts of the city of Reynosa, Tamaulipas, Mexico.

Likewise, the issuance of any Law, regulation or provision in jurisdictions outside the Republic of Mexico, or any act performed outside the national territory, whether it is by the TRUSTOR, BENEFICIARIES or any person related to the Trust, or members of the Technical Committee, or Executive Committee, for the purpose of (i) imposing restrictions on this Trust, imposing the performance of acts different from the purposes for which it is authorized, or which attempts to change or impact the control of the Trust by the TRUSTOR, BENEFICIARIES or the Technical Committee; (ii) that attempts to impose taxes, fees or tax charges other than those allowed by Mexican Law; (iii) that attempts to expropriate, limit, confiscate, seize, take, freeze or offer as collateral the assets of the Trust based on federal, state or municipal legal provisions outside the jurisdiction of the Mexican Republic, are not and shall not be applicable to this Trust, and in all cases the jurisdiction and legislation of the Republic of the United Mexican States will be applied under the terms of the previous paragraph.

SIXTEEN. <u>DECLARATION OF WILL.</u> Both the TRUSTOR as well as the BENEFICIARIES of this Trust declare that this contract is the final and definitive will of the parties, therefore they agree to all of its terms, and they also represent that no error, fraud, bad faith or any defect exists that may affect their understanding or decision regarding its contents.

SEVENTEEN. <u>TRUST AMENDMENTS.</u> This contract may terminated or amended solely based on the prior agreement and instructions of the Technical Committee and the TRUSTEE, through the signature of the corresponding agreement.

EIGHTEEN. <u>NON-TRANSFERABLE CLAUSE.</u> For all the corresponding legal effects, and based on nature of this Trust, no BENEFICIARY of the same shall be in any way entitled to part or the totality of the assets of this Trust, until the assets of the Trust have already been distributed, through its partial or total execution in favor of the corresponding

01243

[LOGO]: Banca Afirme

BENEFICIARY. In no case whatsoever will any BENEFICIARY of the trust be entitled to transfer, appoint, tax, mortgage or pledge their present or future rights or interests contained herein; likewise, this Trust, or the interests or rights of any BENEFICIARY may not be subject to claims or lawsuits from their creditors or the creditors of the BENEFICIARIES, nor will they be subject to taxes, seizures, or enforcement of any ruling in any legal proceeding.

Both the income generated, as well as the assets of the Trust itself, may not be subject to pledges, seizures, guarantees, transfers or sale, or in any way be compromised or offered as collateral by any BENEFICIARY, nor will the assets or any income derived from this Trust be subject to or offered as collateral in any way by acts, debts, contracts or any other act of any BENEFICIARY or the TRUST, or by any claim for alimony or child support by any BENEFICIARY or the TRUSTOR himself, or derived from any separation agreement, neither shall it be subject to any transfer or any other voluntary or involuntary act of disposition or conveyance derived from a legal process, prior to the distribution of the assets of the Trust through the partial or total execution of the Trust in favor of the corresponding BENEFICIARY.

In the cases in which any BENEFICIARY is granted any right under the terms of this Trust, and while the same has not been totally or partially executed in his/ her favor, the TRUSTEE will continue to maintain ownership of the assets of said BENEFICIARY.

NINETEEN: <u>VALIDITY OF THE PROPERTY TITLE DEEDS.</u> The BENEFICIARY acquires ownership of the assets and rights that make up the trust assets, based on the representative title deeds of the SHARES which are hereby delivered by the TRUSTOR, and consequently the TRUSTOR will not be liable in any way whatsoever to the BENEFICIARIES or any third parties, including those to whom all or part of the trust assets are transferred, for defects or hidden defects in the corresponding property title deed or for challenges to the rights covered thereby, and in any case any such liability will be assumed by the TRUSTOR.

[LOGO]: Banca Afirme

TWENTY. REMEDY IN THE EVENT OF DISPOSSESSION The TRUSTOR will be obligated to remedy any dispossession in accordance with the law with respect to the assets and rights contributed by the TRUSTOR to the assets of this trust.

When the TRUSTEE, in compliance with the purposes of this contract, transfers all or part of the trust assets, the TRUSTOR shall remedy any dispossession in accordance with the law, and therefore hereby authorizes the TRUSTEE to make binding decisions under those terms before the individuals or legal entities to whom all or part of the trust assets are transferred under the terms of this contract.

TWENTY-ONE. TRUSTEE LIABILITY When the TRUSTEE acts in accordance with the instructions of the Technical Committee, it shall be released from all liability under the terms provided in article 80 (eighty) of the Credit Institutions Law.

The TRUSTEE is not liable for the deeds, acts or omissions of the contracting parties, or third parties or authorities, prior or subsequent to this date, or for legal acts in which the TRUSTEE has not directly participated, or the interpretations of authorities or changes in applicable laws, that hinder, oppose, prevent or sanction the compliance with their duties or the validity of this Trust, and all legal consequences of the foregoing will be the responsibility of the TRUSTOR, and the TRUSTEE will not be liable for the final use of the amounts transferred or for the material delivery of the trust assets it carries out in compliance with the instructions of the Technical Committee.

In no case will the TRUSTEE be required to respond using its own assets, and, without exception, any claim related to this Trust from Authorities or third parties shall be in the last instance charged to the trust assets, and the parties hereby represent that they are in agreement in that regard. The TRUSTEE does not assume any liability beyond the liability expressly set forth in this contract or the law, excluding tax or labor liability of any type.

The TRUSTEE will not be obligated to exercise the rights inherent to the trust SHARES on the TRUSTEE'S own behalf, it will only be obligated to issue any powers of attorney

which may be necessary to the persons that the Technical Committee indicates for that purpose, without assuming any liability whatsoever with regard to the manner, form and terms in which the SHARES vote, or for the consequences of having exercised the right to vote. When the TRUSTEE receives no instructions regarding the issuance of powers of attorney under the terms of this paragraph, it shall be released from any liability derived from the failure to exercise the right to vote.

The TRUSTEE will not have the liability or responsibility to influence, verify or in any way intervene in the administration decisions of the COMPANIES that issue the trust SHARES.

*Upon request, the TRUSTEE shall render accounts according to*
*Article 84 (eighty four) of the Credit Institutions Law.*

TWENTY-TWO. TRUSTOR LIABILITIES. The TRUSTOR and the PRIMARY and SECONDARY BENEFICIARIES, as applicable in each case, will be obligated to hold the TRUSTEE harmless and return to the TRUSTEE the amounts that the TRUSTEE may have incurred as a result of legal or extrajudicial actions initiated by the TRUSTOR, and /or by third parties against the TRUSTEE, that may affect the TRUSTEE or its officers, by reason of this trust contract.

TWENTY-THREE. POWERS OF THE TRUSTEE.- The TRUSTEE will manage the trust assets with the powers and duties established in articles 391 (three hundred ninety one) and other related articles of the Securities and Credit Transactions Law and article 84 (eighty four) and other applicable articles of the Credit Institutions Law.

TWENTY-FOUR. DEFENSE OF THE TRUST PROPERTY.- Whenever the TRUSTEE receives any notification regarding any judicial lawsuit, requirements from any authority and any notification related to the assets of this contract, the TRUSTEE will send written notice to the TRUSTOR or the Technical Committee, not later than the next business day after the date on which the corresponding notification was received.

01246

[LOGO]: Banca Afirme

The TRUSTOR or the Technical Committee will provide written instructions to the TRUSTEE not later than the next business day after the date on which the notification referred to in the previous paragraph in this clause was received, so that the necessary power of attorney may be granted to the person or persons appointed by the TRUSTOR or by the Technical Committee, in order for them to focus on the care, conservation or legal defense of the trust assets described in this contract.

The TRUSTEE shall not be responsible for the actions taken by the legal representative, nor will it be obligated to pay fees or costs derived from the respective legal proceedings, which will in all cases be charged to the trust assets. The TRUSTOR or the Technical Committee may instruct the TRUSTEE to charge to the trust assets any fees and expenses derived from the care, conservation or defense of the trust assets.

The contents of the preceding paragraph of this clause must be transcribed in every power of attorney for litigation and collections issued by the TRUSTEE under the terms of this trust.

TWENTY-FIVE. REPORTS FROM THE TRUSTEE. The TRUSTEE shall render a report regarding the transactions involving the trust assets to the TRUSTOR or the Technical Committee on a monthly basis.

The TRUSTOR or Technical Committee will have a period of 15 calendar days effective as of the date of issuance of the aforementioned report to comment or request any clarifications they deem appropriate, with the understanding that if the TRUSTOR does not comment or request clarifications within the aforementioned period, it will be understood that the corresponding report has been approved.

TWENTY-SIX. RESIGNATION OR REPLACEMENT OF THE TRUSTEE. The TRUSTEE may resign from the position conferred by this contract for serious reasons,

01247

subject to the ruling of a first instance judge in the TRUSTEE'S domicile, pursuant to article 391 of the Securities and Credit Transactions Law.

The TRUSTOR may replace the TRUSTEE at any time with an advance notice of twenty business days prior to the date on which the replacement is anticipated to occur, so that all necessary procedures required for the formalization of the change may be prepared. The TRUSTEE may be replaced by another international or foreign institution or institutions, if and when they have the legal capacity to perform those duties. The TRUSTEE will proceed with the fiduciary replacement after the payment of the expenses or fees it is entitled to receive under the terms of this contract.

TWENTY-SEVEN. TAXES. The TRUSTEE will be authorized at any time to charge the trust assets for any the taxes owed on the transactions involving the trust assets, in such a way as to ensure that compliance with the corresponding tax obligations is not jeopardized.

If compliance with the purpose of this contract involves full or partial transfer of the SHARES, which make up the assets of this trust, all such transfers shall be subject to applicable tax laws.

TWENTY-EIGHT. THIRD PARTY EXPENSES AND FEES. The expenses incurred in the compliance with the purposes of this contract will be charged to the trust property. The TRUSTEE will charge the trust property for all fees owed to third parties contracted pursuant to the provisions of this contract and which are necessary for the care, conservation or defense of the trust assets.

TWENTY-NINE. TRUST TERM. – The duration of this trust will be the term necessary to comply with its purposes and the trust may be terminated in any of the situations described in article 392 (three hundred and ninety two) of the Securities and Credit Transactions Law that are compatible with the nature and purposes of this contract, with the exception of the grounds for termination described in section VI for failure by the TRUSTOR to expressly reserve the right to revoke this Trust.

[LOGO]: Banca Afirme

THIRTY. TRUSTEE FEES - The TRUSTEE shall charge the following fees to the TRUSTOR for the performance of the duties conferred herein:

a) For the acceptance of the position, study and preparation of the trust contract, the sum of $20,000.00 (twenty thousand Mexican pesos and 00/100) payable one time only upon signature of the trust contract.

b) For the administration of the trust, the monthly sum of $5,000.00 (five thousand Mexican pesos and 00/100) payable by quarters in advance, and once the death of the TRUSTOR occurs; the fees in force as of that date for the administration of the trust shall increase by 40% (forty per cent).

c) For the signature of Amendments to the Trust Contract, the sum of $6,000.00 (six thousand Mexican pesos and 00/100) payable at the time the corresponding Agreement is signed.

d) For the issuance of Powers of Attorney and the execution of any other act necessary to achieve the purposes of the trust, the sum of $3,000.00 (three thousand Mexican pesos and 00/100) payable at the time the corresponding instrument is signed.

The abovementioned fees will be subject to the value added tax, pursuant to applicable law, and shall be adjusted in the month of January of each year, based on the inflation percentage verified during the year prior to the adjustment, and calculated by the Bank of Mexico or any entity that may replace it in the future.

THIRTY-ONE. DOMICILES. The parties designate the addresses listed below as their domiciles for any notification, notice, and in general, for any purposes related to this trust:

THE TRUSTOR: Oaxaca No 620, Col. Rodríguez. Zip Code 88630. Reynosa, Tamaulipas, Mexico.

01249

[LOGO]: Banca Afirme

THE TRUSTEE: Hidalgo Avenue, number 234 West, Central Zone, Monterrey, Nuevo Leon. Zip Code 64000, Mexico.

THE TECHNICAL COMMITTEE: Oaxaca No 620, Col. Rodriguez. Zip Code 88630. Reynosa, Tamaulipas, Mexico

Any address change shall be reported in writing to the TRUSTEE, with the understanding that all communications addressed to the last domicile indicated by the parties shall produce all legal effects.

THIRTY-TWO. EXPENSES, FEES AND TAXES. All expenses, fees and taxes incurred in the compliance with the purposes of this trust will be the responsibility of the TRUSTOR.

THIRTY-THREE. DEFINITIVE DECLARATION OF WILL. Both the TRUSTOR as well as the BENEFICIARIES of this Trust declare that this contract is the final and definitive will of the parties, and therefore they agree to all its terms, furthermore declaring that no error, fraud, bad faith or any defect of consent has occurred that may affect their understanding or decisions regarding its contents.

THIRTY-FOUR. COMPENSATION. The TRUSTOR and the PRIMARY BENEFICIARIES are bound to jointly defend and hold the TRUSTEE, as well as its consultants, fiduciary delegates, officers, employees, agents or advisors harmless from and against all and any responsibility, damages, liability, legal action, judgment, settlement, requirement, expense and/ or costs of any nature, including attorneys' fees, which are directly or indirectly charged, are the result of, are imposed upon or incurred, by reason of or as a consequence of the acts performed by the

TRUSTEE in the compliance of the purposes contained in this trust contract and the defense of the trust assets or by claims, fines, judgments or any other debt of any nature regarding the trust assets or this trust contract, whether it is before administrative, judicial,

[LOGO]: Banca Afirme

court, arbitration or any other instance of authorities, on the local or federal level, in the Republic of Mexico or in any foreign jurisdiction.

If any *de facto* situation or authority act, or consequence of a legal nature was generated and resulted in fines charged to the Trust and/ or the property of the Trustee, caused by acts or omissions of the parties to the trust contract, by the TRUSTEE in compliance with the purposes of this contract or by third parties, including distributions related to the acts and concepts mentioned in the previous paragraph, the payment derived from said pecuniary liabilities shall be the joint obligation of the TRUSTOR and if applicable the PRIMARY BENEFICIARIES, who agree to respond without limitation using their own assets for the payment that was made or will be made by the TRUSTEE, waiving the benefit of order or exclusion that may correspond to them pursuant to the law. Likewise, the TRUSTOR hereby authorizes the TRUSTEE so that, from the trust assets, it may allocate the amounts required to comply with the payment liabilities derived from the concepts mentioned in the content of the two paragraphs of this clause, with the understanding that in no case may said allocations be equated with or absorbed into the fees of the Trustee that are established in this contract.

The mere tacit or express acceptance of the rights of the BENEFICIARY will imply the acceptance of the obligations that are established for the parties in this clause.

THIRTY-FIVE. JURISDICTION. For the interpretation, compliance and execution of this contract, the parties are expressly subject to the courts with jurisdiction in the city of Reynosa, Tamaulipas, expressly waiving any other jurisdiction, regional laws or authority to which they may be entitled by reason of their present or future domicile.

[LOGO]: Banca Afirme

This instrument is signed in triplicate, each of the 3 (three) counterparts having the same value as an original, today, October 15 (fifteen), 2002 (two thousand two), in the presence of the two undersigned witnesses, in the city of Nuevo Laredo, Tamaulipas.

[SIGNATURE]: Illegible

Mr. EDUARDO LONGORIA THERIOT

TRUSTOR

TRUSTEE

BANCA AFIRME, S.A.

FULL-SERVICE BANKING INSTITUTION,

AFIRME FINANCIAL GROUP,

"Fiduciary Division"

Represented by:

[SIGNATURE]: Illegible

LIC. ADRIAN JORGE LOZANO LOZANO GARZA

FIDUCIARY DELEGATE

[SIGNATURE]: Illegible

LIC. MARTHA BEATRIZ LONGORIA

FIDUCIARY DELEGATE

[SIGNATURE]: Illegible

WITNESS

MARTA B. MONTELONGO GARZA ALDAPE

[SIGNATURE]: Illegible

WITNESS

PEDRO RAMIREZ DE ALBA



**PARK**
IP TRANSLATIONS
····· we localize O ·····

January 12, 2015

Certification

### Park IP Translations

This is to certify that the attached translations are, to the best of my knowledge and belief, a true and accurate translation from Spanish into English of the Private Agreement.

Sarah Dunham

Project Manager

Project Number: SUGO_1501_003



# EXHIBIT 4

01254

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT |
| DOROTHY LOUISE LONGORIA, | § | NUMBER ONE |
| DECEASED | § | HARRIS COUNTY, TEXAS |
| | § | |

## Affidavit of Dr. Carlos Gabuardi

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| HARRIS COUNTY | § |

BEFORE ME, the undersigned authority, on this day personally appeared Carlos Alberto Enrique José Lorenzo Gabuardi Arreola, who, being by me first duly sworn, stated the following:

1.     My name is Dr. Carlos Alberto Enrique José Lorenzo Gabuardi Arreola, PhD. I am over twenty-one years of age, of sound mind, and qualified to make this affidavit. I have personal knowledge of the facts stated herein and am competent to testify thereto.

2.     I have been retained by counsel for Shelby Longoria as a consultant and expert witness on Mexican law in the above-titled action.

3.     In connection with this engagement I have been requested to address several legal questions under the context of a Spanish language document named "Acuerdo Privado", signed by Mr. Eduardo Longoria Theriot and Ms. Adriana Longoria Kowalski.

4.     Based on my review of documents and my expertise in Mexican law, I have the following opinions:

   a.  The Jurisdiction and Mexican Law clause in the "Acuerdo Privado" referred to above is a valid and enforceable agreement under Mexican law, and more specifically under the authority of the Civil Code currently in effect in the State of Tamaulipas.

   b.  By the fact that Ms. Adriana Longoria Kowalski actually did execute the "Acuerdo Privado" referred to above, she expressly and voluntarily submitted

1

**01255**

herself to the exclusive jurisdiction of both Mexican law and the courts located in Reynosa, Tamaulipas, Mexico, waiving any other venue whatsoever.

c. Under the terms of the Jurisdiction and Mexican Law clause in the "Acuerdo Privado" referred to above, the parties therein expressly stated their intent to bar the issuance of any law, regulation or provisions in jurisdictions outside Mexico, therefore barring the applicability of any judicial acts taken outside of Mexico.

d. Under the terms of the Jurisdiction and Mexican law clause in the "Acuerdo Privado" referred to above, the parties therein expressly agreed not to perform acts outside Mexico, which would impose the performance of acts different than the purposes for which the "Acuerdo Privado" is authorized, or which would affect the rights of the "Acuerdo Privado" based on laws outside the jurisdiction of Mexico.

e. If Mr. Shelby Longoria is sued upon the basis of the "Acuerdo Privado" referred to above, he may seek the enforcement of the Jurisdiction and Mexican law clauses styled in such agreement.

## I. BACKGROUND

5.      I have studied, practiced, and taught law in Mexico and the United States for over 30 years. I received a License in Jurisprudence from Universidad de Monterrey in 1981; a Master of Laws (LL.M.), with distinction, from Tulane University in 2001; and a Doctorate of Laws (Ph.D.) from Tulane University in 2007.   A true and correct copy of my resume is attached to this Affidavit as Exhibit A.

6.      I have taught law in various law schools in Mexico and the United States.  Since 1983, I have held research and teaching positions at several other universities in Mexico and the United States. For example, I have been a member of the National Researchers System of

2

01256

México, since 2008; I served as Professor of Law and researcher at the Instituto Tecnológico y de Estudios Superiores de Monterrey in Mexico (1998-2011); I acted as the Head of the Law Department and served as Professor of Law at the Universidad de Monterrey in Mexico (1990-1993); I was a Visiting Professor of Law at St. Mary's University School of Law in San Antonio, Texas (1993-1994); and held Adjunct Professor of Law positions at both The Washington College of Law, American University, Washington, D.C. (Summer 1994) and Universidad Regiomontana in Monterrey, Mexico (1983-1985). As a professor, I have taught courses on Comparative International Law, Private International Law, Public International Law, International Business Transactions, and the Legal Framework of Doing Business in México, among others.

7. I have maintained a law practice since 1980 in various companies and law firms. I currently practice law at Gabuardi Abogados in Monterrey, Mexico, since 2004. I have also worked as a lawyer in the legal department of the World Bank in Washington, D.C. (1994-1996) and as both a Corporate Legal Manager and the Assistant Secretary of the Board of Directors of Grupo Gamesa, a Mexican manufacturing company (1980-1985). My law practice focuses on Corporate Law, Contracts, Business Transactions, Private International Law, as well as in International and Domestic Litigation.

8. I am a member of several legal professional organizations in both Mexico and internationally, including the Barra Mexicana de Abogados, Colegio de Abogados, Capítulo Nuevo León (the Mexican Bar Association, Nuevo Leon Inn), where I was the Chair of the International and Comparative Law Committee; the Colegio de Abogados de Monterrey (the Monterrey Bar Association); the Academia Nuevo Leonesa de Derecho Mercantil (the Nuevo Leon Academy of Commercial Law); the Asosiacion Nacional de Abogados de Empresa (the

3

01257

National Association of Corporate Lawyers); the External Advisory Board of NAFTA; the Law and Business Review of the Americas; the Mexican Academy of Private International and Comparative Law (Académia Méxicana de Derecho Internacional Privado y Comparado); the Mexican Association of Private International Law Professors (the Asociación Mexicana de Profesores de Derecho Internacional Privado) and the International Academy of Comparative Law. I also was part of the group that founded the US-Mexico Bar Association and later on served as its Mexican co-chair of the Legal Education Committee.

9. Further, I have served on the Regional Advisory Board of the Centre for Conciliation and Arbitration of St. Mary's University School of Law, San Antonio, Texas. I also co-planned and administered a program titled "Joint Venture. A Transnational Study and Training Program for U.S. and Mexican Business Lawyers" held at the St. Mary's University School of Law and Universidad de Monterrey.

10. During my academic career, I have published more than 20 academic articles and two books in both Mexico and abroad on topics including Commercial Law and Business Transactions, Private International Law and Comparative Law. Most recently, the Puerto Rico Supreme Court cited my article on forum non conveniens titled "Entre la jurisdicción, la competencia y el forum non conveniens," originally published in the Boletín Mexicano de Derecho Comparado in 2008, in its opinion deciding whether to incorporate the common-law doctrine of forum non conveniens in Puerto Rico.

## II. OPINIONS

11. The first part of the 4th Clause in the "Acuerdo Privado," "Jurisdiction and Mexican Law", reads as follows: "This Agreement is established under the **jurisdiction and**

4

laws[1] **of the United Mexican States.** Therefore, the parties **exclusively** submit to the laws of Mexico, thus they expressly **waive** the application of any Law, regulation, provision or rule of any jurisdiction other than Mexico, which might correspond to them due to their residence, paternity, citizenship, domicile, kinship or commercial relationship."

12. Then, as a corollary to that provision, the parties set forth that as a consequence of their submission to the jurisdiction and the laws of Mexico, the parties submitted to the courts located in Reynosa, Tamaulipas, Mexico, to hear cases relating to the interpretation, disputes or any other aspect related to the "Afirme Trust". This language ties together the parties' choice of law and choice of forum, and this linkage makes clear that the choice of forum extends to disputes about the "Acuerdo Privado". Accordingly, any claim by Ms. Adriana Longoria Kowalsky to receive payments under the "Acuerdo Privado," or alternatively to receive payments beyond what the "Acuerdo Privado" provides for, would be subject to the forum selection clause under Mexican Law.

13. The 4th clause has a second paragraph whereby the parties to the "Acuerdo Privado" created a legal wall barring any intrusion from non-Mexican law, regulation or provisions of any sort seeking to (i) impose restrictions or impose performance of acts other than the ones set forth in said instrument; (ii) impose any duties or tax burdens other than those set forth by Mexican Law; (iii) any act of expropriation, limitation, confiscation, re-possession, disposal or any sort, freezing, or any other act which may have an effect on the rights derived from such "Acuerdo Privado"; adding that in any circumstances, the jurisdiction and legislation of Mexico shall be applied to such "Acuerdo Privado" under the terms of the first paragraph of the 4th clause.

---

[1] Emphasis added by Affiant.

5

01259

14. This provision shows the parties' intent not to seek any provisions from a U.S. court which would affect the parties' rights under the "Acuerdo Privado".

15. The 4th clause of the "Acuerdo Privado" fully complies with the Code of Civil Procedure of the State of Tamaulipas, which under the authority of Article 179[2] sets forth that territorial jurisdiction is the only type of jurisdiction upon which the parties to an agreement may agree.

16. There are similar provisions in other Mexican Statutes providing for the possibility of entering into agreements on territorial jurisdiction, and Mexican Federal Courts have settled case law on this matter. For example, an express clause to extend jurisdiction takes place when the parties clearly and categorically waive other jurisdictions to which they may be entitled and designate the court to which they want to be submitted either through a public or a private document.[3] Moreover, if a defendant submitted himself to the courts of a named city, this fact is sufficient to assign jurisdiction to those courts as allowed by applicable legislation.[4]

17. Furthermore, the agreement in the 4th clause, second paragraph, of the "Acuerdo Privado" imposes on the parties the obligation to refrain themselves (an "obligation not do")

---

[2] Article 179 of Code of Civil Procedure of the State of Tamaulipas: "Territorial jurisdiction is the only type of jurisdiction upon which the parties to an agreement may agree."

[3] Question on Jurisdiction 175/81. Controversy between the Second District Court in the State of Morelos and the District Court in the State of Hidalgo. February 29, 1984. Majority of three votes. Dissenting opinions: Gloria León Orantes and Jore Olivera Toro. Writer of the Opinion: Mariano Azuela Güitron. Clerk: Jaime Marroquín Zaleta. Supreme Court of Justice of the Nation. Third Chamber. Judicial Weekly or the Federation. Seventh Epoch, Volume 181-186. Fourth Section. Page: 108. Registry Number: 240245. Isolated thesis. Subject Matter: Civil. See Exhibit B.

[4] Question on Jurisdiction 78/84. Controversy between the Fourth Civil Court of the State of Puebla and the Twentieth Civil Court of the Federal District. May 30, 1985. Five votes. Writer of the Opinion: Ernesto Diaz Infante. Clerk: Tarcicio Obregón Lemus. Supreme Court of Justice of the Nation. Third Chamber. Judicial Weekly or the Federation. Seventh Epoch. Volume 193-198. Fourth Section. Page: 31. Registry Number: 240103. Isolated thesis. Subject Matter: Civil. Seventh Epoch: Report 1985, page 16. Question on Jurisdiction 153/84. Controversy between the Forty Third Civil Court of the Federal District and the Forth Civil Court of First Instance of Torreón, Coahila. May 30, 1985. Five Votes. Writer of the Opinion: Ernesto Diaz Infante. Clerk: Tarcicio Obregón Lemus. See: Appendix to the Judicial Weekly or the Federation 1917-1985. Ninth Section. Thesis 14, page 25, authorized under the heading: "CIVIL JURISDICTION BY SUBMISSION. EXTENSION OF TERRITORIAL JURISDICTION AUTHORIZED BY LAW." See Exhibit C.

6

01260

from seeking to affect the rights of the "Acuerdo Privado" based on law outside of Mexico. The parties therefore agreed, for example, not to file a lawsuit in Texas seeking the application of Texas law to their rights under the "Acuerdo Privado."

18.    The Supreme Court of Mexico has stated that an "obligation not to do" something is continuous and enforceable for the parties to an agreement.[5]

19.    If Mr. Shelby Longoria is sued upon the basis of the "Acuerdo Privado" referred to above, he may seek the enforcement of the Jurisdiction and Mexican Law clause in such agreement against Ms. Adriana Longoria Kowakski based upon the principle set forth in article 1259[6] of the Civil Code of Tamaulipas that provides that the parties to a contract "are bound not only to the contractual terms set forth thereby, but also to the implications of the same according to their own nature according to good faith, usages and the law."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NOT.

_____
Dr. Carlos Alberto Enrique José Lorenzo Gabuardi Arreola

---

[5] Direct Amparo 67647/58. Juan Bringas Zamora, October 14, 1959. Five votes. Writer of the Opinion: Mariano Ramírez Vázquez. Supreme Court of Justice of the Nation. Third Chamber. Judicial Weekly or the Federation. Sixth Epoch. Volume XXVIII. Fourth Section. Page: 224. Registry Number: 271744. Isolated thesis. Subject Matter: Civil. See Exhibit D.

[6] Article 1259 of the Civil Code of Tamaulipas: "All contracts are perfected merely by consent, unless they required to observe formalities set forth by statute. Contracts are binding to the parties thereto since they are perfected, and they are bound not only to the contractual terms set forth thereby, but also to the implications of the same according to their own nature according to good faith, usages and the law."

7

01261

SUBSCRIBED AND SWORN TO BEFORE ME this 13th day of January 2015, to certify which witness my hand and seal of office.

CELIA HERNANDEZ
Notary Public, State of Texas
Commission Expires 11-10-2018

_Celia Hernandez_
Notary Public - State of _Texas_

Printed Name: _____

My Commission Expires: _____

8

01262

# EXHIBIT A

01263

## Executive Summary – Curriculum Vitae
## Dr. Carlos A.Gabuardi, Ph.D.

**Dr. Carlos A. Gabuardi, Lic. Jur., LL.M., Ph.D.,** is a practicing lawyer. He holds a License in Jurisprudence from Universidad de Monterrey; a Master of Laws, with distinction, from of Tulane University and a Doctorate of Laws (Ph.D.) from the same university. Doctor Gabuardi has published several articles in Law Reviews and Journals in Mexico and abroad. He is currently a member of the National Researches System with Level 1.

Dr. Gabuardi was a lawyer in the Legal Department of the World Bank, Washington, D.C.; Corporate Legal Manager and Assistant Secretary of Grupo Gamesa. He was Professor of Law and researcher at the Instituto Tecnológico y de Estudios Superiores de Monterrey, Head of the Law Department and Professor of Law at Universidad de Monterrey; Visiting Professor of Law, St. Mary's University School of Law, San Antonio, Texas; co-planner and administrator of the program: "Joint Venture. A Transnational Study and Training Program for U.S. and Mexican Business Lawyers" (St. Mary's University School of Law and Universidad de Monterrey); Adjunct Professor of Law, The Washington College of Law, American University, Washington, D.C.; Adjunct Professor of Law, Universidad Regiomontana. Member Regional Advisory Board of the Centre for Conciliation and Arbitration of St. Mary's University School of Law, San Antonio, Texas.

He is a member of the Mexican Bar Association, Nuevo León Inn; member of the Monterrey Bar Association (Colegio de Abogados de Monterrey); member of the Academia Nuevo Leonesa de Derecho Mercantil (The Nuevo Leon Academy of Commercial Law); Asosiación Nacional de Abogados de Empresa, A.C. (National Association of Corporate Lawyers), member of the US – Mexico Bar Association, where he was the Mexican co-Chair of the Legal Education Committee; member External Advisory Board de NAFTA: Law and Business Review of the Americas.; member of the Mexican Academy of Private International and Comparative Law; member of the Mexican Academy of member of the International Academy of Comparative Law.

Former President of Province XXVIII of the International Legal Fraternity Phi Delta Phi. He was a member of the Editorial Board of the National Section of the newspaper El Norte (Grupo Reforma) and he represented Monterrey Tech before the Justice Consortium of the Eurosocial Program, and he is also Co-Secretary and a numbered member of the Group of the 100 of the Ceter for Legal Innovation, Development and Research for Latin-America, Garrigues – Tec de Monterrey. Dr. Gabuardi has also produced and conducted los talk-shows "The World of Law and the Law in the World" (Frecuencia Tec, 94.9 FM,) and "Law and Justice" (AW Noticias, 1280 AM)

Dr. Gabuardi has taught courses on Comparative Law, Private International Law, Public International Law and International Business Transactions, and The Legal Framework of Doing Business.

Dr. Gabuardi's law practice focuses on Corporate Law, Contracts, Business Transactions, as well as on International and Domestic Litigation.

01264

# EXHIBIT B

**Jurisdiction. Express voluntary extension. The clause of the document in which that is written, cannot be applied to circumstances other that those set forth by such clause.**

Article 23 of the Federal Code of Civil Procedure sets forth that "territorial jurisdiction may be extended by a mutual consent of the parties, either express or implied". A voluntary express clause to extend jurisdiction (or express extension of jurisdiction, as it has been improperly been called) takes place when the parties concerned clearly and categorically waive to the jurisdiction to which they may be entitled and accurately designate the court to which they want to be submitted. The decision of extending jurisdiction may be stated either in a public or a private document. Now, ever since jurisdiction is a procedural requirement, that is, a *sine qua non* requirement to begin valid legal process, it is without a question that jurisdiction can only be extended, when the terms set forth in such extension clause take place. It cannot be accepted that the court is empowered to arbitrarily apply such clause to circumstances different that those included in the same, because that would create procedural uncertainty and would trigger a larger number of disputes on jurisdictional issues.

Question on Jurisdiction 175/81. Controversy between the Second District Court in the State of Morelos and the District Court in the State of Hidalgo. February 29, 1984. Majority of three votes. Dissenting opinions: Gloria León Orantes and Jore Olivera Toro. Writer of the Opinion: Mariano Azuela Güitron. Clerk: Jaime Marroquín Zaleta. Supreme Court of Justice of the Nation. Third Chamber. Judicial Weekly or the Federation. Seventh Epoch, Volume 181-186. Fourth Section. Page: 108. Registry Number: 240245. Isolated thesis. Subject Matter: Civil.

Séptima Época

Instancia: Tercera Sala

Fuente: Semanario Judicial de la Federación

Volumen 181-186, Cuarta Parte

Tesis:

Página: 108

Núm. de Registro: 240245

Tesis Aislada

Materia(s): Civil

**COMPETENCIA. PRORROGA VOLUNTARIA EXPRESA. LA CLAUSULA DEL DOCUMENTO EN EL QUE SE HAGA CONSTAR, NO PUEDE APLICARSE A SUPUESTOS NO PREVISTOS EN ELLA.**

El artículo 23 del Código Federal de Procedimientos Civiles, dispone que "la competencia territorial es prorrogable por mutuo consentimiento de las partes, expreso o tácito". La prórroga de competencia voluntaria expresa (o prórroga de jurisdicción expresa, como impropiamente se le llama) tiene lugar cuando los interesados renuncian clara y terminantemente al fuero que la ley les concede, y designan con toda precisión al juez a quien se someten. Esta decisión de prorrogar la competencia puede hacerse constar en instrumento público o privado. Ahora bien, como la competencia es un presupuesto procesal, es decir, un requisito sin el cual no puede iniciarse ni desenvolverse válidamente un proceso, es inconcuso que la misma no puede tenerse por prorrogada en forma expresa, sino cuando se actualicen los supuestos previstos por los interesados en la cláusula del documento en que acordaron la prórroga. No es posible aceptar que es facultad del juzgador, la de aplicar a su arbitrio dicha cláusula, a casos distintos de los que mencionen en la misma, pues ello crearía una situación de incertidumbre procesal y daría pie al planteamiento de un mayor número de conflictos competenciales.

Competencia 175/81. Suscitada entre los Jueces Segundo de Distrito en el Estado de Morelos y de Distrito en el Estado de Hidalgo. 29 de febrero de 1984. Mayoría de tres votos. Disidentes: Gloria León Orantes y Jorge Olivera Toro. Ponente: Mariano Azuela Güitrón. Secretario: Jaime Marroquín Zaleta.

# EXHIBIT C

01268

**Civil Jurisdiction by Submission. Extension of Territorial Jurisdiction Authorized by Law.**

If the defendant submitted himself to the courts of a named city in the event of breach of any of the obligations entered into a Deed of Mortgage, this fact is sufficient to assign jurisdiction to a given court if the legislation of the competing courts acknowledge the principle the "it is a court of competent jurisdiction the one to which the parties submitted themselves expressly or impliedly when that jurisdiction can be waived", a principle which is applicable, if there was an extension of territorial jurisdiction as authorized by the law."

Question on Jurisdiction 78/84. Controversy between the Fourth Civil Court of the State of Puebla and the Twentieth Civil Court of the Federal District. May 30, 1985. Five votes. Writer of the Opinion: Ernesto Diaz Infante. Clerk: Tarcicio Obregón Lemus. Supreme Court of Justice of the Nation. Third Chamber. Judicial Weekly or the Federation. Seventh Epoch. Volume 193-198. Fourth Section. Page: 31. Registry Number: 240103. Isolated thesis. Subject Matter: Civil.

Seventh Epoch:

Report 1985, page 16. Question on Jurisdiction 153/84. Controversy between the Forty Third Civil Court of the Federal District and the Forth Civil Court of First Instance of Torreón, Coahila. May 30, 1985. Five Votes. Writer of the Opinion: Ernesto Diaz Infante. Clerk: Tarcicio Obregón Lemus.

See: Appendix to the Judicial Weekly or the Federation 1917-1985. Ninth Section. Thesis 14, page 25, authorized under the heading: "CIVIL JURISDICTION BY SUBMISSION. EXTENSION OF TERRITORIAL JURISDICTION AUTHORIZED BY LAW.".

01269

Séptima Época

Instancia: Tercera Sala

Fuente: Semanario Judicial de la Federación

Volumen 193-198, Cuarta Parte

Tesis:

Página: 31

Núm. de Registro: 240103

Tesis Aislada

Materia(s): Civil

**COMPETENCIA CIVIL POR SUMISION. PRORROGA DE LA COMPETENCIA TERRITORIAL AUTORIZADA POR LA LEY.**

Si la demandada se sometió a los tribunales de una ciudad para el caso de incumplimiento de alguna de las obligaciones contraídas en una escritura de hipoteca, esta circunstancia basta para establecer la competencia si las legislaciones de los Estados cuyos Jueces compiten reconocen el principio de que "es Juez competente aquél al que los litigantes se hubieren sometido expresa o tácitamente cuando se trate de fuero renunciable", principio que tiene aplicación, si hubo prórroga de competencia territorial autorizado por la ley.

Competencia civil 78/84. Suscitada entre los Jueces Cuarto de lo Civil de Puebla, Puebla y Vigésimo de lo Civil del Distrito Federal. 30 de mayo de 1985. Cinco votos. Ponente: Ernesto Díaz Infante. Secretario: Tarcicio Obregón Lemus.

Séptima Epoca:

Informe 1985, página 16. Competencia 153/84. Suscitada entre los Jueces Cuadragésimo Tercero de lo Civil del D.F. y Cuarto de Primera Instancia de lo Civil de Torreón, Coahuila. 30 de mayo de 1985. Cinco votos. Ponente: Ernesto Díaz Infante. Secretario: Tarcicio Obregón Lemus.

Véase: Apéndice al Semanario Judicial de la Federación 1917-1985, Novena Parte, tesis 14, página 25, bajo el rubro "COMPETENCIA CIVIL POR SUMISION PRORROGA DE LA COMPETENCIA TERRITORIAL AUTORIZADA POR LA LEY.".

# EXHIBIT D

01271

**Obligations not to do. Value of the same.**

An obligation not to do is continuous, its value is valued by the harm damages caused by its infringement, because under article 2028 of the Civil Code it is set forth that the one who is obligated not to do something, shall be subject to the payment of the harm and damages caused by its breach, and if there is a material construction, the creditor may require that such construction be destroyed at the cost of the party that caused the breach; therefore, when the defendant fail to comply with its main obligation not to compete with plaintiff in selling milk products within a given time frame, the value of the main obligation is represented by the damages that was caused, that is, that is the privation of the benefit, profit or gain that caused the unfair competition, a value that should be considered as the basis to quantify the penalty agreed upon in the third clause of the contract upon which the cause of action is based. Therefore, it is not accurate that in the obligations not to do there is no principal obligation; refraining such conducts is the cause of the agreement and it reason to exist, additionally in this case, the party to the agreed clause was entered with independence or authonomy of the agreement for the dissolution and liquidation of the company, and that is the best evidence that the amount of capital stock is not the value of the main obligation.

Direct Amparo 67647/58. Juan Bringas Zamora, October 14, 1959. Five votes. Writer of the Opinion: Mariano Ramírez Vázquez. Supreme Court of Justice of the Nation. Third Chamber. Judicial Weekly or the Federation. Sixth Epoch. Volume XXVIII. Fourth Section. Page: 224. Registry Number: 271744. Isolated thesis. Subject Matter: Civil.

Sexta Época

Instancia: Tercera Sala

Fuente: Semanario Judicial de la Federación

Volumen XXVIII, Cuarta Parte

Tesis:

Página: 224

Núm. de Registro: 271744

Tesis Aislada

Materia(s): Civil

**OBLIGACIONES DE NO HACER, VALOR DE LAS.**

La obligación de no hacer es de tracto sucesivo y su valor es el daño o perjuicio que se causa con el hacer correlativo, pues el artículo 2028 del Código Civil establece que el que estuviere obligado a no hacer alguna cosa, quedará sujeto al pago de daños y perjuicios en caso de contravención, y si hubiere obra material, podrá exigir el acreedor que sea destruida a costa del obligado; por tanto, cuando el demandado faltó al cumplimiento de la obligación principal de no competir al actor en la venta de productos lácteos dentro de cierto plazo, el valor de la obligación principal está representado por el del perjuicio que le causó o sea, la privación del beneficio, utilidad o lucro que le ocasionó con la competencia desleal, mismo valor que debe servir de base para la cuantificación de la pena convencional pactada en la cláusula tercera del contrato fundatorio de la acción. Consiguientemente, no es exacto que en las obligaciones de no hacer no existe obligación principal; los actos de abstención son el móvil del pacto y la razón de su existencia, además en la especie, la pactada pudo celebrarse con independencia o autonomía del convenio de disolución y liquidación de la sociedad, y esto es la mejor evidencia de que el monto del capital social no es el valor de la obligación principal.

Amparo directo 6764/58. Juan Bringas Zamora. 14 de octubre de 1959. Cinco votos. Ponente: Mariano Ramírez Vázquez.

# EXHIBIT 5

01274

| IN THE ESTATE OF | § | IN PROBATE COURT NUMBER ONE |
|---|---|---|
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

## FIRST AMENDED COUNTERCLAIMS OF ADRIANA LONGORIA

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW Adriana Longoria, as Counter-Plaintiff, and pleads the following amended counterclaims in response to Shelby Longoria's Second Amended Contest of 2010 Will (or any subsequently filed pleading making the same or similar allegations against Adriana Longoria), and states the following causes of action against Shelby Longoria, as Counter-Defendant.

### The Parties

1.      Counter-Plaintiff Adriana Longoria ("Adriana" or "Counter-Plaintiff") is an individual who resides in Harris County, Texas.

2.      Counter-Defendant Shelby Longoria ("Shelby" or "Counter-Defendant") is an individual who resides in Hidalgo County, Texas.  Counter-Defendant commenced this action and has appeared, through counsel, herein, so this pleading may be served on him through his attorneys of record.

### Jurisdiction

3.      Pursuant to Subsection 32.001(b) of the Texas Estates Codes, and other applicable law, the Court has jurisdiction over the subject matter of this civil action.  The

01275

exercise of pendent and ancillary jurisdiction over these counterclaims is necessary to promote judicial efficiency and economy.

4.     The Court has *in personam* jurisdiction over Counter-Defendant Shelby Longoria by virtue of his filing, on June 18, 2013, of Shelby Longoria's Contest of 2010 Will and his subsequent filing of amendments thereto. In addition, general personal jurisdiction exists because Shelby Longoria has had continuous and systematic contacts with the State of Texas, and specific personal jurisdiction exists because this action arises out of contacts by Shelby Longoria with the State of Texas, as explained below.

### Venue

5.     Pursuant to Sections 33.002 and 33.003 of the Texas Estates Code, the venue of this action is proper.

### Conditions Precedent

6.     All conditions precedent to Counter-Plaintiff's rights to plead and to prosecute these counterclaims, and to recover the relief requested herein, have occurred or been fulfilled.

### Facts Applicable to All Causes of Action[1]

7.     On July 3, 1942, Eduardo Longoria ("Eduardo"), also known as Eduardo Longoria Theriot, and Dorothy Louise Kowalski ("Dorothy") were married in the City of Laredo, in Webb County, Texas.

---

[1] This petition does not recite every fact on which the Counter-Plaintiff's claims are based. It is intended only to be "a short statement of the cause of action sufficient to give fair notice of the claim involved," as required by TEX. R. CIV. P. 47.

FIRST AMENDED COUNTERCLAIMS OF ADRIANA LONGORIA                    Page 2

01276

8. When they were married, Dorothy was a citizen of the United States of America, and Eduardo was a citizen of the United Mexican States ("Mexico"), but he had been living in the United States and, after the wedding, the couple initially settled in McAllen, Texas.

9. The marriage of Eduardo and Dorothy was subject to the laws of the State of Texas, including the law of community property.

10. Eduardo and Dorothy had four children, all of whom are living. Their names are:

    (a)    Adriana Longoria ("Adriana"), who is Counter-Plaintiff herein;

    (b)    Eduardo Longoria, Jr., also known as Wayo Longoria ("Wayo");

    (c)    Sylvia Dorsey (Sylvia);

    (d)    Shelby Longoria ("Shelby"), who is Counter-Defendant herein.

11. Eduardo and Dorothy amassed considerable wealth through a variety of business activities and investments.

12. In the 1970's, Shelby began to work in his parents' businesses and he quickly gained control of them.

13. After he gained control of the family businesses and investments, Shelby controlled his parents by restricting the flow of money to them, even putting them on an "allowance" and strictly regulating it, and by deceiving them concerning the status of their businesses and investments over which he had complete control.

01277

14. Shelby also manipulated his parents with respect to their estate planning and he induced them to enter into various transactions which were shrewdly calculated by Shelby to reduce the amounts to be inherited by each of Shelby's siblings and to increase his own share.

15. On or about December 17, 2002, Shelby induced Eduardo to enter into a contract, entitled "Acuerdo Privada" (or "Private Agreement"), with Adriana. Although the Private Agreement does not state that it includes all of the financial benefits that Adriana would ever receive from her father, Shelby fraudulently induced Eduardo to believe that the amounts to be paid under the Private Agreement would be a fair allocation of his estate as far as Adriana was concerned. The truth, however, was that the amounts contemplated by the Private Agreement – even if paid in full – would represent only a tiny fraction of the value of Eduardo's estate. Moreover, Shelby knew that ultimately he would have the raw power to terminate the payments to Adriana should he choose to do so, and that she probably would lack the resources necessary to seek redress for such action.

16. According to the terms of the Private Agreement, Adriana was to receive $150,000 per year, in monthly installments of $12,500, until she had received a total of $2,069,100 plus interest thereon to be calculated at a rate equal to 75 percent of the"prime rate" published by the Wall Street Journal, and with all sums expressed and to be paid in currency of the United States.

17. Shelby was not a signatory party to the Private Agreement.

FIRST AMENDED COUNTERCLAIMS OF ADRIANA LONGORIA                    Page 4

01278

18. Shelby was, however, named in the Private Agreement as an individual who was responsible to see that the required payments to Adriana were made by the Mexican businesses, and Shelby did, in fact, control the businesses that generated the cash flow that was supposed to be used to make payments under the Private Agreement.

19. Shelby expressly assumed the contractual obligation to cause the payments to be made, and for some time Shelby caused payments to be made to Adriana, but he did so fraudulently, as explained below.

19. The Private Agreement created a trust relationship, and it identified Shelby as a person who was to serve in the role of trustee, i.e., managing certain property (the Mexican businesses and their cash flow) for the benefit of another (Adriana). Shelby accepted this role and thereby assumed a fiduciary responsibility to perform the Private Agreement.

20. Instead of performing his contractual and fiduciary duty to cause the businesses to pay the amounts owed to Adriana pursuant to the Private Agreement, Shelby used his father's money to make payments to Adriana. After his father died, Shelby used his mother's money to make payments to Adriana. Shelby knew that Dorothy intended for Adriana to inherit some of Dorothy's money, so he both defrauded Dorothy and interfered with Adriana's inheritance rights by using Dorothy's money supposedly to satisfy contractual obligations under the Private Agreement, which was not signed by Dorothy and indeed does not even mention Dorothy.

21. Eduardo died on January 26, 2005, in Webb County, Texas.

01279

22. After the death of Eduardo, Shelby continued to cause payments to be made to Adriana, but he did so deceitfully, using Dorothy's money to make the payments instead of using the cash flow of the Mexican businesses as contemplated by the Private Agreement.

23. Shelby has lived in Texas since 1979 and he was living in Texas when the Private Agreement was made.

24. Adriana and Eduardo also lived in Texas when the Private Agreement was made and thereafter.

25. Shelby and Adriana had an informal fiduciary relationship under which Shelby had a fiduciary duty to see that Adriana received the payments contemplated by the Private Agreement. The informal fiduciary relationship between Shelby and Adriana arose in Texas pursuant to Texas law.

26. Shelby and Adriana also had an express fiduciary relationship arising under the Private Agreement.

27. In or around October 2010, Shelby caused the payments to Adriana to cease.

28. Shelby did so with malice toward Adriana, based on a grudge against her, and without legal justification or excuse.

29. Shelby caused further harm to Adriana in 2012, shortly after their mother died on April 6 of that year, by breaching a contractual obligation of which Adriana was a third-party beneficiary.

30. The obligation was set forth in an agreement dated October 9, 2007, between Shelby and Dorothy. The agreement was in the form of a letter which Shelby sent from his

01280

home in McAllen, Texas, to Dorothy at her residence in Houston, Texas, and which Dorothy then signed. In the agreement, Shelby specifically promised that, within thirty days after Dorothy died, he would pay $100,000 to Sylvia and $100,000 to Adriana.

31. Adriana was a third-party beneficiary of the October 9, 2007, contract between Shelby and Dorothy.

32. Upon Dorothy's death, Shelby repudiated and breached his contractual obligation to pay $100,000 to Adriana. While he did tender to Adriana a check for $100,000, he had printed on the check language that, if the check was negotiated, would have resulted in a release of, among other things, "all obligations which Shelby Longoria may have or is claimed to have to the estate of Dorothy Longoria or any beneficiary thereof."

33. Shelby had no right to impose such self-serving conditions, and he did so maliciously, as he knew that Adriana was a beneficiary of Dorothy's estate and that he had obligations to Adriana.

34. Shelby knew that Dorothy intended for her daughters to receive her entire estate, so he manipulated Dorothy to enter into various transactions which were designed to benefit Shelby and to reduce the value of Dorothy's estate.

Respondeat Superior

35. Whenever it is alleged herein that Shelby acted or communicated in any fashion, then such allegation should be taken to mean:

a. That Shelby himself took such action or made such communication; or, in the alternative,

FIRST AMENDED COUNTERCLAIMS OF ADRIANA LONGORIA                    Page 7

01281

b.     That a duly authorized agent of Shelby took such action or made such communication on behalf of Shelby and in the course and scope of the agency; or, in the alternative,

c.     That such action or communication was by one having apparent authority to do so on behalf of Shelby; or, in the alternative,

d.     That Shelby ratified and adopted such action or communication as its own and thereby became legally responsible for it.

**Statement Pursuant to Rule 47 of the Texas Rules of Civil Procedure**

36.     Adriana seeks monetary relief over $1,000,000.

**First Cause of Action**
**Tortious Intererence with Inheritance Rights**

37.     Adriana repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

38.     Shelby tortiously interfered with Adriana's inheritance rights.

39.     The tortious interference by Shelby proximately caused compensable harm to Adriana. Under Texas law, Adriana is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law.

40.     The tortious interference by Shelby was committed with "malice" as that term is defined in Chapter 41 of the Texas Civil Practice and Remedies Code. Under Texas law,

01282

Adriana is entitled to, and hereby requests, entry of judgment against Shelby for exemplary damages in an amount to be determined by the trier of fact in accordance with Texas law.

41. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Adriana pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations, because this counterclaim arises out of the same transactions or occurrences, or at least one if not more of the same transactions or occurrences, that are the subject matter of Shelby's claim against Adriana, and this counterclaim does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

### Second Cause of Action
### Breaches of Fiduciary Duty

42. Adriana repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

43. Under Texas law, Shelby breached his fiduciary duty to Adriana by, *inter alia*, (a) maliciously causing the monthly payments to her to cease, because of a grudge held by him, and (b) asserting a fraudulent excuse for the cessation of the monthly payments.

44. The breaches of fiduciary duty by Shelby proximately caused compensable harm to Adriana. Under Texas law, Adriana is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law.

01283

45. The breaches of fiduciary duty by Shelby constituted "fraud" and were committed with "malice" as those terms are defined in Chapter 41 of the Texas Civil Practice and Remedies Code. Under Texas law, Adriana is entitled to, and hereby requests, entry of judgment against Shelby for exemplary damages in an amount to be determined by the trier of fact in accordance with Texas law.

46. Pursuant to Section 114.064 of the Texas Trust Code, and other applicable law, Adriana is entitled to an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

47. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Adriana pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations, because this counterclaim arises out of the same transactions or occurrences, or at least one if not more of the same transactions or occurrences, that are the subject matter of Shelby's claim against Adriana, and this counterclaim does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

### Third Cause of Action
### Tortious Interference with Contract

48. Adriana repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

49. Shelby tortiously interfered with the performance of the Private Agreement between Eduardo and Adriana.

01284

50. The tortious interference by Shelby proximately caused compensable harm to Adriana. Under Texas law, Adriana is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law.

51. The tortious interference by Shelby was committed with "malice" as that term is defined in Chapter 41 of the Texas Civil Practice and Remedies Code. Under Texas law, Adriana is entitled to, and hereby requests, entry of judgment against Shelby for exemplary damages in an amount to be determined by the trier of fact in accordance with Texas law.

52. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Adriana pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations, because this counterclaim arises out of the same transactions or occurrences, or at least one if not more of the same transactions or occurrences, that are the subject matter of Shelby's claim against Adriana, and this counterclaim does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

## Fourth Cause of Action
## Breach of Contractual Obligation To Perform Private Agreement

53. Adriana repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

54. Shelby assumed the contractual obligation to cause the Mexican businesses to make the payments owed to Adriana under the Private Agreement.

01285

55. Shelby breached his obligations under the Private Agreement, first by using Eduardo's money to make payments that should have been made by the businesses, then by using Dorothy's money to make payments that should have been made by the businesses, and finally by cutting off all payments entirely.

56. The breaches by Shelby proximately caused compensable harm to Adriana. Under Texas law, Adriana is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law.

57. It was both reasonable and necessary for Adriana to retain attorneys to prepare and to prosecute this action. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable law, Adriana is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

### Fifth Cause of Action
### Breach of Promise To Pay $100,000 to Adriana

58. Adriana repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

59. In the agreement dated October 9, 2007, Shelby promised Dorothy that, within thirty days of her death, he would pay $100,000 to Adriana. This promise was made by Shelby while he was residing in Texas, and it was directed to Dorothy at her residence in Houston, Texas. Adriana was a third-party beneficiary of the promise made by Shelby to

FIRST AMENDED COUNTERCLAIMS OF ADRIANA LONGORIA                    Page 12

01286

Dorothy. Shelby breached his promise to Dorothy by tendering to Adriana a check that she could not negotiate without waiving her rights in Dorothy's estate and her rights against Shelby. He had no right to impose such self-serving conditions.

60. Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Adriana is entitled to, and hereby requests, entry of judgment against Shelby for $100,000 in accordance with Texas law.

61. It was both reasonable and necessary for Adriana to retain attorneys to prepare and to prosecute this action. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law, Adriana is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

### Prayer for Relief

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiff Adriana Longoria prays that upon due notice and trial by jury, or upon hearing on motion for entry of default judgment or motion for summary judgment, the Court render judgment for her and against Counter-Defendant Shelby Longoria, awarding the following relief under Texas law:

(1) an award of actual damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law;

(2) an award of exemplary damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law;

01287

(3)     an award of attorney fees (including litigation expenses) reasonably and necessarily incurred by Counter-Plaintiff in connection with her fourth cause of action under Texas law;

(4)     an award of prejudgment interest on all actual damages at the highest rate authorized by Texas law to the date of judgment;

(5)     an award of all costs incurred by Counter-Plaintiff in the course of preparing and prosecuting this civil action;

(6)     an award of postjudgment interest on all monetary relief at the highest rate authorized by Texas law from the date of judgment until paid;

(7)     all writs and processes necessary to collect the judgment; and

(8)     all other relief to which Counter-Plaintiff is entitled under Texas law or which the Court may deem appropriate under the circumstances and applicable Texas law.

Any inconsistent allegations or prayers for relief are pleaded in the alternative, as expressly authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

### Reservation of Rights To Amend and To Supplement This Pleading

Adriana presently does not know all of the specific acts and omissions that caused harm to her, or all of the relevant circumstances surrounding such acts and omissions, so she anticipates that it may be necessary to plead additional causes of action after discovery is conducted. Accordingly, Adriana hereby reserves the rights to amend and to supplement this pleading.

01288

DATED:   December 11, 2014.

Respectfully submitted,

*/s/ James Austin Fisher*
James Austin Fisher
   State Bar of Texas Number 07051650
Shannon L.K. Welch
   State Bar of Texas Number 90001699
**FISHER & WELCH**
**A Professional Corporation**
Ross Tower, Suite 2800
500 North Akard Street
Dallas, Texas 75201
Telephone:   214.661.9400
Facsimile:   214.661.9404

T. Wesley Holmes
   State Bar of Texas Number 09908495
**THE HOLMES LAW FIRM**
10,000 North Central Expressway, Suite 400
Dallas, Texas 75231
Telephone:   214.890.9267
Facsimile:   214.890.9295

**ATTORNEYS FOR COUNTER-PLAINTIFF**
**ADRIANA LONGORIA**

01289

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2014, a true and correct copy of this document was served on Shelby Longoria, through his attorneys of record named below, in the manner indicated and in compliance with Texas law.

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
3900 Essex Lane, Suite 220
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

*/s/ James Austin Fisher*
James Austin Fisher

01290

# EXHIBIT 6

01291

Page 144

NO. 414270

IN THE ESTATE OF            ( IN THE PROBATE COURT
DOROTHY LOUISE LONGORIA, (
DECEASED                   ( HARRIS COUNTY, TEXAS


*************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
ADRIANA LONGORIA
AUGUST 26, 2014
VOLUME II
*************************************************


ORAL AND VIDEOTAPED DEPOSITION OF ADRIANA LONGORIA, produced as a witness at the instance of Counsel for Shelby Longoria, and duly sworn, was taken in the above-styled and numbered cause on the 26th of August, 2014, from 2:08 p.m. to 4:49 p.m., before AMY PRIGMORE, CSR, in and for the State of Texas, reported by stenographic means, at the offices of SUSMAN GODFREY, LLP, 1000 Louisiana, Suite 500, Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

01292

A. This is the one we signed at dinnertime. It was his birthday, October.

Q. And you see the first clause, it says, "The parties recognize the validity and scope of the trust."

Do you see that? The paragraph right before the $3 million to you.

A. Uh-huh.

Q. Okay. So, back in 2002, in October, you say on your father's birthday you executed an agreement that affirms the validity and the scope of this trust referenced in the document, right?

MR. FISHER: Objection; form.

Q. (BY MR. HESS) Your answer?

A. Well, I was not able to read it before I signed it.

Q. All right. Obviously you didn't sign Exhibit 102, but you signed Exhibit 103, the Spanish language one?

A. Yes.

Q. And when you say you were not able to read it, you're not telling me that you're incapable of reading it, right?

A. No. I was saying it was too brief amount of time.

01293

Q. You feel today that you didn't have enough time to read Exhibit 103 before you signed it?

A. Yes.

Q. You don't dispute that you did sign it?

A. I don't dispute that I did sign it.

Q. You don't dispute that you could have had the opportunity to read it whenever you wanted?

A. No. They -- they were picked up then and there.

Q. I see. Do you recognize this is the agreement by which you've been paid --

A. Yes, I do.

Q. -- an allowance --

A. Yes, I do.

Q. -- every month, every year, between --

A. As I had all the years prior in my life.

MR. FISHER: You didn't let him finish the question, so you don't even know what you were answering.

Q. (BY MR. HESS) You don't even know what I was asking.

A. No, I don't. I am so terribly sorry.

Q. That's all right.

A. I suppose I'll leave here a renegade.

Q. Just try to do better.

A. I will. I truly...

Q. You signed an agreement --

A. Yes.

Q. -- in 2002. And under the terms of that agreement, you have been paid an allowance monthly, all way up until October 2010?

A. Yes.

Q. Are you claiming that this agreement is somehow invalid?

A. No.

Q. Okay. This is a valid agreement that you signed and which your father signed?

A. (Witness nods head.)

MR. FISHER: Objection; form.

Q. (BY MR. HESS) You nodded before Mr. Fisher objected.

But what is your answer, anyway, out loud?

A. What I see here on the paper is my signature and my father's signature.

Q. While you may have some complaints today that you wish you had more time to read it, you don't dispute that you signed it and that you've been paid pursuant to this agreement up until October 2010?

A. I -- I did not know what was written on

01295

these pages. And I almost feel that my father, at that time, as you can see his signature, was quite ill.

Q. You don't dispute --

A. No.

Q. -- that you signed it and that you've been paid pursuant to this agreement all the way up to 2010 --

A. Let me say that I do --

Q. -- right?

A. -- not know where those payments came from, were they the same payments from the trust that I had been paid for for 50 years monthly.

When I got my money, I got it in my account like I had been for 50 years prior.

Q. Are you going to turn around and give all that money back if this agreement is invalid?

A. I have no money. I've spent it.

Q. Well, look at the bottom of page 1.

MR. FISHER: Which exhibit?

MR. HESS: Exhibit 102.

Q. (BY MR. HESS) Where it says, "The balance to be delivered to Adriana Longoria Kowalski, in terms of previous paragraph, amounts to 2,069,100." And it carries over onto the second page.

01296

STATE OF TEXAS      )
COUNTY OF HARRIS    )

I, Amy Prigmore, Texas CSR No. 3929, do hereby certify:

That the foregoing deposition of ADRIANA LONGORIA, was taken before me at the time and place herein set forth, at which time the witness was put under oath by me;

That the testimony of the witness made at the time of the examination were recorded stenographically by me, were thereafter transcribed under my direction and supervision and that the foregoing is a true record of same.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

In witness whereof, I have subscribed my name this, the 8 day of Sept., 2014.

AMY PRIGMORE, Texas CSR 3929
Expiration Date:  12/31/14
MERRILL CORPORATION
315 Capitol Street, Suite 210
Houston, Texas  77093
Firm No. 210

# EXHIBIT 7

01298

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | |
| | § | HARRIS COUNTY, TEXAS |

---

## Affidavit of Johnny Carter in Support of
## Shelby Longoria's Motion to Dismiss Adriana Longoria's Claims

---

I, Johnny W. Carter, declare as follows:

1.      My name is Johnny W. Carter. I am over the age of twenty-one (21) years, am competent to testify to the matters stated herein, have personal knowledge of the facts and statements in this declaration, and each of the facts and statements is true and correct.

2.      I am an attorney in the law firm of Susman Godfrey L.L.P. I am licensed to practice law in the state of Texas and before this Court. I am counsel of record for Shelby Longoria in the above-referenced litigation.

3.      Attached as Exhibit 2 is a true and correct copy of a document dated December 17, 2002 titled "Acuerdo Privado."

4.      Attached as Exhibit 2A is a true and correct copy of a certified translation of the Acuerdo Privado.

5.      Attached as Exhibit 3 is a true and correct copy of a document dated October 15, 2002 titled "Banca Afirme Fideicomiso No. 194-2."

6.      Attached as Exhibit 3A is a true and correct copy of a certified translation of Banca Afirme Fideicomiso No. 194-2.

7.      Attached as Exhibit 5 is a true and correct copy of the First Amended Counterclaims of Adriana Longoria.

8.    Attached as Exhibit 6 is a true and correct copy of excerpts from the deposition of Adriana Longoria.

FURTHER, AFFIANT SAITH NOT.



_____
Johnny W. Carter

SUBSCRIBED AND SWORN TO BEFORE ME, a Notary Public, by Johnny W. Carter, on this 14th day of January, 2015, to certify which witness my official hand and seal of office.

_____
Notary Public in and for the State of Texas

CELIA HERNANDEZ
Notary Public, State of Texas
Commission Expires 11-10-2018

My Commission Expires:_____

01300

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

## RESPONSE OF ADRIANA LONGORIA TO SHELBY LONGORIA'S MOTION TO DISMISS ADRIANA LONGORIA'S CLAIMS

TO THE HONORABLE JUDGE OF THIS COURT:

Adriana Longoria ("Adriana") hereby timely responds to "Shelby Longoria's Motion to Dismiss Adriana Longoria's Claims" (the "Motion To Dismiss").

### SUMMARY OF RESPONSE

The Motion To Dismiss should be denied for four reasons.

First, the Motion To Dismiss is based on a forum-selection clause that, by its express terms, does not apply to Adriana's counterclaims.

Second, the forum-selection clause is unreasonable and unjust in light of the pre-existing fiduciary relationship of the parties, where the agreement was made, where the parties resided, and the manifest unacceptability of the specified forum.

Third, the forum-selection clause is unenforceable because it was procured through fraud and overreaching by Shelby Longoria ("Shelby").

Fourth, by litigating Adriana's counterclaims in this Court for a year without invoking the forum-selection clause, Shelby waived his alleged right to do so.

01301

## EVIDENCE SUPPORTING THIS RESPONSE

Adriana hereby offers the following evidence in support of her response.

(1)     The Affidavit of Adriana Longoria, which affidavit is Exhibit A to this response and is incorporated herein by reference. Exhibit 1 to that affidavit (a letter dated October 22, 2010, from Carolyn Beckett to Adriana) is not offered to prove the truth of the assertions therein, except for one passage quoted below.

(2)     The Affidavit of James Austin Fisher ("Fisher Affidavit"), which affidavit is Exhibit B to this response and is incorporated herein by reference. Exhibits 4 through 9 to that affidavit (excerpts of depositions and responses to written discovery requests in this case) are not offered to prove the truth of any assertions therein, but to prove what positions were taken – and, more importantly, what position was *not* taken – by Shelby for a full year after Adriana pleaded her counterclaims against him. The only exception is the deposition testimony of Shelby that he "was the one that was instrumental in getting the money sent [to Adriana] in order to comply with [his] dad's wishes." That testimony is offered to prove the truth of the facts admitted by him.

(3)     The Affidavit of Ilan Rosenberg ("Rosenberg Affidavit"), which affidavit is Exhibit C to this response and is incorporated herein by reference.[1]

---

[1] The affidavit of Ilan Rosenberg was originally filed herein on September 30, 2013. Exhibit C to this response is a true and correct copy of it.

In addition, Adriana hereby requests that the Court take judicial notice of the contents, and the date of filing, of each of the following pleadings:

(1) Original Counterclaims of Adriana Longoria (submitted for electronic filing on January 6, 2014, but not file-stamped until January 9, 2014 due to technical failure).

(2) Counter-Defendant Shelby Longoria's Answer to Original Counterclaims of Adriana Longoria (filed on January 21, 2014).

(3) First Amended Counterclaims of Adriana Longoria (filed on December 11, 2014).

(4) Counter-Defendant Shelby Longoria's Answer to First Amended Counterclaims of Adriana Longoria (filed on January 20, 2015).

(5) Second Amended Counterclaims of Adriana Longoria (filed on February 5, 2015).

**OBJECTIONS TO EVIDENCE ATTACHED TO MOTION TO DISMISS**

Adriana hereby objects to the Affidavit of Dr. Carlos Gabuardi, which is attached to the Motion To Dismiss as Exhibit 4. Paragraph 4, subparagraphs b, c, and d, and paragraphs 11-19 of that affidavit contain opinions about the meaning and legal effect of ordinary terms of a contract. Adriana objects to each of them individually and separately, because the construction of ordinary contractual terms is a matter of law for the Court, and the parol evidence rule prohibits admission of extrinsic evidence that alters the terms of a written contract, *see David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008) (citing

01303

*Rincones v. Windberg*, 705 S.W.2d 846, 849 (Tex. App. – Austin 1986, no writ)), or that renders them ambiguous. *Americo Life, Inc. v. Meyer*, 440 S.W.3d 18, 22 (Tex. 2014) ("the parol evidence rule precludes considering evidence that would render a contract ambiguous when the document, on its face, is capable of a definite legal meaning") (citing *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731-32 (Tex. 1981)). The remainder of the Affidavit of Dr. Carlos Gabuardi is, by itself, irrelevant. Accordingly, Adriana requests that these objections be sustained and that the Affidavit of Dr. Carlos Gabuardi be stricken and disregarded.

Adriana also hereby objects to Exhibits 3 and 3A, which are attached to the Motion To Dismiss, on the ground that they are not authenticated. *See* TEX. R. EVID. 602, 901(a). Those exhibits are referenced in Exhibit 7, the "Affidavit of Johnny Carter in Support of Shelby Longoria's Motion to Dismiss Adriana Longoria's Claims," but the affiant is merely an attorney for Shelby in this proceeding. He does not testify that Exhibit 3 is a true and correct copy of the original. Nor does he testify that he has personal knowledge of the execution or terms of the original. Exhibit 3A is merely a translation of Exhibit 3, so Exhibit 3A can have no better claim of authenticity than Exhibit 3. Consequently, Adriana requests that Exhibits 3 and 3A be stricken and disregarded.

## ARGUMENT AND AUTHORITIES

There are four reasons why the Motion To Dismiss must be denied as a matter of law.

Each is independent of the others, and each, by itself, requires denial.

### I. The Forum-Selection Clause Does Not Apply to Adriana's Claims

#### A. The Forum-Selection Clause Applies Only to Litigation Regarding a Certain Trust, Not Litigation Regarding the Private Agreement

The Private Agreement does indeed contain a forum-selection clause – but the clause

does not say what Shelby wants it to say.

A logical, first step in the analysis would be to identify the forum-selection clause in

question, but the Motion To Dismiss never does so. Instead, Shelby argues at length about

other contractual provisions, such as choice-of-law provisions, which do not speak to the

question of *where* lawsuits may be brought. The *one and only* forum-selection provision in

the Private Agreement is the *third sentence* of the *first paragraph* of the "Fourth" clause of

the Private Agreement. To avoid being accused of taking that one sentence out of context,

we quote the entire paragraph in which it appears:

> This Agreement is established under the jurisdiction and laws of the United Mexican States. Therefore, the parties exclusively submit to the laws of Mexico, thus they expressly waive application of any law, regulation, provision or rule of any jurisdiction other than Mexico, which might correspond to them due to their residence, paternity, citizenship, domicile kinship or commercial relationship. *Therefore, in the event of any interpretation, dispute, or any aspect related to this Trust, they expressly submit to the courts of the city of Reynosa, Tamaulipas, Mexico.*

01305

(Emphasis added.) Only the italicized sentence is a forum-selection provision. There is no other in the Private Agreement.

This forum-selection clause simply does not say that a lawsuit to enforce a right conferred by the Private Agreement must be brought in Reynosa. Rather, it says that the parties submitted to the courts of Reynosa with regard to "any interpretation, dispute or any aspect related to this *Trust*." (Emphasis added.) The Spanish word that is translated, "Trust," is "Fideicomiso." "Fideicomiso" does not mean "Agreement."

"Fideicomiso" is a defined term in the Private Agreement. It is defined as one particular trust, a trust that was created on October 15, 2002, by Eduardo Longoria Theriot (the father of Adriana and Shelby) as settlor and that named Banca Afirme, S.A. as trustee (the "Afirme Trust"). Thus, it is no accident that the word "Fideicomiso" is capitalized in the forum-selection clause; it had a very specific, expressly defined meaning – and that meaning did *not* include the Private Agreement, which did not even exist when the "Trust" was formed. The capitalization of "Fideicomiso" leaves no doubt that the reference to it in the forum-selection clause is a reference to the Afirme Trust – *not* to the Private Agreement.

The words "Acuerdo Privado" mean "Private Agreement." They do not mean the same thing as "Fideicomiso," as the translation proffered by Shelby makes clear.[2] Significantly, the parties used the term "[e]l presente Acuerdo," or "this Agreement," elsewhere in the very paragraph that includes the forum-selection clause – but not in the

---

[2] Motion To Dismiss, Ex. 2A at 3.

RESPONSE OF ADRIANA LONGORIA TO SHELBY LONGORIA'S
MOTION TO DISMISS ADRIANA LONGORIA'S CLAIMS                    Page 6

01306

forum-selection clause itself – thus showing that the reference to "el presente Fideicomiso" in the forum-selection clause was an intentional distinction of the Afirme Trust from the Private Agreement. Nothing in the Private Agreement says that claims to enforce rights conferred by the Private Agreement may only be brought in the courts of Reynosa.

Counsel for Shelby obviously recognized this problem with their position, so they constructed an elaborate sophistry designed to divert attention from the wording of the forum-selection clause to other parts of the Private Agreement.[3] Hence, the Motion To Dismiss relies heavily on *choice-of-law* provisions in the Private Agreement.

But a choice-of-law clause and a forum-selection clause are two, different things. The first two sentences of the "Fourth" clause (quoted above) are, quite plainly, choice-of-law provisions, notwithstanding Shelby's inadmissible, extrinsic evidence to the contrary. They do not require dismissal of Adriana's counterclaims in this Court.

Likewise, a claim to enforce the Private Agreement is not an effort to modify it, or to limit it, or to set it aside. The second paragraph of the "Fourth" clause, therefore, lends no support to Shelby's argument. That paragraph does not address actions to *enforce* the Private Agreement at all. And it does not address *where* such actions may be brought. The fact that

---

[3] Motion To Dismiss at 6-9 (devoting two sentences on pages 6-7 to the forum-selection clause itself, and over three pages to other provisions of the Private Agreement).

Shelby's counsel felt the need to devote so much verbiage to a plainly irrelevant paragraph belies the weakness of their interpretation of the forum-selection clause itself.

**B.    Two of Adriana's Causes of Action Are Unrelated to the Private Agreement, So the Forum-Selection Clause Cannot Apply to Them**

Before moving to the second, independent ground for denial of the Motion To Dismiss, it should be noted that, even if the forum-selection clause had referred to claims related to the Private Agreement (instead of being limited to claims related to the Trust), it still would not apply to all of Adriana's counterclaims. The First Cause of Action and the Fifth Cause of Action pleaded by Adriana neither assert a right arising under the Private Agreement nor depend on its validity or meaning. Consequently, Shelby's request that those causes of action be dismissed is frivolous.

The First Cause of Action is based on the legal theory of tortious interference with inheritance rights. The gravamen of the claim is that Shelby fraudulently reduced the amount of money to be inherited by Adriana. Shelby did so in at least two ways: he lied to his parents about the value of the Mexican businesses that Shelby was managing in an effort to induce his parents to leave the businesses to him and give less money to his sisters; and he misappropriated his parents' money, some of which would otherwise have gone to Adriana. Neither theory of liability depends on the meaning or enforceability of either the Private Agreement or the Afirme Trust. Nor do they seek to set aside either the Private Agreement or the Afirme Trust.

01308

The Fifth Cause of Action is based on a contract dated October 9, 2007, between Shelby and his mother, Dorothy. Adriana is a third-party beneficiary of that contract, because it expressly requires Shelby to pay $100,000 to Adriana. The contract does not mention the Private Agreement and is wholly unrelated to it.

## II. The Forum-Selection Clause Is Unreasonable and Unjust

A forum-selection clause is unenforceable if it is unreasonable and unjust. *In re Automated Collection Technologies, Inc.*, 156 S.W.3d 557, 559 (Tex. 2004); *In re AIU Ins. Co.*, 148 S.W.3d 109, 113 (Tex. 2004). If a specified forum is a "remote alien forum" in which there is "serious inconvenience . . . to one or both of the parties," that forum may be considered unreasonable and unjust. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 592 (1991) (quoting *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 17 (1972)).

As construed by Shelby, the forum-selection clause in the Private Agreement is "unreasonable and unjust" for two reasons: first, it contravenes a pre-existing and overarching fiduciary relationship between Shelby and Adriana, under which she had subtantial rights under Texas law, and it surreptiously operates to negate those rights (according to Shelby) without explicit notice to Adriana that it is doing so – thereby constituting a breach of fiduciary duty by Shelby; and, second, it effectively deprives Adriana of any remedy by requiring litigation in a "remote alien forum" that will not recognize her claims and is so dangerous and corrupt that it is manifestly unreasonable to expect Adriana to assert her claims there.

RESPONSE OF ADRIANA LONGORIA TO SHELBY LONGORIA'S
MOTION TO DISMISS ADRIANA LONGORIA'S CLAIMS                                    Page 9

**01309**

The Private Agreement was signed in Texas – contrary to what it says about the place of execution.[4] Both of the signatory parties were residents of Texas, and both of the other parties who are identified as having "obligations" thereunder – Shelby and his brother, Eduardo Longoria Kowalski – also resided in Texas.[5] The context of the agreement was a longstanding, confidential relationship between Shelby as fiduciary and Adriana as beneficiary.[6] Shelby had assumed the obligation to fulfill his father's wishes with regard to payments to be made to Adriana from the revenues of certain businesses which Shelby was managing. The Private Agreement itself recites these facts: Eduardo had *previously* directed that $3,000,000 be paid to Adriana "from the operating cash flow generated by the companies represented by the shares contributed to the 'TRUST,' or by their subsidiaries," the principal balance owed to Adriana as of the date of the Private Agreement was $2,069,100, and it was the "obligation" of Shelby and his brother to cause that amount, plus interest, to be paid to Adriana by continuing to make monthly payments to her.[7] Thus, when the Private Agreement was signed, there already was a well-established fiduciary relationship

---

[4] Ex. A (Affidavit of Adriana Longoria) at 1 (¶ 3).

[5] *Id.* at 2 (¶ 4).

[6] *Id.*

[7] Motion To Dismiss, Ex. 2A at 1-2.

01310

between Adriana and Shelby. It had arisen in Texas, under Texas law, and it had existed for at least ten years prior to the execution of the Private Agreement.[8]

One of Adriana's counterclaims is based on her informal fiduciary relationship with Shelby. But informal fiduciary relationships are not recognized in Mexico.[9] If construed in the manner urged by Shelby, the forum-selection clause would have the practical effect of depriving Adriana of any remedy for violation of her rights under Texas law – rights independent of the Private Agreement and vested before the Private Agreement ever existed. And the forum-selection clause would do so without explicit notice to Adriana of that result. *Cf. Carnival Cruise Lines*, 499 U.S. at 595 ("respondents have conceded that they were given notice of the forum provision and, therefore, retained the option of rejecting the contract with impunity"). "It bears emphasis that forum-selection clauses . . . are subject to judicial scrutiny for fundamental fairness" and, as part of such scrutiny, courts consider whether there is any indication that the specified forum was selected "as a means to discourage [a party] from pursuing legitimate claims." *Carnival Cruise Lines*, 499 U.S. at 595. That, of course, is precisely what Shelby is trying to do.

The second reason why the forum-selection clause, as misconstrued by Shelby, is unreasonable and unjust is that the specified forum is one of the most dangerous places in the world. The United States Department of State has issued a "Travel Warning" about the

---

[8] Ex. A (Affidavit of Adriana Longoria) at 2 (¶ 4).

[9] Ex. C (Affidavit of Ilan Rosenberg) at 10-11.

01311

security situation in Mexico.[10] It was last updated on December 24, 2014, in order to provide additional warnings and to impose more restrictions on travel by personnel of our government.[11] It provides a chilling view of travel in the "border region" – which, of course, includes Tamaulipas.

> The number of kidnappings throughout Mexico is of particular concern and appears to be on the rise. According to statistics published by the Mexican Secretaria de Gobernacion (SEGOB), in 2013 kidnappings nationwide increased 20 percent over the previous year. While kidnappings can occur anywhere, according to SEGOB, during this timeframe, the states with the highest numbers of kidnappings were *Tamaulipas*, Guerrero, Michoacán, Estado de Mexico, and Morelos. Additionally, according to a widely publicized study by the agency responsible for national statistics (INEGI, the National Institute of Statistics and Geography), Mexico suffered an estimated 105,682 kidnappings in 2012; only 1,317 were reported to the police. Police have been implicated in some of these incidents. Both local and expatriate communities have been victimized.

(Emphasis added.) The situation in Tamaulipas is so bad that employees of the United States Government have been directed to "defer non-essential travel to the state of Tamaulipas" because "[v]iolent conflicts between rival criminal elements and/or the Mexican military can occur in all parts of the region and at all times of the day."[12] The warning continues: "Matamoros, *Reynosa*, Nuevo Laredo, and Ciudad Victoria have experienced numerous gun

---

[10] Ex. B (Fisher Affidavit) at 3 & Ex. 3.

[11] *Id.* at 1.

[12] *Id.* at 5.

01312

battles and attacks with explosive devices in the past year . . . The number of reported kidnappings for Tamaulipas is among the highest in Mexico, and the number of U.S. citizens reported to the consulates in Matamoros and Nuevo Laredo as being kidnapped, abducted, or disappearing involuntarily in 2014 has also increased."[13] All U.S. government employees are prohibited from personal travel to Reynosa and most of the rest of Tamaulipas.[14]

Shelby himself has represented to this Court that "[c]artel violence, street shoot-outs, kidnapping, and extortion" have been "persistent threats" along the Mexican border.[15] And one of Shelby's lawyers wrote, in a letter to Adriana, that "very real threats of kidnapping, torture, and murder [are] part of working as a businessman in the cross-border areas of northern Mexico."[16] She added: "street violence and shootouts are an every day occurrence" and "[i]t is dangerous to travel to many of the areas in which the businesses of the Mexican Companies [defined as the companies "that Eduardo had owned and directed"] are located . . ."[17]

---

[13] *Id.* (emphasis added).

[14] *Id.*

[15] COUNTER-DEFENDANT SHELBY LONGORIA'S BRIEF IN SUPPORT OF HIS MOTION TO DISMISS COUNTERCLAIMS FOR FORUM NON CONVENIENS, OR ALTERNATIVELY TO ABATE PENDING RESOLUTION OF WILL CONTEST AND MEXICAN LITIGATION (filed Aug.7, 2013) at 5.

[16] Ex. A (Affidavit of Adriana Longoria), Ex. 1 at 7.

[17] *Id.*

01313

For Shelby to claim that Reynosa, Tamaulipas, is a "reasonable" venue for litigation of Adriana's counterclaims – in the face of the harsh realities that he has acknowledged elsewhere – betrays a lack of candor toward the Court.

## III.    The Forum-Selection Clause Was Procured by Fraud and Overreaching

It is axiomatic that a failure to disclose information may constitute fraud where there is a duty to disclose. *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001). A duty to disclose arises where there is a confidential or fiduciary relationship. *Insurance Co. v. North America v. Morris*, 981 S.W.2d 667, 674-75 (Tex. 1998). Texas recognizes that fiduciary relationships may arise informally from moral, social, domestic, or purely personal relationships. *Meyer v. Cathey*, 167 S.W.3d 327, 330-31 (Tex. 2005) (quoting *Associated Indemnity Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)); *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962); *MacDonald v. Follett*, 180 S.W.2d 334, 337 (Tex. 1944).

When Adriana signed the Private Agreement, her relationship with Shelby was already one of trust and confidence because he is her brother and because for many years before then he had accepted the responsibility to make payments to her in accordance with her father's wishes.[18] Eduardo's wishes to provide for Adriana were expressed at various times and in various ways, but one such wish that pre-dates the Private Agreement is described in the

---

[18] Ex. A (Affidavit of Adriana Longoria) at 2 (¶ 4).

Private Agreement itself (in the second clause).[19] For about ten years before Adriana signed the Private Agreement, Shelby had caused businesses in Mexico, which he controlled, to make payments to Adriana in accordance with Eduardo's wishes.[20] Many times Adriana had heard Eduardo ask Shelby to see that the businesses made payments to Adriana, and many times Adriana had heard Shelby promise to do so.[21] Shelby himself admitted: "I was the one that was instrumental in getting the money sent in order to comply with my dad's wishes."[22] Moreover, Shelby knew that Adriana was in a vulnerable position and that Adriana needed the payments that her father had promised, and that Shelby had been sending, in order to pay even her most basic living expenses.[23] Throughout this period of time, Eduardo, Shelby, and Adriana all lived in Texas.[24] Thus, based on Shelby's own words and conduct, in Texas, over a period of many years, Adriana understood – and Shelby acknowledged – that they had a relationship of trust and confidence, and specifically that Adriana was trusting him to see that Eduardo's wishes were carried out for her benefit.[25]

---

[19] *Id.*; Motion To Dismiss, Ex. 2A at 1-2.

[20] Ex. A (Affidavit of Adriana Longoria) at 2 (¶ 4).

[21] *Id.*

[22] Ex. B (Fisher Affidavit), Ex. 8 (ORAL AND VIDEOTAPED DEPOSITION OF SHELBY LONGORIA (Oct. 7, 2014)) at 156 (lines 8-9).

[23] Ex. A (Affidavit of Adriana Longoria) at 2 (¶ 4).

[24] *Id.*

[25] *Id.*

01315

Thus, the fiduciary relationship between Shelby and Adriana *predated* and *transcended* the Private Agreement. Because Shelby owed a fiduciary duty to Adriana, he had an affirmative duty to disclose facts that might affect her interests. If it were the case that the Private Agreement contained a forum-selection clause that prevented Adriana from seeking its enforcement in the state where Eduardo, Adriana, and Shelby all lived, and a choice-of-law clause that eliminated his then-existing fiduciary duty to Adriana, then Shelby should have disclosed that when he presented the Private Agreement to Adriana for her to sign and discouraged her from reading it. His failure to comply with his affirmative duty to disclose these alleged facts would constitute fraud, rendering the forum-selection and choice-of-law provisions unenforceable.

## IV. Shelby Waived His Alleged Right To Invoke the Forum-Selection Clause

A forum-selection clause may be waived. *Perry Homes v. Cull*, 258 S.W.3d 580, 589-601 (Tex. 2008) (finding waiver of arbitration clause, a type of forum-selection clause). And one of the ways in which a forum-selection clause may be waived is by "substantially invoking the judicial process [of a different forum] to the other's party's detriment or prejudice." 258 S.W.3d at 589-90. Whether or not a litigant has "substantially invoked the judicial process" is determined "on a case-by-case basis," by examination of the "totality of the circumstances," but the guiding principle is this: "a party who enjoys substantial direct benefits by gaining an advantage in the pretrial litigation process should be barred from

01316

turning around and seeking [litigation in another forum] with the spoils." 258 S.W.3d at 592-93. That is precisely what Shelby has done.

Adriana first pleaded her counterclaims on January 9, 2014.[26] She amended them on December 11, 2014, and again on February 5, 2015.[27] Those amendments added one cause of action, which is denominated the "Fourth Cause of Action" in the last amendment.[28] What are now the First, Second, Third, and Fifth Causes of Action all were pleaded in the original statement of Adriana's counterclaims, filed on January 9, 2014.[29] Shelby litigated those four causes of action for a year before he asserted his alleged right to dismissal of them based on the forum-selection clause.

Shelby filed his original answer to the counterclaims on January 21, 2014.[30] Shelby did not plead that Adriana's counterclaims should be dismissed based on the forum-selection

---

[26] *See* ORIGINAL COUNTERCLAIMS OF ADRIANA LONGORIA (submitted for electronic filing on Jan. 6, 2014, but not file-stamped until Jan. 9, 2014 due to technical failure).

[27] *See* FIRST AMENDED COUNTERCLAIMS OF ADRIANA LONGORIA (filed Dec. 11, 2014); SECOND AMENDED COUNTERCLAIMS OF ADRIANA LONGORIA (filed Feb. 5, 2015).

[28] *See* SECOND AMENDED COUNTERCLAIMS OF ADRIANA LONGORIA (filed Feb. 5, 2015) at 12.

[29] *See* ORIGINAL COUNTERCLAIMS OF ADRIANA LONGORIA (submitted for electronic filing on Jan. 6, 2014, but not file-stamped until Jan. 9, 2014 due to technical failure) at 7-11.

[30] *See* COUNTER-DEFENDANT SHELBY LONGORIA'S ANSWER TO ORIGINAL COUNTERCLAIMS OF ADRIANA LONGORIA (filed Jan. 21, 2014).

clause of the Private Agreement. Shelby's answer did not mention that clause. It did, however, assert numerous defenses – all based on *Texas* law.[31]

On April 3, 2014, Shelby amended his disclosures under Rule 194 of the Texas Rules of Civil Procedure.[32] Shelby's disclosure under subpart (c), which requires a statement of the "legal theories and, in general, the factual bases of your claims or defenses," did not mention the forum-selection clause of the Private Agreement, nor did it disclose that Shelby would seek dismissal of the counterclaims based on it.

On August 26, 2014, Shelby's attorney took the deposition upon oral examination of Adriana, and he asked many questions (filling ten pages of the transcript) about the Private Agreement and payments made under it.[33]

On September 12, 2014, Shelby responded to a set of requests by Adriana for production of documents and things.[34] The requests included nine categories (1 through 6 and 8 through 10) of documents related to the Private Agreement and payments made or to

---

[31] *Id.* Shelby did not plead that any of his defenses were derived from Mexican law.

[32] Ex. B (Fisher Affidavit), Ex. 4 (SHELBY LONGORIA'S SECOND AMENDED RESPONSE TO REQUESTS FOR DISCLOSURE (Apr. 3, 2014)).

[33] Ex. B (Fisher Affidavit), Ex. 5 (ORAL AND VIDEOTAPED DEPOSITION OF ADRIANA LONGORIA (Aug. 26, 2014)) at 197-206.

[34] Ex. B (Fisher Affidavit), Ex. 6 (SHELBY LONGORIA'S RESPONSES TO ADRIANA LONGORIA'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS (Sept. 12, 2015)).

RESPONSE OF ADRIANA LONGORIA TO SHELBY LONGORIA'S
MOTION TO DISMISS ADRIANA LONGORIA'S CLAIMS                    Page 18

01318

be made to Adriana thereunder.[35] Shelby did not object to any request based on the proposition that the litigation of claims related to the Private Agreement should not be conducted here.

On September 15, 2014, Shelby responded to a set of interrogatories propounded by Adriana.[36] All of the interrogatories dealt with the Private Agreement and the payments that had been made thereunder.[37] Shelby answered some of the interrogatories and objected to others, but he did not object to any on the ground that Adriana's counterclaims supposedly could not be litigated in this Court.

On October 7, 2014, an attorney for Adriana took the deposition upon oral examination of Shelby, and questioned Shelby extensively about the formation of the Private Agreement and the payments made pursuant to it.[38] Shelby did not object to any of the questions on the ground that litigation of Adriana's counterclaims in this Court is supposedly improper.

---

[35] *Id.* at 2-6. For example, the first category of items requested was "[a]ll documents in which the Private Agreement is mentioned." *Id.* at 2.

[36] Ex. B (Fisher Affidavit), Ex. 7 (SHELBY LONGORIA'S RESPONSES TO ADRIANA'S [*SIC*] FIRST SET OF INTERROGATORIES (Sept. 15, 2014)).

[37] *Id.* For example, Interrogatory 1 asked Shelby to "state what you contend to be the total amount of money that Adriana has been paid pursuant to the Private Agreement." *Id.* at 2.

[38] Ex. B (Fisher Affidavit), Ex. 8 (ORAL AND VIDEOTAPED DEPOSITION OF SHELBY LONGORIA (Oct. 7, 2014)) at 133-56.

01319

Not until January 14 of this year – about a year after he first pleaded in response to Adriana's counterclaims – did Shelby finally file the Motion To Dismiss, asserting for the first time that Adriana's counterclaims should be dismissed based on the forum-selection clause in the Private Agreement. On the next day, however, Shelby again amended his disclosures, and again failed to disclose any reliance by him on the forum-selection clause of the Private Agreement.[39]

Shelby's delay and ambivalence in asserting his position regarding the forum-selection clause of the Private Agreement has caused demonstrable prejudice to Adriana. She was subjected to deposition questioning of the subject and she was required to provide written discovery as well. Moreover, even if one assumes *arguendo* that her counterclaims would be recognized in Tamaulipas at all, they would be subject to a one-year statute of limitations there,[40] so her ability to recover over a year of payments due would be barred as a result of Shelby's failure to invoke the forum-selection clause in a timely manner. That loss of substantive rights indisputably constitutes prejudice caused directly by Shelby's delay in asserting his alleged right to dismissal of Adriana's counterclaims.

In sum: even if one assumes for the sake of argument that Shelby once had a right to dismissal of Adriana's counterclaims based on the forum-selection clause in the Private

---

[39] Ex. B (Fisher Affidavit), Ex. 9 (SHELBY LONGORIA'S THIRD AMENDED RESPONSE TO REQUESTS FOR DISCLOSURE (Jan. 15, 2015)).

[40] Ex. C (Affidavit of Ilan Rosenberg) at 11.

01320

Agreement, the Motion To Dismiss still must be denied because that supposed right was waived by Shelby. He waived it by litigating the counterclaims in this Court without asserting that they should be dismissed. To allow Shelby to litigate the counterclaims here and then to invoke the forum-selection clause would cause unfair prejudice to Adriana, because a significant portion of her claims are now barred by limitations in Tamaulipas (assuming that, contrary to the testimony of Ilan Rosenberg, her claims would be recognized at all in Tamaulipas).

## CONCLUSION

Adriana's objections to the Affidavit of Dr. Carlos Gabuardi should be sustained and the affidavit stricken; Adriana's objections to Exhibits 3 and 3A should be sustained and the exhibits stricken; and the Motion To Dismiss should be denied. A proposed order accompanies this response.

DATED:   February 9, 2015.

Respectfully submitted,

*/s/ James Austin Fisher*

James Austin Fisher
   State Bar of Texas Number 07051650
   email:  jfisher@fisherwelch.com
Shannon L.K. Welch
   State Bar of Texas Number 90001699
   email:  swelch@fisherwelch.com
**FISHER & WELCH**
**A Professional Corporation**
Ross Tower, Suite 2800
500 North Akard Street
Dallas, Texas 75201
Telephone:   214.661.9400
Facsimile:   214.661.9404

T. Wesley Holmes
   State Bar of Texas Number 09908495
   email:  wes@wesholmes.com
**THE HOLMES LAW FIRM**
10,000 North Central Expressway, Suite 400
Dallas, Texas 75231
Telephone:   214.890.9266
Facsimile:   214:890.9295

**ATTORNEYS FOR
ADRIANA LONGORIA,
SYLVIA DORSEY, AND
JAMES THOMAS DORSEY AS
INDEPENDENT EXECUTOR OF
THE ESTATE OF DOROTHY
LOUISE LONGORIA, DECEASED**

01322

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2015, a true and correct copy of this document was served on Shelby Longoria, through his attorneys of record named below, in the manner indicated and in compliance with Texas law.

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
3900 Essex Lane, Suite 220
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

*/s/ James Austin Fisher*
James Austin Fisher

01323

# EXHIBIT A

01324

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

---

## AFFIDAVIT OF ADRIANA LONGORIA

---

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day appeared in person Adriana Longoria, who is known by me to be the person whose signature appears below, and who, being first duly sworn upon oath, testified as follows:

1. "My name is Adriana Longoria. I have read this affidavit and the exhibits attached hereto. I affirm that the facts set forth in this affidavit are within my personal knowledge and are true and correct.

2. "Eduardo Longoria Theriot was my father. He died in January 2005. Dorothy Louise Longoria was my mother. Her maiden name was Kowalski. She died in April 2012. Shelby Longoria is one of my brothers.

3. "A document entitled 'ACUERDO PRIVADO' is attached to this affidavit as EXHIBIT 2. My brother Shelby presented the original of this document to my father and me for signature in Laredo, Texas. I was not in Reynosa, Tamaulipas, or anywhere else in Mexico, when it was presented to me or when I signed it. Shelby discouraged me from reading the ACUERDO PRIVADO. He did not say to me that it contained a clause saying that I submitted to the courts of the city of Reynosa, Tamaulipas, Mexico in the event of any interpretation, dispute, or other aspect of the ACUERDO PRIVADO, or words to that effect, and I have had no such understanding, either when I signed it or since then. To this day, I do not read the ACUERDO PRIVADO as saying that any lawsuit to enforce my rights under the ACUERDO PRIVADO must be brought in Reynosa. Rather, the ACUERDO

AFFIDAVIT OF ADRIANA LONGORIA　　　　　　　　　　　　　　　　Page 1

PRIVADO says that my father and I submit to the courts of Reynosa only with regard to 'interpretación, controversia o cualquier aspecto relacionado con el presente Fidelcomiso' which I understand to mean, in English, 'interpretation, dispute or any aspect related to this *Trust*' (emphasis added). The word 'Fidelcomiso' means 'Trust' and moreover, it is capitalized, so it seems to me to be referring quite clearly to the defined term 'Fidelcomiso' which is defined in the 'DECLARACIONES' on the first page of the ACUERDO PRIVADO. The term 'Fidelcomiso' is defined on that page as a certain trust relationship supposedly created by my father with Banca Afirme S.A. on October 15, 2002. The words 'ACUERDO PRIVADO' mean 'PRIVATE AGREEMENT' – they do not mean the same thing as 'Fidelcomiso' – and the ACUERDO PRIVADO itself was not dated October 15, 2002, but rather it was dated December 17, 2002. I see nothing in the ACUERDO PRIVADO saying that claims to enforce the ACUERDO PRIVADO may only be brought in the courts of Reynosa.

4. "When I signed the ACUERDO PRIVADO, my relationship with Shelby was one of trust and confidence because he is my brother and because for many years he had accepted the responsibility to make payments to me in accordance with my father's wishes. My father's wishes to provide for me were expressed at various times and in various ways, but one such wish of my father is described in the second clause of the ACUERDO PRIVADO, which appears at the top of the second page. For about ten years before I signed the ACUERDO PRIVADO, Shelby had caused businesses in Mexico, which he controlled, to make payments to me in accordance with my father's wishes. Many times I had heard my father ask Shelby to see that payments were made to me, and many times I had heard Shelby promise to do so. Shelby knew that I was in a vulnerable position and that I needed the payments that my father had promised, and that Shelby had been sending me, in order to pay even my most basic living expenses. Throughout this period of time, my father, Shelby, and I all lived in Texas. Thus, based on Shelby's own words and conduct in Texas over a period of many years, I understood – and Shelby acknowledged – that we had a relationship of trust and confidence, and specifically that I was trusting him to see that my father's wishes were carried out for my benefit. Because of that relationship, I trusted Shelby not to ask me to sign a document that contained a false representation (such as the representation that it was being signed in Mexico when in fact it was signed in Texas), and I trusted Shelby not to ask me to sign a document that contained provisions harmful to my interests, such as a provision that would essentially nullify my rights by requiring me to attempt to pursue them in such a dangerous place as Reynosa, Tamaulipas.

AFFIDAVIT OF ADRIANA LONGORIA                                    Page 2

01326

5.     "The dangers associated with travel in Tamaulipas are well known to my family because, around 1986, my father was kidnapped and held for ransom there. As a result of that traumatic incident, my father and mother moved to Texas, where they lived for the rest of their lives.

6.     "In late October or in November of 2010, I received a leter from Carolyn M. Beckett, an attorney for Shelby. A true and correct copy of this letter is attached to this affidavit as 'EXHIBIT 1.' There are many assertions in the letter with which I disagree, but I note and agree with her description (on page 7) of the extreme level of danger associated with travel in Tamaulipas.

7.     "This concludes my affidavit testimony."

_____
Adriana Longoria

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, by Adriana Longoria on February ___5___ , 2015.

_____
Notary Public in and for the State of Texas

_____
Printed Name of Notary Public

My Commission Expires: 7. 09. 2016



KATHERINE ALEXIS DAMIANOFF
NOTARY PUBLIC
State of Texas
Comm. Exp. 07-09-2016

AFFIDAVIT OF ADRIANA LONGORIA                                          Page 3

01327

# EXHIBIT 1

01328

# EXHIBIT 1

October 22, 2010


Ms. Adriana Longoria                                          <u>**VIA Federal Express**</u>
6138 San Felipe
Houston, TX 77057

Re:  Notice of Request for Resolution and Notice of Intention to Discontinue Future Payments
     Under The 2002 Private Agreement Absent a Resolution of Issues

Dear Ms. Longoria:

As you are aware, this law firm has represented Shelby Longoria ("Shelby") regarding the demands you have made to additional funds you claim are due you from your deceased father's, Eduardo Longoria Theriot's ("Mr. Longoria"), estate. Within the last several months you have not only increased your demands about the manner and the amounts of payments you have received under the terms of the agreement executed in 2002 (the "2002 Private Agreement") between you and your father, Mr. Longoria, but you also have apparently taken to a new level the assault on Shelby's personal reputation, personal life, and his family by impugning his moral and ethical character to numerous of his friends, business associates, and acquaintances.



This letter is intended to communicate to you our firm's investigation and review of all the events concerning Mr. Longoria's estate planning and the probate of his estate and to state to you, in writing, that it is our firm's opinion that Shelby's conduct in handling Mr. Longoria's estate issues has been beyond reproach. It is further this firm's opinion that Shelby's obligation to you arises solely out of his personal feeling of a moral duty to fulfill his deceased father's wishes, and not as a result of any binding obligation, under either Mexican law or the laws of the United States, to continue to arrange the scheduled payments to you.

Most importantly, this letter is to notify you of the following regarding Shelby's intentions:

(i)    Shelby is in the process of initiating litigation against you to enjoin your wrongful and intentional libel and slander of him and his family (this litigation will not be handled by this law firm and this letter will not address your wrongful slanderous conduct); and

(ii)   he will propose to you and your representative, and this firm, a final solution to deal with these demands for money not due under any legally enforceable document; and

(iii)  he hereby notifies you that in the absence of such an agreed solution, Shelby will cease his efforts to arrange for your benefit those payment requests which he has voluntarily undertaken solely out of his respect for his father and his personal integrity to fulfill his father's wishes (wishes that are not reflected in any binding legal obligation or undertaking); and, finally

(iv)   he has requested that this firm prepare and deliver this letter to you in a final attempt to communicate to you his, and this firm's, position regarding each and every document relevant to the numerous claims you have made to additional millions of dollars you apparently believe you are due from your father's estate.



**EXHIBIT**

tabbies®

1

SCHURIG JETEL BECKETT TACKETT
100 Congress Avenue | 22ⁿᵈ Floor | Austin Texas 78701 | T. 512 370 2750 · F 512 370 2751

As this firm understands your demands, you have received, to date, distributions made both prior to and after your father's death, pursuant to the Private Agreement signed by you, in the amount of $3,168,619.00 (including interest). In addition to these amounts paid over time pursuant to the Wish Letter and Private Agreement, you have also received, directly from your father, vehicles, your home in Houston, a large ranch in Mexico and numerous cash gifts. You have now additionally demanded, as an unsubstantiated and illogical "right," to be paid up to $5 million more -- and you apparently claim that these additional millions are due from Shelby directly to you (notwithstanding the fact that your father's estate was divided in your father's last will between Shelby *and* your other brother, Eduardo ("Wayo") Longoria, after consideration had been given by your father to payments previously made to you and Sylvia). It appears you have directed your wrongful demands and threats, and your slander and libel, to only Shelby. After reviewing all of the relevant documents, we have concluded that only the terms of the Private Agreement you signed on December 17, 2002 govern the payments your father had committed to you.

### The Private Agreement

You are fully aware of both your father's "Wish Letter" written in 1992 and the subsequent 2002 Private Agreement you signed with your father. You are also aware that your brother, Shelby, has voluntarily attempted to see that payments under the 2002 Private Agreement have continued to be made to you, although Shelby has never had, nor does he now have, a "legal" responsibility to make those payments - - nor does he have a legal right to compel the trust to approve the release of funds that comprise those payments.



The 2002 Private Agreement was dated December 17, 2002 and constitutes a valid contract under Mexican law wherein your father undertook to *update* the earlier similar, but less formal, statement that he referred to as a "Wish Letter" when he had prepared that earlier statement in 1992. Although the 1992 Wish Letter was signed only by your father, the more formal and binding contract evidenced by the 2002 Private Agreement was signed by both you and your father[1] and describes in some detail the payments your father had made to you under the Wish Letter from 1992 through 2002 and the amounts remaining to be paid as of the December, 2002 date he had prepared the more formal 2002 Private Agreement.

It is clear from the terms of the 2002 Private Agreement that your father was apparently concerned that he might not live long enough to see all of the payments described in that agreement made to you, but he instructed, and was hopeful, that his two sons would continue to make those payments to the extent that they were able to until the terms of the agreement were satisfied. The 2002 Private Agreement, while not a formal bequest under Mexican law, was effectively a private directive by your father to his two sons, Wayo Longoria and Shelby, to attempt to continue the payments he had made you during the last 13 years of his life, if he had not satisfied the agreement's terms by the time of his death. It is also noteworthy that only Shelby has endeavored to fulfill your father's wishes by continuing to request of the trust that payments be set aside for that purpose.

While the 2002 Private Agreement does not impose a legal obligation on Wayo or Shelby under either Mexican or US law to continue the payments described in the agreement, Shelby alone has made the significant effort to honor his father's wishes that payments to you continue under the Private Agreement. Shelby considers the 2002 Private Agreement with you, and the similar agreement he made with Sylvia, to represent a father's commitment to his daughters and although the law does not continue that obligation after his death, Shelby made the decision to attempt to continue to carry out his father's wishes. In fact, the Private Agreement between your father and

---

[1] The 2002 Private Agreement and the 2002 Will were signed at practically the same time, and although you claim to be entitled to the payments described in the 2002 Private Agreement, you have made allegations that your father was not of sufficient mental capacity to execute the 2002 Will. This is an obvious contradiction and you cannot have it both ways.

your sister, Sylvia, was satisfied with a combination of lump sum payments the year following your father's death at Sylvia's request. Shelby has continued to request that the trust agree to allow payments to be made to you since Mr. Longoria's death, often in excess of the amounts provided in the 2002 Private Agreement, solely to fulfill his moral obligation to your father and his expressed desire to provide for you. In addition, Shelby has arranged to provide 100% of the support for your mother and has paid off the loan on the condo in Houston, currently occupied by Mrs. Longoria, although you and Sylvia are the direct beneficiaries of that loan repayment as the shareholders in the corporation that owns that condo.

One of your ongoing allegations this firm has researched and addressed is the idea that there is some document, or some set of documents, that your father may have executed during his lifetime that was more generous to you personally than the documents which have been recognized by the probate court as being Mr. Longoria's testamentary documents. This firm has reviewed each of the relevant documents and set forth below are our opinions on the legal effect of both the goals expressed and anticipated in the documents when your father executed them and the revisions that he made over the years as his plans for his estate solidified. Shelby's attorneys in the U.S. and in Mexico have researched all of these issues and the information which follows is a description of the important documents and events which occurred between 1992 and 2010 and our analysis of the legal enforceability of your 2002 Private Agreement.



1.    **History of Important Documents and Events Between 1992-2010**

    A.    **The 1988 Wills and the 1992 Wish Letter**

Throughout his life, Mr. Longoria was a Mexican citizen. He owned and directed the operations of several companies in Mexico (the "Mexican Companies") and his net worth was at one time valued in excess of $10 million, before he suffered substantial losses in the period from 1989-1995. Two severe economic events seriously depleted your father's U.S. assets and his total net worth during that period. At some point in the 1980s, your brother Wayo moved his residence to Austin, Texas to embark upon various real estate ventures - - with Mr. Longoria and Shelby signing as "guarantors" on many of the loan documents Wayo used to buy properties in Austin on considerably leveraged debt. With the crash of the real estate market in Austin in the late 1980s, Mr. Longoria and Shelby suddenly became directly liable on their guarantees for millions of dollars of debt Wayo had incurred in his real estate speculation. Ultimately Wayo filed for bankruptcy protection against his creditors, an option not taken by, although available to, Mr. Longoria and Shelby. Multiple claims were made against Shelby and Mr. Longoria as guarantors of the debt, and over a long period of time, reductions of the debt were negotiated and approximately $4 million was paid out to creditors some of whom Wayo had been discharged from in his own bankruptcy. These legal actions took their toll on the value of Mr. Longoria's estate such that the only significant U.S. asset remaining was the valuable Laredo house, which Mr. Longoria gave to you and Sylvia in 1995, when he transferred 50% of the stock of Casaco, Inc. to each daughter.

In addition to the Austin financial disaster during that same period, the Mexican Companies suffered severe financial setbacks from multiple peso devaluations. Mr. Longoria's net worth dropped significantly and his estate plan for his family was reconsidered.

In 1992, Mr. Longoria had two wills in place, one executed in Mexico in 1988 (the "1988 Mexican Will"), providing that, upon his death, ownership of the Mexican Companies would be divided equally between his sons, Shelby and Wayo. The second was a will he executed in the United States (the "1988 U.S. Will"). The 1988 U.S. Will left the property he owned in the United States at the time, including the Laredo home, to his wife, with a remainder to his daughters at his wife's death. However, after many of his Mexican and U.S. assets were depleted as a result of the losses in Austin real estate and other business/currency reversals that occurred prior to 1992, Mr. Longoria

determined to put in place a new plan and program to provide current significant cash transfers to his daughters, Sylvia and Adriana, and to have his sons agree to take care of his wife. He clearly abandoned the idea of a separate U.S. Will and instead instituted a gifting program that put immediately available cash in his daughters' hands to effect a transfer of their share of his estate over a period of time. For his sons, he earmarked the non-cash business operations requiring hands-on daily management and work (and considerable business experience and risk) to maintain and realize any long-term value.

Because by 1992 Mr. Longoria had no appreciable business or investment assets left in the U.S., Mr. Longoria implemented his gift giving plan and prepared the 1992 "Wish Letter" mentioned above, promising to give, over a period of time, $3 million to each daughter. The $3 million gift required no corresponding work on your or your sister's part, and gave each of you a risk-free source of funds to be paid out in installments, beginning in 1992. Of significance to Shelby's general feeling of a moral obligation to his father is the fact that the Wish Letter provided that, in the event of his death, the Wish Letter was to act as a non-contractual directive to Mr. Longoria's sons to use their efforts in operating and managing the Mexican companies so as to allow those companies to generate sufficient income to continue making payments to you and Sylvia. Thus, even after your father's death, it is clear that he desired his daughters to have a flow of cash (with no obligation to do anything to be paid) and he intended and desired that his sons receive only the operating businesses (assets that required full-time management and work, considerable risk-taking, and no guaranteed cash flow) as their share of his total estate.



Based on a review of these documents, it is clear that Mr. Longoria intended the 1992 Wish Letter to serve as a substitute for the earlier 1988 U.S. Will and to serve as a corollary to his 1988 Mexican Will. The Wish Letter provided a series of *inter vivos* gifts to each of his daughters over time, with the total gifts worth a very significant percentage of the value of his entire estate at the time. By preparing the 1992 Wish Letter and making this series of *inter vivos* transfers to his daughters, Mr. Longoria attempted to create a mechanism that could provide you and your sister Sylvia the ability to share in his expected estate *prior* to his death, so as to allow you to not only create your own investment fund over time from the cash generated from his Mexican holdings through the monthly payments, but also to start immediate distributions to you to protect you from future financial setbacks similar to those your father experienced in the late 1980s.

Beginning with the first payments he made under the Wish Letter, Mr. Longoria maintained a detailed statement of the amounts he paid each daughter under the Wish Letter -- this statement also showed the remaining balance left to be paid at any point in time from the starting balance of $3 million. As time went on and he became less involved in the businesses, he required his sons, and ultimately only Shelby, to take over the operation of the Mexican Companies and the maintenance of the account statements for each daughter.

Thus, in 1992 the Wish Letter directive represented a significant portion of Mr. Longoria's net worth. It provided that $250,000 was to be paid to each of Adriana and Sylvia between 1992 and 1997 in 59 monthly installments of $4,000, with a final payment of $14,000. After these first 60 payments were made, the remaining balance of $2,750,000 was to be paid annually in 10 equal installments of capital -- with 120 monthly installments of interest added -- provided funds were available from the operating cash flows of the Mexican Companies. If the provisions of the Wish Letter had been followed exactly, Adriana and Sylvia would have received approximately $300,000 each year after 1997 and would have received the full amount of the payments to satisfy the terms of their respective gifts under the Wish Letter by the year 2007. However, as you and Sylvia frequently requested additional amounts be paid to you between 1992 and 1997, you were ultimately each paid over $500,000 during that first 5 year period, leaving approximately $2,500,000 to be paid to each of you over the next ten years. These cash payments, in addition to the interest transferred in the Laredo house, were assets that required no time commitment, no management expertise, and no business or personal risk of either you or your sister.

### B. The 2002 Mexican Will and the Private Agreements

In November of 2002, Mr. Longoria executed a new Will in Nuevo Laredo, Mexico (the "2002 Will") that proved to be his last will and testament, revoking all prior wills.[2] That 2002 Will referenced a transfer Mr. Longoria had made to place all of the Mexican Companies in a Mexican trust for the benefit of his sons. The trustee took responsibility for the legal ownership of all of the Mexican Companies. The trust provided Shelby a 60% beneficial interest and Wayo a 40% beneficial interest (later the value of the interests was equalized by the further transfer of real property to Wayo). The 2002 Will referred to and acknowledged his wife and daughters but expressly did not provide any further bequest to either of Adriana, Sylvia or Mrs. Longoria.

Instead, Mr. Longoria updated the terms of the 1992 Wish Letter, incorporating its terms into the more formal 2002 Private Agreements prepared separately for each daughter.[3] With the restatement of the substantial gifts to both you and Sylvia, he did not further reference an additional bequest for his daughters in the 2002 Will. It was Mr. Longoria's express intent that Shelby and Wayo continue the Private Agreement payments after his death. When he had finished the documentation of his planning, namely, the transfer of the Mexican Companies to the trust, the restatement of his gifts/bequests to his daughters, and the 2002 Will transferring all other properties he may have held at his death to his sons, Mr. Longoria had completed his final dispositive planning of his estate as it existed at that time. All of these dispositive documents were executed within months of each other, and when read together, they clearly demonstrate that your father had carefully provided for all of his family in a manner that he wanted, directed, and intended.[4]



On December 17, 2002, the two separate private agreements were executed between Mr. Longoria and you and Sylvia Longoria. Of course neither daughter has ever claimed that Mr. Longoria was not competent to enter into these Private Agreements. Each Private Agreement effectively served as an updated restatement of the Wish Letter and included the precise remaining balance due, as of December 2002, of the original $3 million provided for each daughter in the original 1992 Wish Letter. A copy of the statement of each account was included as an exhibit to each daughter's Private Agreement showing the history of payments made with respect to that daughter and verifying the remaining balance under the agreement (the "Ledger"). As payments were later made to each daughter under the 2002 Private Agreements during his life, and after his death through the efforts Shelby has made, the Ledgers were continually updated and the Ledger for Adriana now shows approximately $725,737 as the current remaining balance.

---

[2] As noted above, in December of 2002 you and your father negotiated, and you and he signed, the Private Agreement, and you have never claimed that your father was not of sound mind, nor too feeble or aged to have had the mental capacity to agree to this approximately $2.5 million payment to you restated in that agreement. However, you have asserted that the month earlier, your father was too feeble to have executed the 2002 Will and you have actually suggested that Shelby exercised a negative influence over your father to coerce his execution of the new will. Your inconsistent position is so obvious that no further comment is required.

[3] At the time that he executed the 2002 Will, in addition to his multiple business relationships, friends and family all agreeing that he was alert and competent, Mr. Longoria also relied on his friend and physician in Nuevo Laredo to act as a witness in his 2002 Last Will and Testament. There is also a signed letter in the family files from a well respected Laredo, Texas Physician testifying that he was of sound mind. In addition, Mr. Longoria's lifelong and very well respected attorney that prepared the 2002 Will has recently restated his opinion that Mr. Longoria was the author of the contents of his own documents, very thoughtful of the plans he had established for each of his children, and knew precisely what he intended.

[4] His oral but clearly expressed intent was that Shelby and Wayo would care for their mother following his death in a manner that allowed her to remain comfortable but without the ability to dissipate the remaining estate assets. Shelby has honored that directive.

01334

The Private Agreements for each daughter provided that Shelby *and* Wayo were to be responsible for making payments to their sisters in the event they had not been fully paid off at the time of Mr. Longoria's death. The funds to make the payments were to be taken from the operating cash flow of the Mexican Companies, if available. However, neither Shelby nor Wayo signed either private agreement nor did the Mexican trustee of the trust which Mr. Longoria has established. Wayo, perhaps by virtue of his presence in Austin, has never undertaken to participate in fulfilling his father's wishes. Shelby undertook that task alone, yet he is now the brother you have criticized and threatened.

The 2002 Private Agreement between Adriana and Mr. Longoria showed an unpaid balance of $2,069,100 as of the date it was executed in December, 2002. At the time that agreement was signed, Adriana had requested that her monthly payments be reduced to extend the length of time she would receive payments and accrue interest on her remaining balance. Therefore, the 2002 Private Agreement provided that she was to receive monthly payments of $12,500 [composed of principal and interest] totaling $150,000 annually, until the account balance of $2,069,100 together with the interest accrued on that amount, was paid out. Following the execution of the 2002 Private Agreement, Adriana, however, frequently requested monthly payments exceeding $12,500. Shelby accommodated these requests as funds were available, and Adriana received on average $200,000 annually between 2002 and 2010, both prior to and after Mr. Longoria's death. Shelby's staff recorded each of these payments on the Ledger, and the remaining balance after each payment, and forwarded a copy of the Ledger to Adriana, *regularly* each month for her review.



### C. Gifts of Stock in Casaco, Inc. – and Payoff of Debt on the Houston Condo - - 1995-2005

In 1995, Mr. Longoria gifted 500 shares in Casaco, Inc. to each of Adriana and Sylvia, constituting all of the stock of that Texas corporation. At the time, the corporation owned the Laredo home Mr. and Mrs. Longoria used as their U.S. residence, valued at approximately $600,000 in 1995. The daughters' 50% interest in the value of the Laredo home was not deducted from the $3 million provided in the original 1992 Wish Letter or the later 2002 Private Agreements. The transfers of stock were treated as independent of the gifts from Mr. Longoria's estate of cash payments under the Wish Letter.

Following Mr. Longoria's death in 2005, Mrs. Longoria established a residence in Houston, presumably to be closer to her daughters. To accommodate Mrs. Longoria's move, Casaco, Inc. purchased a condo in Houston (the "Houston Condo") in 2005.

To make this purchase, Casaco, Inc. formed a subsidiary, Texas Casaco, LLC, which bought the Houston Condo for $1,130,065, taking a mortgage loan to make the purchase. Shortly thereafter, Casaco sold the Laredo house and the loan on the Houston Condo was reduced by the $825,353 net sales proceeds received on the sale of the house. The loan was completely paid off in December 2009 with funds from the Mexican Companies' operating cash reserves, again on Shelby's request, and with no reduction to the amount posted on the Ledger which recorded the transfers pursuant to the updated Private Agreements. As of 2010, the Houston condo was valued at $1,400,000, such that each daughter now owns approximately $700,000 of the value of the condo, in addition to all of the personal property owned by Mrs. Longoria in the condo. Again, this asset requires no work, no management, no risk of loss, just as your father intended. All risk-taking was, according to his estate plan, assigned only to your brothers and ultimately fell exclusively on the shoulders of Shelby.

### D. The Payment of the Remainder of Sylvia's Private Agreement in 2006

During the early 2000s, Sylvia Longoria requested that the remainder of her balance, pursuant to her Private Agreement (the "SLK Private Agreement"), be paid to her in shorter installments. In 2006, Shelby informed you that Sylvia had requested a prepayment of the remainder of her balance, but that he would be unable to seek consent from the trustee to do the same for you due to a lack of available funds from the Mexican Companies if you also wanted a prepayment of funds under your Private Agreement at the same time.

You expressed no objection and requested that Shelby pay you the remaining balance (then $1,374,262 as of December, 2006) in longer installments so as to last as long as possible, and earn as much interest as possible. With your approval, Shelby paid Sylvia the remainder of her balance and Sylvia signed a release on December 29, 2006 to the effect that the balance on the SLK Private Agreement had been paid in full.

### E. The Value of the Mexican Companies from 2002-2010

Beginning in the early 1990s, at Mr. Longoria's direction, Shelby began to take more responsibility for the operation of the Mexican Companies with Mr. Longoria playing, as time passed, a more limited role in managing the companies.



Shelby had been involved in one way or another in the businesses in Mexico with his father since he came home from college. He started working on a full-time basis in 1975 and Mr. Longoria had put him in a position of responsibility in managing the companies by 1978-1979. As Shelby became increasingly involved in the daily operation of the Mexican Companies, Mr. Longoria was able to turn his attention to other family matters and ranch activities. Since that time, Shelby has lived through all of the ups and downs of the family businesses including the severe losses sustained in the early 1990s in Austin and the major peso devaluations in Mexico.

In addition, Shelby has dealt with significant political instability in the region and the very real threats of kidnapping, torture, and murder that is part of working as a businessman in the cross-border areas of northern Mexico. Street violence and shootouts are an every day occurrence. It is dangerous to travel to many of the areas in which the businesses of the Mexican Companies are located and it is that environment that Shelby works in daily to make the businesses successful. He feels very loyal to the employees of the Mexican Companies and wants to make the businesses work for these employees also, but he does so knowing the personal risks involved in just going back and forth to monitor the companies' activities. This is not a safe stable environment and the very real possibility of governmental nationalization of the businesses is always on his mind. When you contrast the dangers and instability that Shelby confronts daily with the very stable cash flow that Mr. Longoria had set up for his daughters, you begin to see how concerned Shelby is that nether Adriana nor her advisors understand what he must deal with to ensure that her monthly payments can continue to be made on a regular basis.

In 2002, the Mexican Companies conducted several different businesses in different locales. Over Shelby's years as manager of these companies, these activities have increased significantly, an increase attributable exclusively to Shelby's diligence and hard work. The success of the Mexican Companies required dedicated, full-time active work, totally different from the passive flow of funds your father had arranged for his daughters. Mr. Longoria's thought was that if his sons were to achieve value from the Mexican Companies, they had to earn it.

2.    The Enforceability of the Terms of Adriana Longoria's 2002 Private Agreement

The 2002 Private Agreement Adriana signed with her father is subject to Mexican law, specifically the law of the State of Tamaulipas, Mexico.[5] It was executed by Mr. Longoria and Adriana and neither Shelby nor Wayo were involved in its negotiation or in the execution of the agreement.

As a private agreement to be dealt with independently of the probate of Mr. Longoria's 2002 Will, the formal probate proceedings in Mexico appropriately did not include administration of the 2002 Private Agreement or consider it part of the probate of Mr. Longoria's estate. It is what it is labeled - - a private agreement.

Because neither Shelby nor Wayo signed the agreements, they would not individually be subject to enforcement if payments were not made under U.S. or Mexican law. After your father's death in 2005, however, you are certainly aware that payments did not stop. It was through Shelby's efforts that these payments continued. He has not only been a key person in helping the Mexican Companies produce sufficient cash flow to fund the monthly payments; he has also corresponded with the trustee of the trust to gain approval for transfers of the monthly payments.



As you well know from many conversations over the years, Shelby has always felt that the Private Agreements represented a commitment made by his father to give each daughter their share of their parents' estate, to be paid over a period of time as his father had directed. Because of his commitment to his father's wishes, Shelby alone has made the efforts necessary to fulfill his father's wishes and honor the requests for funds made over the years. Shelby was also the person who made sure the condo loan was paid off. Shelby was the person who increased the interest rate on the unpaid balances in the Ledger statement. What has motivated him to fulfill an unenforceable contract and pay more than the contract provided for? It was his love for his father and his love for his family.

In summary, Shelby has never been obligated to continue the monthly payments or to ensure that they were continued, but he has in fact taken all necessary steps to see that there was money available to make the payments and that the payments were approved by the trust to be made. While he had only what he perceived to be a moral commitment to fulfill his father's wishes, he has in fact worked tirelessly to fulfill them.

3.    Adriana's Allegations Against Shelby

The 2002 Will and the 2002 Private Agreements were executed at virtually the same time. Neither sister has ever complained that her father was not competent to enter into the Private Agreements – each have accepted benefits through those Private Agreements and after Sylvia's agreement was paid out, you have continued to demand that your Private Agreement be honored. Interestingly, you now claim that Shelby somehow negatively and unduly influenced Mr. Longoria to exclude you, Sylvia, and Mrs. Longoria from Mr. Longoria's last will executed *one month before* the Private Agreements in 2002. You claim all the benefits of the Private Agreement you negotiated directly with your father in late 2002, yet you claim that Shelby manipulated Mr. Longoria during his failing health in the execution of the 2002 Will one month earlier.

It is this firm's opinion that the allegations you make concerning Shelby, and your demands for more money, are meritless. Given the historical background underpinning the decisions Mr. Longoria made regarding his estate planning and the independent testaments to the quality of his mental faculties in 2002, including the letter from his physician testifying that he was of sound mind at the time that he executed his 2002 Will and the 2002 Private Agreements, your allegations regarding

---

[5] By their specific terms, neither of the Private Agreements with Adriana and Sylvia were subject to the laws of the United States.

some type of negative influence are groundless. It is the case that Mr. Longoria excluded you and Sylvia from his 2002 Will because he had already provided for your bequests in the earlier Wish Letter, which he updated at the time of his 2002 Will by executing the new private agreements with you and Sylvia in 2002. He intended for his continuing and substantial long-term *inter vivos* gifts to provide for his daughters both during his life,[6] and to serve as a nest egg for you to use to provide for yourselves after his death (as expressed in both the Wish Letter and the Private Agreements). Sylvia both understood and acknowledged your father's intentions to Shelby – it is only you, Adriana, that makes and continues to make such meritless claims.

Approximately $725,737.00 is left on the Ledger under Adriana's 2002 Private Agreement as of this date. The Ledger reflects payments made over the past 18 years. The current projection shows that payments can be made in the amount of $150,000 a year for the next 5 years. Mr. Longoria believed that the $3,000,000 provided each daughter in the original Wish Letter and later, as the terms were updated in the 2002 Private Agreements, reflected a fair apportionment of his net worth both in 1992 and, later, in 2002. These payments under these agreements have provided Adriana with 18 years of an income stream to date, with another 5 years left – a total amount sufficient to live comfortably and make plans for the future, to provide for your own support, your estate planning, and your retirement, if used carefully.[7]

Any increase in the value of the Mexican Companies that has occurred over the years and most particularly after Mr. Longoria's death in 2005, has been the result of Shelby's long hours of work, personal sacrifice and resourcefulness and cannot, under any rule of law or private agreement, create an additional obligation for Shelby to provide now a larger bequest to his siblings. Any such demand is without merit.



Shelby has made every effort to cause the trust to allow the Mexican Companies to continue the payments to you and Sylvia in accordance with the provisions of your respective Private Agreements, as evidenced by the payment of the balance to Sylvia in 2006 and the continued payments to you, Adriana, through September, 2010. He has honored requests by you to provide amounts exceeding those provided in the payment schedule of the 2002 Private Agreement, out of respect for his father's wishes, and (even if misplaced) his love and affection for his family. Shelby has taken on the sole financial responsibility of caring for his mother, Mrs. Longoria, and has provided her with monthly cash payments of approximately $17,000 since Mr. Longoria's death in 2005. In addition, he caused the loan on the Houston Condo to be fully paid (directly benefiting his sisters equally) from funds provided from the operating cash flows of the Mexican Companies without further reducing the Ledger balances. No one but Shelby has made any effort to provide for the women in his family in accordance with his father's wishes.

---

[6] It also seems clear that after suffering the Austin financial disaster and the several Mexican government peso devaluations, your father wanted his daughters to begin to have the benefit of his estate immediately, to protect you from the possible future loss of his entire estate. He treated your brothers quite differently – he left them to their own work ethics, and their own decisions on risk taking, and entitled them only to a possible future inheritance through his will after his death, for the assets' at that time.

[7] It is this firm's understanding that Shelby frequently advised Adriana to spend her money wisely and not to spend the funds she receives on frivolous consumer purchases. He has spoken on numerous occasions to Raymond Hart, Adriana's elder sons, to enlist him to help Adriana with both her lifestyle choices regarding financial management and her need to accumulate financial reserves rather than spending each monthly payment as she has received them. Unless Adriana's brother, Wayo, is willing to take on a life-long commitment to support a sister who has made consistently poor choices regarding her own fiscal responsibility, it will fall to Raymond to care for her if an agreement cannot be reached regarding the allegations Adriana has made and continues to make.

Although Shelby's payments to you and Sylvia, including payments made to reduce the loan for the Houston condo, and his continuing support of Mrs. Longoria, testify to Shelby's willingness to fulfill, and exceed, Mr. Longoria's wishes regarding his father's private bequests, that willingness has been destroyed by your intentional threats to harm Shelby and his family and your almost continuous conduct of spreading vicious and false rumors about Shelby and his family this past year.

As a result of the false stories and allegations you have made to Shelby's friends, family members, business associates and even strangers, which have had the calculated effect of slandering Shelby's name and good character, he is initiating a lawsuit to enjoin you from further slander and libel. Based upon the outcome of that suit, and your response, Shelby may continue to try to fulfill his father's wishes, but only if some definitive agreement is reached resolving the egregious threats, and his concerns about the virulent efforts you has employed to harm him and his family.

*      *      *

In summation, Shelby will no longer seek the consent of the trust to provide cash from the trust assets (the Mexican Companies) to continue the monthly payments. This has resulted in discontinued payments effective October 1, 2010. Shelby will make no further efforts on your behalf until you and your representatives have discussed and resolved your disputes with Shelby, or you decide otherwise how you prefer to proceed.

Sincerely,

Carolyn M. Beckett
cbeckett@sjbt.com
512.370.2733 Direct

CMB:tb

01339

# EXHIBIT 2

01340

ACUERDO PRIVADO

QUE CELEBRAN EDUARDO LONGORIA THERIOT Y ADRIANA LONGORIA KOWALSKI RESPECTO DEL RECONOCIMIENTO Y ACEPTACIÓN DE LOS TERMINOS Y CONDICIONES DEL FIDEICOMISO NO. 194-2, CONSTITUIDO EN BANCA AFIRME, S.A. INSTITUCIÓN DE BANCA MULTIPLE, Y DEL RECONOCIMIENTO DE LA OBLIGACIÓN DE PAGO A FAVOR DE LA SEÑORA ADRIANA LONGORIA KOWALSKI, DE ACUERDO A LO SIGUIENTE:

DECLARACIONES

I.    Declaran las partes:

a)    Que en fecha octubre 15 del presente año se celebró un contrato de fideicomiso donde actuó como Fideicomitiente el señor Eduardo Longoria Theriot, como fideicomisarios los señores Eduardo y Shelby Luis Longoria Kowalski y como fiduciaria la institución de crédito Banca Afirme, S.A., Institución de Banca Múltiple, el cual se registro con el número 194-2 y del cual se anexa una copia al presente Acuerdo (en lo sucesivo el "FIDEICOMISO").

b)    Que en dicho "FIDEICOMISO" se designaron como beneficiarios a los señores EDUARDO Y SHELBY LUIS LONGORIA KOWALSKI respecto de la propiedad de las acciones aportadas al mismo.

c)    Que de igual manera que es la voluntad de su padre que EDUARDO Y SHELBY LUIS LONGORIA KOWALSKI reciban la propiedad de las acciones de la totalidad de las empresas, es voluntad de su padre que ADRIANA LONGORIA KOWALSKI reciba la cantidad que se establece en este Acuerdo en las condiciones aquí indicadas.

CLAUSULAS

Primera. Del "FIDEICOMISO".- Las partes reconocen la validez y alcance del "FIDEICOMISO" y en tal sentido están de acuerdo en todos sus términos y condiciones y por lo tanto manifiestan que dicho contrato es la voluntad final y definitiva de las partes, por lo que están conformes en todos sus términos y están conformes que las acciones a él aportadas se transmitan a favor de los beneficiarios designados.



EXHIBIT
2

ADRIANA 00119

**Segunda. Pago a ADRIANA LONGORIA KOWALSKI.-** Es voluntad de su padre que se le entregue la cantidad de US$3,000,000.00 (tres millones de dólares americanos) a su hija ADRIANA LONGORIA KOWALSKI, a cargo de los flujos de operación que generan las empresas que representan las acciones aportadas en el "FIDEICOMISO", o sus subsidiarias; por lo que es obligación de EDUARDO Y SHELBY LUIS LONGORIA KOWALSKI, en los términos que se mencionan a continuación:

A la fecha de firma del presente Acuerdo el saldo por entregar a ADRIANA LONGORIA KOWALSKI en términos del párrafo anterior, asciende a la cantidad de US$2,069,100.00 (dos millones sesenta y nueve mil cien dólares americanos) según estado de cuenta que se anexa a la presente.

En virtud de lo anterior, se le entregará a ADRIANA LONGORIA KOWALSKI una cantidad anual de US$150,000.00 (ciento cincuenta mil dólares americanos) de capital e intereses, en mensualidades de US$12,500.00 (doce mil quinientos dólares americanos) hasta la completa liquidación del saldo que se refiere el párrafo anterior. De igual manera, el saldo por pagar causará un interés normal del 75% (setenta y cinco por ciento) del "prime rate" publicado por el Wall Street Journal.

Se establece que podrán hacerse pagos en bienes, en cuyo caso se acordarán los importes por ambas partes.

Las cantidades serán entregadas en estricto apego a las disposiciones legales y fiscales aplicables al momento de pago.

**Tercera. Condición Determinante de la Voluntad.-** Las partes manifiestan que el presente Acuerdo es la voluntad final y definitiva de las partes, por lo que están conformes en todos sus términos, manifestando además que no existe error, dolo, mala fe o cualquier vicio de la voluntad que pudiere afectar su entendimiento o decisión respecto al contenido del mismo.

La obligación entregar las cantidades mencionadas en favor de ADRIANA LONGORIA KOWALSKI y a cargo del "FIDEICOMISO" en los términos aquí señalados, continuará vigente hasta su completa liquidación, en la inteligencia que una vez liquidadas las cantidades a que se refieren el presente Acuerdo, ADRIANA LONGORIA KOWALSKI se dará por satisfecha respecto de cualquier obligación presente o futura a cargo del patrimonio del "FIDEICOMISO" o de los señores EDUARDO y SHELBY LUIS LONGORIA KOWALSKI.

ADRIANA 00120

01342

Cuarta. Jurisdicción y Legislación Mexicana.- El presente Acuerdo se establece bajo la jurisdicción y leyes de los Estados Unidos Mexicanos. Por tal motivo, las partes se someten exclusivamente a las leyes de México, por lo que renuncian expresamente a la aplicación de cualquier Ley, reglamento, disposición o norma de otra jurisdicción diferente a la mexicana, que pudiere corresponderle por motivo de su residencia, paternidad, ciudadanía, domicilio, parentesco o relación comercial, por lo que en caso de interpretación, controversia o cualquier aspecto relacionado con el presente Fideicomiso, se someten expresamente a los tribunales de la ciudad de Reynosa, Tamaulipas, México.

De igual manera, la emisión de cualquier Ley, reglamento o disposiciones en jurisdicciones fuera de la República Mexicana, o cualquier acto realizado fuera del territorio nacional por cualquiera de las partes que pretenda (i) imponer restricciones al presente Acuerdo o imponer la realización de actos diversos a los fines para los que está autorizado; (ii) que pretenda imponer impuestos, derechos o cargas tributarias diferentes a las previstas en la Legislación Mexicana; (iii) que pretenda expropiar, limitar, confiscar, embargar, disponer, congelar o de cualquier forma afectar los derechos del Acuerdo en base a disposiciones legales, tanto federales, estatales o municipales, fuera de la jurisdicción de la República Mexicana, no es ni será aplicable al presente Acuerdo, debiendo en todo caso aplicarse la jurisdicción y legislación de la República de los Estados Unidos Mexicanos en términos del párrafo anterior.

Visto y leído lo anterior, lo firman las partes en la ciudad de Reynosa Tamaulipas el día 17 de DICIEMBRE del 2002.


_____
Eduardo Longoria Theriot


_____
Adriana Longoria Kowalski

ADRIANA 00121

# EXHIBIT B

01344

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF JAMES AUSTIN FISHER

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF DALLAS | § |

BEFORE ME, the undersigned authority, on this day appeared in person James Austin Fisher, who is known by me to be the person whose signature appears below, and who, being first duly sworn upon oath, testified as follows:

1. "My name is James Austin Fisher. I have read this affidavit and the exhibits attached hereto in their entirety, and I affirm that this affidavit is true and correct. I am 58 years old. I am fully competent to give this testimony.

2. "I became licensed to practice law in the State of Colorado on October 16, 1981, and in the State of Texas on August 29, 1986. Both licenses are in good standing. I also have been admitted *pro hac vice* to practice law in the courts of other states, and I have been admitted to appear in many federal courts of the United States of America, including federal courts in all of the districts situated in the State of Texas. I have practiced law continuously since 1981. Since 1986, I have practiced law primarily in the State of Texas, although I have also represented clients in many other jurisdictions within the United States of America. I have never been the subject of any disciplinary action by any court. Presently, I am the President of a law firm named Fisher & Welch (A Professional Corporation).

3. "I am one of the attorneys for Adriana Longoria in the above-captioned case. In the course of working on this case, I acquired personal knowledge of the facts set forth below.

AFFIDAVIT OF JAMES AUSTIN FISHER

**EXHIBIT**

tabbies

B

Page 1

01345

4.     "Attached hereto as Exhibit 3 is a true and correct copy of a document entitled "Mexico Travel Warning" published on the website of the United States Department of State and printed on February 7, 2015.

5.     "Attached hereto as Exhibit 4 is a true and correct copy of 'Shelby Longoria's Second Amended Response to Requests for Disclosure' which was served on April 3, 2014.

6.     "On August 26, 2014, one of Shelby's attorney took the deposition upon oral examination of Adriana Longoria. Attached hereto as Exhibit 5 is a true and correct copy of pages 197-208 of the transcript of that deposition.

7.     "Attached hereto as Exhibit 6 is a true and correct copy of 'Shelby Longoria's Responses to Adriana Longoria's First Requests for Production of Documents and Things' which was served on September 12, 2014.

8.     "Attached hereto as Exhibit 7 is a true and correct copy of 'Shelby Longoria's Responses to Adriana's [sic] First Set of Interrogatories' which was served on September 15, 2014.

9.     "On October 7, 2014, I took the deposition upon oral examination of Shelby Longoria. Attached hereto as Exhibit 8 is a true and correct copy of pages 133-156 of the transcript of that deposition.

10.    "Attached hereto as Exhibit 9 is a true and correct copy of 'Shelby Longoria's Third Amended Response to Requests for Disclosure' which was served on January 15, 2015.

11.    "This concludes my affidavit testimony."

_____
James Austin Fisher

01346

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, by James Austin Fisher on February 9, 2015.

<u>Notary Public in and for the State of Texas</u>



<u>Angelica M. Aza- Newsom</u>
Printed Name of Notary Public

My Commission Expires:    1-9-2016

# EXHIBIT 3

01348

• Contact Us • Find U.S. Embassies & Consulates

SEARCH 🔎

EXHIBIT

3

tabbies®

Print    Email

Passports > Alerts and Warnings > **Mexico Travel Warning**

# Mexico Travel Warning
LAST UPDATED: DECEMBER 24, 2014

The U.S. Department of State warns U.S. citizens about the risk of traveling to certain places in Mexico due to threats to safety and security posed by organized criminal groups in the country. U.S. citizens have been the target of violent crimes, such as kidnapping, carjacking, and robbery by organized criminal groups in various Mexican states. For information on security conditions in specific regions of Mexico, which can vary, travelers should reference the state-by-state assessments further below. This Travel Warning replaces the Travel Warning for Mexico, issued October 10, 2014, to update information about the security situation and to advise the public of additional restrictions on the travel of U.S. government (USG) personnel.

**General Conditions:**

Millions of U.S. citizens safely visit Mexico each year for study, tourism, and business, including more than 150,000 who cross the border every day. The Mexican government dedicates substantial resources to protect visitors to major tourist destinations, and there is no evidence that organized criminal groups have targeted U.S. visitors or residents based on their nationality. Resort areas and tourist destinations in Mexico generally do not see the levels of drug-related violence and crime that are reported in the border region or in areas along major trafficking routes.

Nevertheless, U.S. travelers should be aware that the Mexican government has been engaged in an extensive effort to counter organized criminal groups that engage in narcotics trafficking and other unlawful activities throughout Mexico. The groups themselves are engaged in a violent struggle to control drug trafficking routes and other criminal activity. Crime and violence are serious problems and can occur anywhere. U.S. citizens have fallen victim to criminal activity, including homicide, gun battles, kidnapping, carjacking, and highway robbery. While many of those killed in organized crime-related violence have themselves been involved in criminal activity, innocent persons have also been killed. The number of U.S. citizens reported to the Department of State as murdered in Mexico was 81 in 2013 and 85 in 2014 to date.

Gun battles between rival criminal organizations or with Mexican authorities have taken place in towns and cities in many parts of Mexico. Gun battles have occurred in broad daylight on streets and in other public venues, such as restaurants and clubs. During some of these incidents, U.S. citizens have been trapped and temporarily prevented from leaving the area. Criminal organizations have used stolen cars, buses, and trucks to create roadblocks on major thoroughfares, preventing the military and police from responding to criminal activity. The location and timing of future armed engagements is unpredictable. We recommend that you defer travel to the areas specifically identified in this Travel Warning and exercise extreme caution when traveling throughout the other areas for which advisories are in effect.

The number of kidnappings throughout Mexico is of particular concern and appears to be on the rise. According to statistics published by the Mexican Secretaria de Gobernacion (SEGOB), in 2013 kidnappings nationwide increased 20 percent over the previous year. While kidnappings can occur anywhere, according to SEGOB, during this timeframe, the states with the highest numbers of kidnappings were Tamaulipas, Guerrero, Michoacán, Estado de Mexico, and Morelos. Additionally, according to a widely publicized study by the agency responsible for national statistics (INEGI, the National Institute of Statistics and Geography), Mexico suffered an estimated 105,682 kidnappings in 2012; only 1,317 were reported to the police. Police have been implicated in some of these incidents. Both local and expatriate communities have been victimized. More than 130 kidnappings of U.S. citizens were reported to the U.S. Embassy and consulates in Mexico between January and November of 2014.

**01349**

U.S. citizens are encouraged to lower their personal profiles and to avoid displaying indicators of wealth such as expensive or expensive-looking jewelry, watches, or cameras. U.S. citizens are encouraged to maintain awareness of their surroundings and avoid situations in which they may be isolated or stand out as potential victims.

Kidnappings in Mexico have included traditional, "express," and "virtual" kidnappings. Victims of traditional kidnappings are physically abducted and held captive until a ransom is paid for release. "Express" kidnappings are those in which a victim is abducted for a short time and forced to withdraw money, usually from an ATM, then released. A "virtual" kidnapping is an extortion-by-deception scheme wherein a victim is contacted by phone and convinced to isolate themselves from family and friends until a ransom is paid. The victim is coerced (by threat of violence) to remain isolated and to provide phone numbers for the victim's family or loved ones. The victim's family is then contacted and a ransom for the "kidnapped" extracted. Recently, some travelers to Mexico staying at hotels as guests have been targets of such "virtual" kidnapping schemes.

Of particular safety concern are casinos, sports books, or other gambling establishments and adult entertainment establishments. U.S. government personnel are specifically prohibited from patronizing these establishments in the states of Coahuila, Durango, Zacatecas, Aguascalientes, San Luis Potosi, Nuevo Leon, Tamaulipas, Jalisco, Colima and Nayarit.

Carjacking and highway robbery are serious problems in many parts of the border region, and U.S. citizens have been murdered in such incidents. Most victims who complied with carjackers' demands have reported that they were not physically harmed. Carjackers have shot at vehicles that have attempted to flee. Incidents have occurred during the day and at night, and carjackers have used a variety of techniques, including roadblocks, bumping/moving vehicles to force them to stop, and running vehicles off the road at high speeds. There are indications that criminals target newer and larger vehicles, especially dark-colored SUVs. However, even drivers of old sedans and buses coming from the United States have been targeted. While violent incidents can occur anywhere and at any time, they most frequently occur at night and on isolated roads. To reduce risk when traveling by road, we strongly urge you to travel between cities throughout Mexico only during daylight hours, to avoid isolated roads, and to use toll roads ("cuotas") whenever possible.

The Mexican government has deployed federal police and military personnel throughout the country as part of its efforts to combat organized criminal groups. U.S. citizens traveling on Mexican roads and highways by car or bus may encounter government checkpoints, staffed by military or law enforcement personnel. In some places, criminal organizations have erected their own unauthorized checkpoints, at times wearing police and military uniforms, and have killed or abducted motorists who have failed to stop at them. You should cooperate at all checkpoints.

Demonstrations are common and occur in all parts of the country. Even demonstrations intended to be peaceful can turn confrontational and escalate into violence. Protesters in Mexico may block traffic on roads, including major thoroughfares, or take control of toll booths on highways. U.S. citizens are urged to avoid areas of demonstrations, and to exercise caution if in the vicinity of any protests. Travelers who encounter protestors demanding unofficial tolls are generally allowed to pass upon payment. Travelers are urged not to exit from major highways. U.S. Citizens should avoid participating in demonstrations and other activities that might be deemed political by the authorities as the Mexican Constitution prohibits political activities by foreigners; such actions may result in detention and/or deportation.

The Department imposes restrictions on U.S. government employees' travel in Mexico. Since July 2010, USG employees are prohibited from driving on non-official travel from the U.S.-Mexico border to or from the interior of Mexico or Central America. Personal travel by motor vehicle is permitted during daylight hours on Highway 15 toll road between Hermosillo and Nogales, on Highway 45 between Ciudad Juarez and Chihuahua City, and on the main roads between Palomas, Chihuahua and Nuevo Casas Grandes, Chihuahua.

U.S. government personnel and their families are prohibited from personal travel to all areas to which it is advised to "defer non-essential travel". When travel for official purposes is essential, it is conducted with extensive security precautions. U.S. government personnel and their families are allowed to travel for personal reasons to the areas where no advisory is in effect or where the advisory is to exercise caution. While the general public is not forbidden from visiting places categorized under "defer non-essential travel," U.S. government personnel will not be able to respond quickly to an emergency situation in those areas due to security precautions that must be taken by U.S. government personnel to travel to those areas. Travel at night is prohibited for U.S. government personnel in some states as indicated below.

For more information on road safety and crime along Mexico's roadways, see the Department of State's Country Specific Information.

**State-by-State Assessment:**

01350

Below is a state-by-state assessment of security conditions throughout Mexico. Travelers should be mindful that even if no advisories are in effect for a given state, crime and violence can still occur. For general information about travel and other conditions in Mexico, see our Country Specific Information.

**Aguascalientes:** Exercise caution when traveling to the areas of the state that border the state of Zacatecas, as criminal organization activity in that region continues.

**Baja California: Tijuana, Rosarito, Ensenada and Mexicali are major cities/travel destinations in the state of Baja California** - Exercise caution in the northern state of Baja California, particularly at night. Criminal activity along highways is a continuing security concern. According to the Baja State Secretariat for Public Security, from January to October 2014 Tijuana and Rosarito experienced increasing homicide rates compared to the same period in the previous year. While most of these homicides appeared to be targeted criminal organization assassinations, turf battles between criminal groups have resulted in violent crime in areas frequented by U.S. citizens. Shooting incidents, in which innocent bystanders have been injured, have occurred during daylight hours.

**Baja California (Sur): Cabo San Lucas and La Paz are major cities/travel destinations in the state of Southern Baja California** – Exercise caution in the state capital of La Paz. According to the Department of Interior of Mexico, in 2013 Baja California Sur registered its highest homicide rate since 1997. Many of these homicides occurred in La Paz, where there has been an increase in organized crime-related violence. .

**Campeche:** No advisory is in effect.

**Chiapas: Palenque and San Cristobal de las Casas are major cities/travel destinations in Chiapas** - No advisory is in effect.

**Chihuahua: Ciudad Juarez, Chihuahua City, and Copper Canyon are major cities/travel destinations in Chihuahua** - Exercise caution in traveling to: the business and shopping districts in the northeast section of Ciudad Juarez and its major industrial parks, the central downtown section and major industrial parks in the city of Chihuahua, the town of Palomas, the urban area of the city of Ojinaga, and the towns of Nuevo Casas Grandes and Casas Grandes and their immediate environs. Travel to the Nuevo Casas Grandes area should be through the Palomas port of entry (POE) on U.S. Highway 11, continuing south until reaching Mexico Highway 2 west to Nuevo Casas Grandes. Travel to Ojinaga should be on the U.S. side via U.S. Highway 67 through the Presidio POE. Defer non-essential travel to other areas in the state of Chihuahua and travel between cities only on major highways and only during daylight hours. Crime and violence remain serious problems throughout the state of Chihuahua, particularly in the southern portion of the state and in the Sierra Mountains, including Copper Canyon.

**Coahuila:** Defer non-essential travel to the state of Coahuila except the city of Saltillo, where you should exercise caution. Violence and criminal activity along the highways are continuing security concerns, particularly along the northern border between Piedras Negras and Nuevo Laredo. The state of Coahuila continues to experience high rates of violent crime, including murder, kidnapping, and armed carjacking..

**Colima: Manzanillo is a major city/travel destination in Colima** - Defer non-essential travel to the areas of the state of Colima that border the state of Michoacán, including the city of Tecoman. The security situation along the Michoacán border continues to be the most unstable in the state, and personal travel by U.S. government personnel is not permitted in this area.

**Durango:** Exercise caution in the state of Durango. Violence and criminal activity along the highways are a continuing security concern. Several areas in the state continue to experience high rates of violence and remain volatile and unpredictable. U.S. government personnel may travel outside the city of Durango only during daylight hours on toll roads, and must return to the city of Durango to abide by a curfew of 1 a.m. to 6 a.m.

**Estado de Mexico: Toluca and Teotihuacan are major travel destinations in Estado de Mexico** - Exercise caution in the State of Mexico. Many areas of the state have seen high levels of crime and insecurity as organized criminal groups have expanded their activities from the states of Guerrero and Michoacán, and have also experienced high levels of street crime. The September 2014 INEGI crime victimization survey indicated that the State of Mexico had the highest incidence of crime in Mexico, with 47,778 victims per 100,000. Due to high rates of crime and insecurity, defer non-essential travel to the municipalities of Coacalco, Ecatepec, Nezahualcoyotl, La Paz, Valle del Chalco, Solidaridad, Chalco, and Ixtapaluca, which are eastern portions of the greater Mexico City metropolitan area, located just to the east of the Federal District of Mexico and Benito Juarez airport, unless traveling directly through the areas on major thoroughfares. Defer non-essential travel to the municipality of Tlatlaya in the southwest portion of the state and non-essential travel on any roads between Santa Marta in the southeast portion of the state and Huitzilac in the state of Morelos, including the Lagunas de Zempoala National Park and surrounding areas, due to high rates of

01351

crime and insecurity.

**Guanajuato: San Miguel de Allende and Leon are major cities/travel destinations in Guanajuato** - No advisory is in effect.

**Guerrero: Acapulco, Ixtapa, Taxco and Zihuatanejo are major cities/travel destinations in Guerrero** - Defer non-essential travel to all parts of the state, except for the cities of Acapulco, Ixtapa, and Zihuatanejo . Travel to Acapulco and Ixtapa/Zihuatanejo only by air or cruise ship, exercise caution, and remain in tourist areas. Travel in and out of Acapulco by air and cruise ship is permitted for U.S. government personnel. U.S. government personnel are prohibited from traveling within Guerrero state by land, including via the 95D toll road ("cuota") to/from Mexico City and Acapulco, as well as highway 200 between Acapulco and Ixtapa/Zihuatanejo. In Acapulco, defer non-essential travel to areas further than two blocks inland of the Costera Miguel Aleman Boulevard, which parallels the popular beach areas. Lodging for U.S. government personnel is limited to the hotel zone ("zona hotelera") of Acapulco, beginning from the Krystal Beach Acapulco hotel in the north and going south through Puerto Marquez, including the Playa Diamante area and ending at The Resort at Mundo Imperial hotel. In general, the popular tourist area of Diamante, just south of the city, has been less affected by violence. Any activity outside the hotel zone for U.S. government personnel is limited to the coastal area from La Quebrada to the beginning of the hotel zone and only during daylight hours. The state of Guerrero was the most violent state in Mexico in 2013, with 2,087 homicides and 207 reported cases of kidnapping, according to the Mexican Secretariado Ejecutivo Nacional de Seguridad Publica. Self-defense groups operate independently of the government in many areas of Guerrero. Armed members of these groups frequently maintain roadblocks and, although not considered hostile to foreigners or tourists, are suspicious of outsiders and should be considered volatile and unpredictable.

**Hidalgo:** No advisory is in effect.

**Jalisco: Guadalajara, Puerto Vallarta, and Lake Chapala are major cities/travel destinations in Jalisco** - Defer non-essential travel to areas of the state that border the states of Michoacán and Zacatecas. The security situation along the Michoacán and Zacatecas borders continues to be unstable. Exercise caution in rural areas and when using secondary highways. U.S. government personnel are authorized to use Federal toll road 15D for travel to Mexico City; however, they may not stop in the town of La Barca for any reason. U.S. government personnel are prohibited from personal travel to areas of Jalisco that border Zacatecas, and are prohibited from intercity travel at night.

**Mexico City (also known as the Federal District):** No advisory is in effect. See also the discussion in the section on Estado de Mexico for areas within the greater Mexico City metropolitan area.

**Michoacán: Morelia is a major city/travel destination in Michoacán** - Defer non-essential travel to the state of Michoacán except the cities of Morelia and Lázaro Cardenas and the area north of federal toll road 15D, where you should exercise caution. U.S. government employees are prohibited from traveling by land in Michoacán except on federal toll road 15D during daylight hours. Flying into Morelia and Lázaro Cardenas is the recommended method of travel. Attacks on Mexican government officials, law enforcement and military personnel, and other incidents of organized crime-related violence, have occurred throughout Michoacán. Armed members of some self-defense groups maintain roadblocks and, although not considered hostile to foreigners or tourists, are suspicious of outsiders and should be considered volatile and unpredictable. Some self-defense groups in Michoacán are reputed to be linked to organized crime.

**Morelos: Cuernavaca is a major city/travel destination in Morelos** - Exercise caution in the state of Morelos due to the unpredictable nature of organized crime violence. You should also defer non-essential travel on any roads between Huitzilac in the northwest corner of the state and Santa Marta in the state of Mexico, including the Lagunas de Zempoala National Park and surrounding areas. Numerous incidents of organized crime-related violence have also occurred in the city of Cuernavaca.

**Nayarit:** The Riviera Nayarit coast, including the cities of Tepic, Xalisco, and San Blas, is a major travel destination in Nayarit: Defer non-essential travel to areas of the state of Nayarit that border the states of Sinaloa or Durango, as well as all rural areas and secondary highways.

**Nuevo Leon: Monterrey is a major city/travel destination in Nuevo Leon** – Exercise caution in the state of Nuevo Leon. Although the level of organized crime-related violence and general insecurity in Monterrey has decreased dramatically within the last two years, sporadic incidents of violence have occurred. Security services in and around Monterrey are robust and have proven responsive and effective in combating violent crimes; however, instances of violence remain a concern in the more remote regions of the state. U.S. government personnel and their dependents may travel outside the city of Monterrey only during daylight hours on toll roads, and must return to the city of San Pedro Garza Garcia municipal boundaries to abide by a curfew of 1 a.m. and 6 a.m., except for travel to the airport after 5 a.m.

01352

**Oaxaca: Oaxaca, Huatulco and Puerto Escondido are major cities/travel destinations in Oaxaca** - No advisory is in effect.

**Puebla:** No advisory is in effect.

**Queretaro:** No advisory is in effect.

**Quintana Roo: Cancun, Cozumel, Playa del Carmen, Riviera Maya and Tulum are major cities/travel destinations in Quintana Roo** - No advisory is in effect.

**San Luis Potosi:** Exercise caution in the state of San Luis Potosi. U.S. government personnel may travel outside the City of San Luis Potosi only during daylight hours on toll roads, and must return to the city of San Luis Potosi to abide by a curfew of 1 a.m. to 6 a.m.

**Sinaloa: Mazatlan is a major city/travel destination in Sinaloa** - Defer non-essential travel to the state of Sinaloa except the city of Mazatlan, where you should exercise caution, particularly late at night and in the early morning. One of Mexico's most powerful criminal organizations is based in the state of Sinaloa, and violent crime rates remain high in many parts of the state. Travel off the toll roads in remote areas of Sinaloa is especially dangerous and should be avoided. We recommend that any travel in Mazatlan be limited to Zona Dorada and the historic town center, as well as direct routes to/from these locations and the airport.

**Sonora: Nogales, Puerto Peñasco, Hermosillo, and San Carlos are major cities/travel destinations in Sonora** - Sonora is a key region in the international drug and human trafficking trades and can be extremely dangerous for travelers. Travelers throughout Sonora are encouraged to limit travel to main roads during daylight hours. The region west of Nogales, east of Sonoyta, and from Caborca north, including the towns of Saric, Tubutama, and Altar, and the eastern edge of Sonora bordering Chihuahua, are known centers of illegal activity, and non-essential travel between these cities should be avoided. Travelers should also defer non-essential travel to the eastern edge of the state of Sonora, which borders the state of Chihuahua (all points along that border east of the northern city of Agua Prieta and the southern town of Alamos), and defer non-essential travel within the city of Ciudad Obregon and south of the city of Navojoa. You should exercise caution while transiting Vicam in southern Sonora due to roadblocks that can be instituted *ad hoc* by local indigenous and environmental groups. U.S. citizens visiting Puerto Peñasco should use the Lukeville, Arizona/Sonoyta, Sonora border crossing, and limit driving to daylight hours.

**Tabasco: Villahermosa is a major city/travel destination in Tabasco**- No advisory is in effect.

**Tamaulipas: Matamoros, Nuevo Laredo, Reynosa, and Tampico are major cities/travel destinations in Tamaulipas** - Defer non-essential travel to the state of Tamaulipas. All U.S. government employees are prohibited from personal travel to all but the central zones of Matamoros and Nuevo Laredo and on Tamaulipas highways outside of Matamoros, Reynosa, and Nuevo Laredo due to the risks posed by armed robbery and carjacking, particularly along the northern border. While no highway routes through Tamaulipas are considered safe, the highways between Matamoros-Ciudad Victoria, Reynosa-Ciudad Victoria, Ciudad Victoria-Tampico, Monterrey-Nuevo Laredo, and Monterrey-Reynosa, are more prone to criminal activity. Public and private passenger buses traveling through Tamaulipas are sometimes targeted by organized criminal groups. These groups sometimes take all passengers hostage and demand ransom payments. In Tamaulipas, U.S. government employees are subject to movement restrictions and a curfew between midnight and 6 a.m. Matamoros, Reynosa, Nuevo Laredo, and Ciudad Victoria have experienced numerous gun battles and attacks with explosive devices in the past year. Violent conflicts between rival criminal elements and/or the Mexican military can occur in all parts of the region and at all times of the day. The number of reported kidnappings for Tamaulipas is among the highest in Mexico, and the number of U.S. citizens reported to the consulates in Matamoros and Nuevo Laredo as being kidnapped, abducted, or disappearing involuntarily in 2014 has also increased.

**Tlaxcala:** No advisory is in effect.

**Veracruz:** Exercise caution when traveling in the state of Veracruz. The state of Veracruz continues to experience violence among rival criminal organizations.

**Yucatan:** Merida and Chichen Itza are major cities/travel destinations in Yucatan - No advisory is in effect.

**Zacatecas:** Exercise caution in the state of Zacatecas. Robberies, carjackings, and organized criminal activity remain a concern. U.S. government personnel may travel outside the city of Zacatecas only during daylight hours on toll roads, and must return to the city of Zacatecas to abide by a curfew of 1 a.m. to 6 a.m.

**01353**

**Further Information**

For more detailed information on staying safe in Mexico, please see the State Department's Country Specific Information for Mexico.

For the latest security information, U.S. citizens traveling abroad should regularly monitor the State Department's internet web site, where the current Worldwide Caution, Travel Warnings, and Travel Alerts can be found. Follow us on Twitter and the Bureau of Consular Affairs page on Facebook as well. Up-to-date information on security can also be obtained by calling 1-888-407-4747 toll free in the United States and Canada or, for callers outside the United States and Canada, a regular toll line at 001-202-501-4444. These numbers are available from 8:00 a.m. to 8:00 p.m. Eastern Time, Monday through Friday (except U.S. federal holidays). U.S. citizens traveling or residing overseas are encouraged to enroll with the State Department's Smart Traveler Enrollment Program. For any emergencies involving U.S. citizens in Mexico, please contact the U.S. Embassy or U.S. Consulate with responsibility for that person's location in Mexico. For information on the ten U.S. consular districts in Mexico, complete with links to Embassy and Consulate websites, please consult the Mexico U.S. Consular District map. The numbers provided below for the Embassy and Consulates are available around the clock. The U.S. Embassy is located in Mexico City at Paseo de la Reforma 305, Colonia Cuauhtemoc, telephone from the United States: 011-52-55-5080-2000; telephone within Mexico City: 5080-2000; telephone long distance within Mexico 01-55-5080-2000. U.S. citizens may also contact the Embassy by e-mail.

**Consulates (with consular districts):**

- Ciudad Juarez (Chihuahua): Paseo de la Victoria 3650, telephone. (011)(52)(656) 227-3000.
- Guadalajara (Nayarit, Jalisco, Aguas Calientes, and Colima): Progreso 175, telephone (011)(52)(333) 268-2100.
- Hermosillo (Sinaloa and the southern part of the state of Sonora): Avenida Monterrey 141, telephone (011)(52)(662) 289-3500.
- Matamoros (the southern part of Tamaulipas with the exception of the city of Tampico): Avenida Primera 2002, telephone (011)(52)(868) 812-4402.
- Merida (Campeche, Yucatan, and Quintana Roo): Calle 60 no. 338-K x 29 y 31, Col. Alcala Martin, Merida, Yucatan, Mexico 97050, telephone (011)(52)(999) 942-5700 or 202-250-3711 (U.S. number).
- Monterrey (Nuevo Leon, Durango, Zacatecas, San Luis Potosi, and the southern part of Coahuila):Prolongacion Ave. Alfonso Reyes No. 150, Col. Valle Poniente, Santa Catarina, Nuevo Leon, 66196, telephone (011)(52)(818) 047-3100.
- Nogales (the northern part of Sonora): Calle San Jose, Nogales, Sonora, telephone (011)(52)(631) 311-8150.
- Nuevo Laredo (the northern part of Coahuila and the northwestern part of Tamaulipas): Calle Allende 3330, Col. Jardin, telephone (011)(52)(867) 714-0512.
- Tijuana (Baja California Norte and Baja California Sur): Paseo de Las Culturas s/n Mesa de Otay, telephone (011) (52) (664) 977-2000.
- All other Mexican states, the Federal District of Mexico City, and the city of Tampico, Tamaulipas, are part of the Embassy's consular district.
- Consular Agencies:
- Acapulco: Hotel Emporio, Costera Miguel Aleman 121 – Suite 14, telephone (011)(52)(744) 481-0100 or (011)(52)(744) 484-0300.
- Cancún: Blvd. Kukulcan Km 13 ZH Torre La Europea, Despacho 301 Cancun, Quintana Roo, Mexico C.P. 77500, telephone (011)(52)(998) 883-0272.
- Los Cabos: Las Tiendas de Palmilla Local B221, Carretera Transpeninsular Km. 27.5, San José del Cabo, BCS, Mexico 23406 telephone, (624) 143-3566 Fax: (624) 143-6750.
- Mazatlán: Playa Gaviotas #202, Zona Dorada, telephone (011)(52)(669) 916-5889.
- Oaxaca: Macedonio Alcalá no. 407, interior 20, telephone (011)(52)(951) 514-3054, (011) (52)(951) 516-2853.
- Piedras Negras: Abasolo #211, Zona Centro, Piedras Negras, Coah., telephone, (011)(52)(878) 782-5586.
- Playa del Carmen: "The Palapa," Calle 1 Sur, between Avenida 15 and Avenida 20, telephone (011)(52)(984) 873-0303 or 202-370-6708(a U.S. number).
- Puerto Vallarta: Paradise Plaza, Paseo de los Cocoteros #1, Local #4, Interior #17, Nuevo Vallarta, Nayarit, telephone (011)(52)(322) 222-0069.
- San Miguel de Allende: Centro Comercial La Luciernaga, Libramiento Manuel Zavala (Pepe KBZON), telephone (011)(52)(415) 152-2357.

**Embassies & Consulates**

01354

Assistance for U.S. Citizens

U.S. Embassy Mexico City
Paseo de la Reforma 305
Colonia Cuauhtemoc
Mexico, D.F., Mexico C.P.
06500

- Telephone
  +(52)(55) 5080-2000

- Emergency After-Hours
  Telephone
  +(52)(55) 5080-2000, ext. 0
  / (01)(55) 5080-2000, ext. 0
  (within Mexico) /5080-2000
  (within Mexico City)

- Fax
  +(52)(55) 5080-2201

- Email
  acsmexicocity@state.gov

- U.S. Embassy Mexico City

  VIEW MORE LOCATIONS

**01355**



click to enlarge

## Learn About Your Destination

| Enter a Country or Area | GO |

### *Enroll in STEP*

Enrolling in this free service will allow us to better assist you in case of an emergency while you are abroad.

ENROLL

- About Us
- Newsroom
- Passport Statistics
- Legal Considerations

- Find a U.S. Embassy or Consulate
- Contact Us
- Careers
- Consular Notification and Access

STAY CONNECTED

- Dipnote Blog
- @travelgov
- Facebook
- YouTube
- Flickr
- RSS

travel.state.gov • U.S. Passports & International Travel • Students Abroad • U.S. Visa • Intercountry Adoption • International Parental Child Abduction

Privacy • Copyright & Disclaimer • FOIA • No FEAR Act Data • Office of the Inspector General • USA.gov • GobiernoUSA.gov

This site is managed by the Bureau of Consular Affairs, U.S. Department of State.

01356

# EXHIBIT 4

01357

| IN THE ESTATE OF | § | IN THE PROBATE |
| DOROTHY LOUISE LONGORIA, | § | COURT NUMBER ONE |
| DECEASED | § | HARRIS COUNTY, TEXAS |

### Shelby Longoria's Second Amended Response to Requests for Disclosure

TO:    James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, Sylvia Dorsey, and Adriana Longoria by and through their attorneys of record, James Austin Fisher, FISHER & WELCH, 2800 Lincoln Plaza, 500 North Akard Street, Dallas, Texas 75201

Shelby Longoria, Will Contestant and Counter-Defendant in the above-styled and numbered cause and, pursuant to Rule 194 of the Texas Rules of Civil Procedure, answers the following requests for disclosure separately and fully in writing.

**REQUEST FOR DISCLOSURE (a):**

The correct names of the parties to the lawsuit.

**RESPONSE:**

The parties are correctly named.

**REQUEST FOR DISCLOSURE (b):**

The name, address, and telephone number of any potential parties.

**RESPONSE:**

Eduardo "Wayo" Longoria Jr.
1702 Cresthaven Dr.
Austin Texas 78704
(512) 535-0105



EXHIBIT

4

**REQUEST FOR DISCLOSURE (c):**

The legal theories and, in general, the factual bases of your claims or defenses.

**RESPONSE:**

The will that Sylvia Longoria Dorsey offered into probate is invalid. On January 21, 2010, Dorothy lacked the testamentary capacity required by law to make a valid last will and testament. Further, the 2010 Will was executed as the result of undue influence exerted by Sylvia

3004728v1/013774

01358

over Dorothy. The influence effectively operated to subvert or overpower Dorothy's mind at the time she executed the instrument in question. Dorothy would not have executed the 2010 Will but for the influence exerted by Sylvia. Sylvia also tortiously interfered with Shelby's inheritance rights by inducing Dorothy to execute the purported 2010 Will. Adriana also tortiously interfered with Shelby's inheritance rights by her actions in 2009 to 2011. Specifically, she induced Dorothy to execute alternative wills; yet she ultimately acquiesced in the probate of the 2010 Will, despite knowledge of a later will, because she needed Sylvia's and Tommy's cooperation to carry out a scheme to assert claims, on behalf of Dorothy's estate, for her own benefit. Sylvia and Adriana thus have received a benefit, directly and indirectly, of a substantial portion of Dorothy's estate and the appointment of Sylvia's husband James Thomas Dorsey ("Tommy") as executor.

Tommy should be removed as independent executor because he was appointed pursuant to an invalid will, procured by Sylvia for the purpose of installing her husband as the executor in order to fraudulently circumvent her release of claims and recognition of the validity of the trust created in 2002. Tommy also should be removed as independent executor because he has material conflict of interests. As independent executor, he has a fiduciary obligation to Dorothy Longoria's estate to investigate Sylvia's misappropriation of money earmarked for Dorothy, and to assert claims as appropriate to recover the misappropriated funds. Tommy will not fulfill this fiduciary obligation, however, because he is married to Sylvia and benefited from her misappropriation. Further, Tommy has entered a joint prosecution agreement with Adriana, Sylvia, and Adriana's son Raymond Hart ("Monte"). Through the joint prosecution agreement, Tommy, Sylvia, Adriana, and Monte have agreed: (1) to "cooperate in the prosecution of the CLAIMS [in this litigation] and to share any proceeds in accordance with the terms" of the agreement; (2) that no party, including Tommy, has "the exclusive right to make decisions about the actions or positions to be taken by the other PARTIES or the ATTORNEYS"; and (3) to "use their best efforts to reach a consensus on any and all decisions relating to LITIGATION or the prosecution or settlement of the CLAIMS" in this lawsuit. Together, these provisions render Tommy "incapable of properly performing the independent executor's fiduciary duties" under Texas Probate Code § 149C because it means he either will not or cannot effectively pursue repayment of monies owed to the Estate by Sylvia, Adriana, and Monte.

Tommy's counterclaims lack merit because Shelby did not owe his mother a fiduciary duty; nor did he breach a promise to hold property for her benefit. Further, in spite of their recent amendment, Tommy's counterclaims, even as amended, should be dismissed on forum non conveniens grounds because they relate to a Mexican marital property agreement that was entered as a judgment of a Mexican court; a Mexican trust holding and owning only Mexican assets, that was set up by a Mexican citizen living in Mexico; and the probate of a Mexican will that took place in Mexican court. Resolving these claims in Texas would require the translation of Spanish-language documents and interpretation of Spanish-language documents, and also face the insuperable obstacle of how to bring Mexican witnesses to court in Texas. These are only some of the reasons dismissal on forum non conveniens grounds is appropriate. Tommy's counterclaims also lack merit because they are outside of the limitations period; fail to state a legally cognizable claim; and are unsupported by the record in this case.

Adriana's counterclaims also lack merit because Shelby has not tortiously interfered with her inheritance rights or any enforceable contractual promise. Further, Adriana cannot show

01359

Shelby owed her a fiduciary duty or breached any promise, let alone a legally cognizable one. Adriana cannot show the malice and/or fraud to support enhanced damages. Adriana's counterclaims also lack merit because they are outside of the limitations period; fail to state a legally cognizable claim; and are unsupported by the record in this case.

## REQUEST FOR DISCLOSURE (d):

The amount and any method of calculating economic damages.

## RESPONSE:

Not applicable.

## REQUEST FOR DISCLOSURE (e):

The name, address, and telephone number of persons having knowledge of relevant facts,

and a brief statement of each identified person's connection with the case.

## RESPONSE:

Shelby Longoria
c/o Johnny Carter, Rick Hess, and Kristen Schlemmer
Susman Godfrey
1000 Louisiana Ste. 5100
Houston, Texas 77002

Shelby Longoria is the will contestant and counter-defendant in this case.

Sylvia Dorsey
c/o James Fisher
500 North Akard Street
Dallas, Texas 75201

Sylvia Dorsey applied for the probate of Dorothy Longoria's purported 2010 will.

James Thomas "Tommy" Dorsey
c/o James Fisher
500 North Akard Street
Dallas, Texas 75201

Tommy is the purported executor of the will Sylvia Dorsey applied to probate.

01360

Eduardo "Wayo" Longoria Jr.
1702 Cresthaven Dr.
Austin Texas 78704
(512) 535-0105

Wayo is Sylvia, Shelby, and Adriana's brother.

Adriana Longoria
6138 San Felipe Street
Houston, TX 77057
(713) 784-0826

Adriana is Sylvia, Shelby, and Wayo's sister.

Thomas Dorsey Jr.
Houston, Texas
(713) 816-0881

Thomas Dorsey Jr. is the son of the will applicant and executor, as well as the business partner of the executor.

Kristin Dorsey
Houston, Texas
(713) 816-0881

Kristin Dorsey is Thomas Dorsey Jr.'s wife and the daughter-in-law of the will applicant and executor.

Elizabeth Fertitta
2706 Eastgrove Lane
Houston, Texas 77027

Elizabeth Fertitta is the daughter of the will applicant and executor, and her husband drafted the will Dorothy Louise Longoria allegedly executed on January 21, 2010.

Zack Fertitta
2706 Eastgrove Lane
Houston, Texas 77027

Zack Fertitta is the son-in-law of the will applicant and executor and drafted the will Dorothy Louise Longoria allegedly executed on January 21, 2010.

Robert Edward "Wayo" Dorsey
15308 Sunset Blvd
Pacific Palisades, CA 90272

Wayo Dorsey is the son of the will applicant and executor.

01361

Adriana Longoria
6138 San Felipe Street
Houston, Texas 77057

Adriana Longoria is Dorothy Longoria's daughter, Sylvia Dorsey and Shelby Longoria's sister, and Tommy's sister-in-law.

Raymond Hart
5834 Candlewood Lane
Houston, TX 77057
(713) 818-2387

Raymond Hart is Adriana Longoria's son.

Forrest Hart
307 Grand Street, Apt. 1C
Brooklyn, New York 11211-4446

Forrest Hart is Adriana Longoria's son.

Adriana Banks
6138 San Felipe Street
Houston, Texas 77057

Adriana Banks is Adriana Longoria's daughter.

Tita Longoria
c/o Johnny Carter, Rick Hess, and Kristen Schlemmer
Susman Godfrey
1000 Louisiana Ste. 5100
Houston, Texas 77002

Tita Longoria is Shelby Longoria's wife and Dorothy Longoria's daughter-in-law.

Marta Beatriz Montelongo Garza
Cerro del Bernal 128 Colonia las Fuentes, Cp. 88710
Reynosa, Tamaulipas

Ms. Montelongo witnessed Eduardo's 2002 will and the 2002 Afirme Trust agreement.

Saul Garza Molina
Real De Cantaro 203, Fracc. Los Cantaros
Reynosa, Tamaulipas

Mr. Garza is the CEO of Grupo Inlosa and had close contact with Eduardo and Dorothy over many years.

01362

Irma Campoy Carrillo
Haya 108 Fracc. Privada Las Ceibas
Reynosa, Tamaulipas

Ms. Campoy is the Treasurer for Grupo Inlosa and was in charge of making payments to Sylvia and Adriana under the Acuerdo Privado.

Patricia Vazquez
Playa Hermosa 507, Col Militar Marte
Iztacalco, Mexico

Ms. Vasquez was the Treasurer for Grupo Inlosa before Ms. Campoy and was responsible for making payments to Sylvia and Adriana under the Acuerdos Privados.

Marco A. Torres
Sierra Nevada 1208, Col Fuentes
Reynosa, Tamaulipas

Mr. Torres was the Administrative Director at Grupo Inlosa for many years and has knowledge of Eduardo and Dorothy's wills and estate planning.

Pedro Ramirez
Padre Mier 1504
Monterrey, N.L

Mr. Ramírez was the attorney who drafted trust documents and the Acuerdos Privados.

Celia Guerrero
Zaragoza 1300 Sur.
Monterrey, N.L.

Ms. Guerrero works with Mr. Ramirez and also assisted Mr. Ramírez in the preparation of many documents.

Mario Gonzalez Mendoza
Dr. Mier 3113 Zona Centro
Nuevo Laredo, Tamaulipas

Mr. Gonzalez Mendoza was Eduardo's and Dorothy's attorney for approximately 40 years and has knowledge relevant to their estate planning, testamentary wishes, and separate property agreement.

Mario Gonzalez Basurto
Dr. Mier 3113 Zona Centro
Nuevo Laredo, Tamaulipas

Mr. Gonzalez Basurto is Mr. Longoria's attorney in the amparo proceedings in Mexico.

01363

Elsa Gonzalez Basurto
Dr. Mier 3113 Zona Centro
Nuevo Laredo, Tamaulipas

Ms. Gonzalez worked on the probate of Eduardo's estate.

Alicia Garcia
Dr. Mier 3113 Zona Centro
Nuevo Laredo, Tamaulipas

Ms. Garcia has been Mr. Gonzalez Mendoza's assistant for many years and knew Eduardo and Dorothy.

Carlos Avila
Hacienda San Abel 215, Fracc. Las Haciendas
Reynosa, Tamaulipas

Mr. Avila was the HR Manager for Grupo Inlosa for many years.

Carlos Gonzalez Hinojosa
Libramiento Luis Echevarria 630
Reynosa, Tamaulipas

Mr. Gonzalez Hinojosa is an attorney in Reynosa who prepared several wills for Eduardo and Dorothy.

Arnulfo Cruz
Calle Del Cerro 131, Colonia Cumbres
Monterrey, N.L.

Mr. Cruz is a tax consultant who participated on many of the documents and tax planning for Dorothy and Eduardo.

Virginia Coronel
Azucena 505, Col. Puerta Del Hierro
Monterrey, N.L.

Ms. Coronel is an attorney with intimate knowledge of documents related to Eduardo's and Dorothy's estate planning and Eduardo's and Shelby's business dealings in Mexico.

01364

Dr. Anselmo Guarneros
Calle Independencia N° 2209
Nuevo Laredo, Tamaulipas

Dr. Guarneros was good friends with Eduardo and Dorothy for many years, witnessed Eduardo's 2002 will, and is knowledgeable about Eduardo's medical condition at the time he executed the 2002 will.

Carlos Lozano
Nayarit N° 3626, Colonia Jardin
Nuevo Laredo, Tamaulipas

Mr. Lozano worked for Eduardo for over thirty years.

Antonio Del Bosque
Boulevard Las Torres Del Bosque 705
Nuevo Laredo, Tamaulipas

Mr. Del Bosque worked for Eduardo for over thirty years.

Lic. Francisco Gaxiola.
Bosque De Ciruelos 140-505
Mexico D.F

Mr. Gaxiola is an attorney that drafted documents for the Serfin Trust.

Nestor Sanchez
Calle Perales N° 750, Colonia Jardin
Reynosa, Tamaulipas

Mr. Sanchez served as Administrative Director of Grupo Inlosa before Marco Torres.

Lic. Adrian Lozano Lozano
Hidalgo 234 Pte. 4° Piso, Zona Centro
Monterrey, N.L.

Mr. Lozano is an executive at Banca Afirme, the trustee of the Afirme Trust.

Martha Beatriz Garza
Hidalgo 234 Pte. 4° Piso, Zona Centro
Monterrey, N.L.

Ms. Garza is an executive at Banca Afirme, the trustee of the Afirme Trust.

01365

Lic. Eduardo Marroquin
Francisco I Madero Pte 218, Monterrey
Nuevo Leon, Tamaulipas

Mr. Marroquin is an executive at Banca Afirme, the trustee of the Afirme Trust.

Dr. Mario Alberto Pérez Coss
Madero 1320
Nuevo Laredo, Tamaulipas

Dr. Perez certified Dorothy's good health in connection with her 1989 Mexican will.

Oscar Chapa Gonzalez
Guatemala # 2802
Col. Ferrocarril
Nuevo Laredo, Tamaulipas 88050

Mr. Chapa is knowledgeable about the valuation of properties in connection with Eduardo's and Dorothy's 1983 Separate Property Agreement.

Jose Luis Saldaña Avendaño
Carretera Piedras Negras
kilometro 19.3 Poniente
Nuevo Laredo, Tamaulipas

Mr. Saldaña is knowledgeable about the 1983 Separate Property Agreement and the valuation of interests divided in that agreement.

## REQUEST FOR DISCLOSURE (f):

For any testifying expert

(1)     The expert's name, address, and telephone number;

(2)     The subject matter on which the expert will testify;

(3)     The general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by you, employed by you, or otherwise subject to your control, documents reflecting such information;

(4)     If the expert is retained by you, employed by you, or otherwise subject to your control:

01366

(A)    All documents, tangible items, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

(B)    The expert's current resume and bibliography.

**RESPONSE:**

Experts will designated on the schedule provided by the Court.

**REQUEST FOR DISCLOSURE (g):**

Any indemnity and insuring agreements described in Rule 192.3(f).

**RESPONSE:**

Not applicable.

**REQUEST FOR DISCLOSURE (h):**

Any settlement agreements described in Rule 192.3(g).

**RESPONSE:**

Sylvia Dorsey signed a contract entitled "Release Agreement" on December 29, 2006 acknowledging full payment of gifts and inheritances she was owed under the Private Agreement and Wish Letter and releasing her claims against Shelby Longoria.

**REQUEST FOR DISCLOSURE (i):**

Any witness statements described in Rule 192.3(h).

**RESPONSE:**

Not applicable.

01367

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: _____

Johnny W. Carter
State Bar No. 00796312
Richard W. Hess
State Bar No. 24046070
Kristen Schlemmer
State Bar No. 24075029
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Robert S. MacIntyre Jr.
MACINTYRE McCULLOCH STANFIELD YOUNG
2900 Weslayan, Suite 150
Houston, Texas 77027
Telephone: (713) 547-5400

*Attorneys for Shelby Longoria*

## CERTIFICATE OF SERVICE

This is to certify that on this April 3, 2014, a true and correct copy of the above and foregoing instrument was properly forwarded to the following counsel of record in accordance with Rule 21 of the Texas Rules of Civil Procedure as indicated below:

James Austin Fisher                                    *Via Electronic Mail*
FISHER & WELCH
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Email: jfisher@fisherwelch.com

T. Wesley Holmes
THE HOLMES LAW FIRM
1000 North Central Expressway, Suite 400
Dallas, Texas 75231
Email: wes@wesholmes.com
*Attorneys for James Thomas Dorsey, Sylvia Dorsey, and Adriana Longoria*

_____
Kristen Schlemmer

3004728v1/013774

11

**01368**

# EXHIBIT 5

01369

Page 197

what he was doing was improper?

A. No, I did not.

Q. Okay. Let me give you two exhibits at the same time, because one's in English and one is in Spanish.

(Exhibits 102 and 103 are marked.)

Q. (BY MR. HESS) Exhibit 102 has "Private Agreement" and "Translation" at the top. Exhibit 103 says "Recuerdo Bravada."

Let's start with 103, Ms. Longoria, and then we'll go back to 102.

So, 103 is the Spanish language Private Agreement between you and your father, right?

A. Yes.

Q. It is signed by you and signed by your father on the third page, right?

A. Yes.

Q. Now, let's go to Exhibit 102, which is in English.

So, in October of 2002, you entered into this agreement with your father, Eduardo Longoria, right?

A. (Witness nods head.)

MR. FISHER: Objection; form.

A. Yes.

Page 198

Q. (BY MR. HESS) Okay. Just so I'm clear, this is the translation of Exhibit 103. And if there's any issue with the translation you see, you let me know.

A. Okay.

Q. And if you don't have time to check, you have capable lawyers who can determine whether or not they have any problems with the translation.

MR. FISHER: I'm not a capable translator, however.

MR. HESS: Right.

Q. (BY MR. HESS) And I'm only using 102 because this language -- this procedure --

A. That's fine.

Q. -- this procedure is taking place in English.

So, at the top of 102 says, "Executed by Eduardo Longoria Theriot and Adriana Longoria Kowalski, with respect to the recognition and acceptance of the terms and conditions of Trust No. 194-2."

Do you see that?

A. Yes, I see it.

Q. Okay. So, the Private Agreement signed in 2002 by you and your father acknowledges that there

Page 199

is a trust, specifically Trust 194-2, right?

A. (Witness nods head.)

Q. You've got to answer audibly.

A. Yes, oh -- yes.

Q. And when you look at the first page under the Declarations, you see that it refers to a trust contract being executed with Mr. Eduardo Longoria Theriot, acting as trustor, and your brothers, Wayo and Shelby, as Trust and Officiaries, right?

A. Yes.

Q. This agreement also affects you in a very real way, because the second clause refers to payments to be paid to you.

Do you see that?

A. (Witness nods head.)

Q. Okay. "The second payment to Adriana Longoria Kowalski is the will of their father that the amount of U.S. $3 million be delivered to his daughter, Adriana Longoria Kowalski."

Do you see that?

A. Yes.

Q. So, this is the private agreement that we've referenced today, and also yesterday, as the instrument by which your father expressed his will that you should get $3 million, right?

Page 200

A. This is the one we signed at dinnertime. It was his birthday, October.

Q. And you see the first clause, it says, "The parties recognize the validity and scope of the trust."

Do you see that? The paragraph right before the $3 million to you.

A. Uh-huh.

Q. Okay. So, back in 2002, in October, you say on your father's birthday you executed an agreement that affirms the validity and the scope of this trust referenced in the document, right?

MR. FISHER: Objection; form.

Q. (BY MR. HESS) Your answer?

A. Well, I was not able to read it before I signed it.

Q. All right. Obviously you didn't sign Exhibit 102, but you signed Exhibit 103, the Spanish language one?

A. Yes.

Q. And when you say you were not able to read it, you're not telling me that you're incapable of reading it, right?

A. No. I was saying it was too brief amount of time.

15 (Pages 197 to 200)

EXHIBIT 5

01370

Page 201

Q. You feel today that you didn't have enough time to read Exhibit 103 before you signed it?

A. Yes.

Q. You don't dispute that you did sign it?

A. I don't dispute that I did sign it.

Q. You don't dispute that you could have had the opportunity to read it whenever you wanted?

A. No. They -- they were picked up then and there.

Q. I see. Do you recognize this is the agreement by which you've been paid --

A. Yes, I do.

Q. -- an allowance --

A. Yes, I do.

Q. -- every month, every year, between --

A. As I had all the years prior in my life.

MR. FISHER: You didn't let him finish the question, so you don't even know what you were answering.

Q. (BY MR. HESS) You don't even know what I was asking.

A. No, I don't. I am so terribly sorry.

Q. That's all right.

A. I suppose I'll leave here a renegade.

Q. Just try to do better.

Page 202

A. I will. I truly...

Q. You signed an agreement --

A. Yes.

Q. -- in 2002. And under the terms of that agreement, you have been paid an allowance monthly, all way up until October 2010?

A. Yes.

Q. Are you claiming that this agreement is somehow invalid?

A. No.

Q. Okay. This is a valid agreement that you signed and which your father signed?

A. (Witness nods head.)

MR. FISHER: Objection; form.

Q. (BY MR. HESS) You nodded before Mr. Fisher objected.

But what is your answer, anyway, out loud?

A. What I see here on the paper is my signature and my father's signature.

Q. While you may have some complaints today that you wish you had more time to read it, you don't dispute that you signed it and that you've been paid pursuant to this agreement up until October 2010?

A. I -- I did not know what was written on

Page 203

these pages. And I almost feel that my father, at that time, as you can see his signature, was quite ill.

Q. You don't dispute --

A. No.

Q. -- that you signed it and that you've been paid pursuant to this agreement all the way up to 2010 --

A. Let me say that I do --

Q. -- right?

A. -- not know where those payments came from, were they the same payments from the trust that I had been paid for for 50 years monthly.

When I got my money, I got it in my account like I had been for 50 years prior.

Q. Are you going to turn around and give all that money back if this agreement is invalid?

A. I have no money. I've spent it.

Q. Well, look at the bottom of page 1.

MR. FISHER: Which exhibit?

MR. HESS: Exhibit 102.

Q. (BY MR. HESS) Where it says, "The balance to be delivered to Adriana Longoria Kowalski, in terms of previous paragraph, amounts to 2,069,100." And it carries over onto the second page.

Page 204

Are you with me, Ms. Longoria?

A. I'm looking at this.

(The witness peruses the document.)

A. I'm going to see -- let's see -- during this, can I ask you questions -- or no.

Q. (BY MR. HESS) If you want to confer with your lawyer because you think you might reveal something privileged between the two of you, then yes. But otherwise, no.

MR. HESS: I'm sorry to interrupt.

MR. FISHER: I agree with what you said, but I want to ask you if you understand what he said.

THE WITNESS: No, no. I didn't know if I could make a reference to you.

MR. FISHER: I can't coach you how to answer or anything like that.

THE WITNESS: It's most --

MR. FISHER: You've just got to answer the question as best you can.

Q. (BY MR. HESS) Right now, I think the question is: Are you reading the same paragraph I am?

MR. FISHER: I'm not sure she is.

A. The second one --

16 (Pages 201 to 204)

01371

Page 205

MR. FISHER: If you could identify it again.

Q. (BY MR. HESS) Sure. The bottom of page 1 carried over to the top of page 2?

A. Yes, that's the one I'm on.

Q. So, by the time that you signed this agreement in 2002, the balance on the $3 million that your father wished to give to you was $2,069,100, right?

A. (Witness nods head.)

Q. I'm pointing to my ear because I want to hear your answer.

A. Oh, thank you. Yes. But --

Q. As we discussed --

A. -- may I ask you --

Q. When this deposition is over, ask me whatever you want.

A. Okay.

Q. When your father passed away in 2005, was there any interruption in the payments you received in 2005?

A. No.

Q. 2006?

A. No.

Q. 2007?

Page 206

A. I don't remember.

Q. Do you remember any interruptions in your monthly allowance in 2008?

A. Those were the period of time when I don't remember much.

Q. Okay. Do you remember any interruption of payments in 2009 or 2010?

A. During this -- right now, I don't remember.

Q. We talked about this earlier today, but is your memory starting to fail you because you're getting disturbed about some of the issues that have bothered you in the past?

A. Perhaps.

Q. Now, in 2005, after your father passed away, your mother moved from Laredo to Houston, right?

A. She did.

Q. Where did she live?

A. At the Bella --

Q. Do you remember the name of the apartment building where she lived?

A. It was the Bella-something.

Q. Okay. Is that a high-rise condominium building?

A. Yes, it is.

Q. Do you remember the address?

Page 207

A. It was across the street from Sylvia's business.

Q. Do you remember the address?

A. No.

Q. Do you remember what unit number your mother lived in?

A. 14 -- 140.

Q. Around what floor did she live on?

A. The 14th floor.

Q. How often did you see your mother when she moved to Houston?

A. I saw her very frequently in the beginning.

Q. When you say "very frequently," what does that mean?

A. Twice a week.

Q. And when you say "in the beginning," what does that mean?

A. That means -- Mother lived here around, I think, six years. And I would say the first three or four years.

Q. 2005 to 2008, you saw her probably two times a week.

And how did that change after 2008?

A. Well, Mother and I had always had a little bit of a caustic relationship, since I was 15, I

Page 208

would say. And some things didn't change.

Q. Was there anything in particular that caused the caustic aspects of your relationship with your mother to resurface after 2008?

A. Oh, no. It never was put to bed.

Q. And then after 2008, how often do you think you would visit with your mother in person?

A. Once a week, once every ten days.

Q. And how long did that last after 2008?

A. Till she died.

Q. At some point in 2009, did your mother express some desire to you for her to change her will?

A. We didn't talk about that much.

Q. It sounds like in 2009, she didn't tell you that she had some desire to go and change her will.

Is that right?

A. No, she did not tell me.

Q. How was your mother doing mental health-wise around that time?

A. We were neck and neck. She was not well.

Q. You were suffering from depression?

A. I was.

Q. And she was suffering from depression?

A. No. She was aged.

17 (Pages 205 to 208)

01372

# EXHIBIT 6

01373

Case Number 414270

| IN THE ESTATE OF | § | IN THE PROBATE |
| DOROTHY LOUISE LONGORIA, | § | COURT NUMBER ONE |
| DECEASED | § | HARRIS COUNTY, TEXAS |
| | § | |

### Shelby Longoria's Responses to Adriana Longoria's First Requests for Production of Documents and Things

TO: Adriana Longoria ("Adriana"), by and through her attorneys of record, James Austin Fisher, Fisher & Welch, 2800 Lincoln Plaza, 500 North Akard Street, Dallas, Texas 75201, and T. Wesley Holmes, The Holmes Law Firm, 10000 North Central Expressway, Suite 400, Dallas, Texas 75231.

Shelby Longoria ("Shelby"), Will Contestant in the above-styled and numbered cause and, pursuant to Rule 196 of the Texas Rules of Civil Procedure, answers the following requests for production of documents separately and fully in writing.

### GENERAL OBJECTIONS

1. Shelby objects to any and all instructions or definitions that would require him to respond in a manner beyond that required by the Texas Rules of Civil Procedure.

2. Shelby further objects to all the requests below as seeking production of documents that have already been produced pursuant to requests for production propounded by Sylvia Dorsey ("Sylvia") and James Thomas Dorsey ("Tommy").

3. Shelby objects to any and all requests to the extent that they seek the production of any documents or information protected from disclosure by the attorney-client privilege, the work-product doctrine, or any other applicable claim of privilege, law or rule ("Privileged Information"). Shelby Longoria will not produce Privileged Information in response to the requests, and any undertaking by him to produce documents should be understood to exclude Privileged Information. Shelby Longoria specifically reserves the right to demand the return of any documents that

EXHIBIT

tabbies

6

inadvertently may be produced if he determines, in his sole discretion, that such documents may constitute or contain Privileged Information.

4.  Shelby has withheld documents and/or communications covered by privilege, including attorney-client privilege and/or work product privilege, responsive to Adriana's RFPs 17, 18, and 19. Pursuant to TRCP 193.3(c), Shelby will exclude privileged communications and documents created from the point at which it consulted an attorney with a view toward obtaining professional legal services from the lawyer in the prosecution of a specific claim in this litigation.

5.  Shelby Longoria reserves all other objections, including, without limitation, objections to the relevance, admissibility, or authenticity of all information or documents provided.

## RESPONSES AND OBJECTIONS

1.  All documents in which the Private Agreement is mentioned.

**RESPONSE:**

In their requests for production #s 5 and 23, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria" and "All documents relating to a document entitled 'Acuerdo Privado' and purportedly signed by Adriana Longoria and Eduardo on or about December 17, 2002." Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents in which the Private Agreement is mentioned, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

2.  All drafts of the Private Agreement (whether or not they are entitled, "Acuerdo Privado").

**RESPONSE:**

01375

In their requests for production #s 5 and 23, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria" and "All documents relating to a document entitled 'Acuerdo Privado' and purportedly signed by Adriana Longoria and Eduardo on or about December 17, 2002." Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has drafts of the Private Agreement, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

3.    All documents in which a draft of the Private Agreement is mentioned.

**RESPONSE:**

In their requests for production #s 5 and 23, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria" and "All documents relating to a document entitled 'Acuerdo Privado' and purportedly signed by Adriana Longoria and Eduardo on or about December 17, 2002." Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents in which a draft of the Private Agreement is mentioned, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

4.    All documents in which there is a reference to a payment of money that was made to Adriana pursuant to the Private Agreement.

**RESPONSE:**

In their requests for production #s 5 and 23, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; and "All documents relating to a document entitled 'Acuerdo Privado' and purportedly signed by Adriana Longoria and Eduardo on

01376

or about December 17, 2002." Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents in which there is a reference to a payment of money that was made to Adriana pursuant to the Private Agreement, Shelby has already produced them. Shelby has, however, identified an updated statement of account for payments made to Adriana pursuant to the Private Agreement, which he will produce. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

5. All documents which identify the source of funds used to make a payment of money to Adriana pursuant to the Private Agreement.

**RESPONSE:**

In their requests for production #s 5 and 23, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; and "All documents relating to a document entitled 'Acuerdo Privado' and purportedly signed by Adriana Longoria and Eduardo on or about December 17, 2002." Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents which identify the source of funds used to make a payment of money to Adriana pursuant to the Private Agreement, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

6. All written communications to or from Adriana in which the Private Agreement is mentioned.

**RESPONSE:**

In their requests for production #s 5, 8, and 23, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; "All documents relating to

01377

communications between [Shelby] and Adriana Longoria"; and "All documents relating to a document entitled 'Acuerdo Privado' and purportedly signed by Adriana Longoria and Eduardo on or about December 17, 2002." Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications to or from Adriana in which the Private Agreement is mentioned, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

7.  All written communications to or from Adriana in which any payment of money to Adriana is mentioned.

**RESPONSE:**

In their requests for production #s 5 and 8, Sylvia and Tommy requested "All documents referring or relating to Adriana Longoria" and "All documents relating to communications between [Shelby] and Adriana Longoria." Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications to or from Adriana in which any payment of money to Adriana is mentioned, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

8.  All documents which state, or purport to state, the balance owed to Adriana pursuant to the Private Agreement as of any date.

**RESPONSE:**

In their request for production #23, Sylvia and Tommy requested "All documents relating to a document entitled 'Acuerdo Privado' and purportedly signed by Adriana Longoria and Eduardo on or about December 17, 2002." Subject to the objections listed in the responses to that request,

01378

Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents which state, or purport to state, the balance owed to Adriana pursuant to the Private Agreement as of any date, Shelby has already produced them. Shelby has, however, identified an updated statement of account for payments made to Adriana pursuant to the Private Agreement, which he will produce. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

9. All documents which state, or purport to state, the total amount paid to Adriana pursuant to the Private Agreement as of any date.

**RESPONSE:**

In their request for production #23, Sylvia and Tommy requested "All documents relating to a document entitled 'Acuerdo Privado' and purportedly signed by Adriana Longoria and Eduardo on or about December 17, 2002." Subject to the objections listed in the responses to that request, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents which state, or purport to state, the total amount paid to Adriana pursuant to the Private Agreement as of any date, Shelby has already produced them. Shelby has, however, identified an updated statement of account for payments made to Adriana pursuant to the Private Agreement, which he will produce. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

10. All documents which list, or purport to list, payments to Adriana pursuant to the Private Agreement.

**RESPONSE:**

In their request for production #23, Sylvia and Tommy requested "All documents relating to a document entitled 'Acuerdo Privado' and purportedly signed by Adriana Longoria and Eduardo

01379

on or about December 17, 2002." Subject to the objections listed in the responses to that request, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents which list, or purport to list, payments to Adriana pursuant to the Private Agreement, Shelby has already produced them. Shelby has, however, identified an updated statement of account for payments made to Adriana pursuant to the Private Agreement, which he will produce. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

11.     All documents which mention a payment of money by Eduardo and/or Dorothy to Adriana.

**RESPONSE:**

In their request for production #5, Sylvia and Tommy requested "All documents referring or relating to Adriana Longoria." Subject to the objections listed in the responses to that request, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents which mention a gift of property by Eduardo and/or Dorothy to Adriana, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

12.     All documents which mention a gift of property by Eduardo and/or Dorothy to Adriana.

**RESPONSE:**

In their requests for production #s 5, 43, and 44, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; "All documents evidencing any assignment, conveyance, gift, sale, or other transfer by Eduardo of any property owned by her at any time"; and "All documents evidencing any assignment, conveyance, gift, sale, or other transfer by Dorothy of any property owned by her at any time." Subject to the objections listed in the

01380

responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents which mention a gift of property by Eduardo and/or Dorothy to Adriana, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

13. All written communications to or from Adriana in which any property owned, or formerly owned, or formerly owned, by Eduardo is mentioned.

**RESPONSE:**

In their requests for production #s 5, 8, and 43, Sylvia and Tommy requested "All documents referring or relating to Adriana Longoria"; "All documents relating to communications between [Shelby] and Adriana Longoria"; and "All documents evidencing any assignment, conveyance, gift, sale, or other transfer by Eduardo of any property owned by her at any time." Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications to or from Adriana in which any property owned, or formerly owned, or formerly owned, by Eduardo is mentioned, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

14. All written communications to or from Adriana in which any property owned, or formerly owned, by Dorothy is mentioned.

**RESPONSE:**

In their requests for production #s 5, 8, and 44, Sylvia and Tommy requested "All documents referring or relating to Adriana Longoria"; "All documents relating to communications between [Shelby] and Adriana Longoria"; and "All documents evidencing any assignment, conveyance, gift, sale, or other transfer by Dorothy of any property owned by her at any time."

01381

Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications to or from Adriana in which any property owned, or formerly owned, by Dorothy is mentioned, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

15. All written communications which include an instruction to make a payment of money to Adriana.

**RESPONSE:**

In their request for production #5, Sylvia and Tommy requested "All documents referring or relating to Adriana Longoria." Subject to the objections listed in the responses to that request, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications which include an instruction to make a payment of money to Adriana, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

16. All written communications which include an instruction not to make a payment of money to Adriana.

**RESPONSE:**

In their request for production #5, Sylvia and Tommy requested "All documents referring or relating to Adriana Longoria." Subject to the objections listed in the responses to that request, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications which include an instruction not to make a payment of money to Adriana, Shelby has already produced them. Shelby has not withheld any documents

01382

responsive to this request on the basis of his previous objections.

17.    All documents which characterize or describe your relationship with Adriana at any time after 1978.

**RESPONSE:**

In their request for production #5, Sylvia and Tommy requested "All documents referring or relating to Adriana Longoria." Subject to the objections listed in the responses to that request, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents which characterize or describe his relationship with Adriana at any time after 1978, Shelby has already produced them. Shelby has not withheld any nonprivileged documents responsive to this request on the basis of his previous objections.

18.    All documents which characterize or describe Eduardo's relationship with Adriana at any time after 1978.

**RESPONSE:**

In their requests for production #s 3, 5, 11, 12, 23, 63(a), and 65 Sylvia and Tommy requested "All documents referring or relating to Eduardo"; "All documents referring or relating to Adriana Longoria"; "All documents relating to communications between [Shelby] and Eduardo Longoria Theriot"; and "All documents relating to communications between you and others regarding Eduardo Longoria Theriot"; "All documents relating to a document entitled 'Acuerdo Privado' purportedly signed by Adriana Longoria and Eduardo on or about December 17, 2002"; and "All written communications in which any one or more of the following is mentioned: (a) Eduardo"; "All written communications to or from Eduardo."

Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has

01383

documents which characterize or describe Eduardo's relationship with Adriana at any time after 1978, Shelby has already produced them. Shelby has not withheld any nonprivileged documents responsive to this request on the basis of his previous objections.

19.     All documents which characterize or describe Dorothy's relationship with Adriana at any time after 1978.

**RESPONSE:**

In their request for production #s 2, 5, 9, 10, 64(a), and 66, Sylvia and Tommy requested "All documents referring or relating to Dorothy"; "All documents referring or relating to Adriana Longoria"; "All documents relating to communications between you and Dorothy Louise Longoria"; "All documents relating to communications between you and others regarding Dorothy Louise Longoria"; "All written communications in which any one or more of the following is mentioned: (a) Dorothy"; and "All written communications to or from Dorothy."

Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents which characterize or describe Dorothy's relationship with Adriana at any time after 1978, Shelby has already produced them. Shelby has not withheld any nonprivileged documents responsive to this request on the basis of his previous objections.

20.     All written communications in which Eduardo and/or Dorothy asked or instructed you to pay money to Adriana or to cause another person or business to pay money to Adriana.

**RESPONSE:**

In their requests for production #s 5, 9, 10, 11, and 12, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; "All documents relating to communications between you and Dorothy Louise Longoria"; "All documents relating to communications between you and others regarding Dorothy Louise Longoria"; "All documents

01384

relating to communications between you and Eduardo Longoria Theriot"; and "All documents relating to communications between you and others regarding Eduardo Longoria Theriot."

Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications in which Eduardo and/or Dorothy asked or instructed Shelby to pay money to Adriana or to cause another person or business to pay money to Adriana, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

21. All written communications which respond to a request or instruction by Eduardo and/or Dorothy that you pay money to Adriana or that you cause another person or business to pay money to Adriana.

**RESPONSE:**

In their requests for production #s 5, 9, 10, 11, and 12, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; "All documents relating to communications between you and Dorothy Louise Longoria"; "All documents relating to communications between you and others regarding Dorothy Louise Longoria"; "All documents relating to communications between you and Eduardo Longoria Theriot"; and "All documents relating to communications between you and others regarding Eduardo Longoria Theriot."

Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications in which Eduardo and/or Dorothy asked or instructed Shelby to pay money to Adriana or to cause another person or business to pay money to Adriana, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of

01385

his previous objections.

22.   All documents which mention to a request or instruction by Eduardo and/or Dorothy that you pay money to Adriana or that you cause another person or business to pay money to Adriana.

**RESPONSE:**

In their requests for production #s 5, 9, 10, 11, and 12, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; "All documents relating to communications between you and Dorothy Louise Longoria"; "All documents relating to communications between you and others regarding Dorothy Louise Longoria"; "All documents relating to communications between you and Eduardo Longoria Theriot"; and "All documents relating to communications between you and others regarding Eduardo Longoria Theriot."

Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications in which Eduardo and/or Dorothy asked or instructed Shelby to pay money to Adriana or to cause another person or business to pay money to Adriana, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

23.   All written communications in which Eduardo and/or Dorothy asked or instructed you to do something for the benefit of Adriana or to cause another person or business to do something for the benefit of Adriana.

**RESPONSE:**

In their requests for production #s 5, 9, 10, 11, and 12, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; "All documents relating to communications between you and Dorothy Louise Longoria"; "All documents relating to communications between you and others regarding Dorothy Louise Longoria"; "All documents

01386

relating to communications between you and Eduardo Longoria Theriot"; and "All documents relating to communications between you and others regarding Eduardo Longoria Theriot."

Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications in which Eduardo and/or Dorothy asked or instructed you to do something for the benefit of Adriana or to cause another person or business to do something for the benefit of Adriana, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

24. All written communications which respond to a request or instruction by Eduardo and/or Dorothy that you something for the benefit of Adriana or that you cause another person or business to do something for the benefit of Adriana.

**RESPONSE:**

In their requests for production #s 5, 9, 10, 11, and 12, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; "All documents relating to communications between you and Dorothy Louise Longoria"; "All documents relating to communications between you and others regarding Dorothy Louise Longoria"; "All documents relating to communications between you and Eduardo Longoria Theriot"; and "All documents relating to communications between you and others regarding Eduardo Longoria Theriot."

Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications which respond to a request or instruction by Eduardo and/or Dorothy that you something for the benefit of Adriana or that you cause another person or business to do something for the benefit of Adriana, Shelby has already produced them. Shelby has not withheld

01387

any documents responsive to this request on the basis of his previous objections.

25.    All documents which mention a request or instruction by Eduardo and/or Dorothy that you do something for the benefit of Adriana or that you cause another person or business to do something for the benefit of Adriana.

**RESPONSE:**

In their requests for production #s 5, 9, 10, 11, and 12, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; "All documents relating to communications between you and Dorothy Louise Longoria"; "All documents relating to communications between you and others regarding Dorothy Louise Longoria"; "All documents relating to communications between you and Eduardo Longoria Theriot"; and "All documents relating to communications between you and others regarding Eduardo Longoria Theriot."

Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has documents which mention a request or instruction by Eduardo and/or Dorothy that you do something for the benefit of Adriana or that you cause another person or business to do something for the benefit of Adriana, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

26.    All written communications between you and Dorothy in which Adriana is mentioned or referred to.

**RESPONSE:**

In their requests for production #s 5 and 9, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; and "All documents relating to communications between you and Dorothy Louise Longoria." Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those

01388

requests. Accordingly, to the extent Shelby has written communications between himself and Dorothy in which Adriana is mentioned or referred to, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

27.    All written communications between you and Eduardo in which Adriana is mentioned or referred to.

**RESPONSE:**

In their requests for production #s 5 and 11, Sylvia and Tommy requested (respectively) "All documents referring or relating to Adriana Longoria"; and "All documents relating to communications between you and Eduardo Longoria Theriot." Subject to the objections listed in the responses to those requests, Shelby produced all documents in his possession, custody, or control that are responsive to those requests. Shelby maintains any objections raised in response to those requests. Accordingly, to the extent Shelby has written communications between himself and Eduardo in which Adriana is mentioned or referred to, Shelby has already produced them. Shelby has not withheld any documents responsive to this request on the basis of his previous objections.

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By:_____
Johnny W. Carter
State Bar No. 00796312
jcarter@susmangodfrey.com
Richard W. Hess
State Bar No. 24046070
rhess@susmangodfrey.com
Kristen Schlemmer
State Bar No. 24075029
kschlemmer@susmangodfrey.com
1000 Louisiana Street, Suite 5100

01389

Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Robert S. MacIntyre Jr.
State Bar No. 12760700
macintyre@mmlawtexas.com
MACINTYRE MCCULLOCH STANFIELD YOUNG
2900 Weslayan, Suite 150
Houston, Texas 77027
Telephone: (713) 547-5400
*Attorneys for Shelby Longoria*

## CERTIFICATE OF SERVICE

This is to certify that on September 12, 2014, a true and correct copy of the above and foregoing

instrument was properly forwarded to the following counsel of record in accordance with Rule 21

of the Texas Rules of Civil Procedure as indicated below:

James Austin Fisher          *Via Email*
FISHER & WELCH
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Email: jfisher@fisherwelch.com

T. Wesley Holmes          *Via Email*
THE HOLMES LAW FIRM
10000 North Central Expressway, Suite 400
Dallas, Texas 75231
Email: wes@wesholmes.com
*Attorneys for James Thomas Dorsey, Sylvia Dorsey, and Adriana Longoria*

Kristen Schlemmer

01390

# EXHIBIT 7

01391

Case Number 414270

| IN THE ESTATE OF | § | IN THE PROBATE COURT |
| DOROTHY LOUISE LONGORIA, | § | NUMBER ONE OF |
| DECEASED | § | HARRIS COUNTY, TEXAS |

<u>Shelby Longoria's Responses to Adriana's First Set of Interrogatories</u>

TO: Adriana Longoria, by and through her attorneys of record, James Austin Fisher, Fisher & Welch, 2800 Lincoln Plaza, 500 North Akard Street, Dallas, Texas 75201 and Wes Holmes, The Holmes Law Firm, 10000 North Central Expressway, Suite 400, Dallas, Texas 75231

Shelby Longoria, Will Contestant and Counter-Defendant in the above-styled and numbered cause, pursuant to Rule 197 of the Texas Rules of Civil Procedure, answers the following interrogatories separately and fully in writing.

## GENERAL OBJECTIONS

1. Shelby Longoria objects to each instruction, definition, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Texas Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2. Shelby Longoria objects to each interrogatory that is overly broad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence.

3. Shelby Longoria objects to each instruction, definition, and interrogatory to the extent that it seeks documents protected from disclosure by the attorney-client privilege, deliberative process privilege, attorney work product doctrine, or any other applicable privilege. Should any such disclosure by Shelby Longoria occur, it is inadvertent and shall not constitute a waiver of any privilege.

4. Shelby Longoria incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection

EXHIBIT
tabbies
7

01392

for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Shelby Longoria reserves his right to amend his responses below.

## OBJECTIONS & RESPONSES TO INTERROGATORIES

### INTERROGATORY NUMBER 1:

Please state what you contend to be the total amount of money that Adriana has been paid pursuant to the Private Agreement.

### RESPONSE:

The total amount of money that Adriana has been paid pursuant to the Private Agreement is $3,168,619, as noted in the document attached as Exhibit 1 and bates labeled SLONGORIA 002565-002568.

### INTERROGATORY NUMBER 2:

For each payment of money that has been made to Adriana pursuant to the Private Agreement, please state:

    (a)    the date on which the payment was sent to Adriana;

    (b)    the manner in which the payment was made (for example, by check or by wire-transfer);

    (c)    the full name, address, and telephone number of the business which actually sent the payment to Adriana;

    (d)    the full name, address, and telephone number of the individual who directed the business described in part (b) to send the payment to Adriana;

    (e)    the full name, address, and telephone number of the owner (or each of the owners, of more than one) of the account from which the money was taken to make the payment to Adriana;

    (f)    the number of the account from which the money was taken to make the payment to Adriana; and

01393

(g) the full name, address, and telephone number of the financial institution at which that account was maintained.

PLEASE PROVIDE THE INFORMATION DESCRIBED IN PARTS (a) THROUGH (g) SEPARATELY FOR EACH PAYMENT OF MONEY WHICH, YOU CONTEND, WAS MADE TO ADRIANA PURSUANT TO THE PRIVATE AGREEMENT.

**RESPONSE:**

Shelby Longoria objects to this interrogatory as unduly burdensome and calling for information that is equally available to Adriana Longoria or already in Adriana's possession or scope of knowledge, as she was personally involved in receiving these payments. Shelby also objects to this interrogatory as seeking information outside the scope of his personal knowledge. Shelby Longoria further objects to this interrogatory as vague and overbroad because it seeks information covering a 20-year time period. Subject to these objections, Shelby Longoria provides responses to each of the subparts as follows:

(a) The statement of account attached as Exhibit 1 and labeled SLONGORIA 002565-002568 reflects all dates on which payments were made to Adriana. To the best of Shelby's knowledge, this statement accurately reflects the dates on which Adriana received payments.

(b) To the best of Shelby's knowledge, Shelby believes payments were made by wire transfer since at least 2008.

(c) To the best of Shelby's knowledge, no business actually sent a payment to Adriana.

(d) To the best of Shelby's knowledge, no business actually sent a payment to Adriana.

(e) To the best of his knowledge, Shelby believes his father Eduardo owned the bank account from which Adriana was paid. After Eduardo's death, it is Shelby's understanding that Dorothy owned the bank account.

01394

(f) To the best of his knowledge, Shelby answers that the most recent bank account number used to pay Adriana was 900559-5.

(g) Banco Nacional de Mexico, S.A. (BANAMEX), which is located at Guerrero 919, col. Centro, C.P. 88000, Nuevo Laredo, Tamaulipas. As noted on the bank's website, the bank's phone number is 01 (867) 712 3093.

## INTERROGATORY NUMBER 3:

If you contend that, pursuant to the Private Agreement, Adriana ever received property other than money, please state the following with respect to such property:

    (a)    a detailed description of the property which, you contend, was received by Adriana pursuant to the Private Agreement;

    (b)    the date on which, you contend, the property was received by Adriana pursuant to the Private Agreement;

    (c)    the manner in which, you contend, the property was transferred to Adriana (for example, by delivery of a deed) pursuant to the Private Agreement;

    (d)    the full name, address, and telephone number of the person or business which, you contend, owned the property immediately before it was received by Adriana pursuant to the Private Agreement;

    (e)    the full name, address, and telephone number of the individual who directed the owner of the property to transfer it to Adriana; and

    (f)    what you contend to have been the fair market value of the property at the time when, you contend, it was received by Adriana pursuant to Private Agreement.

    PLEASE PROVIDE THE INFORMATION DESCRIBED IN PARTS (a) THROUGH (f) SEPARATELY FOR EACH ITEM OF PROPERTY WHICH, YOU CONTEND, WAS RECEIVED BY ADRIANA PURSUANT TO THE PRIVATE AGREEMENT.

## RESPONSE:

Shelby Longoria objects to this interrogatory as unduly burdensome and calling for information that is equally available to Adriana Longoria or already in Adriana's possession or scope of knowledge, as she was personally involved in receiving these payments. Shelby also

01395

objects to this interrogatory as seeking information outside the scope of his personal knowledge. Shelby Longoria further objects to this interrogatory as vague and overbroad because it seeks information covering a 20-year time period.

Subject to these objections, Shelby understands that in addition to over $3 million received under the Private Agreement, Adriana also received 50% of the shares of CASACO, as noted in documents produced by Adriana's co-parties Sylvia and Tommy at DORSEY 01913-01951. Shelby's knowledge of CASACO is limited to the information contained in those documents.

## INTERROGATORY NUMBER 4:

For each business which has ever made a payment of money to Adriana pursuant to the Private Agreement, please state the following:

  (a)    the name(s) of the owner(s) of the business at each of the times when it made a payment of money to Adriana pursuant to the Private Agreement;

  (b)    your position or title in the business which made a payment of money to Adriana pursuant to the Private Agreement; and

  (c)    your position or title in any business which was an owner of the business which made a payment of money to Adriana pursuant to the Private Agreement.

  PLEASE PROVIDE THE INFORMATION DESCRIBED IN PARTS (a) THROUGH (c) SEPARATELY FOR EACH BUSINESS WHICH, YOU CONTEND, MADE A PAYMENT OF MONEY TO ADRIANA PURSUANT TO THE PRIVATE AGREEMENT.

## RESPONSE:

To the best of Shelby's knowledge, no business made a payment to Adriana pursuant to the Private Agreement.

## INTERROGATORY NUMBER 5:

For each business which, you contend, has ever made an assignment, conveyance, or other transfer, of any kind, of property to Adriana pursuant to the Private Agreement, please state the following:

01396

(a)     the name(s) of the owner(s) of the business at each of the times when, you contend, it made an assignment, conveyance, or other transfer, of any kind, of property to Adriana pursuant to the Private Agreement;

(b)     your position or title in the business which, you contend, made the assignment, conveyance, or other transfer, of any kind, of property to Adriana pursuant to the Private Agreement; and

(c)     your position or title in any business which, you contend, was an owner of the business which made the assignment, conveyance, or other transfer, of any kind, of property to Adriana pursuant to the Private Agreement.

PLEASE PROVIDE THE INFORMATION DESCRIBED IN PARTS (a) THROUGH (c) SEPARATELY FOR EACH BUSINESS WHICH, YOU CONTEND, MADE A PAYMENT OF MONEY TO ADRIANA PURSUANT TO THE PRIVATE AGREEMENT.

**RESPONSE:**

Shelby Longoria does not contend that any business made an assignment, conveyance, or other transfer, of any kind, of non-monetary property to Adriana pursuant to the Private Agreement.

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: _____
Johnny W. Carter
State Bar No. 00796312
jcarter@susmangodfrey.com
Richard W. Hess
State Bar No. 24046070
rhess@susmangodfrey.com
Kristen Schlemmer
State Bar No. 24075029
kschlemmer@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096

3285112v1/013774                      6

**01397**

Telephone: (713) 651-9366
Fax: (713) 654-6666

Robert S. MacIntyre Jr.
State Bar No. 12760700
macintyre@mmlawtexas.com
MACINTYRE MCCULLOCH STANFIELD YOUNG
2900 Weslayan, Suite 150
Houston, Texas 77027
Telephone: (713) 547-5400
*Attorneys for Shelby Longoria*

01398

# EXHIBIT A

01399

## Estado de Cuenta de ALK

| 60 Pagos Iniciales | Mes | Saldo Inicial | Pago de Capital | Pago de Intereses | Total Pago Mensual | Intereses No Pagados | Saldo Final | | Prime | 50% Prime |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | ago-92 | 3,000,000 | 29,000 | 0 | 29,000 | 0 | 2,971,000 | | 6.00% | 3.00% |
| 2 | sep-92 | 2,971,000 | 4,000 | 0 | 4,000 | 0 | 2,967,000 | | 6.00% | 3.00% |
| 3 | oct-92 | 2,967,000 | 4,000 | 0 | 4,000 | 0 | 2,963,000 | | 6.00% | 3.00% |
| 4 | nov-92 | 2,963,000 | 4,000 | 0 | 4,000 | 0 | 2,959,000 | | 6.00% | 3.00% |
| 5 | dic-92 | 2,959,000 | 4,000 | 0 | 4,000 | 0 | 2,955,000 | | 6.00% | 3.00% |
| 6 | ene-93 | 2,955,000 | 4,000 | 0 | 4,000 | 0 | 2,951,000 | | 6.00% | 3.00% |
| 7 | feb-93 | 2,951,000 | 4,800 | 0 | 4,800 | 0 | 2,946,200 | | 6.00% | 3.00% |
| 8 | Mzo-93 | 2,946,200 | 8,245 | 0 | 8,245 | 0 | 2,937,955 | | 6.00% | 3.00% |
| 9 | abr-93 | 2,937,955 | 36,000 | 0 | 36,000 | 0 | 2,901,955 | | 6.00% | 3.00% |
| 10 | Myo-93 | 2,901,955 | 15,227 | 0 | 15,227 | 0 | 2,886,728 | | 6.00% | 3.00% |
| 11 | jun-93 | 2,886,728 | 10,938 | 0 | 10,938 | 0 | 2,875,790 | | 6.00% | 3.00% |
| | 1er. Período Pagos Iniciales | | 124,210 | 0 | 124,210 | 0 | | | | |
| 12 | jul-93 | 2,875,790 | 7,138 | 0 | 7,138 | 0 | 2,868,652 | | 6.00% | 3.00% |
| 13 | ago-93 | 2,868,652 | 7,138 | 0 | 7,138 | 0 | 2,861,514 | | 6.00% | 3.00% |
| 14 | sep-93 | 2,861,514 | 2,937 | 0 | 2,937 | 0 | 2,858,577 | | 6.00% | 3.00% |
| 15 | oct-93 | 2,858,577 | 5,706 | 0 | 5,706 | 0 | 2,852,871 | | 6.00% | 3.00% |
| 16 | nov-93 | 2,852,871 | 10,235 | 0 | 10,235 | 0 | 2,842,636 | | 6.00% | 3.00% |
| 17 | dic-93 | 2,842,636 | 16,450 | 0 | 16,450 | 0 | 2,826,186 | | 6.00% | 3.00% |
| 18 | ene-94 | 2,826,186 | 7,450 | 0 | 7,450 | 0 | 2,818,736 | | 6.00% | 3.00% |
| 19 | feb-94 | 2,818,736 | 8,900 | 0 | 8,900 | 0 | 2,809,836 | | 6.00% | 3.00% |
| 20 | Mzo-94 | 2,809,836 | 24,900 | 0 | 24,900 | 0 | 2,784,936 | | 6.25% | 3.13% |
| 21 | abr-94 | 2,784,936 | 6,200 | 0 | 6,200 | 0 | 2,778,736 | | 6.75% | 3.38% |
| 22 | Myo-94 | 2,778,736 | 11,200 | 0 | 11,200 | 0 | 2,767,536 | | 7.25% | 3.63% |
| 23 | jun-94 | 2,767,536 | 8,900 | 0 | 8,900 | 0 | 2,758,636 | | 7.25% | 3.63% |
| | 2o. Período Pagos Iniciales | | 117,154 | 0 | 117,154 | 0 | | | | |
| 24 | jul-94 | 2,758,636 | 6,000 | 0 | 6,000 | 0 | 2,752,636 | | 7.25% | 3.63% |
| 25 | ago-94 | 2,752,636 | 8,451 | 0 | 8,451 | 0 | 2,744,185 | | 7.75% | 3.88% |
| 26 | sep-94 | 2,744,185 | 14,500 | 0 | 14,500 | 0 | 2,729,685 | | 7.75% | 3.88% |
| 27 | oct-94 | 2,729,685 | 7,000 | 0 | 7,000 | 0 | 2,722,685 | | 7.75% | 3.88% |
| 28 | nov-94 | 2,722,685 | 9,100 | 0 | 9,100 | 0 | 2,713,585 | | 8.50% | 4.25% |
| 29 | dic-94 | 2,713,585 | 11,365 | 0 | 11,365 | 0 | 2,702,220 | | 8.50% | 4.25% |
| 30 | ene-95 | 2,702,220 | 11,715 | 0 | 11,715 | 0 | 2,690,505 | | 8.50% | 4.25% |
| 31 | feb-95 | 2,690,505 | 9,900 | 0 | 9,900 | 0 | 2,680,605 | | 9.00% | 4.50% |
| 32 | Mzo-95 | 2,680,605 | 8,000 | 0 | 8,000 | 0 | 2,672,605 | | 9.00% | 4.50% |
| 33 | abr-95 | 2,672,605 | 10,000 | 0 | 10,000 | 0 | 2,662,605 | | 9.00% | 4.50% |
| 34 | Myo-95 | 2,662,605 | 10,500 | 0 | 10,500 | 0 | 2,652,105 | | 9.00% | 4.50% |
| 35 | jun-95 | 2,652,105 | 11,500 | 0 | 11,500 | 0 | 2,640,605 | | 9.00% | 4.50% |
| | 3er. Período Pagos Iniciales | | 118,031 | 0 | 118,031 | 0 | | | | |
| 36 | jul-95 | 2,640,605 | 10,300 | 0 | 10,300 | 0 | 2,630,305 | | 8.75% | 4.38% |
| 37 | ago-95 | 2,630,305 | 10,300 | 0 | 10,300 | 0 | 2,620,005 | | 8.75% | 4.38% |
| 38 | sep-95 | 2,620,005 | 10,300 | 0 | 10,300 | 0 | 2,609,705 | | 8.75% | 4.38% |
| 39 | oct-95 | 2,609,705 | 10,300 | 0 | 10,300 | 0 | 2,599,405 | | 8.75% | 4.38% |
| 40 | nov-95 | 2,599,405 | 9,000 | 0 | 9,000 | 0 | 2,590,405 | | 8.75% | 4.38% |
| 41 | dic-95 | 2,590,405 | 11,000 | 0 | 11,000 | 0 | 2,579,405 | | 8.50% | 4.25% |
| 42 | ene-96 | 2,579,405 | 13,043 | 0 | 13,043 | 0 | 2,566,362 | | 8.50% | 4.25% |
| 43 | feb-96 | 2,566,362 | 11,500 | 0 | 11,500 | 0 | 2,554,862 | | 8.25% | 4.13% |
| 44 | Mzo-96 | 2,554,862 | 9,000 | 0 | 9,000 | 0 | 2,545,862 | | 8.25% | 4.13% |
| 45 | abr-96 | 2,545,862 | 14,000 | 0 | 14,000 | 0 | 2,531,862 | | 8.25% | 4.13% |
| 46 | Myo-96 | 2,531,862 | 11,000 | 0 | 11,000 | 0 | 2,520,862 | | 8.25% | 4.13% |
| 47 | jun-96 | 2,520,862 | 10,000 | 0 | 10,000 | 0 | 2,510,862 | | 8.25% | 4.13% |
| | 4o. Período Pagos Iniciales | | 129,743 | 0 | 129,743 | 0 | | | | |
| 48 | jul-96 | 2,510,862 | 12,000 | 0 | 12,000 | 0 | 2,498,862 | | 8.25% | 4.13% |
| 49 | ago-96 | 2,498,862 | 12,500 | 0 | 12,500 | 0 | 2,486,362 | | 8.25% | 4.13% |
| 50 | sep-96 | 2,486,362 | 14,500 | 0 | 14,500 | 0 | 2,471,862 | | 8.25% | 4.13% |
| 51 | oct-96 | 2,471,862 | 17,439 | 0 | 17,439 | 0 | 2,454,423 | | 8.25% | 4.13% |
| 52 | nov-96 | 2,454,423 | 11,816 | 0 | 11,816 | 0 | 2,442,607 | | 8.25% | 4.13% |
| 53 | dic-96 | 2,442,607 | 13,639 | 0 | 13,639 | 0 | 2,428,968 | | 8.25% | 4.13% |
| 54 | ene-97 | 2,428,968 | 11,639 | 0 | 11,639 | 0 | 2,417,329 | | 8.25% | 4.13% |
| 55 | feb-97 | 2,417,329 | 12,284 | 0 | 12,284 | 0 | 2,405,045 | | 8.25% | 4.13% |
| 56 | Mzo-97 | 2,405,045 | 14,639 | 0 | 14,639 | 0 | 2,390,406 | | 8.50% | 4.25% |
| 57 | abr-97 | 2,390,406 | 13,147 | 0 | 13,147 | 0 | 2,377,259 | | 8.50% | 4.25% |
| 58 | Myo-97 | 2,377,259 | 8,895 | 0 | 8,895 | 0 | 2,368,364 | | 8.50% | 4.25% |
| 59 | jun-97 | 2,368,364 | 8,645 | 0 | 8,645 | 0 | 2,359,719 | | 8.50% | 4.25% |
| | 5o. Período Pagos Iniciales | | 151,143 | 0 | 151,143 | 0 | | | | |
| 60 | jul-97 | 2,359,719 | 10,164 | 0 | 10,164 | 0 | 2,349,555 | | 8.50% | 4.25% |
| | Int. Devengados x Pagos Anticipados | 2,349,555 | 40,030 | 0 | 40,030 | 0 | 2,309,525 | | 8.50% | 4.25% |
| | Último Pago de 60/60 | | 50,194 | 0 | 50,194 | 0 | | | | |
| | Sub-Total | | 690,475 | 0 | 690,475 | 0 | | | | |
| 8,180 | ago-97 | 2,309,525 | 0 | 7,645 | 7,645 | 535 | 2,310,059 | | 8.50% | 4.25% |
| 8,181 | sep-97 | 2,310,059 | 3,516 | 8,181 | 11,697 | 0 | 2,306,544 | | 8.50% | 4.25% |
| 8,169 | oct-97 | 2,306,544 | 476 | 8,169 | 8,645 | 0 | 2,306,068 | | 8.50% | 4.25% |
| 8,167 | nov-97 | 2,306,068 | 0 | 7,645 | 7,645 | 522 | 2,306,590 | | 8.50% | 4.25% |

SLONGORIA002565

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 8,169 | dic-97 | 2,306,590 | 976 | 8,169 | 9,145 | 0 | 2,305,614 | 8.50% | 4.25% |
| 8,166 | ene-98 | 2,305,614 | 3,279 | 8,166 | 11,445 | -0 | 2,302,335 | 8.50% | 4.25% |
| 8,154 | feb-98 | 2,302,335 | 491 | 8,154 | 8,645 | 0 | 2,301,844 | 8.50% | 4.25% |
| 8,152 | Mzo-98 | 2,301,844 | 0 | 7,645 | 7,645 | 507 | 2,302,351 | 8.50% | 4.25% |
| 8,154 | abr-98 | 2,302,351 | 291 | 8,154 | 8,445 | 0 | 2,302,060 | 8.50% | 4.25% |
| 8,153 | Myo-98 | 2,302,060 | 0 | 7,645 | 7,645 | 508 | 2,302,569 | 8.50% | 4.25% |
| 8,155 | jun-98 | 2,302,569 | 3,490 | 8,155 | 11,645 | -0 | 2,299,078 | 8.50% | 4.25% |
| 8,143 | jul-98 | 2,299,078 | 502 | 8,143 | 8,645 | -0 | 2,298,576 | 8.50% | 4.25% |
| | 1er. Periodo Pago Intereses | | 13,021 | 95,871 | 108,892 | 2,073 | | | |
| 8,141 | ago-98 | 2,298,576 | 0 | 7,645 | 7,645 | 496 | 2,299,072 | 8.50% | 4.25% |
| 7,903 | sep-98 | 2,299,072 | 0 | 7,645 | 7,645 | 258 | 2,299,330 | 8.25% | 4.13% |
| 7,664 | oct-98 | 2,299,330 | 0 | 7,645 | 7,645 | 19 | 2,299,349 | 8.00% | 4.00% |
| 7,425 | nov-98 | 2,299,349 | 1,350 | 7,425 | 8,775 | -0 | 2,297,999 | 7.75% | 3.88% |
| 7,421 | dic-98 | 2,297,999 | 2,224 | 7,421 | 9,645 | -0 | 2,295,775 | 7.75% | 3.88% |
| 7,413 | ene-99 | 2,295,775 | 7,232 | 7,413 | 14,645 | 0 | 2,288,543 | 7.75% | 3.88% |
| 7,390 | feb-99 | 2,288,543 | 1,255 | 7,390 | 8,645 | 0 | 2,287,288 | 7.75% | 3.88% |
| 7,386 | Mzo-99 | 2,287,288 | 2,459 | 7,386 | 9,845 | 0 | 2,284,829 | 7.75% | 3.88% |
| 7,378 | abr-99 | 2,284,829 | 1,367 | 7,378 | 8,745 | 0 | 2,283,463 | 7.75% | 3.88% |
| 7,374 | Myo-99 | 2,283,463 | 2,271 | 7,374 | 9,645 | -0 | 2,281,191 | 7.75% | 3.88% |
| 7,366 | jun-99 | 2,281,191 | 6,279 | 7,366 | 13,645 | 0 | 2,274,913 | 7.75% | 3.88% |
| 7,583 | jul-99 | 2,274,913 | 1,062 | 7,583 | 8,645 | 0 | 2,273,851 | 8.00% | 4.00% |
| | 2er. Periodo Pago Intereses | | 25,499 | 89,671 | 115,170 | 774 | | | |
| 7,816 | ago-99 | 2,273,851 | 829 | 7,816 | 8,645 | 0 | 2,273,022 | 8.25% | 4.13% |
| 7,814 | sep-99 | 2,273,022 | 1,831 | 7,814 | 9,645 | -0 | 2,271,190 | 8.25% | 4.13% |
| 7,807 | oct-99 | 2,271,190 | 2,588 | 7,807 | 10,395 | 0 | 2,268,603 | 8.25% | 4.13% |
| 8,035 | nov-99 | 2,268,603 | 4,710 | 8,035 | 12,745 | -0 | 2,263,892 | 8.50% | 4.25% |
| 8,018 | dic-99 | 2,263,892 | 627 | 8,018 | 8,645 | -0 | 2,263,265 | 8.50% | 4.25% |
| 8,016 | ene-00 | 2,263,265 | 3,829 | 8,016 | 11,845 | -0 | 2,259,436 | 8.50% | 4.25% |
| 8,238 | feb-00 | 2,259,436 | 0 | 8,145 | 8,145 | 93 | 2,259,529 | 8.75% | 4.38% |
| 8,473 | Mzo-00 | 2,259,529 | 0 | 8,145 | 8,145 | 328 | 2,259,857 | 9.00% | 4.50% |
| 8,474 | abr-00 | 2,259,857 | 0 | 8,145 | 8,145 | 329 | 2,260,186 | 9.00% | 4.50% |
| 8,947 | Myo-00 | 2,260,186 | 358 | 8,947 | 9,305 | -0 | 2,259,828 | 9.50% | 4.75% |
| 8,945 | jun-00 | 2,259,828 | 1,360 | 8,945 | 10,305 | 0 | 2,258,468 | 9.50% | 4.75% |
| 8,940 | jul-00 | 2,258,468 | 365 | 8,940 | 9,305 | -0 | 2,258,103 | 9.50% | 4.75% |
| | 3er. Periodo Pago Intereses | | 16,497 | 98,773 | 115,270 | 749 | | | |
| 8,938 | ago-00 | 2,258,103 | 4,881 | 8,938 | 13,819 | 0 | 2,253,222 | 9.50% | 4.75% |
| 8,919 | sep-00 | 2,253,222 | 886 | 8,919 | 9,805 | 0 | 2,252,336 | 9.50% | 4.75% |
| 8,915 | oct-00 | 2,252,336 | 890 | 8,915 | 9,805 | 0 | 2,251,447 | 9.50% | 4.75% |
| 8,912 | nov-00 | 2,251,447 | 893 | 8,912 | 9,805 | -0 | 2,250,554 | 9.50% | 4.75% |
| 8,908 | dic-00 | 2,250,554 | 6,074 | 8,908 | 14,982 | 0 | 2,244,480 | 9.50% | 4.75% |
| 8,417 | ene-01 | 2,244,480 | 4,023 | 8,417 | 12,440 | -0 | 2,240,457 | 9.00% | 4.50% |
| 7,935 | feb-01 | 2,240,457 | 2,705 | 7,935 | 10,640 | -0 | 2,237,752 | 8.50% | 4.25% |
| 7,925 | Mzo-01 | 2,237,752 | 3,715 | 7,925 | 11,640 | 0 | 2,234,037 | 8.50% | 4.25% |
| 7,447 | abr-01 | 2,234,037 | 4,193 | 7,447 | 11,640 | -0 | 2,229,844 | 8.00% | 4.00% |
| 6,968 | Myo-01 | 2,229,844 | 3,672 | 6,968 | 10,640 | 0 | 2,226,172 | 7.50% | 3.75% |
| 6,493 | jun-01 | 2,226,172 | 5,107 | 6,493 | 11,600 | 0 | 2,221,065 | 7.00% | 3.50% |
| 6,247 | jul-01 | 2,221,085 | 4,392 | 6,248 | 10,640 | -1 | 2,216,672 | 6.75% | 3.38% |
| | 4er. Periodo Pago Intereses | | 41,431 | 96,025 | 137,456 | 0 | | | |
| 6,234 | ago-01 | 2,216,672 | 10,106 | 6,234 | 16,340 | 0 | 2,206,566 | 6.75% | 3.38% |
| 5,976 | sep-01 | 2,206,566 | 4,664 | 5,976 | 10,640 | 0 | 2,201,902 | 6.50% | 3.25% |
| 5,046 | oct-01 | 2,201,902 | 6,594 | 5,046 | 11,640 | 0 | 2,195,308 | 5.50% | 2.75% |
| 5,031 | nov-01 | 2,195,308 | 9,254 | 5,031 | 14,285 | 0 | 2,186,054 | 5.50% | 2.75% |
| 5,010 | dic-01 | 2,186,054 | 4,985 | 5,010 | 9,995 | 0 | 2,181,069 | 5.50% | 2.75% |
| 4,317 | ene-02 | 2,181,069 | 6,558 | 4,317 | 10,875 | 0 | 2,174,511 | 4.75% | 2.38% |
| 4,304 | feb-02 | 2,174,511 | 16,709 | 4,304 | 21,013 | 0 | 2,157,801 | 4.75% | 2.38% |
| 4,271 | Mzo-02 | 2,157,801 | 6,724 | 4,271 | 10,995 | 0 | 2,151,077 | 4.75% | 2.38% |
| 4,257 | abr-02 | 2,151,077 | 11,738 | 4,257 | 15,995 | 0 | 2,139,339 | 4.75% | 2.38% |
| 4,234 | Myo-02 | 2,139,339 | 10,761 | 4,234 | 14,995 | 0 | 2,128,579 | 4.75% | 2.38% |
| 4,213 | jun-02 | 2,128,579 | 7,782 | 4,213 | 11,995 | 0 | 2,120,796 | 4.75% | 2.38% |
| 4,197 | jul-02 | 2,120,796 | 5,798 | 4,197 | 9,995 | 0 | 2,114,999 | 4.75% | 2.38% |
| | 5o. Periodo Pago Intereses | | 101,673 | 57,090 | 158,763 | 0 | | | |
| 4,186 | ago-02 | 2,114,999 | 9,309 | 4,186 | 13,495 | 0 | 2,105,690 | 4.75% | 2.38% |
| 4,168 | sep-02 | 2,105,690 | 7,502 | 4,168 | 11,670 | 0 | 2,098,187 | 4.75% | 2.38% |
| 4,153 | oct-02 | 2,098,187 | 9,661 | 4,153 | 13,813 | 0 | 2,088,527 | 4.75% | 2.38% |
| 3,698 | nov-02 | 2,088,527 | 8,615 | 3,698 | 12,313 | 0 | 2,079,912 | 4.25% | 2.13% |
| 3,683 | dic-02 | 2,079,912 | 10,812 | 3,683 | 14,495 | 0 | 2,069,100 | 4.25% | 2.13% |
| | | | | | | | | Prime | 75% Prime |
| 5,496 | ene-03 | 2,069,100 | 18,908 | 5,496 | 24,404 | 0 | 2,050,192 | 4.25% | 3.19% |
| 5,446 | feb-03 | 2,050,192 | 60,872 | 5,446 | 66,318 | 0 | 1,989,320 | 4.25% | 3.19% |
| 5,284 | Mzo-03 | 1,989,320 | 97,630 | 5,284 | 102,914 | 0 | 1,891,690 | 4.25% | 3.19% |
| 5,025 | abr-03 | 1,891,690 | 8,793 | 5,025 | 13,818 | 0 | 1,882,896 | 4.25% | 3.19% |
| 5,001 | Myo-03 | 1,882,896 | 9,822 | 5,001 | 14,823 | 0 | 1,873,075 | 4.25% | 3.19% |
| 4,683 | jun-03 | 1,873,075 | 10,136 | 4,683 | 14,818 | 0 | 1,862,939 | 4.00% | 3.00% |
| 4,657 | jul-03 | 1,862,939 | 11,961 | 4,657 | 16,618 | 0 | 1,850,978 | 4.00% | 3.00% |
| | 6o. Periodo Pago Intereses | | 264,021 | 55,480 | 319,501 | 0 | | | |
| | | | | | | | | Prime | 75% Prime |
| 4,627 | ago-03 | 1,850,978 | 11,191 | 4,627 | 15,818 | 0 | 1,839,788 | 4.00% | 3.00% |
| 4,599 | sep-03 | 1,839,788 | 13,219 | 4,599 | 17,818 | 0 | 1,826,569 | 4.00% | 3.00% |
| 4,566 | oct-03 | 1,826,569 | 11,252 | 4,566 | 15,818 | 0 | 1,815,317 | 4.00% | 3.00% |
| 4,538 | nov-03 | 1,815,317 | 14,788 | 4,538 | 19,326 | 0 | 1,800,529 | 4.00% | 3.00% |

SLONGORIA002566

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 4,501 | dic-03 | 1,800,529 | 15,317 | 4,501 | 19,818 | 0 | 1,785,212 | 4.00% | 3.00% |
| 4,463 | ene-04 | 1,785,212 | 11,565 | 4,463 | 16,028 | 0 | 1,773,647 | 4.00% | 3.00% |
| 4,434 | feb-04 | 1,773,647 | 10,198 | 4,434 | 14,632 | 0 | 1,763,449 | 4.00% | 3.00% |
| 4,409 | mar-04 | 1,763,449 | 11,734 | 4,409 | 16,142 | 0 | 1,751,716 | 4.00% | 3.00% |
| 4,379 | abr-04 | 1,751,716 | 11,239 | 4,379 | 15,618 | 0 | 1,740,477 | 4.00% | 3.00% |
| 4,351 | may-04 | 1,740,477 | 17,071 | 4,351 | 21,422 | 0 | 1,723,406 | 4.00% | 3.00% |
| 4,309 | jun-04 | 1,723,406 | 17,526 | 4,309 | 21,834 | 0 | 1,705,880 | 4.00% | 3.00% |
| 4,531 | jul-04 | 1,705,880 | 10,100 | 4,531 | 14,631 | 0 | 1,695,780 | 4.25% | 3.19% |
| | 7o. Periodo Pago Intereses | | 155,198 | 53,709 | 208,907 | 0 | | | |
| 4,504 | ago-04 | 1,695,780 | 13,622 | 4,504 | 18,126 | 0 | 1,682,158 | 4.25% | 3.19% |
| 4,731 | sep-04 | 1,682,158 | 13,395 | 4,731 | 18,126 | 0 | 1,668,763 | 4.50% | 3.38% |
| 4,954 | oct-04 | 1,668,763 | 12,664 | 4,954 | 17,618 | 0 | 1,656,099 | 4.75% | 3.56% |
| 4,917 | nov-04 | 1,656,099 | 9,710 | 4,917 | 14,626 | 0 | 1,646,390 | 4.75% | 3.56% |
| 5,145 | dic-04 | 1,646,390 | 9,481 | 5,145 | 14,626 | 0 | 1,636,908 | 5.00% | 3.75% |
| 5,371 | ene-05 | 1,636,908 | 11,947 | 5,371 | 17,318 | 0 | 1,624,961 | 5.25% | 3.94% |
| 5,332 | feb-05 | 1,624,961 | 9,286 | 5,332 | 14,618 | 0 | 1,615,675 | 5.25% | 3.94% |
| 5,554 | mar-05 | 1,615,675 | 9,064 | 5,554 | 14,618 | 0 | 1,606,611 | 5.50% | 4.13% |
| 5,774 | abr-05 | 1,606,611 | 13,862 | 5,774 | 19,636 | 0 | 1,592,749 | 5.75% | 4.31% |
| 5,724 | may-05 | 1,592,749 | 8,904 | 5,724 | 14,628 | 0 | 1,583,844 | 5.75% | 4.31% |
| 6,187 | jun-05 | 1,583,844 | 13,431 | 6,187 | 19,618 | 0 | 1,570,413 | 6.25% | 4.69% |
| 6,134 | jul-05 | 1,570,413 | 8,494 | 6,134 | 14,628 | 0 | 1,561,919 | 6.25% | 4.69% |
| | 8o. Periodo Pago Intereses | | 133,861 | 64,327 | 198,188 | 0 | | | |
| 6,101 | ago-05 | 1,561,919 | 12,535 | 6,101 | 18,636 | 0 | 1,549,384 | 6.25% | 4.69% |
| 6,294 | sep-05 | 1,549,384 | 11,334 | 6,294 | 17,628 | 0 | 1,538,051 | 6.50% | 4.88% |
| 6,489 | oct-05 | 1,538,051 | 11,139 | 6,489 | 17,628 | 0 | 1,526,911 | 6.75% | 5.06% |
| 6,680 | nov-05 | 1,526,911 | 17,964 | 6,680 | 24,644 | 0 | 1,508,948 | 7.00% | 5.25% |
| 6,602 | dic-05 | 1,508,948 | 15,035 | 6,602 | 21,636 | 0 | 1,493,913 | 7.00% | 5.25% |
| 6,536 | ene-06 | 1,493,913 | 8,082 | 6,536 | 14,618 | 0 | 1,485,831 | 7.00% | 5.25% |
| 6,733 | feb-06 | 1,485,831 | 7,885 | 6,733 | 14,618 | 0 | 1,477,946 | 7.25% | 5.44% |
| 6,928 | mar-06 | 1,477,946 | 10,190 | 6,928 | 17,118 | 0 | 1,467,755 | 7.50% | 5.63% |
| 6,880 | abr-06 | 1,467,755 | 7,738 | 6,880 | 14,618 | 0 | 1,460,017 | 7.50% | 5.63% |
| 6,844 | may-06 | 1,460,017 | 13,324 | 6,844 | 20,168 | 0 | 1,446,693 | 7.50% | 5.63% |
| 7,233 | jun-06 | 1,446,693 | 9,385 | 7,233 | 16,618 | 0 | 1,437,308 | 8.00% | 6.00% |
| 7,411 | jul-06 | 1,437,308 | 9,207 | 7,411 | 16,618 | 0 | 1,428,101 | 8.25% | 6.19% |
| | 9o. Periodo Pago Intereses | | 133,818 | 80,731 | 214,549 | 0 | | | |
| 7,364 | ago-06 | 1,428,101 | 9,255 | 7,364 | 16,618 | 0 | 1,418,847 | 8.25% | 6.19% |
| 7,316 | sep-06 | 1,418,847 | 12,302 | 7,316 | 19,618 | 0 | 1,406,545 | 8.25% | 6.19% |
| 7,252 | oct-06 | 1,406,545 | 9,366 | 7,252 | 16,618 | 0 | 1,397,179 | 8.25% | 6.19% |
| 7,204 | nov-06 | 1,397,179 | 17,414 | 7,204 | 24,618 | 0 | 1,379,765 | 8.25% | 6.19% |
| 7,114 | dic-06 | 1,379,765 | 5,504 | 7,114 | 12,618 | 0 | 1,374,262 | 8.25% | 6.19% |
| 7,086 | ene-07 | 1,374,262 | 17,054 | 7,086 | 24,140 | 0 | 1,357,208 | 8.25% | 6.19% |
| 6,998 | feb-07 | 1,357,208 | 9,620 | 6,998 | 16,618 | 0 | 1,347,588 | 8.25% | 6.19% |
| 6,949 | mar-07 | 1,347,588 | 11,051 | 6,949 | 18,000 | 0 | 1,336,537 | 8.25% | 6.19% |
| 6,892 | abr-07 | 1,336,537 | 8,908 | 6,892 | 15,800 | 0 | 1,327,628 | 8.25% | 6.19% |
| 6,846 | may-07 | 1,327,628 | 8,954 | 6,846 | 15,800 | 0 | 1,318,674 | 8.25% | 6.19% |
| 6,799 | jun-07 | 1,318,674 | 14,001 | 6,799 | 20,800 | 0 | 1,304,673 | 8.25% | 6.19% |
| 6,727 | jul-07 | 1,304,673 | 9,073 | 6,727 | 15,800 | 0 | 1,295,600 | 8.25% | 6.19% |
| | 10o. Periodo Pago Intereses | | 132,501 | 84,547 | 217,048 | 0 | | | |
| 6,680 | ago-07 | 1,295,600 | 12,120 | 6,680 | 18,800 | 0 | 1,283,481 | 8.25% | 6.19% |
| 6,618 | sep-07 | 1,283,481 | 9,182 | 6,618 | 15,800 | 0 | 1,274,299 | 8.25% | 6.19% |
| 6,172 | oct-07 | 1,274,299 | 9,628 | 6,172 | 15,800 | 0 | 1,264,671 | 7.75% | 5.81% |
| 5,928 | nov-07 | 1,264,671 | 11,872 | 5,928 | 17,800 | 0 | 1,252,799 | 7.50% | 5.63% |
| 5,872 | dic-07 | 1,252,799 | 9,928 | 5,872 | 15,800 | 0 | 1,242,872 | 7.50% | 5.63% |
| 5,632 | ene-08 | 1,242,872 | 15,668 | 5,632 | 21,300 | 0 | 1,227,203 | 7.25% | 5.44% |
| 4,602 | feb-08 | 1,227,203 | 29,198 | 4,602 | 33,800 | 0 | 1,198,005 | 6.00% | 4.50% |
| 4,493 | mar-08 | 1,198,005 | 14,307 | 4,493 | 18,800 | 0 | 1,183,698 | 6.00% | 4.50% |
| 3,884 | abr-08 | 1,183,698 | 16,916 | 3,884 | 20,800 | 0 | 1,166,782 | 5.25% | 3.94% |
| 3,646 | may-08 | 1,166,782 | 12,154 | 3,646 | 15,800 | 0 | 1,154,628 | 5.00% | 3.75% |
| 3,608 | jun-08 | 1,154,628 | 22,192 | 3,608 | 25,800 | 0 | 1,132,436 | 5.00% | 3.75% |
| 3,539 | jul-08 | 1,132,436 | 12,261 | 3,539 | 15,800 | 0 | 1,120,175 | 5.00% | 3.75% |
| | 11o. Periodo Pago Intereses | | 175,425 | 60,675 | 236,100 | 0 | | | |
| 3,501 | ago-08 | 1,120,175 | 12,299 | 3,501 | 15,800 | 0 | 1,107,876 | 5.00% | 3.75% |
| 3,462 | sep-08 | 1,107,876 | 12,338 | 3,462 | 15,800 | 0 | 1,095,538 | 5.00% | 3.75% |
| 3,424 | oct-08 | 1,095,538 | 17,376 | 3,424 | 20,800 | 0 | 1,078,161 | 5.00% | 3.75% |
| 2,695 | nov-08 | 1,078,161 | 13,105 | 2,695 | 15,800 | 0 | 1,065,057 | 4.00% | 3.00% |
| 2,663 | dic-08 | 1,065,057 | 13,137 | 2,663 | 15,800 | 0 | 1,051,920 | 4.00% | 3.00% |
| 2,137 | ene-09 | 1,051,920 | 17,163 | 2,137 | 19,300 | 0 | 1,034,756 | 3.25% | 2.44% |
| 2,102 | feb-09 | 1,034,756 | 14,698 | 2,102 | 16,800 | 0 | 1,020,058 | 3.25% | 2.44% |
| 2,072 | mar-09 | 1,020,058 | 16,728 | 2,072 | 18,800 | 0 | 1,003,330 | 3.25% | 2.44% |
| 2,038 | abr-09 | 1,003,330 | 13,762 | 2,038 | 15,800 | 0 | 989,568 | 3.25% | 2.44% |
| 2,010 | may-09 | 989,568 | 13,790 | 2,010 | 15,800 | 0 | 975,778 | 3.25% | 2.44% |
| 1,982 | jun-09 | 975,778 | 13,818 | 1,982 | 15,800 | 0 | 961,960 | 3.25% | 2.44% |
| 1,954 | jul-09 | 961,960 | 18,846 | 1,954 | 20,800 | 0 | 943,114 | 3.25% | 2.44% |

SLONGORIA002567

| | | | 12o. Periodo Pago Intereses | | | 177,061 | 30,039 | 207,100 | 0 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1,916 | ago-09 | 943,114 | 13,884 | 1,916 | 15,800 | 0 | 929,230 | 3.25% | 2.44% |
| 1,887 | sep-09 | 929,230 | 13,913 | 1,887 | 15,800 | 0 | 915,317 | 3.25% | 2.44% |
| 1,859 | oct-09 | 915,317 | 13,941 | 1,859 | 15,800 | 0 | 901,377 | 3.25% | 2.44% |
| 1,831 | nov-09 | 901,377 | 33,969 | 1,831 | 35,800 | 0 | 867,408 | 3.25% | 2.44% |
| 1,762 | dic-09 | 867,408 | 14,038 | 1,762 | 15,800 | 0 | 853,369 | 3.25% | 2.44% |
| 1,733 | ene-10 | 853,369 | 14,067 | 1,733 | 15,800 | 0 | 839,303 | 3.25% | 2.44% |
| 1,705 | feb-10 | 839,303 | 14,095 | 1,705 | 15,800 | 0 | 825,208 | 3.25% | 2.44% |
| 1,676 | mar-10 | 825,208 | 14,124 | 1,676 | 15,800 | 0 | 811,084 | 3.25% | 2.44% |
| 1,648 | abr-10 | 811,084 | 14,152 | 1,648 | 15,800 | 0 | 796,931 | 3.25% | 2.44% |
| 1,619 | may-10 | 796,931 | 14,181 | 1,619 | 15,800 | 0 | 782,750 | 3.25% | 2.44% |
| 1,590 | jun-10 | 782,750 | 14,210 | 1,590 | 15,800 | 0 | 768,540 | 3.25% | 2.44% |
| 1,561 | jul-10 | 768,540 | 14,239 | 1,561 | 15,800 | 0 | 754,301 | 3.25% | 2.44% |
| | 13o. Periodo Pago Intereses | | 188,813 | 20,787 | 209,600 | 0 | | | |
| 1,532 | ago-10 | 754,301 | 14,268 | 1,532 | 15,800 | 0 | 740,033 | 3.25% | 2.44% |
| 1,503 | sep-10 | 740,033 | 14,297 | 1,503 | 15,800 | 0 | 725,737 | 3.25% | 2.44% |
| 1,474 | oct-10 | 725,737 | 0 | 0 | 0 | 1,474 | 727,211 | 3.25% | 2.44% |
| 1,477 | nov-10 | 727,211 | 0 | 0 | 0 | 1,477 | 728,688 | 3.25% | 2.44% |
| 1,480 | dic-10 | 728,688 | 0 | 0 | 0 | 1,480 | 730,168 | 3.25% | 2.44% |
| 1,483 | ene-11 | 730,168 | 0 | 0 | 0 | 1,483 | 731,651 | 3.25% | 2.44% |
| 1,486 | feb-11 | 731,651 | 0 | 0 | 0 | 1,486 | 733,137 | 3.25% | 2.44% |
| 1,489 | mar-11 | 733,137 | 0 | 0 | 0 | 1,489 | 734,627 | 3.25% | 2.44% |
| 1,492 | abr-11 | 734,627 | 0 | 0 | 0 | 1,492 | 736,119 | 3.25% | 2.44% |
| 1,495 | may-11 | 736,119 | 0 | 0 | 0 | 1,495 | 737,614 | 3.25% | 2.44% |
| 1,498 | jun-11 | 737,614 | 0 | 0 | 0 | 1,498 | 739,112 | 3.25% | 2.44% |
| 1,501 | jul-11 | 739,112 | 0 | 0 | 0 | 1,501 | 740,614 | 3.25% | 2.44% |
| | 14o. Periodo Pago Intereses | | 28,565 | 3,035 | 31,600 | 14,877 | | | |
| 1,504 | ago-11 | 740,614 | 0 | 0 | 0 | 1,504 | 742,118 | 3.25% | 2.44% |
| 1,507 | sep-11 | 742,118 | 0 | 0 | 0 | 1,507 | 743,625 | 3.25% | 2.44% |
| 1,510 | oct-11 | 743,625 | 0 | 0 | 0 | 1,510 | 745,136 | 3.25% | 2.44% |
| 1,514 | nov-11 | 745,136 | 0 | 0 | 0 | 1,514 | 746,649 | 3.25% | 2.44% |
| 1,517 | dic-11 | 746,649 | 0 | 0 | 0 | 1,517 | 748,166 | 3.25% | 2.44% |
| 1,520 | ene-12 | 748,166 | 0 | 0 | 0 | 1,520 | 749,686 | 3.25% | 2.44% |
| 1,523 | feb-12 | 749,686 | 0 | 0 | 0 | 1,523 | 751,209 | 3.25% | 2.44% |
| 1,526 | mar-12 | 751,209 | 0 | 0 | 0 | 1,526 | 752,734 | 3.25% | 2.44% |
| 1,529 | abr-12 | 752,734 | 0 | 0 | 0 | 1,529 | 754,263 | 3.25% | 2.44% |
| 1,532 | may-12 | 754,263 | 0 | 0 | 0 | 1,532 | 755,796 | 3.25% | 2.44% |
| 1,535 | jun-12 | 755,796 | 0 | 0 | 0 | 1,535 | 757,331 | 3.25% | 2.44% |
| 1,538 | jul-12 | 757,331 | 0 | 0 | 0 | 1,538 | 758,869 | 3.25% | 2.44% |
| 1,541 | ago-12 | 758,869 | 0 | 0 | 0 | 1,541 | 760,411 | 3.25% | 2.44% |
| 1,545 | sep-12 | 760,411 | 0 | 0 | 0 | 1,545 | 761,955 | 3.25% | 2.44% |
| | 15o. Periodo Pago Intereses | | 0 | 0 | 0 | 21,342 | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Sub-Total | | | 1,587,383 | 890,760 | 2,478,144 | 39,814 | |
| Total | 3,000,000 | 2,277,859 | 890,760 | 3,168,619 | 39,814 | 761,955 |

SLONGORIA002568

## CERTIFICATE OF SERVICE

This is to certify that on September, 15, 2014, a true and correct copy of the above and foregoing instrument was properly forwarded to the following counsel of record in accordance with Rule 21 of the Texas Rules of Civil Procedure as indicated below:

James Austin Fisher           ***Via Email***
FISHER & WELCH
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Email: jfisher@fisherwelch.com

T. Wesley Holmes           ***Via Email***
THE HOLMES LAW FIRM
10000 North Central Expressway, Suite 400
Dallas, Texas 75231
Email: wes@wesholmes.com
***Attorneys for James Thomas Dorsey, Sylvia Dorsey, and Adriana Longoria***

Kristen Schlemmer

3285112v1/013774

# EXHIBIT 8

01405

Q. There's no reference here in your mother's estate, is there?

A. I don't see that.

Q. Now, would you please look at Exhibits 103 and 104 -- excuse me -- 102 and 103.

Did I give you 103?

A. Yes.

MR. HESS: Do you have an extra copy of 103 for me?

MR. FISHER: (Handing).

MR. HESS: Thank you.

Q (By Mr. Fisher) Do you recognize Exhibit 103 as the Spanish version of the private agreement between your father your sister, Adriana?

A. Yes.

Q. Were you present when it was signed?

A. No.

Q. Did you play any part in the creation or preparation of this document?

A. I don't recall playing a part in the creation of this document.

Q. Please look at your father's signature on the third page. Was he physically going through a difficult time in December of 2002?

A. Well, as we spoke earlier, he was getting

EXHIBIT

8

older and physically he was -- started to decline.

Q. Would you agree that his signature here is significantly worse than earlier?

A. I'll just say that, yes, he -- physically he was in a state and he was declining. His goal was going a little bit down, so -- but that was just aging.

Q. Was he also depressed?

A. I don't remember him being depressed in 2002.

Q. All right. Now, if you would please look at the English version. Help me out. Exhibit 102.

Did you view this agreement as creating a moral obligation but not a legal obligation for you?

A. Well, I would just say that generally speaking what my dad's wishes were and which they seem to be written down in these documents, those are the wishes that I tried morally speaking to fulfill or help him to fulfill.

Q. Please look at the paragraph that begins with the word second toward the bottom of the first page.

A. Okay.

Q. It says: Payment to Adriana Longoria Kowalski. It is the will of their father that the amount of U.S. $3 million be delivered to his daughter, Adriana Longoria Kowalski, from the operating flows generated by the companies represented by the shares

01407

contributed to the trust, or by their subsidiaries, and therefore it is the obligation of Eduardo and Shelby Luis Longoria Kowalski in the terms mentioned below, end quote.

What did you understand to be the companies referenced there?

A.    The companies that we have been talking about.

Q.    Okay.  And there is a reference to a trust, and that trust is identified as the Afirme, above on that page, right?

A.    Yes.

Q.    The Afirme Trust held stock in the Vertice Empresarial and in Inmuebles y Terrenos?

A.    Correct.

Q.    And those two companies, in turn, owned other companies?

A.    Correct.

Q.    And this agreement, from the language we just read, kind of places the payments to Adriana would be made from the operating flows generated by the companies, right?

A.    Correct.

Q.    Not from your personal funds?

A.    Correct.

Q.    So -- but you were running the companies,

01408

right?

A.   Well, I was participating in running the companies.  There were other managers involved.

Q.   Well, was there anyone with more authority than you?  Did you report to anyone?

A.   In 2002?

Q.   Yes, sir.

A.   To my dad.

Q.   Well, he was semi-retired.

A.   Yes, but still, he was my moral leader.

Q.   In terms of actual position in the companies, you were at the top of the organizational chart, weren't you?

A.   Probably, yes.

Q.   Did you believe that this private agreement created a legal obligation for the companies to pay Adriana or was it only a moral obligation for them as well?

MR. HESS:  Object to form.

A.   I don't make that correlation.  I never thought about that.

Q    (By Mr. Fisher) Okay.  You never thought about whether the companies had a legal obligation to make payments?

A.   Well, your question is more technical in

01409

nature, so I never really thought about that.

Q. What do you think now? Did the companies --

A. The same thing I've always thought.

Q. Which is?

A. Which is that I and my brother were morally obligated to fulfill my dad's wishes.

Q. But not legally?

A. Not legally.

Q. Okay. And I think you used the word inheritance earlier to describe what these agreements meant to your sisters.

They were to be the inheritance that your sisters would receive, correct?

A. That's a understanding, yes.

Q. But at the same time you're saying that after your father died, there was no one who was obligated to make those payments.

That's your contention in this lawsuit, isn't it?

A. Again, I will tell you that I felt a strong moral obligation to fulfill my dad's wishes for what he wanted my sisters to receive.

Q. Okay. But if after your father died, your darker side took over, and you suppressed that moral sense, you didn't feel like there was any legal

01410

obligation to pay your sisters one cent?

MR. HESS: Object to form.

A. Well, I don't recall having a darker side. And again, I can only emphasize the strong feeling that I had for the love of my father and my family to do the best I could to comply with his wishes.

Q (By Mr. Fisher) Well, in fact, in October of 2010, you stopped making the payments to Adriana, didn't you?

A. The payments stopped in October of 2010.

Q. And it's your contention in this lawsuit there's no legal obligation for those payments to be made, right?

A. Well, she was -- she was paid in full.

Q. So that's your contention?

A. Yes. Based on the wish letter and what he had specifically described.

Q. Okay. Now, is it your contention in this case that she was paid in full, from the operating flows generated by the companies?

A. Well, that was the only money that money was being generated is from the companies. I can't think of another place where the money could have been generated.

Q. No, she received gifts from her mother Dorothy, and you have taken those against her, haven't

01411

you?

A. I don't have specific recollection of that. You'd have to be more specific or show me.

Q. All right.

A. And then go to the statement of account to see if that was charged to her account.

Q. Do you contend in this case that gifts from Dorothy to Adriana should be counted against the amounts to be paid to her under the private agreement?

A. No. If my mom owned something by herself, separate, and she was to give something to one of her daughters, that was totally and completely up to her.

Q. Okay. Now, the private agreement calls for payments, beginning at the bottom of the first page, the balance to be delivered to Adriana amounts to $2,069,100, correct?

A. That is correct.

Q. The next paragraph said that she's to receive an annual amount of $150,000 of principal and interest in monthly payments of 12,500 each, right?

A. Right. That's what it says.

Q. Okay. The first month after this was signed was January 2003, correct?

A. Yes.

Q. January 2003 to October 2010, when she was cut

01412

off, that's 91 months?

MR. HESS: Object to form.

A. I don't know.

Q. (By Mr. Fisher) Seven years through 2009, plus another nine months, up to October 2010, 91 months.

A. Okay.

Q. And 91 times 12,500 is $1,137,500. You trust me on that?

A. I'll trust you on that.

Q. The balance was $2,069,100. If all of the monthly payments were made up to October 2010, that would amount to $1,137,500, leaving a unpaid principal amount, not including any interest whatsoever, of $931,600?

MR. HESS: Object to form.

Q (By Mr. Fisher) Do you disagree with any of that math?

A. Well, I'd have to run the math myself. But if you want me to, I'll take your word for it.

Q. Okay. So, is it your testimony, sir, that pre-payments were made to Adriana exceeding $930,000 between January 2003 and October 2010?

A. Well, the calculation that I'm making is based on the wish letter which speaks of $3 million. And based on the wish letter, it talks about the house in

01413

Laredo could be used as payment. So, that was never deducted from the statement of account.

So, if we take the value of the Laredo house, which later turned into the Houston condo, and we were to subtract 50 percent of that value from the balance of the $3 million, I haven't run the numbers exactly, but it seems to me like she would have been paid in full, based on the wish letter.

Q. Who owned the Laredo house in 1992?

A. In 1992 it was owned by Casaco.

Q. Okay. So, when the wish letter was signed, that Laredo house was owned by Casaco?

A. Maybe not. No, I don't recall. I don't recall who owned it in 1992.

Q. The Laredo house was not given to Adriana, was it?

A. Well, it was -- Casaco was formed, whatever year that was, and it was suggested to my dad that he give the shares to my sisters.

Q. Okay.

A. But still that I could subtract it from the statement of account.

Q. Okay. So, the Laredo house was transferred to Casaco; is that your testimony?

A. Yes, that's my recollection.

Dickman Davenport, Inc
214.855.5100    www.dickmandavenport.com    800.445.9548

Q.   And that definitely happened before December of 2002, didn't it?

A.   Well, I don't have the dates, so -- if I could see some documentation, I could probably --

Q.   Maybe we'll do that.

You're telling me now, you don't remember if the Laredo house was conveyed to Casaco before December of 2002?

A.   It was probably before 2002, yeah.

Q.   Okay.   So then we come to December 2002 and your father signs a private agreement that says the balance is $2,069,100 --

A.   Right.

Q.   -- after the house is conveyed to Casaco, right?

A.   But if you go to the wish letter, it says payments may be rendered in kind to which the following properties may be conveyed, Laredo house.

Q.   Okay.   Private agreement came after the wish letter, true?

A.   Yes.

Q.   And the private agreement says as of December of 2002, balance is $2,069,100, right?

A.   I'd have to -- if we could see the statement of account, that would probably help me.

01415

Q.    Sure.  What are we up to?

(Exhibit 110 marked)

Q    (By Mr. Fisher) Please look at Exhibit 110. See title:  Shelby Longoria's Responses to Adriana's First Set of Interrogatories?

A.    Yes.

Q.    Appears to be signed by one of your attorneys on September 15th, 2014, less than a month ago.

A.    Correct.

Q.    Have you seen this document before?

A.    Yes.

Q.    Does it have attached to it a statement of accounts for Adriana?

A.    Yes, it does.

Q.    What does it show the balance to be as of January 2003?

A.    According to this, January 2003, 2,050,192.

Q.    Isn't that February?

A.    Well, see ENE?

Q.    Yes.

A.    That's January.

Q.    Yeah, and it says $2,069,100.

A.    No, but the balance, if you go -- that's the original balance after the payments.

Q.    All right.  At the beginning of January,

01416

$2,069,100?

A.   Yes.

Q.   It is a perfect match to the amount in the private agreement?

A.   All right.

MR. HESS:   Jim, you've been going for about an hour and 20 minutes.

MR. FISHER:   Would you like to take a break, sir?

THE WITNESS:   I need to go to the restroom.

MR. FISHER:   Let's take a break.

THE VIDEOGRAPHER:   The time is 2:09 p.m. We are off the record.

(Short break held)

THE VIDEOGRAPHER:   The time is 2:21 p.m. We are back on the record.

Q    (By Mr. Fisher) We are back on the record, Mr. Longoria; do you understand that?

A.   Yes.

Q.   We were discussing Exhibit 110, which is entitled your responses to Adriana's first set of interrogatories.

Did you review these answers before today?

A. Yes.

Q. Are they true and correct, to the best of your knowledge?

A. Yes.

Q. Please turn to --

A. Are we not on 110?

Q. Yes, sir. Yes.

Page 2, Interrogatory No. 2 asks for certain information about each payment of money that has been made to Adriana pursuant to a private agreement.

Do you see that, sir?

A. Yes.

Q. Paragraph E asked for the number of the account in which the money is taken to make the payment to Adriana. If you'll turn back to Page 3, your answer is, quote: To the best of his knowledge, Shelby believes his father Eduardo owned the bank account from which Adriana was paid. After Eduardo's death, it was Shelby's understanding that Dorothy owned the bank account, end quote.

Do you see that?

A. Yes.

Q. Where was the account that Dorothy owned?

A. I believe it was in Reynosa.

Q. Was that one of the accounts that was

01418

identified earlier?

A.   I'm not sure.

Q.   And so, is it your understanding that all of the payments made after your father died were made from a bank account owned by Dorothy?

A.   That's my understanding.

Q.   All right.

A.   Up until a certain point.

Q.   What happened then?

A.   Well, my recollection, that at a certain point, my mom was considered a U.S. person for tax purposes, so I don't know if that changed, how the payments were made.  I have no -- I can't recall.

(Exhibit 111 marked)

Q    (By Mr. Fisher) Please look at Exhibit 111. This is a copy of a letter from Carolyn M. Beckett to Adriana Longoria.

A.   Yes.

Q.   Have you seen it before?

A.   Yes, I have.

Q.   Carolyn Becket was your attorney, wasn't she?

A.   Yes.

Q.   In this letter she writes to Adriana, in the second paragraph, that in 2008 your mother declared herself a U.S. resident and ceased to make transfers of

01419

funds to you in her own name.

Do you see that, sir?

A.   I do see that.

Q.   Was that the event you were describing a few minutes ago?

A.   Yes.

Q.   Do you have any understanding as to why your mother declared herself a U.S. resident in 2008?

A.   Well, I know there was -- I relied on Carolyn Beckett's expertise and Adrian Hernandez, their support, people, to make those determinations.

Q.   Okay.  So, it was advice from Adrian Hernandez and Carolyn Beckett was involved --

A.   Primarily Carolyn Becket who was a tax attorney.

Q.   What was the tax benefit to be derived from your mother declaring herself to be a U.S. resident?

MR. HESS:  Object to form.

A.   Well, I don't think it was a matter about being a benefit.  It was about matter of doing what needed to be done based on her current status.

Q   (By Mr. Fisher) What was your understanding or what is your understanding as to why that needed to be done?

A.   Again, relying on tax experts to evaluate what

01420

her tax position is so we can be totally -- or at least my mom could be totally compliant.

Q. So the letter continues in the next sentence, quote: Instead, cash payments made in 2009, were made through ITSA, pursuant to the private agreement you and your father entered into in 2002. Funds were withdrawn from the operating cash accounts of ITSA and payments were made to your Mexican account to the extent of the corporation's available funds. These funds were deposited into an account in Mexico, titled in your name, after which they were available to you to be transferred to your account in the U.S., end quote.

Do you see that?

A. Yes, I do.

Q. Is ITSA a reference to Inmuebles y Terrenos?

A. Yes.

Q. That was a company that was held in the --

A. Afirme Trust.

Q. -- Afirme Trust?

A. Correct.

Q. Although by 2009, it was no longer the Afirme Trust, right, it was Bank Santander?

MR. HESS: Object to form.

A. 2009? I don't recall specifically.

Q (By Mr. Fisher) Did that not change when you

01421

had your transaction with your brother in 2007?

A.   I don't believe -- I always refer to it as the Afirme Trust.

Q.   In any event, Inmuebles y Terrenos was held in a trust?

A.   Correct.

Q.   Of which you were a beneficiary?

A.   I was a beneficiary.

Q.   So, based on this letter, was it your understanding that from the time of your father's death through 2008, the payments to Adriana pursuant to the private agreement were made from an account owned by your mother Dorothy?

A.   Yes, I believe so.  I don't know specifically, but yes.

Q.   All right.

          (Exhibit 112 marked)

Q    (By Mr. Fisher) If you please look at Exhibit 112, sir.

          MR. FISHER:  Would you give one to Mr. Hess?

          MR. HESS:  Thanks.

Q    (By Mr. Fisher) Is this a copy of an affidavit that you signed on or about July 29, 2013?

A.   Yes.

01422

Q.    Now, there were many exhibits to this affidavit and they are not included in this exhibit -- this deposition exhibit.  I note for the record, this is only your testimony.

Do you see that, sir?

A.    I see that.

Q.    You understood, when you signed this, that an affidavit is testimony, right?

A.    Yes.

Q.    In fact, beginning in the first page it says: Before me, the undersigned authority, on this day personally Shelby Longoria, who, being by me first duly sworn, stated the following.

A.    Right.

Q.    Do you see that?

A.    Yes, I do.

Q.    So, you understood it was important for this document to be accurate?

A.    Well, yes, I understand most documents should be accurate.

Q.    Okay.  Well, especially a document that's signed under oath?

A.    Correct.

Q.    Please turn to Page 4.  Paragraph 16 refers to private agreements with each of your sisters, correct?

01423

A.    Right.

Q.    Let me just begin reading the second sentence there.  The Mexican Trust, the Mexican companies owned by the Mexican Trust and I were not parties to those agreements.  Nevertheless, the payments my sisters received were paid from the Mexican companies owned by the Mexican Trust, end quote.

Some of the payments weren't made by the Mexican companies, were they?

MR. HESS:  Object to form.

A.    Well, they were paid from the Mexican entity.

Q.    (By Mr. Fisher)  Well --

A.    To -- somehow the money came from the Mexican entity to either my father or my mother's account first, and then from there it was paid to my sisters.

Q    (By Mr. Fisher) You testified just a few minutes ago that from the time your father died in January of 2005 through 2008, the payments came from an account owned by your mother Dorothy, didn't you?

A.    Yes, and right now I just said that either they came -- the cash flow came from a Mexican company to my father's account while he was alive, and after his death, then it went into my mom's account, is my understanding.

Q.    Let's look down at paragraph 18, which reads,

01424

and I quote:  Following my father's death, Adriana and Sylvia continued to receive payments under their Acuerdos Privados.  The Mexican companies owned by the Mexican Trust, though not obligated by the terms of the Acuerdos Privados to make these payments, treated these payments to my sisters as a matter of first priority.

Once again, you're saying that the Mexican companies made the payments, aren't you?

MR. HESS:  Object to form.

A.    What I'm saying is that the cash flow from the Mexican companies.

Q    (By Mr. Fisher) Okay.  So, you're saying the Mexican companies paid Dorothy and then Dorothy paid Adriana?

A.    Yes.

Q.    But the money belonged to Dorothy once she received it?

A.    I would assume that's the case, yes.

Q.    All right.  I mean, it wasn't paid to her with some string attached?

A.    Well, I don't think so.  Again, I had to rely on attorneys and accountants to help with this.

Q.    Also, in paragraph 18, we see you saying that the Mexican companies owned by the Mexican Trust were not obligated by the terms of the Acuerdos Privados to

make these payments.

A.   I don't believe they were.

Q.   Okay.  I thought earlier today you were uncertain about their obligation, but you -- now you're clearly saying they were not obligated?

A.   Well, I don't believe that they were.

Q.   And you testified that you -- that they weren't?

A.   Yes.

Q.   The reason I'm emphasizing that is because I want it to be very clear, sir, that you're saying that the amounts to be paid to Sylvia and Adriana were their inheritance, and yet you're also saying at the same time that when your father died, there was no one on the face of the planet who had the legal obligation to make those payments to your sisters.

That's your position in this case, right?

MR. HESS:  Object to form.

A.   What I'm saying is that when my father died, I still felt the moral obligation, not just because he was gone, to do -- to take every effort on my part and also on my brother's part to fulfill his desires, including my mom, which is what her desires were, too.  That's what I'm saying.

Q   (By Mr. Fisher) Okay.  You're using the word

01426

moral obligation, that's something different from the legal obligation, isn't it?

A.   Yes, it is.

Q.   Okay.

(Exhibit 113 marked)

Q   (By Mr. Fisher) Would you, please, look at Exhibit 113, sir.  This is pleading entitled:  Shelby Longoria's Contest of 2010 Will.

Do you see that, sir?

A.   I do see that.

Q.   And is this a pleading that was filed on your behalf by your attorney in this case?

A.   Yes, it was.

Q.   Have you ever read it before?

A.   Yes, I have.

Q.   Do you believe it to be true and accurate?

A.   I do.

Q.   Please turn to Page 4 and look at paragraph 8. Paragraph 8 says, and I quote:  After Eduardo Senior's death in January 2005, Shelby continued to make payments to Adriana and Sylvia as provided by the private agreements, end quote.

So, here, we have an assertion that you made payments.

A.   Well, I look at it more as semantics more than

Shelby Longoria - October 7, 2014

anything. I felt -- I continued to feel the obligation -- Shelby continued to feel the obligation to continue to make the payments to Adriana and Sylvia.

Q. All right, sir. But this doesn't say that you continued to feel an obligation. It says Shelby continued to make payments to Adriana and Sylvia as provided by the private agreements, end quote.

That just wasn't true, was it?

MR. HESS: Object to form.

A. Well --

Q (By Mr. Fisher) Did you make the payments?

A. I --

Q. Did you make the payments?

MR. HESS: Let's do one at a time. Y'all are speaking over each other. It doesn't give me a chance to object. I think it's getting hard for the court reporter to follow. Let's do question and answer.

Q (By Mr. Fisher) After your father died, did you make payments under the private agreement?

A. I did not personally make payments.

Q. If we turn to Page 5, Paragraph 11, it says again, quote: Shelby also continued to send payments to Adriana in accordance with the private agreement between her and Eduardo Senior, end quote.

So, fact is, you personally did not send

01428

payments?

A. I did not personally send payments; out of my checking account, to be more specific.

Q. The money sent was not your money and you weren't the one who sent the money?

A. I didn't say that.

Q. Were you the one who sent the money?

A. I was the one that was instrumental in getting the money sent in order to comply with my dad's wishes.

Q. Explain how you were instrumental. What did you do that was instrumental?

A. Well, what I've done all along was to be supportive of my dad's wishes and my mom's wishes and what they wanted to do regarding my sister's inheritance. So, that's been the case all along is to give my support and do everything I can in my power, regardless of what the economy is doing with the Mexican companies. I make every effort that they get their money. That's what I'm saying.

Q. Did your parents, were either of them give gifts to your wife Tita?

A. Yes, I believe they did.

Q. Did those gifts include stock in the bank?

A. My dad -- yes, my dad give them gifts of stock.

01429

# EXHIBIT 9

01430

Case Number 414270

| IN THE ESTATE OF | § | IN THE PROBATE |
| DOROTHY LOUISE LONGORIA, | § | COURT NUMBER ONE |
| DECEASED | § | HARRIS COUNTY, TEXAS |

### Shelby Longoria's Third Amended Response to Requests for Disclosure

TO: James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, Sylvia Dorsey, and Adriana Longoria by and through their attorneys of record, James Austin Fisher, FISHER & WELCH, 2800 Lincoln Plaza, 500 North Akard Street, Dallas, Texas 75201

Shelby Longoria, Will Contestant and Counter-Defendant in the above-styled and numbered cause, pursuant to Rule 194 of the Texas Rules of Civil Procedure, answers the following requests for disclosure separately and fully in writing.

### REQUEST FOR DISCLOSURE (a):

The correct names of the parties to the lawsuit.

### RESPONSE:

The parties are correctly named.

### REQUEST FOR DISCLOSURE (b):

The name, address, and telephone number of any potential parties.

### RESPONSE:

Eduardo "Wayo" Longoria Jr.
1702 Cresthaven Dr.
Austin Texas 78704
(512) 535-0105



EXHIBIT
9

### REQUEST FOR DISCLOSURE (c):

The legal theories and, in general, the factual bases of your claims or defenses.

### RESPONSE:

The will that Sylvia Longoria Dorsey offered into probate is invalid. On January 21, 2010, Dorothy lacked the testamentary capacity required by law to make a valid last will and testament. Further, the 2010 Will was executed as the result of undue influence exerted by Sylvia

3495696v1/013774

**01431**

over Dorothy. The influence effectively operated to subvert or overpower Dorothy's mind at the time she executed the instrument in question. Dorothy would not have executed the 2010 Will but for the influence exerted by Sylvia. Sylvia also tortiously interfered with Shelby's inheritance rights by inducing Dorothy to execute the purported 2010 Will. Adriana also tortiously interfered with Shelby's inheritance rights by her actions in 2009 to 2011. Specifically, she induced Dorothy to execute alternative wills; yet she ultimately acquiesced in the probate of the 2010 Will, despite knowledge of a later will, because she needed Sylvia's and Tommy's cooperation to carry out a scheme to assert claims, on behalf of Dorothy's estate, for her own benefit. Sylvia and Adriana thus have received a benefit, directly and indirectly, of a substantial portion of Dorothy's estate and the appointment of Sylvia's husband James Thomas Dorsey ("Tommy") as executor.

Tommy should be removed as independent executor because he was appointed pursuant to an invalid will, procured by Sylvia for the purpose of installing her husband as the executor in order to fraudulently circumvent her release of claims and recognition of the validity of the trust created in 2002. Tommy also should be removed as independent executor because he has material conflict of interests. As independent executor, he has a fiduciary obligation to Dorothy Longoria's estate to investigate Sylvia's misappropriation of money earmarked for Dorothy, and to assert claims as appropriate to recover the misappropriated funds. Tommy will not fulfill this fiduciary obligation, however, because he is married to Sylvia and benefited from her misappropriation. Further, Tommy has entered a joint prosecution agreement with Adriana, Sylvia, and Adriana's son Raymond Hart ("Monte"). Through the joint prosecution agreement, Tommy, Sylvia, Adriana, and Monte have agreed: (1) to "cooperate in the prosecution of the CLAIMS [in this litigation] and to share any proceeds in accordance with the terms" of the agreement; (2) that no party, including Tommy, has "the exclusive right to make decisions about the actions or positions to be taken by the other PARTIES or the ATTORNEYS"; and (3) to "use their best efforts to reach a consensus on any and all decisions relating to LITIGATION or the prosecution or settlement of the CLAIMS" in this lawsuit. Together, these provisions render Tommy "incapable of properly performing the independent executor's fiduciary duties" under Texas Probate Code § 149C because it means he either will not or cannot effectively pursue repayment of monies owed to the Estate by Sylvia, Adriana, and Monte.

Tommy's counterclaims lack merit because Shelby did not owe his mother a fiduciary duty; nor did he breach a promise to hold property for her benefit. Further, Tommy's counterclaims, even as amended, should be dismissed on forum non conveniens grounds because they relate to a Mexican marital property agreement that was entered as a judgment of a Mexican court; a Mexican trust holding and owning only Mexican assets, that was set up by a Mexican citizen living in Mexico; and the probate of a Mexican will that took place in Mexican court. Resolving these claims in Texas would require the translation of Spanish-language documents and interpretation of Spanish-language documents, and also face the insuperable obstacle of how to bring Mexican witnesses to court in Texas. These are only some of the reasons dismissal on forum non conveniens grounds is appropriate. Tommy's counterclaims also lack merit because they are outside of the limitations period; fail to state a legally cognizable claim; and are unsupported by the record in this case.

Adriana's counterclaims also lack merit because Shelby has not tortiously interfered with her inheritance rights or any enforceable contractual promise. Further, Adriana cannot show

01432

Shelby owed her a fiduciary duty or breached any promise, let alone a legally cognizable one. Adriana cannot show the malice and/or fraud to support enhanced damages. Adriana's counterclaims also lack merit because they are outside of the limitations period; fail to state a legally cognizable claim; and are unsupported by the record in this case.

## REQUEST FOR DISCLOSURE (d):

The amount and any method of calculating economic damages.

## RESPONSE:

According to the Inventory, Appraisement, and List of Claims filed by the Estate, the Estate is claiming a 50% interest in two Mexican companies, Vertice Empresarial, S.A. de C.V. and Inmuebles y Terrenos, S.A. de C.V. In her April 27, 1989 will, Dorothy Longoria bequeathed the entirety of her hereditary wealth in the Mexican Republic in equal parts to Shelby Longoria and Eduardo Longoria Jr. Under the terms of that will, half of any interest by Dorothy Longoria in the Mexican companies would be inherited by Shelby Longoria. To the extent that the Estate recovers any interest in the Mexican companies, or damages compensating for the loss of interests in Mexico, half of that recovery is owed to Shelby Longoria pursuant to the 1989 will. This amount will be owed by Sylvia and Adriana as damages for their tortious interference with Shelby's inheritance rights. Moreover, Adriana and Sylvia will owe contribution to Shelby for any recovery by the Estate, as described in Shelby's pleadings.

## REQUEST FOR DISCLOSURE (e):

The name, address, and telephone number of persons having knowledge of relevant facts,

and a brief statement of each identified person's connection with the case.

## RESPONSE:

Shelby Longoria
c/o Johnny Carter, Rick Hess, and Kristen Schlemmer
Susman Godfrey
1000 Louisiana Ste. 5100
Houston, Texas 77002

Shelby Longoria is the will contestant and counter-defendant in this case.

Sylvia Dorsey
c/o James Fisher
500 North Akard Street
Dallas, Texas 75201

Sylvia Dorsey applied for the probate of Dorothy Longoria's purported 2010 will.

James Thomas "Tommy" Dorsey

01433

c/o James Fisher
500 North Akard Street
Dallas, Texas 75201

Tommy is the purported executor of the will Sylvia Dorsey applied to probate.

Eduardo "Wayo" Longoria Jr.
1702 Cresthaven Dr.
Austin Texas 78704
(512) 535-0105

Wayo is Sylvia, Shelby, and Adriana's brother.

Adriana Longoria
6138 San Felipe Street
Houston, TX 77057
(713) 784-0826

Adriana is Sylvia, Shelby, and Wayo's sister.

Thomas Dorsey Jr.
Houston, Texas
(713) 816-0881

Thomas Dorsey Jr. is the son of the will applicant and executor, as well as the business partner of the executor.

Kristin Dorsey
Houston, Texas
(713) 816-0881

Kristin Dorsey is Thomas Dorsey Jr.'s wife and the daughter-in-law of the will applicant and executor.

Elizabeth Fertitta
2706 Eastgrove Lane
Houston, Texas 77027

Elizabeth Fertitta is the daughter of the will applicant and executor, and her husband drafted the will Dorothy Louise Longoria allegedly executed on January 21, 2010.

Zack Fertitta
2706 Eastgrove Lane
Houston, Texas 77027

Zack Fertitta is the son-in-law of the will applicant and executor and drafted the will Dorothy Louise Longoria allegedly executed on January 21, 2010.

01434

Robert Edward "Wayo" Dorsey
15308 Sunset Blvd
Pacific Palisades, CA 90272

Wayo Dorsey is the son of the will applicant and executor.

Adriana Longoria
6138 San Felipe Street
Houston, Texas 77057

Adriana Longoria is Dorothy Longoria's daughter, Sylvia Dorsey and Shelby Longoria's sister, and Tommy's sister-in-law.

Raymond Hart
5834 Candlewood Lane
Houston, TX 77057
(713) 818-2387

Raymond Hart is Adriana Longoria's son.

Forrest Hart
307 Grand Street, Apt. 1C
Brooklyn, New York 11211-4446

Forrest Hart is Adriana Longoria's son.

Adriana Banks
6138 San Felipe Street
Houston, Texas 77057

Adriana Banks is Adriana Longoria's daughter.

Tita Longoria
c/o Johnny Carter, Rick Hess, and Kristen Schlemmer
Susman Godfrey
1000 Louisiana Ste. 5100
Houston, Texas 77002

Tita Longoria is Shelby Longoria's wife and Dorothy Longoria's daughter-in-law.

Marta Beatriz Montelongo Garza
Cerro del Bernal 128 Colonia las Fuentes, Cp. 88710
Reynosa, Tamaulipas

Ms. Montelongo witnessed Eduardo's 2002 will and the 2002 Afirme Trust agreement.

Saul Garza Molina
Real De Cantaro 203, Fracc. Los Cantaros

01435

Reynosa, Tamaulipas

Mr. Garza is the CEO of Grupo Inlosa and had close contact with Eduardo and Dorothy over many years.

Irma Campoy Carrillo
Haya 108 Fracc. Privada Las Ceibas
Reynosa, Tamaulipas

Ms. Campoy is the Treasurer for Grupo Inlosa and was in charge of making payments to Sylvia and Adriana under the Acuerdo Privado.

Patricia Vazquez
Playa Hermosa 507, Col Militar Marte
Iztacalco, Mexico

Ms. Vasquez was the Treasurer for Grupo Inlosa before Ms. Campoy and was responsible for making payments to Sylvia and Adriana under the Acuerdos Privados.

Marco A. Torres
Sierra Nevada 1208, Col Fuentes
Reynosa, Tamaulipas

Mr. Torres was the Administrative Director at Grupo Inlosa for many years and has knowledge of Eduardo and Dorothy's wills and estate planning.

Pedro Ramirez
Padre Mier 1504
Monterrey, N.L

Mr. Ramírez was the attorney who drafted trust documents and the Acuerdos Privados.

Celia Guerrero
Zaragoza 1300 Sur.
Monterrey, N.L.

Ms. Guerrero works with Mr. Ramirez and also assisted Mr. Ramírez in the preparation of many documents.

Mario Gonzalez Mendoza
Dr. Mier 3113 Zona Centro
Nuevo Laredo, Tamaulipas

Mr. Gonzalez Mendoza was Eduardo's and Dorothy's attorney for approximately 40 years and has knowledge relevant to their estate planning, testamentary wishes, and separate property agreement.

01436

Mario Gonzalez Basurto
Dr. Mier 3113 Zona Centro
Nuevo Laredo, Tamaulipas

Mr. Gonzalez Basurto is Mr. Longoria's attorney in the amparo proceedings in Mexico.

Elsa Gonzalez Basurto
Dr. Mier 3113 Zona Centro
Nuevo Laredo, Tamaulipas

Ms. Gonzalez worked on the probate of Eduardo's estate.

Alicia Garcia
Dr. Mier 3113 Zona Centro
Nuevo Laredo, Tamaulipas

Ms. Garcia has been Mr. Gonzalez Mendoza's assistant for many years and knew Eduardo and Dorothy.

Carlos Avila
Hacienda San Abel 215, Fracc. Las Haciendas
Reynosa, Tamaulipas

Mr. Avila was the HR Manager for Grupo Inlosa for many years.

Carlos Gonzalez Hinojosa
Libramiento Luis Echevarria 630
Reynosa, Tamaulipas

Mr. Gonzalez Hinojosa is an attorney in Reynosa who prepared several wills for Eduardo and Dorothy.

Arnulfo Cruz
Calle Del Cerro 131, Colonia Cumbres
Monterrey, N.L.

Mr. Cruz is a tax consultant who participated on many of the documents and tax planning for Dorothy and Eduardo.

Virginia Coronel
Azucena 505, Col. Puerta Del Hierro
Monterrey, N.L.

Ms. Coronel is an attorney with intimate knowledge of documents related to Eduardo's and Dorothy's estate planning and Eduardo's and Shelby's business dealings in Mexico.

01437

Dr. Anselmo Guarneros
Calle Independencia N° 2209
Nuevo Laredo, Tamaulipas

Dr. Guarneros was good friends with Eduardo and Dorothy for many years, witnessed Eduardo's 2002 will, and is knowledgeable about Eduardo's medical condition at the time he executed the 2002 will.

Carlos Lozano
Nayarit N° 3626, Colonia Jardin
Nuevo Laredo, Tamaulipas

Mr. Lozano worked for Eduardo for over thirty years.

Antonio Del Bosque
Boulevard Las Torres Del Bosque 705
Nuevo Laredo, Tamaulipas

Mr. Del Bosque worked for Eduardo for over thirty years.

Lic. Francisco Gaxiola.
Bosque De Ciruelos 140-505
Mexico D.F

Mr. Gaxiola is an attorney that drafted documents for the Serfin Trust.

Nestor Sanchez
Calle Perales N° 750, Colonia Jardin
Reynosa, Tamaulipas

Mr. Sanchez served as Administrative Director of Grupo Inlosa before Marco Torres.

Lic. Adrian Lozano Lozano
Hidalgo 234 Pte. 4° Piso, Zona Centro
Monterrey, N.L.

Mr. Lozano is an executive at Banca Afirme, the trustee of the Afirme Trust.

Martha Beatriz Garza
Hidalgo 234 Pte. 4° Piso, Zona Centro
Monterrey, N.L.

Ms. Garza is an executive at Banca Afirme, the trustee of the Afirme Trust.

3495696v1/013774                                    8

**01438**

Lic. Eduardo Marroquin
Francisco I Madero Pte 218, Monterrey
Nuevo Leon, Tamaulipas

Mr. Marroquin is an executive at Banca Afirme, the trustee of the Afirme Trust.

Dr. Mario Alberto Pérez Coss
Madero 1320
Nuevo Laredo, Tamaulipas

Dr. Perez certified Dorothy's good health in connection with her 1989 Mexican will.

Oscar Chapa Gonzalez
Guatemala # 2802
Col. Ferrocarril
Nuevo Laredo, Tamaulipas 88050

Mr. Chapa is knowledgeable about the valuation of properties in connection with Eduardo's and Dorothy's 1983 Separate Property Agreement.

Jose Luis Saldaña Avendaño
Carretera Piedras Negras
kilometro 19.3 Poniente
Nuevo Laredo, Tamaulipas

Mr. Saldaña is knowledgeable about the 1983 Separate Property Agreement and the valuation of interests divided in that agreement.

Marin Espinosa
1801 South 2nd Street
McAllen, Texas 78503

Mr. Espinosa is knowledgeable about the history of Inter National Bank, as well as the value over time of shares of Inter National Bank.

Dr. Carlos Cigarroa
702 East Calton Road
Laredo, TX 78041
(956) 728-8255

Dr. Cigarroa is knowledgeable about Eduardo Longoria Sr.'s execution of a will in October 2002, including Mr. Longoria's mental and physical condition at that time.

## REQUEST FOR DISCLOSURE (f):

01439

For any testifying expert

(1)    The expert's name, address, and telephone number;

(2)    The subject matter on which the expert will testify;

(3)    The general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by you, employed by you, or otherwise subject to your control, documents reflecting such information;

(4)    If the expert is retained by you, employed by you, or otherwise subject to your control:

(A)    All documents, tangible items, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

(B)    The expert's current resume and bibliography.

**RESPONSE:**

George S. Glass, M.D., P.A.
4600 Post Oak Place Drive, Suite 307
Houston, Texas 77027
Telephone: (713) 627-3834

Dr. Glass may testify regarding Dorothy Longoria's overall mental health, including but not limited to her mental capacity to execute wills and other legal documents in December 2009 and continuing through the end of her life. Specifically, Dr. Glass may testify that Dorothy Longoria did not possess the mental capacity and was not capable of understanding and meeting the necessary legal requirements to execute wills and other legal documents. Dr. Glass also may testify to a reasonable degree of medical certainty that Dorothy Longoria was susceptible to or submitted to undue influence or psychological domination of her daughters, Sylvia Dorsey and/or Adriana Longoria, at the time that she executed wills and other legal documents on or after December 1, 2009.

Dr. Glass has reviewed the medical records produced in this litigation as well as the depositions of the parties. Dr. Glass's current resume and bibliography have previously been provided.

Sheila A. Enriquez, CPA, JD
Briggs & Veselka Co.

01440

Nine Greenway Plaza, Suite 1700
Houston, Texas 77046
Telephone: 713-353-1909

Ms. Enriquez may testify concerning Dorothy's Longoria finances and expenditures between her move to Houston and her death, including an examination of "red flags" that are indicative of potential theft, fraud, or mismanagement of Dorothy Longoria's assets by her daughter Sylvia Dorsey, for the benefit of Sylvia Dorsey, Adriana Longoria, Tommy Dorsey, and others.

Ms. Enriquez has reviewed the bank records and other records containing financial information produced in this litigation as well as the depositions of the parties. Ms. Enriquez's current resume and bibliography have previously been provided.

Mario Gonzalez Mendoza
Dr. Mier 3113
Nuevo Laredo, Tamaulipas CP 88000

Mr. Gonzalez Mendoza may be called to testify about Eduardo and Dorothy Longoria's 1983 agreement to partition all their community property and related proceedings in Mexico. The general substance of Mr. Gonzalez Mendoza's mental impressions and opinions are reflected in his October 8, 2014 deposition. Mr. Gonzalez Mendoza is of the opinion that the 1983 agreement is valid under Mexican law and operated to partition all the couple's existing and future community property so that the couple maintained separate property from 1983 forward. Mr. Gonzalez Mendoza's employment and educational information is contained in his deposition.

Johnny Carter
Rick Hess
Susman Godfrey L.L.P.
1000 Louisiana St., Ste. 5100
Houston, Texas 77002
Telephone: (713) 654-6694

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
2900 Weslayan, Suite 150
Houston, Texas 77027
Telephone: (713) 547-5400

Mr. Carter, Mr. Hess, and Mr. MacIntyre may testify as to the reasonable and necessary attorneys' fees and expenses incurred by Shelby Longoria due to the above referenced lawsuit(s).

Mr. Carter and Mr. Hess are of the opinion that reasonable fees in this case equal $650 per hour for Mr. Carter's time, $500 per hour for Mr. Hess's time, $375 per hour for Ms. Schlemmer's time, and $275 per hour for paralegals' time, multiplied by the number of hours they have each spent and do spend in the preparation, prosecution and trial of this case, and through its final resolution. Mr. MacIntyre is of the opinion that reasonable fees in this case

01441

equal $500 per hour for Mr. MacIntyre's time multiplied by the number of hours he has spent and does spend in the preparation, prosecution and trial of this case, and through its final resolution.

Mr. Carter, Mr. Hess, and Mr. MacIntyre have considered the following factors in reaching their opinions concerning attorney fees:

(i)     the time and labor required;

(ii)     the novelty and difficulty of the questions involved;

(iii)     the skill required to perform the legal services properly;

(iv)     the likelihood that involvement in this case precludes other employment;

(v)     the fee customarily charged in Houston, Texas for similar legal services;

(vi)     the amount involved; (vii) time limitations imposed by the circumstances; and

(vii)     the experience, reputation, and ability of the attorney performing the services.

Mr. Carter's, Mr. Hess's, and Mr. MacIntyre's opinions will be further based on the agreement between the clients and the attorneys, the attorneys' education, active practice in the state of Texas, and their familiarity with attorneys' fees customarily charged in Houston, Harris County, Texas for legal services such as those provided in this matter.

Mr. Carter, Mr. Hess, and Mr. MacIntyre will review the engagement letter, pleadings, documents and all time entries and invoices prepared by their respective firms through the date of trial. The resumes of Mr. Carter, Mr. MacIntyre, and Mr. Hess have previously been provided.

Janet Fenner Masson
Forensic Document Examiner
908 Town & Country Boulevard, Suite 120
Houston, Texas 77024
Telephone: (713) 973-7552

Ms. Masson has examined handwriting on documents produced in this case, and may testify about the extent to which the handwriting on various documents is consistent with the handwriting of various individuals. She also may offer her opinion concerning the authorship of the documents. In particular, Ms. Masson may examine and testify about the handwriting on July 2011 documents purporting to describe the last will and testament of Dorothy Longoria, including her opinion concerning the authorship of the documents. Ms. Masson's CV has previously been provided.

Phil Innes
Ernest & Young LLP
5 Houston Center

3495696v1/013774                                    12

01442

Suite 1200
1401 McKinney Street
Houston, Texas 77010

Mr. Innes is a Certified Public Accountant (CPA) licensed in Texas and New York and as a CPA has examined accounting records, financial statements and related documentation of small family run businesses as well as large international publically traded companies operating domestically and internationally. As a CPA he has expressed opinions on accounting including retention by the Securities and Exchange Commission. He is also certified in valuation of companies as a Certified Valuation Analyst (CVA) and a member of the National Association of Certified Valuation Analysts ("NACVA"). Over his over 25 years of experience Mr. Innes has investigated allegation of fraud and misuse of funds and is a member of the Association of Certified Fraud Examiners ("ACFE"). He has been appointed by the US Attorney for the Southern District of NY as a compliance monitor after the companies agreed deferred prosecution agreement alleging fraud. Mr. Innes is currently an Executive Director at Ernst & Young ("EY"), which is a global leader in assurance, tax, transaction and advisory services, with over 160,000 employees worldwide. Mr. Innes is a practice leader in EY's Fraud Investigation and Dispute Services practice based in Houston. His current curriculam vitae is submitted with these disclosures.

Mr. Innes is expected to testify about events in the Mexico that negatively influenced companies operating in Mexico including operating profitability, investment decisions and obligations denominated in US dollars. Mr. Innes will provide the court his opinions regarding his analysis of pertinent transaction including testimony regarding the structure of the trust assets in this matter and the movement of funds from those trusts to various beneficiaries. He will testify that the activities of the trusts, the related companies and that of Shelby Longoria were consistent with the wishes expressed by Eduardo Longoria and Dorothy Louise Longoria. He will also provide opinions on the sources and use of funds in various transactions such as the sale of real estate assets. Mr. Innes will identify for the court accounting, banking and other related financial records produced in this matter supporting his opinions. Mr. Innes is expected to also testify that the actions of Shelby Longoria complained of by Plaintiffs are not supported by the financial documents produced in this matter. Finally, Mr. Innes will also provide rebuttal testimony concerning the Dorseys' and Adriana Longoria's quantification of damages. In reaching his opinions Mr. Innes has relied on his analysis of the documents produced in this matter as well as upon his education, training and experience.

Carlos Gabuardi
Alejandria #125
Col. Roma, 64700
Monterrey, N.L.
64600 MEXICO

Mr. Gabuardi will testify concerning the legal effect of the separate property agreement in Mexico; Mexican legal regimes governing the parties' business transactions, contracts, and other activities subject to Mexican law (for example, the Adriana Longoria Private Agreement); the concept of domicile under Mexican law; and other aspects of Mexican law. Some of Mr. Gabuardi's opinions have been provided in affidavits filed with briefs in this matter, and Mr.

01443

Gabuardi may offer additional opinions in connection with summary judgment and other motions to be filed by Shelby Longoria. Mr. Gabuardi has reviewed documents produced in this matter. Mr. Gabuardi's current CV can be found as an exhibit to his affidavit in support of dismissal of Adriana Longoria's claims.

## RESERVATION OF RIGHTS:

Shelby Longoria cross-designates each and every person designated, in the past or in the future, by another party to this action to be a testifying expert, and reserves the right to elicit opinions from those experts on any subject matter for which they were designated to testify for any other party.

In the event that James Thomas Dorsey, Sylvia Dorsey, or Adriana Longoria designates one or more expert witnesses, Shelby Longoria reserves the right to call one or more experts in same fields to critique and to rebut the expert testimony presented by James Thomas Dorsey, Sylvia Dorsey, or Adriana Longoria

As of the time of this response, it has not been decided whether other expert witnesses will be called to testify on Shelby Longoria's behalf. Shelby Longoria reserves the rights to amend and to supplement this response as may be necessary.

## REQUEST FOR DISCLOSURE (g):

Any indemnity and insuring agreements described in Rule 192.3(f).

## RESPONSE:

Not applicable.

## REQUEST FOR DISCLOSURE (h):

Any settlement agreements described in Rule 192.3(g).

## RESPONSE:

Sylvia Dorsey signed a contract entitled "Release Agreement" on December 29, 2006 acknowledging full payment of gifts and inheritances she was owed under the Private Agreement and Wish Letter and releasing her claims against Shelby Longoria.

## REQUEST FOR DISCLOSURE (i):

Any witness statements described in Rule 192.3(h).

## RESPONSE:

Not applicable.

01444

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: _____
    Johnny W. Carter
    State Bar No. 00796312
    Richard W. Hess
    State Bar No. 24046070
    Kristen Schlemmer
    State Bar No. 24075029
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002-5096
    Telephone: (713) 651-9366
    Fax: (713) 654-6666

    Robert S. MacIntyre Jr.
    MACINTYRE MCCULLOCH STANFIELD YOUNG
    2900 Weslayan, Suite 150
    Houston, Texas 77027
    Telephone: (713) 547-5400

    *Attorneys for Shelby Longoria*

## CERTIFICATE OF SERVICE

This is to certify that on this January 15, 2015, a true and correct copy of the above and foregoing instrument was properly forwarded to the following counsel of record in accordance with Rule 21 of the Texas Rules of Civil Procedure as indicated below:

James Austin Fisher                  ***Via Electronic Mail***
FISHER & WELCH
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
Email: jfisher@fisherwelch.com

T. Wesley Holmes
THE HOLMES LAW FIRM
1000 North Central Expressway, Suite 400
Dallas, Texas 75231
Email: wes@wesholmes.com
*Attorneys for James Thomas Dorsey, Sylvia Dorsey, and Adriana Longoria*

_____
Johnny W. Carter

01445

≡ ERNST & YOUNG

Philip J. Innes
Executive Director
Fraud Investigation & Dispute Services

Direct: +1 713 750 4817
Fax:    +1 866 610 2299

phil.innes@ey.com

5 Houston Center
1401 McKinney Street
Suite 1200
Houston, TX 77010

Phil Innes is an Executive Director based in Houston. Phil has over 25 years of experience in accounting and auditing, corporate investigations, dispute advisory services, financial advisory services, valuations, financial reporting, expert witness testimony and case consultancies. He has provided professional services to clients in a wide variety of industries including recent work in: Upstream Oil & Gas, transportation of hydrocarbons, oil field services and manufacturing.

Mr. Innes' investigation experience includes investigating alleged accounting irregularities including those related to revenue recognition, inventory and fixed asset controls, purchasing and disbursements. The investigations have included understanding complex banking transactions, including the tracing of funds both domestic and international. He has been retained by audit committees, companies and outside counsel to assist in investigating alleged misconduct and present the results of the investigation to management, corporate boards, auditors and regulators such as the SEC and DOJ. The investigations have also focused on allegations of self-dealings, anti-bribery law violations, and investigation of other alleged fraudulent activities domestically in the United States and abroad. All of the investigations have involved analyzing company documents, bank records, company internal controls, interviews of personnel, and discussions with auditors, management, boards, and regulators. Mr. Innes' investigation work has also involved assessing and making recommendations for the purpose of improving a company's internal controls and anti-bribery compliance programs. Phil has also served as a compliance monitor as part of a company's deferred prosecution agreement after being selected by the company with agreement from the US Attorney's office. This monitor work involved a third party provider for instant fund transfers, directly from a member's checking account or credit card to an electronic wallet.

01446

Mr. Innes has been designated as an expert in Federal and State courts as well as domestic and international arbitrations on matters involving claims requiring the analysis of financial data including accounting records, banking records, trading activity, financial statements, business plans and projections, valuations, as well as market and industry data. He has been designated as an expert on accounting, finance and valuation matters including the calculation of damages. His testimony has been used in various matters including contract disputes, post-acquisition disputes, fraudulent conveyances, anti-trust, accounting irregularities, breach of contract, mergers and acquisitions, valuations of businesses and business assets. He has also been admitted as an expert and has offered testimony regarding application of accounting and auditing standards including acting as an expert for the Securities and Exchange Commission on such a matter. He has testified on matters involving oil and gas accounting including matters involving: COPAS, mineral royalties, pipeline transportation, hydrocarbon storage and oil field services.

In addition to services in investigations and litigation, his work has been used by companies and lending institutions in their assessment of value and improvements to a company's financial performance. Phil has advised companies in mergers and acquisitions including developing merger plans, identification of synergies and development of business plans to achieve and track cost savings. He has also assisted companies in their development of operational business plans, organization structures, accounting systems as well as the identification of weaknesses in their systems of internal controls providing steps and processes for improving these controls. Phil has performed business valuations including negotiation of selling prices and purchase terms, as well as conducting purchase and sale due diligence.

Prior to entering consulting, Phil was the Chief Financial Officer of publicly traded company that was a non-operator in the Gulf of Mexico as well as gas marketer and prior to that he practiced as a public accountant practicing in both the audit and tax fields.

## Case Highlights

- Provided expert testimony concerning damages resulting from alleged breach of fiduciary duty, alleged breach of non-compete agreement and misappropriation of trade secrets, damages included breach of contract and diminution in value
- Provided expert testimony regarding the accounting for conveyance of Term and Perpetual Overriding Royalty Interests.
- Provided expert testimony regarding the application of COPAS.
- Provided expert testimony regarding a company's financial condition and ability to pay dividends. Testimony included effects of alternative financing on capital structure, capital spending and the ability to pay dividends.
- Provided expert testimony regarding contractual audit clauses and the conduct of an auditor concerning their compliance with Generally Accepted Auditing Standards.
- Provided expert testimony regarding revenue and cost disputes identified in a COPAS audits.
- Provided expert testimony regarding accounting and claims related to the operations of a common carrier oil pipeline.
- Provided expert testimony regarding accounting and auditing disputes for offshore GOA oil and gas joint venture operations.
- Provided expert testimony regarding compliance with Generally Accepted Accounting Principles and Generally Accepted Auditing Standards.

- Provided expert testimony regarding contract disputes related to insurance contracts. Testimony included addressing the accounting treatment for the contracts and damages.
- Provided expert testimony concerning Generally Accepted Accounting Principles specifically related to restatement of financial statements. Testimony included reporting on the company's internal controls, accounting records, financial reporting, forecasting – earnings projections, and actions taken by senior executives.
- Provided testimony and analysis in a fraud-related matter, including the investigation of existing accounting and bank records in the United States, Middle East and Caribbean. Reconstructed accounting records. Provided testimony regarding solvency.
- Provided testimony regarding damages from alleged infringement of patents.
- Provided expert testimony regarding the financial effect of certain contract clauses, including an investigation of the financial activity between the parties operating in the Chemical Industry. Also provided testimony regarding damages.
- Provided testimony on reasonably equivalent value in fraudulent conveyance action relating to the transfer of medical practice assets, real estate and certain guarantees by fiduciaries. Also provided testimony regarding damages.
- Retained by the SEC to provide testimony in an accounting dispute regarding the application of Generally Accepted Accounting Principles.
- Provided analysis and testimony in trade secret matter involving claims for damages due to the loss of customers.
- Provided testimony in trade secret and trade name infringement suit involving computer software.
- Provided expert testimony in trade secret, trade dress claims in the telecommunication industry including analysis of a reasonable royalty.
- Provided expert testimony in valuation of pharmaceuticals and bioluminescence technology.
- Provided expert testimony on financial performance and accounting for a natural gas production joint venture and damages due to breach of contract.
- Provided expert testimony on claims for construction costs including opining on the adequacy of internal controls to capture these costs. Provided expert testimony on the reasonableness of supporting accounting documentation.
- Provided expert testimony regarding post acquisition accounting and valuation of net assets.

Forensic and Financial Investigation Experience

- Retained by counsel for the board of directors of and Upstream Oil and Gas Company to investigate certain activities of its Chief Executive Officers.
- Retained by counsel for home warranty provider to investigate and quantify alleged fraudulent activities.
- Retained by counsel for a distribution company to investigate disbursement activity to identify potential fraudulent activity and to review certain actions of the company's Chief Financial Officer.
- Retained by counsel for an oil field service companies regarding alleged violations of export controls.
- Retained by Monitor to assist in an oil field service company's adherence to its deferred prosecution agreement with the DOJ.
- Retained by counsel for drilling company regarding alleged violation of the Foreign Corrupt Practices Act.
- Retained by counsel for the audit committee of a wireless telecommunications company to investigate restatement of financial statements including investigating accounting for

**01448**

revenues, fixed asset additions, E-911 services, and to assess management's established internal controls including an assessment of tone at the top.

- Retained by counsel for the audit committee of an International service company to investigate whistle-blower allegations concerning proper reporting of revenues, investigation of alleged insurance fraud and an assessment of senior management's influence over financial reporting.
- Retained by foreign government agency to investigate contracts for gas pipelines, refineries, fertilizer plant and offshore Caspian region concessions. Work included economic analysis of the contracts, investigation into related party transactions and analysis of financial reporting. Subsequent to initial work was retained by outside counsel to perform transition management of all financial matters involving the governmental agency.
- Retained by foreign governmental agency and outside counsel to investigate fraud allegations, accounting irregularities, related party transactions and costs involving oil and gas development and exploration activities in central Asia.
- Retained by an International Bank to investigate fraudulent transfers of funds to senior management.
- Retained by lenders to investigate and document financial and operational controls for retailers. Work included an assessment of the borrowing base.

## Valuation and Financial Due Diligence Experience

- Performed acquisition due diligence and structured financing of oil and gas properties and gas gathering systems.
- Performed acquisition due diligence for service and communication companies.
- Performed acquisition due diligence of oil field services company. Analysis including breakdown of profitability between the "to be" acquired service lines including analysis of the drivers of costs and cost sharing between service lines.
- Performed merger and acquisition consulting to accounting, fabrication and purchasing departments. Work was used to define goals and take advantage of synergies. Work was also used in development and reporting of synergies to the public markets.
- Performed and testified to the valuation of start-up companies with embryonic technologies.

## Audit, Tax and Financial Consulting

- Approximately, ten years of audit and tax services to clients in a wide variety of industries including technology and telecommunications, casualty insurance, oil and gas, energy, oil field services, medical, entertainment, construction, waste management, retail, real estate and manufacturing. Work included: representation of clients in IRS audits, independent financial statement audits and reviews, SEC reporting and performing special projects such as Initial Public Offerings and acquisition due diligence.
- Provided interim transition management services for a multi-billion dollar foreign oil and gas company responsible for financial reporting, completion of audits, JIB audits, analysis of financial impact of divestitures and other contracts, management of data room on sale of oil and gas concessions, hiring of staff and implementation of accounting controls.
- Advised clients on various cost accounting and financial analysis matters, including:
  - developing and assessing models for allocation of indirect costs;
  - assessment of activity based costing procedures;
  - analysis of profitability; and
  - cost reduction plans.
- Chief Financial Officer responsible for financial reporting, due diligence on acquisition and divestitures, fund raising activities and negotiation of transactions.

**01449**



**ERNST & YOUNG**
*Quality In Everything We Do*

Certifications

- Certified Public Accountant – Licensed in Texas and New York
- Certified Valuation Analyst

**01450**

# EXHIBIT C

01451

## AFFIDAVIT OF ILAN ROSENBERG

I, Ilan Rosenberg, hereby declare and state as follows:

### PERSONAL BACKGROUND

1. I am over the age of 21, and competent to make this affidavit. I have drafted this affidavit based on my personal knowledge (unless otherwise stated), and having reviewed it, can attest that it is true and correct.

2. I hold a Bachelor of Laws degree (J.D. equivalent) awarded by the Escuela Libre de Derecho in Mexico City, Mexico, as well as Master of Laws (LL.M.) and Master of Comparative Laws (LL.C.M.) degrees from the University of Pennsylvania Law School.

3. I am an attorney licensed to practice law in every jurisdiction in Mexico, as well as in the Commonwealth of Pennsylvania. I am also licensed to practice before the Supreme Court of the United States, the United States Courts of Appeals for the Third and Federal Circuits, as well as the United States District Courts for the Eastern and Middle Districts of Pennsylvania, Northern District of Illinois, and the Eastern District of Wisconsin. A copy of my *Curriculum Vitae* is attached as Exhibit "A" to this affidavit.

4. In addition to my practice in the United States of America, I have actively and continuously practiced before Mexican state and federal courts for more than fifteen years.

5. I am a Partner of the law firm of Gordon & Rees, in Philadelphia, Pennsylvania.

6. I am also a Lecturer at Law at the University of Pennsylvania Law School.

7. I have been retained by James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased (the "Estate"), and asked to prepare this affidavit as an expert in the field of Mexican law.



**EXHIBIT**

tabbies

C

01452

## QUESTIONS PRESENTED

8.     The Estate has asked me to opine on the following questions under Mexican law:

   a)     How does the Mexican state of Tamaulipas regulate service of process on individual defendants?

   b)     Would a Tamaulipas court have jurisdiction over an action filed by the Estate against Shelby Longoria?

   c)     Does the law of Tamaulipas provide a remedy for a breach of fiduciary duty, or recognize private trusts and informal fiduciary relationships?

   d)     Does the filing of an Amparo lawsuit result in a general waiver of jurisdictional defenses in Mexico?

## MATERIALS REVIEWED

9.     In formulating the opinions below, I have relied on my review of Shelby Longoria's Amended Contest of 2010 Will, the Counterclaims thereto asserted by the Estate, Shelby Longoria's Motion to Dismiss Counterclaims for Forum Non Conveniens and its supporting Brief, the Affidavit of Dr. Carlos Gabuardi, an August 5, 1983 letter signed by Eduardo Longoria, Jr. and Shelby Luis Longoria to Dorothy Kowalski de Longoria, as well as my professional knowledge and experience, and my independent research of Mexican statutory and case law.

## OPINIONS

### I.     Preliminary Statement on Mexican Jurisdictional Determinations

10.     Mexico, like the United States, is a federal republic comprised of individual states that have autonomous governments – including state legislative, executive and judiciary branches.

11.     Thus, Mexico has separate state and federal bodies of laws.

-2-

12. Pursuant to Article 104, Section II of the Mexican Constitution ("Constitucion Politica de los Estados Unidos Mexicanos") and Article 53, Section I of the Mexican Federal Judiciary Organization Law ("Ley Organica del Poder Judicial de la Federacion"), in civil cases, Mexican federal courts have subject matter jurisdiction only over claims that are governed by federal laws or international treaties to which Mexico is a party. These provisions state, in pertinent part, as follows:

**Article 104.-** The Federal Courts shall adjudicate:

...

II. All civil or commercial controversies that arise concerning compliance with or application of federal laws or international treaties executed by Mexico. The plaintiff may choose, when the interests at issue only affect private parties, that these disputes be heard by the judges and tribunals of the states.

**Article 53.-** Federal district court judges shall adjudicate:

...

I. Those civil controversies that arise concerning compliance with or application of federal laws or international treaties executed by Mexico. When those controversies only affect private interests they may be heard, at the option of the plaintiff, by the judges and tribunals of the states and the Federal District.

13. Insofar as it concerns civil disputes among private parties, Article 13 of the Mexican Federal Civil Code, "Codigo Civil Federal" (or "CC") sets forth whether they are to be resolved under Mexican federal or state civil law – and thus determines whether there is Mexican federal subject matter jurisdiction over a particular dispute.

14. Article 13, Section IV of the CC, sets forth choice of law rules relating to the formalities for the creation of legal rights. Specifically, Section IV provides that "[t]he formalities of legal acts will be governed by the laws of the place where they are created. However, they may be subject to the formalities set forth in this Code when the act is to have effects in the Federal District or throughout the Republic on federal matters [.]"

-3-

01454

15. Furthermore, Article 13, Section V of the CC supplies the choice of law rules to determine the law that governs the legal effects of acts and contracts. Section V provides that "[s]ubject to the provisions of the foregoing sections, the legal effects of acts and contracts are to be governed by the laws of the place where they are to be performed, unless the parties have validly designated the application of different laws."

16. Pursuant to Mexican choice of law rules, there is no Mexican federal interest at issue with respect to the disputes between the Estate and Shelby Longoria. Thus, this analysis is premised on the substantive and procedural laws of the State of Tamaulipas, where Shelby Longoria argues certain relevant facts took place.

II. **Pursuant to the Laws of the Mexican State of Tamaulipas, Service of Process Must Be Effected Personally Upon an Individual Defendant at His Home**

17. The Mexican State of Tamaulipas, where Shelby Longoria claims to have business interests and contends is the more convenient venue for this action, has its own Civil Code, the "Codigo Civil para el Estado de Tamaulipas" (or "CCT"), as well as its own Code of Civil Procedure, the "Codigo de Procedimientos Civiles para el Estado de Tamaulipas" (or "CPCT").

18. Tamaulipas law charges the courts, and not the litigants, with the obligation to effect service of process. Specifically, Articles 29 and 30 of the CPCT provide that only court personnel may serve a defendant with original process.

19. Article 67, in Sections I and III, of the CPCT provides the rules for effecting original service of process on individuals by the courts of Tamaulipas. Those sections provide as follows:

> ARTICLE 67.- Original service of process must be effected in accordance with the following rules:
>
> II. If [the defendant] is an individual, [original service of process must be made] directly to that person, unless the individual lacks procedural capacity, as then it must be effected upon his/her legal guardian. Original service of process upon an agent is only

-4-

01455

authorized when the agent resides within the seat of the court and the person intended to be served lives outside that place or is of unknown whereabouts, or if the agent lives outside the jurisdiction, but within the Republic and the person to be served lives abroad and has no known residence or the person's whereabouts are unknown. In this case the agent is required to have a general or special power of attorney with sufficient authority to answer the complaint and defend the action being served, pursuant to the provisions of Article 52 [dealing with the need to appoint duly licensed attorneys]. The agent can only refuse to intervene if he/she proves that he/she did not accept or has renounced the power of attorney;

III. ...

IV. **Original service of process must be effected in the place designated by the party so requesting, and *must be precisely the home of the party to be served* with original process,** if an individual, and if a corporation, in its corporate domicile, its principal offices or principal commercial establishment, except when dealing with branches with an individual agent authorized to appear in the action, when dealing with business transacted by the branches, or in which the branches have intervened. The serving officer must verify that all of this information is contained [in the complaint], and may be specially authorized to serve process on the individual defendant or agent at their place of regular employment or wherever they may be found within the jurisdiction; but in this case, [service may be effected only to] the specific individual at issue, and the server must note specifically, during the process, the means used to identify the individual, the verification of authority of an agent [through a power of attorney] and set forth all relevant information;

[...]

(Emphasis supplied).

20. The Mexican Federal Courts of Appeal have ruled, in binding precedent, that in order for original service of process to be effective, the court official must verify that the location where the defendant is served is in fact the defendant's home (Precedent No. 162858):

ORIGINAL SERVICE OF PROCESS UPON INDIVIDUALS. IF THE COURT OFFICIAL SETS FORTH ONLY THAT THE ADDRESS OF THE DEFENDANT IS CORRECT BASED ON THE NAME OF THE STREETS, NUMBER, NEIGHBORHOOD AND CITY, HE FAILS TO SATISFY THE ESSENTIAL PROCEDURAL FORMALITIES, WHICH VIOLATES THE RULES THAT GOVERN IT. (LEGISLATION OF THE STATE OF TAMAULIPAS).

01456

> Articule 67, section III, of the Code of Civil Procedure for the State orders that original service of process on individuals must be effected at the address designated by the party so requesting, *which must coincide with the place where the defendant* lives; therefore, the official, when effecting [original service of process] must verify that these circumstances are all met and include [the steps taken to so verify] in the respective certification. Therefore, if the official does not set forth in the certification that the location where the official appeared to serve original process is the defendant's home and, instead, only states that he verified that the address was correct based on his observation of the correct street names, number, neighborhood and city, such certification fails to satisfy the essential procedural formalities, because that information does not provide certainty that the address is where the defendant lives. Accordingly, that irregularity is a violation of the rules that govern the procedures for said action.
>
> 9th Session; Circuit Courts of Appeal; Federal Judiciary Reporter and its Gazette; Volume XXXIII, February of 2011; P. 2044.

(Emphasis added).[1]

21. Thus, the laws of Tamaulipas specifically require that original service of process upon an individual be made directly upon the defendant and at the defendant's home. Otherwise, original service of process will be ineffective.

22. Article 97 of the CPCT also provides that when official court action is to take place outside of the Mexico, the court will follow the procedures set forth in the international treaties to which Mexico is a party. In this respect, Mexico is a party to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters and the Inter-American Convention on Letters Rogatory. Therefore, in order to effect valid service of original process on an individual residing outside of Mexico in an action filed in Tamaulipas, service must be effected directly upon the individual at their home following the procedures set forth in the Hague or Inter-American Conventions.

23. Dr. Carlos Gabuardi, proffered by Shelby Longoria as an expert in Mexican law, admits (at ¶ 16) that the CPCT requires that original service of process be effected at the defendant's home (or "the place where they live"). Dr. Gabuardi opines, however, that the

---

[1] A true and correct copy of the precedent in its original Spanish is attached as Exhibit "B."

01457

provisions of the CPCT are irrelevant based on a Mexican Supreme Court opinion finding that service of process may be effected on a defendant at (a) his home, (b) his place of business, or (c) wherever he may be found, without regard to any particular order. What Dr. Gabuardi fails to point out is that the Supreme Court opinion at issue does not deal with Tamaulipas procedure at all, but rather with the provisions of the Codes of Civil Procedure of the Mexican states of Jalisco, Puebla, Chiapas as well as the Federal District (Mexico City), whose rules for service of original process are markedly different from those of Tamaulipas. Jalisco, Puebla, Chiapas and the Federal District all provide that original service of process may be effected at a defendant's "domicile," which their respective civil codes define as including not only the home, but also the place where a defendant transacts business or where the defendant may be located. The non-binding Seventh Circuit precedent referenced by Dr. Gabuardi (at ¶ 18) focuses on the Code of Civil Procedure of Veracruz, which also provides (in Article 82) that original service of process must take place at the defendant's domicile. Tamaulipas, in stark contrast to these other Mexican jurisdictions, refers specifically to the place where the individual defendant has his or her home. Therefore, while the precedent referenced by Dr. Gabuardi (at ¶¶ 16-17) may be binding on all courts applying provisions similar to those in Jalisco, Puebla, Chiapas and the Federal District, it is inapposite in the case of Tamaulipas. Similarly, the non-binding precedent from the Seventh Circuit (at ¶ 18) is of no import as Veracruz's requirements for effecting original service of process track those of Jalisco, Puebla, Chiapas and the Federal District, but not their sister state of Tamaulipas.

III.     Jurisdiction of Tamaulipas Courts

24.     Pursuant to Article 172 of the CPCT, "[e]very complaint must be filed before a competent judge."[2]

---

[2]     Under Mexican law, "competence" is functionally synonymous with the United States' concept of jurisdiction (in Mexico, jurisdiction is generally used to refer to the geographic area where governmental actors have authority). Those terms are therefore used interchangeably herein.

-7-

01458

25.     Under Mexican law, "competence" – a functional synonym of the United States' concept of jurisdiction – is determined by statute. In Tamaulipas, the CPCT provides (in Article 20, Section III), that "the jurisdiction of the courts is governed by the provisions of this code."[3]

26.     Article 173 of the CPCT specifically provides that competence or jurisdiction will be determined by the amount, the subject matter, the appellate level and by the territory.[4]

27.     Notwithstanding Dr. Gabuardi's opinion (at ¶ 13) that Shelby Longoria "maintains sufficient contacts with ... Tamaulipas," personal or territorial jurisdiction in Mexico is not determined by "contacts" but rather by specifically defined express statutory provisions. Contacts with a specific jurisdiction, standing alone, are of no import with respect to whether a Mexican court has jurisdiction. Indeed, Dr. Gabuardi himself has recognized as much in the article he references at ¶ 11. In that article, Dr. Gabuardi states that, in Mexico, the bases for asserting jurisdiction are limited to those established by law. *See* Gabuardi, Carlos A. "Entre la Jurisdicción, la Competencia y el Forum Non Conveniens," *Boletin Mexicano de Derecho Comparado*, nueva serie, año XLI, núm. 121, enero-abril de 2008, at p. 89. Thus, Dr. Gabuardi explains, Mexican law on competence establishes detailed rules to determine what types of cases can be heard by a particular court. *Id.* In Dr. Gabuardi's own words, "competence sets forth the specific rules which must be strictly observed from an operational standpoint to assign controversies as between the different courts of a country." *Id.* (Translation is ours). According to Dr. Gabuardi's own analysis, "contacts" are not a basis for asserting jurisdiction in Mexico. *Id.* at n. 48 (pointing out that the only bases to assert jurisdiction are those expressly listed in the operative Codes of Civil Procedure, which do not include "contacts").

---

[3]     Notably, Article 2 of the CPCT provides that the rules of procedure are of public order and cannot be waived by stipulation of private parties.

[4]     Territorial jurisdiction or competence is akin to personal jurisdiction in the United States.

-8-

## IV. Tamaulipas Courts Do Not Have Original Jurisdiction Over Shelby Longoria, Adriana Longoria, or Sylvia Dorsey

28. The CPCT provides, in Article 195, Section IV, that the competent judge is the one located "in the domicile of the defendant, in actions involving movable property, or *in personam* or civil status actions, unless provided otherwise [in law]."[5]

29. Pursuant to Article 24 of the CCT, an individual's domicile is the place where he or she lives. If the individual's home address is unknown, but only then, the law will repute as a domicile the place where the individual principally conducts his or her business and, if this location is also unknown, then an individual's domicile is wherever he or she can be found. In other words, the Civil Code of Tamaulipas' reference to an individual's primary place of business or their actual physical location is intended to provide "alternative" domiciles only in those cases where an individual's actual place of residence is unknown.[6]

30. As explained in the foregoing sections, a plaintiff filing suit in Tamaulipas must identify the *home address* of the defendant in order to achieve valid original service of process.

31. According to Article 175 of the CPCT, "[n]o tribunal may refuse to entertain a case *unless it determines it lacks jurisdiction.* In such cases, it must set forth in the order the legal bases supporting its conclusion." (Emphasis supplied).

---

[5] As Dr. Gabuardi recognizes, the claims asserted by the Estate are *in personam* claims.

[6] In addition to referring to provisions that do not apply in Tamaulipas, the opinions cited by Dr. Gabuardi (in ¶¶ 16-18) are of no import to the question of "domicile" for purposes of asserting jurisdiction. Indeed, in the cases to which Dr. Gabuardi refers, the Mexican federal courts (including the Supreme Court) explained that their liberal construction of the term "domicile" was for purposes of service of process only, because the primary purpose of service of process is to put a defendant on notice of an action. The court opinions, however, made clear that the ruling on domicile for purposes of service of process is of no implication to substantive considerations associated with domicile, including the ability of the courts to exercise jurisdiction over a particular case. By way of analogy, consider that original process in a Texas action can be served on a Mexican individual domiciled in Mexico. The only implication of service is that the foreign citizen is on notice of the action. It does not mean the Texas court has jurisdiction over that individual.

01460

32. Thus, in Tamaulipas, trial courts must review the complaint when filed and make a *sua sponte* determination as to whether they have jurisdiction.

33. There is no dispute that Shelby Longoria lives in Texas. Indeed, his Amended Contest of 2010 Will (at ¶ 2) avers that "Shelby Longoria (Shelby) is an individual domiciled in Hidalgo County, Texas."

34. Therefore, a Tamaulipas court lacks statutory jurisdiction over a tort case against Shelby Longoria, a foreign defendant, and will almost certainly dismiss any action filed against him *sua sponte*.[7] The same conclusion follows with respect to Adriana Longoria and Sylvia Dorsey, as both of them live in Houston, Texas.

35. Moreover, a court may dismiss the complaint for lack of *subject matter jurisdiction.*

36. A Tamaulipas court would have to recognize this Court's jurisdiction over the Estate's counterclaim (particularly where the counterclaim would predate any Tamaulipas action).[8] Indeed, Article 189 of the CPCT provides that the court before which the principal cause of action is pending has exclusive subject matter jurisdiction over related counterclaims.

37. Pursuant to Article 177 of the CPCT, "[a] court that expressly recognizes the jurisdiction of another [court] cannot assert jurisdiction."

V.    **Tamaulipas Law Does Not Provide a Remedy for Breach of Fiduciary Duties**

38. Article 1388 of the CCT provides as follows:

> When an act causes damages and losses to a person, and the law imposes upon the perpetrator of that act or on someone else the obligation to repair those damages and losses, there is civil liability.

---

[7]    A Tamaulipas court may do so even if the plaintiff pleads that the defendant has waived a challenge to the court's territorial jurisdiction.

[8]    I understand Shelby Longoria does not challenge this Court's jurisdiction.

-10-

01461

39.     Mexican law generally, and Tamaulipas law specifically, do not impose or recognize a fiduciary duty[9] on the part of an adult child to manage business affairs of, or for the benefit of, a parent.[10]

40.     Mexican law also does not recognize informal fiduciary relationships or, specifically, private trusts,[11] so the August 5, 1983 letter signed by Eduardo Longoria, Jr. and Shelby Luis Longoria to Dorothy Kowalski de Longoria – whereby they agree to hold, maintain and manage certain assets for the Decedent's benefit – does not create a fiduciary duty. Rather, the letter creates only a "moral" obligation or duty, which is unenforceable under Tamaulipas law (CCT Articles 1028 and 1370).

41.     Even assuming, for the sake of argument only, that there were a basis to recover in tort for breach of fiduciary duty, any such claim is barred under Tamaulipas' one-year statute of limitations, pursuant to Article 1510, Section III of the CCT.

42.     Because more than a year has elapsed since the death of Dorothy Longoria, any claim sounding in tort under Tamaulipas law is barred as a matter of law.

---

[9]     Indeed, a cause of action for breach of fiduciary duty, regardless of its nature, would be impossible to plead and prove under Tamaulipas law, which requires plaintiffs to provide a detailed description of all facts and attach or list all the items of evidence that support a cause of action from the outset (Articles 247 to 249 of the CPCT). Amendments to pleadings are not allowed. Moreover, Article 330 of the CPCT precludes a party from inspecting an opponent's general accounting.

[10]     We note that the only duty flowing from children to their parents is a statutory obligation (under Articles 277 and 282 of the CCT) to provide support for food, clothing, housing and medical care, when necessary.

[11]     Mexican law only recognizes trusts created through federally-licensed financial institutions, subject to regulatory directive and oversight. The Mexican Supreme Court explained that United States-style trusts were "adopted partially by the Mexican [federal] legislature, according to our system, even though strictly speaking it structured an institution wholly different than the trust, and established it as an exclusive banking operation, due to the solvency of banks and the government's oversight over them." See Precedent No. 246296, TRUSTS, NATURE OF. 7th Session, Auxiliary Chamber, Supreme Court, Federal Judiciary Reporter, Volume 21, Seventh Section, p. 39.

01462

**VI.** **The Mexican Amparo Proceedings Do Not Imply a Wholesale Submission to the Jurisdiction of Mexican Courts**

43. The United States concepts of "minimum contacts," "general jurisdiction," or "specific jurisdiction" do not exist under Mexican law. A Mexican court's authority to hear a particular case is determined on a case-by-case basis, as defined by statute – i.e., the codes of civil procedure. Therefore, the fact that a party has invoked the jurisdiction of a Mexican court in a particular case does not mean that it will be subject to that same Mexican court's jurisdiction in any and every future action.

44. Thus, the pursuit of an Amparo action in Mexico is inconsequential to whether a Mexican court can assert jurisdiction over Amparo claimants (or anyone else, for that matter) in future civil actions. A Mexican's court's ability to exercise jurisdiction will have to be assessed after the filing of every complaint.

45. More importantly, the filing of an Amparo action in Mexico cannot be described (as Dr. Gabuardi does at pp. 6-8) as an acknowledgement of "the adequacy, reliability and better convenience of the Mexican judicial system" for the purposes of adjudicating the private party matters pending before this Court.

46. In order to understand why the filing of an Amparo action implies none of what Dr. Gabuardi suggests, we must explain the nature of the "Juicio de Amparo."

47. An Amparo action, which arises under Articles 103 and 107 of the Mexican Constitution, is a proceeding by which any private person (individual or corporate) can challenge the constitutionality of the actions of a *state or federal government actor* – regardless of whether that actor is a member of the executive, legislative or judiciary branch. In other words, the only possible defendants in Amparo actions are Mexican government actors in their official capacities.[12]

---

[12] Insofar as the Amparo actions referenced by Dr. Gabuardi, the only defendant is a Tamaulipas court.

-12-

01463

48. The Mexican Supreme Court has interpreted the constitutional guarantee of due process broadly to include the misapplication of any law, whether state or federal, within the scope of Amparo protection. Court rulings are included in the definition of official governmental acts, and therefore any court judgment (including judgments by state courts interpreting state laws) is reviewable by federal courts acting under their Amparo jurisdiction, because an erroneous application of a principle of federal or state law is deemed to be a violation of Constitutional due process.

49. When a private person is aggrieved by the adjudication of his/her/its rights by a Mexican court without due process of law, Amparo proceedings provide the only means to seek redress for that constitutional violation.

50. Amparo proceedings are far more circumscribed than "a federal proceeding by which the plaintiff seeks the protection of the federal justice system upon an argument that there has been infringement of the strict application of the Mexican Constitution, statutory law, due process of law, or other fundamental rights." (Gabuardi Affidavit at ¶ 26). Amparo proceedings provide the only remedy available to private party plaintiffs for constitutional violations on the part of the Mexican government defendants, including the Mexican courts. Amparo proceedings are not available to challenge actions on the part of private actors.

51. The Mexican federal judiciary is the only court system with jurisdiction to hear Amparo cases, and ultimately adjudicate the (Mexican) constitutionality of an official Mexican governmental act. The relief available through an Amparo proceeding cannot be pursued in any other court.[13]

---

13   Notably, in the context of an Amparo, the Mexican courts have made clear that they lack jurisdiction to in any way compel action by, much less invalidate the acts of, a foreign tribunal. *See* Precedent No. 166416, DECLINATION OF JURISDICTION BY DECLINATION. THE ORDER THAT DECLARES IT BY FINDING THAT A FOREIGN COURT HAS JURISDICTION PUTS AN END TO THE ACTION, AND THEREFORE MAY BE CHALLENGED IN DIRECT AMPARO. (LEGISLATION OF THE FEDERAL DISTRICT).

-13-

01464

52. Consequently, Dr. Gabuardi's opinion that the filing of an Amparo proceeding is an acknowledgement of "the adequacy, reliability and better convenience of the Mexican judicial system" is incorrect.

**RESERVATION OF RIGHT TO ISSUE SUPPLEMENTAL OPINIONS**

53. I understand this matter is in its early stages and additional facts may develop. I have been advised that the Estate may therefore require further opinions on Mexican law. Accordingly, I reserve the right to amend and/or supplement the opinions expressed herein, whether in writing or live testimony, as called upon to do so.

I declare under penalty of perjury, pursuant to the laws of the Commonwealth of Pennsylvania, that the foregoing statements are true and correct.

Executed in Philadelphia, Pennsylvania, this 30th day of September, 2013.

By: _____
Ilan Rosenberg
1900 Market Street
Philadelphia, PA 19103
(215) 665-4621

SWORN and SUBSCRIBED before me in Philadelphia, Pennsylvania on this 30th day of September, 2013.

Lorraine S. Costro
Notary Public
My commission expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
LORRAINE S. COSTRO, Notary Public
City of Philadelphia, Phila. County
My Commission Expires April 22, 2016

9th Session; 1st Chamber, Supreme Court, Federal Judiciary Reporter and its Gazette, Volume XXX, September 2009; P. 120.

-14-

01465

## ILAN ROSENBERG

1123 Coventry Avenue
Cheltenham, PA 19012
Phone: 215-635-2005  Fax: 215-701-2021
Email: janeandilan@comcast.net

## PROFESSIONAL EXPERIENCE

**Gordon & Rees**, Philadelphia, PA.                                      June 2013-Present
**Partner:**  Concentrating practice in complex insurance coverage and commercial litigation, and international commercial matters and dispute resolution with an emphasis on matters relating to Mexico and Latin America; outside legal advisor to the Mexican Ministry of Foreign Relations.

**Cozen O'Connor**, Philadelphia, PA.                                September 2002-June 2013
**Member:**  Concentrated practice in complex domestic and international insurance coverage, commercial and civil matters; Co-Chair of Latin American Subrogation Practice Group.

**Chevez, Ruiz, Zamarripa y Cia, S.C.**, Mexico City, Mexico.           September 1999-June 2001
**Associate:**  Concentrated practice in tax planning and tax and civil rights litigation.  Handled trial and appellate matters before Mexican state and federal courts, as well as the Mexican Federal Supreme Court.

**Mexican Federal Ministry of Finance**, Mexico City, Mexico.           January 1998-June 1999
**Supervisor of the Legal Consulting Department:**  Advised various branches of the Mexican government concerning public finance and tax law and developed federal tax rules and regulations.

## EDUCATION

**University of Pennsylvania Law School**, Philadelphia, PA.
Master of Comparative Law (LL.C.M.)                                 September 2009-May 2011
Master of Laws (LL.M.) (recipient of merit-based scholarship)            July 2001-May 2002

**Escuela Libre de Derecho**, Mexico City, Mexico.                       August 1993-July 1998
Bachelor of Laws (J.D. Equivalent)

## LEADERSHIP POSITIONS

**America-Israel Chamber of Commerce:** Advisory Board Member.
**HIAS and Council Migration Service of Philadelphia:** Board Vice President; Chair – Policy Committee.

## HONORS/AWARDS

Pennsylvania Super Lawyer – Rising Star 2007, 2008 and 2013.
Recipient of the National Law Journal Pro Bono Award in 2008.

## BAR ADMISSIONS

**Mexico (all jurisdictions)**
**Pennsylvania**
**United States District Courts:** Eastern and Middle Districts of Pennsylvania, Eastern District of Wisconsin, Northern District of Illinois.
**United States Courts of Appeals:** Third and Federal Circuits.
**United States Supreme Court**



EXHIBIT

A

## TEACHING/LECTURING EXPERIENCE

University of Pennsylvania Law School, Philadelphia, PA.                    October 2012-Present
Lecturer in Law: Comparative law course entitled Common Law Contracts for Civil Lawyers.

Escuela Libre de Derecho (Law School), Mexico City.                    September 1999-August 2000
Adjunct Professor: Tax Law and Administrative Procedure.

01467

| Tesis: XIX.1o. J/10 | Semanario Judicial de la Federación y su Gaceta | Novena Época | 162 858 |
|---|---|---|---|
| Tribunales Colegiados de Circuito | S.J.F. y su Gaceta | Pág. 2044 | Jurisprudencia (Civil) |

**Registro No.** 162 858

[J]; 9a. Época; T.C.C.; S.J.F. y su Gaceta; Tomo XXXIII, Febrero de 2011; Pág. 2044

**EMPLAZAMIENTO A PERSONAS FÍSICAS. SI EN LA RAZÓN DEL ACTUARIO SÓLO SEÑALA QUE EL DOMICILIO DEL DEMANDADO ES CORRECTO POR ADVERTIRLO DE LAS NOMENCLATURAS DE LAS CALLES, NÚMERO, COLONIA Y CIUDAD, ELLO NO COLMA LAS FORMALIDADES ESENCIALES DEL PROCEDIMIENTO, LO QUE CONSTITUYE UNA VIOLACIÓN A LAS REGLAS QUE LO RIGEN (LEGISLACIÓN DEL ESTADO DE TAMAULIPAS).**

El artículo 67, fracción III, del Código de Procedimientos Civiles para el Estado ordena que el emplazamiento a las personas físicas se realice en el domicilio señalado por la parte que lo pide, el cual debe corresponder con el lugar en donde habita el demandado; por tanto, el actuario, al realizarlo debe cerciorarse de que queden satisfechas esas circunstancias y asentarlo en el acta relativa. En esas condiciones, si en la razón del actuario no se señala que en el domicilio en el que se constituyó para practicar el emplazamiento habita el demandado y, en cambio, sólo refiere que se cercioró de que era correcto por así advertirlo de las nomenclaturas de las calles, número, colonia y ciudad correspondientes, con estas expresiones no se colman las formalidades esenciales del procedimiento, dado que esa información no brinda la seguridad



01468

de que ese domicilio sea el lugar donde habita el demandado. Consecuentemente, esa irregularidad constituye una violación a las reglas que rigen el procedimiento de dicha diligencia.

## PRIMER TRIBUNAL COLEGIADO DEL DÉCIMO NOVENO CIRCUITO.

Amparo en revisión 235/2008. **********. 15 de octubre de 2008. Unanimidad de votos. Ponente: Miguel Mendoza Montes. Secretaria: Piedad del Carmen Hernández Ávila. Amparo en revisión 37/2010. Guadalupe Luis de León Zamora. 25 de marzo de 2010. Unanimidad de votos. Ponente: Lucio Antonio Castillo González. Secretaria: Gina Estela Cecopieri Gómez. Amparo en revisión 127/2010. José Portilla Guerra. 29 de abril de 2010. Unanimidad de votos. Ponente: Héctor Gálvez Tánchez. Secretaria: Julia Soto Valdez. Amparo en revisión 192/2010. Pedro Hugo Salinas Bravo. 2 de julio de 2010. Unanimidad de votos. Ponente: Lucio Antonio Castillo González. Secretaria: Belén Alarcón Cortés. Amparo en revisión 281/2010. Juan Francisco Jiménez Chapa. 28 de octubre de 2010. Unanimidad de votos. Ponente: Lucio Antonio Castillo González. Secretario: Faustino Gutiérrez Pérez.

01469

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | |
| | § | HARRIS COUNTY, TEXAS |

## ORDER DENYING SHELBY LONGORIA'S MOTION TO DISMISS ADRIANA LONGORIA'S CLAIMS

Now before the Court is Shelby Longoria's Motion To Dismiss Adriana Longoria's Claims (the "Motion"). After conducting a hearing and considering the Motion, the response filed on behalf of Adriana Longoria, the evidence properly before the Court, the pleadings on file, and the arguments of counsel, the Court finds that the Motion should be, and it hereby is, DENIED.

SO ORDERED on this _____ day of _____ , 2015.

_____
PRESIDING JUDGE
PROBATE COURT NUMBER ONE
HARRIS COUNTY, TEXAS

01470

| IN THE ESTATE OF | § | IN PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

**ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY,
INDEPENDENT EXECUTOR OF THE ESTATE OF
DOROTHY LOUISE LONGORIA, DECEASED, TO
SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL**

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW James Thomas Dorsey in his capacity as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, as Counter-Plaintiff, and pleads the following counterclaims in response to Shelby Longoria's Third Amended Contest of 2010 Will, stating the following causes of action against Shelby Longoria, as Counter-Defendant.

**Discovery Level**

1.      Pursuant to TEX. R. CIV. P. 190, Counter-Plaintiff states that discovery in this case is intended to be conducted under Level 3 of that Rule.

**Overview**

2.      These counterclaims are brought by a citizen of Texas against another citizen of Texas. Counter-Plaintiff is the personal representative of an estate pending in this Court, and adjudication of these counterclaims is essential to administration of that estate. The

Decedent lived in Texas for the last 25 years of her life. These counterclaims are based entirely on Texas law. None of them is based on any law of the United Mexican States.

## The Parties

3.     Counter-Plaintiff James Thomas Dorsey is an individual who is bringing these counterclaims in his capacity as the duly appointed Independent Executor of the Estate of Dorothy Louise Longoria, Deceased.

4.     Counter-Defendant Shelby Longoria is an individual who resides in Hidalgo County, Texas. Counter-Defendant commenced this action and has appeared, through counsel, in this action, so this pleading may be served on him through his attorneys of record.

## Jurisdiction

5.     Pursuant to Sections 4A, 4B, and 4F of the Texas Probate Code, the Court has jurisdiction over the subject matter of this civil action. The Estate of Dorothy Louise Longoria is pending in this Court, and this Court is a statutory probate court. As explained more fully below, this action is brought by a personal representative on behalf of that estate and this action is related to that estate. In addition, the exercise of pendent or ancillary jurisdiction over this action is necessary to promote judicial efficiency and economy.

6.     The Court has *in personam* jurisdiction over Counter-Defendant Shelby Longoria by virtue of his filing of Shelby Longoria's Third Amended Contest of 2010 Will, in response to which these counterclaims are pleaded. In addition, general personal

01472

jurisdiction exists because the Counter-Defendant has had continuous and systematic contacts with the State of Texas, and specific personal jurisdiction exists because this action arises out of contacts by the Counter-Defendant with the State of Texas, as explained below.

## Venue

7.     Pursuant to Section 6A of the Texas Probate Code, the venue of this action is proper because the Estate of Dorothy Louise Longoria, Deceased, is pending in this Court and this action is related to that estate, as explained more fully below.

## Conditions Precedent

8.     All conditions precedent to Counter-Plaintiff's rights to plead and to prosecute these counterclaims, and to recover the relief requested herein, have occurred or been fulfilled.

## Facts Applicable to All Causes of Action[1]

9.     On July 3, 1942, Eduardo Longoria ("Eduardo") and Dorothy Louise Kowalski ("Dorothy") were married in the City of Laredo, in Webb County, Texas.

10.     When they were married, Dorothy was a citizen of the United States of America, and Eduardo was a citizen of the United Mexican States ("Mexico"), but he had

---

[1]  This petition does not recite every fact on which the Counter-Plaintiff's claims are based.  It is intended only to be "a short statement of the cause of action sufficient to give fair notice of the claim involved," as required by TEX. R. CIV. P. 47.

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 3

01473

been living in the United States and, after the wedding, the couple initially settled in McAllen, Texas.

11.     The marriage of Eduardo and Dorothy was subject to the laws of the State of Texas, including the law of community property.

12.     Eduardo and Dorothy had four children, all of whom are living. Their names are: Adriana Louise Longoria ("Adriana"), Eduardo Longoria, Jr., also known as Wayo Longoria ("Wayo"), Sylvia Rene Dorsey ("Sylvia"), and Shelby Longoria ("Shelby"). All of them reside in Texas.

13.     Eduardo and Dorothy amassed considerable wealth through a variety of business activities and investments.

14.     Over time, Shelby took control over the business and investments owned by Eduardo and Dorothy.

15.     Shelby managed property and accounts owned by Dorothy and represented to her that he was doing so for her benefit. Indeed, the account statements were not even sent to Dorothy, even though she was identified as the sole owner of the accounts. The accounts included, but are not limited to, the following accounts (collectively, "Dorothy's Accounts in Mexico"):

      a.     Banamex Account Number 7572369315;

      b.     Banamex Account Number 7518181565; and

01474

c. BanRegio Account Number 75-00454-001-8.

16. In addition, Shelby expressly agreed to hold in trust, for the benefit of Dorothy, property that Shelby obtained from Eduardo. In a letter to Dorothy dated August 5, 1983, for example, Shelby and Wayo promised Dorothy that "the assets that Daddy has willed to us, as long as you live, we will hold them as if they were yours" and "[w]e will make the fruits available to you for your direction as to their use." These promises were made by Shelby while he was residing in Texas, and they were set forth in a letter that was sent to Dorothy from an address in Texas. Shelby breached these promises to Dorothy by failing to account for the property that was given to Shelby by Eduardo, by concealing from Dorothy material facts about that property (including its nature, extent, value, and profitability), by failing to hold and maintain that property as if it belonged to Dorothy, by paying himself income generated by the property, by failing to disclose to Dorothy that he had done so, and by failing generally to make the fruit of that property available to her for her use.

17. Likewise, in a letter dated October 9, 2007, which Shelby sent to Dorothy at her residence in Houston, Texas, Shelby made specific promises with respect to a large sum of money that Eduardo wished for Dorothy to have upon his death. Admitting that he held such funds in trust for Dorothy, and in recognition that Dorothy intended to leave her estate to her daughters, Shelby promised that, within thirty days after Dorothy died, he would pay $100,000 to Sylvia and $100,000 to Adriana. Upon Dorothy's death, Shelby repudiated and

01475

breached this promise to Dorothy. While he did tender a check for $100,000 to Sylvia and a check for $100,000 to Adriana, he printed on the checks language that, if the checks were negotiated, would have resulted in a release of their rights in Dorothy's estate and rights against Shelby – self-serving conditions which Shelby had no right to impose. The fact that Shelby arbitrarily demanded such releases for his benefit, as conditions on his performance of an unconditional duty to pay $100,000 to Sylvia and $100,000 to Adriana, proves that (a) Shelby knew that Dorothy owned valuable claims against him, (b) Shelby knew that Dorothy intended to leave her entire estate to Sylvia and Adriana, and (c) Shelby knew that Sylvia and Adriana themselves had valuable claims against him – all of which he now dishonestly denies.

18.    Shelby owed a fiduciary duty to Dorothy (a) as an agent for Dorothy, (b) as a trustee of an express trust for the benefit of Dorothy, and, in addition or in the alternative, (c) pursuant to an informal fiduciary relationship with Dorothy.

19.    In contravention of his fiduciary duty to Dorothy under Texas law, Shelby failed to advise Dorothy fully and fairly regarding the nature and extent of her property and his actions with respect to her property and the property he was holding in trust, supposedly for her benefit.

20.    In fact, Shelby managed for his own benefit Dorothy's property, as well as property he was holding in trust supposedly for her benefit. He caused income from the

01476

property to be paid to him or to others for his benefit, and failed to disclose to Dorothy that he had done so.

21. Eduardo died on January 26, 2005, at the age of 91. (He was born on October 25, 1913.)

22. When Eduardo died, all of the property in his estate was community property of which one-half was owned by Dorothy under Texas law.

23. Eduardo died in Webb County, Texas, where he and Dorothy had lived for many years.

24. After the death of Eduardo, Shelby continued to manage Dorothy's property and continued to represent to her that he was managing her property for her benefit, but he intentionally concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property.

25. In fact, Shelby managed the property for his own benefit and engaged in self-dealing transactions that he failed to disclose to Dorothy.

26. Dorothy died in Harris County, Texas, on April 6, 2012, at the age of 92. (She was born on May 4, 1919.)

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 7

01477

27. By order dated October 9, 2012, this Court admitted to probate Dorothy's Last Will and Testament, dated January 21, 2010, and appointed James Thomas Dorsey Independent Executor of the Estate of Dorothy.

28. Letters Testamentary were issued to James Thomas Dorsey on the same day, and such Letters Testamentary are currently in full force and effect, so he is fully authorized to bring this action.

29. Whenever it is alleged herein that Shelby acted or communicated in any fashion, then such allegation should be taken to mean:

    a. That the Shelby himself took such action or made such communication; or, in the alternative,

    b. That a duly authorized agent of Shelby took such action or made such communication on behalf of Shelby and in the course and scope of the agency; or, in the alternative,

    c. That such action or communication was by one having apparent authority to do so on behalf of Shelby; or, in the alternative,

    d. That Shelby ratified and adopted such action or communication as his own and thereby became legally responsible for it.

01478

## First Cause of Action
## Demand for Accounting

30.    Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

31.    Pursuant to Section 489B of the Texas Probate Code, Section 113.151 of the Texas Trust Code, and the common law of the State of Texas, Counter-Plaintiff is entitled to, and hereby requests, that Shelby provide a full accounting of (1) all of his activities as an agent for Dorothy, (2) all transactions done or caused by him involving property owned, in whole or in part, by Dorothy, including but not limited to Dorothy's Accounts in Mexico, and (3) all transactions involving property held by him in trust for Dorothy.

32.    Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads, under Texas law, the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because

he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

33. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Section 113.151 of the Texas Trust Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

## Second Cause of Action
### Breaches of Fiduciary Duty

34. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

35. Under Texas law, Shelby breached his fiduciary duty to Dorothy by (a) failing to disclose to her, fully and fairly, all information that might affect her interests in property managed by him, including both her community property and property held by Shelby in trust for her; (b) failing to act with utmost good faith and fair dealing in the management of her property and property held in trust for her, and in his other activities affecting her interests; (c) failing to act with undivided loyalty to Dorothy in the management of her property and

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL                Page 10

01480

property held by him in trust for her, and in his other activities affecting her interests; and (d) engaging in self-dealing transactions that were detrimental to her and, in addition or in the alternative, improperly benefited him.

36. The breaches of fiduciary duty by Shelby proximately caused compensable harm to Dorothy and her estate. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law. The damages awarded should include all amounts of money which were withdrawn from Dorothy's Accounts in Mexico and which Shelby cannot show specifically to have been withdrawn for Dorothy's benefit or with her fully informed consent.

37. The breaches of fiduciary duty by Shelby constituted "fraud," "gross negligence," and "malice" as those terms are defined in Chapter 41 of the Texas Civil Practice and Remedies Code. Despite his fiduciary duty under Texas law to disclose to Dorothy all facts that might affect her interests, Shelby intentionally or, in the alternative, with reckless disregard for Dorothy's rights, concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for exemplary damages in an amount to be determined by the trier of fact in accordance with Texas law.

01481

38. Shelby derived profits by means of the breaches of his fiduciary duty to Dorothy. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment decreeing that Shelby disgorge all profits received by him or by his wife, his children, or any other persons designated by him, as a result of the breaches of his fiduciary duty to Dorothy.

39. Shelby acquired property by means of the breaches of his fiduciary duty to Dorothy. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment imposing a constructive trust on all property acquired by Shelby or by his wife, his children, or any other persons designated by him, by means of the breaches of his fiduciary duty to Dorothy.

40. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads, under Texas law, the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because

01482

he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

41. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Section 114.064 of the Texas Trust Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

### Third Cause of Action
### Breach of Promise To Hold Property for Dorothy's Benefit

42. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

43. Shelby promised Dorothy that he would hold in trust for Dorothy all of the assets that Eduardo gave to Shelby and Wayo and that he would make the income from such property available to her for her direction as to their use. These promises were made by Shelby while he was residing in Texas. Shelby breached these promises to Dorothy by failing to account for the property that was given to Shelby and Wayo by Eduardo, by concealing from Dorothy material facts about that property (including its nature, extent,

01483

value, and profitability), by failing to hold and maintain that property as if it belonged to Dorothy, by paying himself income generated by the property, by failing to disclose to Dorothy that he had done so, and by failing generally to make the fruit of that property available to her for her use.

44.    These breaches by Shelby proximately caused compensable harm to Dorothy and her estate. Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law.

45.    Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads under Texas law the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's

01484

interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

46. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

### Fourth Cause of Action
### Breach of Promise To Pay $100,000 to Adriana and $100,000 to Sylvia

47. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

48. Shelby promised Dorothy that, within thirty days of her death, he would pay $100,000 to Adriana and $100,000 to Sylvia. These promises were made by Shelby while he was residing in Texas, and they were directed to Dorothy at her residence in Houston, Texas. Shelby breached these promises to Dorothy by tendering to Adriana and Sylvia checks that they could not negotiate without waiving their rights in Dorothy's estate and their rights against Shelby – self-serving conditions which Shelby had no right to impose.

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 15

01485

49. Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for $200,000 in accordance with Texas law.

50. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads under Texas law the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

51. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and

01486

hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

## Fifth Cause of Action
### Declaration of Invalidity of Donation Agreement dated January 11, 2005

52. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

53. On January 8, 2015, Shelby produced for the first time a photocopy of a document dated January 11, 2005, written in Spanish, entitled "CONTRATO DE DONACIÓN" (the "Donation Agreement"). The Donation Agreement purports to be signed by Eduardo and Dorothy.

54. By order dated January 29, 2014, Shelby was ordered by this Court to produce documents such as the Donation Agreement no later than February 28, 2014. His production of the Donation Agreement on January 8, 2015, was over ten months late.

55. On the date of the Donation Agreement, Eduardo was dying and on hospice care. Fifteen days later, Eduardo died. The Executor believes, and now avers, that on January 11, 2005, Eduardo lacked the requisite mental capacity to make a legally enforceable contract.

56. The Donation Agreement states that it was signed in Reynosa, Tamaulipas. Eduardo was not in Reynosa on the date of the Donation Agreement.

01487

57. In the seven years that Dorothy lived after the date of the Donation Agreement, she never mentioned it to either of her daughters, both of whom lived near her in Houston, or to her son-in-law (the Executor), whom she saw frequently, or in her correspondence, which was extensive, or in her personal notes, where she wrote extensively about her financial situation. Indeed, during those seven years she made numerous statements, both written and oral, that are inconsistent with the existence of the Donation Agreement.

58. Based on the foregoing facts, and others, the Executor believes, and therefore avers, that the Donation Agreement is a forgery.

59. The Executor believes, and now avers, that the Donation Agreement is unenforceable for lack of consideration or, in the alternative, for failure of consideration.

60. There exists an actual controversy between the Executor and Shelby as to whether or not the Donation Agreement is a valid and enforceable contract.

61. Consequently, under Chapter 37 of the Texas Civil Practice and Remedies Code, the Executor hereby requests entry of a judgment declaring that the Donation Agreement is invalid and wholly unenforceable.

62. Pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code, the Executor requests an award of costs and reasonable and necessary attorney's fees as are equitable and just.

01488

## Prayer for Relief

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiff James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, prays that upon due notice and trial by jury, or upon hearing on motion for entry of default judgment or motion for summary judgment, the Court render judgment for Counter-Plaintiff and against Counter-Defendant Shelby Longoria, awarding the following relief under Texas law:

(1)  a decree commanding Counter-Defendant Shelby Longoria to render an accounting of all property that was owned, in whole or in part, by Dorothy Louise Longoria and that was within his possession, custody, or control, and all transactions affecting her property, and an accounting of all actions taken by him as her agent or trustee, specifically including a complete accounting of all monies withdrawn from Dorothy's Accounts in Mexico;

(2)  an award of actual damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law, but the maximum amount of actual damages currently sought by Counter-Plaintiff – while reserving his right under Texas law to amend this pleading to request a greater or lesser amount as more evidence is uncovered and the whole truth comes to light – is $43,500,000;

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 19

**01489**

(3)    an award of exemplary damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law, but the maximum amount of exemplary damages currently sought by Counter-Plaintiff – while reserving his right under Texas law to amend this pleading to request a greater or lesser amount as more evidence is uncovered and the whole truth comes to light – is $10,000,000;

(4)    an award of attorney fees (including litigation expenses) reasonably and necessarily incurred by Counter-Plaintiff in connection with each of his causes of actions under Texas law;

(5)    a decree commanding Counter-Defendant Shelby Longoria to disgorge all profits received by him, or by others for his benefit, as a result of a breach by him of his fiduciary duty to Dorothy Louise Longoria;

(6)    a decree imposing a constructive trust on all property acquired by Counter-Defendant Shelby Longoria, or by others for his benefit, by means of a breach of fiduciary duty owed to Dorothy Louise Longoria;

(7)    an award of prejudgment interest on all actual damages at the highest rate authorized by law to the date of judgment;

(8)    an award of all costs incurred by Counter-Plaintiff in the course of preparing and prosecuting this civil action;

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 20

01490

(9)    an award of postjudgment interest on all monetary relief at the highest rate authorized by law from the date of judgment until paid;

(10)    a judgment declaring that the Donation Agreement dated January 11, 2005, is invalid and wholly unenforceable;

(11)    all writs and processes necessary to collect the judgment; and

(12)    all other relief to which Counter-Plaintiff is entitled or which the Court may deem appropriate under the circumstances and the applicable law.

Any inconsistent allegations or prayers for relief are pleaded in the alternative, as expressly authorized by TEX. R. CIV. P. 47 and 48.

### Reservation of Rights To Amend and To Supplement This Pleading

Because Counter-Plaintiff presently does not know all of Counter-Defendant's acts and omissions that caused harm to Dorothy Louise Longoria or her estate, or all of the relevant circumstances surrounding such acts and omissions, Counter-Plaintiff anticipates that it may be necessary to plead additional causes of action after discovery is completed. Accordingly, Counter-Plaintiff hereby reserves the rights to amend and to supplement this pleading.

01491

# VERIFICATION

STATE OF TEXAS  §
  §
COUNTY OF DALLAS  §

BEFORE ME, the undersigned authority, on this day appeared in person James Austin Fisher and made the following statement under oath:

> My name is James Austin Fisher. I am one of the attorneys of record for James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, in Case Number 414270 in Probate Court Number One of Harris County, Texas, and I am authorized under Rule 14 of the Texas Rules of Civil Procedure to execute this verification on his behalf. I have read the averments set forth in paragraphs 53 through 60 above and I affirm that those averments are either within my personal knowledge or are supported by evidence of which I am aware, and are true and correct.

_____
James Austin Fisher

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, by James Austin Fisher on February 11, 2015.

_____
Notary Public in and for the State of Texas

Angelica M. Aza –Newsom
Printed Name of Notary Public

My Commission Expires: 1 - 9 - 2016

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 22

01492

DATED:   February 11, 2015.

Respectfully submitted,

*/s/ James Austin Fisher*

James Austin Fisher
   State Bar of Texas Number 07051650
   email address:  jfisher@fisherwelch.com
Shannon L.K. Welch
   State Bar of Texas Number 90001699
   email address:  swelch@fisherwelch.com
**FISHER & WELCH**
**A Professional Corporation**
Ross Tower, Suite 2800
500 North Akard Street
Dallas, Texas 75201
Telephone:  214.661.9400
Facsimile:  214.661.9404

T. Wesley Holmes
   State Bar of Texas Number 09908495
   email address:  wes@wesholmes.com
**THE HOLMES LAW FIRM**
10,000 North Central Expressway, Suite 400
Dallas, Texas 75231
Telephone:  214.890.9266

**ATTORNEYS FOR COUNTER-PLAINTIFF**
**JAMES THOMAS DORSEY,**
**INDEPENDENT EXECUTOR OF**
**THE ESTATE OF DOROTHY**
**LOUISE LONGORIA, DECEASED**

01493

# CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2015, a true and correct copy of this document was served on Shelby Longoria, through his attorneys of record named below, in the manner indicated and in compliance with Texas law.

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
3900 Essex Lane, Suite 220
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

/s/ *James Austin Fisher*
James Austin Fisher

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL                Page 24

01494

NO. 414,270

| IN THE ESTATE OF | § | IN THE PROBATE COURT |
|---|---|---|
| | § | |
| DOROTHY LOUISE LONGORIA, | § | NUMBER ONE (1) OF |
| | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

## DOCKET CONTROL ORDER

The following Docket Control Order shall apply to this case unless modified by the court. If no date is given below, the item is governed by the Texas Rules of Civil Procedure.

1. **N/A**    **JOINDER.** All parties must be added and served, whether by amendment or third party practice, by this date. THE PARTY CAUSING THE JOINDER SHALL PROVIDE A COPY OF THIS DOCKET CONTROL ORDER AT THE TIME OF SERVICE.

2.    **EXPERT WITNESSES DESIGNATION.** Expert witness designations are required and must be served by the following dates. The designation must include the information listed in Rule 194.2(f)(1) and (2). Failure to timely respond will be governed by Rule 19.6.

   (a)   **8/3/15**   Experts for parties seeking affirmative relief.
   (b)   **9/3/15**   All other experts.

3. **N/A**    **ALTERNATIVE DISPUTE RESOLUTION.** Mediation is hereby ORDERED and shall be completed by this date.

4. **10/2/15**    **DISCOVERY PERIOD ENDS.** All discovery must be conducted before the end of the discovery period. Parties seeking discovery must serve requests sufficiently far in advance of the end of the discovery period that the deadline for responding will be within the discovery period. Counsel may conduct discovery beyond this deadline by Rule 11 agreement. Incomplete discovery will not delay the trial.

5.    **DISPOSITIVE MOTIONS AND PLEAS.** Must be heard or set by submission as follows:

   (a)   **9/30/15**   Dispositive motions or pleas subject to an interlocutory appeal must be considered by this date.
   (b)   **9/30/15**   Summary judgment motions not subject to an interlocutory appeal must be considered by this date.
   (c)   **8/3/15**   Rule 166a(i) motions may not be considered before this date.

6. **11/16/15**    **CHALLENGES TO EXPERT TESTIMONY.** All motions to exclude testimony and evidentiary challenges to expert testimony must be filed by this date, unless extended by leave of court.

7. **8/3/15**    **PLEADINGS.** All amendments and supplements must be filed by this date. This order does not preclude prompt filing of pleadings directly responsive to any timely filed pleadings.

8. **1/25/16**    **WRITTEN STATEMENTS OF THE PARTIES CONTENTIONS** are to be filed with the Court and exchanged between the parties counsel by this date.

   **AGREED WRITTEN STIPULATIONS** are to be filed with the Court and exchanged between the parties counsel by this date.

   **CONTESTED ISSUES OF FACT** are to be filed with the Court and exchanged between parties counsel by this date.

   **PROPOSED JURY CHARGE QUESTIONS, INSTRUCTIONS AND DEFINITIONS** are to be filed with the Court and exchanged between parties counsel by this date.

01495

MOTIONS IN LIMINE must be filed with the Court by this date.

9.  1/27/16  PRETRIAL CONFERENCE. Parties shall be prepared to discuss all aspects of trial with the court on this date. TIME: 1:30 p.m. This matter may be DISMISSED FOR WANT OF PROSECUTION for failure to appear at Pretrial.

10. 2/1/16  TRIAL. If not assigned by the second Friday following this date, the case will be reset.

___ Days ___ Bench __x_ Jury ___ Panel

Signed: *March 18, 2015* Judge: _____

K H

PARTY: Shelby Longoria
Counsel Name: Kristen Schlemmer

Counsel Signature: _____
Firm: Susman Godfrey L.L.P.
Address: 1000 Louisiana Street, Suite 5100
         Houston, TX 77002
Telephone: ( ) 713-653-7885
Telecopier: ( ) 713-654-6666
Email: kschlemmer@susmangodfrey.com

PARTY: *Shelby Longoria.*
Co-Counsel Name: *Robert S. MAC Intyre JR*

Counsel Signature: _____
Firm: *MacIntyre McCulloch Stanfield Young*
Address: *2900 Weslayan*
         *Suite 150*
Telephone: (713) *547-5400*
Telecopier: (713) *572-2902*
Email: *MAC Intyre @ mMLawTexas.com*

PARTY: *Sylvia Dorsey, Adriana Longoria,*
*and James Thomas Dorsey as Indep.*
Counsel Name: *James A. Fisher* *Executor*

Counsel Signature: _____
Firm: *Fisher & Welch*
Address: *Ross Tower, Suite 2800*
         *500 N. Akard St., Dallas TX 75201*
Telephone: (214) *661-9400*
Telecopier: (214) *661-9404*
Email: *j.fisher@fisherwelch.com*

PARTY: _____
Counsel Name: _____

Counsel Signature: _____
Firm: _____
Address: _____
Telephone: ( ) _____
Telecopier: ( ) _____
Email: _____

01496

Petition for Writ of Mandamus Conditionally Granted, in Part, and Denied, in Part, and Opinion filed July 16, 2015.



In The

## Fourteenth Court of Appeals

### NO. 14-15-00261-CV

### IN RE SHELBY LONGORIA, Relator

ORIGINAL PROCEEDING
WRIT OF MANDAMUS
Probate Court No. 1
Harris County, Texas
Trial Court Cause No. 414270

## OPINION

On March 25, 2015, relator Shelby Longoria filed a petition for writ of mandamus in this court. *See* Tex. Gov't Code Ann. § 22.221 (West 2004); *see also* Tex. R. App. P. 52. In the petition, Shelby asks this court to compel the Honorable Loyd Wright, presiding judge of Probate Court No. 1 of Harris County, to set aside his February 18, 2015 order denying Shelby's motion to dismiss the claims of real

01497

party in interest, Adriana Longoria, based on a forum-selection clause. We conditionally grant the petition for writ of mandamus, in part, and deny it, in part.

## I. BACKGROUND

Eduardo Longoria, Sr., a Mexican citizen and businessman, was the father of Shelby Longoria, Adriana Longoria, Eduardo Longoria, Jr. ("Wayo"), and Sylvia Dorsey. In 2002, Eduardo transferred shares of his two Mexican holding companies, Vertice Empresarial, S.A. de C.V. and Inmuebles y Terrenos, S.A. de C.V. (the "Mexican companies"), to a trust administered by a Mexican bank. Banca Afirme Grupo Financiero. Eduardo designated Shelby as 60% beneficiary and Wayo 40% beneficiary of this trust, which the parties describe as the "Afirme Trust." At the same time, Eduardo executed a new will, naming Shelby as executor. Eduardo also signed a "Carta de Voluntad," or "Wish Letter," granting Sylvia and Adriana each $3,000,000 in cash to be distributed over time by the Afirme Trust. In December 2002, Eduardo and Adriana executed an "Acuerdo Privado," or "Private Agreement," providing that Adriana would receive $3,000,000 from the operating cash flow generated by the Mexican companies.

Eduardo died in 2005. Dorothy Longoria, Eduardo's wife and the mother of the children, died in 2012. On May 6, 2013, Tommy Dorsey, Sylvia's husband and executor of Dorothy's estate, sued Shelby for a demand for an accounting and breach of fiduciary duty to Dorothy, alleging that Shelby had diverted her community property interests to himself. Specifically, Tommy alleged, among other things, that (1) Shelby had induced Eduardo into signing the 2002 Afirme Trust, into which Eduardo conveyed all of his and Dorothy's shares in the Mexican companies and of which he made Shelby and Wayo the beneficiaries; and (2)

2

01498

Shelby had induced Eduardo into signing the 2002 will, leaving all of Eduardo's remaining property to Shelby and Wayo.

On June 18, 2013, Shelby filed a will contest, alleging that Sylvia and Adriana had exerted undue influence over Dorothy in connection with her will, which divided Dorothy's estate equally between Adriana and Sylvia and named Tommy executor, and that Dorothy lacked the capacity to execute the will. Shelby also sought the removal of Tommy as executor. On August 23, 2013, Shelby filed a third-party petition, alleging that Sylvia and Adriana were responsible in contribution for any damages found owing by Shelby to the estate.

Adriana answered the will contest on December 4, 2013, and filed counterclaims against Shelby on January 6, 2014. Adriana amended her counterclaims on December 11, 2014, February 5, 2015, and February 11, 2015. Adriana alleged that Shelby induced Eduardo into entering the Private Agreement and into believing that it would be a fair allocation of the estate. She also counterclaimed for tortious interference with inheritance rights, breach of fiduciary duty, tortious inference with the Private Agreement, breach of the obligation to perform the Private Agreement, and breach of the agreement to pay Adriana $100,000 upon Dorothy's death and sought a declaration that an agreement called the Donation Agreement is not an enforceable contract.[1]

On January 14, 2015, Shelby filed a motion to dismiss Adriana's counterclaims based on a forum-selection clause in the Private Agreement that provides for exclusive venue in the courts of Reynosa, Tamaulipas, Mexico.

---

[1] Adriana does not explain in her third amended petition what the Donation Agreement is or identify the parties to it.

3

01499

In response to the motion to dismiss, Adriana contended that (1) the forum-selection clause does not apply to her counterclaims; (2) the forum-selection clause is unreasonable and unjust in light of a pre-existing fiduciary relationship between Shelby and Adriana, where the agreement was made, where the parties resided, and the unacceptability of the Mexican forum; (3) the forum-selection clause is unenforceable because it was procured through fraud and overreaching by Shelby; and (4) Shelby waived his right to enforce the forum-selection clause by litigating Adriana's counterclaims in the trial court for a year without invoking the clause.

The trial court held a hearing on Shelby's motion to dismiss on February 12, 2015, and signed the order denying Shelby's motion on February 18, 2015.

## II. MANDAMUS STANDARD OF REVIEW

To be entitled to mandamus relief, a relator must demonstrate (1) the trial court clearly abused its discretion; and (2) the relator has no adequate remedy by appeal. *In re Reece*, 341 S.W.3d 360, 364 (Tex. 2011) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam). A trial court abuses its discretion when it fails to properly interpret or apply a forum-selection clause. *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 883 (Tex. 2010) (orig. proceeding) (per curiam). An appellate remedy is inadequate when a trial court improperly refuses to enforce a forum-selection clause because allowing the trial to go forward will vitiate and render illusory the

4

01500

subject matter of an appeal, i.e., trial in the proper forum. *Id.* Thus, mandamus relief is available to enforce an unambiguous forum-selection clause. *Id.*

## III. Scope of the Forum-Selection Clause

Shelby argues that most of Adriana's claims fall within the scope of the forum-selection clause in the Private Agreement.[2]

Forum-selection clauses are generally enforceable and presumptively valid. *In re Laibe Corp.*, 307 S.W.3d 314, 316 (Tex. 2010) (orig. proceeding) (per curiam); *In re Int'l Profit Assocs., Inc.*, 274 S.W.3d 672, 675 (Tex. 2009) (orig. proceeding) (per curiam). A trial court abuses its discretion in refusing to enforce a forum-selection clause unless the party opposing enforcement meets its heavy burden of showing that (1) enforcement would be unreasonable or unjust; (2) the

---

[2] Shelby contends that, as a non-signatory to the forum-selection clause, he can enforce the clause under estoppel principles. Even though Adriana has not argued that Shelby cannot enforce the forum-selection clause in the Private Agreement based on the fact that he is not a signatory to the Agreement we, nonetheless, address this issue.

Equitable estoppel theories allowing non-signatories to enforce arbitration agreements also apply to forum-selection clauses. *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.*, 234 S.W.3d 679, 693–94 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (citing *Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d, 605, 622–24 (Tex. App.—Houston [1st Dist.] 2005, no pet.)). "A person who has agreed to resolve disputes with one party in a particular forum may be required in some circumstances to resolve related disputes with other parties in the same forum." *Smith v. Kenda Capital, LLC*, 451 S.W.3d 453, 458 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Under the theory of direct benefits estoppel, a nonsignatory may enforce a forum-selection clause that contains other terms on which the signatory plaintiff must rely to prosecute its claims. *Id.*; *In re Cornerstone Healthcare Holding Grp., Inc.*, 348 S.W.3d 538, 544–45 (Tex. App.—Dallas 2011, orig. proceeding). Direct benefits estoppel applies when a signatory's claim against a nonsignatory references or presumes the existence of the written agreement containing the clause. *Smith*, 451 S.W.3d at 458. Adriana's claims against Shelby clearly reference or presume the existence the agreement containing the forum-selection clause, i.e., the Private Agreement. Therefore, Shelby may enforce the forum-selection clause in the Private Agreement to the extent that it encompasses Adriana's claims.

5

clause is invalid for reasons of fraud or overreaching; (3) enforcement would contravene a strong public policy of the forum where the suit was brought; or (4) the selected forum would be seriously inconvenient for trial. *Laibe Corp.*, 307 S.W.3d at 316; *In re ADM Inv. Servs., Inc.*, 304 S.W.3d 371, 375 (Tex. 2010) (orig. proceeding).

The court must first determine whether the claims fall within the scope of the forum-selection clause. *Deep Water Slender Wells, Ltd.*, 234 S.W.3d at 687–88. The court bases its determination on the language of the clause and the nature of the claims purportedly subject to the forum-selection clause. *Id.* at 688. If the claims fall within the scope, the court must determine whether to enforce the clause. *Id.*

In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). If a contract is worded so that it can be given a certain or definite meaning then it is unambiguous, and the court will construe it as a matter of law. *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012). If, after applying the pertinent rules of contract construction, the contract is subject to two or more reasonable interpretations, the contract is ambiguous. *Id.* The court must enforce an unambiguous contract as a matter of law without considering parol evidence. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam).

The Private Agreement between Eduardo and Sylvia provides the following, in relevant part:

6

01502

**First. Regarding "THE TRUST."** The parties recognize the validity and scope of the "TRUST", and in this regard they are in agreement with all its terms and conditions, and therefore declare that the agreement is the final and definitive will of the parties, and therefore, they comply with all terms and agree that the shares contributed to it are to be transferred to the designated beneficiaries.

**Second. Payment to ADRIANA LONGORIA KOWALSKI.** It is the will of her father that the amount of $3,000,000.00 (three million U.S. dollars) be delivered to his daughter ADRIANA LONGORIA KOWALSKI, from the operating cash flow generated by the companies represented by the shares contributed to the "TRUST", or by their subsidiaries, and therefore it is the obligation of EDUARDO AND SHELBY LUIS LONGORIA KOWALSKI in the terms mentioned below:

On the date this Agreement is signed, the balance to be delivered to ADRIANA LONGORIA KOWALSKI, in terms of the preceding paragraph, amounts to the sum USD $2,069,100.00 (two million sixty-nine thousand one hundred U.S. dollars), according the statement of account that is attached hereto.

By virtue of the foregoing, an annual amount of $150,000.00 (one hundred fifty thousand U.S. dollars) of principal and interest will be given to ADRIANA LONGORIA KOWALSKI, in monthly installments of $12,500 (twelve thousand five hundred U.S. dollars) until the complete payment of the balance referred to above. In addition, the balance payable shall earn a normal interest rate of 75% (seventy-five percent) of the "prime rate" published by the Wall Street Journal.

\*       \*       \*

**Third. Final and Definitive Will of the Parties.** The parties state that this Agreement is the final and definitive will of the parties; therefore, they are in agreement with all its terms, further stating that there is no mistake, fraud, bad faith, or any defect of will that might affect their understanding or decision regarding the content.

7

01503

The TRUST's obligation to deliver the mentioned quantities to ADRIANA LONGORIA KOWALSKI, in the terms set forth herein, shall continue in effect until full payment, acknowledging that, after payment of the amounts referred to in this Agreement, ADRIANA LONGORIA KOWALSKI shall be satisfied in relation to any present or future obligation charged to the "TRUST" assets or to those of Messrs. EDUARDO and SHELBY LUIS LONGORIA KOWALSKI.

**Fourth.  Jurisdiction and Mexican Law.**  This Agreement is established under the jurisdiction and laws of the United Mexican States.  Therefore, the parties exclusively submit to the laws of Mexico, thus they expressly waive the application of any law, regulation, provision or rule of any jurisdiction other than Mexico, which might correspond to them due to their residence, paternity, citizenship, domicile, kinship or commercial relationship.  Therefore, in the event of any interpretation, dispute, or any aspect related to this Trust, they expressly submit to the court of the city of Reynosa, Tamaulipas, Mexico.

Likewise, the issuance of any law, regulation or provisions in jurisdictions outside the Republic of Mexico, or any act performed outside the national territory by any party seeking to (i) impose restrictions on this Agreement or to impose the performance of acts different from the purposes for which it is authorized[;] (ii) impose taxes, duties or tax burdens other than those under Mexican Law; (iii) expropriate, limit, confiscate, seize, dispose of, freeze or otherwise affect the rights of the Agreement based on federal, state or municipal laws, outside the jurisdiction of the Republic of Mexico, shall not apply to this Agreement, in all cases the jurisdiction and laws of the Republic of the United Mexican States being applicable under the terms of the previous paragraph.

Having seen and read the foregoing, the parties sign it in the city of Reynosa, Tamaulipas, on DECEMBER 17th, 2002.

The Fourth Clause of the Private Agreement contains two paragraphs that address the choice of forum and choice of law provisions.  The first paragraph

8

provides the following, with respect to the forum selected by the parties: "in the event of any interpretation, dispute, or an aspect related to *this Trust*, they expressly submit to the courts of the city of Reynosa, Tamaulipas, Mexico."[3]

Adriana contends that the forum-selection clause does not apply to the Private Agreement because it specifically applies to the Afirme Trust. Eduardo created the Afirme Trust, into which he placed his and Dorothy's shares of the Mexican companies. The Third Clause of the Private Agreement expressly states that the source of the payments made to Adriana under the Agreement was the Afirme Trust. Adriana specifically alleged that (1) Shelby induced Eduardo into entering various transactions that would increase his own inheritance while decreasing the inheritances of Wayo, Sylvia, and Adriana; and (2) Shelby induced Eduardo into entering the Private Agreement and into believing that this would be a fair allocation of his estate. Adriana further asserted that Shelby did not make the required payments from the Afirme Trust, but from Eduardo's funds and then from Dorothy's funds after the death of Eduardo. Shelby ceased making any payments in October 2010.

In the First Clause of the Private Agreement, Adriana recognized the scope and validity of the Afirme Trust and that the Mexican companies held in the Trust would be the source of money to make the payments to her under the Private Agreement. Adriana acknowledged this in her response to the mandamus petition.

The Afirme Trust is the designated source of funds to pay Adriana under the Private Agreement. Without the Afirme Trust, there would be no causes of action against Shelby for interference with inheritance rights, tortious interference with

---

[3] Emphasis added.

9

the Private Agreement, breach of his contractual obligation to perform the Private Agreement, or breach of his fiduciary duty related to the purported trust relationship created by the Private Agreement.

Adriana contends that, even if the forum-selection clause applies to the Private Agreement, which she implicitly conceded would encompass her claims for tortious interference with the Private Agreement and breach of the contractual obligation to perform the Private Agreement, it still does not apply to her claim for tortious interference with inheritance rights. Adriana has focused on the forum-selection clause as applying to the Private Agreement. As explained above, the forum-selection clause is applicable to Adriana's claims because she would have no grounds for her allegations without the Afirme Trust.

Moreover, courts have consistently held the language *"any interpretation, dispute, or any aspect related to"* is broad. *See, e.g.*, *TGI Friday's Inc. v. Great Nw. Rests., Inc.*, 652 F. Supp. 2d 750, 759 (N.D. Tex. 2009) ("Forum selection clauses cover claims 'relating to' an agreement are broad in scope."); *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 701 (Tex. App.—Dallas 2010, no pet.) ("The phrase 'relates to,' in particular, is recognized as a very broad term.") (internal quotes and citations omitted); *see also Young v. Valt.X Holdings, Inc.*, 336 S.W.3d 258, 263 (Tex. App.—Austin 2010, pet. dism'd) (holding that each fraud, breach of fiduciary duty, and securities claim "arises under" or "relates to" the stock sale and, therefore, was encompassed by the forum-selection clause). Adriana, furthermore, cannot plead tort claims to avoid the application of the forum-selection clause if those causes of action relate to the Afirme Trust. *See My Café-CCC, Ltd. v. Lunchstop, Inc.*, 107 S.W.3d 860, 866 (Tex. App.—Dallas 2003, no

10

01506

pet.) ("Pleading alternative noncontractual theories of recovery will not alone avoid a forum selection clause if those alternative claims arise out of the contractual relations and implicate the contract's terms.").

Adriana does not address her claim for breach of the fiduciary duty that allegedly arose prior to the existence of the Private Agreement. We, nonetheless, address whether Adriana's pre-contractual tort claim is subject to the forum-selection clause. This court and other courts have held that fraud-in-the-inducement claims can be subject to a forum-selection clause because it is a dispute involving the parties' agreement. *See, e.g., Clark v. Power Mktg. Direct, Inc.*, 192 S.W.3d 796, 799–800 (Tex. App.—Houston [14th Dist.] 2006, no pet.); *My Café-CCC, Ltd.*, 107 S.W.3d at 867; *see also Accelerated Christian Educ. Inc. v. Oracle Corp.*, 925 S.W.2d 66, 73 (Tex. App—Dallas 1996, no writ), *overruled in part on other grounds by In re Tyco Elecs. Power Sys., Inc.*, No. 05-04-01808-CV, 2005 WL 237232, at *4 (Tex. App.—Dallas Feb. 2, 2005, orig. proceeding [mand. denied]) (mem. op.) (stating that pre-contractual claims for misrepresentations made before the execution of the contract are not excluded from the scope of the forum-selection clause merely because the conduct took place before the contract came into existence). This court, however, did not address whether a forum-selection clause necessarily encompasses all pre-contractual claims. *Clark*, 192 S.W.3d at 800.

As explained above, the forum-selection clause is very broad, encompassing "any interpretation, dispute, or any aspect related to this Trust." "When all the claims arise out of the parties' contractual relations and implicate the contract's terms, the forum selection clause will encompass all the causes of action relating to

11

01507

the agreement." *My Café-CCC, Ltd.*, 107 S.W.3d at 866. Adriana claims that Shelby had assumed a fiduciary duty to her by making payments to her from the Mexican companies ten years prior to the execution of the Private Agreement. Those payments then continued from the funds of the Afirme Trust. Adriana's pre-contractual claim for breach of fiduciary duty implicates the Afirme Trust and is subject to the forum-selection clause. There would be no breach of fiduciary duty without the trust.

Adriana further asserts that the forum-selection clause does not apply to her claim for breach of the promise between Shelby and Dorothy to pay her $100,000 upon Dorothy's death. Shelby concedes that Adriana's claim for the breach of the promise to pay her $100,000 upon Dorothy's death does not fall within the scope of the forum-selection clause.

As to her request for a declaratory judgment that the January 11, 2005 Donation Agreement is unenforceable, Adriana first pleaded her request the day before the hearing on Shelby's motion to dismiss. Adriana's petition does not explain what the Donation Agreement is, no copy of the agreement was attached to the petition, and there was no briefing on the applicability of the forum-selection clause to this claim. Shelby, however, contends in his mandamus petition that the agreement bears directly on the manner in which payments would be made under the Private Agreement. Shelby suggests the request for a declaratory judgment was not before the court and "[t]he trial court will be able to address the proper venue for this claim [regarding the Donation Agreement] upon receiving direction from this Court relating to the other claims." The trial court stated in its order that it considered the pleadings of the parties and did not carve out any claims that were

12

01508

not being addressed in its ruling on the motion to dismiss. We do not have enough information from the mandamus record to determine that the forum-selection clause encompasses Adriana's claim that Shelby breached the Donation Agreement.

In summary, we hold that the forum-selection clause applies to Adriana's claims for (1) tortious interference with inheritance rights; (2) breach of fiduciary duty; (3) tortious interference with the Private Agreement; and (4) breach of the contractual obligation to perform the Private Agreement. The forum-selection clause, however, does not apply to Adriana's claim that Shelby breached the agreement to pay Adriana $100,000 upon Dorothy's death and, based on this record, we cannot say that Adriana's claim that Shelby breached the Donation Agreement falls within the scope of the forum-selection clause.

## V. OBJECTIONS RAISED BY ADRIANA

### A. Adriana's Objections to the Mandamus Record

Adriana complains that Shelby cites, in his mandamus petition, materials that were not presented to the trial court in connection with the motion to dismiss, which, therefore, should not be considered in the mandamus proceeding. Adriana refers to most of the items contained in the mandamus record filed by Shelby, including pleadings filed by the parties, a motion to quash, the reporter's record of the hearing on a previously denied motion to dismiss for forum non conveniens, and filings related to the motion to dismiss for forum non conveniens. The trial court stated in the order that it considered, among other things, "the pleadings on file." Moreover, a relator must file a "certified or sworn copy of every document that is material to the relator's claim for relief and that was filed in any underlying

13

proceeding." Tex. R. App. P. 52.7(a)(1). There is nothing improper about the items Shelby included in the mandamus record, and we are not aware of any authority for penalizing a relator for erring on the side of over-inclusion in connection with a mandamus record. Therefore, we reject Adriana's contention that we cannot consider most of the items in the record in our review of the mandamus petition.

## B. Objections to Evidence Attached to the Motion to Dismiss

Adriana objected to Exhibits 3 and 3A, which were the October 15, 2002 "Banca Afirme Fideicomiso No. 194-2", the Afirme Trust, and a certified translation of the Afirme Trust, respectively. Johnny Carter, one of Shelby's attorneys, stated, in his affidavit submitted in support of Shelby's motion to dismiss, in relevant part:

> 5. Attached as Exhibit 3 is a true and correct copy of a document dated October 15, 2002 titled "Banca Afirme Fideicomiso No. 194-2."

> 6. Attached as Exhibit 3A is a true and correct copy of a certified translation of Banca Afirme Fideicomiso No. 194.2.

Adriana argued that Carter did not testify that Exhibit 3 was a true and correct copy of the original or that he had personal knowledge of the execution or terms of the original, and, because Exhibit 3A was a translation of Exhibit 3, Exhibit 3A could "have no better claim of authenticity than Exhibit 3." Adriana requested that the trial court strike and disregard Exhibits 3 and 3A.

Shelby asserts that Adriana waived her objections to Exhibits 3 and 3A because she did not obtain a ruling from the trial court. Shelby contends that Rule 166a standards for summary judgment proceedings govern the motion to dismiss

14

01510

for improper venue. *See* Tex. R. Civ. P. 166a. Courts look to cases on arbitration for guidance on forum-selection clauses. *See, e.g., Smith*, 451 S.W.3d at 457 ("Reference to cases addressing the applicability of arbitration clauses is appropriate when examining whether particular claims or parties fall within a forum selection clause's reach."); *In re Boehme*, 256 S.W.3d 878, 884 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding) ("In deciding whether a party has waived a forum-selection clause, the Supreme Court has repeatedly resorted to cases involving arbitration agreements.").

In the arbitration context, the trial court conducts a summary proceeding to determine the applicability of an arbitration clause based on the parties' affidavits, pleadings, discovery, and stipulations. *In re Estate of Guerrero*, No. 14-13-00580-CV, — S.W.3d —, 2015 WL 1884068, at *3 (Tex. App.—Houston [14th Dist.] Apr. 23, 2015, pet. filed) (en banc). The procedure is similar to a motion for summary judgment and is subject to the same evidentiary standards. *Id.*

Under the summary judgment standard, copies of documents must be authenticated to constitute competent summary judgment evidence. *Id.* at *6. A properly sworn affidavit stating that the attached documents are true and correct copies of the original authenticates the copies so they may be considered as summary judgment evidence. *Id.*

A defect in the form of authentication of documents, i.e., a defect in the affidavit attempting to authenticate the attached documents, is waived without an objection in, and a ruling from, the trial court. *Id.* at *9; *see also Hicks v. Humble Oil & Ref. Co.*, 970 S.W.2d 90, 93 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) ("Appellants objected to Exxon's exhibits as not being properly

15

authenticated but did not get a ruling of the trial court on any of their objections. By failing to secure rulings on their objections to Exxon's summary judgment proof, appellants have waived any complaint on this appeal as to their admissibility into evidence."). Here, Adriana objected to the form of the authentication and, therefore, was required to obtain a ruling on her objections.

Adriana asserts that the trial court implicitly sustained her objections by denying Shelby's motion to dismiss. Shelby responds that a ruling on the merits of a summary judgment motion is not an implicit ruling on evidentiary objections to summary judgment evidence and the prevailing party cannot avoid waiver of its evidentiary objections by arguing that it received a favorable ruling on the merits of the motion. *See Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P.*, 391 S.W.3d 596, 604 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (holding that the trial court's granting of a summary judgment is not an implicit ruling on the movant's objection to the nonmovant's summary-judgment evidence); *Duncan-Hubert v. Mitchell*, 310 S.W.3d 92, 100 (Tex. App.—Dallas 2010, pet. denied) (holding that, where movant objected to nonmovant's evidence, it could not be inferred that the trial court sustained movant's objections merely by granting summary judgment);

Even if the summary judgment procedure were not followed in the context of a motion to dismiss for a forum-selection clause, to preserve a complaint for appellate review, the record must show the complaint was made to the trial court by a timely request, objection, or motion that was sufficiently specific and the trial court (1) ruled on the request, objection, or motion either expressly or implicitly or (2) refused to rule on the request, objection, or motion, and the complaining party

16

01512

objected to the refusal. Tex. R. App. P. 33.1(a). There is nothing in the record to suggest that the trial court implicitly ruled on Adriana's objections to Shelby's exhibits submitted in support of his motion to dismiss. At the hearing, there was argument concerning the Afirme Trust, but Adriana did not object to the authentication of the Afirme Trust.

Adriana also objected to Exhibit 4 to the motion dismiss, which was the affidavit of Shelby's Mexican law expert, Dr. Carlos Gabuardi, and in particular paragraph 4, subparagraphs b, c, and d, and paragraphs 11–19 because they contained opinions of the meaning and legal effect of the ordinary terms of a contract, which are questions of law for the court, and the parol evidence rule prohibits the admission of extrinsic evidence that alters the terms of a written contract. Adriana further objected that the remainder of Gabuardi's affidavit was irrelevant, asked the trial court to sustain her objections, and strike and disregard Gabuardi's affidavit.

An objection to a defect in the substance of an affidavit may be raised for the first time on appeal. *Pipkin v. Kroger Tex., L.P.*, 383 S.W.3d 655, 670 (Tex. App.—Houston [14th Dist. 2012, pet. denied). The complained of portions of Gabuardi's affidavit are mostly his interpretations of the Private Agreement and the forum-selection clause, which are questions of law for the court. *See Akin v. Santa Clara Land Co., Ltd.*, 34 S.W.3d 334, 339 (Tex. App.—San Antonio 2000, pet. denied) ("Expert testimony regarding the legal interpretation of an unambiguous agreement encroaches upon the trial court's province to determine the correct legal interpretation."). No ruling on an objection was required to preserve error on those portions of Gabuardi's affidavit because they offered legal

17

conclusions. *See Ramirez v. Transcon. Ins. Co.*, 881 S.W.2d 818, 829 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (holding that "[a]n objection to an affidavit on the grounds that it states only a legal conclusion is one that relates to a defect of substance," which may be raised for the first time on appeal).

Even though Adriana did not waive her objections to Gabuardi's affidavit, we need not address her objections in light of the well-settled rules for contract construction. We have considered the interpretation of the forum-selection clause as a question of law, reviewing the trial court's interpretation de novo, without considering parol evidence. *See David J. Sacks, P.C.*, 266 S.W.3d at 450.

## VI. ADRIANA'S DEFENSES TO THE ENFORCEABILITY OF THE FORUM-SELECTION CLAUSE

### A.    Whether the Forum-Selection Clause is Unreasonable or Procured by Fraud

Adriana argues the forum-selection clause in the Private Agreement is unreasonable because it contravenes a pre-existing and overarching fiduciary relationship between Shelby and her and it was procured by fraud. Adriana claims a confidential relationship arose between Shelby and her, prior to the execution of the Private Agreement, because Shelby had assumed the obligation to make payments to her from the revenue of the Mexican companies he had been managing for a number of years. According to Adriana, because informal fiduciary relationships are not recognized in Mexico, the application of the forum-selection clause and the choice-of-law clause[4] would deprive her of rights, which

---

[4] The choice-of-law clause was not the subject of Shelby's motion to dismiss.

18

had vested prior to the Private Agreement's existence. Adriana claims that Shelby, in his role as a fiduciary, failed to make her aware of the Private Agreement's negating a potential cause of action. Also based on this claimed fiduciary relationship, Adriana asserts that she was fraudulently induced into executing the forum-selection clause.

No duty of disclosure arises without evidence of a confidential relationship. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674–75 (Tex. 1998). A failure to disclose information may constitute fraud where there is a duty to disclose. *Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001). "Fraudulent inducement to sign an agreement containing a dispute resolution agreement such as an arbitration clause or forum-selection clause will not bar enforcement of the clause unless the specific clause was the product of fraud or coercion." *Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 232 (Tex. 2008) (orig. proceeding) (per curiam). The fraud or overreaching in question must involve the negotiation of the forum-selection clause itself. *Young*, 336 S.W.3d at 266–67.

However, a party who signs a contract is presumed to know its contents and its legal effects. *Profits Assocs., Inc.*, 286 S.W.3d at 923; *Mo. Pac. R.R. Co. v. Lely Dev. Corp.*, 86 S.W.3d 787, 791 (Tex. App.—Austin 2002, pet. dism'd). A party cannot avoid a contract clause by simply failing to read it. *In re U.S. Home Corp.*, 236 S.W.3d 761, 764 (Tex. 2007) (orig. proceeding) (per curiam). Evidence that a party concealed a forum-selection clause combined with evidence proving that concealment was part of an intent to defraud a party may be sufficient to invalidate the clause." *Profits Assocs., Inc.*, 286 S.W.3d at 923.

19

01515

Adriana, in her affidavit in support of her response to Shelby's motion to dismiss, claimed that "Shelby discouraged me from reading the ACUERDO PRIVADO. He did not say to me that it contained a clause saying that I submitted to the courts of the city of Reynosa, Tamaulipas, Mexico in the event of any interpretation, dispute, or other aspect of the ACUERDO PRIVADO, or words to that effect, and I have had no such understanding, either when I signed it or since then." Adriana does not claim that Shelby prevented her from reading the forum-selection clause. An allegation that Shelby merely "discouraged" her from reading the Private Agreement before she signed it is not sufficient to establish fraud. *See id.* at 923–24 (rejecting relator's argument that forum-selection clause was procured by fraud or overreaching because relator was not shown the clause); *U.S. Home Corp.*, 236 S.W.3d at 764 (holding there was no evidence of fraud as relators conceded that no one prevented them from reading the back-side of a single sheet contract that contained the arbitration clause).

Moreover, Eduardo and Adriana agreed that the Private Agreement was the "final and definitive will of the parties" and there was "no mistake, fraud, bad faith or any defect of will that might affect their understanding or decision regarding the content." *See In re Emex Holdings, LLC*, No. 13-11-00145-CV, 2013 WL 1683614, at *8 (Tex. App.—Corpus Christi Apr. 18, 2013, orig. proceeding [mand. denied]) (mem. op. en banc) (noting that the parties stated in the agreement that there was no fraud, bad faith, injury, or any other cause of nullity established by law and holding that the real parties had not clearly shown that the forum-selection clause was the product of fraud or overreaching).

20

01516

Here, Adriana's claim that she trusted Shelby as fiduciary to tell her that the forum-selection clause would negate a potential cause of action for breach of fiduciary duty in Mexico, does not render a forum-selection clause unenforceable. *See id.* (holding parties, who did not read the forum-selection clause before signing the agreement because they had instructed the attorney to change the clause and trusted him to do so, were charged with knowledge of the forum-selection clause). Not being able to bring certain causes of action in the designated forum is not a reason to avoid enforcement of a forum-selection clause. *Lyon Fin. Servs., Inc.,* 257 S.W.3d at 234 (holding inability to assert a claim for usury under Pennsylvania law did not create a public policy reason to deny enforcement of the forum-selection clause).

Moreover, Adriana has not shown any evidence that Shelby knew that she would not be able to maintain claims for breach of fiduciary duty based on an informal confidential relationship under Mexican law. A claim based on the failure to disclose information necessarily presumes that the party with the duty to speak has knowledge of the facts. *Cf. Four Bros. Boat Works, Inc. v. Tesoro Petroleum Cos.,* 217 S.W.3d 653, 670 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (stating that the failure to disclose information does not constitute fraud unless there is a duty to disclose information). Shelby had no duty to disclose facts of which he was not aware. *See HTM Rests., Inc. v. Goldman Sachs & Co.,* 797 S.W.2d 326, 329 (Tex. App.—Houston [14th Dist.] 1990, writ denied) ("A party cannot be guilty of fraudulently or intentionally concealing facts of which he is not aware. Although silence can be a form of misrepresentation, the duty to speak does not arise until the silent party is aware of the facts.") (citations omitted).

21

01517

Adriana has not shown that Shelby had a duty to disclose to her the forum-selection and choice-of-law provisions in the Private Agreement and their consequences. Adriana further has not demonstrated that the forum-selection and choice-of-law provisions were procured by fraud or overreaching.

## B.    Whether Reynosa, Tamaulipas, Mexico is a Seriously Inconvenient Forum

Adriana further contends that the forum-selection clause is unenforceable as seriously inconvenient such that she will be denied her day in court because the specified forum—Reynosa, Tamaulipas, Mexico—is "one of the most dangerous places in the world." When inconvenience in litigating in the chosen forum is foreseeable at the time of contracting, the challenger must show that the trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court. *ADM Inv. Servs., Inc.*, 304 S.W.3d at 375. "By entering into an agreement with a forum-selection clause, the parties effectively represent to each other that the agreed forum is not so inconvenient that enforcing the clause will deprive either party of its day in court, whether for cost or other reasons." *Int'l Profit Assocs., Inc.*, 274 S.W.3d at 680. Adriana agrees that financial difficulties and inconvenience to the witnesses are not sufficient to avoid application of the forum-selection clause, but asserts that the dangerous conditions in Reynosa render the forum seriously inconvenient. *See Lyon Fin. Servs., Inc.*, 257 S.W.3d at 254; *In re Zotec Partners, LLC*, 353 S.W.3d 533, 537 (Tex. App.—San Antonio 2011, orig. proceeding).

Relying on forum-non-conveniens cases, Shelby contends that purported dangerous conditions are not sufficient to avoid enforcement of a forum-selection

22

01518

clause in the absence of evidence that such conditions have an adverse impact on the operation of the judiciary.[5] Shelby presented uncontroverted evidence that Adriana, Sylvia, and Tommy have hired attorneys and filed claims against him in Tamaulipas, Adriana's Mexican law expert has handled litigation in Tamaulipas, and Reynosa has a fully functioning court system. Adriana responds that forum non conveniens cases are not applicable in the forum-selection clause analysis. We disagree. There is no reason not to consider forum non conveniens cases, which have addressed whether political unrest or other conditions render the alternative forum inadequate.

---

[5] *See, e.g., Paolicelli v. Ford Motor Co.*, 289 Fed. App'x 387, 391 (11th Cir. 2008) ("absent evidence the political unrest has affected the Columbian judicial system or would affect litigation of this case, this fact is not sufficient to outweigh the other factors that weigh in favor of dismissal"); *Rustal Trading US, Inc. v. Makki*, 17 Fed. App'x 331, 337 (6th Cir. 2001) (holding political unrest in a foreign jurisdiction did not render the forum inadequate absent some showing that the unrest had had an adverse effect on the judicial system there); *Transunion Corp v. PepsiCo, Inc.*, 811 F.2d 127, 129 (2d Cir. 1987) (holding there had been no showing that political unrest in the Philippines had an adverse impact on the judicial system); *Miralda v. Tidewater, Inc.*, Civ. A. No. 11-1170, 2012 WL 3637845, at *4 (E.D. La. Aug. 23, 2012) (observing that several federal appellate courts had uniformly concluded that political unrest of the alternative forum had not per se rendered the forum inadequate in the forum non conveniens context absent some showing that this unrest negatively affected the judicial system of the country or the litigation at issue); *Morales v. Ford Motor Co.*, 313 F. Supp. 2d 672, 682 (S.D. Tex. 2004) (rejecting contention that political situation in Venezuela would make trial in U.S. more convenient because of "paucity of evidence and information submitted to the court" on the issue); *In re Bridgestone/Firestone, Inc., Tires Prods. Liability Litig.*, 190 F. Supp. 2d 1125, 1143–44 (S.D. Ind. 2002) (considering physical threats to litigants and witnesses arising from then current volatile political situation in Columbia—"of particular interest [was] the fact that, in the recent past, judicial officers have been the targets of guerilla violation"—to be a factor weighing in favor of retaining jurisdiction); *In re BPZ Res., Inc.*, 359 S.W.3d 866, 879 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding [mand. denied]) (holding that political unrest alone, was insufficient to establish that Peru was an inconvenient forum)

23

01519

Under these circumstances, Adriana has not shown that litigating in Reynosa is so gravely difficult and inconvenient that she will for all practical purposes be deprived of her day in court.

## C. Waiver of the Right to Enforce the Forum-Selection Clause

Adriana asserts that Shelby has waived his right to enforce the forum-selection clause. Adriana pleaded four of her six counterclaims on January 9, 2014, and added two claims in her amended pleadings on December 11, 2014, February 5, 2015, and February 11, 2015. Shelby litigated those four original causes of action for a year, including pleading affirmative defenses based on Texas law, before seeking dismissal of Adriana's claims pursuant to the forum-selection clause.

A party may waive the right to enforce a forum-selection clause. *Boehme*, 256 S.W.3d at 884. In determining waiver of a forum-selection clause, the court may look to arbitration cases for guidance. *Id.* The test for waiver of an arbitration clause is whether (1) the party seeking arbitration has "substantially invoked the judicial process," and (2) the party resisting arbitration suffered actual prejudice as a result. *Id.*

Waiver is primarily a function of intent and requires either the intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 393–94 (Tex. 2014). Whether a party has substantially invoked the judicial process depends on the totality of the circumstances. *Richmont Holdings, Inc. v. Superior Recharge Sys., L.L.C.*, 445 S.W.3d 573, 575 (Tex. 2015) (per curiam).

24

01520

Adriana contends that Shelby substantially invoked the judicial process by deposing her and serving her with written discovery requests and by having his own deposition taken and responding to Adriana's discovery requests. These limited actions do not establish that Shelby substantially invoked the judicial process such that he waived his right to enforce the forum-selection clause. *See In re Vesta Ins. Grp., Inc.*, 192 S.W.3d 759, 763–64 (Tex. 2006) (orig. proceeding) (per curiam) (holding the relators did not substantially invoke the judicial process by serving requests for disclosure, noticing four depositions, and sending a request for production); *In re AIU Ins. Co.*, 148 S.W.3d 109, 121 (Tex. 2004) (orig. proceeding) (holding the relator did not waive enforcement of the forum-selection clause by filing answer, requesting a jury, and paying the jury fee; *Boehme*, 256 S.W.3d at 885 (holding that deposing three witnesses, producing two witnesses for deposition, exchanging documents, and participating in a temporary injunction hearing did not constitute waiver of forum-selection clause).

Adriana also asserts that she has been prejudiced by Shelby's delay in seeking to enforce the forum-selection clause. Mere delay in moving to enforce the forum-selection clause does not constitute waiver. *Cf. Richmont Holdings, Inc.*, 455 S.W.3d at 576 (holding that moving to compel arbitration nineteen months after lawsuit was filed was not waiver of right to arbitrate); *Vesta Ins. Grp., Inc.*, 192 S.W.3d at 763–64 (holding that moving to compel arbitration two years after lawsuit was filed was not waiver of right to arbitrate).

Adriana contends that Shelby gained an advantage in this litigation by questioning her at her deposition about the Private Agreement and payments made pursuant to it. Shelby responds that he had been seeking to take Adriana's

25

01521

deposition since June 2013, several months prior to Adriana filing her counterclaims. Shelby's counsel questioned Adriana about the Private Agreement because Adriana had initiated changes to Dorothy's will due to her dissatisfaction with the payments she received pursuant to the Private Agreement. Adriana cannot show prejudice from any discovery requests to which she responded as she chose to litigate in a forum not agreed to by the parties. *See In re Automated Collection Techs., Inc.*, 156 S.W.3d 557, 560 (Tex. 2004) (orig. proceeding) (per curiam) (holding that real party in interest could not show prejudice from any duplication of time or efforts in litigating case where it had initiated proceedings in a forum other that the one to which it had contractually agreed).

Adriana further argues that she suffered prejudice by Shelby's delay in invoking the forum-selection clause because the one-year statute of limitations in Mexico will limit her recovery of damages. Shelby points out that, because the last payment Adriana received under the Private Agreement was in October 2010, the delay from January 2014 to January 2015 is immaterial for limitations purposes in Mexico. Moreover, Adriana is complaining of the choice-of-law provision in the Private Agreement, which is not the subject matter of the trial court's order or this original proceeding. Adriana has not shown that she has been prejudiced by Shelby's delay in seeking to enforce the forum-selection clause. Therefore, Adriana has not established that Shelby waived his right to enforce the forum-selection clause.

## VII. CONCLUSION

We hold that Adriana's claims for tortious interference with inheritance rights, breach of fiduciary duty, tortious interference with the Private Agreement,

26

01522

and breach of the contractual obligation to perform the Private Agreement fall within the scope of the forum-selection clause, but Adriana's claims for breach of the agreement to pay her $100,000 upon Dorothy's death and breach of the Donation Agreement do not. We further hold that Adriana has not established that the forum-selection clause was procured as a result of overreaching or fraud, that Reynosa, Taumalipas is a seriously inconvenient forum, or that Shelby waived his right to enforce the clause.

Thus, the trial court abused its discretion by denying Shelby's motion to dismiss based on the forum-selection clause contained in the Private Agreement as to Adriana's claims for tortious interference with inheritance rights, breach of fiduciary duty, tortious interference with the Private Agreement, and breach of the contractual obligation to perform the Private Agreement, and Shelby does not have an adequate remedy by appeal. The trial court did not abuse its discretion by denying Shelby's motion to dismiss as to Adriana's claims for breach of the agreement to pay her $100,000 upon Dorothy's death and breach of the Donation Agreement.

Accordingly, we conditionally grant the petition for writ of mandamus, in part, and direct the trial court to vacate its February 18, 2015 order to the extent that it denies Shelby's motion to dismiss as to Adriana's claims for tortious interference with inheritance rights, breach of fiduciary duty, tortious interference with the Private Agreement, and breach of the contractual obligation to perform the Private Agreement, and dismiss those claims. We deny the remainder of the petition as to Adriana's claims for breach of the agreement to pay her $100,000

27

01523

upon Dorothy's death and breach of the Donation Agreement. The writ will issue only if the trial court fails to act in accordance with this opinion.

/s/    Tracy Christopher
        Justice

Panel consists of Justices Christopher, Donovan, and Brown.

28

01524

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

---

## FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL

---

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW James Thomas Dorsey in his capacity as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, as Counter-Plaintiff, and pleads the following counterclaims in response to Shelby Longoria's Third Amended Contest of 2010 Will (or any pleading subsequently filed by Shelby Longoria), stating the following causes of action against Shelby Longoria, as Counter-Defendant.

### Discovery Level

1. Pursuant to TEX. R. CIV. P. 190, Counter-Plaintiff states that discovery in this case is intended to be conducted under Level 3 of that Rule.

### Overview

2. These counterclaims are brought by a citizen of Texas against another citizen of Texas. Counter-Plaintiff is the personal representative of an estate pending

01525

in this Court, and adjudication of these counterclaims is essential to administration of that estate. The Decedent lived in Texas for the last 25 years of her life. These counterclaims are based entirely on Texas law. None of them is based on any law of the United Mexican States.

## The Parties

3. Counter-Plaintiff James Thomas Dorsey is an individual who is bringing these counterclaims in his capacity as the duly appointed Independent Executor of the Estate of Dorothy Louise Longoria, Deceased.

4. Counter-Defendant Shelby Longoria is an individual who resides in Hidalgo County, Texas. Counter-Defendant commenced this action and has appeared, through counsel, in this action, so this pleading may be served on him through his attorneys of record.

## Jurisdiction

5. Pursuant to Sections Sections 32.001, 32.002, and 32.005 of the Texas Estates Code, the Court has jurisdiction over the subject matter of this civil action. The Estate of Dorothy Louise Longoria is pending in this Court, and this Court is a statutory probate court. As explained more fully below, this action is brought by a personal representative on behalf of that estate and this action is related to that estate.

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 2

In addition, the exercise of pendent or ancillary jurisdiction over this action is necessary to promote judicial efficiency and economy.

6.     The Court has *in personam* jurisdiction over Counter-Defendant Shelby Longoria by virtue of his filing of Shelby Longoria's Third Amended Contest of 2010 Will, in response to which these counterclaims are pleaded. In addition, general personal jurisdiction exists because the Counter-Defendant has had continuous and systematic contacts with the State of Texas, and specific personal jurisdiction exists because this action arises out of contacts by the Counter-Defendant with the State of Texas, as explained below.

## Venue

7.     Pursuant to Sections 33.001 and 33.002 of the Texas Estates Code, the venue of this action is proper because the Estate of Dorothy Louise Longoria, Deceased, is pending in this Court and this action is related to that estate, as explained more fully below.

## Conditions Precedent

8.     All conditions precedent to Counter-Plaintiff's rights to plead and to prosecute these counterclaims, and to recover the relief requested herein, have occurred or been fulfilled.

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 3

01527

## Facts Applicable to All Causes of Action[1]

9.     On July 3, 1942, Eduardo Longoria ("Eduardo") and Dorothy Louise Kowalski ("Dorothy") were married in the City of Laredo, in Webb County, Texas.

10.     When they were married, Dorothy was a citizen of the United States of America, and Eduardo was a citizen of the United Mexican States ("Mexico"), but he had been living in the United States and, after the wedding, the couple initially settled in McAllen, Texas.

11.     The marriage of Eduardo and Dorothy was subject to the laws of the State of Texas, including the law of community property.

12.     Eduardo and Dorothy had four children, all of whom are living. Their names are:  Adriana Louise Longoria ("Adriana"), Eduardo Longoria, Jr., also known as Wayo Longoria ("Wayo"), Sylvia Rene Dorsey ("Sylvia"), and Shelby Longoria ("Shelby"). All of them reside in Texas.

13.     Eduardo and Dorothy amassed considerable wealth through a variety of business activities and investments.

---

[1]  This petition does not recite every fact on which the Counter-Plaintiff's claims are based. It is intended only to be "a short statement of the cause of action sufficient to give fair notice of the claim involved," as required by TEX. R. CIV. P. 47.

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 4

01528

14. Over time, Shelby took control over the business and investments owned by Eduardo and Dorothy.

15. Shelby managed property and accounts owned by Dorothy and represented to her that he was doing so for her benefit. Indeed, the account statements were not even sent to Dorothy, even though she was identified as the sole owner of the accounts. The accounts included, but are not limited to, the following accounts (collectively, "Dorothy's Accounts in Mexico"):

    a.    Banamex Account Number 7572369315;

    b.    Banamex Account Number 7518181565; and

    c.    BanRegio Account Number 75-00454-001-8.

16. In addition, Shelby expressly agreed to hold in trust, for the benefit of Dorothy, property that Shelby obtained from Eduardo. In a letter to Dorothy dated August 5, 1983, for example, Shelby and Wayo promised Dorothy that "the assets that Daddy has willed to us, as long as you live, we will hold them as if they were yours" and "[w]e will make the fruits available to you for your direction as to their use." These promises were made by Shelby while he was residing in Texas, and they were set forth in a letter that was sent to Dorothy from an address in Texas. Shelby breached these promises to Dorothy by failing to account for the property that was

01529

given to Shelby by Eduardo, by concealing from Dorothy material facts about that property (including its nature, extent, value, and profitability), by failing to hold and maintain that property as if it belonged to Dorothy, by paying himself income generated by the property, by failing to disclose to Dorothy that he had done so, and by failing generally to make the fruit of that property available to her for her use.

17. Likewise, in a letter dated October 9, 2007, which Shelby sent to Dorothy at her residence in Houston, Texas, Shelby made specific promises with respect to a large sum of money that Eduardo wished for Dorothy to have upon his death. Admitting that he held such funds in trust for Dorothy, and in recognition that Dorothy intended to leave her estate to her daughters, Shelby promised that, within thirty days after Dorothy died, he would pay $100,000 to Sylvia and $100,000 to Adriana. Upon Dorothy's death, Shelby repudiated and breached this promise to Dorothy. While he did tender a check for $100,000 to Sylvia and a check for $100,000 to Adriana, he printed on the checks language that, if the checks were negotiated, would have resulted in a release of their rights in Dorothy's estate and rights against Shelby – self-serving conditions which Shelby had no right to impose. The fact that Shelby arbitrarily demanded such releases for his benefit, as conditions on his performance of an unconditional duty to pay $100,000 to Sylvia and $100,000

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 6

01530

to Adriana, proves that (a) Shelby knew that Dorothy owned valuable claims against him, (b) Shelby knew that Dorothy intended to leave her entire estate to Sylvia and Adriana, and (c) Shelby knew that Sylvia and Adriana themselves had valuable claims against him – all of which he now dishonestly denies.

18. Shelby owed a fiduciary duty to Dorothy (a) as an agent for Dorothy, (b) as a trustee of an express trust for the benefit of Dorothy, and, in addition or in the alternative, (c) pursuant to an informal fiduciary relationship with Dorothy.

19. In contravention of his fiduciary duty to Dorothy under Texas law, Shelby failed to advise Dorothy fully and fairly regarding the nature and extent of her property and his actions with respect to her property and the property he was holding in trust, supposedly for her benefit.

20. In fact, Shelby managed for his own benefit Dorothy's property, as well as property he was holding in trust supposedly for her benefit. He caused income from the property to be paid to him or to others for his benefit, and failed to disclose to Dorothy that he had done so.

21. Eduardo died on January 26, 2005, at the age of 91. (He was born on October 25, 1913.)

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 7

01531

22. When Eduardo died, all of the property in his estate was community property of which one-half was owned by Dorothy under Texas law.

23. Eduardo died in Webb County, Texas, where he and Dorothy had lived for many years.

24. After the death of Eduardo, Shelby continued to manage Dorothy's property and continued to represent to her that he was managing her property for her benefit, but he intentionally concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property.

25. In fact, Shelby managed the property for his own benefit and engaged in self-dealing transactions that he failed to disclose to Dorothy.

26. Dorothy died in Harris County, Texas, on April 6, 2012, at the age of 92. (She was born on May 4, 1919.)

27. By order dated October 9, 2012, this Court admitted to probate Dorothy's Last Will and Testament, dated January 21, 2010, and appointed James Thomas Dorsey Independent Executor of the Estate of Dorothy.

01532

28. Letters Testamentary were issued to James Thomas Dorsey on the same day, and such Letters Testamentary are currently in full force and effect, so he is fully authorized to bring this action.

29. Whenever it is alleged herein that Shelby acted or communicated in any fashion, then such allegation should be taken to mean:

a. That the Shelby himself took such action or made such communication; or, in the alternative,

b. That a duly authorized agent of Shelby took such action or made such communication on behalf of Shelby and in the course and scope of the agency; or, in the alternative,

c. That such action or communication was by one having apparent authority to do so on behalf of Shelby; or, in the alternative,

d. That Shelby ratified and adopted such action or communication as his own and thereby became legally responsible for it.

01533

## First Cause of Action
## Demand for Accounting

30. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

31. Pursuant to Section 489B of the Texas Probate Code, Section 113.151 of the Texas Trust Code, and the common law of the State of Texas, Counter-Plaintiff is entitled to, and hereby requests, that Shelby provide a full accounting of (1) all of his activities as an agent for Dorothy, (2) all transactions done or caused by him involving property owned, in whole or in part, by Dorothy, including but not limited to Dorothy's Accounts in Mexico, and (3) all transactions involving property held by him in trust for Dorothy.

32. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads, under Texas law, the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he

01534

had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

33. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Section 113.151 of the Texas Trust Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

## Second Cause of Action
## Breaches of Fiduciary Duty

34. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 11

01535

35. Under Texas law, Shelby breached his fiduciary duty to Dorothy by (a) failing to disclose to her, fully and fairly, all information that might affect her interests in property managed by him, including both her community property and property held by Shelby in trust for her; (b) failing to act with utmost good faith and fair dealing in the management of her property and property held in trust for her, and in his other activities affecting her interests; (c) failing to act with undivided loyalty to Dorothy in the management of her property and property held by him in trust for her, and in his other activities affecting her interests; and (d) engaging in self-dealing transactions that were detrimental to her and, in addition or in the alternative, improperly benefited him.

36. The breaches of fiduciary duty by Shelby proximately caused compensable harm to Dorothy and her estate. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law. The damages awarded should include all amounts of money which were withdrawn from Dorothy's Accounts in Mexico and which Shelby cannot show specifically to have been withdrawn for Dorothy's benefit or with her fully informed consent. In the alternative, the damages awarded should, at a minimum, include all amounts of

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 12

01536

money which were withdrawn from Dorothy's Accounts in Mexico and used to make payments to her daughters, Adriana and Sylvia, based on the alleged contract dated January 11, 2005, written in Spanish, entitled "CONTRATO DE DONACIÓN" (the "Donation Agreement"), which is a forgery and unenforceable for the reasons set forth in the Fifth Cause of Action herein.

37. The breaches of fiduciary duty by Shelby constituted "fraud," "gross negligence," and "malice" as those terms are defined in Chapter 41 of the Texas Civil Practice and Remedies Code. Despite his fiduciary duty under Texas law to disclose to Dorothy all facts that might affect her interests, Shelby intentionally or, in the alternative, with reckless disregard for Dorothy's rights, concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for exemplary damages in an amount to be determined by the trier of fact in accordance with Texas law.

38. Shelby derived profits by means of the breaches of his fiduciary duty to Dorothy. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment decreeing that Shelby disgorge all profits received by him or by his wife,

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 13

01537

his children, or any other persons designated by him, as a result of the breaches of his fiduciary duty to Dorothy.

39. Shelby acquired property by means of the breaches of his fiduciary duty to Dorothy. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment imposing a constructive trust on all property acquired by Shelby or by his wife, his children, or any other persons designated by him, by means of the breaches of his fiduciary duty to Dorothy.

40. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads, under Texas law, the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to

01538

Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

41. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Section 114.064 of the Texas Trust Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

## Third Cause of Action
## Breach of Promise To Hold Property for Dorothy's Benefit

42. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

43. Shelby promised Dorothy that he would hold in trust for Dorothy all of the assets that Eduardo gave to Shelby and Wayo and that he would make the income from such property available to her for her direction as to their use. These promises were made by Shelby while he was residing in Texas. Shelby breached these promises to Dorothy by failing to account for the property that was given to Shelby and Wayo by Eduardo, by concealing from Dorothy material facts about that property

01539

(including its nature, extent, value, and profitability), by failing to hold and maintain that property as if it belonged to Dorothy, by paying himself income generated by the property, by failing to disclose to Dorothy that he had done so, and by failing generally to make the fruit of that property available to her for her use.

44. These breaches by Shelby proximately caused compensable harm to Dorothy and her estate. Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law. The damages awarded should include all amounts of money which were withdrawn from Dorothy's Accounts in Mexico and which Shelby cannot show specifically to have been withdrawn for Dorothy's benefit or with her fully informed consent. In the alternative, the damages awarded should, at a minimum, include all amounts of money which were withdrawn from Dorothy's Accounts in Mexico and used to make payments to her daughters, Adriana and Sylvia, based on the alleged contract dated January 11, 2005, written in Spanish, entitled "CONTRATO DE DONACIÓN" (the "Donation Agreement"), which is a forgery and unenforceable for the reasons set forth in the Fifth Cause of Action herein.

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 16

01540

45. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads under Texas law the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

46. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

01541

## Fourth Cause of Action
## Breach of Promise To Pay $100,000 to Adriana and $100,000 to Sylvia

47. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

48. Shelby promised Dorothy that, within thirty days of her death, he would pay $100,000 to Adriana and $100,000 to Sylvia. These promises were made by Shelby while he was residing in Texas, and they were directed to Dorothy at her residence in Houston, Texas. Shelby breached these promises to Dorothy by tendering to Adriana and Sylvia checks that they could not negotiate without waiving their rights in Dorothy's estate and their rights against Shelby – self-serving conditions which Shelby had no right to impose.

49. Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for $200,000 in accordance with Texas law.

50. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 18

01542

Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads under Texas law the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

51. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

01543

## Fifth Cause of Action
## Declaration of Invalidity of Donation Agreement dated January 11, 2005

52. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

53. On January 8, 2015, Shelby produced for the first time a photocopy of a document dated January 11, 2005, written in Spanish, entitled "CONTRATO DE DONACIÓN" (the "Donation Agreement"). The Donation Agreement purports to be signed by Eduardo and Dorothy.

54. By order dated January 29, 2014, Shelby was ordered by this Court to produce documents such as the Donation Agreement no later than February 28, 2014. His production of the Donation Agreement on January 8, 2015, was over ten months late.

55. On the date of the Donation Agreement, Eduardo was dying and on hospice care. Fifteen days later, Eduardo died. The Executor believes, and now avers, that on January 11, 2005, Eduardo lacked the requisite mental capacity to make a legally enforceable contract.

01544

56. The Donation Agreement states that it was signed in Reynosa, Tamaulipas. Eduardo was not in Reynosa on the date of the Donation Agreement.

57. In the seven years that Dorothy lived after the date of the Donation Agreement, she never mentioned it to either of her daughters, both of whom lived near her in Houston, or to her son-in-law (the Executor), whom she saw frequently, or in her correspondence, which was extensive, or in her personal notes, where she wrote extensively about her financial situation. Indeed, during those seven years she made numerous statements, both written and oral, that are inconsistent with the existence of the Donation Agreement.

58. Based on the foregoing facts, and others, the Executor believes, and therefore avers, that the Donation Agreement is a forgery.

59. The Executor believes, and now avers, that the Donation Agreement is unenforceable for lack of consideration or, in the alternative, for failure of consideration.

60. There exists an actual controversy between the Executor and Shelby as to whether or not the Donation Agreement is a valid and enforceable contract.

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL        Page 21

01545

61. Consequently, under Chapter 37 of the Texas Civil Practice and Remedies Code, the Executor hereby requests entry of a judgment declaring that the Donation Agreement is invalid and wholly unenforceable.

62. Pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code, the Executor requests an award of costs and reasonable and necessary attorney's fees as are equitable and just.

### Prayer for Relief

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiff James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, prays that upon due notice and trial by jury, or upon hearing on motion for entry of default judgment or motion for summary judgment, the Court render judgment for Counter-Plaintiff and against Counter-Defendant Shelby Longoria, awarding the following relief under Texas law:

(1) a decree commanding Counter-Defendant Shelby Longoria to render an accounting of all property that was owned, in whole or in part, by Dorothy Louise Longoria and that was within his possession, custody, or control, and all transactions affecting her property, and an accounting of all actions taken by him as her agent or

01546

trustee, specifically including a complete accounting of all monies withdrawn from Dorothy's Accounts in Mexico;

(2)     an award of actual damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law, but the maximum amount of actual damages currently sought by Counter-Plaintiff – while reserving his right under Texas law to amend this pleading to request a greater or lesser amount as more evidence is uncovered and the whole truth comes to light – is $43,500,000;

(3)     an award of exemplary damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law, but the maximum amount of exemplary damages currently sought by Counter-Plaintiff – while reserving his right under Texas law to amend this pleading to request a greater or lesser amount as more evidence is uncovered and the whole truth comes to light – is $10,000,000;

(4)     an award of attorney fees (including litigation expenses) reasonably and necessarily incurred by Counter-Plaintiff in connection with each of his causes of actions under Texas law;

01547

(5)     a decree commanding Counter-Defendant Shelby Longoria to disgorge all profits received by him, or by others for his benefit, as a result of a breach by him of his fiduciary duty to Dorothy Louise Longoria;

(6)     a decree imposing a constructive trust on all property acquired by Counter-Defendant Shelby Longoria, or by others for his benefit, by means of a breach of fiduciary duty owed to Dorothy Louise Longoria;

(7)     an award of prejudgment interest on all actual damages at the highest rate authorized by law to the date of judgment;

(8)     an award of all costs incurred by Counter-Plaintiff in the course of preparing and prosecuting this civil action;

(9)     an award of postjudgment interest on all monetary relief at the highest rate authorized by law from the date of judgment until paid;

(10)     a judgment declaring that the Donation Agreement dated January 11, 2005, is invalid and wholly unenforceable;

(11)     all writs and processes necessary to collect the judgment; and

(12)     all other relief to which Counter-Plaintiff is entitled or which the Court may deem appropriate under the circumstances and the applicable law.

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 24

01548

Any inconsistent allegations or prayers for relief are pleaded in the alternative, as expressly authorized by TEX. R. CIV. P. 47 and 48.

**Reservation of Rights To Amend and To Supplement This Pleading**

Because Counter-Plaintiff presently does not know all of Counter-Defendant's acts and omissions that caused harm to Dorothy Louise Longoria or her estate, or all of the relevant circumstances surrounding such acts and omissions, Counter-Plaintiff anticipates that it may be necessary to plead additional causes of action after discovery is completed. Accordingly, Counter-Plaintiff hereby reserves the rights to amend and to supplement this pleading.

01549

# VERIFICATION

STATE OF TEXAS    §
                  §
COUNTY OF DALLAS §

     BEFORE ME, the undersigned authority, on this day appeared in person James Austin Fisher and made the following statement under oath:

> My name is James Austin Fisher. I am one of the attorneys of record for James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, in Case Number 414270 in Probate Court Number One of Harris County, Texas, and I am authorized under Rule 14 of the Texas Rules of Civil Procedure to execute this verification on his behalf. I have read the averments set forth in paragraphs 53 through 60 above and I affirm that those averments are either within my personal knowledge or are supported by evidence of which I am aware, and are true and correct.

_____
James Austin Fisher

     SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, by James Austin Fisher on August 3, 2015.

Notary Public in and for the State of Texas

Angelica M. Aza-Newsom
Printed Name of Notary Public

My Commission Expires: 1-9-2016

FIRST AMENDED COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL     Page 26

DATED:   August 3, 2015.

Respectfully submitted,

/s/ *James Austin Fisher*

James Austin Fisher
   State Bar of Texas Number 07051650
   email address:  jfisher@fisherwelch.com
Shannon L.K. Welch
   State Bar of Texas Number 90001699
   email address:  swelch@fisherwelch.com
**FISHER & WELCH**
**A Professional Corporation**
Ross Tower, Suite 2800
500 North Akard Street
Dallas, Texas 75201
Telephone:  214.661.9400
Facsimile:  214.661.9404

**ATTORNEYS   FOR   COUNTER-PLAINTIFF**
**JAMES THOMAS DORSEY,**
**INDEPENDENT EXECUTOR OF**
**THE ESTATE OF DOROTHY**
**LOUISE LONGORIA, DECEASED**

01551

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2015, a true and correct copy of this document was served on Shelby Longoria, through his attorneys of record named below, in the manner indicated and in compliance with Texas law.

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
2900 Weslayan, Suite 150
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

*/s/ James Austin Fisher*
James Austin Fisher

01552

FILED
8/27/2015 9:40:18 PM
Stan Stanart
County Clerk
Harris County

CASE NUMBER 414270

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE |
| DOROTHY LOUISE LONGORIA, | § | COURT NUMBER ONE |
| DECEASED | § | HARRIS COUNTY, TEXAS |

**Shelby Longoria's Motion to Dismiss the
Estate's Counterclaims Relating to Dorothy Longoria's Banamex Accounts**

Shelby Longoria ("Shelby") moves to dismiss the Estate's counterclaims arising out of Dorothy Longoria's ("Dorothy") Banamex bank accounts ("Mexican Bank Accounts").

The Estate first asserted its theory of "bank account misappropriation" in an amended petition filed on February 11, 2015 – fifteen days before Shelby filed his summary-judgment motion.[1] In amended disclosure responses served on June 8, 2015, the Estate purported to calculate its damages based on this theory. The bulk of the "damages" related to withdrawals from two Banamex bank accounts.

On December 12, 1999, Dorothy opened Banamex US Dollars Checking Account no. ███████.[2] On February 10, 2005, Dorothy opened Banamex Mexican pesos Checking Account no. ████████.[3] Dorothy passed away on April 6, 2012. On April 18, 2012, both the Banamex Mexican pesos account and the Banamex Dollars account were closed.[4]

After Dorothy died, Sylvia offered one of her mother's purported wills to probate. Sylvia's husband James Thomas Dorsey ("Tommy") was appointed executor of Dorothy's estate. As the Estate's executor, Tommy sued Shelby. Shelby filed a will contest and claims against Sylvia and Adriana, and Sylvia and Adriana each raised additional counterclaims against Shelby.

---

[1] Exh. 1, at 4-5.

[2] Exh. 2. This document contains sensitive data. Per TRCP 21c, all sensitive data has been redacted; an unredacted copy will be maintained during the pendency of this case and any appeal.

[3] Exh. 3

[4] Exh. 4; Further, Attached as Exh. 103, the First Amended Disclosures of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, the Estate's attachments show that the last transaction of the Banamex Dollars checking account occurred on December 20, 2010 (at 78), and the last transaction for the Banamex Mexican pesos checking account occurred on April 16, 2012 (at 51).

**01553**

Beginning in February 2015, the Estate alleged that Shelby was liable to the Estate for "all amounts of money which were withdrawn from Dorothy's Accounts in Mexico and which Shelby cannot show specifically to have been withdrawn for Dorothy's benefit or with her fully formed consent."[5] These claims must be dismissed under the plain terms of the Banamex Agreement forum-selection clause.

## II.

### The Banamex Accounts Are Subject to Forum-Selection Clauses

In Mexico, to determine the terms and conditions in force in a contract with a bank, it is not enough to examine the language of the original contract. Because banks can unilaterally change the terms and conditions by notifying the customer of the changes, it is necessary to also examine all versions of the agreement through the duration of the contract for any changes. Attached as **Exhibit 5** to this motion is the Affidavit of Carlos Gabuardi, a respected Mexican lawyer and academic. Professor Gabuardi explains that Mexican law allows for banks to unilaterally change the terms of contracts, in accordance with their notification clauses.[6] For this reason, banks make the contents of their contracts public in the "Registry of Adhesive Contracts" (RECA).[7] In this system, the terms and conditions in force are those currently registered and not the terms established at the time of execution.[8] If an account is closed, the terms and conditions in force are those that are established at the time the bank account closed.[9]

For the Banamex Dollars account[10], Dorothy signed an application with language that incorporates a separate document containing the terms and conditions.[11] Similarly, the language

---

[5] Exh. 1 at ¶¶ 36; the Estate, Sylvia, and Adrian all raise other counterclaims that are not subject to this motion.
[6] Exh. 5 at ¶¶ 14
[7] *Id.* at ¶¶ 16.
[8] *Id.* at ¶¶ 9-10.
[9] *Id.* at ¶¶ 14
[10] Exh. 2
[11] *Id.* at 3, translated in Exhibit 2A

01554

above the signature in the application to the Banamex Mexican pesos Account[12] incorporates a separate document containing terms and conditions.[13]

Attached as **Exhibit 6A** are the terms and conditions that were in effect on April 18, 2012, the date when the accounts were closed. Thus, the terms and conditions in **Exhibit 6A** apply to both Banamex Accounts.

## III.

### The Estate's Claims Must Be Dismissed Pursuant to the Mexican Banks' Respective Forum-Selection Clauses

"In construing a forum-selection clause, 'our primary goal is to give effect to the written expression of the parties' agreement.' . . . 'We must read the provision in its entirety, striving to give meaning to every sentence, clause, and word to avoid rendering any portion inoperative.'" *Phoenix Network Techs. (Europe) Ltd. v. Neon Sys., Inc.*, 177 S.W.3d 605, 615 (Tex. App. – Houston [1st Dist.] 2005, no pet.) (quoting *Southwest Intelecom, Inc. v. Hotel Networks Corp.*, 997 S.W.2d 322, 324 (Tex. App. – Austin 1999, pet. denied)).

A.     The Plain Language of the Forum-Selection Clause Encompasses the Estate's Claims

The Banamex forum selection clause provides provides for a Mexican venue for any dispute relating to the peso and Dollars accounts:

> **CLAUSE XIII.17. – JURISDICTION.** The present Contract will be governed by the laws of Mexico, the parties shall expressly accept the jurisdiction of the courts of Mexico City, waiving any other that may correspond to them under whatever circumstance.[14]

---

[12] Exhibit 3
[13] *Id.* at 3, translated in Exhibit 3A
[14] Exhibit 6 at 20, ¶¶XIII.17, Translated in Exhibit 6A

01555

As Dorothy's representative, the forum-selection clause applies to the Executor and Executor's claims on the Estate's behalf.

B.    The Forum-Selection Clauses Provides for Exclusive Jurisdiction in Mexico.

By agreeing that the contract is "governed by the laws of Mexico, the parties shall expressly accept the jurisdiction of the courts of Mexico City, waiving any other that may correspond to them under whatever circumstance" the parties established Mexico as the *exclusive forum* for resolution of disputes in the Banamex accounts. *See In re Automated Collection Techs., Inc.*, 156 S.W.3d 557, 558 (Tex. 2004) (directing dismissal of a Texas case where the parties had consented "to the exclusive jurisdiction of the courts of Montgomery County, Pennsylvania.").

The Estate has run afoul of the forum-selection clauses of both Banamex bank account agreements by filing this lawsuit in Texas under Texas law. Where, as here, the parties agree to submit to venue in one jurisdiction, while waiving venue in other locations, they have made a selection of an exclusive forum for resolving claims. *In re Fisher*, 433 S.W.3d 523, 532 (Tex. 2014) (finding that a forum-selection clause was mandatory, even when the selected jurisdiction was "non-exclusive," when the contract stated that a party "agrees not to bring any proceeding arising out of or relating to this Agreement in any other court"); *In re Emex Holdings L.L.C.*, 2013 WL 1683614, at *1 (Tex. App. – Corpus Christi Apr. 18, 2013, orig. proceeding) (finding that the following clause was enforceable and exclusive: "The parties agree that for the construction and compliance herewith, they expressly submit themselves to the Jurisdiction and Competence of the Common Affairs Laws and Courts seated in Mexico, *waiving to any other that may correspond to them due to their present or future domiciles*"); *Dixon v. TSE Int'l Inc.*, 330 F.3d 396, 397 (5th Cir. 2003) (finding that the following clause was enforceable and

01556

exclusive: "The Courts of Texas, U.S.A., shall have jurisdiction over all controversies with respect to the execution, interpretation or performance of this Agreement, *and the parties waive any other venue to which they may be entitled by virtue of domicile or otherwise*"); *Export-Import Bank of the U.S. v. Hi-Films S.A. de C.V.*, 2010 WL 3743826, at *7 (S.D.N.Y. Sep. 24, 2010) (forum-selection clauses are mandatory, even though they do not expressly use the word "exclusive," because the parties waived other jurisdictions).

C.    The Result Is the Same Under Mexican Law

When a contract contains a choice-of-law clause, the Court must apply the law chosen by the parties to determine the scope of the forum-selection clause. *Hooks Indus., Inc. v. Fairmont Supply Co.*, 2001 WL 395341, at *2 (Tex. App.—Houston [14th Dist.] Apr. 19, 2001, no pet.); *Martinez v. Bloomberg LP*, 740 F.3d 211, 224 (2d Cir. 2014); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 651 (4th Cir. 2010); *Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 428 (10th Cir. 2006).

Here, the parties to the Banamex bank agreements chose the application of Mexican law. In his Affidavit, Professor Gabuardi explains that Mexican law recognizes forum-selection clauses[15] and that the forum-selection clause here is written to express the parties' intent that lawsuits concerning the respective Bank Accounts will be brought in Mexico.[16]

D.    The Court Must Enforce the Forum-Selection Clause and Dismiss

"A trial court *must* presume that a mandatory forum-selection clause is valid and enforceable." *In re Boehme*, 256 S.W.3d 878, 881 (Tex. App.—Houston [14th Dist.] 2008, orig. proceeding) (emphasis in original). "The trial court gives full effect to a forum selection clause 'absent a strong showing by the resisting party that the court should set aside the clause because

---

[15] Exh. 5 at ¶¶ 15.
[16] *Id.* at ¶¶ 16.

01557

(1) the clause is invalid based on reasons such as fraud, undue influence, or overweening bargaining power; or (2) enforcement would be unreasonable and unjust.'" *Smith v. Kenda Capital, LLC*, 2014 WL 5783581, at *4 (Tex. App.—Houston [14th Dist.] Oct. 21, 2014, no pet. h.) (quoting *Deep Water Slender Wells, Ltd. v. Shell Int'l Explor. & Prod., Inc.*, 234 S.W.3d 679, 692 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)). Enforcement can be avoided only in "extreme circumstances that courts cannot presently anticipate or foresee." *In re ADM Investor Servs., Inc.*, 304 S.W.3d 371, 376 (Tex. 2010).

Because the forum-selection clause that governs both Banamex accounts is mandatory and there is no reason not to enforce it, this Court must dismiss the Estate's counterclaims based on the Bank agreements forum-selection clause. *See Deep Water Slender Wells, Ltd. v. Shell Int'l Explor. & Prod., Inc.*, 234 S.W.3d 679, 687 (Tex. App.—Houston [14th Dist] 2007, pet. denied) ("A motion to dismiss is the proper procedural mechanism for enforcing a forum-selection clause that a party to the agreement has violated in filing suit.").

V.

Conclusion

The Court should enter the proposed order submitted with this motion and dismiss the Estate's claims arising out of Dorothy's Banamex bank accounts.

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: /s/ Mateo Fisher
　　Johnny W. Carter
　　State Bar No. 00796312
　　jcarter@susmangodfrey.com
　　Richard W. Hess
　　State Bar No. 24046070

01558

rhess@susmangodfrey.com
Kristen Schlemmer
State Bar No. 24075029
kschlemmer@susmangodfrey.com
Mateo Fisher
State Bar No. 24077692
mfisher@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Robert S. MacIntyre Jr.
State Bar No. 12760700
macintyre@mmlawtexas.com
MacIntyre McCulloch Stanfield Young
2900 Weslayan, Suite 150
Houston, Texas 77027
Telephone: (713) 547-5400
*Attorneys for Shelby Longoria*

01559

## CERTIFICATE OF CONFERENCE

Counsel for Shelby Longoria has conferred with counsel for James Thomas Dorsey, on August 25, 2015 in a good faith effort to resolve the matters raised by this motion, and counsel for Plaintiff is opposed to the disposition of the matters raised in this motion.

/s/ Mateo Fisher
Mateo Fisher

## CERTIFICATE OF SERVICE

This is to certify that on August 27, 2015, a true and correct copy of the above and foregoing instrument was properly forwarded to the following counsel of record in accordance with Rule 21 of the Texas Rules of Civil Procedure as indicated below:

James Austin Fisher                    *Via E-Service*
Fisher & Welch
Ross Tower, Suite 2800
500 North Akard Street
Dallas, Texas 75201
Email: jfisher@fisherwelch.com

**Attorneys for James Thomas Dorsey, Sylvia Dorsey, and Adriana Longoria**

/s/ Mateo Fisher
Mateo Fisher

01560

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN THE PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | |
| | § | HARRIS COUNTY, TEXAS |

## Affidavit of Mateo Fisher

I, Mateo Fisher, declare as follows:

1.     My name is Mateo Fisher.  I am over the age of twenty-one (21) years, am competent to testify to the matters stated herein, have personal knowledge of the facts and statements in this declaration, and each of the facts and statements is true and correct.

2.     I am an attorney in the law firm of Susman Godfrey L.L.P.  I am licensed to practice law in the state of Texas and before this Court. I represent Shelby Longoria in the above referenced litigation. I provide this affidavit in support of Shelby Longoria's Motion to Dismiss the Estate's Counterclaims Relating to Dorothy Longoria's Banamex Accounts.

3.     Attached as Exhibit 1 is a true and correct copy of the Original Counterclaims of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, To Shelby Longoria's Third Amended Contest of 2010 Will, of February 11, 2015.

4.     Attached as Exhibit 2 is a true and correct copy of a document produced by Shelby Longoria bates-labelled SLONGORIA003085, consisting of a signed bank account application for Banamex Dollars Checking Account dated December 12, 1999.

5.     Attached as Exhibit 2A is a true and correct certified partial translation of Exhibit 2, a document produced by Shelby Longoria bates-labelled SLONGORIA003085, consisting of a

signed bank account application for Banamex Dollars Checking Account dated December 12, 1999.

6.     Attached as Exhibit 3 is a true and correct copy of a document produced by Shelby Longoria bates-labelled SLONGORIA002740, consisting of a signed bank account application for Banamex Mexican pesos Checking Account dated February 10, 2005.

7.     Attached as Exhibit 3A is a true and correct certified partial translation of a document produced by Shelby Longoria bates-labelled SLONGORIA002740, consisting of a signed bank account application for Banamex Mexican pesos checking Account dated February 10, 2005.

8.     Attached as Exhibit 4 is a true and correct copy of a Banamex Bank document showing that the Banamex Dollars checking account no. [redacted] and the Banamex Mexican pesos checking account no. [redacted] were both closed on April 18, 2012.

9.     Attached as Exhibit 5 is a true and correct copy of the Affidavit of Dr. Carlos Gabuardi.

10.     Attached as Exhibit 6 is a true and correct copy of a document produced by Shelby Longoria bates-labelled SLONGORIA002934, consisting of the terms and conditions for Banamex checking accounts.

11.     Attached as Exhibit 6A true and correct copy of a document produced by Shelby Longoria bates-labelled SLONGORIA002934, consisting of the terms and conditions for Banamex checking accounts.

12.     Attached as Exhibit 103 is a true and correct redacted copy of the First Amended Disclosures of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, of June 8, 2015.

2

01563

FURTHER, AFFIANT SAITH NOT.

_____
Mateo Fisher

SUBSCRIBED AND SWORN TO BEFORE ME, a Notary Public, by Mateo Fisher, on this 27th day of August, 2015, to certify which witness my official hand and seal of office.

KARON G. ALLEN
Notary Public, State of Texas
Commission Expires 06-22-2018

_____
Notary Public in and for the State of Texas

My Commission Expires: 6/22/2018

3

01564

# EXHIBIT 1

01566

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN PROBATE COURT NUMBER ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

## ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW James Thomas Dorsey in his capacity as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, as Counter-Plaintiff, and pleads the following counterclaims in response to Shelby Longoria's Third Amended Contest of 2010 Will, stating the following causes of action against Shelby Longoria, as Counter-Defendant.

### Discovery Level

1.      Pursuant to TEX. R. CIV. P. 190, Counter-Plaintiff states that discovery in this case is intended to be conducted under Level 3 of that Rule.

### Overview

2.      These counterclaims are brought by a citizen of Texas against another citizen of Texas. Counter-Plaintiff is the personal representative of an estate pending in this Court, and adjudication of these counterclaims is essential to administration of that estate. The

01567

Decedent lived in Texas for the last 25 years of her life. These counterclaims are based entirely on Texas law. None of them is based on any law of the United Mexican States.

## The Parties

3. Counter-Plaintiff James Thomas Dorsey is an individual who is bringing these counterclaims in his capacity as the duly appointed Independent Executor of the Estate of Dorothy Louise Longoria, Deceased.

4. Counter-Defendant Shelby Longoria is an individual who resides in Hidalgo County, Texas. Counter-Defendant commenced this action and has appeared, through counsel, in this action, so this pleading may be served on him through his attorneys of record.

## Jurisdiction

5. Pursuant to Sections 4A, 4B, and 4F of the Texas Probate Code, the Court has jurisdiction over the subject matter of this civil action. The Estate of Dorothy Louise Longoria is pending in this Court, and this Court is a statutory probate court. As explained more fully below, this action is brought by a personal representative on behalf of that estate and this action is related to that estate. In addition, the exercise of pendent or ancillary jurisdiction over this action is necessary to promote judicial efficiency and economy.

6. The Court has *in personam* jurisdiction over Counter-Defendant Shelby Longoria by virtue of his filing of Shelby Longoria's Third Amended Contest of 2010 Will, in response to which these counterclaims are pleaded. In addition, general personal

01568

jurisdiction exists because the Counter-Defendant has had continuous and systematic contacts with the State of Texas, and specific personal jurisdiction exists because this action arises out of contacts by the Counter-Defendant with the State of Texas, as explained below.

## Venue

7.     Pursuant to Section 6A of the Texas Probate Code, the venue of this action is proper because the Estate of Dorothy Louise Longoria, Deceased, is pending in this Court and this action is related to that estate, as explained more fully below.

## Conditions Precedent

8.     All conditions precedent to Counter-Plaintiff's rights to plead and to prosecute these counterclaims, and to recover the relief requested herein, have occurred or been fulfilled.

## Facts Applicable to All Causes of Action[1]

9.     On July 3, 1942, Eduardo Longoria ("Eduardo") and Dorothy Louise Kowalski ("Dorothy") were married in the City of Laredo, in Webb County, Texas.

10.     When they were married, Dorothy was a citizen of the United States of America, and Eduardo was a citizen of the United Mexican States ("Mexico"), but he had

---

[1] This petition does not recite every fact on which the Counter-Plaintiff's claims are based. It is intended only to be "a short statement of the cause of action sufficient to give fair notice of the claim involved," as required by TEX. R. CIV. P. 47.

01569

been living in the United States and, after the wedding, the couple initially settled in McAllen, Texas.

11.     The marriage of Eduardo and Dorothy was subject to the laws of the State of Texas, including the law of community property.

12.     Eduardo and Dorothy had four children, all of whom are living. Their names are: Adriana Louise Longoria ("Adriana"), Eduardo Longoria, Jr., also known as Wayo Longoria ("Wayo"), Sylvia Rene Dorsey ("Sylvia"), and Shelby Longoria ("Shelby"). All of them reside in Texas.

13.     Eduardo and Dorothy amassed considerable wealth through a variety of business activities and investments.

14.     Over time, Shelby took control over the business and investments owned by Eduardo and Dorothy.

15.     Shelby managed property and accounts owned by Dorothy and represented to her that he was doing so for her benefit. Indeed, the account statements were not even sent to Dorothy, even though she was identified as the sole owner of the accounts. The accounts included, but are not limited to, the following accounts (collectively, "Dorothy's Accounts in Mexico"):

    a.     Banamex Account Number 7572369315;

    b.     Banamex Account Number 7518181565; and

01570

c.    BanRegio Account Number 75-00454-001-8.

16.    In addition, Shelby expressly agreed to hold in trust, for the benefit of Dorothy, property that Shelby obtained from Eduardo. In a letter to Dorothy dated August 5, 1983, for example, Shelby and Wayo promised Dorothy that "the assets that Daddy has willed to us, as long as you live, we will hold them as if they were yours" and "[w]e will make the fruits available to you for your direction as to their use." These promises were made by Shelby while he was residing in Texas, and they were set forth in a letter that was sent to Dorothy from an address in Texas. Shelby breached these promises to Dorothy by failing to account for the property that was given to Shelby by Eduardo, by concealing from Dorothy material facts about that property (including its nature, extent, value, and profitability), by failing to hold and maintain that property as if it belonged to Dorothy, by paying himself income generated by the property, by failing to disclose to Dorothy that he had done so, and by failing generally to make the fruit of that property available to her for her use.

17.    Likewise, in a letter dated October 9, 2007, which Shelby sent to Dorothy at her residence in Houston, Texas, Shelby made specific promises with respect to a large sum of money that Eduardo wished for Dorothy to have upon his death. Admitting that he held such funds in trust for Dorothy, and in recognition that Dorothy intended to leave her estate to her daughters, Shelby promised that, within thirty days after Dorothy died, he would pay $100,000 to Sylvia and $100,000 to Adriana. Upon Dorothy's death, Shelby repudiated and

01571

breached this promise to Dorothy. While he did tender a check for $100,000 to Sylvia and a check for $100,000 to Adriana, he printed on the checks language that, if the checks were negotiated, would have resulted in a release of their rights in Dorothy's estate and rights against Shelby – self-serving conditions which Shelby had no right to impose. The fact that Shelby arbitrarily demanded such releases for his benefit, as conditions on his performance of an unconditional duty to pay $100,000 to Sylvia and $100,000 to Adriana, proves that (a) Shelby knew that Dorothy owned valuable claims against him, (b) Shelby knew that Dorothy intended to leave her entire estate to Sylvia and Adriana, and (c) Shelby knew that Sylvia and Adriana themselves had valuable claims against him – all of which he now dishonestly denies.

18.    Shelby owed a fiduciary duty to Dorothy (a) as an agent for Dorothy, (b) as a trustee of an express trust for the benefit of Dorothy, and, in addition or in the alternative, (c) pursuant to an informal fiduciary relationship with Dorothy.

19.    In contravention of his fiduciary duty to Dorothy under Texas law, Shelby failed to advise Dorothy fully and fairly regarding the nature and extent of her property and his actions with respect to her property and the property he was holding in trust, supposedly for her benefit.

20.    In fact, Shelby managed for his own benefit Dorothy's property, as well as property he was holding in trust supposedly for her benefit. He caused income from the

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 6

01572

property to be paid to him or to others for his benefit, and failed to disclose to Dorothy that he had done so.

21. Eduardo died on January 26, 2005, at the age of 91. (He was born on October 25, 1913.)

22. When Eduardo died, all of the property in his estate was community property of which one-half was owned by Dorothy under Texas law.

23. Eduardo died in Webb County, Texas, where he and Dorothy had lived for many years.

24. After the death of Eduardo, Shelby continued to manage Dorothy's property and continued to represent to her that he was managing her property for her benefit, but he intentionally concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property.

25. In fact, Shelby managed the property for his own benefit and engaged in self-dealing transactions that he failed to disclose to Dorothy.

26. Dorothy died in Harris County, Texas, on April 6, 2012, at the age of 92. (She was born on May 4, 1919.)

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL         Page 7

01573

27. By order dated October 9, 2012, this Court admitted to probate Dorothy's Last Will and Testament, dated January 21, 2010, and appointed James Thomas Dorsey Independent Executor of the Estate of Dorothy.

28. Letters Testamentary were issued to James Thomas Dorsey on the same day, and such Letters Testamentary are currently in full force and effect, so he is fully authorized to bring this action.

29. Whenever it is alleged herein that Shelby acted or communicated in any fashion, then such allegation should be taken to mean:

a. That the Shelby himself took such action or made such communication; or, in the alternative,

b. That a duly authorized agent of Shelby took such action or made such communication on behalf of Shelby and in the course and scope of the agency; or, in the alternative,

c. That such action or communication was by one having apparent authority to do so on behalf of Shelby; or, in the alternative,

d. That Shelby ratified and adopted such action or communication as his own and thereby became legally responsible for it.

01574

## First Cause of Action
## Demand for Accounting

30.    Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

31.    Pursuant to Section 489B of the Texas Probate Code, Section 113.151 of the Texas Trust Code, and the common law of the State of Texas, Counter-Plaintiff is entitled to, and hereby requests, that Shelby provide a full accounting of (1) all of his activities as an agent for Dorothy, (2) all transactions done or caused by him involving property owned, in whole or in part, by Dorothy, including but not limited to Dorothy's Accounts in Mexico, and (3) all transactions involving property held by him in trust for Dorothy.

32.    Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads, under Texas law, the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because

01575

he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

33. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Section 113.151 of the Texas Trust Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

**Second Cause of Action**
**Breaches of Fiduciary Duty**

34. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

35. Under Texas law, Shelby breached his fiduciary duty to Dorothy by (a) failing to disclose to her, fully and fairly, all information that might affect her interests in property managed by him, including both her community property and property held by Shelby in trust for her; (b) failing to act with utmost good faith and fair dealing in the management of her property and property held in trust for her, and in his other activities affecting her interests; (c) failing to act with undivided loyalty to Dorothy in the management of her property and

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 10

01576

property held by him in trust for her, and in his other activities affecting her interests; and (d) engaging in self-dealing transactions that were detrimental to her and, in addition or in the alternative, improperly benefited him.

36. The breaches of fiduciary duty by Shelby proximately caused compensable harm to Dorothy and her estate. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law. The damages awarded should include all amounts of money which were withdrawn from Dorothy's Accounts in Mexico and which Shelby cannot show specifically to have been withdrawn for Dorothy's benefit or with her fully informed consent.

37. The breaches of fiduciary duty by Shelby constituted "fraud," "gross negligence," and "malice" as those terms are defined in Chapter 41 of the Texas Civil Practice and Remedies Code. Despite his fiduciary duty under Texas law to disclose to Dorothy all facts that might affect her interests, Shelby intentionally or, in the alternative, with reckless disregard for Dorothy's rights, concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for exemplary damages in an amount to be determined by the trier of fact in accordance with Texas law.

01577

38. Shelby derived profits by means of the breaches of his fiduciary duty to Dorothy. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment decreeing that Shelby disgorge all profits received by him or by his wife, his children, or any other persons designated by him, as a result of the breaches of his fiduciary duty to Dorothy.

39. Shelby acquired property by means of the breaches of his fiduciary duty to Dorothy. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment imposing a constructive trust on all property acquired by Shelby or by his wife, his children, or any other persons designated by him, by means of the breaches of his fiduciary duty to Dorothy.

40. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads, under Texas law, the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED,
TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL          Page 12

01578

he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

41. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Section 114.064 of the Texas Trust Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

### Third Cause of Action
### Breach of Promise To Hold Property for Dorothy's Benefit

42. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

43. Shelby promised Dorothy that he would hold in trust for Dorothy all of the assets that Eduardo gave to Shelby and Wayo and that he would make the income from such property available to her for her direction as to their use. These promises were made by Shelby while he was residing in Texas. Shelby breached these promises to Dorothy by failing to account for the property that was given to Shelby and Wayo by Eduardo, by concealing from Dorothy material facts about that property (including its nature, extent,

01579

value, and profitability), by failing to hold and maintain that property as if it belonged to Dorothy, by paying himself income generated by the property, by failing to disclose to Dorothy that he had done so, and by failing generally to make the fruit of that property available to her for her use.

44. These breaches by Shelby proximately caused compensable harm to Dorothy and her estate. Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law.

45. Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads under Texas law the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's

01580

interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

46. It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

## Fourth Cause of Action
### Breach of Promise To Pay $100,000 to Adriana and $100,000 to Sylvia

47. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

48. Shelby promised Dorothy that, within thirty days of her death, he would pay $100,000 to Adriana and $100,000 to Sylvia. These promises were made by Shelby while he was residing in Texas, and they were directed to Dorothy at her residence in Houston, Texas. Shelby breached these promises to Dorothy by tendering to Adriana and Sylvia checks that they could not negotiate without waiving their rights in Dorothy's estate and their rights against Shelby – self-serving conditions which Shelby had no right to impose.

01581

49.     Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for $200,000 in accordance with Texas law.

50.     Anticipating that Shelby will plead the defense of limitations in response to this cause of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads under Texas law the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

51.     It was both reasonable and necessary for Counter-Plaintiff to retain attorneys to prepare and to prosecute this action. Pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law, Counter-Plaintiff is entitled to, and

01582

hereby requests, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action.

**Fifth Cause of Action**
**Declaration of Invalidity of Donation Agreement dated January 11, 2005**

52. Counter-Plaintiff repeats and incorporates by reference all of the foregoing averments. If any averment is inconsistent with this cause of action, the averment is pleaded in the alternative, as authorized by Rules 47 and 48 of the Texas Rules of Civil Procedure.

53. On January 8, 2015, Shelby produced for the first time a photocopy of a document dated January 11, 2005, written in Spanish, entitled "CONTRATO DE DONACIÓN" (the "Donation Agreement"). The Donation Agreement purports to be signed by Eduardo and Dorothy.

54. By order dated January 29, 2014, Shelby was ordered by this Court to produce documents such as the Donation Agreement no later than February 28, 2014. His production of the Donation Agreement on January 8, 2015, was over ten months late.

55. On the date of the Donation Agreement, Eduardo was dying and on hospice care. Fifteen days later, Eduardo died. The Executor believes, and now avers, that on January 11, 2005, Eduardo lacked the requisite mental capacity to make a legally enforceable contract.

56. The Donation Agreement states that it was signed in Reynosa, Tamaulipas. Eduardo was not in Reynosa on the date of the Donation Agreement.

01583

57. In the seven years that Dorothy lived after the date of the Donation Agreement, she never mentioned it to either of her daughters, both of whom lived near her in Houston, or to her son-in-law (the Executor), whom she saw frequently, or in her correspondence, which was extensive, or in her personal notes, where she wrote extensively about her financial situation. Indeed, during those seven years she made numerous statements, both written and oral, that are inconsistent with the existence of the Donation Agreement.

58. Based on the foregoing facts, and others, the Executor believes, and therefore avers, that the Donation Agreement is a forgery.

59. The Executor believes, and now avers, that the Donation Agreement is unenforceable for lack of consideration or, in the alternative, for failure of consideration.

60. There exists an actual controversy between the Executor and Shelby as to whether or not the Donation Agreement is a valid and enforceable contract.

61. Consequently, under Chapter 37 of the Texas Civil Practice and Remedies Code, the Executor hereby requests entry of a judgment declaring that the Donation Agreement is invalid and wholly unenforceable.

62. Pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code, the Executor requests an award of costs and reasonable and necessary attorney's fees as are equitable and just.

01584

## Prayer for Relief

WHEREFORE, PREMISES CONSIDERED, Counter-Plaintiff James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, prays that upon due notice and trial by jury, or upon hearing on motion for entry of default judgment or motion for summary judgment, the Court render judgment for Counter-Plaintiff and against Counter-Defendant Shelby Longoria, awarding the following relief under Texas law:

(1)     a decree commanding Counter-Defendant Shelby Longoria to render an accounting of all property that was owned, in whole or in part, by Dorothy Louise Longoria and that was within his possession, custody, or control, and all transactions affecting her property, and an accounting of all actions taken by him as her agent or trustee, specifically including a complete accounting of all monies withdrawn from Dorothy's Accounts in Mexico;

(2)     an award of actual damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law, but the maximum amount of actual damages currently sought by Counter-Plaintiff – while reserving his right under Texas law to amend this pleading to request a greater or lesser amount as more evidence is uncovered and the whole truth comes to light – is $43,500,000;

01585

(3)     an award of exemplary damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law, but the maximum amount of exemplary damages currently sought by Counter-Plaintiff – while reserving his right under Texas law to amend this pleading to request a greater or lesser amount as more evidence is uncovered and the whole truth comes to light – is $10,000,000;

(4)     an award of attorney fees (including litigation expenses) reasonably and necessarily incurred by Counter-Plaintiff in connection with each of his causes of actions under Texas law;

(5)     a decree commanding Counter-Defendant Shelby Longoria to disgorge all profits received by him, or by others for his benefit, as a result of a breach by him of his fiduciary duty to Dorothy Louise Longoria;

(6)     a decree imposing a constructive trust on all property acquired by Counter-Defendant Shelby Longoria, or by others for his benefit, by means of a breach of fiduciary duty owed to Dorothy Louise Longoria;

(7)     an award of prejudgment interest on all actual damages at the highest rate authorized by law to the date of judgment;

(8)     an award of all costs incurred by Counter-Plaintiff in the course of preparing and prosecuting this civil action;

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL                    Page 20

01586

(9)    an award of postjudgment interest on all monetary relief at the highest rate authorized by law from the date of judgment until paid;

(10)    a judgment declaring that the Donation Agreement dated January 11, 2005, is invalid and wholly unenforceable;

(11)    all writs and processes necessary to collect the judgment; and

(12)    all other relief to which Counter-Plaintiff is entitled or which the Court may deem appropriate under the circumstances and the applicable law.

Any inconsistent allegations or prayers for relief are pleaded in the alternative, as expressly authorized by TEX. R. CIV. P. 47 and 48.

### Reservation of Rights To Amend and To Supplement This Pleading

Because Counter-Plaintiff presently does not know all of Counter-Defendant's acts and omissions that caused harm to Dorothy Louise Longoria or her estate, or all of the relevant circumstances surrounding such acts and omissions, Counter-Plaintiff anticipates that it may be necessary to plead additional causes of action after discovery is completed. Accordingly, Counter-Plaintiff hereby reserves the rights to amend and to supplement this pleading.

01587

# VERIFICATION

STATE OF TEXAS §
§
COUNTY OF DALLAS §

BEFORE ME, the undersigned authority, on this day appeared in person James Austin Fisher and made the following statement under oath:

> My name is James Austin Fisher. I am one of the attorneys of record for James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, in Case Number 414270 in Probate Court Number One of Harris County, Texas, and I am authorized under Rule 14 of the Texas Rules of Civil Procedure to execute this verification on his behalf. I have read the averments set forth in paragraphs 53 through 60 above and I affirm that those averments are either within my personal knowledge or are supported by evidence of which I am aware, and are true and correct.

_____
James Austin Fisher

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, by James Austin Fisher on February 11, 2015.

_____
Notary Public in and for the State of Texas

Angelica M. Aza -Newsom
Printed Name of Notary Public

My Commission Expires: 1 - 9 - 2016

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL                    Page 22

01588

DATED: February 11, 2015.

Respectfully submitted,

/s/ *James Austin Fisher*

James Austin Fisher
   State Bar of Texas Number 07051650
   email address: jfisher@fisherwelch.com
Shannon L.K. Welch
   State Bar of Texas Number 90001699
   email address: swelch@fisherwelch.com
**FISHER & WELCH**
**A Professional Corporation**
Ross Tower, Suite 2800
500 North Akard Street
Dallas, Texas 75201
Telephone: 214.661.9400
Facsimile: 214.661.9404

T. Wesley Holmes
   State Bar of Texas Number 09908495
   email address: wes@wesholmes.com
**THE HOLMES LAW FIRM**
10,000 North Central Expressway, Suite 400
Dallas, Texas 75231
Telephone: 214.890.9266

**ATTORNEYS FOR COUNTER-PLAINTIFF
JAMES THOMAS DORSEY,
INDEPENDENT EXECUTOR OF
THE ESTATE OF DOROTHY
LOUISE LONGORIA, DECEASED**

01589

# CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2015, a true and correct copy of this document was served on Shelby Longoria, through his attorneys of record named below, in the manner indicated and in compliance with Texas law.

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
3900 Essex Lane, Suite 220
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

*/s/ James Austin Fisher*
James Austin Fisher

ORIGINAL COUNTERCLAIMS OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED, TO SHELBY LONGORIA'S THIRD AMENDED CONTEST OF 2010 WILL    Page 24

01590

# EXHIBIT 2

01592


**Banamex**
Banco Nacional de México, S.A.

SLONGORIA 003085

SUCURSAL: ANZALDUAS REYNOSA T          NUM:   935 FECHA: 1999/12/01
SOLICITUD O FORMA AUTOMATIZADA IMPRESA                    HOJA: 1/3
DATOS GENERALES DEL SOLICITANTE / CLIENTE
Nombre: DOROTHY,KOWALSKI/LONGORIA
Cliente:      29945360
Actividad:    AMA DE CASA
Nacionalidad: MEXICANA      Tipo persona: PERSONAS FISICAS
Fecha de nacimiento/R.F.C.: 19190504/KOLD190504
DOMICILIO PRINCIPAL:
  OAXACA 620                    RODRIGUEZ
  REYNOSA                       TAM              CP.:  88630
  Tel1:     224143   Ext:       Tel2:            Ext:

DATOS DEL EMPLEO:
  Nombre Empresa:
  Domicilio:
  Colonia:                      Del./Mun./Pob.:
  Estado: NO         C.P.:  00000  Tel:

TRES REFERENCIAS QUE NO VIVAN EN SU DOMICILIO: (EMPRESA REF. COMERCIALES)
1-)Nombre:
   Domicilio:
   Telefono:
2-)Nombre:
   Domicilio:
   Telefono:
3-)Nombre:
   Domicilio:
   Telefono:
TRES REFERENCIAS BANCARIAS :
1-)Banco:         Numero de Cuenta:
2-)Banco:         Numero de Cuenta:
3-)Banco:         Numero de Cuenta:

SLONGORIA 003086


**Banamex**
Banco Nacional de México, S.A.

SUCURSAL: ANZALDUAS REYNOSA T                    NUM:  935 FECHA: 1999/12/01
SOLICITUD O FORMA AUTOMATIZADA IMPRESA                      HOJA: 2/3
 DATOS GENERALES DE(L) (LOS) PRODUCTO(S)/SERVICIO(S)
Nombre: DOROTHY,KOWALSKI/LONGORIA
Cliente:     29945360

Producto:
  CHEQUES DOLARES SIN INTERESES
 Suc:  935                         Contrato:      7518181565
 Manejo: INDIVIDUAL              Moneda: DOLAR USCY
 Uso de la cuenta: PERSONAL

 Inversion integral:
 Inversion a plazo :
 Banca Digital       :      29945360

ENVIAR CORRESPONDENCIA AL DOMICILIO:
 OAXACA 620                         RODRIGUEZ
 REYNOSA                            TAM                CP.:  88630
 TEL1:  0000224143   EXT:           TEL2:              EXT:

**COTITULAR(ES):
              Nombre            Parentesco                    Firma

**DOCUMENTOS:
 Identificacion[X]   Comprobante domicilio[X]   R.F.C.(P.M. y P.F.A.E.)[ ]
 Acta constitutiva y poderes(P.M.)[ ]
 Efectuar verificacion?    SI[ ] NO[ ]        Nomina ejecutivo:     3217108

SLONGORIA 003087


**Banamex**
Banco Nacional de México. S.A.

SUCURSAL: ANZALDUAS REYNOSA T        NUM:   935 FECHA: 1999/12/01
SOLICITUD O FORMA AUTOMATIZADA IMPRESA             HOJA: 3/3
Nombre: DOROTHY,KOWALSKI/LONGORIA
Cliente:     29945360

** BENEFICIARIOS/Nombre         Relacion con titular       %
  EDUARDO,LONGORIA/            CONYUGE           100

EN CASO DE QUE LOS BENEFICIARIOS SEAN MENORES DE EDAD, ENTREGAR POR
CONDUCTO DEL REPRESENTANTE LEGAL.

     DECLARO QUE LOS DOCUMENTOS Y DATOS QUE SE PROPORCIONAN SON CORRECTOS
     Y AUTORIZO AL BANCO A VERIFICAR Y EN SU CASO PROPORCIONAR ESTA
     INFORMACION A SOCIEDADES DE INFORMACION CREDITICIA DEBIDAMENTE
     AUTORIZADAS A EFECTO DE QUE CONOZCAN MI COMPORTAMIENTO COMO CLIENTE
     DEL SECTOR BANCARIO, FINANCIERO Y COMERCIAL AHI REGISTRADO.

HE RECIBIDO Y LEIDO EL CONTRATO DE DEPOSITO BANCARIO DE DINERO CONOCIDO
COMO Y FORMA(S):
     CUENTAS DE CHEQUES EN DOLARES.

ESTOY DE ACUERDO CON SUS TERMINOS Y CONDICIONES Y, ACEPTO QUE ESTA
SOLICITUD ES PARTE INTEGRANTE DEL CONTRATO.

    CLIENTE (FIRMA)           FUNCIONARIO          (NOMBRE Y FIRMA)

# EXHIBIT 2A

01597

I DECLARE THAT THE DOCUMENTS AND INFORMATION PROVIDED ARE CORRECT AND AUTHORIZE THE BANK TO VERIFY AND, WHERE APPROPRIATE, TO PROVIDE THIS INFORMATION TO DULY AUTHORIZED CREDIT REFERENCE ORGANISATIONS FOR THE PURPOSE OF UNDERSTANDING MY BEHAVIOUR AS A CUSTOMER OF THE BANKING AND FINANCE SECTOR THERE REGISTERED.


TRANSPERFECT

City of New York, State of New York, County of New York

I, Alitasha Younger, hereby certify that the document "Banamex Dollars Account Clause" is to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

_____
Alitasha Younger

Sworn to before me this
August 27, 2015

_____
Signature, Notary Public

SENIDA KULJANCIC
Notary Public - State of New York
No. 01KU6322856
Qualified In KING County
Commission Expires April 13, 2019

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

01599

# EXHIBIT 3

01601





29945360

0 0 0 0 6 6 5 3 8 3 6 5

**VENTA REALIZADA POR**

| NOMINA | APELLIDO PATERNO APELLIDO MATERNO NOMBRES(S) | TELEFONO . | SUCURSAL |
|---|---|---|---|
| 3231461 | NOCHEBUENA/JUAREZ,FLOR MARIA | | 4761 PRADOS SUR,TAMPS |

| NO. DE CLIENTE | | FECHA DE APERTURA (AÑO/MES/DIA) |
|---|---|---|
| 29945360 | | 2005 / 02 / 10 |

**DATOS GENERALES DEL SOLICITANTE**

| NOMBRES(S) APELLIDO PATERNO/APELLIDO MATERNO O RAZON SOCIAL |
|---|
| DOROTHY KOWALSKI LONGORIA |

| FECHA DE NACIMIENTO (AÑO/MES/DIA) | RFC | FECHA DE CONSTITUCION (AÑO/MES/DIA) | NACIONALIDAD |
|---|---|---|---|
| 1919/05/04 | KOLD190504FS4 | | MEXICANA |

| CURP | E-MAIL / PAGINA INTERNET | OCUPACION DESEMPLEADOS | GIRO ECONOMICO DESEMPLEADO |
|---|---|---|---|

| DOMICILIO PRINCIPAL (CALLE Y NUMERO) |
|---|
| PEDRO J MENDEZ 333 |

| COLONIA | DELEGACION / MUNICIPIO / POBLACION | ESTADO | PAIS DE RESIDENCIA | CODIGO POSTAL |
|---|---|---|---|---|
| ZONA CENTRO | REYNOSA | TAMAULIPAS | MEXICO | 88500 |

| TIPO DE TELEFONO (1) | (CLAVE L.D) TELEFONO (1) | TIPO DE TELEFONO (2) | (CLAVE L.D) TELEFONO (2) |
|---|---|---|---|
| OFICINA O EMPRESA | 8999090350 | | |

**INFORMACION DEL PRODUCTO**

| PRODUCTO/SERVICIO | CONTRATO / CUENTA CONCENTRADORA | TIPO DE MANEJO | CUENTA EJE |
|---|---|---|---|
| CHEQUES MONEDA NACIONAL CUENTA | 7572369315 | INDIVIDUAL | |
| CHEQUERA | TARJETA DEBITO (TITULAR) | PRODUCTO/SERVICIO | CONTRATO |
| | | INVERSION INTEGRAL BANAMEX | 7572369323 |

| PRODUCTO/SERVICIO | CONTRATO | PRODUCTO/SERVICIO | CONTRATO |
|---|---|---|---|
| INVERSIONES PLAZO FIJO MONEDA | 29945360018 | | |

| TIPO DE PERSONA | USO DE CUENTA |
|---|---|
| FISICA EMPRESARIAL NACIONAL EN EL PAIS | USO EMPRESARIAL (PERSONA MORAL/PERSONA F |

**DOMICILIO PARA ENTREGA DE ESTADO DE CUENTA**

| DOMICILIO PRINCIPAL (CALLE Y NUMERO) |
|---|
| PEDRO J MENDEZ 333 |

| COLONIA | DELEGACION / MUNICIPIO / POBLACION | ESTADO | CODIGO POSTAL |
|---|---|---|---|
| ZONA CENTRO | REYNOSA | TAMAULIPAS | 88500 |

**DOCUMENTOS ENTREGADOS**

IDENTIFICACION, COMPROBANTE DE DOMICILIO, COMPROBANTE FISCAL(P.F.A.E. Y P.M.)

**DECLARACIONES**

EL CLIENTE DECLARA (i) QUE LOS DATOS Y DOCUMENTOS PROPORCIONADOS SON CIERTOS Y OBTENIDOS EN LA FECHA DE LA PRESENTE MEDIANTE ENTREVISTA, AUTORIZANDO A BANAMEX A QUE CORROBORE LO ANTERIOR (ii) QUE LOS RECURSOS UTILIZADOS EN LA APERTURA DE LA CUENTA, SON DE PROCEDENCIA LICITA, (iii) Y AUTORIZA A BANAMEX A UTILIZAR Y / O PROPORCIONAR LA INFORMACION Y / O DOCUMENTOS CONTENIDA EN ESTA SOLICITUD Y / O QUE DERIVEN DE LA APERTURA DE LA CUENTA O DE CUALQUIER RELACION QUE MANTENGA CON BANAMEX, A LOS INTEGRANTES DEL GRUPO FINANCIERO BANAMEX, A LAS FILIALES O SUBSIDIARIAS O A CUALQUIER EMPRESA CONTROLADA DIRECTA O INDIRECTAMENTE POR CITIGROUP, PARA PROMOCIONARLE PRODUCTOS Y SERVICIOS U OTRO FIN. LO ANTERIOR EN CUMPLIMIENTO A LAS DISPOSICIONES QUE REGULAN EL ARTICULO 115 DE LA LEY DE INSTITUCIONES DE CREDITO. "EL CLIENTE DECLARA QUE ESTA ACTUANDO A NOMBRE Y POR CUENTA PROPIA, ES DECIR, QUE LOS BENEFICIOS DERIVADOS DE ESTA CUENTA O CONTRATO Y DE CADA OPERACION RELACIONADA CON EL MISMO NO SE REALIZAN NI REALIZARAN A NOMBRE Y POR CUENTA DE UN TERCERO. ASIMISMO, DECLARA QUE NO EXISTE O EXISTIRA BENEFICIARIO FINAL ALGUNO DISTINTO AL MISMO CLIENTE QUE RECIBA LOS BENEFICIOS DE ESTA CUENTA O CONTRATO".

HE RECIBIDO Y LEIDO EL (LOS) CONTRATO(S), CONVENIO(S) Y ANEXO(S) CONOCIDO(S) COMO:

CONTRATO UNICO DE CAPTACION PARA PERSONAS FISICAS, COMISIONES DE CUENTA DE CHEQUES M.N. BANAMEX PERSONAS FISICAS, FORMA(S) OR-8-1491, OR-8-1614 ANEXO

Y ESTOY DE ACUERDO CON SUS TERMINOS Y CONDICIONES Y ACEPTO QUE ESTA SOLICITUD ES PARTE INTEGRANTE DEL (LOS) MISMO (S).

| CLIENTE | BANCO NACIONAL DE MEXICO, S.A. INTEGRANTE DEL GRUPO FINANCIERO BANAMEX |
|---|---|
| | ALBERTO GONZALEZ LOZANO |
| | GERENTE |
| | 39-70 |

**AUTORIZACION PARA CONSULTAS EN SOCIEDADES DE INFORMACION CREDITICIA**

CONFORME AL ARTICULO 28 DE LA LEY PARA REGULAR LAS SOCIEDADES DE INFORMACION CREDITICIA, EN FORMA EXPRESA AUTORIZO A ESTE BANCO PARA QUE LLEVE A CABO LAS INVESTIGACIONES QUE CONSIDERE NECESARIAS SOBRE MI COMPORTAMIENTO E HISTORIAL CREDITICIO, ASI COMO, CUALQUIER OTRA INFORMACION DE NATURALEZA ANALOGA, CON CUALQUIER SOCIEDAD DE INFORMACION CREDITICIA AUTORIZADA, EN EL ENTENDIDO QUE, EN ESTE ACTO MANIFIESTO QUE TENGO PLENO CONOCIMIENTO DE: (i) LA NATURALEZA Y ALCANCE DE LA INFORMACION QUE LA SOCIEDAD DE INFORMACION CREDITICIA DE QUE SE TRATE INFORMARA AL BANCO, (ii) EL USO QUE EL BANCO HARA DE LA MISMA; Y (iii) QUE EL BANCO PODRA REALIZAR CONSULTAS PERIODICAS CUANTAS VECES CONSIDERE NECESARIAS, DURANTE TODO EL TIEMPO EN QUE MANTENGAMOS UNA RELACION JURIDICA, LA PRESENTE AUTORIZACION TENDRA UNA VIGENCIA DE TRES AÑOS CONTADOS A PARTIR DE LA FECHA QUE SE EXPIDE.

| CLIENTE | |
|---|---|
| | BANCO |

ESTA INFORMACION ES DE USO INTERNO Y CONFIDENCIAL

SLONGORIA002740

01602

 

299/ANEX COTI/APOD/FIR

000029945360   C: 39679   P: 00112

| NUMERO DE CLL. | PRODUCTO | NUMERO DE CONTRATO | DIA | MES | AÑO |
|---|---|---|---|---|---|
| 29945360 | CHEQUES MONEDA NACIONAL | 7572369315 | 17 | 02 | 2006 |

**NOMBRE DEL CLIENTE (NOMBRE (S), APELLIDO PATERNO / APELLIDO MATERNO O RAZON SOCIAL)**

DOROTHY LOUISE KOWALSKI DE LONGORIA

**DATOS GENERALES (1)**

COTITULAR ☐   APODERADO ☐   REPRESENTANTE LEGAL ☐   FIRMANTE ☑   ADICIONAL ☐

**NOMBRE(S), APELLIDO PATERNO / APELLIDO MATERNO**

RAFAEL DE JESUS CARBAJAL GALINDO

| FECHA DE NACIMIENTO | | | RFC | NACIONALIDAD | CURP |
|---|---|---|---|---|---|
| AÑO | MES | DIA | CAGR490608 | MEXICANA | |
| 1949 | 06 | 08 | | | |

| OCUPACION | GIRO ECONOMICO |
|---|---|
| EMPLEADO | SERV. ADMINISTRATIVOS |

| E-MAIL | DOMICILIO PRINCIPAL (CALLE Y NUMERO) |
|---|---|
| | N HEROES 121 |

| COLONIA | DELEGACION / MUNICIPIO / POBLACION | ESTADO | PAIS DE RESIDENCIA | C. POSTAL |
|---|---|---|---|---|
| FRACC RIO BRAVO | RIO BRAVO | TAMAULIPAS | MEXICO | 88900 |

**TELEFONO**

| TIPO: | OFICINA / EMPRESA ☑ | FAX ☐ | CLAVE (L.D.) TELEFONO | EXTENSION | TIPO: | OFICINA / EMPRESA ☐ | FAX ☐ | CLAVE (L.D.) TELEFONO | EXTENSION |
|---|---|---|---|---|---|---|---|---|---|
| DOMICILIO ☐ | RECADOS ☐ | CELULAR ☐ | 899 9090350 | | DOMICILIO ☐ | RECADOS ☐ | CELULAR ☐ | | |

| ¿ES FIGURA PUBLICA? | ¿ESTA RELACIONADO(A) CON UNA FIGURA PUBLICA? | DOCUMENTOS ENTREGADOS |
|---|---|---|
| SI ☐   NO ☑ | SI ☐   NO ☑ | IDENTIFICACION ☑   COMPROBANTE DE DOMICILIO ☑ |

FIRMA

---

**DATOS GENERALES (1)**

COTITULAR ☐   APODERADO ☐   REPRESENTANTE LEGAL ☐   FIRMANTE ☑   ADICIONAL ☑

**NOMBRE(S), APELLIDO PATERNO / APELLIDO MATERNO**

MARCO ANTONIO TORRES GARZA

| FECHA DE NACIMIENTO | | | RFC | NACIONALIDAD | CURP |
|---|---|---|---|---|---|
| AÑO | MES | DIA | TOGM860811 | MEXICANA | |
| 1986 | 08 | 11 | | | |

| OCUPACION | GIRO ECONOMICO |
|---|---|
| EMPLEDO | SERV ADMINISTRATIVOS |

| E-MAIL | DOMICILIO PRINCIPAL (CALLE Y NUMERO) |
|---|---|
| | SIERRA NEVADA 1206 |

| COLONIA | DELEGACION / MUNICIPIO / POBLACION | ESTADO | PAIS DE RESIDENCIA | C. POSTAL |
|---|---|---|---|---|
| FUENTES SECC LOM | REYNOSA | TAMAULIPAS | MEXICO | 88743 |

**TELEFONO**

| TIPO: | OFICINA / EMPRESA ☑ | FAX ☐ | CLAVE (L.D.) TELEFONO | EXTENSION | TIPO: | OFICINA / EMPRESA ☐ | FAX ☐ | CLAVE (L.D.) TELEFONO | EXTENSION |
|---|---|---|---|---|---|---|---|---|---|
| DOMICILIO ☐ | RECADOS ☐ | CELULAR ☐ | 899 9090350 | | DOMICILIO ☐ | RECADOS ☐ | CELULAR ☐ | | |

| ¿ES FIGURA PUBLICA? | ¿ESTA RELACIONADO(A) CON UNA FIGURA PUBLICA? | DOCUMENTOS ENTREGADOS |
|---|---|---|
| SI ☐   NO ☑ | SI ☐   NO ☑ | IDENTIFICACION ☑   COMPROBANTE DE DOMICILIO ☑ |

FIRMA

---

CLIENTE

Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex

ESTA INFORMACION ES DE USO INTERNO Y CONFIDENCIAL

ALBERTO GONZALEZ LOZANO
GERENTE
39-70

OR-30-36003  11-04

SLONGORIA002741

01603


| NUMERO DE CLIENTE | PRODUCTO | NUMERO DE CONTRATO | DIA | MES | AÑO |
|---|---|---|---|---|---|
| 29945388 | CHEQUES MONEDA NACIONAL | 7572388315 | 17 | 02 | 2005 |

NOMBRE DEL CLIENTE (NOMBRE (S), APELLIDO PATERNO / APELLIDO MATERNO O RAZON SOCIAL)

DOROTHY LOUISE KOWALSKI DE LONGORIA

**DATOS GENERALES (1)**

COTITULAR ☐   APODERADO ☐   REPRESENTANTE LEGAL ☐   FIRMANTE ☑   ADICIONAL ☐

NOMBRE(S), APELLIDO PATERNO / APELLIDO MATERNO
PATRICIA VAZQUEZ FAVELA

| FECHA DE NACIMIENTO AÑO / MES / DIA | RFC | NACIONALIDAD | CURP |
|---|---|---|---|
| 1965  01  04 | VAFP650104 | MEXICANA | |

OCUPACION
EMPLEADO

GIRO ECONOMICO
SERV. ADMINISTRATIVOS

E-MAIL

DOMICILIO PRINCIPAL (CALLE Y NUMERO)
CERRO SAN MIGUEL 1206

| COLONIA | DELEGACIÓN / MUNICIPIO / POBLACIÓN | ESTADO | PAIS DE RESIDENCIA | C. POSTAL |
|---|---|---|---|---|
| LAS LOMAS | REYNOSA | TAMAULIPAS | MEXICO | 88710 |

TELÉFONO

TIPO: OFICINA / EMPRESA ☑ FAX ☐  DOMICILIO ☐ RECADOS ☐ CELULAR ☐   CLAVE (L.D.) TELEFONO 899 9090350   EXTENSION

TIPO: OFICINA / EMPRESA ☐ FAX ☐  DOMICILIO ☐ RECADOS ☐ CELULAR ☐   CLAVE (L.D.) TELEFONO   EXTENSION

¿ES FIGURA PUBLICA?  SI ☐  NO ☑

¿ESTA RELACIONADO(A) CON UNA FIGURA PUBLICA?  SI ☐  NO ☑

DOCUMENTOS ENTREGADOS  IDENTIFICACION ☑   COMPROBANTE DE DOMICILIO ☑

FIRMA

---

**DATOS GENERALES (1)**

COTITULAR ☐   APODERADO ☐   REPRESENTANTE LEGAL ☐   FIRMANTE ☑   ADICIONAL ☑

NOMBRE(S), APELLIDO PATERNO / APELLIDO MATERNO
MARIA DEL CARMEN TORRES ZAMARRON

| FECHA DE NACIMIENTO AÑO / MES / DIA | RFC | NACIONALIDAD | CURP |
|---|---|---|---|
| 1970  02  19 | TOZC700219 | MEXICANA | |

OCUPACION
EMPLEDO

GIRO ECONOMICO
SERV ADMINISTRATIVOS

E-MAIL

DOMICILIO PRINCIPAL (CALLE Y NUMERO)
SIERRA NEGRA 301

| COLONIA | DELEGACIÓN / MUNICIPIO / POBLACIÓN | ESTADO | PAIS DE RESIDENCIA | C. POSTAL |
|---|---|---|---|---|
| LOMA LINDA | REYNOSA | TAMAULIPAS | MEXICO | 88700 |

TELÉFONO

TIPO: OFICINA / EMPRESA ☑ FAX ☐  DOMICILIO ☐ RECADOS ☐ CELULAR ☐   CLAVE (L.D.) TELEFONO 899 9090350   EXTENSION

TIPO: OFICINA / EMPRESA ☐ FAX ☐  DOMICILIO ☐ RECADOS ☐ CELULAR ☐   CLAVE (L.D.) TELEFONO   EXTENSION

¿ES FIGURA PUBLICA?  SI ☐  NO ☑

¿ESTA RELACIONADO(A) CON UNA FIGURA PUBLICA?  SI ☐  NO ☑

DOCUMENTOS ENTREGADOS  IDENTIFICACION ☑   COMPROBANTE DE DOMICILIO ☑

FIRMA

---

CLIENTE

Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex

**ALBERTO GONZALEZ LOZANO**
GERENTE
39-70

ESTA INFORMACION ES DE USO INTERNO Y CONFIDENCIAL

OR-30-3600B  11-04

SLONGORIA002742

01604





303/PERFIL DEL CLIENTE

000029945360   C: 39853   P: 00168

| NO. DE CLIENTE | PRODUCTO | No. DE CONTRATO | DIA | MES | AÑO |
|---|---|---|---|---|---|
| 29945360 | CHEQUES MONEDA NACIONAL CUENTA CORRIENTE | 7572369315 | 10 | 02 | 2005 |

### NOMBRE(S),APELLIDO PATERNO/APELLIDO MATERNO O RAZON SOCIAL DEL CLIENTE

DOROTHY KOWALSKI LONGORIA

### DATOS DE LA ACTIVIDAD DEL CLIENTE

| NUMERO DE UBICACIONES DE LA EMPRESA | COBERTURA GEOGRAFICA | OPERACIONES DE IMPORTACION / EXPORTACION |
|---|---|---|
| 1 | REGIONAL | NO IMPORTA NI EXPORTA |

### REFERENCIAS PERSONALES / COMERCIALES

| NOMBRE | DOMICILIO | (CLAVE L.D.) TELEFONO |
|---|---|---|
| | | |

DECLARO QUE EL ORIGEN DE LOS FONDOS QUE ENTREGUE PARA LA APERTURA DE PRODUCTOS Y SERVICIOS DEL BANCO QUE SOLICITE , PROCEDEN DE ACTIVIDADES LICITAS LAS CUALES SEÑALO A CONTINUACION:

PATRIMONIO - AHORRO

HONORARIOS/SUELDO

Y NO ADMITIRE QUE TERCEROS EFECTUEN DEPOSITOS A MIS CUENTAS CON RECURSOS PROVENIENTES DE ACTIVIDADES ILICITAS CONTEMPLADAS EN EL CODIGO PENAL MEXICANO O EN CUALQUIER NORMA QUE LO MODIFIQUE O ADICIONE, NI EFECTUARE TRANSACCIONES DESTINADAS A TALES ACTIVIDADES A FAVOR DE PERSONAS RELACIONADAS CON LAS MISMAS. ASI MISMO DECLARO QUE ESPERO REALIZAR OPERACIONES MENSUALES DE ACUERDO AL NUMERO Y MONTO DETALLADOS A CONTINUACION:

| TIPO DE OPERACIONES | NUMERO DE OPERACIONES | MONTO |
|---|---|---|
| NUMERO PROMEDIO DE ABONOS MENSUALES | DE 50 A 100 | |
| IMPORTE PROMEDIO DE ABONOS MENSUALES | | 1 - 3 MILLONES |
| IMPORTE MENSUAL TRANF FONDOS DEL/AL EXT | | 1 - 3 MILLONES |
| IMPORTE MENSUAL CH CAJA/CH VIAJ/DIV/MET | | NINGUNA |

Y  NO  FORMO PARTE DE UN GRUPO EMPRESARIAL O DE NEGOCIO, CON UNA RELACION DE: _____

CON EL GRUPO _____  CUYO R.F.C. ES _____

| CLIENTE | BANCO NACIONAL DE MEXICO, S.A. INTEGRANTE DEL GRUPO FINANCIERO BANAMEX |
|---|---|
| | |

ESTA INFORMACION ES DE USO INTERNO Y CONFIDENCIAL

ALBERTO GONZALEZ LOZANO  BANCO
GERENTE
39-70

SLONGORIA002743

01605

 **Banamex**


VENTA N.

| NOMINA | APELLIDO PATERNO APELLIDO MATERNO NOMBRES (S) | SUCURSAL | |
|---|---|---|---|
| 3231461 | NOCHEBUENA/JUAREZ,FLOR MARIA | 4761   PRADOS SUR,TAMPS | |
| No DE CLIENTE | NOMBRE DEL CLIENTE | CTA / CONTRATO | FECHA DE APERTURA (AÑO/MES/DIA) |
| 29945360 | DOROTHY KOWALSKI LONGORIA | 7572369315 | 2005 / 02 / 10 |

| NOMBRE | PARENTESCO | PORCENTAJE |
|---|---|---|
| SHELBY L LONGORIA KOWALSKI | HIJO(A) | 100 |

| FECHA DE NACIMIENTO / R.F.C | DOMICILIO DEL BENEFICIARIO | C.P. |
|---|---|---|
| 08-08-1952 | Pedro J mendoza 333 Col. Zona Centro Reynosa, Tamps | 88500 |

| CLIENTE | BANCO NACIONAL DE MEXICO, S.A. INTEGRANTE DEL GRUPO FINANCIERO BANAMEX |
|---|---|
| *(firma)* | *(firma)* |

ESTA INFORMACION ES DE USO INTERNO Y CONFIDENCIAL   ALBERTO GONZALEZ LOZANO
GERENTE
39-70

SLONGORIA002744

01606



| LUGAR | DIA | MES | AÑO |
|---|---|---|---|
| REYNOSA, TAMPS. | 17 | 02 | 2005 |

NOMBRE Y NÚMERO DE LA SUCURSAL
PRADO SUR 4761

NÚMERO DE CUENTA
3156

ESTIMADOS SEÑORES:

POR MEDIO DE LA PRESENTE LES PARTICIPO (AMOS) QUE CON ESTA FECHA HE (MOS) AUTORIZADO A LA PERSONA CUYO NOMBRE Y FIRMA CONSTAN AL CALCE, PARA QUE HAGA DISPOSICIONES DE LAS SUMAS DEPOSITADAS EN MI (NUESTRA) CUENTA DE CHEQUES ARRIBA CITADA, EN LOS TÉRMINOS DEL ARTÍCULO 57 DE LA LEY DE INSTITUCIONES DE CRÉDITO, ASÍ COMO PARA ENDOSAR PARA ABONO EN CUENTA CUALQUIER CLASE DE TÍTULOS DE CRÉDITO A MI FAVOR, DE ACUERDO CON LA DISPOSICIÓN CONTENIDA EN EL ARTÍCULO 9°. FRACCIÓN II DE LA LEY GENERAL DE TÍTULOS Y OPERACIONES DE CRÉDITO.

NOMBRE DEL CLIENTE

DOROTHY LOUISE KOWALSKI DE LONGORIA

FIRMA DEL CLIENTE

BANCO NACIONAL DE MÉXICO, S.A.,
INTEGRANTE DEL GRUPO FINANCIERO BANAMEX

NOMBRE Y FIRMA DEL EJECUTIVO

ALBERTO GONZALEZ LOZANO
GERENTE
39-70

NOMBRE Y FIRMA DEL AUTORIZADO

MARCO ANTONIO TORRES GARZA

OR-8-1473 08-02    Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex    B) BANCO

SLONGORIA002745

01607



| LUGAR | | DIA | MES | AÑO |
|---|---|---|---|---|
| REYNOSA, TAMPS. | | 17 | 02 | 2005 |

| NOMBRE Y NÚMERO DE LA SUCURSAL | NÚMERO DE CUENTA |
|---|---|
| PRADO SUR 4781 | 3158 |

ESTIMADOS SEÑORES:

POR MEDIO DE LA PRESENTE LES PARTICIPO (AMOS) QUE CON ESTA FECHA HE (MOS) AUTORIZADO A LA PERSONA CUYO NOMBRE Y FIRMA CONSTAN AL CALCE, PARA QUE HAGA DISPOSICIONES DE LAS SUMAS DEPOSITADAS EN MI (NUESTRA) CUENTA DE CHEQUES ARRIBA CITADA, EN LOS TÉRMINOS DEL ARTÍCULO 57 DE LA LEY DE INSTITUCIONES DE CRÉDITO, ASÍ COMO PARA ENDOSAR PARA ABONO EN CUENTA CUALQUIER CLASE DE TÍTULOS DE CRÉDITO A MI FAVOR, DE ACUERDO CON LA DISPOSICIÓN CONTENIDA EN EL ARTÍCULO 9°, FRACCIÓN II DE LA LEY GENERAL DE TÍTULOS Y OPERACIONES DE CRÉDITO.

NOMBRE DEL CLIENTE

DOROTHY LOUISE KOWALSKI DE LONGORIA

BANCO NACIONAL DE MÉXICO, S.A.,
INTEGRANTE DEL GRUPO FINANCIERO BANAMEX

FIRMA DEL CLIENTE

NOMBRE Y FIRMA DEL EJECUTIVO

NOMBRE Y FIRMA DEL AUTORIZADO

ALBERTO GONZALEZ LOZANO
GERENTE
39-70

MARIA DEL CARMEN TORRES ZAMARRON

OR-8-1472 09-02          Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex          B) BANCO

SLONGORIA002746

01608



AUTORIZACIÓN PARA MANEJO
DE CUENTA DE CHEQUES

301/AUT P MANEJO CTA C

0000289453B0    C: 39679    P: 00112

| DIA | MES | AÑO |
|-----|-----|-----|
| 17 | 02 | 2005 |

LUGAR
REYNOSA, TAMPS.

NOMBRE Y NÚMERO DE LA SUCURSAL
PRADO SUR 4761                                                3156

ESTIMADOS SEÑORES:

POR MEDIO DE LA PRESENTE LES PARTICIPO (AMOS) QUE CON ESTA FECHA HE (MOS) AUTORIZADO A LA PERSONA CUYO NOMBRE Y FIRMA CONSTAN AL CALCE, PARA QUE HAGA DISPOSICIONES DE LAS SUMAS DEPOSITADAS EN MI (NUESTRA) CUENTA DE CHEQUES ARRIBA CITADA, EN LOS TÉRMINOS DEL ARTÍCULO 57 DE LA LEY DE INSTITUCIONES DE CRÉDITO, ASÍ COMO PARA ENDOSAR PARA ABONO EN CUENTA CUALQUIER CLASE DE TÍTULOS DE CRÉDITO A MI FAVOR, DE ACUERDO CON LA DISPOSICIÓN CONTENIDA EN EL ARTÍCULO 9°, FRACCIÓN II DE LA LEY GENERAL DE TÍTULOS Y OPERACIONES DE CRÉDITO.

NOMBRE DEL CLIENTE
DOROTHY LOUISE KOWALSKI DE LONGORIA

BANCO NACIONAL DE MÉXICO, S.A.
INTEGRANTE DEL GRUPO FINANCIERO BANAMEX

FIRMA DEL CLIENTE

NOMBRE Y FIRMA DEL EJECUTIVO

NOMBRE Y FIRMA DEL AUTORIZADO

ALBERTO GONZALEZ LOZANO
GERENTE
39-70

RAFAEL DE JESUS CARBAJAL GALINDO

OR-B-1472 99-02          Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex          B) BANCO

SLONGORIA002747

01609

 **Banamex**

| LUGAR | | DIA | MES | AÑO |
|---|---|---|---|---|
| REYNOSA, TAMPS. | | 17 | 02 | 2005 |

| NOMBRE Y NÚMERO DE LA SUCURSAL | NÚMERO DE CUENTA |
|---|---|
| PRADO SUR 4781 | 3156 |

ESTIMADOS SEÑORES:

POR MEDIO DE LA PRESENTE LES PARTICIPO (AMOS) QUE CON ESTA FECHA HE (MOS) AUTORIZADO A LA PERSONA CUYO NOMBRE Y FIRMA CONSTAN AL CALCE, PARA QUE HAGA DISPOSICIONES DE LAS SUMAS DEPOSITADAS EN MI (NUESTRA) CUENTA DE CHEQUES ARRIBA CITADA, EN LOS TÉRMINOS DEL ARTÍCULO 57 DE LA LEY DE INSTITUCIONES DE CRÉDITO, ASÍ COMO PARA ENDOSAR PARA ABONO EN CUENTA CUALQUIER CLASE DE TÍTULOS DE CRÉDITO A MI FAVOR, DE ACUERDO CON LA DISPOSICIÓN CONTENIDA EN EL ARTÍCULO 9°. FRACCIÓN II DE LA LEY GENERAL DE TÍTULOS Y OPERACIONES DE CRÉDITO.

NOMBRE DEL CLIENTE

DOROTHY LOUISE KOWALSKI DE LONGORIA

BANCO NACIONAL DE MÉXICO, S.A.,
INTEGRANTE DEL GRUPO FINANCIERO BANAMEX

FIRMA DEL CLIENTE

NOMBRE Y FIRMA DEL EJECUTIVO

NOMBRE Y FIRMA DEL AUTORIZADO

PATRICIA VAZQUEZ FAVELA

ALBERTO GONZALEZ LOZANO
GERENTE
39-70

OR-8-1473 02-02

Banco Nacional de México, S.A., Integrante del Grupo Financiero Banamex        B) BANCO

SLONGORIA002748

01610

# EXHIBIT 3A

01612

I HAVE RECEIVED AND READ THE CONTRACT(S), AGREEMENTS AND APPENDICES AS SINGLE CONTRACT FOR INDIVIDUAL PERSONS, CHECKING ACCOUNT FEES MN BANAMEX INDIVIDUAL PERSONS; FORM(S) [illegible]

_____

_____

_____

_____

_____

AND I AGREE WITH ITS TERMS AND CONDITIONS AND ACCEPT THAT THIS APPLICATION IS INTEGRAL TO THEM

**01613**



TRANSPERFECT

City of New York, State of New York, County of New York

I, Alitasha Younger, hereby certify that the document "Banamex Peso Account Clause" is to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Alitasha Younger

Sworn to before me this
August 27, 2015

Signature, Notary Public

SENIDA KULJANCIC
Notary Public - State of New York
No. 01KU6322856
Qualified in KING County
Commission Expires April 13, 2019

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 I T 212.689.5555 I F 212.689.1059 I WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

**01614**

# EXHIBIT 4

01616

01617

# EXHIBIT 5

01620

| IN THE ESTATE OF | § | IN THE PROBATE COURT |
| DOROTHY LOUISE LONGORIA, | § | NUMBER ONE |
| DECEASED | § | HARRIS COUNTY, TEXAS |
| | § | |

## Affidavit of Dr. Carlos Gabuardi

| STATE OF NUEVO LEON, | § |
| MONTERREY, MEXICO | § |
| | § |

BEFORE ME, Jorge Luis Trevino Trevino, the undersigned Notario Publico, on this day personally appeared Carlos Alberto Enrique José Lorenzo Gabuardi Arreola, who, being by me first duly sworn, stated the following:

1.     My name is Dr. Carlos Alberto Enrique José Lorenzo Gabuardi Arreola, PhD. I am over twenty-one years of age, of sound mind, and qualified to make this affidavit. I have personal knowledge of the facts stated herein and am competent to testify thereto.

2.     I have been retained by counsel for Shelby Longoria as a consultant and expert witness on Mexican law in the above-titled action.

3.     In connection with this engagement I have been requested to address several legal questions under the context of contracts entered into with a Mexican Bank, Banco Nacional de México, S.A. (Banamex), in reference to the following checking accounts: (a) Banamex US Dollars Checking Account for Client No. 7518181565 opened by Ms. Dorothy Kowalsky Longoria on December 12, 1999; and (b) Banamex Mexican pesos Checking Account No. ███████ for Client No. ███████ opened by Ms. Dorothy Kowalsky Longoria on February 10, 2005.

4.     Based on my review of documents and my expertise in Mexican law, I have the following opinions:

a. In Mexico all contracts for mass banking transactions that Mexican banks conduct with the public, including checking accounts, are documented using Standard Contractual Forms (Unilateral Adhesion Contracts) that each bank may unilaterally amend from time to time.

b. The terms and conditions set forth in the Standard Contractual Forms are binding for all the parties of that particular banking transaction, either acting as the financial institution or as customers.

c. The process to amend a given Standard Contractual Form are set forth in each of the contracts concerned.

d. All of the Standard Contractual Forms documenting the checking accounts referred to in point 3 above and the amendments thereto are valid and enforceable under Mexican Law.

e. The Jurisdiction and Mexican Law clauses in the Standard Contractual Forms documenting the checking accounts referred to in point 3 are valid and enforceable contractual clauses under Mexican law.

f. The fact that the parties to these contracts actually did execute the Standard Contractual Forms referred to above, means that they expressly and voluntarily submitted themselves to the exclusive jurisdiction of both Mexican law and the Mexican Judiciary, that is, to the courts located in Mexico City or Monterrey (Banamex) waiving any other venue whatsoever.

## I. BACKGROUND

1. I have studied, practiced, and taught law in Mexico and the United States for over 30 years. I received a License in Jurisprudence from Universidad de Monterrey in 1981; a Master of Laws (LL.M.), with distinction, from Tulane

University in 2001; and a Doctorate of Laws (Ph.D.) from Tulane University in 2007. A true and correct copy of my resume is attached to this Affidavit as Exhibit A.

2.     I have taught law in various law schools in Mexico and the United States. Since 1983, I have held research and teaching positions at several other universities in Mexico and the United States. For example, I was a member of the National Researchers System of México, from 2008 until 2014; I served as Professor of Law and researcher at the Instituto Tecnológico y de Estudios Superiores de Monterrey in Mexico (1998-2011); I acted as the Head of the Law Department and served as Professor of Law at the Universidad de Monterrey in Mexico (1990-1993); I was a Visiting Professor of Law at St. Mary's University School of Law in San Antonio, Texas (1993-1994); and held Adjunct Professor of Law positions at both The Washington College of Law, American University, Washington, D.C. (Summer 1994) and Universidad Regiomontana in Monterrey, Mexico (1983-1985). As a professor, I have taught courses on Comparative International Law, Private International Law, Public International Law, International Business Transactions, and the Legal Framework of Doing Business in México, among others.

3.     I have maintained a law practice since 1980 in various companies and law firms. I currently practice law at Gabuardi Abogados in Monterrey, Mexico, since 2004. I have also worked as a lawyer in the legal department of the World Bank in Washington, D.C. (1994-1996) and as both a Corporate Legal Manager and the Assistant Secretary of the Board of Directors of Grupo Gamesa, a Mexican manufacturing company (1980-1985). My law practice focuses on Corporate Law, Contracts, Business Transactions, Private International Law, as well as in International and Domestic Litigation.

01623

4.      I had been a member of several legal professional organizations in both Mexico and internationally, including the Barra Mexicana de Abogados, Colegio de Abogados, Capítulo Nuevo León (the Mexican Bar Association, Nuevo Leon Inn), where I was the Chair of the International and Comparative Law Committee; the Colegio de Abogados de Monterrey (the Monterrey Bar Association); the Academia Nuevo Leonesa de Derecho Mercantil (the Nuevo Leon Academy of Commercial Law); the Asosiacion Nacional de Abogados de Empresa (the National Association of Corporate Lawyers); the External Advisory Board of NAFTA; the Law and Business Review of the Americas; the Mexican Academy of Private International and Comparative Law (Académia Méxicana de Derecho Internacional Privado y Comparado); the Mexican Association of Private International Law Professors (the Asociación Mexicana de Profesores de Derecho Internacional Privado) and the International Academy of Comparative Law.  I also was part of the group that founded the US-Mexico Bar Association and later on served as its Mexican co-chair of the Legal Education Committee.

5.      Further, I have served on the Regional Advisory Board of the Centre for Conciliation and Arbitration of St. Mary's University School of Law, San Antonio, Texas. I also co-planned and administered a program titled "Joint Venture. A Transnational Study and Training Program for U.S. and Mexican Business Lawyers" held at the St. Mary's University School of Law and Universidad de Monterrey.

6.      During my academic career, I have published more than 20 academic articles and two books in both Mexico and abroad on topics including Commercial Law and Business Transactions, Private International Law and Comparative Law.  Most recently, the Puerto Rico Supreme Court cited my article on

forum non conveniens titled "Entre la jurisdicción, la competencia y el forum non conveniens," originally published in the Boletín Mexicano de Derecho Comparado in 2008, in its opinion deciding whether to incorporate the common-law doctrine of forum non conveniens in Puerto Rico.

## II. OPINIONS

7.    In Mexico all contracts for mass banking transactions that Mexican banks conduct with the public, including checking accounts, are documented using Standard Contractual Forms (Unilateral Adhesion Contracts) that each bank may unilaterally amend from time to time.

8.    The use of Standard Contractual Forms (Unilateral Adhesion Contracts) for mass banking transactions, including checking accounts is governed, by the Statute for the Protection and Defense of Users of Financial Services (Ley de Protección y Defensa al Usuario de Servicios Financieros), the Statute for Transparency and Order in Financial Services (Ley para la Transparencia y Ordenamiento de los Servicios Financieros) and the Sole Regulation of the Commission for the Protection and Defense of Users of Financial Services Applicable to Financial Entities (Disposición Única de la Condusef aplicable a las Entidades Financieras) and the Agency for the Protection of Consumer (Procuraduría Federal del Consumidor).

9.    Standard Contractual Forms (Unilateral Adhesion Contracts) for mass banking transactions are defined as non-negotiable documents unilaterally prepared by Financial Entities setting forth in standard forms the terms and conditions applicable to the banking transactions entered into with their customers.[1]

---

[1] Art. 56, 2nd paragraph of the Statute for the Protection and Defense of Users of Financial Services ,Art. 3 section v of the Statute for Transparency and Order in Financial Services and Art. 2, section iv of the Sole Regulation of the Commission for the Protection and Defense of Users of Financial Services Applicable to Financial Entities.

10. The terms and conditions set forth in the Standard Contractual Forms are binding for all the parties of that particular banking transaction, either acting as the financial institution or as customers.[2]

11. In the Banamex Standard Contract Form I have reviewed (OR-8-1401 03-08 and OR-8-1401 08-11), there is a clause providing for the exclusive jurisdiction of Mexican Law and the Courts located in Mexico City for all matters concerning such contract.[3]

12. I am of the opinion that the clauses providing for the exclusive jurisdiction of Mexican Law and the Courts located in Mexico City for all matters concerning the Banamex Standard Contract Forms (OR-8-1401 03-08 and OR-8-1401 08-11), that is, the original version of the contract at the time when the account was opened, and the latest version of the contract in effect at the time when the account was closed, are the same. The clause on exclusive jurisdiction did not change over the years and remained unchanged until the account was closed on April 18, 2012.

13. Under the authority of Article 11 section IV of the Statute for Transparency and Order in Financial Services[4] and Article 5 paragraph b of the Sole Regulation of the Commission for the Protection and Defense of Users of Financial Services Applicable to Financial Entities,[5] the Standard Contractual Forms used by the banking institution shall include the procedure for customer to accept amendments to such Standard Contractual Forms.

---

[2] Article 78 of the Code of Commerce: "In commercial contracts each party is bound to the contract under the terms and conditions in the contract, the validity of a commercial transaction does not depend on observing any predetermined formalities or requirements."

[3] Clause 9. All controversies derived from this Standard Contract shall be governed by Mexican law and the jurisdiction of the competent courts in Mexico City, waiving to any other jurisdiction with the parties may have by reason of their current or future domicile."

[4] Article 11 section IV: Contractual Standard Forms shall include the following: The notification process, as well as the basis for the customers to accept amendments to the Contractual Standard Forms with which the entered into a contractual relation with the banking institution.

[5] Article 5 paragraph b: The Contractual Standard Forms used by banking institutions shall include, at least: the conditions and procedures to amend the Contractual Standard Forms.

14.    The Banamex contracts provide that this banking institution may unilaterally amend its own Standard Contractual Forms providing notice for such amendments through reasonable means of notice established in those contracts. If an account is closed, the terms and conditions that govern the contract are those that are established at the time the bank account closed.

15.    I have no knowledge and I have not seen any evidence showing me that Ms. Dorothy Kowalsky Longoria challenged or opposed to any amendments to the contracts under scrutiny while maintaining her Banamex Accounts.

16.    Furthermore, under the authority of Article 11, section VIII, second paragraph of the Statute for Transparency and Order in Financial Services, the Commission for the Protection and Defense of Users of Financial Services, shall maintain a Registry for the Standard Contractual Forms used by financial institutions, to the purpose of publicity and making these contracts available to the public.[6]

17.    All of the Standard Contractual Forms that I have reviewed in this document, concerning the checking accounts referred to in this documents and the amendments thereto are valid and enforceable contractual clauses under Mexican Law.

18.    All versions of the Standard Contractual Forms used by Banamex during the time in which Ms. Dorothy Kowalsky Longoria maintained her Banamex accounts consistently set forth that the parties to the same expressly and voluntarily submitted themselves to the exclusive jurisdiction of both Mexican law and the Mexican Judiciary, that is, to the courts located in Mexico City (Banamex) waiving any other venue whatsoever.

19.    The fact that the parties to these contracts actually did execute the Standard Contractual Forms referred to in this Affidavit, means that they expressly and voluntarily submitted themselves to the exclusive jurisdiction of both Mexican law and the Mexican Judiciary, that is, to the courts located in Mexico City (Banamex) waiving any other venue whatsoever.

---

[6] Article 11, section VIII, second paragraph of the Statute for Transparency and Order in Financial Services: Financial Entities shall send to the Commission for the Protection and Defense of Users of Financial Services, the Standard Contractual Forms, to publish this in a Registry of Standard Contractual Forms that could be consulted by the general public at large.

20.     It is important to emphasize that in any and all cases all of the Standard Contractual Forms under review always point towards the laws of Mexico and to the jurisdiction of Mexican courts which venue is always located in the country of Mexico.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

FURTHER AFFIANT SAYETH NOT.

01628



# NOTARÍA PÚBLICA 34

### LIC. JORGE LUIS TREVIÑO TREVIÑO
TITULAR

## ACTA FUERA DE PROTOCOLO
## NUMERO 46,903/2015.-

------ EN LA CIUDAD DE MONTERREY, CAPITAL DEL ESTADO DE NUEVO LEON, hoy día 27 veintisiete de agosto de 2015, dos mil quince, Yo, Licenciado: - - - - - - - - -

### JORGE LUIS TREVIÑO TREVIÑO

----- Notario Público, Titular de la Notaría Pública Número 34 treinta y cuatro, con ejercicio en este Primer Distrito Registral del Estado, y con residencia en esta ciudad, HAGO CONSTAR lo siguiente: Que Ante Mí, comparece el señor Doctor **CARLOS ALBERTO ENRIQUE JOSE LORENZO GABUARDI ARREOLA**, persona de mi leal conocimiento, quien manifiesta bajo juramento que el contenido del documento escrito en idioma inglés que se anexa a la presente acta, contiene declaración jurada (affidavit), el que fue elaborado por él mismo, conforme a su más leal saber y entender, en su carácter de Abogado, Doctor en Derecho y experto en Derecho Mexicano, el cual SUSCRIBE EN MI PRESENCIA DE SU PUÑO Y LETRA, por lo que Yo, el Notario Doy Fe que el documento de referencia es auténtico y legítimo.

### G E N E R A L E S

--- El señor CARLOS ALBERTO ENRIQUE JOSE LORENZO GABUARDI ARREOLA, manifiesta por generales las siguientes: Llamarse como quedó escrito, ser mexicano por nacimiento, mayor de edad, casado, originario de ésta ciudad de Monterrey, Nuevo Leon, donde nació el día 17 diecisiete de agosto de 1957 mil novecientos cincuenta y siete, de 58 cincuenta y ocho años de edad, Abogado, en el ejercicio de su profesión, al corriente en el pago del Impuesto sobre la Renta, sin justificarlo de momento, con Registro Federal de Contribuyentes número GAAC-570817-628, con domicilio en calle Montes Claros número 3429 tres mil cuatrocientos veintinueve, del Fraccionamiento Villasol, en ésta Ciudad de Monterrey, Nuevo Leon; e identificándose con Credencial para votar, expedida por el Instituto Federal Electoral, Registro Federal de Electores con número 141221768634, Folio número 34369408, con año de registro 1991-0 mil novecientos noventa y uno guión cero, y en la que aparece la fotografía del compareciente la cual coincide con la fisonomía del mismo; con Clave Unica de Registro de Población (CURP) GAAC570817HNLBRR06, expedida por el Registro Nacional de Población, por lo que indica que es la persona de que se trata. Yo, el Notario tengo a la vista y agrego una copia de la misma al original que de esta acta expido, la cual devuelvo a su presentante.

01629

----- **TODO LO CUAL YO, EL NOTARIO, DOY FE**: De la verdad del acto: De que conozco al compareciente a quién considero con la capacidad legal necesaria para otorgar el acto jurídico de que se trata, sin que me conste nada en contrario; De que tuve a la vista los documentos de que se tomó razón; de que advertí al compareciente de las penas en que incurren los que declaran con falsedad ante autoridad alguna, Establecidas en el Código Penal vigente en el Estado de Nuevo León; De que todo lo relacionado e inserto concuerda con sus originales a que me remito;- De que todo lo manifestado por el compareciente fue bajo Protesta de decir verdad; De que se cumplieron los requisitos que señalan los Artículos 136 ciento treinta y seis, 139 ciento treinta y nueve y 140 ciento cuarenta todos de la Ley del Notariado vigente en el Estado; De que el suscrito Notario **CERTIFICO Y HAGO CONSTAR**: Que en cumplimiento a lo dispuesto por la Ley Federal de Protección de Datos Personales en Posesión de los Particulares y las disposiciones locales que en su caso apliquen, hice saber a los comparecientes que sus datos personales proporcionados para la formulación del presente escrito no se transfieren a ningún tercero, salvo para el cumplimiento de requisitos u obligaciones de carácter legal y satisfacer los necesarios del trámite notarial respectivo, con oficinas registrales y autoridades fiscales, administrativas y judiciales que correspondan; por lo tanto se dan por enterados del Aviso de Privacidad; se expide para los efectos legales a que haya lugar, tomándose razón en el Libro de Actas Fuera de Protocolo que se lleva en esta Notaría Pública a mi cargo, bajo el número **46,903/2015 CUARENTA Y SEIS MIL NOVECIENTOS TRES DIAGONAL DOS MIL QUINCE**, al principio mencionado.- DOY FE.-



LIC. JORGE LUIS TREVIÑO TREVIÑO.
NOTARIO PÚBLICO NÚMERO 34.

AFP 46,903/2015
mzi

01630

# EXHIBIT 6

01632


CONTRATO ÚNICO DE CAPTACIÓN PARA PERSONAS FÍSICAS, QUE EN LOS TÉRMINOS DE LA SOLICITUD, ASÍ COMO DE LAS DECLARACIONES Y LAS CLÁUSULAS QUE APARECEN A CONTINUACIÓN, CELEBRAN, POR UNA PARTE, BANCO NACIONAL DE MÉXICO, S.A., INTEGRANTE DEL GRUPO FINANCIERO BANAMEX (EN LO SUCESIVO DENOMINADO COMO "BANAMEX") Y, POR LA OTRA PARTE, LA PERSONA CUYOS DATOS APARECEN EN LA SOLICITUD DEL PRESENTE CONTRATO (EN ADELANTE REFERIDO COMO EL "CLIENTE"):

## DECLARACIONES

I. Declara Banamex, por conducto de su(s) funcionario(s) autorizado(s), que:

a) Es una sociedad legalmente constituida conforme a las leyes de México, encontrándose debidamente autorizada como institución de banca múltiple.

b) Designa al Centro de Atención Telefónica como su enlace con el Cliente para efectos de consultas de saldo, aclaraciones y movimientos; cuyo número de teléfono en la Ciudad de México es: 12-26-26-39 (1 BANAMEX) y 22-62-63-91 (BANAMEX 1), desde Guadalajara y Monterrey 12-26-26-39 (1 BANAMEX) y lada sin costo 01-800-021-2345 o aquellos números telefónicos que se encuentren al reverso de la Tarjeta de Débito.

c) El Contrato se encuentra debidamente inscrito en el Registro de Contratos de Adhesión de la Condusef bajo los siguientes números, de acuerdo al Producto contratado: (i) Cuenta de Cheques M.N. Banamex Personas Físicas 0300-436-000550/09-13189-0811; (ii) Cuenta Productiva M.N. Banamex Personas Físicas 0300-436-000552/09-13190-0811; (iii) Cuenta Maestra Opción Banamex 0300-436-000553/09-13191-0811; (iv) Cuenta Maestra Banamex 0300-436-000554/09-13192-0811; (v) Cuenta Perfiles Banamex 0300-436-000556/09-13193-0811; (vi) Cuenta Básica Banamex 0300-003-000633/09-13194-0811; (vii) Mi Cuenta Banamex 0300-003-000632/09-13195-0811; (viii) Invermático Pumas 0300-003-000631/09-13196-0811; (ix) Inversión Integral Banamex para Personas Físicas 0300-003-000634/09-13197-0811; (x) Inversión Perfiles Banamex 0300-003-000666/09-13198-0811; (xi) Depósito de Dinero a Plazo Fijo Moneda Nacional para Personas Físicas 0300-003-000667/10-13199-0811; (xii) Cuenta de Cheques Dólares Banamex Personas Físicas 0300-003-000672/09-13200-0811; (xiii) Cuenta Productiva Dólares Banamex Personas Físicas 0300-003-000673/09-13201-0811; (xiv) Invermático Estados 0300-003-000695/09-13202-0811; (xv) Débito Fútbol 0300-003-000696/09-13203-0811; (xvi) Pagaré Personas Físicas 0300-429-000694/09-13204-0811; y, (xvii) Inversión Inteligente 0300-429-001619/08-13205-0811.

II. Declara el Cliente que:

a) Tiene la capacidad legal suficiente para celebrar el presente Contrato y reconoce como suyos los datos asentados en la Solicitud, todo lo cual acredita con la información que proporcionó a Banamex en la entrevista que éste le efectuó en esta misma fecha, previo a la suscripción de este instrumento, y con los documentos que se anexan al Contrato, los cuales fueron debidamente cotejados contra su original, aceptando que Banamex en cualquier momento podrá verificar la autenticidad de los datos ahí asentados y, en consecuencia, actualizarlos en su expediente. Asimismo, se obliga a entregar a Banamex los documentos que éste le solicite en cualquier momento.

b) El dinero que será abonado a la Cuenta, es de su propiedad, derivado del desarrollo de actividades lícitas, manifestando que conoce y entiende plenamente las disposiciones relativas a las operaciones realizadas con recursos de procedencia ilícita y sus consecuencias. En el evento de que el dinero que abone a la Cuenta sea propiedad de un tercero, se obliga a notificar tal situación a Banamex, así como a identificar al tercero por cuenta del cual actúe.

c) Autoriza a Banamex a proporcionar los datos y documentos relativos a su identificación a las demás entidades integrantes del Grupo Financiero Banamex, S.A. de C.V., así como a sus subsidiarias, controladoras y afiliadas con las que pretenda establecer una relación comercial, con la finalidad de que dichas sociedades integren un solo expediente de identificación.

d) Desea celebrar Operaciones con Banamex, realizándolas entre otras por medio de Instrucciones a través de los Medios Electrónicos que Banamex ponga a su disposición, por lo cual reconoce y acepta que la Firma Electrónica le identifica y le autentica cumpliendo las disposiciones legales aplicables de conformidad con los términos, condiciones y alcances que en el presente Contrato se establecen.

e) Es de su conocimiento que Banamex no es una sucursal de Citigroup, Inc. o de ninguna de sus afiliadas o subsidiarias; así como que las obligaciones de Banamex derivadas del presente Contrato serán única y exclusivamente a cargo de Banamex en términos de las leyes aplicables (incluyendo cualquier decreto, regulación, orden o acción gubernamental).

f) Manifiesta expresamente su consentimiento para ajustarse a las políticas internas de Banamex.

g) Banamex le proporcionó los siguientes datos de la Condusef: (i) Centro de Atención Telefónica 01 (55) 53-400-999 y lada sin costo 01-800-999-8080; (ii) dirección de Internet www.condusef.gob.mx; y (iii) correo electrónico webmaster@condusef.gob.mx.

h) Sabe que en cualquier momento podrá revocar la autorización que, en su caso, confirió a Banamex para que utilice su información para cualquier fin, incluyendo la comercialización de otros productos o servicios, lo cual podrá efectuar entregando en cualquiera de las sucursales Banamex el formato que éste ponga a su disposición para tales efectos.

Con base en lo anterior, las partes convienen las siguientes:

## CLÁUSULAS

### CAPÍTULO PRIMERO
### DEFINICIONES

**CLÁUSULA I.1.- CONCEPTOS DEFINIDOS.** Para efectos del presente Contrato, los siguientes términos escritos con mayúscula inicial tendrán los significados que se expresan a continuación, igualmente aplicables en singular o plural:

"Algoritmo especial": significa la fórmula matemática que genera las Instrucciones a seguir por Banamex, a fin de que el Cliente opere en los sistemas Banamex el Servicio Electrónico de Pagos.

"Archivo Global de Pagos": significa el archivo electrónico que el Cliente envía al Buzón Electrónico de la Red de Datos y que deberá estar contenido en alguno de los formatos de los Documentos Electrónicos y que contendrá los datos de los Proveedores, las cantidades a abonar o entregar en sucursal, y en su caso, las Cuentas de los Proveedores y el número de sucursal que corresponda.

01633

"Atención Telefónica": significa el servicio telefónico establecido por Banamex para recibir las solicitudes del Cliente que deban hacerse por esta vía, así como para brindar apoyo inmediato a las necesidades del Cliente que se derivan del uso de la Banca Electrónica o cualquier otro producto, operación y/o servicio de atención a clientes que Banamex llegue a poner a disposición del Cliente.

"Audiomático": significa el Medio Electrónico propiedad de Banamex, el cual es accesible por el Cliente a través del uso del teléfono como medio de comunicación, cuya utilización le permite convenir con Banamex determinados Servicios, mediante Instrucciones y eligiendo las opciones habilitadas en el Medio Electrónico utilizando Firmas Electrónicas como medio de expresión de la voluntad del Cliente.

"Autenticación": significa el conjunto de técnicas y procedimientos utilizados para verificar la identidad de un Cliente, y expresa su consentimiento para realizar operaciones o recibir instrucciones a través de los Medios de Comunicación.

"Baja": significa cualquier Instrucción realizada electrónicamente para cancelar o revocar un Alta o cualquier otra operación denominada como tal en cualquiera de los Medios de Comunicación.

"Banca Electrónica": significa el conjunto de Servicios y operaciones bancarias que Banamex realiza con sus Clientes a través de Medios Electrónicos. Su utilización le permite al Cliente con su Firma Electrónica como medio de expresión de la voluntad convenir con Banamex los Servicios mediante Instrucciones y eligiendo las opciones habilitadas.

"Banca Móvil", "BancaNet Móvil" o "Banamex Móvil": significa indistintamente el servicio de acceso a los Servicios a través de un Dispositivo de Acceso celular, inalámbrico o de radiofrecuencia cuyo número de línea se encuentre asociado al Servicio.

"Banca Telefónica Audio Respuesta": servicio de Banca Electrónica mediante el cual Banamex recibe instrucciones del Cliente a través de un sistema telefónico, e interactúa con el propio Cliente mediante grabaciones de voz y tonos o mecanismos de reconocimiento de voz, incluyendo los sistemas de respuesta interactiva de voz.

"Banca Telefónica Voz a Voz": significa el servicio de Banca Electrónica mediante el cual el Cliente instruye vía telefónica a través de un representante de la institución debidamente autorizado por ésta, con funciones específicas, el cual podrá operar en un centro de atención telefónica, a realizar determinadas operaciones a nombre del propio Cliente.

"Bitácora": significa el registro o asiento efectuado en forma electrónica de todas y cada una de las Operaciones a través de los cuales se podrá conocer de manera enunciativa más no limitativa, datos de acceso al Medio Electrónico, así como de la Operación instruida por el Cliente.

"Bloqueo de Factores de Autenticación": significa el proceso por el cual Banamex inhabilita temporalmente el uso de un Factor de Autenticación.

"Buzón Electrónico": significa el área de almacenamiento electrónico que Banamex ofrece y/o tiene contratado, donde se almacena virtualmente la información que es enviada y recibida por Banamex y/o el Cliente y al que tendrá acceso el Cliente mediante el uso de su Firma Electrónica.

"Cajero Automático": significa el Dispositivo de Acceso de autoservicio que le permite al Cliente realizar consultas y Operaciones diversas, tales como la disposición de dinero en efectivo y al cual el Cliente accede mediante una tarjeta o cuenta bancaria para utilizar el servicio de Banca Electrónica.

"Carátula": significa el documento que contiene las principales características de la operación que el Cliente celebrará al amparo del Contrato y que forma parte del mismo.

"Cargos Programados": significan las Instrucciones por escrito o a través de otros medios de comunicación autorizados que el Cliente instruye para que Banamex le cargue a una o más de sus Cuentas ciertas sumas de dinero con la periodicidad que asimismo especifique y las abone a la Cuenta de Abono del Cliente beneficiario de las mismas.

"Certificado Digital": significa el registro electrónico que genera Banamex o un tercero por éste designado respecto de la confirmación de identidad del Cliente y los datos de creación de su firma electrónica avanzada. Dicho Certificado contiene datos de la emisión de la clave o llave pública y privada del Cliente: (i) el nombre del Cliente, (ii) un número de serie asignado por Banamex o el Tercero, (iii) fecha de vencimiento y (iv) la clave pública del Cliente. El Cliente podrá utilizar el Certificado Digital para transmitir mensajes de datos firmando con su clave privada.

"Cheque": significa el documento que reúna los requisitos que señala la Ley General de Títulos y Operaciones de Crédito para ser considerado como tal.

"Chequera": significa el talonario que contiene los esqueletos de Cheques que, en su caso, Banamex proporcionará al Cliente de acuerdo con lo dispuesto en el presente Contrato.

"Cifrado": significa el mecanismo utilizado por Banamex para proteger la confidencialidad de los Mensajes de Datos o información mediante métodos criptográficos, basado en una evaluación de riesgos que determinará la complejidad del Algoritmo de encripción utilizado y la longitud de sus respectivas claves o llaves criptográficas.

"Clave Dinámica": es parte de la Firma Electrónica y consiste en un esquema de identificación del Cliente basado en el control del acceso a la Banca Electrónica mediante el uso conjuntamente con otros elementos de una cadena de caracteres generados automáticamente a través de un dispositivo físico. Cada Clave Dinámica generada da acceso únicamente a una Sesión o a la realización de una Operación o Instrucción.

"Concentración de Fondos": significa la recepción de depósitos con referencia(s) para abono a una Cuenta Concentradora. Los depósitos podrán ser recibidos en sucursales, corresponsales o Banca Electrónica. Las referencias pueden ser numéricas de hasta 10 posiciones, alfanuméricas de hasta 20 caracteres o ambos tipos, de conformidad con las reglas establecidas por Banamex.

"Condusef": significa la Comisión Nacional para la Protección y Defensa de los Usuarios de Servicios Financieros.

"Constancia de Depósito": significa la constancia nominativa y no negociable, emitida por Banamex para documentar el Depósito a Plazo que efectúe el Cliente en términos del Capítulo Sexto. Las Constancias de Depósito no son títulos de crédito.

"Contrato": significa conjuntamente la Solicitud, la Carátula, el presente instrumento, sus anexos y cualquier convenio que lo modifique o adicione.

"Contraseña", "Número de Identificación Personal" o "Clave Confidencial": significa la cadena estática sea numérica o alfanumérica generada por el Cliente para la utilización de los Servicios a través de los Medios Electrónicos, debiendo activarse en cualquiera de las sucursales de Banamex o en los propios Medios Electrónicos, o a través de cualquiera de los medios que Banamex determine para tales efectos.

"Correo Electrónico": significa la ubicación o dirección en Internet indicada por el Cliente en cualquiera de los documentos que forman parte del Contrato o mediante comunicado posterior que el Cliente entregue a Banamex, a través del cual, el Cliente pueda enviar y recibir comunicaciones.

"Cuenta": significa la cuenta bancaria que, en su caso, Banamex abrirá al Cliente en términos de lo dispuesto en la Cláusula II.1 del Contrato.

01634

"Cuenta Concentradora": significa una Cuenta Propia que será utilizada para llevar a cabo la Concentración de Fondos, ésta puede ser una cuenta virtual con sucursal 870, o bien alguna cuenta existente en cuyo caso se denominará "Cuenta Regionalizada".

"Cuenta de Abono": significa la Cuenta Incorporada en la cual se acreditarán en forma global los depósitos derivados del Servicio Electrónico de Pagos, del Servicio de Domiciliación y del Servicio de Cobranza Referenciada Banamex, y en la cual, se cargarán las comisiones que se deriven de dichos Servicios.

"Cuenta de Cargo Global": significa cualquier Cuenta Propia que ha sido incorporada y respecto de la cual, Banamex se encuentra autorizado por el Cliente para realizar cargos en relación con el Servicio denominado TEF.

"Cuentas de Proveedores": significan las cuentas en las que se harán los abonos contenidos en un Archivo Global de Pagos enviado al Buzón Electrónico.

"Cuenta de Terceros": significa cualquier cuenta dada de alta en la que el Cliente solamente podrá realizar depósitos, cuyo titular sea un tercero que tenga alguna relación con el Cliente.

"Cuenta Incorporada": significa cualquier Cuenta, cuyo titular sea el Cliente o un tercero, a las cuales tiene acceso el Cliente a través de cualesquiera de los Medios de Comunicación para conocer los saldos, realizar operaciones monetarias y otras que permita cada Medio de Comunicación, en virtud de haber sido dada de Alta.

"Cuenta Propia": significa una Cuenta Incorporada cuyo titular es el Cliente.

"Depósito": significa el depósito bancario de dinero que se efectúe a la Cuenta o bien la constitución o incremento del Depósito a Plazo o del Pagaré, mediante la entrega a Banamex de cantidades determinadas de dinero de acuerdo con lo estipulado en el presente Contrato.

"Depósito a Plazo": significa el depósito bancario de dinero a plazo fijo que efectúe el Cliente en los términos y condiciones referidos en el Capítulo Sexto del Contrato.

"Desbloqueo de Factores de Autenticación": significa el proceso por el cual Banamex habilita el uso de un Factor de Autenticación que se encuentre bloqueado.

"Desembolso": significa la disposición de la Línea de Crédito efectuada en términos de lo estipulado en la Cláusula XII.2.

"Día Hábil": significa cualquier día del año que no sea sábado ni domingo, en que las instituciones de crédito estén autorizadas para celebrar operaciones con el público.

"Dispositivo de Acceso": significa el equipo o medio que permite a un Cliente acceder a los Servicio de Banca Electrónica.

"Divisa": significa los Dólares, así como cualquier otra moneda extranjera libremente transferible y convertible de inmediato a Dólares.

"Documentos Electrónicos": significa toda aquella información generada, enviada, recibida, archivada o comunicada a través de medios electrónicos, ópticos o de cualquier otra tecnología denominado Mensaje de Datos, utilizado entre otros para la prestación de los Servicios.

"Dólares": significa la moneda de curso legal en los Estados Unidos de América.

"Equipo de Cómputo": significa el equipo conformado por computadora, un módem o acceso inalámbrico a red que tenga instalado algún Programa de Cómputo para que a través de una línea telefónica o cualquier otro medio autorizado, se conecte a Internet o Intranet y transmita sus Instrucciones.

"Estado de Cuenta": significa el documento elaborado por Banamex a que se refiere la Cláusula X.1 del Contrato.

"Factor de Autenticación": significa el mecanismo tangible o intangible, basado en las características físicas del Cliente, en dispositivos o información que solo el Cliente posea o conozca, pudiendo ser, de manera enunciativa más no limitativa: (i) Información que el Cliente conozca y que Banamex valide mediante cuestionarios practicados por los operadores del centro de atención telefónica; (ii) Información que únicamente el Cliente conozca, pudiendo ser contraseñas o números de identificación personal estática; (iii) Información generada por dispositivos generadores de Contraseñas dinámicas de un solo uso dinámicos (OTP); y, (iv) información derivada de las características físicas o biometrías del Cliente.

"Firma Electrónica", "Dispositivo de Acceso", "Factores de Autenticación", "Número Confidencial", "NIP", "PIN", "Password", "Claves de Acceso", "Clave Confidencial", "Número de Identificación Personal", "Firma Electrónica Avanzada" o cualquier otra que se agregue o designe (siendo aplicadas de manera individual o conjuntamente cualquiera de ellas): significa los datos en forma electrónica utilizados por el Cliente para identificarse con Banamex o con terceros por él autorizados y aceptar la atribución de las Instrucciones enviadas al propio Banamex consignados en un Mensaje de Datos transmitido. La Firma Electrónica tiene los mismos efectos jurídicos que la firma autógrafa conforme a la legislación, siendo admisible como prueba en juicio.

"GAT": significa la ganancia anual total neta expresada en términos porcentuales anuales que, para fines informativos y de comparación, incorpora los intereses nominales capitalizables que, en su caso, genere el Producto contratado por el Cliente, menos los costos relacionados con el mismo, incluidos los de apertura.

"Horario Bancario" u "Horario de Servicio": significa en Días Hábiles el horario comprendido de las 9:00 horas a las 16:00 horas, hora del centro de México. El Horario Bancario podrá ser modificado en cualquier momento por Banamex, sin necesidad de previo aviso. En caso de recibirse Instrucciones en días inhábiles o fuera del Horario de Servicio las mismas se ejecutaran al Día Hábil siguiente dentro del Horario de Servicio.

"Instrucción": significa cada una de las Operaciones solicitadas por el Cliente a Banamex a través de los Medios Electrónicos utilizando una Firma Electrónica para obtener Servicios en relación con alguna(s) Cuenta(s) o número de cliente en su caso.

"Internet": significa el medio de comunicación masivo a través del cual un Dispositivo de Acceso, incluyendo un dispositivo celular o inalámbrico que reúna un mínimo de características puede enviar y recibir datos, voz, vídeo y demás información a través de redes telefónicas locales o internacionales, vía cable o transmisión de ondas, incluyendo vía satélite y demás redes públicas de comunicación.

"IPAB": significa el Instituto para la Protección al Ahorro Bancario.

"Línea Banamex Digitem": significa el Programa de Cómputo instalado en el Equipo de Cómputo del Cliente y que éste podrá utilizar para tener acceso a los Servicios establecidos en la Cláusula VIII.5 de este Contrato.

"Línea de Crédito": significa el crédito en cuenta corriente a que se refiere la Cláusula XII.1.

"Medios Electrónicos": significa cualesquiera de los equipos electrónicos, ópticos o cualquier otra tecnología utilizados mediante el uso de la Firma Electrónica y puestos a disposición del Cliente por parte de Banamex, incluyendo Micrositios y de terceros relacionados y aprobados por Banamex para su acceso, a fin de que el Cliente pueda llevar a cabo el envío de las Instrucciones y su ejecución tanto en lo relativo a Servicios o solicitud de información, así como respecto de la actualización o modificación de representantes legales o perfiles de operación de los mismos. Dichos Dispositivos de Acceso son enunciativa y no limitativamente: Banamex Móvil, Audiomático, Operador Telefónico, Portal de Internet de Servicios de: Banca Electrónica, de Cash Management, Línea Banamex Digitem, Cajeros Automáticos, Terminales Punto de Venta y Telefonía Móvil, pudiendo Banamex en cualquier momento y sin mediar notificación alguna incorporar o eliminar cualquiera de ellos.

01635

"Mensaje de Datos": significa la información generada, transmitida o archivada a través de los Medios Electrónicos, en los cuales se contienen las Instrucciones para la ejecución de Operaciones.

"Mensajes Cortos de Texto o SMS": significa el servicio de mensaje corto, el cual está disponible en redes de telefonía móvil permitiendo enviar y recibir mensajes de texto a Teléfonos Móviles vía el centro de mensajes de un operador de red.

"México": significa los Estados Unidos Mexicanos.

"Negocios Afiliados": significan los proveedores de bienes, servicios o efectivo que se encuentren afiliados a la marca de la Tarjeta de Débito o cualquier otro medio de disposición determinado por Banamex y, por lo tanto, acepten los mismos como instrumento de pago o medio de disposición del dinero depositado en la Cuenta.

"Número de Cliente": significa la identificación numérica o alfanumérica que genera Banamex para cada Cliente y/o para cada relación jurídica establecida, según sea el caso, misma que es dada a conocer al Cliente para que éste pueda tener acceso conjuntamente con otros elementos a alguno(s) de los Medios de Comunicación que conforman la Banca Electrónica.

"Número de Instrucción" o "Número de Autorización": significa la identificación numérica que hace la Banca Electrónica en relación con cada Operación del Cliente sea en la solicitud de un Servicio en específico o de la ejecución que realizará Banamex respecto de la Instrucción. Esta Identificación es también aplicable para el caso de cambio de Clave Confidencial. A la consulta de saldos no le será aplicable lo anterior.

"Operaciones": significa cualquiera de las transacciones físicas o de Banca Electrónica que celebre el Cliente con Banamex al amparo del Contrato asociada a los Servicios.

"Operación Monetaria": significa la transferencia o retiro de recursos dinerarios, las cuales podrán ser: (i) micro pagos: operaciones que equivalen en Pesos a 70 UDIS; (ii) de baja cuantía, que equivale hasta un monto en Pesos de 250 UDIS diarias; (iii) de mediana cuantía, operaciones que equivalen a 1,500 UDIS diarias; y, (iv) por montos superiores al equivalente en Pesos a 1,500 UDIS diarias. El importe de las Operaciones Monetarias podrá variar de acuerdo con lo que establezcan las disposiciones legales aplicables.

"Operador Telefónico": significa el Medio Electrónico accesible por el Cliente a través del uso del teléfono como medio de comunicación, cuya utilización le permite convenir con Banamex los Servicios mediante Instrucciones verbales a un operador, y eligiendo las opciones habilitadas.

"Pagaré": significa el título de crédito denominado "Pagaré con Rendimiento Liquidable a Vencimiento" que emitirá Banamex para documentar el préstamo que le otorgue el Cliente de conformidad con lo dispuesto en el Capítulo Sexto del Contrato.

"Pago Móvil": significa el Medio Electrónico accesible para el Cliente a través del uso del Teléfono Móvil, cuyo número único de identificación se encuentra asociado a una cuenta, pudiendo el Cliente realizar entre otras las siguientes Operaciones: (i) consulta de saldo; (ii) Operaciones Monetarias limitadas a pagos o transferencias de recursos dinerarios hasta por el monto establecido en las disposiciones legales aplicables, con cargo a las tarjetas o cuentas bancarias que se tengan asociadas a este medio; así como, (iii) administración del servicio.

"Personas Autorizadas": significan las personas físicas que sean autorizadas por el Cliente para hacer disposiciones de dinero con cargo a la Cuenta o a la Línea de Crédito, bastando para ello la inclusión de sus nombres y firmas en la Solicitud o bien mediante autorización posterior que proporcione el Cliente a Banamex a través de los formatos que éste determine para tales efectos.

Banamex podrá negar la autorización señalada anteriormente cuando el Cliente no le proporcione todos los documentos que el primero le solicite para cerciorarse de la identidad de las personas físicas que el Cliente pretenda autorizar.

"Pesos": significa la moneda de curso legal en México.

"Portal Banamex": significa la dirección electrónica de Banamex dentro de la red mundial conocida como Internet e identificada como "www.banamex.com" o cualquier otra que Banamex le determine al Cliente mediante un aviso enviado a través de cualquiera de los medios señalados en la Cláusula XIII.8.

"Producto": significa el nombre comercial a través del cual el Cliente podrá identificar el tipo de Operación que celebrará con Banamex al amparo del Contrato.

"Programa de Cómputo" o "Software": significa cualquier aplicación instalada en el Equipo de Cómputo del Cliente para que éste pueda recibir determinados Servicios; entre otros Programas de Cómputo se encuentran los denominados Línea Banamex Digitem y TEF.

"Restablecimiento de contraseñas": procedimiento por el cual el Cliente podrá definir una nueva contraseña o Número de Identificación Personal.

"Servicios": significa cualesquiera de los siguientes: (a) transferencia de fondos entre cuentas propias y cuentas de terceros; (b) cargos a las cuentas propias para depósitos en tarjetas de crédito Banamex u otros adeudos con Banamex o con cualquier tercero; (c) cargos a las cuentas propias respectivas para depósitos por concepto de servicios o depósitos a Terceros; (d) cargos a las cuentas de cargo para depósitos de nómina a empleados o funcionarios del Cliente o de sus subsidiarias o afiliadas; (e) cargos a las cuentas propias para realizar órdenes de pago; (f) transferencias de fondos de las cuentas propias para realizar inversiones a la vista, a plazo o con previo aviso, compra y venta de acciones de sociedades de inversión; (g) cargos a las cuentas propias para compraventa de divisas para abono a cuentas propias; (h) cambio de Clave Confidencial, (i) consultas de saldos, movimientos y estados de cuenta; (j) consulta de estado de cheques librados, operaciones para protección de cheques en caso de robos o extravíos; (k) solicitud de talonarios de chequeras de las cuentas propias de las que el Cliente es titular; (l) altas de cuentas de terceros y bajas de cuentas propias y cuentas de terceros; (m) altas y bajas de Firmas Electrónicas y administración de facultades; y, (n) cualesquiera otros servicios que Banamex preste o llegue a prestar en un futuro a través de los Medios Electrónicos.

"Servicio de Domiciliación": significa el servicio ofrecido por Banamex que permite al Cliente realizar cargos automáticos, tanto recurrentes como eventuales a las cuentas de sus propios clientes, para el pago de bienes y/o servicios.

"Servicio Electrónico de Pagos": es el servicio que presta Banamex el cual consiste en la aceptación de pagos mediante la recepción de depósitos de terceros.

"Sesión": significa el periodo de tiempo sin interrupción en el cual el Cliente podrá llevar a cabo consultas, Operaciones Monetarias y cualquier otro tipo de transacción bancaria o de Servicios una vez que haya ingresado con su correspondiente Firma Electrónica a algún Medio de Comunicación y hasta que se hubiere desconectado.

"Solicitud": significa la página de datos generales del Contrato en la cual se hace constar, entre otros, la información general del Cliente.

"Sucursal": significa el establecimiento de Banamex cuya clave y nombre se especifica en la Solicitud.

"Tarjeta de Débito": significa la tarjeta de plástico con banda magnética que, en su caso, Banamex entregue al Cliente de conformidad con lo dispuesto en el Contrato, la cual será utilizada por el Tarjetahabiente como un medio de disposición del dinero depositado en la Cuenta e instrumento de pago asociado a la misma.

"Tarjetahabiente": significa el Cliente o la Persona Autorizada a cuyo favor expedirá Banamex la Tarjeta de Débito de acuerdo con lo dispuesto en el Contrato.

**01636**

"Teléfono Móvil": significa el dispositivo electrónico de comunicación celular, radiofrecuencia o inalámbrico propiedad o en uso del Cliente, el cual tiene un número único de identificación y permite realizar actividades comerciales y compras de baja cuantía.

"Terminal Punto de Venta": significa el Medio Electrónico consistente en terminales de cómputo, teléfonos móviles o programas de cómputo, operados por terceros para instruir el pago de bienes o servicios con cargo a la Tarjeta de Débito o a la Cuenta.

"Transferencia Electrónica de Fondos o TEF": significa el servicio ofrecido por Banamex para establecer instrucciones de cargo a Cuentas, al cual puede acceder el Cliente mediante: (i) Software instalado por Banamex en el Equipo de Cómputo del Cliente o, (ii) a través de Internet utilizando BancaNet, de acuerdo a las disposiciones establecidas en la Cláusula VIII.7 de este Contrato.

"UDIS": significa las unidades de inversión a que se refiere el "Decreto por el que se establecen las obligaciones que podrán denominarse en Unidades de Inversión y reforma y adiciona diversas disposiciones del Código Fiscal de la Federación y de la Ley del Impuesto Sobre la Renta", publicado en el Diario Oficial de la Federación el 1° de abril de 1995.

"Unidad Especializada": significa la unidad especializada de atención a usuarios de Banamex cuyo objeto es atender cualquier queja o reclamación del Cliente, ubicada en 16 de Septiembre número 71, 4° piso, colonia Centro, Delegación Cuauhtémoc, 06000 México, Distrito Federal y la cual cuenta con los siguientes teléfonos en la Ciudad de México: 1226-2639 y 2262-6391, lada sin costo 01-800-021-2345, lada sin costo desde Estados Unidos de América y Canadá 1-800-226-2639 y su correo electrónico es: aclaracionesbmx23@banamex.com.

Dicha Unidad Especializada cuenta con personal en cada Estado de la República Mexicana, cuyos datos podrán ser obtenidos por el Cliente en cualquier sucursal de Banamex.

## CAPÍTULO SEGUNDO
## DEL DEPÓSITO BANCARIO DE DINERO A LA VISTA

**CLÁUSULA II.1.- CUENTA.** En caso de que el Cliente así lo solicite, Banamex procederá a abrirle una cuenta bancaria identificada con el número señalado en la Solicitud, en la cual el Cliente podrá efectuar Depósitos y retiros de dinero, en los términos y condiciones que más adelante se señalan.

En virtud de los Depósitos, el Cliente transfiere la propiedad del dinero a Banamex, obligándose este último a restituir la suma depositada en la misma especie de conformidad con lo estipulado en el Contrato.

En la Cuenta se reflejará el saldo de dinero, el cual se compondrá de los Depósitos e intereses que, en su caso, devenguen los mismos, menos los retiros efectuados, comisiones, gastos y demás cargos.

Al amparo del presente Contrato y previa autorización de Banamex, el Cliente podrá solicitar la asignación de números de cuenta adicionales, lo cual le permitirá dividir entre ellas el saldo total de los Depósitos. Las distintas Cuentas abiertas al amparo del Contrato se identificarán con el mismo número de Cliente contenido en la Solicitud.

Las distintas Cuentas deberán ser solicitadas por el Cliente a través de los medios y formatos que Banamex determine para tales efectos, incluso mediante la utilización de Banca Electrónica.

A todas las Cuentas les serán aplicables las cláusulas contenidas en el presente instrumento, por lo que el término "Cuenta" se entenderá referido a todas las Cuentas abiertas al amparo del Contrato.

Ambas partes reconocen y aceptan que las Personas Autorizadas estarán facultadas para disponer de los recursos depositados en todas y cada una de las Cuentas, salvo que el Cliente determine expresamente lo contrario a Banamex.

Asimismo, las partes convienen en que las personas designadas por el Cliente en términos de lo estipulado en la Cláusula XIII.6 serán beneficiarios de todas las Cuentas abiertas en virtud del presente Contrato, a menos de que el Cliente expresamente designe a personas distintas como beneficiarios de cada una de las citadas Cuentas, lo cual deberá efectuar a través de los formatos que Banamex le proporcione para tales efectos.

**CLÁUSULA II.2.- FECHA DE CORTE.** Banamex determinará la fecha de corte mensual de la Cuenta, la cual podrá ser consultada por el Cliente en el Estado de Cuenta; dicha fecha de corte podrá ser modificada por Banamex previo aviso por escrito que envíe al Cliente a través de cualquiera de los medios señalados en la Cláusula XIII.8.

**CLÁUSULA II.3.- RENDIMIENTOS.** Dependiendo el tipo de Producto contratado, el saldo de dinero a favor del Cliente registrado en la Cuenta podrá generar rendimientos, los cuales serán brutos, se computarán mensualmente y se pagarán mediante abono a la Cuenta a más tardar el Día Hábil siguiente a la fecha de corte. Si el Producto contratado genera rendimientos, en la Carátula se señalará la tasa de interés anual aplicable y, en su caso, la GAT correspondiente.

Los citados rendimientos se calcularán sobre el promedio de saldos diarios que el Cliente mantenga depositado en la Cuenta, dividiendo la tasa de interés anual determinada por Banamex entre 360 (trescientos sesenta) y multiplicando el resultado así obtenido por el número de días efectivamente transcurridos durante el período en el cual se devenguen los rendimientos a la tasa correspondiente. Los cálculos se efectuarán cerrándose a centésimas.

Banamex se reserva el derecho de revisar y ajustar diariamente la tasa de interés señalada en los párrafos anteriores y el promedio de saldos diarios vigentes a los que se aplicará ésta. Asimismo, Banamex en cualquier momento podrá determinar los Productos que dejarán de generar rendimientos.

El tratamiento fiscal de los rendimientos estará sujeto a las disposiciones legales aplicables.

**CLÁUSULA II.4.- SALDO MÍNIMO.** El Cliente acepta que Banamex tiene la facultad de determinar y, en su caso, modificar el saldo mínimo de dinero que el Cliente deberá mantener depositado en la Cuenta de acuerdo al tipo de Producto contratado.

En el supuesto de que Banamex incremente el saldo señalado en el párrafo anterior, deberá proceder a notificarlo al Cliente mediante comunicado que le envíe con al menos 30 (treinta) días naturales de anticipación a que surta efectos la citada modificación, a través de cualquiera de los medios señalados en la Cláusula XIII.8.

Si en la fecha de celebración del presente instrumento el Producto contratado requiere de un monto de apertura o de un saldo mínimo, dichos conceptos y el importe de los mismos serán determinados por Banamex en el anexo de comisiones referido en la Cláusula IX.1.

**CLÁUSULA II.5.- DEPÓSITOS A LA CUENTA.** El Cliente o cualquier tercero podrán efectuar Depósitos para ser abonados a la Cuenta, los cuales deberán realizar en Pesos, excepto por lo dispuesto en el Capítulo Tercero. Los citados Depósitos podrán efectuarse en efectivo, con Cheque, mediante transferencia electrónica de dinero o a través de cualquier otro medio que Banamex autorice para tales efectos, en el entendido de que Banamex en cualquier momento podrá modificar, limitar o restringir la forma en que recibirá los citados Depósitos. Dichos Depósitos serán acreditados en la Cuenta de la siguiente forma:

**01637**

a) Tratándose de Depósitos en efectivo, el importe será acreditado en la misma fecha en que se efectúen, siempre y cuando sean recibidos por Banamex en Días Hábiles y dentro del Horario Bancario, en caso contrario los Depósitos serán acreditados el Día Hábil siguiente.

b) En el supuesto de que los Depósitos se realicen con Cheque, este último será recibido por Banamex "salvo buen cobro" y, por lo tanto, el importe que ampare el mismo será acreditado una vez que el Cheque sea cubierto por el obligado al pago.

Cuando por cualquier causa Banamex no pueda cobrar el Cheque, lo devolverá a su tenedor, pudiendo Banamex negarse a recibir nuevamente el Cheque devuelto.

El Cliente reconoce y acepta que Banamex estará facultado para retener cualquier Cheque que, a juicio de este último, no cumpla con los requerimientos mínimos de seguridad que establezcan las disposiciones legales aplicables o sus políticas internas.

c) En caso de Depósitos realizados mediante transferencias electrónicas de dinero, la cantidad respectiva se acreditará en la fecha en que Banamex efectivamente reciba dichos Depósitos.

Banamex tiene la facultad de determinar el monto máximo de los Depósitos a ser recibidos en cada Operación cuando ésta no se ajuste a las sanas prácticas bancarias.

CLÁUSULA II.6.- **OPERACIONES ILÍCITAS.** Cuando los Depósitos sean considerados como derivados de una operación ilícita a juicio de cualquier autoridad competente y ésta requiera a Banamex la reversión del abono, el Cliente autoriza a Banamex a cargar de inmediato el importe correspondiente, así como el de las penalizaciones y gastos de defensa, haciéndose directamente responsable de las consecuencias legales que en su caso procedan.

Asimismo, Banamex tendrá la facultad de negarse a recibir Depósitos a la Cuenta cuando lo considere necesario para prevenir el encubrimiento y la realización de operaciones con recursos de procedencia ilícita o bien en cumplimiento a sus políticas internas.

CLÁUSULA II.7.- **FORMA DE EFECTUAR RETIROS.** El Cliente y las Personas Autorizadas, siempre que cumplan con las medidas de seguridad que determine Banamex, podrán hacer retiros de dinero con cargo al saldo de la Cuenta a través de cualquiera de las siguientes formas:

a) Disposición de dinero en efectivo en las sucursales de Banamex o en los establecimientos de los Negocios Afiliados o comisionistas de Banamex que se encuentren autorizados para tales efectos, a través del libramiento de Cheques o de la presentación de la Tarjeta de Débito.

b) Cargos a través del libramiento de Cheques para ser abonados en otras cuentas de depósito bancario de dinero abiertas en Banamex o en otras instituciones de crédito.

c) Disposición de efectivo a través de Cajeros Automáticos en los cuales sea aceptada la Tarjeta de Débito o cualquier otro medio determinado por Banamex.

d) Adquisición de bienes o la contratación de servicios en los Negocios Afiliados, mediante la utilización de la Tarjeta de Débito o cualquier otro medio determinado por Banamex en Terminales Punto de Venta.

e) Órdenes de compra de bienes o de contratación de servicios celebrados con los Negocios Afiliados, mediante la transmisión de la información de la Tarjeta de Débito o cualquier otro medio determinado por Banamex a través de redes de telecomunicaciones o por alguna vía electrónica, óptica o de cualquier otra tecnología.

f) Transferencias de dinero mediante la utilización de Banca Electrónica.

Banamex podrá determinar otras formas para realizar retiros de dinero con cargo al saldo disponible de la Cuenta; asimismo, el Cliente reconoce y acepta que Banamex estará facultado para establecer, en cualquier momento, el monto máximo de dinero que se podrá retirar de la Cuenta, dependiendo la forma a través de la cual se efectúe el citado retiro.

CLÁUSULA II.8.- **FORMALIZACIÓN DE RETIROS.** Los retiros de dinero de la Cuenta serán documentados, a elección de Banamex, a través de alguno de los siguientes medios: (i) la suscripción autógrafa o electrónica por parte del Cliente o de las Personas Autorizadas, de recibos, pagarés, vouchers o cualesquiera otras constancias físicas o electrónicas; (ii) la expedición de comprobantes físicos o electrónicos que emita Banamex, sus comisionistas, los Negocios Afiliados u otras instituciones bancarias; o (iii) los registros contables que se generen en los sistemas de Banamex, de sus comisionistas, de los Negocios Afiliados o de otras instituciones bancarias.

CLÁUSULA II.9.- **SOBREGIRO.** El Cliente se obliga a que la suma de todos los retiros de dinero en ningún momento exceda el saldo disponible en la Cuenta, por lo que será su responsabilidad llevar en forma personal el control sobre el mismo, evitando cualquier sobregiro.

Para cubrir posibles sobregiros en la Cuenta y con el objeto de que no se dejen de pagar documentos suscritos por el Cliente o las Personas Autorizadas, Banamex podrá otorgar al Cliente un crédito hasta por el monto y plazo de disposición que Banamex determine.

El Cliente manifiesta expresamente su voluntad a disponer del crédito en el momento en que se presente cualquier sobregiro en la Cuenta, instruyendo a Banamex para que abone a la citada Cuenta la cantidad de dinero suficiente para cubrir el referido sobregiro, en el entendido de que Banamex estará facultado en todo momento para restringir las disposiciones y el importe del crédito.

El Cliente se obliga a pagar la totalidad de las disposiciones del crédito que efectúe en términos de la presente Cláusula, a más tardar al día siguiente en que realice la misma, mediante abono a la Cuenta y, en caso de que no sea posible efectuar dicho abono, haciendo el pago en cualquiera de las sucursales de Banamex.

El Cliente desde este momento autoriza a Banamex para cargarle el monto de la disposición efectuada en términos de la presente Cláusula a cualquier otra cuenta de depósito bancario de dinero que el Cliente tenga abierta con Banamex.

Ambas partes reconocen y aceptan que el crédito conferido en términos de la presente Cláusula es distinto a la Línea de Crédito señalada en el Capítulo Décimo Segundo del Contrato.

CLÁUSULA II.10.- **CARGOS A LA CUENTA.** Banamex podrá cargar a la Cuenta el importe de los pagos que el Cliente deba realizar a proveedores de bienes o servicios que utilicen este mecanismo de pago, siempre y cuando: (i) cuente con la autorización del Cliente; o bien, (ii) el Cliente autorice los cargos por medio del proveedor y éste, a través de la institución de crédito que le ofrezca el servicio de cobro respectivo, instruya a Banamex a realizar el cargo correspondiente, en cuyo caso la autorización del Cliente podrá quedar en poder del citado proveedor; en ambos supuestos, la Cuenta deberá mantener saldo disponible y suficiente para realizar el cargo.

El Cliente, sin requisito adicional alguno y en cualquier momento, podrá solicitar a Banamex la cancelación de los cargos que se efectúen en términos del párrafo anterior sin que se requiera de la previa autorización de los respectivos proveedores de bienes o servicios, la cual surtirá efectos a más tardar a los 10 (diez) Días Hábiles siguientes a aquél en que Banamex reciba la instrucción correspondiente. El Cliente reconoce y acepta que Banamex no tendrá responsabilidad alguna derivada de la citada cancelación.

Las autorizaciones e instrucciones a que se refiere la presente Cláusula podrán llevarse a cabo por escrito con firma autógrafa, mediante la utilización de Banca Electrónica o a través de otros medios electrónicos, ópticos o de cualquier otra tecnología que Banamex determine para tales efectos.

El Cliente reconoce y acepta que Banamex no tendrá responsabilidad alguna derivada de los cargos que efectúe en cumplimiento a lo dispuesto en la presente Cláusula, ni por la imposibilidad de efectuar los mismos en caso de que la Cuenta no mantenga saldo disponible suficiente.

**CLÁUSULA II.11.- COMPENSACIÓN.** El Cliente en este acto autoriza de manera irrevocable a Banamex para compensar o bien para pagar con recursos provenientes de la Cuenta cualquier adeudo de dinero a cargo del Cliente y a favor de Banamex, así como las operaciones que, en su caso, celebren ambas partes al amparo de éste u otros contratos y cualquier comisión, interés o gasto derivado del Contrato.

## CAPÍTULO TERCERO
## DEL DEPÓSITO EN DIVISAS

**CLÁUSULA III.1.- REQUISITOS.** El Cliente podrá efectuar Depósitos de dinero en Divisas, siempre y cuando cumpla con cualquiera de los siguientes supuestos:

a) Se encuentre domiciliado en poblaciones localizadas en una franja de 20 (veinte) kilómetros, paralela a la línea divisoria internacional norte del País o en los Estados de Baja California y Baja California Sur; o bien,

b) Si es ciudadano extranjero y presta sus servicios en representaciones oficiales de gobiernos extranjeros, organismos internacionales e instituciones análogas, o si es corresponsal extranjero; en cualquier caso, el Cliente deberá estar acreditado en México ante las autoridades correspondientes.

Banamex requerirá al Cliente la documentación que, a su juicio, demuestre que cumple con alguno de los supuestos anteriormente señalados, obligándose el Cliente a notificar a Banamex cuando deje de cumplir con cualquiera de dichos supuestos.

**CLÁUSULA III.2.-DEPÓSITOS EN DIVISAS.** Los Depósitos en Divisas sólo podrán ser constituidos o incrementados mediante: (i) traspasos de fondos de depósitos bancarios denominados y pagaderos en Divisas; (ii) la entrega de documentos a la vista denominados en Divisas y pagaderos sobre el exterior; o (iii) cuando Banamex así lo autorice, la entrega de Divisas. Dichos Depósitos serán acreditados en la Cuenta de la siguiente forma:

a) En caso de Depósitos realizados mediante traspasos, la cantidad respectiva se acreditará en la fecha en que Banamex efectivamente reciba dichos Depósitos.

b) En el supuesto de que los Depósitos se realicen mediante la entrega de documentos a la vista, estos últimos serán recibidos por Banamex "salvo buen cobro" y, por lo tanto, el importe que amparen los mismos será acreditado una vez que el documento sea cubierto por el obligado al pago.

c) Tratándose de entrega de Divisas, el importe será acreditado en la misma fecha en que ésta se efectúe, siempre y cuando sean recibidas por Banamex en Días Hábiles y dentro del Horario Bancario, en caso contrario los Depósitos serán acreditados el Día Hábil siguiente.

Banamex en cualquier momento podrá modificar, adicionar, limitar o restringir la forma en que se podrán constituir o incrementar los Depósitos en Divisas.

**CLÁUSULA III.3.- FORMA DE EFECTUAR RETIROS DE DIVISAS.** El Cliente y las Personas Autorizadas, siempre que cumplan con las medidas de seguridad que determine Banamex, podrán hacer retiros de Divisas con cargo al saldo disponible de la Cuenta, a través de cualquiera de las siguientes formas:

a) Situaciones de fondos en cuentas de depósitos bancarios denominados y pagaderos en Divisas.

b) La entrega de documentos a la vista denominados en Divisas y pagaderos sobre el exterior.

c) La entrega de la Divisa respectiva, la cual estará en todo momento condicionada a la disponibilidad de billetes y monedas metálicas de la Divisa correspondiente, por parte de la sucursal en la que el Cliente, la Persona Autorizada o el beneficiario pretenda efectuar el retiro de que se trate.

d) Mediante el libramiento de Cheques con cargo a: (i) las sucursales que Banamex tenga establecidas en las poblaciones a que se refiere el inciso a) de la Cláusula III.1, cuando el Cliente se ubique en el supuesto señalado en dicho inciso, y (ii) en todo México cuando el Cliente cumpla con el supuesto referido en el inciso b) de la citada Cláusula.

El pago de los Cheques se efectuará, a elección del beneficiario respectivo, mediante alguna de las formas previstas en los incisos que anteceden.

e) En su caso, mediante la utilización de Tarjetas de Débito.

Banamex podrá determinar otras formas para realizar retiros de Divisas; asimismo, el Cliente reconoce y acepta que Banamex estará facultado para establecer, en cualquier momento, el monto máximo de Divisas que podrá retirar de la Cuenta, dependiendo la forma a través de la cual se efectúe el citado retiro.

Banamex se obliga a pagar los recursos abonados en la Cuenta mediante la entrega al Cliente de la misma Divisa que éste le hubiese depositado, excepto por lo dispuesto en el segundo párrafo de la Cláusula XIII.13, en cuyo caso el Cliente desde este momento acepta expresamente que Banamex le entregue Pesos.

**CLÁUSULA III.4.- CONCEPTOS APLICABLES.** A los Depósitos en Divisas les será aplicable lo estipulado en el Capítulo anterior, excepto por lo dispuesto en las Cláusulas II.5 y II.7.

## CAPÍTULO CUARTO
## DE LA TARJETA DE DÉBITO

**CLÁUSULA IV.1.- TARJETA.** Dependiendo el tipo de Producto contratado por el Cliente, Banamex podrá proporcionarle una Tarjeta de Débito y, en caso de que el Cliente así lo solicite, Banamex podrá también proporcionarle Tarjetas de Débito adicionales para las Personas Autorizadas. Asimismo, Banamex proporcionará al Cliente una Clave Confidencial. El Cliente reconoce y acepta que Banamex podrá restringir la emisión de Tarjetas de Débito adicionales.

Banamex asignará a cada Tarjeta de Débito un número único, el cual se encontrará impreso en el anverso de la misma. Las Tarjetas de Débito serán intransferibles y deberán ser firmadas por el Tarjetahabiente en el panel de firma que se encuentra al reverso de las mismas.

Todas las Tarjetas de Débito serán propiedad de Banamex, por lo que el Cliente se obliga por él y por los demás Tarjetahabientes, a devolverlas a Banamex en la fecha de vencimiento de las mismas o a la terminación de este Contrato.

01639

El Cliente manifiesta expresamente su consentimiento para que Banamex, en caso de que así lo considere conveniente, lleve a cabo los actos necesarios tendientes a que la tarjeta prepagada que, en su caso, el primero hubiese adquirido y cuyo número se incluye en la Solicitud, evolucione a Tarjeta de Débito, con la finalidad de que el Cliente pueda utilizarla para disponer de dinero con cargo a la Cuenta.

En el supuesto anterior, ambas partes convienen en dejar sin efectos los términos y condiciones de la tarjeta prepagada correspondiente, instruyendo el Cliente a Banamex para que traspase a la Cuenta el saldo de dinero que, en su caso, tenga disponible en la citada tarjeta prepagada.

**CLÁUSULA IV.2.- UTILIZACIÓN DE LA CLAVE CONFIDENCIAL.** Ambas partes aceptan que la utilización de la Clave Confidencial sustituirá la firma autógrafa del Tarjetahabiente por una de carácter electrónico, por lo que las constancias documentales o técnicas en donde aparezca producirán los mismos efectos que las leyes otorguen a los documentos suscritos y, en consecuencia, tendrán igual valor probatorio.

El Cliente reconoce el carácter personal e intransferible de la Clave Confidencial, la cual quedará bajo la custodia, control y cuidado del Tarjetahabiente, por lo que será de la exclusiva responsabilidad del Cliente cualquier daño o perjuicio que pudiese sufrir como consecuencia del uso indebido de la misma.

La Clave Confidencial podrá ser modificada por el Tarjetahabiente a través de los medios que Banamex disponga para tales efectos.

**CLÁUSULA IV.3.- ENTREGA DE TARJETA.** Las Tarjetas de Débito se entregarán al Cliente de acuerdo con el procedimiento que Banamex determine para tales efectos, en el entendido de que Banamex estará facultado para entregar las mismas a la persona que se encuentre en el domicilio del Cliente o a la persona física que este último autorice para tal fin. Es responsabilidad exclusiva del Cliente la entrega de las Tarjetas de Débito adicionales a sus respectivos Tarjetahabientes.

Banamex entregará desactivadas las Tarjetas de Débito; los Tarjetahabientes deberán seguir las indicaciones que Banamex les dé al momento de la entrega para activarlas y de esta manera poder efectuar retiros y disposiciones con las mismas.

Una vez entregadas las Tarjetas de Débito, el Cliente será el único responsable de todos los retiros o disposiciones que con ellas se efectúen, por lo que este último reconoce y acepta que Banamex no tendrá ninguna responsabilidad derivada del mal uso que se haga de las Tarjetas de Débito por culpa o negligencia de los Tarjetahabientes.

**CLÁUSULA IV.4.- MEDIO DE DISPOSICIÓN.** La Tarjeta de Débito sólo representa un medio de disposición de los Depósitos efectuados, por lo que a través de la utilización de la misma el Tarjetahabiente podrá efectuar únicamente retiros o disposiciones de dinero hasta por el límite del saldo disponible de la Cuenta. No obstante lo anterior, cuando Banamex lo autorice, el Cliente podrá solicitar por escrito un límite menor para cualquiera de las Tarjetas de Débito.

**CLÁUSULA IV.5.- UTILIZACIÓN DE LA TARJETA.** Mediante la utilización de la Tarjeta de Débito y la marcación de la Clave Confidencial o la suscripción de los documentos que Banamex determine, el Tarjetahabiente podrá efectuar retiros o disposiciones de dinero con cargo a la Cuenta y consultar el saldo de la misma a través de los medios que Banamex autorice para tales efectos, entre los cuales se podrán incluir los siguientes: (i) los Cajeros Automáticos de Banamex o de otras instituciones bancarias con los que Banamex o la marca de la Tarjeta de Débito tengan celebrados acuerdos; (ii) las sucursales de Banamex; (iii) los establecimientos de los comisionistas autorizados por Banamex; (iv) las sucursales de otras instituciones bancarias con las que Banamex o la marca de la Tarjeta de Débito tengan celebrados acuerdos; o bien, (v) los Negocios Afiliados.

El Cliente reconoce y acepta que el saldo de la Cuenta que le proporcione Banamex, a través de cualquiera de los medios señalados en el párrafo anterior, podrá no estar actualizado, en razón de encontrarse pendiente de aplicar algún cargo o abono efectuado a la misma.

**CLÁUSULA IV.6.- IDENTIFICACIÓN PARA USO DE TARJETA.** Banamex, sus comisionistas, otras instituciones bancarias o los Negocios Afiliados podrán requerir al Tarjetahabiente se identifique debidamente, previo a que éste efectúe un retiro o disposición de dinero mediante la utilización de la Tarjeta de Débito.

**CLÁUSULA IV.7.- RETIROS DE DINERO.** Los retiros de dinero que efectúe el Tarjetahabiente mediante la utilización de la Tarjeta de Débito en Cajeros Automáticos estarán sujetos a: (i) la disponibilidad de efectivo que exista en el Cajero Automático al momento de intentar efectuar el retiro; y (ii) los límites máximos de disposición diaria establecidos por Banamex u otras instituciones bancarias, según sea el caso.

**CLÁUSULA IV.8.- ROBO O EXTRAVÍO DE LA TARJETA.** El Cliente se obliga por él y por los demás Tarjetahabientes a avisar de manera inmediata a Banamex, a través de los medios que este último ponga a su disposición para estos efectos, el robo o extravío de cualquier Tarjeta de Débito, así como su retención en Cajeros Automáticos, en el entendido de que Banamex no tendrá responsabilidad alguna por los retiros o disposiciones que, en su caso, se hubiesen efectuado mediante la utilización de la Tarjeta de Débito con anterioridad a dicho aviso.

Una vez efectuado el aviso señalado en el párrafo anterior, Banamex procederá a bloquear la Tarjeta de Débito, a partir de lo cual cesará la responsabilidad del Cliente por el uso de la misma. Banamex proporcionará al Cliente una clave que éste deberá conservar para futuras aclaraciones.

Al momento de ser bloqueada la Tarjeta de Débito, Banamex procederá a expedir una nueva Tarjeta de Débito que entregará al Cliente en términos de lo dispuesto en la Cláusula IV.3.

Si el Cliente o los demás Tarjetahabientes recobrasen la Tarjeta de Débito después de haber notificado su robo, extravío o retención, deberán abstenerse de usarla y entregarla de inmediato a Banamex.

**CLÁUSULA IV.9.- RETENCIÓN.** Banamex estará facultado para retener, bloquear, cancelar o sustituir en cualquier momento las Tarjetas de Débito por cualquiera de las cuestiones que de manera enunciativa, más no limitativa, se señalan a continuación: (i) por haberse terminado el presente Contrato; (ii) por haber cambiado el tipo de Tarjeta de Débito; (iii) para permitir el uso internacional de la Tarjeta de Débito, en caso de que inicialmente sólo fuese válida en territorio nacional; (iv) por motivos de seguridad; (v) derivado de su robo o extravío; (vi) por la implementación de nuevas tecnologías; (vii) por la implementación de nuevas marcas; o, en su caso, (viii) porque el Cliente cumpla la mayoría de edad, en este último caso, el Cliente se obliga a acudir a cualquier sucursal de Banamex con la finalidad de sustituir la Tarjeta de Débito correspondiente.

**CLÁUSULA IV.10.- NO RESPONSABILIDAD.** Banamex no asumirá responsabilidad alguna:

a) Si cualquiera de los Negocios Afiliados o comisionistas de Banamex no admite al Tarjetahabiente la Tarjeta de Débito.

b) Si el Tarjetahabiente no puede efectuar retiros por la suspensión de servicios en las sucursales de Banamex o en los Cajeros Automáticos.

c) Si el Tarjetahabiente no puede utilizar la Tarjeta de Débito por daños en la banda magnética de la misma.

d) Por la cantidad, calidad y cualquier otra característica de las mercancías y servicios adquiridos por el Tarjetahabiente mediante la utilización de la Tarjeta de Débito, así como de la entrega o ejecución de los mismos, obligándose el Cliente a presentar cualquier tipo de reclamación por los conceptos antes mencionados exclusivamente ante el Negocio Afiliado de que se trate.

**CLÁUSULA IV.11.- TIPO DE CAMBIO.** Cuando el Tarjetahabiente utilice la Tarjeta de Débito para realizar disposiciones de dinero en Divisas, o bien para efectuar pagos de bienes o servicios en Divisas, el monto de la disposición o pago siempre se cargará a la Cuenta en Pesos o, en su caso, en la Divisa en que se encuentre denominada la Cuenta, tratándose de los Depósitos en Divisas a que se refiere el Capítulo Tercero. El tipo de cambio que se utilice para calcular la equivalencia del Peso en relación con el Dólar, no podrá exceder de la cantidad que resulte de multiplicar por 1.01 (uno punto cero uno) el tipo de cambio que el Banco de México determine el día de presentación de los documentos de cobro respectivos, de conformidad con lo señalado en las Disposiciones aplicables a la determinación del tipo de cambio para solventar obligaciones denominadas en moneda extranjera pagaderas en la República Mexicana y que publique en el Diario Oficial de la Federación el Día Hábil siguiente.

**CLÁUSULA IV.12.- CARGOS PRESUNTAMENTE FRAUDULENTOS. Banamex podrá restituir al Cliente el monto de los retiros o disposiciones que Banamex determine que fueron presuntamente efectuados mediante el uso fraudulento de la Tarjeta de Débito, aún cuando la misma no hubiese sido robada o extraviada, obligándose el Cliente a colaborar en todo momento con Banamex, debiendo entregarle toda la documentación que Banamex le requiera para que este último se encuentre en condiciones de llevar a cabo la investigación correspondiente.**

En caso de que el resultado de la investigación efectuada por Banamex concluya que los retiros o disposiciones no fueron efectuados de manera fraudulenta, el Cliente autoriza a Banamex para cargar a la Cuenta el monto que éste le hubiese restituido en términos de lo dispuesto en el párrafo anterior.

## CAPÍTULO QUINTO
## DE LA CHEQUERA

**CLÁUSULA V.1.- CHEQUERA.** Dependiendo el tipo de Producto contratado por el Cliente, Banamex podrá proporcionarle una o más Chequeras, mediante las cuales el Cliente y las Personas Autorizadas, en su caso, podrán efectuar retiros o disposiciones de dinero con cargo al saldo registrado en la Cuenta a favor del Cliente, a través del libramiento de Cheques.

El Cliente no podrá utilizar esqueletos de Cheques distintos a los que Banamex le proporcione en la citada Chequera, salvo aquellos casos en que, previa solicitud por escrito, Banamex autorice al Cliente el uso de formas o esqueletos de Cheques especiales, los cuales deberán cumplir con las especificaciones bancarias aplicables.

El Cliente reconoce que los Cheques especiales podrán ser rechazados cuando no cumplan con las citadas especificaciones bancarias, por lo que desde este momento acepta que Banamex no será responsable de los daños y perjuicios que el Cliente o cualquier tercero pudiesen sufrir como consecuencia de la falta de pago del Cheque rechazado, aún y cuando existan fondos suficientes en la Cuenta.

**CLÁUSULA V.2.- RETIROS CON CHEQUE.** Los retiros que se realicen a través del libramiento de Cheques serán cargados a la Cuenta en el momento en que se presenten a Banamex para su cobro.

**CLÁUSULA V.3.- ENTREGA DE LA CHEQUERA.** Banamex entregará la Chequera en la Sucursal o en cualquier otro lugar que Banamex determine, previo acuse de recibo del Cliente o de la persona física que el Cliente autorice por escrito.

A partir de la fecha del acuse de recibo respectivo, el Cliente será el único responsable de la guarda, custodia y uso de la Chequera, estando exento Banamex de cualquier responsabilidad derivada del mal uso que se haga de los esqueletos de Cheques contenidos en la misma por culpa o negligencia del Cliente, de sus representantes o de las Personas Autorizadas.

**CLÁUSULA V.4.- CHEQUES ROBADOS O EXTRAVIADOS. El Cliente no tendrá acción legal para reclamar a Banamex indemnización por el pago de Cheques extraviados o robados, cuando el primero no hubiere dado aviso de ello a Banamex por escrito o a través de cualquier medio que Banamex ponga a disposición del Cliente para ese efecto. Dicho aviso tendrá que presentarse de manera previa a que se efectúe el pago del Cheque correspondiente.**

**Una vez efectuado el aviso señalado en el párrafo anterior, Banamex procederá a bloquear los Cheques extraviados o robados, a partir de lo cual cesará la responsabilidad del Cliente por el uso de los mismos. Banamex proporcionará al Cliente una clave que éste deberá conservar para futuras aclaraciones.**

**El Cliente sólo tendrá acción para reclamar a Banamex el pago de Cheques alterados o falsificados, cuando la alteración o la falsificación fueren notorias a juicio de Banamex.**

**CLÁUSULA V.5.- REVOCACIÓN DE CHEQUES.** El Cliente y las Personas Autorizadas no podrán revocar los Cheques librados, ni oponerse a su pago, sino después de que transcurra el plazo de presentación que establezcan las disposiciones legales aplicables. Transcurrido dicho plazo, el Cliente podrá revocar los Cheques o se podrá oponer a su pago mediante notificación que entregue por escrito a Banamex.

## CAPÍTULO SEXTO
## DEL DEPÓSITO A PLAZO Y DE LOS PAGARÉS

**CLÁUSULA VI.1.- FORMALIZACIÓN.** El Cliente podrá instruir a Banamex por escrito, mediante Banca Electrónica o a través de los medios que Banamex determine para tales efectos, a fin de que con cargo al saldo disponible en la Cuenta, se invierta el dinero que el propio Cliente determine en Depósitos a Plazo, en préstamos instrumentados mediante Pagarés, o bien, a través de otros pasivos a cargo de Banamex, tales como depósitos bancarios de dinero de cualquier tipo que Banamex se encuentre operando y ofrezca a sus clientes.

Asimismo, cuando Banamex así lo autorice, los Depósitos a Plazo y los Pagarés podrán ser constituidos sin la necesidad de que el Cliente mantenga una Cuenta.

En el supuesto señalado en el párrafo anterior, la constitución e incremento de los Depósitos a Plazo y de los Pagarés deberán ser formalizados por el Cliente mediante Depósitos a los cuales les será aplicable lo estipulado en la Cláusula II.5 del presente Contrato; asimismo, el Cliente podrá efectuar retiros a través de cualquiera de las formas señaladas en los incisos a) y b) de la Cláusula II.7 o cualquier otra que Banamex determine para tales efectos.

Banamex determinará libremente los montos y plazos a partir de los cuales estará dispuesto a recibir Depósitos a Plazo o préstamos documentados en Pagarés.

**01641**

**CLÁUSULA VI.2.- DOCUMENTACIÓN.** Cada Depósito a Plazo o préstamo celebrado en los términos del presente Capítulo se documentarán mediante la emisión de Constancias de Depósito o de Pagarés, respectivamente, los cuales Banamex recibirá del Cliente en depósito para su guarda y administración, acreditándose dicho depósito con el comprobante de Operación que Banamex emita para tales efectos, el cual desde este momento el Cliente reconoce que no es un título de crédito.

Las Operaciones señaladas en el párrafo anterior no podrán vencerse anticipadamente, por lo que el Cliente reconoce y acepta que únicamente podrá retirar los recursos invertidos en dichas Operaciones al vencimiento del plazo de las mismas.

**CLÁUSULA VI.3.- INTERESES.** Banamex pagará al Cliente intereses sobre las sumas que éste le entregue en Depósito a Plazo o en préstamo, a la tasa anual pactada entre las partes, la cual podrá corresponder a la tasa de interés que para dichas operaciones dé a conocer Banamex en lugares abiertos al público en sus oficinas.

Los intereses referidos en el párrafo anterior se causarán a partir del día en que se constituya el Depósito a Plazo o se otorgue el préstamo y hasta el día anterior al de la conclusión del plazo correspondiente, los cuales se calcularán dividiendo la tasa de interés anual aplicable entre 360 (trescientos sesenta) y multiplicando el resultado así obtenido por el número de días efectivamente transcurridos durante el período en el cual se devenguen los intereses a la tasa correspondiente. Los cálculos se efectuarán cerrándose a centésimas.

Los intereses que devenguen las Operaciones antes señaladas serán brutos y se pagarán al vencimiento de las mismas, tratándose de Depósitos a Plazo, los intereses podrán pagarse en las fechas que ambas partes determinen al momento de pactar la Operación. El tratamiento fiscal de los rendimientos estará sujeto a las disposiciones legales aplicables.

En la Carátula se señala la tasa de interés anual aplicable únicamente en la fecha de celebración del **Contrato** y la GAT del Depósito a Plazo o del Pagaré, según corresponda.

**CLÁUSULA VI.4.- PLAZO.** Al constituirse el Depósito a Plazo o al expedirse el Pagaré que documente el préstamo, las partes pactarán el plazo de los mismos en días naturales, no debiendo ser menor a 1 (un) día y será forzoso para ambas partes. Banamex podrá determinar el período mínimo respecto del cual estará dispuesto a celebrar este tipo de Operaciones.

Cuando el vencimiento del Depósito a Plazo o del Pagaré ocurra en un día inhábil, el pago se efectuará el Día Hábil inmediato siguiente, en el entendido de que los intereses continuarán devengándose conforme se establece en la Cláusula anterior, a la tasa de interés originalmente pactada.

**CLÁUSULA VI.5.- RENOVACIÓN DEL DEPÓSITO A PLAZO.** Banamex podrá renovar los Depósitos a Plazo en forma automática a su vencimiento, quedando sujeta la citada renovación a la aceptación de Banamex.

En caso de ser procedente la renovación del Depósito a Plazo, el mismo se entenderá constituido al mismo plazo que el anterior, siendo aplicable la tasa de interés que Banamex haya dado a conocer al público en general para esa misma clase de Operación el Día Hábil correspondiente al de la renovación.

Cuando el vencimiento del Depósito a Plazo fuere en día inhábil, la Operación será renovada precisamente en dicho día inhábil, aplicando al efecto la tasa de interés que Banamex hubiese dado a conocer el Día Hábil inmediato anterior. En este supuesto, si el Cliente se presentara el Día Hábil inmediato siguiente al de la renovación, podrá retirar el monto total del Depósito a Plazo.

**CLÁUSULA VI.6.- REINVERSIÓN DEL PAGARÉ.** El Cliente instruye a Banamex para que el monto derivado de la amortización del Pagaré se invierta en otro Pagaré por un plazo igual al anterior, aplicándole la tasa de interés que Banamex haya dado a conocer al público en general para esa misma clase de Operación el Día Hábil correspondiente al de la reinversión. En todo caso, la reinversión antes señalada queda sujeta a la aceptación de Banamex. Cuando el vencimiento del Pagaré fuere en día inhábil, la reinversión será efectuada el Día Hábil posterior.

El Cliente o las Personas Autorizadas, en cualquier momento, podrán instruir a Banamex para que no proceda a efectuar la reinversión señalada en la presente Cláusula.

**CLÁUSULA VI.7.- ABONO A LA CUENTA.** Cuando no proceda la renovación del Depósito a Plazo o la reinversión del Pagaré, Banamex pondrá a disposición del Cliente el monto derivado de la liquidación total o parcial del primero o bien de la amortización del segundo, mediante abono a la Cuenta de la cantidad de dinero que corresponda; en caso de que el Cliente no mantenga una Cuenta, Banamex pondrá a disposición del Cliente el importe respectivo en efectivo, Cheque o cualquier otra forma que Banamex determine.

**CLÁUSULA VI.8.- OPERACIONES EN UDIS.** Las partes podrán pactar que las Operaciones a que se refiere el presente Capítulo sean denominadas en UDIS, en cuyo caso el plazo de las mismas no podrá ser inferior a 3 (tres) meses.

## CAPÍTULO SÉPTIMO
### DE LAS DIVERSAS CLASES DE PRODUCTOS

**CLÁUSULA VII.1.- SOLICITUD DE PRODUCTOS.** Previa autorización de Banamex, el Cliente podrá solicitar cualquiera de los Productos incluidos en el Portal Banamex o en el presente Capítulo, para lo cual deberá cumplir con las características y requisitos que sean determinados por Banamex para la contratación de los mismos.

El Cliente reconoce y acepta que Banamex estará facultado para modificar las características del Producto contratado por el Cliente e incluso cambiarlo a otro Producto, bastando para ello un aviso por escrito dado al Cliente con 30 (treinta) días de anticipación a la fecha en que la modificación o el cambio entre en vigor, a través de cualesquiera de los medios señalados en la Cláusula XIII.8. Durante dicho plazo, el Cliente tendrá derecho a dar por terminado el Contrato sin que Banamex pueda cobrarle cantidad adicional alguna por este hecho, con excepción de los adeudos que ya se hubieren generado a la fecha en que el Cliente notifique a Banamex la terminación antes referida.

### SECCIÓN I
### INVERSIÓN INTEGRAL BANAMEX

**CLÁUSULA VII.2.- DESCRIPCIÓN.** Inversión Integral Banamex es un depósito de dinero a la vista en Pesos, que genera rendimientos diarios.

El Cliente en cualquier momento podrá instruir a Banamex por escrito, mediante la utilización de Banca Electrónica o a través de los medios que Banamex determine para tales efectos, para que este último transfiera de la cuenta eje los recursos que el Cliente desee depositar en este Producto o viceversa.

El Cliente reconoce y acepta que la transferencia a que se refiere el párrafo anterior únicamente se podrá efectuar en Días Hábiles y dentro de un horario de las 9:00 a las 15:00 horas, hora del centro de México; en caso de que el Cliente instruya la citada transferencia fuera de los días u horario antes señalado, ésta se aplicará hasta el Día Hábil siguiente.

Los rendimientos que genere el dinero registrado en Inversión Integral Banamex serán brutos y se calcularán sobre el saldo diario que el Cliente mantenga depositado en dicho Producto, dividiendo la tasa de interés anual determinada por Banamex entre 360 (trescientos sesenta). Los cálculos se efectuarán cerrándose a centésimas.

La tasa de interés anual aplicable y la GAT de Inversión Integral se señalan en la Carátula. Banamex se reserva el derecho de revisar y ajustar diariamente la citada tasa de interés.

## SECCIÓN II
### INVERSIÓN PERFILES BANAMEX

<u>CLÁUSULA VII.3.- DESCRIPCIÓN.</u> Inversión Perfiles Banamex es un depósito de dinero a la vista en Pesos, que genera rendimientos diarios.

El Cliente en cualquier momento podrá instruir a Banamex por escrito, mediante la utilización de Banca Electrónica o a través de los medios que Banamex determine para tales efectos, para que este último transfiera de la cuenta eje los recursos que el Cliente desee depositar en este Producto o viceversa.

El Cliente reconoce y acepta que la transferencia a que se refiere el párrafo anterior únicamente se podrá efectuar en Días Hábiles y dentro de un horario de las 9:00 a las 15:00 horas, hora del centro de México; en caso de que el Cliente instruya la citada transferencia fuera de los días u horario antes señalado, ésta se aplicará hasta el Día Hábil siguiente.

Los rendimientos que genere el dinero registrado en Inversión Perfiles Banamex serán brutos y se calcularán sobre el saldo diario que el Cliente mantenga depositado en dicho Producto, dividiendo la tasa de interés anual determinada por Banamex entre 360 (trescientos sesenta). Los cálculos se efectuarán cerrándose a centésimas.

La tasa de interés anual aplicable y la GAT de Inversión Integral se señalan en la Carátula. Banamex se reserva el derecho de revisar y ajustar diariamente la citada tasa de interés.

## SECCIÓN III
### INVERSIÓN INTELIGENTE BANAMEX

<u>CLÁUSULA VII.4.- DESCRIPCIÓN.</u> Inversión Inteligente Banamex es un Depósito a Plazo cuyo rendimiento se determina en función de las variaciones que se observen en los precios de un subyacente, los cuales pueden ser: (i) índices de precios sobre acciones que coticen en una bolsa de valores; (ii) Pesos, Divisas y UDIS; (iii) índices de precios referidos a la inflación; o bien, (iii) tasas de interés nominales, reales o sobretasas, en las cuales quedan comprendidos cualquier título de deuda.

En todo caso, el Cliente reconoce y acepta que este instrumento de inversión podrá no generar rendimientos, o estos ser inferiores a los existentes en el mercado, pero en ningún caso, al vencimiento de la Operación, se podrá liquidar un importe nominal inferior al principal invertido.

<u>CLÁUSULA VII.5.- CONCEPTOS APLICABLES.</u> A los Depósitos a Plazo descritos en la presente Sección les serán aplicables todas las estipulaciones contenidas en el presente Contrato relativas al Depósito a Plazo, así como lo dispuesto en el documento denominado "Términos y condiciones generales", el cual se adjuntará a este instrumento únicamente en caso de que el Cliente desee celebrar este tipo de Operaciones.

## CAPÍTULO OCTAVO
### DE LA BANCA ELECTRÓNICA

<u>CLÁUSULA VIII.1.- DE LOS MEDIOS ELECTRÓNICOS.</u> Ambas partes manifiestan expresamente su voluntad de pactar Operaciones a través de Instrucciones que el Cliente elija de las opciones habilitadas utilizando su Firma Electrónica.

Las Operaciones pactadas a través de los Medios Electrónicos podrán estar asociadas a contratos relacionados con operaciones activas, pasivas o de servicios celebrados entre el Cliente y Banamex, supuesto en el cual, los términos y condiciones de dichos contratos quedarán intactos y seguirán surtiendo sus efectos con los alcances en ellos convenidos, siendo que el presente Capítulo regulará únicamente la forma en la cual las partes convendrán las referidas Operaciones.

Asimismo, el Cliente podrá dar de alta su número de PIN mediante Audiomático, siendo ésta de un solo uso, toda vez que una vez dentro del Medio Electrónico, se le pedirá al Cliente que digite otro número.

Banamex manifiesta que en cualquier momento posterior al de la formalización de este Contrato, el Cliente tiene derecho a solicitarle, la activación de aquellos Servicios que no hubiere habilitado inicialmente, o modificar las condiciones de los previamente pactados, debiendo manifestar su consentimiento expreso mediante los medios que señale Banamex para tal fin; así como la instalación del Software en su Equipo de Cómputo para la recepción de los Servicios que así lo requieran, en el entendido que dicha solicitud se deberá realizar mediante identificación plena y a satisfacción de Banamex y de conformidad con los términos y condiciones establecidos en este documento y de la legislación.

El Cliente reconoce que la Banca Electrónica está conformada por diversos Medios de Comunicación y que cada uno de ellos está programado para prestar determinados Servicios o la totalidad de los mismos, por lo que reconoce que solamente podrá recibir los Servicios que correspondan al Medio de Comunicación de que se trate.

La Banca Electrónica está programada para que el Cliente pueda dar Instrucciones sujeto a los Horarios de Servicio publicados en los mismos medios, limitaciones y especificaciones que correspondan en cada caso. El Cliente se obliga a seguir las Instrucciones que le indique el Medio de Comunicación para poder tener acceso a los Servicios que correspondan. El Cliente, cuando así lo requiera, podrá, bajo su estricta responsabilidad cancelar Instrucciones previamente realizadas, siempre que se operen en el mismo día en que las Instrucciones fueron efectuadas. En todos los casos, se requerirá de la confirmación o aceptación por parte de Banamex respecto de la Instrucción de la cancelación a fin de que sea válida la misma. El Cliente manifiesta y está de acuerdo en que las Instrucciones canceladas no aparecerán en sus estados de cuenta.

El Cliente está de acuerdo que la moneda (ya sean Pesos o Dólares) de las Cuentas a las que se hagan cargos deberán coincidir con la moneda de las Cuentas a las que se hagan abonos, salvo que el Cliente opte por llevar a cabo una operación de compraventa de divisas, en el entendido que el Cliente acepta que el tipo de cambio aplicable a dicha operación sea el tipo de cambio que determina discrecionalmente Banamex, mismo que le será notificado a través de los Medios de Comunicación, al momento en que la Instrucción respectiva sea procesada. Banamex no es responsable frente al Cliente de los traspasos o abonos que se efectúen a otras cuentas (ya sean cuentas en Banamex o en

otros bancos) por lo que respecta al tipo de cuenta, ni a la relación causal que exista o pudiere existir entre el Cliente y los titulares de dichas cuentas a las que se hagan traspasos o abonos con cargos a las Cuentas Incorporadas, considerando que en ningún caso Banamex asumirá obligación o responsabilidad alguna que derive de operaciones que desconozca el Cliente al haber entre otras causas comprometido su Firma Electrónica por no seguir las recomendaciones de seguridad que se publican en el Portal Banamex.

El Cliente únicamente podrá pactar las Operaciones que los Medios Electrónicos antes señalados le permitan, manifestando expresamente saber que el acuerdo de voluntades relacionado con cada Operación pactada a través de los mismos se tendrá por perfeccionado, para todos los efectos legales a que haya lugar, al momento en que el Medio Electrónico utilizado le proporcione el Número de Autorización.

Banamex podrá restringir o limitar los Medios Electrónicos antes señalados, así como determinar otros adicionales a través de los cuales el Cliente podrá efectuar Operaciones; asimismo, el Cliente deberá otorgar a Banamex las direcciones IP de Internet para facilitarle el servicio de Banca Electrónica; así como, el número telefónico de la línea de Teléfono Móvil para los servicios de Pago Móvil y Banca Móvil.

El Cliente reconoce que podrá contratar, modificar y/o cancelar cualquiera de los Servicios que Banamex ponga a su disposición mediante la Banca Electrónica, debiendo utilizar el Factor de Autenticación correspondiente.

CLÁUSULA VIII.2.- OPERACIONES. De conformidad con lo dispuesto en la Ley de Instituciones de Crédito, ambas partes convienen que Banamex podrá suspender o cancelar las Instrucciones de las operaciones y/o Servicios que el Cliente pretenda realizar o utilizar mediante los Medios de Comunicación; Banca Electrónica; BancaNet; Banamex Móvil, Pago Móvil Blink, GssNet o cualquier otro que Banamex ponga a disposición del Cliente, siempre y cuando Banamex cuente con elementos suficientes para presumir que la Autenticación del Cliente; su Certificado Digital, Clave Confidencial, Clave Dinámica, Firma Electrónica, Clave de Acceso, NIP, Número de Identificación Personal, Password, Token, NetKey, Número Confidencial, FIEL, Firma Electrónica Avanzada ha sido comprometida, utilizados en forma indebida o bien cuando se detecte algún error en la Instrucción respectiva. Para el acceso a los distintos servicios de la Banca Electrónica, Banamex le proporcionará al Cliente distintos medios de autenticación para el acceso a éstos. En caso de no contar con ellos, el Cliente no podrá utilizar los Servicios que se describen en el presente Contrato, considerando que:

1) Banamex podrá bloquear el servicio de Banca Electrónica en caso de que el Cliente introduzca su Firma Electrónica en diversas ocasiones, situación por la que deberá acudir a la sucursal Banamex para desbloquear el servicio y deberá otorgar otro número para restablecer el servicio.

2) Cuando Banamex hubiese recibido recursos mediante alguno de los Medios de Comunicación y cuente con elementos suficientes para presumir que los medios de Autenticación del Cliente han sido utilizados en forma indebida, podrá restringir hasta por 15 (quince) Días Hábiles la disposición de tales recursos, a fin de llevar a cabo las investigaciones y las consultas que sean necesarias con otras instituciones de crédito relacionadas con la operación de que se trate. Banamex podrá prorrogar discrecionalmente el plazo antes referido hasta por 10 (diez) Días Hábiles más, siempre que se haya dado vista a la autoridad competente sobre probables hechos ilícitos cometidos en virtud de la Instrucción respectiva.

3) En los casos en que por motivo de las investigaciones referidas en el inciso anterior, Banamex tenga evidencia de que para la formalización del presente Contrato se proveyó con información o documentación falsa, o bien, que los medios de autenticación del Cliente para la emisión de las instrucciones de que se traten, fueron utilizados en forma indebida, podrá, bajo su responsabilidad, cargar a la Cuenta, sea Concentradora, de Abono, de Cargo Global, de Proveedores, de terceros, Eje, Incorporada o Propia, el importe respectivo con el propósito de que se abone en la Cuenta de la que procedieron los recursos correspondientes.

4) En caso de que Banamex hubiese abonado por error dinero a una Cuenta, el Cliente desde este momento faculta a Banamex para cargar el importe respectivo a la referida Cuenta con el propósito de corregir el error cometido.

El Cliente, reconoce expresamente el derecho que se reserva Banamex, a suspender una o más funcionalidades del Servicio en caso de que las Cuentas hayan sido canceladas, bloqueadas, o se encuentren en algún estatus que impida realizar algún abono o cargo, así como cualquier otra causa vinculada con la licitud de los fondos o relacionada con la identificación del Cliente.

Banamex pondrá a disposición del Cliente los medios alternos para recibir la prestación de los Servicios que en su caso requiera. Los términos y condiciones bajo los cuales se regirán los medios alternos, serán los dados a conocer al Cliente en las sucursales de Banamex o mediante los Medios de Comunicación que correspondan.

5) En caso de robo o extravío del Dispositivo de Acceso a los Medios Electrónicos, el Cliente deberá de notificarlo a Banamex, debiéndose comunicar al Centro de Atención Telefónica para solicitar la cancelación; o podrá solicitarlo en línea por medio del Administrador de Seguridad.

El Cliente deberá de acudir a la sucursal Banamex para que posteriormente a la notificación indicada en la presente cláusula llene el formato correspondiente para que se le haga entrega del nuevo dispositivo de seguridad aquí referido.

CLÁUSULA VIII.3.- FIRMA ELECTRÓNICA. Las Partes otorgan su consentimiento en que la Firma Electrónica sustituirá, para todos los efectos legales a que haya lugar, a la firma autógrafa del Cliente o de su representante legal con plenas facultades, produciendo los mismos efectos que las leyes otorgan a la firma autógrafa o de su representante legal con plenas facultades, incluyendo el valor probatorio de ésta.

El Cliente manifiesta que conoce el alcance que en el presente Contrato se le atribuye a la Firma Electrónica, por lo que su uso y digitación en los Medios Electrónicos es bajo su estricta responsabilidad, así como el hecho de que su uso sea realizado por representantes legales del Cliente que cuenten con plenas facultades para convenir los Servicios. El Cliente, en protección de sus propios intereses, deberá mantener la Firma Electrónica como confidencial y prevenir a sus representantes a que le reconozcan dicho carácter, toda vez que el uso de dicha Firma Electrónica, para todos los efectos legales a que haya lugar, en todo caso será atribuido al Cliente, aún y cuando medie caso fortuito o fuerza mayor.

Las partes convienen en que serán aplicables, en su momento, los términos del Código de Comercio y cualquier otra disposición aplicable, respecto de la identidad y expresión de consentimiento de las mismas por medios electrónicos, óptico o de cualquier otra tecnología mediante el uso de la firma electrónica avanzada, a fin de que los Mensajes de Datos sean comunicados entre las partes de manera segura en su identificación, auténticos e íntegros en su contenido y no repudiables respecto del emisor y receptor.

El Cliente reconoce ser el único y exclusivo responsable del uso que se haga de la(s) Firma(s) Electrónica(s) para el acceso, operación y manejo de los Servicios y conviene en sacar en paz y a salvo a Banamex de cualquier responsabilidad que pudiere llegar a generarse a su cargo por el uso indebido que le diera a la(s) Firma(s) Electrónica(s). El Cliente se obliga a modificar periódicamente la Clave Confidencial con la finalidad de mantener en confidencialidad la(s) Firma(s) Electrónica(s) y a seguir estrictamente las recomendaciones de seguridad que Banamex de indique.

01644

El Cliente manifiesta conocer el riesgo existente en el uso de los Medios de Comunicación y el alcance legal que la legislación aplicable atribuye a las Firmas Electrónicas, por lo que su uso en cualquiera de los Medios de Comunicación y/o la Banca Electrónica es bajo su estricta responsabilidad, independientemente de la persona que las use, por lo que Banamex no será responsable de los daños y perjuicios que el uso indebido de las Firmas Electrónicas le pudiere causar al Cliente, aún cuando exista caso fortuito o fuerza mayor. La responsabilidad del Cliente cesará por defunción, robo, extravío o hechos ilícitos a partir de que éstos sean notificados a Banamex.

Es responsabilidad del Cliente habilitar la Firma Electrónica por cualquiera de los Medios de Comunicación que así lo requiera inmediatamente después de que la reciba o siguiendo el procedimiento que Banamex hubiera instruido al Cliente para tales efectos. El Cliente reconoce que al momento de recibir por primera vez la Clave Confidencial se encontrará salvo indicación expresa vencida o inactiva, y no podrá ser utilizada para recibir los Servicios salvo para tener acceso inicial a algún Medio de Comunicación y modificar a su vez la Clave Confidencial. Una vez modificada la Clave Confidencial y por ende la Firma Electrónica, el Cliente podrá recibir los Servicios a través de la Banca Electrónica.

En caso de que con anterioridad a la fecha de ejecución del presente, el Cliente ya hubiera tenido acceso a alguno de los Medios de Comunicación con base en algún otro contrato celebrado entre el Cliente y Banamex, caso en el que Banamex no entregará al Cliente una Firma Electrónica adicional, por lo que el Cliente continuará utilizando la(s) Firma(s) Electrónica(s) que le hubieran sido dadas de Alta en los Medios de Comunicación.

CLÁUSULA VIII.4.- EQUIPO Y PROGRAMAS DE CÓMPUTO. El Cliente expresamente conviene en obligarse de conformidad con las disposiciones de esta Cláusula respecto al Equipo de Cómputo y al(los) Programa(s) de Cómputo que sean instalados en el Equipo de Cómputo del Cliente, y su uso, como parte de los Medios de Comunicación, por lo que:

a) El Equipo de Cómputo a ser utilizado para la instalación del o los Programas de Cómputo será suministrado exclusivamente por el Cliente y deberá reunir el mínimo de características que Banamex (o el tercero autorizado por Banamex) determine como necesarias para que dichos Programas de Cómputo funcionen adecuadamente.

b) El Cliente será responsable de todos los gastos necesarios para dar mantenimiento y reparación al mismo a fin de que esté siempre en buenas condiciones para su uso.

c) El Cliente reconoce que Banamex es el único y exclusivo titular de los derechos de autor sobre los Programas de Cómputo (o en su caso que Banamex cuenta con los derechos para el uso, explotación o licenciamiento de dichos Programas de Cómputo). Todos los derechos de patentes, propiedad intelectual, derechos de autor, marcas y secretos industriales relacionados con los Servicios y los Programas de Cómputo relacionados con los Medios de Comunicación son propiedad única y exclusiva de Banamex o tiene derecho al uso de los mismos, por lo que el Cliente no podrá por ningún motivo y de ninguna forma copiar, modificar, suprimir o alterar los Programas de Cómputo indicados.

d) El Cliente será el único responsable del mal uso que pudiera darse a los Programas de Cómputo que estén instalados en su Equipo de Cómputo.

e) Banamex otorga al Cliente una licencia limitada, intransferible y sin exclusividad para que utilice el o los Programas de Cómputo que éste requiera para tener acceso a los Servicios, sujeto a que: (i) el Cliente utilice el o los Programa de Cómputo en los términos y bajo las condiciones del presente Contrato, y (ii) los Programas de Cómputo sean utilizados exclusivamente para los fines aquí establecidos y en el curso ordinario de los negocios del Cliente.

f) El Cliente se obliga a tratar de manera confidencial el o los Programas de Cómputo y a no divulgar a ninguna persona el contenido, formato o características de los mismos. El Cliente se obliga a indemnizar a Banamex de los daños y perjuicios que le llegaré a causar el incumplimiento de la obligación de confidencialidad pactada en este inciso.

g) Banamex no será responsable por los daños o perjuicios causados al Cliente o a cualquier persona por las fallas de los Programas de Cómputo o de la Banca Electrónica, en el Equipo de Cómputo, cuando dichas fallas no sean imputables directamente a Banamex.

CLÁUSULA VIII.5.- SERVICIOS A TRAVÉS DEL PORTAL BANAMEX, BANCANET, BANCA MÓVIL, AUDIOMÁTICO Y OPERADOR TELEFÓNICO. A través de los Medios de Comunicación o cualquier otro disponible en la fecha de celebración de este Contrato o en el futuro, el Cliente podrá recibir los Servicios habilitados en el Medio que corresponda.

El Cliente podrá obtener alguno(s) de los Servicios, autenticándose y dando las Instrucciones que en cada caso sean necesarias para la obtención de dichos Servicios, en el entendido de que los mismos estén sujetos a las limitaciones, condiciones, horarios, montos y demás reglas aplicables que se detallan en cada Medio de Comunicación a que se refiere esta Cláusula. El Cliente se obliga a cumplir con los procesos y reglas que Banamex establezca a través de los Medios de Comunicación para poder recibir los Servicios. Una Sesión inactiva por el tiempo que determine Banamex será suspendida.

Banamex podrá en todo momento adicionar nuevos Servicios para ser prestados a través de cualesquier Medios de Comunicación, y el Cliente que desee utilizar dichos nuevos Servicios estará sujeto a las limitaciones, condiciones, horarios, montos y demás reglas aplicables que se detallen en cada Medio de Comunicación que corresponda. Asimismo, Banamex podrá en todo momento adicionar nuevos Medios de Comunicación para que los Clientes puedan recibir los Servicios.

Banamex podrá ofrecer de conformidad con la legislación vigente la presentación de los estados de cuenta y resúmenes de movimientos de los distintos Productos y Servicios, ya sea que éstos sean enviados electrónicamente al Cliente o que residan en los sistemas de Banamex a fin de que el propio Cliente acceda a ellos para su consulta.

El Cliente podrá utilizar como contingencia a los Medios de Comunicación Línea Banamex Digitem y TEF, así como recibir alguno(s) de los Servicios en las sucursales de Banamex en las que el Cliente tenga establecidas Cuentas de las cuales él sea el titular.

Las partes convienen en que dentro del Medio de Comunicación se ofrece en cumplimiento de las disposiciones legales procedimientos para establecer límites a los montos individuales y agregados diarios, que en caso de no ser definidos por el Cliente serán sugeridos por Banamex.

En el evento de que se ofrezcan servicios de entidades relacionadas con Banamex o de terceros mediante enlaces electrónicos, Banamex en cumplimiento de disposiciones legales cerrará la Sesión establecida una vez que ingrese a aquella otra cuya seguridad no depende, ni es responsabilidad de Banamex.

A través de la Línea Banamex Digitem, el Cliente podrá, entre otros: (i) consultar saldos, movimientos y estados de cuenta de las Cuentas Incorporadas, (ii) realizar traspasos de fondos de una Cuenta Incorporada a otra Cuenta Incorporada o a una Cuenta de terceros, (iii) expedir órdenes de pago para ser cubiertas en efectivo en otras plazas, en sucursales de Banamex, (iv) realizar depósitos por concepto de servicios, impuestos federales con fondos de Cuentas Incorporadas, (v) enviar y recibir correos electrónicos a Banamex y a otros Clientes de Banamex, (vi) realizar pagos interbancarios, bajo las reglas y condiciones que tenga pactados Banamex con otros bancos, (vii) dar de Alta Cuentas bajo el concepto de Cuentas de terceros, (viii) dar de Baja cualesquiera Cuentas Incorporadas o Cuentas de terceros, (ix) dar de Alta y Baja Firmas

01645

Electrónicas y administrar sus facultades, (x) cambio de Clave Confidencial, (xi) consulta de estado de cheques librados, operaciones para protección de cheques en caso de robos o extravíos, (xii) solicitud de talonarios de chequeras de las Cuentas Incorporadas de las que el Cliente es titular, y (xiii) los demás Servicios que en su momento puedan efectuarse mediante la digitación de las Instrucciones correspondientes en el Programa de Cómputo denominado Línea Banamex Digitem.

El Cliente reconoce y está de acuerdo en que Banamex podrá, libremente y sin limitación alguna, realizar todas las modificaciones técnicas, físicas, mecánicas o de cualquier otra naturaleza, que sean necesarias para mejorar, actualizar o suprimir algunas de las funciones de los Medios Electrónicos, inclusive la eliminación de algunas Operaciones o la eliminación total de algunos de los Medios Electrónicos, según Banamex lo considere necesario.

Asimismo, el Cliente reconoce que Banamex podrá ejecutar las Operaciones en línea o hacer los cargos y abonos correspondientes con posterioridad al momento en que el Cliente envíe las Instrucciones a través de los Medios Electrónicos.

Banamex no será responsable frente al Cliente de cualesquiera daños o perjuicios que se le pudieren ocasionar a este último en virtud de las modificaciones que Banamex efectúe en los Medios Electrónicos.

El Cliente reconoce expresamente que Banamex no será responsable de los daños y perjuicios que llegaren a causársele por la no disponibilidad de los Medios Electrónicos. No obstante ello, Banamex podrá poner a disposición del Cliente en sus sucursales, los medios alternos para pactar Operaciones.

Banamex no responde por las fallas en los Medios Electrónicos, cuando éstos sean motivados por caso fortuito o causas de fuerza mayor.

CLÁUSULA VIII.6.- SERVICIOS DE BANCA MÓVIL Y PAGO MÓVIL. El Cliente que tenga contratado o activado servicio de Banamex Móvil, podrá acceder mediante su Teléfono Móvil a los Servicios que Banamex proporcione por esta vía, pudiendo realizar, entre otras las siguientes operaciones, de consulta de saldos y movimientos, transferencias y pagos a cuentas, pago de servicios y compra de tiempo aire.

Todas las operaciones previamente descritas y aquellas que en un futuro, se adhieran al presente servicio, para el conocimiento del cliente, serán notificadas vía mensaje de texto SMS.

CLÁUSULA VIII.7.- SERVICIOS A TRAVÉS DE TEF. A través del servicio de TEF, el Cliente podrá, entre otros: (i) realizar depósitos, mediante Instrucciones a Banamex para que cargue en la Cuenta de Cargo Global del Cliente el monto Global o en alguna de las Cuentas Incorporadas como Propias y deposite a cualquier Cuenta cuyo titular sea un tercero, (ii) realizar cobros, mediante Instrucciones a Banamex para que cargue ciertas sumas a las Cuentas Incorporadas cuyos titulares sean terceros (cuyas Cuentas hayan sido incorporadas mediante autorización por escrito del tercero), (iii) pago de contraprestaciones laborales, sociales y mercantiles de cualquier naturaleza, sujeto a las condiciones y términos que en su momento determine e informe Banamex y, (iv) los demás Servicios que en su momento puedan efectuarse mediante la digitación de las Instrucciones correspondientes a través del Servicio de TEF.

Cuando el Servicio implique la aplicación de un archivo de pagos, el Cliente se obliga a proveer fondos suficientes a la Cuenta de Cargo Global por el monto Global con anticipación a la fecha en que Banamex deba realizar la aplicación de los cargos, conforme a los convenios establecidos con los demás bancos para pagos interbancarios y sujetos a la regulación jurídica vigente.

CLÁUSULA VIII.8.- SERVICIO DE DOMICILIACIÓN. El Cliente que tenga contratado un Medio de Comunicación podrá realizar cargos automáticos a las cuentas de sus propios Clientes para el pago de un bien o servicio, de conformidad con las siguientes disposiciones:

El Cliente deberá firmar y entregar de acuerdo a sus necesidades el documento autorizado que contendrá al menos: las especificaciones de periodicidad de Cargos Programados, los montos mínimos, máximos o sin límite de dichos cargos, así como la Cuenta de Abono en la que Banamex acreditará los Cargos Programados.

Para que los terceros autoricen a Banamex a realizar Cargos Programados deberán en sucursal, firmar y entregar el formato de autorización. A través de la Banca Electrónica el Cliente podrá efectuar sus Cargos Programados a través de algún Medio de Comunicación. Esta alternativa sólo podrá ser utilizada por aquéllos terceros que tengan contratado el Servicio de Banca Electrónica. El Número de Autorización que se asigne a dicha operación será utilizado para cualquier aclaración posterior.

Banamex entregará al Cliente un archivo electrónico en los Días Hábiles que contendrá: (i) el listado de los terceros que hayan autorizado el alta, baja y modificación de Cargos Programados, (ii) un archivo con los cargos que se pudieron o no realizar y (iii) un archivo que contiene los reversos. El Cliente libera a Banamex de cualquier inconformidad que se presente por parte del Tercero con la limitación de montos máximos estipulados.

El Cliente reconoce que los terceros que hayan autorizado a Banamex la realización de cargos automáticos programados, podrán revocar dichas Instrucciones cuando así lo deseen sin ningún costo siguiendo las disposiciones legales aplicables.

El Cliente libera a Banamex de los daños y perjuicios y no se hará responsable al no poder realizar el cobro de los Cargos Programados cuando las Cuentas de los terceros tengan fondos insuficientes, hayan sido canceladas, o por cualquier causa que imposibilite a Banamex realizar los cargos.

El Cliente autoriza a Banamex a cargarle en su Cuenta el monto acumulado de los reversos dentro del plazo legal, y los cargos no reconocidos de los cuales no se entregue la carta autorización del tercero en los siguientes 10 (diez) días a su solicitud, teniendo la posibilidad de, al no encontrar fondos en la Cuenta, utilizar de manera discrecional y a su elección los sistemas de búsqueda de fondos de cualquier Cuenta que se encuentre bajo el nombre del Cliente para dicho cobro. El no ejercicio del derecho antes mencionado no limita su aplicación o elimina su ejecución.

Toda aclaración deberá efectuarse por escrito entre el Cliente y Banamex dentro del plazo legal. Si el Cliente no responde a la solicitud de aclaración, Banamex cargará a la Cuenta de Abono el importe sujeto a la aclaración.

No obstante a lo anterior, el Cliente podrá cancelar en cualquier momento el servicio antes descrito, sin perjuicio y costo alguno.

CLÁUSULA VIII.9.- SERVICIOS BANCARIOS, FINANCIEROS E INFORMATIVOS OPERADOS A TRAVÉS DE TERCEROS. Banamex podrá prestar alguno o algunos de los Servicios a través de terceros autorizados, en el entendido que en determinadas operaciones, se realizarán utilizando los niveles de seguridad necesarios para la transmisión de Mensajes de Datos, sujeto entre otras a las siguientes condiciones y términos:

a) El Cliente queda en libertad de determinar si desea recibir Servicios y de dar Instrucciones a Banamex a través de dichos terceros, en el entendido de que cuando así lo haga, el Cliente está de acuerdo en que Banamex transmita información sobre confirmaciones, rechazos y devoluciones del Cliente por conducto de dichos terceros.

b) Los Servicios Financieros Operados a través de terceros se conforman de Mensajes de Datos que Instruyen a Banamex para realizar cargos en Cuentas Incorporadas del Cliente y para su abono a otras Cuentas tanto del Cliente como de otros terceros, Cuentas que podrán estar contratadas con Banamex o en otras instituciones financieras.

01646

c) El Cliente reconoce que tratándose de Instrucciones sobre abonos a Cuentas que no sean de Banamex, dichas Instrucciones se realizarán conforme a los convenios establecidos con dichas Instituciones para pagos interbancarios y estarán sujetas a la regulación jurídica vigente, por lo que el Cliente se obliga a revisar la aplicación de las Instrucciones a efecto de confirmar si alguna Instrucción ha sido rechazada por otras instituciones financieras.

d) En el caso de que la prestación de los Servicios Financieros Operados a través de terceros se lleve a cabo con Certificados Digitales, dicha prestación está sujeta a que: (1) Banamex active el Certificado Digital; (2) Banamex tendrá el derecho a no activar el Certificado Digital o a cancelar el mismo en cualquier momento, en caso de que los datos que el Cliente haya proporcionado al solicitarlo no concuerden con la información que Banamex tenga al respecto. En tal caso, el Cliente podrá acudir a cualquiera de las sucursales Banamex a efecto de proporcionar los datos correctos y solicitar nuevamente la emisión del Certificado Digital, conforme a los procedimientos establecidos por Banamex; (3) Banamex notificará al Cliente la cancelación del Certificado Digital en base a los datos proporcionados en el mismo; (4) El Cliente asume cualquier responsabilidad sobre el uso de su Certificado Digital, quien tendrá la libertad de determinar si usa el Certificado Digital para recibir los Servicios Financieros Operados a través de terceros.

e) Los Terceros que presten por Banamex servicios informativos o de comercio electrónico se sujetarán a las políticas de seguridad, transparencia e identificación que determine discrecionalmente Banamex.

Cuando a través de los Medios Electrónicos se convengan los Servicios, tales como cargos a cuentas propias cuyo titular sea persona distinta al Cliente, éste deberá entregar en cualquiera de las sucursales de Banamex en las que el Cliente tenga aperturadas cuentas de las que éste sea titular, la autorización por escrito y firmada por el tercero que es titular de la cuenta que se desea incorporar como cuenta propia o su representante, que cumpla con las disposiciones legales que sean aplicables y los requisitos que Banamex establezca. La omisión en la realización de los actos señalados, no obligará a Banamex a prestar los Servicios antes precisados, sin que por ello asuma responsabilidad alguna frente al Cliente.

Los Servicios de alta y baja de cuentas autorizadas podrán ser convenidos a través de sucursales, BancaNet o aquellos Medios Electrónicos que Banamex estipule en un futuro, en cumplimiento a las indicaciones y prevenciones que se muestren en el cuadro de diálogo que aparezca en el módulo denominado "Alta/Baja de Cuentas" y BancaNet, por cada alta de cuentas autorizadas, generará un Número de Autorización, no obstante no se realice afectación a los estados contables de Banamex. El Cliente podrá optar por instruir alta y baja de cuentas autorizadas, en las sucursales en las que éste tenga aperturadas cuentas incorporadas de las que sea propietario, supuesto en el cual dichas instrucciones surtirán sus efectos transcurridos treinta días de la fecha en que Banamex haya recibido en sus sucursales las Instrucciones correspondientes, lo anterior sin perjuicio de que Banamex las ejecute en cualquier tiempo comprendido dentro de dicho plazo.

Cuando a través de los Medios Electrónicos se realicen operaciones que tengan por objeto el pago a terceros de bienes o servicios, las relaciones del Cliente y dichos terceros se regirán por los propios convenios que hayan celebrado para dichos efectos, por lo que Banamex no asumirá responsabilidad alguna derivada de esas relaciones jurídicas, ya sea por el pago o por la insuficiencia en la prestación de los bienes o servicios, por lo que el Cliente se obliga a indemnizar y a sacar en paz y a salvo a Banamex de cualquier reclamación que se relacione con lo anterior.

Banamex sólo tendrá obligación de prestar los Servicios relacionados a transferencias de fondos, en el evento de que en las cuentas propias cuenten con los fondos que sean suficientes para dar cumplimiento a dichas transferencias, por lo que Banamex no asumirá responsabilidad alguna derivado de lo anterior.

Asimismo, el Cliente reconoce que Banamex podrá prestar los Servicios inmediatamente o con posterioridad al momento en que el Cliente envíe las Instrucciones en la Banca Electrónica. A efecto de lo anterior, Banamex informará mediante la presentación de una ventana que contenga la información relativa a la operación y habiendo sido ejecutada, se incluirá un número de autorización o un número de recepción, si la misma se ejecutará posteriormente. Adicionalmente a la notificación que se realice en el medio de comunicación utilizado, se notificará al correo electrónico señalado por el Cliente.

CLÁUSULA VIII.10.- LA BITÁCORA Y ESTADOS DE CUENTA. La Banca Electrónica guarda una Bitácora de las operaciones realizadas, misma que podrá ser consultada e impresa por el Cliente de conformidad con las Instrucciones del Medio de Comunicación de que se trate. El Cliente es responsable de verificar que las Instrucciones operadas hayan quedado debidamente registradas en la Bitácora.

Dicha Bitácora contendrá la fecha, hora (hh:mm:ss), número de cuenta origen y destino y demás información que permita identificar el mayor número de elementos involucrados en los accesos a los Medios de Comunicación y los datos de las consultas y operaciones incluyendo, en su caso, las direcciones de los protocolos de Internet o similares.

El Cliente podrá consultar la información sobre las Instrucciones que se hayan operado en relación con las Cuentas Incorporadas tanto en la Banca Electrónica como en las sucursales y obtener estados de cuenta a través de algunos de los Medios de Comunicación. Asimismo, el Cliente podrá programar que le sean enviados estados de cuentas a través de los Medios de Comunicación cuando estos lo permitan. La Bitácora tendrá validez legal cuando se cumplan los requerimientos de la legislación vigente.

Banamex podrá ofrecer de conformidad con la legislación vigente la presentación de los estados de cuenta y resúmenes de movimientos de los distintos Productos y Servicios, ya sea que éstos sean enviados electrónicamente al cliente o que residan en los sistemas de Banamex a fin de que el propio Cliente acceda a ellos para su consulta. A partir del momento en que estén a disposición del Cliente dichos estados de Cuenta correrán los plazos establecidos por Ley para la presentación de aclaraciones, transcurrido el cual, el Cliente manifiesta expresamente su aceptación a las operaciones ahí contenidas.

Los estados de cuenta a los que el Cliente tiene acceso a través de los Medios de Comunicación no se consideran comprobantes para efectos fiscales y tendrá carácter únicamente informativo, salvo que en virtud de las disposiciones legales aplicables Banamex establezca la validez contractual, legal y/o fiscal de dichos estados de cuenta.

CLÁUSULA VIII.11.- CONCESIONES. Para efectos de prevenir una controversia futura, las partes convienen en otorgarse las siguientes recíprocas concesiones:

a) El uso de la Firma Electrónica tendrá para todos los efectos legales a que haya lugar, los mismos efectos e implicaciones de la firma autógrafa auténtica, dentro de los cuales de manera enunciativa más no limitativa se señalan, la de representar el acuerdo de voluntades entre el Cliente y Banamex, sustentado en facultades suficientes para obligarles en los términos y condiciones de los convenios relativos a las Operaciones.

El Cliente expresa, manifiesta y acepta que las Operaciones e Instrucciones que realice mediante el uso de la Firma Electrónica, lo identifican plenamente ante Banamex, por lo que la expresión de su consentimiento otorgado por estos medios respecto de las Operaciones serán absolutamente válidos, no pudiendo ser desconocidos, revocados, repudiados o rechazados por el Cliente tanto respecto de dicha identificación como de la ejecución de las Operaciones que se hubiesen realizado.

b) A las Operaciones le son aplicables todos los términos y condiciones establecidos en el presente Capítulo, en los contratos que, en su caso, se asocien a éstas, por aquéllos que se establezcan en los cuadros de diálogos de los propios Medios Electrónicos y por los efectos que el uso de los Medios Electrónicos y la convención de las Operaciones tengan sobre los contratos asociados a éstos.

c) Los asientos contables efectuados por Banamex, la Bitácora, los estados de cuenta, el Número de Autorización, las fichas o documentos que se generen con motivo de la ejecución de las Operaciones, así como las demás constancias documentales y técnicas derivadas del uso de los Medios Electrónicos, harán prueba plena de la existencia y validez de las Operaciones pactadas a través de ellos.

d) Las Operaciones pactadas a través de los Medios Electrónicos mediante el uso de la Firma Electrónica, representa el acuerdo de voluntades entre el Cliente y Banamex, cuyo perfeccionamiento se rige por las reglas de los convenios celebrados entre presentes.

**CLÁUSULA VIII.12.- MICRO PAGOS.** Banamex podrá no requerir la Clave Confidencial o la firma autógrafa del Cliente cuando éste instruya, a través del Teléfono Móvil o de Terminales Punto de Venta, Operaciones por un importe determinado en las disposiciones legales aplicables. En este supuesto, Banamex asumirá los riesgos y por lo tanto los costos de tales Operaciones que no sean reconocidas por el Cliente, obligándose a abonar en la Cuenta el importe de la Operación no reconocida a más tardar 48 (cuarenta y ocho) horas posteriores a que el Cliente hubiese presentado la reclamación correspondiente.

## CAPÍTULO NOVENO
### COMISIONES

**CLÁUSULA IX.1.- DE LAS COMISIONES.** El Cliente se obliga a pagar a Banamex las cantidades que se deriven de las comisiones que se describen en el documento que como anexo se adjunta al presente Contrato, el cual se considerará, para todos los efectos legales a que haya lugar, como parte integrante del mismo.

Al monto de las comisiones se les adicionará el Impuesto al Valor Agregado (I.V.A.).

El Cliente podrá consultar las comisiones vigentes en cualquier sucursal Banamex y en el Portal Banamex.

Banamex podrá incrementar el importe de las comisiones anteriormente señaladas, así como establecer nuevas comisiones, previo aviso que publique en el Portal Banamex o en lugares abiertos al público en sus oficinas; o bien, previa notificación enviada al Cliente a través de cualquiera de los medios señalados en la Cláusula XIII.8; cualquiera de ellos con al menos 30 (treinta) días de anticipación a que surtan efectos las mismas.

El Cliente que no esté de acuerdo con el incremento o con las nuevas comisiones podrá solicitar la terminación del Contrato dentro de los 30 (treinta) días posteriores al aviso arriba señalado, sin responsabilidad alguna a su cargo, tras lo cual Banamex le deberá entregar el saldo disponible de la Cuenta sin aplicar comisión adicional alguna, con excepción de los adeudos que ya se hubieren generado a la fecha en que el Cliente retire el citado saldo.

**CLÁUSULA IX.2.- COBRO DE COMISIONES.** El Cliente autoriza expresamente a Banamex para cobrar las comisiones señaladas en el presente Capítulo mediante cargo a la Cuenta, en el entendido de que si, por cualquier causa, Banamex no efectúa el cargo respectivo, el Cliente no quedará eximido de cumplir con sus obligaciones de pago.

**CLÁUSULA IX.3.- FALTA DE PAGO.** El Cliente manifiesta estar de acuerdo en que Banamex bloqueé su acceso a los Medios Electrónicos en caso de que el primero no cubra a Banamex, en tiempo y forma, las comisiones anteriormente pactadas. La falta de ejecución del derecho antes indicado no limita, elimina o modifica el mismo.

## CAPÍTULO DÉCIMO
### ESTADO DE CUENTA

**CLÁUSULA X.1.- DEL ESTADO DE CUENTA.** Banamex estará obligado a enviar al Cliente dentro de los primeros 10 (diez) días siguientes a la fecha de corte, un Estado de Cuenta con la relación de todos los movimientos efectuados en la Cuenta durante el periodo al que corresponda el mismo.

Se entenderá para todos los efectos legales a que haya lugar que Banamex ha enviado el Estado de Cuenta al Cliente en cualquiera de los siguientes supuestos pactados en la Solicitud o en el formato que Banamex determine para tal fin:

a) Si Banamex lo envía al último domicilio determinado por el Cliente para recibir correspondencia o al Correo Electrónico que el Cliente haya proporcionado a Banamex; o bien,

b) Si Banamex lo pone a disposición del Cliente para su consulta en la Sucursal o a través de Medios Electrónicos.

El Cliente en este acto acepta expresamente que cualquier comunicado que le sea dado a conocer por Banamex a través de los Estados de Cuenta, surtirá plenos efectos legales como si la notificación hubiese sido realizada en forma personal.

**CLÁUSULA X.2.- SUSPENSIÓN DE ENVÍO.** Cuando la Cuenta no presente ningún tipo de movimiento en el transcurso de 30 (treinta) días consecutivos, Banamex estará facultado para suspender el envío del Estado de Cuenta con la periodicidad pactada en la Cláusula anterior, obligándose a enviar dicho Estado de Cuenta cuando menos una vez cada 6 (seis) meses. De existir un movimiento posterior a la suspensión, Banamex deberá reanudar el envío del Estado de Cuenta.

No obstante lo anterior, el Cliente podrá en todo momento consultar el saldo de la Cuenta y, en caso de que mantenga saldo disponible, podrá solicitar a Banamex que reanude el envío del Estado de Cuenta correspondiente.

**CLÁUSULA X.3.- CONSULTA DE SALDO.** El Cliente podrá consultar el saldo de la Cuenta, así como una relación de los movimientos del periodo, en cualquier sucursal de Banamex, a través de Banca Electrónica o, en su caso, a través de los Cajeros Automáticos.

El Cliente podrá solicitar a Banamex en cualquiera de sus sucursales y a través de los formatos que éste ponga a su disposición para tales efectos, una relación de los saldos y movimientos presentados en la Cuenta en otros periodos, la cual le será entregada por Banamex dentro de los 15 (quince) días siguientes a la fecha en que sea recibida su solicitud.

## CAPÍTULO DÉCIMO PRIMERO
### ACLARACIONES

**CLÁUSULA XI.1.- DEL PROCEDIMIENTO ACLARATORIO.** De conformidad con lo dispuesto en el artículo 23 de la Ley para la Transparencia y Ordenamiento de los Servicios Financieros, cuando el Cliente no esté de acuerdo con alguno de los movimientos que aparezcan en el Estado de Cuenta, podrá solicitar a Banamex la aclaración correspondiente, la cual deberá presentar por escrito en la Sucursal o en la Unidad Especializada, o a través de cualquier otro medio que Banamex ponga a su disposición para tales

efectos, dentro de los 90 (noventa) días siguientes contados a partir de la fecha de corte. La solicitud deberá contener de forma detallada los movimientos con los cuales no esté de acuerdo, así como la dirección a donde se le pude enviar la respuesta y, en su caso, copia de su identificación.

Una vez recibida la solicitud de aclaración, Banamex tendrá un plazo de 45 (cuarenta y cinco) días para entregar al Cliente el dictamen correspondiente. En caso de aclaraciones relativas a Operaciones realizadas en el extranjero, el plazo previsto en este párrafo será hasta de 180 (ciento ochenta) días.

Banamex, dentro del plazo señalado en el párrafo anterior entregará al Cliente el dictamen a través del Servicio Postal Mexicano o cualquier servicio de mensajería que el primero determine; si transcurrido el plazo estipulado, el Cliente no ha recibido respuesta, éste podrá acudir a la Unidad Especializada o a la sucursal donde presentó su reclamación para que pueda recoger el dictamen correspondiente.

Asimismo, dentro del plazo de 45 (cuarenta y cinco) días contado a partir de la entrega del dictamen a que se refiere el párrafo anterior, Banamex pondrá a disposición del Cliente en la Sucursal, o bien, en la Unidad Especializada, el expediente generado con motivo de la solicitud de aclaración.

**CLÁUSULA XI.2.- SUSPENSIÓN DEL PROCEDIMIENTO.** El procedimiento previsto en la Cláusula anterior quedará sin efectos a partir de que el Cliente presente su demanda ante autoridad jurisdiccional o conduzca su reclamación en términos de la Ley de Protección y Defensa al Usuario de Servicios Financieros.

**CLÁUSULA XI.3.- COMISIÓN MERCANTIL PARA ACLARACIONES.** En este acto el Cliente otorga a Banamex una comisión mercantil para que este último, en su caso, lo represente ante cualquier tercero que hubiese participado en la transacción o movimiento que el Cliente no reconozca y en virtud del cual inició el procedimiento aclaratorio referido en la Cláusula XI.1 anterior.

## CAPÍTULO DÉCIMO SEGUNDO
### DEL CREDICHEQUE

**CLÁUSULA XII.1.- AUTORIZACIÓN Y SUSCRIPCIÓN DE CONTRATO.** Sujeto a las autorizaciones de crédito correspondientes y posterior a la celebración del Contrato de Apertura de Crédito, Banamex podrá otorgar al Cliente un crédito en Pesos, bajo la forma de apertura de crédito en cuenta corriente, hasta por una cantidad igual a la consignada en la comunicación que Banamex dirija al Cliente por escrito, bastando para ello con la anotación correspondiente que se haga en el estado de cuenta que más adelante se hace mención.

En el supuesto de que Banamex otorgue al Cliente la Línea de Crédito referida en el párrafo anterior, ambas partes deberán suscribir el Contrato de Apertura de Crédito correspondiente, a través del cual estipularán los términos y condiciones que regularán a la Línea de Crédito.

**CLÁUSULA XII.2.- DISPOSICIONES.** Una vez suscrito el Contrato de Apertura de Crédito, el Cliente y las Personas Autorizadas, en su caso, podrán efectuar disposiciones con cargo a la Línea de Crédito a través de cualquiera de los siguientes medios:

a) Por Banca Electrónica o por vía telefónica en el Centro de Atención Telefónica, debiendo el Cliente utilizar el número confidencial que le será proporcionado por Banamex de conformidad con lo que disponga el Contrato de Apertura de Crédito. Los servicios que preste el Centro de Atención Telefónica y Banca Electrónica estarán disponibles dentro del horario que Banamex comunique de tiempo en tiempo al Cliente.

b) Mediante el libramiento de Cheques denominados CrediCheque.

Las disposiciones de la Línea de Crédito se formalizarán mediante abonos de dinero que Banamex efectuará en la Cuenta, mismos que estarán sujetos a los días y horarios que éste determine.

Banamex podrá ofrecer al Cliente o a las Personas Autorizadas, en su caso, acceso a la Línea de Crédito a través de otros canales o mecanismos previa notificación, por lo que la utilización por parte del Cliente de dichos canales o mecanismos constituirá la aceptación a los términos de los mismos.

**CLÁUSULA XII.3.- DEL CREDICHEQUE.** En la Chequera proporcionada al Cliente de acuerdo con lo estipulado en la Cláusula V.1, Banamex podrá incluir esqueletos de Cheque que denominará CrediCheque, a través de los cuales el Cliente o las Personas Autorizadas, en su caso, podrán realizar Desembolsos.

Con la finalidad de que el Cliente pueda distinguir el título de crédito señalado en el párrafo anterior, en el mismo se incluirá la leyenda "CrediCheque" y será de un color distinto a los demás esqueletos incluidos en la Chequera.

**CLÁUSULA XII.4.- NATURALEZA DEL CREDICHEQUE.** Ambas partes reconocen y aceptan que la naturaleza jurídica del CrediCheque es la de un Cheque, toda vez que reúne las características legales necesarias para ser considerado como tal. Por lo anterior, al CrediCheque le serán aplicables todas las estipulaciones contenidas en el presente Contrato relativas al Cheque y a la Chequera en general.

**CLÁUSULA XII.5.- USO.** En el supuesto de que el Cliente tenga autorizada una Línea de Crédito y hubiese suscrito el Contrato de Apertura de Crédito correspondiente, éste acepta expresamente que a través del libramiento de los Cheques denominados CrediCheque hará uso de la citada Línea de Crédito, aún y cuando mantenga saldo disponible en la Cuenta.

El monto de los Desembolsos solicitados por el Cliente o por las Personas Autorizadas, en su caso, a través del libramiento de Cheques denominados CrediCheque, serán acreditados por Banamex a la Cuenta.

El Cliente reconoce y acepta que para poder disponer de la Línea de Crédito en los términos antes señalados, es necesario que la misma esté vigente, mantenga saldo disponible suficiente para cubrir el importe del CrediCheque y se encuentre al corriente en sus pagos; en caso contrario, el importe del CrediCheque será cubierto con recursos provenientes del saldo disponible en la Cuenta.

## CAPÍTULO DÉCIMO TERCERO
### DISPOSICIONES GENERALES

**CLÁUSULA XIII.1.- CUENTA EJE.** Ambas partes están de acuerdo en que la Cuenta pueda ser eje de cualquier otro producto que el Cliente tenga contratado con Banamex, siempre y cuando éste así lo autorice.

**CLÁUSULA XIII.2.- TRÁMITE DE OPERACIONES.** De conformidad con lo dispuesto en la Ley de Instituciones de Crédito, ambas partes convienen que:

a) Banamex podrá suspender o cancelar el trámite de Operaciones que el Cliente pretenda realizar mediante el uso de equipos, medios electrónicos, ópticos o de cualquier otra tecnología, sistemas automatizados de procesamiento de datos y redes de telecomunicaciones, ya

01649

sean privados o públicos, incluyendo Banca Electrónica, siempre y cuando Banamex cuente con elementos suficientes para presumir que los medios de identificación pactados para tal efecto han sido utilizados en forma indebida o bien cuando Banamex detecte algún error en la instrucción respectiva.

b) Cuando Banamex hubiese recibido recursos mediante alguno de los equipos o medios señalados en el inciso anterior y cuente con elementos suficientes para presumir que los medios de identificación pactados para tal efecto han sido utilizados en forma indebida, podrá restringir hasta por 15 (quince) Días Hábiles la disposición de tales recursos, a fin de llevar a cabo las investigaciones y las consultas que sean necesarias con otras instituciones de crédito relacionadas con la Operación de que se trate. Banamex podrá prorrogar el plazo antes referido hasta por 10 (diez) Días Hábiles más, siempre que se haya dado vista a la autoridad competente sobre probables hechos ilícitos cometidos en virtud de la Operación respectiva.

c) En los casos en que, por motivo de las investigaciones referidas en el inciso anterior, Banamex tenga evidencia de que el presente Contrato fue celebrado con información o documentación falsa, o bien, que los medios de identificación pactados para la realización de la Operación de que se trate fueron utilizados en forma indebida, podrá, bajo su responsabilidad, cargar a la Cuenta el importe respectivo con el propósito de que se abone en la cuenta de la que procedieron los recursos correspondientes.

d) En caso de que Banamex hubiese abonado por error dinero a la Cuenta, el Cliente desde este momento faculta a Banamex para cargar el importe respectivo a la referida Cuenta con el propósito de corregir el error cometido.

Banamex notificará al Cliente a través de cualquiera de los medios señalados en la Cláusula XIII.8, la realización de las acciones que hubiese llevado a cabo de conformidad con lo previsto en los incisos anteriores.

Asimismo, el Cliente reconoce y acepta que Banamex podrá bloquear la Cuenta, en cualquier momento, por motivos de seguridad.

**CLÁUSULA XIII.3.- AUTORIZACIÓN BANCA ELECTRÓNICA.** El Cliente reconoce que en el Contrato se encuentran comprendidos los servicios de Banca Electrónica, cuyos términos y condiciones acepta expresamente.

**CLÁUSULA XIII.4.- GARANTÍA IPAB.** Banamex hace del conocimiento del Cliente que, únicamente están garantizados por el IPAB, los depósitos bancarios de dinero: a la vista, retirables en días preestablecidos, de ahorro, y a plazo o con previo aviso, así como los préstamos y créditos que acepte Banamex, hasta por el equivalente a 400,000 (cuatrocientas mil) UDIS por persona, cualquiera que sea el número, tipo y clase de dichas obligaciones a su favor y a cargo de Banamex.

**CLÁUSULA XIII.5.- CONTRATO INDIVIDUAL.** Las partes convienen expresamente que el Contrato es individual, por lo que el Cliente será el único titular de los derechos y obligaciones derivados del mismo.

En virtud de que el Cliente es el único titular del Contrato, éste tendrá derecho al pago del saldo de las obligaciones garantizadas de acuerdo con lo estipulado en la Cláusula anterior y, por lo tanto, desde este momento es señalado expresamente como titular garantizado ante el IPAB.

**CLÁUSULA XIII.6.- BENEFICIARIOS.** Conforme a lo dispuesto en la Ley de Instituciones de Crédito, el Cliente señala como beneficiario(s) del saldo de las Operaciones a la(s) persona(s) mencionada(s) en la Solicitud o en el formato que Banamex le proporcione para tales efectos, el cual debidamente firmado por el Cliente y entregado a Banamex pasará a formar parte integrante del Contrato; dicho(s) beneficiario(s) tendrá(n) derecho a recibir, cuando acredite(n) fehacientemente a satisfacción de Banamex el fallecimiento del Cliente y su identidad, el importe correspondiente del saldo disponible de cada Operación.

Si fueran varios los beneficiarios designados, Banamex les entregará la parte proporcional determinada por el Cliente y si no se hubiere establecido la proporción que a cada uno de ellos le corresponda, les entregará por partes iguales el saldo a que tengan derecho de acuerdo a lo estipulado en la presente Cláusula.

En cualquier momento el Cliente podrá adicionar nuevos beneficiarios, o bien sustituir o retirar a los previamente designados, lo cual deberá efectuar mediante el formato que Banamex le proporcione en cualquier sucursal o a través de los medios que Banamex determine para tales efectos.

En caso de que el Cliente no hubiese designado a ningún beneficiario de conformidad con lo señalado anteriormente, Banamex devolverá el saldo de las Operaciones a los derechohabientes de las mismas determinados de acuerdo con la legislación común.

Una vez acreditado el fallecimiento del Cliente, Banamex procederá a bloquear la Tarjeta de Débito que, en su caso, le hubiese entregado de conformidad con lo dispuesto en el Contrato, a partir de lo cual cesará la responsabilidad del Cliente por el uso de la misma. Banamex proporcionará a la persona que acredite el fallecimiento del Cliente, una clave que ésta deberá conservar para futuras aclaraciones.

**CLÁUSULA XIII.7.- TERMINACIÓN.** La duración del Contrato es indefinida, pudiendo cualquiera de las partes darlo por terminado, en forma inmediata, de acuerdo con lo siguiente:

a) En caso de que Banamex pretenda terminar el Contrato, deberá informar tal situación al Cliente por escrito entregado en cualquiera de las sucursales de Banamex; o bien, a través de un comunicado enviado al Cliente a través de cualquiera de los medios estipulados en la Cláusula XIII.8 del Contrato.

El Cliente deberá retirar el saldo de la Cuenta dentro de los 5 (cinco) días siguientes a la fecha en que surta efectos la terminación del Contrato; de lo contrario, Banamex podrá contabilizarlos a disposición del Cliente en la forma que el primero determine.

Tratándose de Depósitos a Plazo o Pagarés, el Cliente deberá retirar el saldo de dichas Operaciones al vencimiento de las mismas.

b) Por su parte, el Cliente podrá dar por terminado el Contrato mediante solicitud por escrito que presente en cualquier sucursal de Banamex, debiendo acompañar a dicha solicitud los medios de disposición vinculados a la Cuenta o una manifestación por escrito y bajo protesta de decir verdad de que fueron destruidos o que no cuenta con ellos.

Banamex estará facultado para establecer otros medios a través de los cuales el Cliente podrá notificarle su voluntad de dar por terminado el Contrato.

Una vez que Banamex se cerciore de la identidad del Cliente, proporcionará a éste un acuse de recibo, clave de confirmación o folio que el Cliente deberá conservar para futuras aclaraciones.

La terminación solicitada por el Cliente surtirá efectos al momento en que éste retire el saldo disponible que mantenga a su favor o, en su caso, cubra los adeudos y comisiones devengados a esa fecha de acuerdo a lo establecido en el Contrato.

El Cliente contará con un periodo de 10 (diez) Días Hábiles posteriores a la firma del Contrato para terminar éste sin responsabilidad alguna de su parte, en cuyo caso, Banamex no podrá cobrar comisión alguna siempre y cuando el Cliente no hubiese utilizado u operado ninguno de los Productos.

c) El Cliente podrá solicitar por escrito la terminación del Contrato por conducto de otra entidad financiera autorizada para captar recursos del público a la que se denominará receptora, la cual deberá abrir una cuenta a nombre del Cliente y remitir a Banamex los documentos originales en los que conste la manifestación de la voluntad de dar por terminada la relación contractual, a fin de que Banamex transfiera el saldo disponible de la Cuenta a la receptora, quien llevará los trámites respectivos bajo su exclusiva responsabilidad.

Una vez presentada la solicitud para terminar el Contrato, Banamex deberá (i) cancelar los medios de disposición vinculados a la Cuenta; (ii) rechazar cualquier disposición que pretenda efectuarse con posterioridad a la cancelación de los medios de disposición, por lo que no se podrán hacer nuevos cargos adicionales a partir del momento en que se realice la cancelación, excepto los ya generados; (iii) cancelar, sin su responsabilidad, los servicios de domiciliación en la fecha de la solicitud de terminación, con independencia de quien conserve la autorización de los cargos correspondientes; (iv) abstenerse de condicionar la terminación a la devolución del Contrato que obre en poder del Cliente; y, (v) abstenerse de cobrar al Cliente comisión o penalización por la terminación del Contrato.

CLÁUSULA XIII.8.- NOTIFICACIONES. El Cliente reconoce y acepta que cualquier aviso que Banamex le tenga que dar a conocer relacionado con el Contrato, éste podrá hacerlo a través de: (i) un comunicado por escrito enviado al domicilio del Cliente o entregado en cualquier sucursal Banamex; (ii) un mensaje contenido en el Estado de Cuenta; (iii) un mensaje enviado al Correo Electrónico o al Teléfono Móvil del Cliente; o bien, (iv) un mensaje dado a conocer a través del Portal Banamex, de Banca Electrónica o del Cajero Automático.

Los avisos y cualquier otra comunicación del Cliente a Banamex deberán ser por escrito y entregados en la Sucursal, salvo que en el Contrato se estipule que deban ser presentados a través de otro medio.

CLÁUSULA XIII.9.- DOMICILIOS. Para efectos del Contrato, Banamex señala como su domicilio el ubicado en Isabel la Católica número 44, Colonia Centro, Delegación Cuauhtémoc, 06000 México, Distrito Federal y el Cliente el indicado en la Solicitud.

El Cliente deberá notificar a Banamex cualquier cambio de domicilio o de Correo Electrónico mediante escrito entregado en la Sucursal, debiendo adjuntar los documentos que Banamex le solicite para tales efectos, en el entendido de que dicha notificación surtirá efectos a más tardar a los 3 (tres) Días Hábiles siguientes a que ésta se hubiese recibido. El cambio de domicilio de Banamex podrá ser notificado al Cliente mediante un aviso enviado a través de cualquiera de los medios contenidos en la Cláusula anterior.

En caso de que no sea notificado por las partes el cambio de domicilio en los términos pactados en el Contrato, las notificaciones que se realicen en los domicilios previamente señalados surtirán plenos efectos legales para las partes.

CLÁUSULA XIII.10.- MODIFICACIONES AL CONTRATO. El Cliente reconoce expresamente el derecho de Banamex de modificar el Contrato en cualquier tiempo, bastando para ello un aviso por escrito dado al Cliente con 30 (treinta) días de anticipación a la fecha en que las modificaciones entren en vigor, a través de cualesquiera de los medios señalados en la Cláusula XIII.8 y mediante publicaciones en periódicos de amplia circulación.

En el evento de que el Cliente no esté de acuerdo con las modificaciones al Contrato, éste podrá solicitar a Banamex la terminación del mismo de conformidad con lo dispuesto en la Cláusula XIII.7, sin responsabilidad alguna a su cargo, para lo cual contará con un plazo de hasta 30 (treinta) días posteriores al aviso arriba señalado y bajo las condiciones anteriores a la modificación, en el entendido de que las modificaciones al Contrato entrarán en vigor en el plazo referido en el párrafo precedente

Se entenderá que el Cliente acepta las modificaciones efectuadas al Contrato si éste celebra cualquier Operación en fecha posterior a que tales modificaciones entren en vigor, manteniendo vigente su derecho a dar por terminado el Contrato en términos de lo señalado en el párrafo anterior.

Ambas partes reconocen y aceptan que cualquier adecuación a las comisiones señaladas en el Capítulo Noveno e incluso la determinación de nuevas comisiones, no se entenderán como modificación al Contrato, por lo que en dichos supuestos no será aplicable lo dispuesto en el primer párrafo de la presente Cláusula.

CLÁUSULA XIII.11.- IMPUESTOS. En caso de que las disposiciones fiscales así lo establezcan, Banamex retendrá y enterará a las autoridades fiscales correspondientes cualquier impuesto a cargo del Cliente que se genere en virtud del Contrato.

CLÁUSULA XIII.12.- INCUMPLIMIENTO. El Cliente reconoce y acepta que Banamex no responderá por los daños y perjuicios que, en su caso, se le causen por el incumplimiento de las obligaciones a cargo de Banamex derivado de caso fortuito o por causas de fuerza mayor.

CLÁUSULA XIII.13.- CUENTA GLOBAL. El Cliente reconoce que Banamex le informó que, de acuerdo con lo dispuesto en la Ley de Instituciones de Crédito, el principal y los intereses depositados en la Cuenta y, en su caso, de las Operaciones celebradas al amparo del Contrato que no tengan fecha de vencimiento, o bien, que teniéndola se renueven o reinviertan en forma automática, así como las transferencias de dinero o las inversiones vencidas y no reclamadas, que en el transcurso de 3 (tres) años no hayan tenido movimiento por Depósitos o retiros y, después de que se haya dado aviso por escrito, en el domicilio del Cliente que conste en el expediente respectivo, con noventa días de antelación, serán abonados en una cuenta global que llevará Banamex para estos efectos. El dinero aportado a dicha cuenta únicamente generará un interés mensual equivalente al aumento en el Índice Nacional de Precios al Consumidor en el período respectivo.

Ambas partes convienen y están de acuerdo en que las Operaciones denominadas en Divisas podrán ser convertidas a Pesos por Banamex el Día Hábil anterior a que éstas sean abonadas en la cuenta global referida en el párrafo que antecede, para lo cual Banamex deberá utilizar el "Tipo de cambio para solventar obligaciones denominadas en moneda extranjera pagaderas en la República Mexicana" que publique el Banco de México en el Diario Oficial de la Federación el día de la conversión.

Cuando el Cliente se presente para realizar un depósito o retiro, o a reclamar la transferencia o inversión, Banamex deberá retirar de la cuenta global el importe total, a efecto de abonarlo a la Cuenta o entregárselo al Cliente.

Los derechos derivados de los Depósitos e inversiones y sus intereses a que se refiere esta Cláusula, sin movimientos en el transcurso de 3 (tres) años contados a partir de que estos últimos se depositen en la cuenta global, cuyo importe no exceda por cuenta, al equivalente a 300 (trescientos) días de salario mínimo general vigente en el Distrito Federal, prescribirán a favor del patrimonio de la beneficencia pública, por lo que Banamex estará obligado a entregarle dichos recursos.

El Cliente renuncia a ejercer cualquier acción que pudiese derivarse en contra de Banamex en razón del cumplimiento a lo dispuesto en la presente Cláusula.

CLÁUSULA XIII.14.- SEGUROS. El Cliente autoriza a Banamex para que lo incluya, sin costo alguno, en la colectividad asegurada correspondiente a la póliza de seguro que, en su caso, éste contrate para titulares de los Productos determinados por Banamex, por lo que el Cliente desde este momento instruye a Banamex para que proporcione sus datos a la compañía aseguradora con la cual contrate la citada

01651

póliza. Lo anterior en el entendido de que Banamex no estará obligado a incluir o mantener al Cliente en la colectividad asegurada en cuestión. Este beneficio estará sujeto a los términos, condiciones y exclusiones consignados en la póliza vigente; y para todos los efectos legales a que haya lugar, el Cliente desde este momento designa como beneficiario(s) del seguro a la(s) misma(s) persona(s) designada(s) como beneficiario(s) de acuerdo con lo estipulado en la Cláusula XIII.6.

El Certificado del Seguro que, en su caso, le corresponda al Cliente, se encontrará a disposición de éste a partir de los 45 (cuarenta y cinco) días posteriores a la contratación de cualquiera de los productos señalados en el párrafo anterior, obligándose el Cliente a solicitar el mismo al teléfono 1226-8222 en el Distrito Federal ó 01-800-888-8432 para todo México.

El Cliente reconoce y acepta que Banamex se reserva el derecho unilateral de: (i) terminar anticipadamente la póliza de seguro señalada en el primer párrafo que antecede o bien de no renovarla; (ii) incluir o excluir Productos de la citada póliza de seguro; y (iii) modificar el tipo de seguro contratado; bastando para ello un aviso por escrito enviado al Cliente, a través de cualquiera de los medios señalados en la Cláusula XIII.8 anterior, con cuando menos 30 (treinta) días de anticipación.

**CLÁUSULA XIII.15.- BENEFICIOS.** El Cliente autoriza a Banamex para que lo incluya, sin costo alguno, en cualquier programa de beneficios creado por Banamex a favor de sus clientes, a través de los cuales Banamex podrá, de manera enunciativa, más no limitativa, cubrir reembolsos, compensaciones o comisiones al Cliente, así como incluir a éste en sorteos, programas de lealtad, de recomendación, de puntos o de cualquier otro tipo. Lo anterior en el entendido de que dichos beneficios y programas podrán ser modificados, suspendidos o cancelados en cualquier momento por Banamex sin causa de responsabilidad.

**CLÁUSULA XIII.16.- CESIÓN.** El Cliente no podrá ceder, delegar, transferir, negociar, enajenar o transmitir en forma alguna los derechos y las obligaciones que asume en virtud del presente Contrato, sin la autorización previa y por escrito de Banamex.

**CLÁUSULA XIII.17.- JURISDICCIÓN.** El presente Contrato se regirá por las leyes de México, sometiéndose las partes expresamente a la jurisdicción de los tribunales de la Ciudad de México, Distrito Federal, renunciando a cualquier otro fuero que por cualquier motivo les pudiere corresponder.

**CLÁUSULA XIII.18.- AVISO DE PRIVACIDAD.** En cumplimiento a lo dispuesto en la Ley Federal de Protección de Datos Personales en Posesión de los Particulares, Banamex informa al Cliente que los datos obtenidos en virtud de la celebración del Contrato serán tratados de manera confidencial a través de los sistemas provistos para tales efectos y serán usados para la operación y registro de los productos que el Cliente hubiese contratado, así como para ofrecerle, en su caso, otros productos bancarios o financieros de Banamex o de cualquiera de sus afiliadas, subsidiarias, controladoras, asociadas, comisionistas o sociedades integrantes del Grupo Financiero Banamex y promociones de otros bienes o servicios relacionados con los citados productos bancarios.

El Cliente podrá consultar el aviso de privacidad completo en la siguiente dirección de Internet www.banamex.com/avisodeprivacidad. Banamex notificará al Cliente cualquier modificación al aviso de privacidad mediante un comunicado por escrito enviado a través de cualesquiera de los medios señalados en la Cláusula XIII.8, o bien, a través de mensajes publicados en las sucursales de Banamex.

**CLÁUSULA XIII.19.- TÍTULO DE LAS CLÁUSULAS.** Ambas partes están de acuerdo en que el objeto de los títulos de las Cláusulas es meramente informativo, por lo que el contenido de dichos títulos no tiene efecto vinculatorio alguno.

Leído que fue por las partes el presente Contrato y enteradas de su contenido y alcance jurídico, lo firman –en el espacio correspondiente de la Solicitud– por duplicado, quedando un ejemplar en poder de cada una de ellas.

01652

# EXHIBIT 6A

01654

CLAUSE XIII.17. – JURISDICTION. The present Contract will be governed by the laws of Mexico, the parties shall expressly accept the jurisdiction of the courts of Mexico City, waiving any other that may correspond to them under whatever circumstance.


TRANSPERFECT

City of New York, State of New York, County of New York

I, Alitasha Younger, hereby certify that the document "Banamex Jurisdiction Clause" is to the best of my knowledge and belief, a true and accurate translation from Spanish into English.

Alitasha Younger

Sworn to before me this
August 27, 2015

Signature, Notary Public

SENIDA KULJANCIC
Notary Public - State of New York
No. 01KU6322856
Qualified in KING County
Commission Expires April 13, 2019

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
THREE PARK AVENUE, 39TH FLOOR, NEW YORK, NY 10016 | T 212.689.5555 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# EXHIBIT 103

01658

| | | |
|---|---|---|
| IN THE ESTATE OF | § | IN PROBATE COURT NO. ONE |
| DOROTHY LOUISE LONGORIA, | § | |
| DECEASED | § | HARRIS COUNTY, TEXAS |

## FIRST AMENDED DISCLOSURES OF
## JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR
## OF THE ESTATE OF DOROTHY LOUISE LONGORIA

TO: PLAINTIFF SHELBY LONGORIA, by and through his attorneys of record.

James Thomas Dorsey, as Independent Executor of the Estate of Dorothy Louise Longoria, Deceased (the "Executor"), hereby timely amends his responses to the Requests for Disclosure served on him by Shelby Longoria.

**(a)    The correct names of the parties to the lawsuit**

RESPONSE:

Contestant/Counter-Defendant:    Shelby Longoria

Defendants/Counter-Plaintiffs:    James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased

Sylvia Rene Dorsey

Adriana Longoria

**(b)    the name, address, and telephone number of any potential parties**

RESPONSE:

Eduardo ("Wayo") Longoria, Jr.
1702 Cresthaven Drive
Austin, Texas 78704
telephone:  512-535-0105

01659

(c)     the legal theories and, in general, the factual bases of the responding
        party's claims or defenses

RESPONSE:

The Executor generally denies the allegations of Shelby Longoria's Third Amended Contest of 2010 Will (and any subsequently filed pleading in which the same or similar allegations are made) and demands strict proof thereof in accordance with Texas law.

The Executor pleads the following additional defense in response to Shelby Longoria's Third Amended Contest of 2010 Will (and any subsequently filed pleading in which the same or similar allegations are made), but he does not assume the burden of proof with respect to this defense, except to the extent required by law.

Shelby Longoria lacks standing to maintain an action for removal of James Thomas Dorsey as the duly appointed Independent Executor of the Estate of Dorothy Louise Longoria, Deceased.

James Thomas Dorsey is the Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, and he is defending in good faith, and with just cause, the Last Will and Testament of Dorothy Louise Longoria, dated January 21, 2010, which this Court admitted to probate on October 9, 2012. Consequently, pursuant to Section 352.052 of the Texas Estates Code, and other applicable law, James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, is entitled to, and hereby requests, allowance out of the Estate of Dorothy Louise Longoria, Deceased, of his necessary expenses and disbursements, including reasonable attorney's fees, in these proceedings.

The Executor has pleaded, as counterclaims, the following claims against Shelby Longoria.

On July 3, 1942, Eduardo Longoria ("Eduardo") and Dorothy Louise Kowalski ("Dorothy") were married in the City of Laredo, in Webb County, Texas.

When they were married, Dorothy was a citizen of the United States of America, and Eduardo was a citizen of the United Mexican States ("Mexico"), but he had been living in the United States and, after the wedding, the couple initially settled in McAllen, Texas.

The marriage of Eduardo and Dorothy was subject to the laws of the State of Texas, including the law of community property.

Eduardo and Dorothy had four children, all of whom are living. Their names are: Adriana Louise Longoria ("Adriana"), Eduardo Longoria, Jr., also known as Wayo Longoria

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 2

**01660**

("Wayo"), Sylvia Rene Dorsey ("Sylvia"), and Shelby Longoria ("Shelby"). All of them reside in Texas.

Eduardo and Dorothy amassed considerable wealth through a variety of business activities and investments.

Over time, Shelby took control over the business and investments owned by Eduardo and Dorothy.

Shelby managed property and accounts owned by Dorothy and represented to her that he was doing so for her benefit. Indeed, the account statements were not even sent to Dorothy, even though she was identified as the sole owner of the accounts. The accounts included, but are not limited to, the following accounts (collectively, "Dorothy's Accounts in Mexico"):

a.   Banamex Account Number          REDACTED
b.   Banamex Account Number
c.   BanRegio Account Number

In addition, Shelby expressly agreed to hold in trust, for the benefit of Dorothy, property that Shelby obtained from Eduardo. In a letter to Dorothy dated August 5, 1983, for example, Shelby and Wayo promised Dorothy that "the assets that Daddy has willed to us, as long as you live, we will hold them as if they were yours" and "[w]e will make the fruits available to you for your direction as to their use." These promises were made by Shelby while he was residing in Texas, and they were set forth in a letter that was sent to Dorothy from an address in Texas. Shelby breached these promises to Dorothy by failing to account for the property that was given to Shelby by Eduardo, by concealing from Dorothy material facts about that property (including its nature, extent, value, and profitability), by failing to hold and maintain that property as if it belonged to Dorothy, by paying himself income generated by the property, by failing to disclose to Dorothy that he had done so, and by failing generally to make the fruit of that property available to her for her use.

Likewise, in a letter dated October 9, 2007, which Shelby sent to Dorothy at her residence in Houston, Texas, Shelby made specific promises with respect to a large sum of money that Eduardo wished for Dorothy to have upon his death. Admitting that he held such funds in trust for Dorothy, and in recognition that Dorothy intended to leave her estate to her daughters, Shelby promised that, within thirty days after Dorothy died, he would pay $100,000 to Sylvia and $100,000 to Adriana. Upon Dorothy's death, Shelby repudiated and breached this promise to Dorothy. While he did tender a check for $100,000 to Sylvia and a check for $100,000 to Adriana, he printed on the checks language that, if the checks were negotiated, would have resulted in a release of their rights in Dorothy's estate and rights against Shelby – self-serving conditions which Shelby had no right to impose. The fact that

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 3

01661

Shelby arbitrarily demanded such releases for his benefit, as conditions on his performance of an unconditional duty to pay $100,000 to Sylvia and $100,000 to Adriana, proves that (a) Shelby knew that Dorothy owned valuable claims against him, (b) Shelby knew that Dorothy intended to leave her entire estate to Sylvia and Adriana, and (c) Shelby knew that Sylvia and Adriana themselves had valuable claims against him – all of which he now dishonestly denies.

Shelby owed a fiduciary duty to Dorothy (a) as an agent for Dorothy, (b) as a trustee of an express trust for the benefit of Dorothy, and, in addition or in the alternative, (c) pursuant to an informal fiduciary relationship with Dorothy.

In contravention of his fiduciary duty to Dorothy under Texas law, Shelby failed to advise Dorothy fully and fairly regarding the nature and extent of her property and his actions with respect to her property and the property he was holding in trust, supposedly for her benefit.

In fact, Shelby managed for his own benefit Dorothy's property, as well as property he was holding in trust supposedly for her benefit. He caused income from the property to be paid to him or to others for his benefit, and failed to disclose to Dorothy that he had done so.

Eduardo died on January 26, 2005, at the age of 91. (He was born on October 25, 1913.) When Eduardo died, all of the property in his estate was community property of which one-half was owned by Dorothy under Texas law. Eduardo died in Webb County, Texas, where he and Dorothy had lived for many years.

After the death of Eduardo, Shelby continued to manage Dorothy's property and continued to represent to her that he was managing her property for her benefit, but he intentionally concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property.

In fact, Shelby managed the property for his own benefit and engaged in self-dealing transactions that he failed to disclose to Dorothy.

Dorothy died in Harris County, Texas, on April 6, 2012, at the age of 92. (She was born on May 4, 1919.)

By order dated October 9, 2012, this Court admitted to probate Dorothy's Last Will and Testament, dated January 21, 2010, and appointed James Thomas Dorsey Independent Executor of the Estate of Dorothy. Letters Testamentary were issued to James Thomas Dorsey on the same day, and such Letters Testamentary are currently in full force and effect.

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 4

01662

## First Cause of Action
## Demand for Accounting

Pursuant to Section 489B of the Texas Probate Code, Section 113.151 of the Texas Trust Code, and the common law of the State of Texas, Counter-Plaintiff is entitled to, and hereby requests, that Shelby provide a full accounting of (1) all of his activities as an agent for Dorothy, (2) all transactions done or caused by him involving property owned, in whole or in part, by Dorothy, including but not limited to Dorothy's Accounts in Mexico, and (3) all transactions involving property held by him in trust for Dorothy.

In connection with this claim, the Executor is entitled to and is seeking herein, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action as permitted by Section 113.151 of the Texas Trust Code, and other applicable Texas law.

## Second Cause of Action
## Breaches of Fiduciary Duty

Under Texas law, Shelby breached his fiduciary duty to Dorothy by (a) failing to disclose to her, fully and fairly, all information that might affect her interests in property managed by him, including both her community property and property held by Shelby in trust for her; (b) failing to act with utmost good faith and fair dealing in the management of her property and property held in trust for her, and in his other activities affecting her interests; (c) failing to act with undivided loyalty to Dorothy in the management of her property and property held by him in trust for her, and in his other activities affecting her interests; and (d) engaging in self-dealing transactions that were detrimental to her and, in addition or in the alternative, improperly benefitted him.

The breaches of fiduciary duty by Shelby proximately caused compensable harm to Dorothy and her estate. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law. The damages awarded should include all amounts of money which were withdrawn from Dorothy's Accounts in Mexico and which Shelby cannot show specifically to have been withdrawn for Dorothy's benefit or with her fully informed consent.

The breaches of fiduciary duty by Shelby constituted "fraud," "gross negligence," and "malice" as those terms are defined in Chapter 41 of the Texas Civil Practice and Remedies Code. Despite his fiduciary duty under Texas law to disclose to Dorothy all facts that might affect her interests, Shelby intentionally or, in the alternative, with reckless disregard for Dorothy's rights, concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 5

otherwise derived from the property. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for exemplary damages in an amount to be determined by the trier of fact in accordance with Texas law.

Shelby derived profits by means of the breaches of his fiduciary duty to Dorothy. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment decreeing that Shelby disgorge all profits received by him or by his wife, his children, or any other persons designated by him, as a result of the breaches of his fiduciary duty to Dorothy.

Shelby acquired property by means of the breaches of his fiduciary duty to Dorothy. Under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment imposing a constructive trust on all property acquired by Shelby or by his wife, his children, or any other persons designated by him, by means of the breaches of his fiduciary duty to Dorothy.

In connection with this claim, the Executor is entitled to and is seeking herein, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action as permitted by Section 114.064 of the Texas Trust Code.

## Third Cause of Action
## Breach of Promise To Hold Property for Dorothy's Benefit

Shelby promised Dorothy that he would hold in trust for Dorothy all of the assets that Eduardo gave to Shelby and Wayo and that he would make the income from such property available to her for her direction as to their use. These promises were made by Shelby while he was residing in Texas. Shelby breached these promises to Dorothy by failing to account for the property that was given to Shelby and Wayo by Eduardo, by concealing from Dorothy material facts about that property (including its nature, extent, value, and profitability), by failing to hold and maintain that property as if it belonged to Dorothy, by paying himself income generated by the property, by failing to disclose to Dorothy that he had done so, and by failing generally to make the fruit of that property available to her for her use.

These breaches by Shelby proximately caused compensable harm to Dorothy and her estate. Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for actual damages in an amount to be determined by the trier of fact in accordance with Texas law.

In connection with this cause of action, the Executor is entitled to and is seeking herein, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action as permitted Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law.

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 6

**01664**

## Fourth Cause of Action
### Breach of Promise To Pay $100,000 to Adriana and $100,000 to Sylvia

Shelby promised Dorothy that, within thirty days of her death, he would pay $100,000 to Adriana and $100,000 to Sylvia. These promises were made by Shelby while he was residing in Texas, and they were directed to Dorothy at her residence in Houston, Texas. Shelby breached these promises to Dorothy by tendering to Adriana and Sylvia checks that they could not negotiate without waiving their rights in Dorothy's estate and their rights against Shelby – self-serving conditions which Shelby had no right to impose.

Based on the doctrines of breach-of-contract, promissory estoppel, and money-had-and-received, under Texas law, Counter-Plaintiff is entitled to, and hereby requests, entry of judgment against Shelby for $200,000 in accordance with Texas law.

In connection with this claim, the Executor is entitled to and is seeking herein, an award of attorney fees (including litigation expenses) reasonably and necessarily incurred in connection with this action as permitted by Chapter 38 of the Texas Civil Practice and Remedies Code, and other applicable Texas law.

## Fifth Cause of Action
### Declaration of Invalidity of Donation Agreement dated January 11, 2005

On January 8, 2015, Shelby produced for the first time a photocopy of a document dated January 11, 2005, written in Spanish, entitled "CONTRATO DE DONACIÓN" (the "Donation Agreement"). The Donation Agreement purports to be signed by Eduardo and Dorothy.

By order dated January 29, 2014, Shelby was ordered by this Court to produce documents such as the Donation Agreement no later than February 28, 2014. His production of the Donation Agreement on January 8, 2015, was over ten months late.

On the date of the Donation Agreement, Eduardo was dying and on hospice care. Fifteen days later, Eduardo died. The Executor believes, and now avers, that on January 11, 2005, Eduardo lacked the requisite mental capacity to make a legally enforceable contract.

The Donation Agreement states that it was signed in Reynosa, Tamaulipas. Eduardo was not in Reynosa on the date of the Donation Agreement.

In the seven years that Dorothy lived after the date of the Donation Agreement, she never mentioned it to either of her daughters, both of whom lived near her in Houston, or to her son-in-law (the Executor), whom she saw frequently, or in her correspondence, which

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 7

01665

was extensive, or in her personal notes, where she wrote extensively about her financial situation. Indeed, during those seven years she made numerous statements, both written and oral, that are inconsistent with the existence of the Donation Agreement.

Based on the foregoing facts, and others, the Executor believes, and therefore avers, that the Donation Agreement is a forgery.

The Executor believes and avers that the Donation Agreement is unenforceable for lack of consideration or, in the alternative, for failure of consideration.

There exists an actual controversy between the Executor and Shelby as to whether or not the Donation Agreement is a valid and enforceable contract.

Consequently, under Chapter 37 of the Texas Civil Practice and Remedies Code, the Executor hereby requests entry of a judgment declaring that the Donation Agreement is invalid and wholly unenforceable.

Pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code, the Executor is seeking an award of costs and reasonable and necessary attorney's fees as are equitable and just in connection with this cause of action.

Anticipating that Shelby will plead the defense of limitations in response to some or all of the aforementioned causes of action, Counter-Plaintiff pleads that Section 16.069 of the Texas Civil Practice and Remedies Code is applicable and precludes application of any statute of limitations. In addition, Counter-Plaintiff pleads under Texas law the discovery rule and fraudulent concealment by Shelby. Despite his fiduciary duty of full disclosure, Shelby concealed from Dorothy the nature, extent, and value of her property, what he had done with her property over the years, and how much money he had been paid or otherwise derived from the property. The nature of the injuries to Dorothy and her estate were inherently undiscoverable because of the relationship of trust and confidence between Dorothy and Shelby and because he breached his fiduciary duty of full disclosure of all facts that might affect Dorothy's interests. The injuries to Dorothy and her estate are objectively verifiable because money that should have been paid to Dorothy was withheld from her and diverted to Shelby's benefit.

Based on the foregoing causes of action, the Executor is seeking the following relief under Texas law:

(1)    a decree commanding Counter-Defendant Shelby Longoria to render an accounting of all property that was owned, in whole or in part, by Dorothy Louise Longoria and that was within his possession, custody, or control, and all transactions affecting her property, and an accounting of all actions taken by him as her agent or trustee, specifically

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 8

01666

including a complete accounting of all monies withdrawn from Dorothy's Accounts in Mexico;

(2)    an award of actual damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law, but the maximum amount of actual damages currently sought by Counter-Plaintiff – while reserving his right under Texas law to amend this pleading to request a greater or lesser amount as more evidence is uncovered and the whole truth comes to light – is $43,500,000;

(3)    an award of exemplary damages, from and against Counter-Defendant Shelby Longoria, in amounts to be determined by the trier of fact in accordance with Texas law, but the maximum amount of exemplary damages currently sought by Counter-Plaintiff – while reserving his right under Texas law to amend this pleading to request a greater or lesser amount as more evidence is uncovered and the whole truth comes to light -- is $10,000,000;

(4)    an award of attorney fees (including litigation expenses) reasonably and necessarily incurred by Counter-Plaintiff in connection with each of his causes of actions under Texas law;

(5)    a decree commanding Counter-Defendant Shelby Longoria to disgorge all profits received by him, or by others for his benefit, as a result of a breach by him of his fiduciary duty to Dorothy Louise Longoria;

(6)    a decree imposing a constructive trust on all property acquired by Counter-Defendant Shelby Longoria, or by others for his benefit, by means of a breach of fiduciary duty owed to Dorothy Louise Longoria;

(7)    an award of prejudgment interest on all actual damages at the highest rate authorized by law to the date of judgment;

(8)    an award of all costs incurred by Counter-Plaintiff in the course of preparing and prosecuting this civil action;

(9)    an award of postjudgment interest on all monetary relief at the highest rate authorized by law from the date of judgment until paid;

(10)    a judgment declaring that the Donation Agreement dated January 11, 2005, is invalid and wholly unenforceable;

(11)    all writs and processes necessary to collect the judgment; and

01667

(12)    all other relief to which Counter-Plaintiff is entitled or which the Court may deem appropriate under the circumstances and the applicable law.

(d)    **The amount and any method of calculating economic damages**

RESPONSE:

Shelby Longoria ("Shelby") managed property and accounts owned by Dorothy Longoria ("Dorothy") and represented to her that he was doing so for her benefit. These accounts included, but are not limited to, Dorothy's Accounts in Mexico. Dorothy's Accounts in Mexico are more specifically identified as follows:

a.    Banamex Account Number
b.    Banamex Account Number
c.    BanRegio Account Number

REDACTED

Shelby made, or caused to be made, withdrawals from these accounts without Dorothy's knowledge or consent. Thus, the Executor seeks to recover the amounts wrongfully withdrawn from Dorothy's Accounts in Mexico. The total amount of wrongful withdrawals sought by the Executor based on the information currently available to the Executor is $28,878,274.54.

This amount was calculated by adding the amount of withdrawals made in each of Dorothy's Accounts in Mexico as reflected on the account statements produced by Shelby.[1] Because some of the statements reflect transactions in pesos, each such withdrawal was converted from pesos to dollars. The exchange rates used in these calculations were from xe.com for transactions after November 2001, and from oanda.com for transactions prior to November 2001. (Both of these websites are identified by the Internal Revenue Service as credible sources for exchange rates.) The attached spreadsheets reflect these calculations.

Because Shelby owed a fiduciary duty to Dorothy with respect to Dorothy's Accounts in Mexico, which were owned by her, Shelby has the duty to account to the Executor of Dorothy's estate for all withdrawals from the accounts and the burden to prove that all such withdrawals were fully disclosed to Dorothy and properly made for her benefit and not for Shelby's benefit. Shelby has failed and refused to provide such accounting or such proof with regard to any of the withdrawals listed in the attached spreadsheets, so Shelby is personally

---

[1]Some of the monthly bank statements for each of Dorothy's Accounts in Mexico have not produced, including the bank statements for Banamex Account Number          for any month during the years 2011 and 2012. The Executor reserves the right to amend this calculation once all of the bank statements have been produced.

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 10

REDACTED

liable to pay as damages the full amount of such withdrawals. In the event that Shelby demonstrates, with credible evidence, that a particular withdrawal was merely a transfer to another account that was owned by Dorothy and disclosed to her, or was used to pay living expenses or medical expenses actually incurred by Dorothy, the Executor will withdraw his claim for damages to the extent of that withdrawal.

The Executor also seeks $25,000,000, which is an estimate based on information that the businesses that Shelby managed, or was supposed to manage, for the benefit of Dorothy made profits of approximately $10,000,000 per year. Assuming (but without admitting) that it was reasonable for the businesses to retain one-half of that amount, then Shelby should have distributed to Dorothy as the beneficiary of the fiduciary relationship, at least one-half of the remaining amount, or $2,500,000 per year. Over a period of ten years, the total amount that should have been distributed is $25,000,000. The Executor is also requesting an award of prejudgment interest on all amounts that should have been distributed to Dorothy.

Shelby made an unconditional promise to Dorothy, in a letter dated October 9, 2007, that he would pay $100,000 to Sylvia Dorsey and $100,000 to Adriana Longoria. Shelby did not fulfill his promise. The Executor also seeks recovery of the $200,000 that is the subject of his promise to Dorothy.

(e) **The name, address, and telephone number of persons having knowledge of relevant facts, and a brief statement of each identified person's connection with the case**

The following individuals have knowledge of relevant facts.

Alejandra Arguindegui                                      *granddaughter of Decedent*
315 Stratford Lane
Laredo, Texas 78041
telephone:  956-206-7773

Silvia Auila, RN                                  *nurse who cared for Eduardo Longoria*
Laredo Home Health
1700 Hendricks, 2nd Floor
Laredo, Texas 78040
telephone:  956-796-3266

Adriana Banks                                      *daughter of Adriana Longoria*
6138 San Felipe Street
Houston, Texas 77057

01669

Carolyn Beckett                              *provided legal services to*
Beckett Tackett & Jetel, PLLC                *Decedent, Shelby and Wayo*
7800 North Mopac Expressway
Suite 210
Austin, Texas 78759
telephone: 512-436-9102

J. F. Cardenas, LBSW          *social worker who evaluated Eduardo Longoria*
Laredo Home Health
1700 Hendricks, 2nd Floor
Laredo, Texas 78040
telephone:    956-796-3266

Johnny W. Carter                              *attorney for Shelby Longoria*
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
telephone:    713.653.7818

Leonides Cigarroa, Jr., M.D.        *physician who treated Eduardo Longoria*
Laredo Cigarroa Heart & Vascular Institute
1710 E. Saunders st.
Tower B 5th Floor
Laredo, Texas 78041
telephone:    956-725-0833

Cynthia Coffman                              *nurse who cared for Decedent*
931 West 23rd Street, Unit J
Houston, Texas 77008
telephone:    713-304-1353

Cherry Damianoff                             *acquaintance of Decedent*
23 Journey's End
The Woodlands, Texas 77381
telephone:    713-303-1216

Juannie Rodriguez de Chavez                  *provided care to Eduardo Longoria*
516 Prescott Loop
Laredo, Texas 78046
telephone:    956-652-8661

01670

Cezar De Los Rios                                        *nurse who cared for Decedent*
6722 Sylmar Road
Houston, Texas 77074
telephone:   713-240-4081

Teauie Dielyn, RN                              *nurse who cared for Eduardo Longoria*
Laredo Home Health
1700 Hendricks, 2nd Floor
Laredo, Texas 78040
telephone:   956-796-3266

Marilyn Doherty                                           *acquaintance of Decedent*
Montebello Condominiums
1100 Uptown Park Boulevard
Houston, Texas 77056
telephone:   713-993-1100

James Thomas Dorsey                          *Independent Executor of the Estate*
c/o James A. Fisher                           *of Dorothy Louise Longoria, Deceased,*
Fisher & Welch                              *Respondent and Counter-Plaintiff herein*
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
telephone:   214-661-9400

Robert Edward "Wayo" Dorsey                         *son of Applicant and Executor*
15308 Sunset Blvd.
Pacific Palisades, California 90272

Sylvia Dorsey                                               *daughter of Decedent*
c/o James A. Fisher                          *Defendant and Counter-Plaintiff herein*
Fisher & Welch
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
telephone:   214-661-9400

Ali R. Fazel                                               *witness to will signing*
The Law Offices of Scardino & Fazel
1004 Congress Street, Third Floor
Houston, Texas 77002
telephone:   713-229-9292

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 13

**01671**

Elizabeth Dorsey Fertitta                                   *granddaughter of Decedent*
2706 Eastgrove Lane
Houston, Texas 77027

Zachary B. Fertitta                                       *attorney for Dorothy Louise Longoria*
The Fertitta Law Firm
1004 Congress Street
Houston, Texas 77002
telephone: 713-228-5900

James A. Fisher                          *attorney for Sylvia Dorsey, Adriana Longoria, and*
Fisher & Welch                             *James Thomas Dorsey, Independent Executor*
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
telephone: 214-661-9400

Pedro Frommer, M.D.                           *physician who treated Dorothy Longoria*
10023 Main Street, Suite C9
Houston, Texas 77025
telephone: 713-791-1633

Rafael De Jesus Carbajal Galindo                        *signatory on the Mexican*
N. Heroes 121                                    *bank accounts in Dorothy's name*
Rio Bravo, Mexico 88900
telephone: 899-909-0350

Neal B. Gittleman                                      *prosthodontist who saw Dorothy*
50 Briar Hollow Lane, Suite 150 West
Houston, Texas 77027
telephone: 713-993-0003

Micki Grimland                                      *psychologist who treated Decedent*
Southwest Psychotherapy Associates, P.A.
2500 Wilcrest Drive, Suite 300
Houston, Texas 77042
telephone: 713-954-4851

01672

Dan Hancock                                         *acquaintance of Decedent*
Montebello Condominiums
1100 Uptown Park Boulevard
Houston, Texas 77056
telephone:   713-993-1100

Raymond Hart                                        *grandson of Decedent*
5834 Candlewood Lane
Houston, Texas 77057
telephone:   713-818-2387

Adrian Hernandez                                    *Decedent and Contestant's*
Adrian Hernandez & Associates, PC                   *accountant*
9543 Bissonnet St.
Houston, Texas 77036
telephone:   713-961-0262

Richard W. Hess                                     *attorney for Shelby Longoria*
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
telephone:    713.653.7818

Carlos Gonzalez Hinojosa        *attorney that prepared several wills for Decedent*
Libramiento Luis Echevarria 630
Reynosa, Tamaulipas

Holly M. Holmes, M.D.                               *physician who treated Decedent*
MD Anderson Cancer Center
1515 Holcombe Boulevard
Houston, Texas 77030
telephone:   877-632-6789

T. Wesley Holmes                *attorney for Sylvia Dorsey, Adriana Longoria, and*
The Holmes Law Firm                 *James Thomas Dorsey, Independent Executor*
10,000 North Central Expressway, Suite 400
Dallas, Texas 75231
telephone:    214-890-9266

**01673**

Carlos Hornedo III, D.O.                        *physician who treated Eduardo Longoria*
Laredo Home Health
1700 Hendricks, 2nd Floor
Laredo, Texas 78040
telephone:   956-796-3266


Cezar A. Iliescu, M.D.                          *physician who treated Decedent*
MD Anderson Cancer Center
1515 Holcombe Boulevard, Unit Number 1451
Houston, Texas 77030
telephone:  877-632-6789


Karen Ledbetter                                 *acquaintance of Decedent*
Montebello Condominiums
1100 Uptown Park Boulevard
Houston, Texas 77056
telephone:  713-993-1100


Philippe Licause                                *Decedent's hairdresser*
3614 Montrose Blvd. # 206
Houston, Texas
telephone:  214-794-2149


Adriana Longoria                                *daughter of Decedent*
c/o James A. Fisher                   *Defendant and Counter-Plaintiff herein*
Fisher & Welch
2800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201
telephone:  214-661-9400


Eduardo ("Wayo") Longoria, Jr.                  *son of Decedent*
1702 Cresthaven Drive
Austin, Texas 78704
telephone:  512-535-0105


Enriqueta Chapa Longoria                        *wife of Shelby Longoria*
c/o Shelby A. Jordan
Jordan, Hyden, Womble, Culbreth & Holzer, P.C.
500 North Shoreline Boulevard, Suite 900
Corpus Christi, Texas 78401
361-884-5678

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 16

**01674**

Shelby Longoria                              *Contestant and Counter-Defendant*
c/o Johnny W. Carter
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
telephone: 713-651-9366

Shelby Longoria, Jr.                         *son of Shelby Longoria*
c/o Shelby A. Jordan
Jordan, Hyden, Womble, Culbreth & Holzer, P.C.
500 North Shoreline Boulevard, Suite 900
Corpus Christi, Texas 78401
telephone: 361-884-5678

Lynne Meiers                                 *acquaintance of Decedent*
115 Munger Street
Pasadena, Texas 77505
telephone: 713-304-1592

Mario Gonzalez Mendoza                       *notary to several documents*
Dr. Mier 3113                                *signed in Mexico*
Nuevo Laredo, Tamaulipas CP 88000

Elizabeth Morgan                             *Wayo Longoria's lawyer*
Elizabeth Morgan & Associates, LLP
5150 Tamiami Trail N. Suite 207
Naples, Florida
Telephone: 512-370-2750

Domnica Portillo                             *Dorothy Longoria's housekeeper*
7206 Rising Brook Drive                      *in Houston for 2 ½ years*
Cypress, Texas 77433
Telephone: 832-293-0392

Sandra Ramirez, LVN                          *nurse who cared for Eduardo Longoria*
Laredo Home Health
1700 Hendricks, 2nd Floor
Laredo, Texas 78040
telephone: 956-796-3266

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 17

01675

Sofia Rodriguez  
9013 Seller Loop  
Laredo, Texas 78045  
telephone:   956-319-0414

*CNA who provided care to Eduardo Longoria*

Anna Rubio  
Laredo Home Health  
1700 Hendricks, 2nd Floor  
Laredo, Texas 78040  
telephone:   956-796-3266

*director of Laredo Home Health*

Anthony Scardino  
The Law Offices of Scardino & Fazel  
1004 Congress Street, Third Floor  
Houston, Texas 77002  
telephone:   713-229-9292

*witness to will signing*

Carlos Solis  
Montebello Condominiums  
1100 Uptown Park Boulevard  
Houston, Texas 77056  
telephone:   281-777-4892

*acquaintance of Decedent*

Crispin O. Soto  
Laredo Home Health  
1700 Hendricks, 2nd Floor  
Laredo, Texas 78040  
telephone:   956-796-3266

*chaplain who provided spiritual*
*support to Eduardo Longoria*

Marco A. Torres  
Sierra Nevada 1208, Col Fuentes  
Reynosa, Tamaulipas

*administrative director of Grupo Inlosa*

Patricia Vasquez  
Playa Hermosa 507 Col Militar Marte  
Iztacalco, Mexico

*treasurer for Grupo Inlosa*

Randall S. Weber, M.D.  
MD Anderson Cancer Center  
1515 Holcombe Boulevard, Unit Number 1445  
Houston, Texas 77030  
telephone:   713-745-0497

*physician who treated Decedent*

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 18

01676

Maria Del Carmen Torres Zamarron                    *signatory on Mexican*
Sierra Negra 301                                 *bank accounts in Dorothy's name*
Reynosa, Mexico 88700
telephone:    899-909-0350

custodian of records of MD Anderson Cancer Center
1515 Holcombe Boulevard
Houston, Texas 77030
telephone:  877-632-6789

custodian of records of Laredo Home Health
Laredo Home Health
1700 Hendricks, 2nd Floor
Laredo, Texas 78040
telephone:    956-796-3266

custodian of records of Montebello Condominiums
Montebello Condominiums
1100 Uptown Park Boulevard
Houston, Texas 77056
telephone:  281-777-4892

The Executor, Sylvia and Adriana incorporate herein by reference all of the disclosures, by other parties to this case, of persons who may have knowledge of relevant facts. In so doing, the Executor, Sylvia and Adriana do not admit that any particular individual does, in fact, have knowledge of a relevant fact.

(f)     **For any testifying expert:**

    (1)     the expert's name, address, and telephone number;

    (2)     the subject matter on which the expert will testify;

    (3)     the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;

    (4)     if the expert is retained by, employed by, or otherwise subject to control of the responding party:

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 19

01677

(A)    all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

(B)    the expert's current resume and bibliography

First Designated Expert Witness – Mario Gonzalez Mendoza

(1)    Mario Gonzalez Mendoza
Dr. Mier 3113
Nuevo Laredo, Tamaulipas CP 88000

(2)    The subject matter of the testimony of Mr. Gonzalez is the agreement allegedly signed by Dorothy and Eduardo in 1983 with respect to certain community property owned by them, and the judicial proceedings in Tamaulipas, Mexico, with regard to that agreement.

(3)    The general substance of the mental impressions and opinions of Mr. Gonzalez (as reflected in his deposition testimony given on October 8, 2014, in connection with this case) is that the alleged agreement between Dorothy and Eduardo, and the related proceedings, did not affect any community property that was not specifically identified in the agreement, and all such property continued to be community property. In other words, under the laws of Tamaulipas, Dorothy retained her community interest in any property that is not specifically mentioned in the agreement and related proceedings. The basis of these mental impressions and opinions is Mr. Gonzalez's education and extensive experience as an attorney and *notario publico* in Tamaulipas, Mexico, which education and experience is described in his deposition testimony. To the extent consistent with this disclosure, the deposition testimony of Mr. Gonzalez is incorporated by reference into this disclosure.

(4)    Mr. Gonzalez was not retained by, employed by, or otherwise subject to the control of the Executor.

<u>Second Designated Expert Witness</u>:   James Austin Fisher

(1)   James Austin Fisher
      Fisher & Welch (A Professional Corporation)
      Ross Tower, Suite 2800
      500 North Akard Street
      Dallas, Texas 75201
      214-661-9400

(2)   The subject matter of Mr. Fisher's expert testimony will be the necessity and reasonableness of legal services rendered, and litigation expenses incurred, in this case.

(3)   The general substance of Mr. Fisher's mental impressions and opinions is as follows:

      (a)   The legal services rendered to the Executor have been necessary and the amounts of time expended in rendering those legal services have been reasonable.

      (b)   For the legal services rendered by the attorneys for the Executor in connection with this case, an hourly rate of $500 is reasonable, given their experience and qualifications, and such rate is within the range of what is customary in Harris County, Texas.  In addition, for purposes of an determining an appropriate award of attorney's fees under Texas law, an enhancement of at least 100 percent should be added to this rate because the attorneys for the Executor are in fact working for contingent fees rather than fees based on hourly rates and billed currently, and such enhancement is reasonable in light of the circumstances and demands of the litigation, the complexity of the issues, the amounts at stake, the characteristics of the parties, and the disparity of resources between the parties.

      (c)   The litigation expenses incurred by counsel for the Executor in connection with this civil action are reasonable and were necessary.

      (d)   Some of the legal services rendered to Shelby Longoria were unnecessary and unreasonable, including but not limited to (i) asserting a meritless claim against Adriana for tortious interference with inheritance rights, and (ii) presenting to the Probate Court a meritless motion to dismiss for forum non conveniens and presenting to the Court

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 21

01679

of Appeals and the Supreme Court of Texas meritless petitions for writ of mandamus.

Mr. Fisher may be asked to render an opinion as to a total amount that would be a reasonable attorney's fee for the legal services rendered to the Executor for the prosecution of the claims asserted by her. The total amount, however, cannot be determined until the time of trial.

Mr. Fisher also may be asked to consider and to opine as to the validity of the expert testimony, if any, offered by Shelby Longoria in this civil action with regard to legal services rendered or litigation expenses incurred, including legal services rendered or litigation expenses incurred on behalf of Shelby Longoria. To date, Shelby Longoria has not made proper disclosure of the expert testimony, if any, that Shelby Longoria is planning to offer in this case.

A brief summary of the basis of these mental impressions and opinions is as follows: the timing and content of the documents filed and/or served in the course of this proceeding, Mr. Fisher's experience practicing law in Harris County, Texas and elsewhere, his knowledge of rates customarily charged by attorneys in Harris County, Texas, and elsewhere for the same or similar services, and application of the factors listed in Texas Disciplinary Rule of Professional Conduct 1.04(b). Mr. Fisher generates time records reflecting the specific amounts of time expended, the services rendered, and the litigation expenses incurred. The billing records may contain privileged information, but it will be redacted prior to production in this case. Mr. Fisher is not relying on the redacted information as a basis for any of his opinions. The redacted billing records will be produced at least 30 days before trial or by such other date as may be ordered by the Court or as the parties may agree.

(4)     Mr. Fisher is an attorney who has been engaged to represent the Executor, Sylvia, and Adriana in this case. Mr. Fisher has not been retained by the Executor, Sylvia and Adriana to serve as an expert witness, and he is not employed by or subject to the control of the Executor, Sylvia, or Adriana.

Third Designated Expert Witness – T. Wesley Holmes

(1)     T. Wesley Holmes
        The Holmes Law Firm
        10,000 North Central Expressway, Suite 400
        Dallas, Texas 75231
        214.890.9266

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 22

01680

(2)     The subject matter of Mr. Holmes's expert testimony will be the necessity and reasonableness of legal services rendered, and litigation expenses incurred, in this case.

(3)     The general substance of Mr. Holmes's mental impressions and opinions is as follows:

   (a)     The legal services rendered to the Executor, Sylvia and Adriana have been necessary and the amounts of time expended in rendering those legal services have been reasonable.

   (b)     For the legal services rendered by the attorneys for the Executor, Sylvia and Adriana in connection with this case, an hourly rate of $500 is reasonable, given their experience and qualifications, and such rate is within the range of what is customary in Harris County, Texas. In addition, for purposes of an determining an appropriate award of attorney's fees under Texas law, an enhancement of at least 100 percent should be added to this rate because the attorneys for the Executor, Sylvia and Adriana are in fact working for contingent fees rather than fees based on hourly rates and billed currently, and such enhancement is reasonable in light of the circumstances and demands of the litigation, the complexity of the issues, the amounts at stake, the characteristics of the parties, and the disparity of resources between the parties.

   (c)     The litigation expenses incurred by counsel for the Executor in connection with this civil action are reasonable and were necessary.

   (d)     Some of the legal services rendered to Shelby Longoria were unnecessary and unreasonable, including but not limited to (i) asserting a meritless claim against Adriana for tortious interference with inheritance rights, (ii) asserting meritless objections to discovery requests and a meritless opposition to a motion to compel discovery, (iii) presenting to the Probate Court a meritless motion to dismiss for forum non conveniens, and (iv) presenting to the Court of Appeals and the Supreme Court of Texas meritless petitions for writ of mandamus.

Mr. Holmes may be asked to render an opinion as to a total amount that would be a reasonable attorney's fee for the legal services rendered to the Executor for the prosecution of the claims asserted by her. The total amount, however, cannot be determined until the time of trial.

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 23

01681

Mr. Holmes also may be asked to consider and to opine as to the validity of the expert testimony, if any, offered by Shelby Longoria in this civil action with regard to legal services rendered or litigation expenses incurred, including legal services rendered or litigation expenses incurred on behalf of Shelby Longoria. To date, Shelby Longoria has not made proper disclosure of the expert testimony, if any, that Shelby Longoria is planning to offer in this case.

A brief summary of the basis of these mental impressions and opinions is as follows: the timing and content of the documents filed and/or served in the course of this proceeding, Mr. Holmes's experience practicing law in Harris County, Texas and elsewhere, his knowledge of rates customarily charged by attorneys in Harris County, Texas, and elsewhere for the same or similar services, and application of the factors listed in Texas Disciplinary Rule of Professional Conduct 1.04(b). Mr. Holmes generates time records reflecting the specific amounts of time expended, the services rendered, and the litigation expenses incurred. The billing records may contain privileged information, but it will be redacted prior to production in this case. Mr. Holmes is not relying on the redacted information as a basis for any of his opinions. The redacted billing records will be produced at least 30 days before trial or by such other date as may be ordered by the Court or as the parties may agree.

(4)  Mr. Holmes is an attorney who has been engaged to represent the Executor, Sylvia and Adriana in this case. Mr. Holmes has not been retained by the Executor, Sylvia, or Adriana to serve as an expert witness, and he is not employed by or subject to the control of the Executor, Sylvia, or Adriana.

Fourth Designated Expert Witness - Christopher B. Ticknor, M.D.

(1)  Christopher B. Ticknor, M.D.
1202 E. Sonterra Boulevard, Suite 202
San Antonio, Texas 78258
Telephone:  210 692 7775

(2)  The subject matter of the testimony of Dr. Ticknor will include his education, qualifications and experience in the fields of psychiatry and forensic psychiatry, the tasks he has performed in reaching his conclusions in this case, his opinions and mental impressions regarding the testamentary capacity of Dorothy Louise Longoria, and his review of the qualifications, opinions, and/or testimony of any expert designated by Contestant on the issue of testamentary capacity.

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 24

01682

(3)     The general substance of Dr. Ticknor's mental impressions and opinions include Dr. Ticknor's conclusion that, based on reasonable medical probability, Dorothy Louise Longoria had testamentary capacity (as defined in Texas law) on January 21, 2010. Dr. Ticknor may also testify as to the meaning and significance of various medical records related to Dorothy Louise Longoria. It is anticipated that Dr. Ticknor will also testify that his qualifications and experience are more suitable for making determinations regarding testamentary capacity than those of George S. Glass, M.D. Dr. Ticknor will also respond to the testimony, if any, of George S. Glass, M.D. and any of Dorothy Louise Longoria's healthcare providers. If Dr. Ticknor is deposed, his deposition testimony is incorporated herein by reference.

(4)(A)     The following items have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony:

1.     The definition of testamentary capacity:

2.     Application for Probate of January 21, 2010 Will and Issuance of Letters Testamentary dated June 28, 2012;

3.     Preliminary Inventory, Appraisement, and List of Claims dated August 27, 2013;

4.     Shelby Longoria's Amended Contest of 2010 Will dated August 30, 2013;

5.     Original Counterclaims of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Louise Longoria, Deceased, to Shelby Longoria's Amended Contest of 2010 Will dated September 26, 2013;

6.     Original Answer of James Thomas Dorsey, Independent Executor of the Estate of Dorothy Longoria, Deceased, to Shelby Longoria's Amended Contest of 2010 Will dated September 26, 2013;

7.     Original Answer of Sylvia Rene Dorsey to Shelby Longoria's Amended Contest of 2010 Will dated September 26, 2013;

8.     Last Will and Testament of Dorothy Louise Longoria dated April 6, 1988;

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 25

01683

9.      Last Will and Testament of Dorothy Louise Longoria dated December 11, 2009;

10.     Last Will and Testament of Dorothy Louise Longoria dated January 8, 2010;

11.     Last Will and Testament of Dorothy Louise Longoria dated January 21, 2010;

12.     Last Will and Testament of Dorothy Louise Longoria purportedly signed in July of 2011;

13.     Directive to Physicians and Family or Surrogates (Living Will) signed on February 8, 2010;

14.     Medical Power of Attorney dated February 8, 2010;

15.     Inpatient Physician Orders – No Cardiopulmonary Resuscitation Orders (DNR) dated November 3, 2011;

16.     Records from M.D. Anderson Cancer Center;

17.     Shelby Longoria's Supplemental Response to Request for Disclosures;

18.     The CV of George S. Glass, M.D.;

19.     Records from Daniela White, M.D.;

20.     Transcripts of the depositions of the following witnesses:

        a.      James Thomas Dorsey;
        b.      Sylvia Rene Longoria Dorsey;
        c.      Adriana Longoria (three volumes);
        d.      Shelby Longoria;
        e.      Zachary Fertitta;
        f.      Elizabeth Dorsey Fertitta; and
        g.      Raymond Hart.

21.     Checks written and signed by Dorothy K. Longoria from November 2009 through July 2010;

01684

22. The records of Micki Grimland, Ph.D. (Bates labeled SWPA 0000001-SWPA 0000083);

23. Affidavit of Dr. George Glass; and

24. A copy of the handwritten journal of Dorothy Longoria (Bates labeled DORSEY 003712 - DORSEY 003751).

Dr. Ticknor may also review additional documents, depositions, medical records and other materials as this case progresses.

(4)(B)     Dr. Ticknor's current curriculum vitae was provided on January 15, 2015. It is incorporated herein by reference.

Fifth Designated Expert Witness - Holly M. Holmes, M.D.

(1)     Holly M. Holmes, M.D.
        The University of Texas MD Anderson Cancer Center
        1515 Holcombe Blvd.
        Houston, Texas 77030
        713 792 2121

(2)     The subject matter of the testimony of Dr. Holmes is her education, qualifications, and experience in the fields of internal and geriatric medicine, her participation in the care and treatment of Dorothy Louise Longoria, the medical conditions for which she treated Dorothy Louise Longoria, her observations, diagnoses, and conclusions throughout their doctor-patient relationship, and the mental status, including the testamentary capacity, of Dorothy Louise Longoria.

(3)     The general substance of the mental impressions and opinions of Dr. Holmes are reflected in the medical records of Dorothy Louise Longoria, including but not limited to the records form the University of Texas MD Anderson Cancer Center. These medical records have previously been produced in this case. It is anticipated that Dr. Holmes will also testify that, based on reasonable medical probability, Dorothy Louise Longoria had testamentary capacity (as defined in Texas law) on January 21, 2010. If Dr. Holmes is deposed, her deposition testimony is incorporated herein by reference.

(4)     Dr. Holmes was not retained by, employed by, or otherwise subject to the control of the Executor.

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 27

**01685**

<u>Sixth Designated Expert Witness - Cezar A. Iliescu, M.D.</u>

(1)     Cezar A. Iliescu, M.D.
        The University of Texas MD Anderson Cancer Center
        1515 Holcombe Blvd.
        Houston, Texas 77030
        713 792 2121

(2)     The subject matter of the testimony of Dr. Iliescu is his education, qualifications, and experience in the field of cardiology, his participation in the care and treatment of Dorothy Louise Longoria, the medical conditions for which he treated Dorothy Louise Longoria, his observations, diagnoses, and conclusions throughout their doctor-patient relationship, and the mental status, including the testamentary capacity, of Dorothy Louise Longoria.

(3)     The general substance of the mental impressions and opinions of Dr. Iliescu are reflected in the medical records of Dorothy Louise Longoria, including but not limited to the records form the University of Texas MD Anderson Cancer Center. These medical records have previously been produced in this case. It is anticipated that Dr. Iliescu will also testify that, based on reasonable medical probability, Dorothy Louise Longoria had testamentary capacity (as defined in Texas law) on January 21, 2010. If Dr. Iliescu is deposed, his deposition testimony is incorporated herein by reference.

(4)     Dr. Iliescu was not retained by, employed by, or otherwise subject to the control of the Executor.


<u>Seventh Designated Expert Witness - Randal S. Weber, M.D.</u>

(1)     Randal S. Weber, M.D.
        The University of Texas MD Anderson Cancer Center
        1515 Holcombe Blvd.
        Houston, Texas 77030
        713 792 2121

(2)     The subject matter of the testimony of Dr. Weber is his education, qualifications, and experience in the field of head and neck surgery, his participation in the care and treatment of Dorothy Louise Longoria, the medical conditions for which he treated Dorothy Louise Longoria, his

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT
EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED          Page 28

01686

observations, diagnoses, and conclusions throughout their doctor-patient relationship, and the mental status, including the testamentary capacity, of Dorothy Louise Longoria.

(3)     The general substance of the mental impressions and opinions of Dr. Weber are reflected in the medical records of Dorothy Louise Longoria, including but not limited to the records form the University of Texas MD Anderson Cancer Center. These medical records have previously been produced in this case. It is anticipated that Dr. Weber will also testify that, based on reasonable medical probability, Dorothy Louise Longoria had testamentary capacity (as defined in Texas law) on January 21, 2010. If Dr. Weber is deposed, his deposition testimony is incorporated herein by reference.

(4)     Dr. Weber was not retained by, employed by, or otherwise subject to the control of the Executor.

Reservation of Right To Call Experts Designated by Other Parties:     The Executor hereby cross-designates each and every person designated, in the past or in the future, by another party to this civil action to be a testifying expert, and the Executor reserves the right to elicit opinions from such experts on any subject matter for which they were designated to testify for any other party.

Reservation of Right To Call Rebuttal Experts:     In the event that Shelby designates one or more expert witnesses, the Executor reserves the right to call one or more experts in same fields to critique and to rebut the expert testimony presented by Shelby.

Reservation of Rights To Designate and To Call Additional Expert Witnesses:     As of the time of this response, it has not been decided whether or not other expert witnesses will be called to testify on behalf of the Executor. The Executor reserves the rights to amend and to supplement this response as may be necessary.

(i)     Any witness statements described in Rule 192.3(h)

Response:

The Executor refers to the depositions upon oral examination that have been taken in this case (all of which were attended by at least one attorney of record for Shelby) and the affidavits which have been filed in the record for this case.

01687

Other than those depositions and affidavits, the Executor does not have what he understands to be a "witness statement" within the meaning of Rule 192.3(h) but he does have copies of letters, emails, notes, and other documents written by people who are likely to be called as witnesses in this case. All such items of which the Executor is aware have already been produced by the parties to this case.

(l)    **the name, address, and telephone number of any person who may be designated as a responsible third party**

**Response:**

Contestant has filed motions to designate James Thomas Dorsey, Raymond Hart, Sylvia Dorsey and Adriana Longoria as responsible parties. The Executor does not believe that designating these four people as responsible third parties is proper, and the Executor is not aware of any other person who may be properly designated as a responsible third party.

## RESERVATION OF RIGHTS TO AMEND AND TO SUPPLEMENT

The Executor reserves the rights to amend and to supplement the foregoing disclosures, or any part thereof, in accordance with Texas law.

DATED:   June 8, 2015.

FIRST AMENDED DISCLOSURES OF JAMES THOMAS DORSEY, INDEPENDENT EXECUTOR OF THE ESTATE OF DOROTHY LOUISE LONGORIA, DECEASED     Page 30

01688

Respectfully submitted,

*/s/ Shannon L.K. Welch*

James Austin Fisher
   State Bar of Texas Number 07051650
   email: jfisher@fisherwelch.com
Shannon L.K. Welch
   State Bar of Texas Number 90001699
   email: swelch@fisherwelch.com
**FISHER & WELCH**
**A Professional Corporation**
Ross Tower, Suite 2800
500 North Akard Street
Dallas, Texas 75201
Telephone:   214.661.9400
Facsimile:   214.661.9404

T. Wesley Holmes
   State Bar of Texas Number 09908495
   email: wes@wesholmes.com
**THE HOLMES LAW FIRM**
10,000 North Central Expressway, Suite 400
Dallas, Texas 75231
Telephone:   214.890.9266
Facsimile:   214:890.9295

**ATTORNEYS FOR**
**ADRIANA LONGORIA,**
**SYLVIA DORSEY, AND**
**JAMES THOMAS DORSEY,**
**INDIVIDUALLY AND AS**
**INDEPENDENT EXECUTOR OF THE**
**ESTATE OF DOROTHY LOUISE**
**LONGORIA, DECEASED**

01689

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2015, a true and correct copy of this document was served on Shelby Longoria, through his attorneys of record named below, in the manner indicated and in compliance with Texas law.

Johnny W. Carter, Richard W. Hess, and Kristen Schlemmer
Susman Godfrey L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
*BY EMAIL TO jcarter@susmangodfrey.com, rhess@susmangodfrey.com, and kschlemmer@susmangodfrey.com*

Robert S. MacIntyre Jr.
MacIntyre McCulloch Stanfield Young
2900 Weslayan, Suite 150
Houston, Texas 77027
*BY EMAIL TO macintyre@mmlawtexas.com*

*/s/ Shannon L.K. Welch*
Shannon L.K. Welch

01690

01691

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 3/18/2005 | $16,928.84 | 0.0894966 | $1,515.07 |
| | | | |
| 4/15/2005 | $15,190.00 | 0.090185354 | $1,369.92 |
| 4/15/2005 | $35,860.00 | 0.090185354 | $3,234.05 |
| 4/20/2005 | $16,928.84 | 0.090394207 | $1,530.27 |
| | | | |
| 5/4/2005 | $330,188.68 | 0.091013652 | $30,051.68 |
| 5/5/2005 | $451,189.50 | 0.091334478 | $41,209.16 |
| 5/5/2005 | $660,377.36 | 0.091334478 | $60,315.22 |
| 5/5/2005 | $566,037.74 | 0.091334478 | $51,698.76 |
| 5/13/2005 | $1,210.00 | 0.090717504 | $109.77 |
| 5/20/2005 | $16,928.84 | 0.09115308 | $1,543.12 |
| 5/27/2005 | $660,377.36 | 0.091859657 | $60,662.04 |
| | | | |
| 6/9/2005 | $283,018.86 | 0.091953116 | $26,024.47 |
| 6/21/2005 | $16,928.84 | 0.092677952 | $1,568.93 |
| 6/30/2005 | $0.62 | 0.092820649 | $0.06 |
| 6/30/2005 | $0.06 | 0.092820649 | $0.01 |
| | | | |
| 7/14/2005 | $16,928.84 | 0.094052247 | $1,592.20 |
| | | | |
| 8/18/2005 | $16,928.84 | 0.093857938 | $1,588.91 |
| 8/19/2005 | $1,782,000.00 | 0.092943352 | $165,625.05 |
| 8/19/2005 | $1,637,820.00 | 0.092943352 | $152,224.48 |
| 8/19/2005 | $144,180.00 | 0.092943352 | $13,400.57 |
| 8/30/2005 | $343,053.18 | 0.092267609 | $31,652.70 |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 8/30/2005 | $85,763.29 | 0.092267609 | $7,913.17 |
| 8/30/2005 | $128,644.94 | 0.092267609 | $11,869.76 |
| 8/30/2005 | $325,900.52 | 0.092267609 | $30,070.06 |
| 8/30/2005 | $643,224.70 | 0.092267609 | $59,348.80 |
| 8/30/2005 | $171,526.59 | 0.092267609 | $15,826.35 |
| 8/30/2005 | $814,751.29 | 0.092267609 | $75,175.15 |
| 8/30/2005 | $600,345.05 | 0.092267609 | $55,392.40 |
| 8/30/2005 | $857,632.93 | 0.092267609 | $79,131.74 |
| | | | |
| 9/19/2005 | $16,928.84 | 0.092098658 | $1,559.12 |
| 9/23/2005 | $2,000,000.00 | 0.09223452 | $184,469.04 |
| 9/26/2005 | $643,224.70 | 0.092033449 | $59,198.19 |
| 9/26/2005 | $814,751.29 | 0.092033449 | $74,984.37 |
| 9/26/2005 | $343,053.17 | 0.092033449 | $31,572.37 |
| 9/26/2005 | $85,763.29 | 0.092033449 | $7,893.09 |
| 9/26/2005 | $128,644.94 | 0.092033449 | $11,839.64 |
| 9/27/2005 | $325,900.51 | 0.091869359 | $29,940.27 |
| 9/27/2005 | $600,343.05 | 0.091869359 | $55,153.13 |
| 9/28/2005 | $3,213.40 | 0.092187623 | $296.24 |
| 9/28/2005 | $857,632.93 | 0.092187623 | $79,063.14 |
| | | | |
| 10/20/2005 | $16,928.84 | 0.092210049 | $1,561.01 |
| 10/28/2005 | $3,842,195.53 | 0.092240886 | $354,407.52 |
| 10/31/2005 | $857,632.93 | 0.092684435 | $79,489.22 |
| 10/31/2005 | $171,526.59 | 0.092684435 | $15,897.85 |
| 10/31/2005 | $600,343.05 | 0.092684435 | $55,642.46 |

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 10/31/2005 | $814,751.29 | 0.092684435 | $75,514.76 |
| 10/31/2005 | $343,053.17 | 0.092684435 | $31,795.69 |
| 10/31/2005 | $85,763.29 | 0.092684435 | $7,948.92 |
| 10/31/2005 | $128,644.94 | 0.092684435 | $11,923.38 |
| 10/31/2005 | $325,900.51 | 0.092684435 | $30,205.90 |
| 10/31/2005 | $643,224.70 | 0.092684435 | $59,616.92 |
| | | | |
| 11/1/2005 | $814,751.29 | 0.092858225 | $75,656.36 |
| 11/1/2005 | $643,224.70 | 0.092858225 | $59,728.70 |
| 11/1/2005 | $857,632.92 | 0.092858225 | $79,638.27 |
| 11/1/2005 | $325,900.51 | 0.092858225 | $30,262.54 |
| 11/1/2005 | $600,343.05 | 0.092858225 | $55,746.79 |
| 11/4/2005 | $85,763.29 | 0.09304409 | $7,979.77 |
| 11/4/2005 | $128,644.94 | 0.09304409 | $11,969.65 |
| 11/4/2005 | $343,053.17 | 0.09304409 | $31,919.07 |
| 11/9/2005 | $293,332.95 | 0.093317797 | $27,373.18 |
| 11/14/2005 | $57,177.13 | 0.093597791 | $5,351.65 |
| 11/21/2005 | $16,928.84 | 0.093990907 | $1,591.16 |
| 11/30/2005 | $0.62 | 0.094546798 | $0.06 |
| 11/30/2005 | $0.06 | 0.094546798 | $0.01 |
| | | | |
| 12/2/2005 | $85,763.28 | 0.095639135 | $8,202.33 |
| 12/2/2005 | $343,053.17 | 0.095639135 | $32,809.31 |
| 12/2/2005 | $128,644.94 | 0.095639135 | $12,303.49 |
| 12/2/2005 | $85,763.28 | 0.095639135 | $8,202.33 |
| 12/2/2005 | $857,632.82 | 0.095639135 | $82,023.26 |

REDACTED

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 12/2/2005 | $600,343.05 | 0.095639135 | $57,416.29 |
| 12/2/2005 | $814,751.29 | 0.095639135 | $77,922.11 |
| 12/2/2005 | $643,224.70 | 0.095639135 | $61,517.45 |
| 12/7/2005 | $857,632.93 | 0.095651284 | $82,033.69 |
| 12/7/2005 | $128,644.94 | 0.095651284 | $12,305.05 |
| 12/7/2005 | $85,763.29 | 0.095651284 | $8,203.37 |
| 12/7/2005 | $85,763.29 | 0.095651284 | $8,203.37 |
| 12/7/2005 | $343,053.17 | 0.095651284 | $32,813.48 |
| 12/7/2005 | $600,343.05 | 0.095651284 | $57,423.58 |
| 12/7/2005 | $643,224.70 | 0.095651284 | $61,525.27 |
| 12/7/2005 | $814,751.29 | 0.095651284 | $77,932.01 |
| 12/9/2005 | $502,560.00 | 0.093992978 | $47,237.11 |
| 12/14/2005 | $16,928.84 | 0.09302667 | $1,574.83 |
| 12/19/2005 | $140,000.00 | 0.093294661 | $13,061.25 |
| 12/29/2005 | $500,000.00 | 0.093467862 | $46,733.93 |
| 12/29/2005 | $400,000.00 | 0.093467862 | $37,387.14 |
| 12/30/2005 | $400,000.00 | 0.094081982 | $37,632.79 |
| 12/30/2005 | $382,311.00 | 0.094081982 | $35,968.58 |
| 1/19/2006 | $16,928.84 | 0.094795319 | $1,604.77 |
| 2/8/2006 | $750,000.00 | 0.09497466 | $71,230.99 |
| 2/20/2006 | $16,928.84 | 0.09583901 | $1,622.44 |
| 2/22/2006 | $400,000.00 | 0.095348301 | $38,139.32 |
| 2/23/2006 | $350,000.00 | 0.095201724 | $33,320.60 |

BANAMEX ACCOUNT NO.

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 3/10/2006 | $377,358.49 | 0.093423046 | $35,253.98 |
| 3/10/2006 | $16,928.84 | 0.093423046 | $1,581.54 |
| 3/16/2006 | $12,000.00 | 0.094141488 | $1,129.70 |
| 3/17/2006 | $1,872.30 | 0.093466733 | $175.00 |
| 3/17/2006 | $16,928.84 | 0.093466733 | $1,582.28 |
| 3/27/2006 | $330,188.67 | 0.091405861 | $30,181.18 |
| | | | |
| 4/6/2006 | $150,000.00 | 0.090259821 | $13,538.97 |
| 4/19/2006 | $16,928.84 | 0.090937984 | $1,539.47 |
| 4/21/2006 | $760,000.00 | 0.090298815 | $68,627.10 |
| 4/21/2006 | $2,000,008.20 | 0.090298815 | $180,598.37 |
| 4/24/2006 | $1,900,000.00 | 0.090337174 | $171,640.63 |
| 4/27/2006 | $11,145.00 | 0.090116813 | $1,004.35 |
| | | | |
| 5/9/2006 | $200,000.00 | 0.091465839 | $18,293.17 |
| 5/9/2006 | $1,000.00 | 0.091465839 | $91.47 |
| 5/18/2006 | $16,928.84 | 0.089091593 | $1,508.22 |
| 5/22/2006 | $25,000.00 | 0.088609071 | $2,215.23 |
| 5/23/2006 | $10,000.00 | 0.089417004 | $894.17 |
| 5/25/2006 | $66,000.00 | 0.089377236 | $5,898.90 |
| 5/25/2006 | $66,000.00 | 0.089377236 | $5,898.90 |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) | |
|---|---|---|---|---|
| | | 0.088639888 | | Missing daily transactions part of this statement - Value is estimated by monthly exchange rate instead of daily |
| 6/*/2006 | $46,928.84 | | $4,159.77 | |
| 7/21/2006 | $16,928.84 | 0.091660194 | $1,551.70 | |
| 8/21/2006 | $16,928.84 | 0.092534045 | $1,566.49 | |
| 9/11/2006 | $4,446.67 | 0.090366588 | $401.83 | |
| 9/19/2006 | $16,928.84 | 0.091414876 | $1,547.55 | |
| 9/28/2006 | $700,000.00 | 0.09049115 | $63,343.81 | |
| 9/28/2006 | $170,000.00 | 0.09049115 | $15,383.50 | |
| 9/28/2006 | $150,000.00 | 0.09049115 | $13,573.67 | |
| 9/28/2006 | $200,000.00 | 0.09049115 | $18,098.23 | |
| 9/28/2006 | $200,000.00 | 0.09049115 | $18,098.23 | |
| 9/28/2006 | $250,000.00 | 0.09049115 | $22,622.79 | |
| 10/2/2006 | $1,000,000.00 | 0.091161747 | $91,161.75 | |
| 10/5/2006 | $1,050,000.00 | 0.090773917 | $95,312.61 | |
| 10/5/2006 | $50,000.00 | 0.090773917 | $4,538.70 | |
| 10/18/2006 | $16,928.84 | 0.09241388 | $1,564.46 | |
| 10/19/2006 | $250,000.00 | 0.092588597 | $23,147.15 | |
| 10/20/2006 | $1,000,000.00 | 0.09241108 | $92,411.08 | |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 10/20/2006 | $200,000.00 | 0.09241108 | $18,482.22 |
| 10/20/2006 | $700,000.00 | 0.09241108 | $64,687.76 |
| 10/26/2006 | $150,000.00 | 0.093187031 | $13,978.05 |
| 10/30/2006 | $5,000.00 | 0.092924998 | $464.62 |
| 10/31/2006 | $0.62 | 0.092869876 | $0.06 |
| 10/31/2006 | $0.06 | 0.092869876 | $0.01 |
| | | | |
| 11/7/2006 | $1,050,000.00 | 0.092496987 | $97,121.84 |
| 11/7/2006 | $170,000.00 | 0.092496987 | $15,724.49 |
| 11/10/2006 | $146,874.38 | 0.091606048 | $13,454.58 |
| 11/22/2006 | $16,928.84 | 0.091154124 | $1,543.13 |
| 11/22/2006 | $300,000.00 | 0.091154124 | $27,346.24 |
| 11/23/2006 | $400,000.00 | 0.091167481 | $36,466.99 |
| 11/23/2006 | $500,000.00 | 0.091167481 | $45,583.74 |
| 11/23/2006 | $200,000.00 | 0.091167481 | $18,233.50 |
| 11/23/2006 | $1,000,000.00 | 0.091167481 | $91,167.48 |
| 11/23/2006 | $700,000.00 | 0.091167481 | $63,817.24 |
| 11/23/2006 | $340,000.00 | 0.091167481 | $30,996.94 |
| 11/24/2006 | $700,000.00 | 0.090709967 | $63,496.98 |
| 11/24/2006 | $1,000,000.00 | 0.090709967 | $90,709.97 |
| 11/30/2006 | $1.86 | 0.090926298 | $0.17 |
| 11/30/2006 | $0.18 | 0.090926298 | $0.02 |
| 11/30/2006 | $350,000.00 | 0.090926298 | $31,824.20 |
| | | | |
| 12/5/2006 | $2,100,000.00 | 0.091841997 | $192,868.19 |
| 12/20/2006 | $16,928.84 | 0.09247769 | $1,565.54 |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 12/22/2006 | $150,000.00 | 0.092098006 | $13,814.70 |
| 12/22/2006 | $350,000.00 | 0.092098006 | $32,234.30 |
| 12/22/2006 | $1,050,000.00 | 0.092098006 | $96,702.91 |
| 12/22/2006 | $200,000.00 | 0.092098006 | $18,419.60 |
| 12/22/2006 | $340,000.00 | 0.092098006 | $31,313.32 |
| 12/27/2006 | $250,000.00 | 0.091898939 | $22,974.73 |
| 12/27/2006 | $400,000.00 | 0.091898939 | $36,759.58 |
| 12/27/2006 | $1,000,000.00 | 0.091898939 | $91,898.94 |
| 12/27/2006 | $700,000.00 | 0.091898939 | $64,329.26 |
| 12/27/2006 | $250,000.00 | 0.091898939 | $22,974.73 |
| 12/27/2006 | $150,000.00 | 0.091898939 | $13,784.84 |
| 12/27/2006 | $1,000,000.00 | 0.091898939 | $91,898.94 |
| 12/27/2006 | $1,050,000.00 | 0.091898939 | $96,493.89 |
| 12/28/2006 | $700,000.00 | 0.091951508 | $64,366.06 |
| 12/29/2006 | $3.10 | 0.092591641 | $0.29 |
| 12/29/2006 | $0.31 | 0.092591641 | $0.03 |
| | | | |
| 1/12/2007 | $34,241.99 | 0.091076353 | $3,118.64 |
| 1/15/2007 | $34,000.00 | 0.091399775 | $3,107.59 |
| | | | |
| 2/9/2007 | $9,769.50 | 0.091278396 | $891.74 |
| 2/14/2007 | $2,500,000.00 | 0.091597187 | $228,992.97 |
| 2/14/2007 | $51,991.82 | 0.091597187 | $4,762.30 |
| 2/14/2007 | $246,779.00 | 0.091597187 | $22,604.26 |
| 2/14/2007 | $295,549.00 | 0.091597187 | $27,071.46 |
| 2/14/2007 | $349,076.40 | 0.091597187 | $31,974.42 |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|------|---------------------|---------------|------------------------|
| 2/28/2007 | $6.00 | 0.089626167 | $0.54 |
| 2/28/2007 | $0.60 | 0.089626167 | $0.05 |
| | | | |
| 3/30/2007 | $1.24 | 0.09053237 | $0.11 |
| 3/30/2007 | $0.12 | 0.09053237 | $0.01 |
| 3/30/2007 | $150.00 | 0.09053237 | $13.58 |
| 3/30/2007 | $15.00 | 0.09053237 | $1.36 |
| | | | |
| 4/30/2007 | $150.00 | 0.091515002 | $13.73 |
| 4/30/2007 | $15.00 | 0.091515002 | $1.37 |
| | | | |
| 5/31/2007 | $1.24 | 0.093122836 | $0.12 |
| 5/31/2007 | $0.12 | 0.093122836 | $0.01 |
| 5/31/2007 | $9,200.00 | 0.093122836 | $856.73 |
| 5/31/2007 | $6.00 | 0.093122836 | $0.56 |
| 5/31/2007 | $0.60 | 0.093122836 | $0.06 |
| 5/31/2007 | $150.00 | 0.093122836 | $13.97 |
| 5/31/2007 | $15.00 | 0.093122836 | $1.40 |
| | | | |
| 6/29/2007 | $103.75 | 0.092667499 | $9.61 |
| 6/29/2007 | $10.37 | 0.092667499 | $0.96 |
| | | | |
| 7/*/07 | | | STATEMENT MISSING |
| 8/*/07 | | | STATEMENT MISSING |
| | | | |
| 9/5/2007 | $444,000.00 | 0.090187287 | $40,043.16 |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 9/5/2007 | $322,200.00 | 0.090187287 | $29,058.34 |
| 9/5/2007 | $227,325.00 | 0.090187287 | $20,501.83 |
| 9/5/2007 | $317,585.00 | 0.090187287 | $28,642.13 |
| 9/5/2007 | $32,814.00 | 0.090187287 | $2,959.41 |
| 9/5/2007 | $332,250.00 | 0.090187287 | $29,964.73 |
| 9/5/2007 | $54,200.00 | 0.090187287 | $4,888.15 |
| 9/7/2007 | $1,110,834.65 | 0.089868318 | $99,828.84 |
| 9/10/2007 | $12,359.68 | 0.089698161 | $1,108.64 |
| 9/10/2007 | $91,650.00 | 0.089698161 | $8,220.84 |
| 9/10/2007 | $4,007.00 | 0.089698161 | $359.42 |
| 9/19/2007 | $2,000,000.00 | 0.091011842 | $182,023.68 |
| 9/24/2007 | $2,240,000.00 | 0.091416951 | $204,773.97 |
| 9/24/2007 | $2,240,000.00 | 0.091416951 | $204,773.97 |
| | | | |
| 10/31/2007 | $3,053,070.00 | 0.093433513 | $285,259.05 |
| 10/31/2007 | $3,083,802.00 | 0.093433513 | $288,130.45 |
| 10/31/2007 | $4,913,207.00 | 0.093433513 | $459,058.19 |
| 10/31/2007 | $4,009,800.00 | 0.093433513 | $374,649.70 |
| 11/*/07 | $7,729,862.79 | 0.093737606 | $724,578.83 |

Missing daily transactions part of this statement - Value is estimated by monthly exchange rate instead of daily

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 12/4/2007 | $1,200,000.00 | 0.091675567 | $110,010.68 |
| 12/4/2007 | $235,049.05 | 0.091675567 | $21,548.25 |
| 12/4/2007 | $1,264,150.94 | 0.091675567 | $115,891.75 |
| 12/4/2007 | $603,773.58 | 0.091675567 | $55,351.29 |
| 12/4/2007 | $745,283.02 | 0.091675567 | $68,324.24 |
| 12/5/2007 | $306,603.77 | 0.092137913 | $28,249.83 |
| 12/5/2007 | $745,283.02 | 0.092137913 | $68,668.82 |
| 12/5/2007 | $235,849.06 | 0.092137913 | $21,730.64 |
| 12/6/2007 | $603,773.58 | 0.092292979 | $55,724.06 |
| 12/6/2007 | $236,849.06 | 0.092292979 | $21,859.51 |
| 12/6/2007 | $745,283.02 | 0.092292979 | $68,784.39 |
| 12/6/2007 | $632,075.47 | 0.092292979 | $58,336.13 |
| 12/11/2007 | $745,283.02 | 0.092588392 | $69,004.56 |
| 12/14/2007 | $306,603.77 | 0.092368839 | $28,320.63 |
| 12/18/2007 | $3,792,452.83 | 0.092077484 | $349,199.51 |
| 12/18/2007 | $1,528,301.89 | 0.092077484 | $140,722.19 |
| 12/18/2007 | $1,886,792.45 | 0.092077484 | $173,731.10 |
| 12/18/2007 | $943,396.20 | 0.092077484 | $86,865.55 |
| 12/18/2007 | $1,400,000.00 | 0.092077484 | $128,908.48 |
| 12/18/2007 | $2,991,132.04 | 0.092077484 | $275,415.91 |
| 12/18/2007 | $2,641,509.40 | 0.092077484 | $243,223.54 |
| 12/19/2007 | $951,000.00 | 0.092196736 | $87,679.10 |
| 12/20/2007 | $3,000,000.00 | 0.092237059 | $276,711.18 |
| 12/20/2007 | $1,090,000.00 | 0.092237059 | $100,538.39 |
| 12/20/2007 | $1,090,000.00 | 0.092237059 | $100,538.39 |
| 12/20/2007 | $857,632.93 | 0.092237059 | $79,105.54 |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 12/20/2007 | $1,254,150.94 | 0.092237059 | $115,679.19 |
| 12/20/2007 | $910,377.36 | 0.092237059 | $83,970.53 |
| 12/20/2007 | $600,000.00 | 0.092237059 | $55,342.24 |
| 12/20/2007 | $745,283.02 | 0.092237059 | $68,742.71 |
| 12/20/2007 | $235,649.06 | 0.092237059 | $21,735.58 |
| 12/24/2007 | $1,029,159.51 | 0.092508646 | $95,206.15 |
| | | | |
| 1/30/2008 | $745,283.02 | 0.092296063 | $68,786.69 |
| 1/30/2008 | $428,816.47 | 0.092296063 | $39,578.07 |
| 1/30/2008 | $600,000.00 | 0.092296063 | $55,377.64 |
| 1/30/2008 | $1,264,150.94 | 0.092296063 | $116,676.15 |
| 1/30/2008 | $235,849.06 | 0.092296063 | $21,767.94 |
| 1/31/2008 | $745,283.02 | 0.092425223 | $68,882.95 |
| 1/31/2008 | $428,816.47 | 0.092425223 | $39,633.46 |
| 1/31/2008 | $910,377.36 | 0.092425223 | $84,141.83 |
| | | | |
| 2/*/08 | $0.00 | | $0.00 |
| 3/*/08 | $0.00 | | $0.00 |
| 4/10/2008 | $20,000.00 | 0.094793655 | $1,895.87 |
| 4/16/2008 | $180,000.00 | 0.095578826 | $17,204.19 |
| 4/25/2008 | $849,056.60 | 0.095529704 | $81,110.13 |
| 4/30/2008 | $1,037,735.85 | 0.095152532 | $98,743.19 |
| | | | |
| 5/2/2008 | $377,358.49 | 0.095646975 | $36,093.20 |
| 5/2/2008 | $377,358.49 | 0.095646975 | $36,093.20 |
| 5/2/2008 | $1,886,792.45 | 0.095646975 | $180,465.99 |

REDACTED

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 5/2/2008 | $943,396.23 | 0.095646975 | $90,233.00 |
| | | | |
| 6/17/2008 | $7,566.00 | 0.096949296 | $733.52 |
| 6/24/2008 | $4,000.00 | 0.097137584 | $388.55 |
| 6/24/2008 | $2,500.00 | 0.097137584 | $242.84 |
| | | | |
| 7/*/08 | $0.00 | | $0.00 |
| 8/19/2008 | $25,000.00 | 0.098154035 | $2,453.85 |
| 8/28/2008 | $77,000.00 | 0.097999057 | $7,545.93 |
| | | | |
| 9/1/2008 | $2,215,035.53 | 0.096643994 | $214,069.88 |
| 9/1/2008 | $2,200,000.00 | 0.096643994 | $212,616.79 |
| 9/1/2008 | $2,220,000.00 | 0.096643994 | $214,549.67 |
| 9/4/2008 | $2,000,000.00 | 0.0955293 | $191,058.60 |
| 9/4/2008 | $2,002,068.50 | 0.0955293 | $191,256.20 |
| 9/4/2008 | $2,000,000.00 | 0.0955293 | $191,058.60 |
| 9/5/2008 | $3,600,000.00 | 0.09528028 | $343,009.01 |
| 9/5/2008 | $2,000,000.00 | 0.09528028 | $190,560.56 |
| 9/5/2008 | $3,600,000.00 | 0.09528028 | $343,009.01 |
| 9/5/2008 | $10,825.78 | 0.09528028 | $1,031.48 |
| 9/10/2008 | $50,000.00 | 0.094388457 | $4,719.42 |
| 9/18/2008 | $80,000.00 | 0.092151537 | $7,372.12 |
| | | | |
| 10/31/2008 | $1.86 | 0.078904629 | $0.15 |
| 10/31/2008 | $0.18 | 0.078904629 | $0.01 |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) | |
|---|---|---|---|---|
| 11/*/08 | $0.00 | | $0.00 | |
| 12/16/2008 | $4,802,590.37 | 0.075665004 | $363,388.02 | |
| 12/17/2008 | $1,647,524.00 | 0.075937512 | $125,108.87 | |
| 1/15/2009 | $87,000.00 | 0.070625161 | $6,144.39 | |
| 2/*/09 | $0.00 | | $0.00 | |
| 3/3/2009 | $80,000.00 | 0.065168528 | $5,213.48 | |
| 3/31/2009 | $0.62 | 0.070393833 | $0.04 | |
| 3/31/2009 | $0.06 | 0.070393833 | $0.00 | |
| 4/30/2009 | $0.62 | 0.0724446 | $0.04 | |
| 4/30/2009 | $0.06 | 0.0724446 | $0.00 | |
| 5/*/09 | $0.00 | | $0.00 | |
| 6/*/09 | $0.00 | | $0.00 | |
| 7/*/09 | $11,152.24 | 0.076331754 | $851.27 | Missing daily transactions part of this statement - Value is estimated by monthly exchange rate instead of daily |
| 8/31/2009 | $1.24 | 0.074977588 | $0.09 | |
| 8/31/2009 | $0.12 | 0.074977588 | $0.01 | |
| 8/31/2009 | $14,438.81 | 0.074977588 | $1,082.59 | |

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 9/*/09 | $0.00 | | $0.00 |
| 10/30/2009 | $0.62 | 0.076007132 | $0.05 |
| 10/30/2009 | $0.06 | 0.076007132 | $0.00 |
| 11/30/2009 | $2.48 | 0.077408228 | $0.19 |
| 11/30/2009 | $0.24 | 0.077408228 | $0.02 |
| 12/*/09 | $13,212.30 | 0.077785256 | $1,027.72 |
| 1/*/10 | $0.00 | | $0.00 |
| 2/10/2010 | $9,275.00 | 0.076607076 | $710.53 |
| 3/25/2010 | $222.00 | 0.080039004 | $17.77 |
| 3/31/2010 | $10.00 | 0.081293487 | $0.81 |
| 3/31/2010 | $1.10 | 0.081293487 | $0.09 |
| 4/*/10 | $0.00 | | $0.00 |
| 5/*/10 | $0.00 | | $0.00 |
| 6/*/10 | $0.00 | | $0.00 |
| 7/*/10 | $0.00 | | $0.00 |

Missing daily transactions part of this statement - Value is estimated by monthly exchange rate instead of daily

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) | |
|---|---|---|---|---|
| 8/*/10 | | | | STATEMENT MISSING |
| 9/*/10 | | | | STATEMENT MISSING |
| 10/*/10 | $0.00 | | $0.00 | |
| 11/*/10 | $0.00 | | $0.00 | |
| 12/20/2010 | $11,276.56 | 0.080558385 | $908.42 | |
| | | | | |
| 1/*/11 | $0.00 | | $0.00 | |
| 2/11/2011 | $2,857,142.85 | 0.082857639 | $236,736.11 | |
| 2/14/2011 | $952,380.95 | 0.083018128 | $79,064.88 | |
| 2/28/2011 | $1.86 | 0.082549386 | $0.15 | |
| 2/28/2011 | $0.20 | 0.082549386 | $0.02 | |
| 2/28/2011 | $24.00 | 0.082549386 | $1.98 | |
| 2/28/2011 | $2.64 | 0.082549386 | $0.22 | |
| | | | | |
| 3/*/11 | $0.00 | | $0.00 | |
| 4/*/11 | $0.00 | | $0.00 | |
| 5/*/11 | $0.00 | | $0.00 | |
| 6/*/11 | $0.00 | | $0.00 | |
| 7/*/11 | $0.00 | | $0.00 | |
| 8/*/11 | $0.00 | | $0.00 | |
| 9/12/2011 | $8,486.00 | 0.078277219 | $664.26 | |
| 9/30/2011 | $12.00 | 0.072619447 | $0.87 | |
| 9/30/2011 | $1.32 | 0.072619447 | $0.10 | |
| | | | | |
| 10/*/11 | $0.00 | | $0.00 | |
| 11/*/11 | $0.00 | | $0.00 | |

01707

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 12/9/2011 | $11,975.69 | 0.073448392 | $879.60 |
| 12/30/2011 | $12.00 | 0.071662224 | $0.86 |
| 12/30/2011 | $1.32 | 0.071662224 | $0.09 |
| | | | $0.00 |
| | | | |
| 1/23/2012 | $79,410.00 | 0.076053019 | $6,039.37 |
| 1/31/2012 | $12.00 | 0.076682584 | $0.92 |
| 1/31/2012 | $1.32 | 0.076682584 | $0.10 |
| | | | |
| 2/7/2012 | $76,050.00 | 0.079161481 | $6,020.23 |
| 2/29/2012 | $12.00 | 0.078150624 | $0.94 |
| 2/29/2012 | $1.32 | 0.078150624 | $0.10 |
| | | | |
| 3/5/2012 | $76,920.00 | 0.077973108 | $5,997.69 |
| 3/5/2012 | $1,063.00 | 0.077973108 | $82.89 |
| 3/30/2012 | $24.00 | 0.078036978 | $1.87 |
| 3/30/2012 | $2.64 | 0.078036978 | $0.21 |
| | | | |
| 4/9/2012 | $77,895.00 | 0.076971936 | $5,995.73 |
| 4/16/2012 | $4,235.79 | 0.075607558 | $320.26 |
| | | | |
| **TOTALS** | **$183,452,714.49** | | **$16,888,823.95** |

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 12/6/1999 | $3,000.00 | |
| | | $3,000.00 |
| 1/6/2000 | $3,000.00 | |
| | | $3,000.00 |
| 2/7/2000 | $3,000.00 | |
| | | $3,000.00 |
| 3/6/2000 | $3,000.00 | |
| 3/24/2000 | $2,000.00 | |
| | | $5,000.00 |
| 4/6/2000 | $5,000.00 | |
| 4/6/2000 | $3,000.00 | |
| 4/28/2000 | $1,417.00 | |
| | | $9,417.00 |
| 5/4/2000 | $3,000.00 | |
| | | $3,000.00 |
| 6/5/2000 | $3,000.00 | |
| | | $3,000.00 |
| 7/3/2000 | $3,000.00 | |
| | | $3,000.00 |
| 8/4/2000 | $3,000.00 | |
| | | $3,000.00 |
| 9/5/2000 | $3,000.00 | |
| | | $3,000.00 |
| 10/5/2000 | $3,000.00 | |
| | | $3,000.00 |
| 11/6/2000 | $3,000.00 | |
| | | $3,000.00 |
| 12/5/2000 | $3,000.00 | |
| | | $3,000.00 |
| 1/4/2001 | $3,000.00 | |
| | | $3,000.00 |
| 2/*/01 | $0.00 | |
| | | $0.00 |
| 3/5/2001 | $3,000.00 | |
| 3/20/2001 | $2,000.00 | |
| | | $5,000.00 |
| 4/*/01 | | STATEMENT MISSING |
| 5/*/01 | | STATEMENT MISSING |
| 6/*/01 | | STATEMENT MISSING |

01710

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | | Monthly Totals |
|---|---|---|---|
| | | STATEMENT | |
| 7/*/01 | | MISSING | |
| 8/6/2001 | $3,000.00 | | |
| | | | $3,000.00 |
| 9/4/2001 | $3,000.00 | | |
| | | | $3,000.00 |
| 10/4/2001 | $3,000.00 | | |
| 10/16/2001 | $4,000.00 | | |
| | | | $7,000.00 |
| 11/5/2001 | $3,000.00 | | |
| | | | $3,000.00 |
| | | All exchange rates from this date forward were referenced from | |
| 12/6/2001 | $3,000.00 | xe.com. | |
| | | | $3,000.00 |
| | | STATEMENT | |
| 1/*/02 | | MISSING | |
| 2/6/2002 | $3,000.00 | | |
| 2/26/2002 | $600.00 | | |
| | | | $3,600.00 |
| 3/5/2002 | $3,000.00 | | |
| 3/5/2002 | $600.00 | | |
| | | | $3,600.00 |
| 4/4/2002 | $3,000.00 | | |
| 4/4/2002 | $600.00 | | |
| 4/16/2002 | $1,000.00 | | |
| | | | $4,600.00 |
| 5/6/2002 | $3,600.00 | | |
| | | | $3,600.00 |
| | | STATEMENT | |
| 6/*/02 | | MISSING | |
| 7/5/2002 | $3,600.00 | | |
| | | | $3,600.00 |
| 8/5/2002 | $3,600.00 | | |
| | | | $3,600.00 |
| 9/5/2002 | $3,600.00 | | |
| 9/17/2002 | $10,000.00 | | |

01711

BANAMEX ACCOUNT NO.

| Date | Withdrawals (Dollars) | | Monthly Totals |
|---|---|---|---|
| | | | $13,600.00 |
| 10/4/2002 | $3,600.00 | | |
| | | | $3,600.00 |
| 11/5/2002 | $3,600.00 | | |
| | | | $3,600.00 |
| 12/5/2002 | $3,600.00 | | |
| 12/24/2002 | $10,200.00 | | |
| | | | $13,800.00 |
| 1/6/2003 | $3,600.00 | | |
| | | | $3,600.00 |
| 2/4/2003 | $3,600.00 | | |
| | | | $3,600.00 |
| 3/6/2003 | $3,600.00 | | |
| | | | $3,600.00 |
| 4/4/2003 | $3,600.00 | | |
| | | | $3,600.00 |
| 5/5/2003 | $3,600.00 | | |
| | | | $3,600.00 |
| 6/*/03 | $0.00 | | |
| | | | $0.00 |
| 7/8/2003 | $3,600.00 | | |
| | | | $3,600.00 |
| 8/6/2003 | $3,600.00 | | |
| | | | $3,600.00 |
| 9/*/03 | | STATEMENT MISSING | |
| 10/6/2003 | $3,600.00 | | |
| | | | $3,600.00 |
| 11/6/2003 | $3,608.00 | | |
| | | | $3,608.00 |
| 12/5/2003 | $13,608.00 | | |
| | | | $13,608.00 |
| 1/5/2004 | $3,608.00 | | |
| | | | $3,608.00 |
| 2/6/2004 | $3,608.00 | | |
| 2/13/2004 | $658.00 | | |
| 2/20/2004 | $10,000.00 | | |
| 2/23/2004 | $3,608.00 | | |
| | | | $17,874.00 |
| 3/5/2004 | $3,608.00 | | |
| | | | $3,608.00 |
| 4/2/2004 | $3,608.00 | | |

01712

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| | | $3,608.00 |
| 5/6/2004 | $3,608.00 | |
| 5/20/2004 | $10,000.00 | |
| | | $13,608.00 |
| 6/7/2004 | $3,608.00 | |
| | | $3,608.00 |
| 7/6/2004 | $3,600.00 | |
| 7/23/2004 | $10,000.00 | |
| | | $13,600.00 |
| 8/13/2004 | $3,600.00 | |
| 8/26/2004 | $1,700.00 | |
| | | $5,300.00 |
| 9/7/2004 | $3,600.00 | |
| | | $3,600.00 |
| 10/6/2004 | $3,600.00 | |
| | | $3,600.00 |
| 11/8/2004 | $3,600.00 | |
| | | $3,600.00 |
| 12/7/2004 | $3,600.00 | |
| | | $3,600.00 |
| 1/6/2005 | $3,600.00 | |
| | | $3,600.00 |
| 2/4/2005 | $3,600.00 | |
| 2/7/2005 | $7,500.00 | |
| 2/7/2005 | $4,385.00 | |
| 2/28/2005 | $1,075.95 | |
| | | $16,560.95 |
| 3/2/2005 | $11,883.00 | |
| 3/4/2005 | $3,608.00 | |
| 3/4/2005 | $4,383.00 | |
| 3/7/2005 | $39,595.19 | |
| 3/8/2005 | $22,917.00 | |
| 3/16/2005 | $2,715.50 | |
| 3/17/2005 | $40,000.00 | |
| 3/18/2005 | $40,000.00 | |
| 3/29/2005 | $3,008.00 | |
| 3/31/2005 | $384.00 | |
| | | $168,493.69 |
| 4/4/2005 | $3,608.00 | |
| 4/4/2005 | $5,008.00 | |
| 4/5/2005 | $5,683.60 | |
| 4/5/2005 | $14,686.18 | |
| 4/5/2005 | $364.00 | |

01713

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 4/5/2005 | $14,618.19 | |
| 4/5/2005 | $23,345.00 | |
| 4/5/2005 | $4,405.00 | |
| 4/8/2005 | $14,105.24 | |
| 4/8/2005 | $7,958.00 | |
| 4/11/2005 | $1,008.00 | |
| 4/11/2005 | $2,917.00 | |
| 4/12/2005 | $1,100.51 | |
| 4/12/2005 | $1,008.00 | |
| 4/14/2005 | $3,418.00 | |
| 4/15/2005 | $2,008.00 | |
| 4/15/2005 | $5,519.00 | |
| 4/19/2005 | $750.00 | |
| 4/21/2005 | $3,758.00 | |
| 4/25/2005 | $508.00 | |
| 4/25/2005 | $27,198.55 | |
| 4/26/2005 | $41,100.00 | |
| 4/26/2005 | $2,008.00 | |
| 4/27/2005 | $150.00 | |
| 4/27/2005 | $384.00 | |
| | | $186,616.27 |
| 5/2/2005 | $28,020.00 | |
| 5/2/2005 | $5,600.64 | |
| 5/2/2005 | $691.18 | |
| 5/2/2005 | $3,608.00 | |
| 5/2/2005 | $4,383.00 | |
| 5/4/2005 | $951.00 | |
| 5/4/2005 | $364.00 | |
| 5/5/2005 | $22,686.88 | |
| 5/6/2005 | $14,618.19 | |
| 5/6/2005 | $7,530.00 | |
| 5/6/2005 | $15,010.00 | |
| 5/6/2005 | $23,425.00 | |
| 5/6/2005 | $19,909.41 | |
| 5/6/2005 | $2,917.00 | |
| 5/9/2005 | $74.66 | |
| 5/9/2005 | $15.93 | |
| 5/9/2005 | $3,905.85 | |
| 5/11/2005 | $258.00 | |
| 5/16/2005 | $21,711.00 | |
| 5/27/2005 | $5,238.00 | |
| 5/27/2005 | $40,000.00 | |
| 5/31/2005 | $29,892.60 | |

01714



BANAMEX ACCOUNT NO.

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| | | $250,810.34 |
| 6/3/2005 | $28,020.00 | |
| 6/3/2005 | $691.18 | |
| 6/3/2005 | $5,461.48 | |
| 6/3/2005 | $15,010.00 | |
| 6/3/2005 | $6,508.00 | |
| 6/3/2005 | $3,608.00 | |
| 6/7/2005 | $38,139.19 | |
| 6/7/2005 | $684.00 | |
| 6/7/2005 | $12,233.44 | |
| 6/9/2005 | $100,025.00 | |
| 6/9/2005 | $1,108.00 | |
| 6/10/2005 | $508.00 | |
| 6/14/2005 | $5,008.00 | |
| 6/17/2005 | $25,912.00 | |
| 6/20/2005 | $2,460.00 | |
| 6/23/2005 | $20,000.00 | |
| 6/23/2005 | $2,917.00 | |
| 6/27/2005 | $2,681.50 | |
| 6/28/2005 | $3,888.00 | |
| 6/29/2005 | $1,000.00 | |
| | | $275,862.79 |
| 7/1/2005 | $608.00 | |
| 7/4/2005 | $15,000.00 | |
| 7/4/2005 | $25,000.00 | |
| 7/5/2005 | $1,986.22 | |
| 7/5/2005 | $28,020.00 | |
| 7/5/2005 | $691.18 | |
| 7/5/2005 | $7,508.00 | |
| 7/5/2005 | $3,608.00 | |
| 7/8/2005 | $3,008.00 | |
| 7/8/2005 | $37,689.19 | |
| 7/11/2005 | $2,008.00 | |
| 7/12/2005 | $20,000.00 | |
| 7/12/2005 | $2,917.00 | |
| 7/13/2005 | $45.71 | |
| 7/15/2005 | $15,000.00 | |
| 7/15/2005 | $30,026.00 | |
| 7/19/2005 | $2,608.00 | |
| 7/29/2005 | $4,858.00 | |
| | | $200,581.30 |
| 8/2/2005 | $33,348.98 | |
| 8/2/2005 | $608.00 | |

01715



| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 8/2/2005 | $12.00 | |
| 8/3/2005 | $691.18 | |
| 8/3/2005 | $19,000.00 | |
| 8/4/2005 | $3,608.00 | |
| 8/8/2005 | $7,508.00 | |
| 8/8/2005 | $37,738.19 | |
| 8/9/2005 | $20,000.00 | |
| 8/9/2005 | $2,917.00 | |
| 8/12/2005 | $180,030.00 | |
| 8/15/2005 | $4,008.00 | |
| 8/15/2005 | $10,008.00 | |
| 8/18/2005 | $151,675.00 | |
| 8/30/2005 | $4,858.00 | |
| 8/31/2005 | $15,010.00 | |
| | | $491,020.35 |
| 9/1/2005 | $19,886.19 | |
| 9/1/2005 | $808.00 | |
| 9/2/2005 | $23,027.52 | |
| 9/2/2005 | $28,711.18 | |
| 9/2/2005 | $12,000.00 | |
| 9/2/2005 | $3,608.00 | |
| 9/5/2005 | $2,352.00 | |
| 9/6/2005 | $15,010.00 | |
| 9/6/2005 | $7,969.00 | |
| 9/6/2005 | $22,000.00 | |
| 9/12/2005 | $40,000.00 | |
| 9/20/2005 | $5,008.00 | |
| 9/22/2005 | $8,008.00 | |
| 9/22/2005 | $2,116.79 | |
| 9/27/2005 | $2,508.00 | |
| 9/28/2005 | $1,008.00 | |
| 9/28/2005 | $15.00 | |
| 9/28/2005 | $2.25 | |
| 9/30/2005 | $6,068.00 | |
| 9/30/2005 | $1,984.25 | |
| 9/30/2005 | $1,008.00 | |
| | | $203,098.18 |
| 10/3/2005 | $28,020.00 | |
| 10/3/2005 | $691.18 | |
| 10/3/2005 | $5,446.32 | |
| 10/3/2005 | $808.00 | |
| 10/3/2005 | $6,008.00 | |
| 10/5/2005 | $15,210.00 | |

01716



| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 10/5/2005 | $2,917.00 | |
| 10/5/2005 | $8,350.00 | |
| 10/5/2005 | $7,508.00 | |
| 10/7/2005 | $40,638.19 | |
| 10/7/2005 | $208.00 | |
| 10/11/2005 | $3,008.00 | |
| 10/13/2005 | $3,608.00 | |
| 10/18/2005 | $5,008.00 | |
| 10/18/2005 | $300.00 | |
| 10/19/2005 | $294.72 | |
| 10/21/2005 | $7,308.00 | |
| 10/24/2005 | $6,057.82 | |
| 10/27/2005 | $7,008.00 | |
| 10/27/2005 | $100.00 | |
| 10/28/2005 | $6,492.89 | |
| 10/31/2005 | $2,219.52 | |
| 10/31/2005 | $60,000.00 | |
| | | $217,209.64 |
| 11/1/2005 | $158,350.00 | |
| 11/1/2005 | $808.00 | |
| 11/1/2005 | $691.18 | |
| 11/1/2005 | $5,449.36 | |
| 11/1/2005 | $28,020.00 | |
| 11/2/2005 | $56,000.00 | |
| 11/3/2005 | $300.00 | |
| 11/3/2005 | $7,508.00 | |
| 11/3/2005 | $3,608.00 | |
| 11/3/2005 | $30,000.00 | |
| 11/4/2005 | $888.00 | |
| 11/4/2005 | $40,669.19 | |
| 11/7/2005 | $919.00 | |
| 11/7/2005 | $2,000.00 | |
| 11/7/2005 | $13,000.00 | |
| 11/7/2005 | $5,008.00 | |
| 11/17/2005 | $70,000.00 | |
| 11/18/2005 | $3,008.00 | |
| 11/21/2005 | $2,008.00 | |
| 11/22/2005 | $3,908.00 | |
| 11/22/2005 | $7,027.89 | |
| 11/24/2005 | $131.00 | |
| 11/30/2005 | $2,219.52 | |
| | | $441,521.14 |
| 12/1/2005 | $691.18 | |

01717

BANAMEX ACCOUNT NO.

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 12/1/2005 | $5,309.81 | |
| 12/1/2005 | $28,020.00 | |
| 12/1/2005 | $408.00 | |
| 12/2/2005 | $18,631.90 | |
| 12/6/2005 | $23,046.00 | |
| 12/6/2005 | $17,618.19 | |
| 12/6/2005 | $22.00 | |
| 12/6/2005 | $4,608.00 | |
| 12/6/2005 | $7,508.00 | |
| 12/6/2005 | $1,855.00 | |
| 12/7/2005 | $20,000.00 | |
| 12/14/2005 | $100,000.00 | |
| 12/14/2005 | $28.00 | |
| 12/14/2005 | $3,342.89 | |
| 12/14/2005 | $36,000.00 | |
| 12/14/2005 | $10,000.00 | |
| 12/20/2005 | $10,360.00 | |
| 12/20/2005 | $2,219.52 | |
| 12/20/2005 | $8.00 | |
| 12/20/2005 | $4,000.00 | |
| | | $293,676.49 |
| 1/3/2006 | $4,305.97 | |
| 1/3/2006 | $1,404.70 | |
| 1/3/2006 | $5,370.77 | |
| 1/3/2006 | $8.00 | |
| 1/3/2006 | $28,020.00 | |
| 1/6/2006 | $3,608.00 | |
| 1/6/2006 | $7,508.00 | |
| 1/9/2006 | $37,161.19 | |
| 1/10/2006 | $20,000.00 | |
| 1/10/2006 | $1,855.00 | |
| 1/12/2006 | $8.00 | |
| 1/12/2006 | $3,000.00 | |
| 1/20/2006 | $15,000.00 | |
| 1/20/2006 | $22,000.00 | |
| 1/26/2006 | $40,000.00 | |
| 1/31/2006 | $31,016.00 | |
| 1/31/2006 | $2,219.52 | |
| | | $222,485.15 |
| 2/2/2006 | $28,020.00 | |
| 2/2/2006 | $691.18 | |
| 2/2/2006 | $2,274.79 | |
| 2/3/2006 | $508.00 | |

01718

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 2/7/2006 | $37,161.19 | |
| 2/7/2006 | $5,296.48 | |
| 2/7/2006 | $3,608.00 | |
| 2/8/2006 | $20,000.00 | |
| 2/8/2006 | $1,763.00 | |
| 2/10/2006 | $4,408.00 | |
| 2/14/2006 | $285.00 | |
| 2/15/2006 | $22,852.47 | |
| 2/15/2006 | $30,000.00 | |
| 2/16/2006 | $15,013.00 | |
| 2/28/2006 | $2,219.52 | |
| | | $174,100.63 |
| 3/1/2006 | $18,631.90 | |
| 3/1/2006 | $1,508.00 | |
| 3/1/2006 | $25,583.53 | |
| 3/1/2006 | $508.00 | |
| 3/1/2006 | $691.18 | |
| 3/2/2006 | $5,000.00 | |
| 3/3/2006 | $3,608.00 | |
| 3/6/2006 | $39,654.19 | |
| 3/6/2006 | $10,008.00 | |
| 3/6/2006 | $6,011.43 | |
| 3/7/2006 | $1,721.00 | |
| 3/7/2006 | $20,000.00 | |
| 3/10/2006 | $150,020.00 | |
| 3/13/2006 | $44,000.00 | |
| 3/22/2006 | $8,008.00 | |
| 3/23/2006 | $60,000.00 | |
| 3/27/2006 | $6,008.00 | |
| 3/30/2006 | $2,219.52 | |
| 3/31/2006 | $60,000.00 | |
| | | $463,180.75 |
| 4/3/2006 | $5,536.25 | |
| 4/3/2006 | $4,426.80 | |
| 4/3/2006 | $28,020.00 | |
| 4/4/2006 | $3,608.00 | |
| 4/4/2006 | $5,296.48 | |
| 4/5/2006 | $37,060.19 | |
| 4/5/2006 | $1,185.05 | |
| 4/5/2006 | $2,278.94 | |
| 4/6/2006 | $20,000.00 | |
| 4/6/2006 | $15,000.00 | |
| 4/7/2006 | $3,418.00 | |

01719

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 4/7/2006 | $15,010.00 | |
| 4/7/2006 | $6,008.00 | |
| 4/10/2006 | $60,000.00 | |
| 4/11/2006 | $1,638.00 | |
| 4/12/2006 | $12.00 | |
| 4/12/2006 | $21,000.00 | |
| 4/18/2006 | $1,513.00 | |
| 4/20/2006 | $100,025.00 | |
| 4/26/2006 | $100.00 | |
| 4/27/2006 | $3,008.00 | |
| 4/28/2006 | $2,219.52 | |
| 4/28/2006 | $100,025.00 | |
| | | $436,388.23 |
| 5/3/2006 | $5,615.10 | |
| 5/3/2006 | $691.18 | |
| 5/3/2006 | $28,020.00 | |
| 5/3/2006 | $5,296.48 | |
| 5/3/2006 | $3,608.00 | |
| 5/4/2006 | $18,180.19 | |
| 5/5/2006 | $21,870.00 | |
| 5/8/2006 | $20,000.00 | |
| 5/8/2006 | $1,221.00 | |
| 5/8/2006 | $2,008.00 | |
| 5/8/2006 | $15,015.00 | |
| 5/9/2006 | $1,000.00 | |
| 5/9/2006 | $300.00 | |
| 5/12/2006 | $6,013.00 | |
| 5/17/2006 | $100.00 | |
| 5/23/2006 | $15,000.00 | |
| 5/30/2006 | $2,264.00 | |
| 5/30/2006 | $18,633.90 | |
| | | $164,835.85 |
| 6/1/2006 | $19,000.00 | |
| 6/1/2006 | $1,185.00 | |
| 6/1/2006 | $15,000.00 | |
| 6/1/2006 | $23,020.00 | |
| 6/1/2006 | $567.18 | |
| 6/2/2006 | $5,720.45 | |
| 6/7/2006 | $36,381.19 | |
| 6/7/2006 | $10,815.00 | |
| 6/7/2006 | $3,808.00 | |
| 6/7/2006 | $5,292.48 | |
| 6/8/2006 | $8,008.00 | |

01720

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 6/9/2006 | $2,006.00 | |
| 6/16/2006 | $7,000.00 | |
| 6/16/2006 | $8,000.00 | |
| | | $145,803.30 |
| 7/3/2006 | $4,006.00 | |
| 7/3/2006 | $6,003.00 | |
| 7/3/2006 | $9,645.68 | |
| 7/3/2006 | $11,015.00 | |
| 7/3/2006 | $4,427.27 | |
| 7/3/2006 | $28,020.00 | |
| 7/3/2006 | $6,008.00 | |
| 7/3/2006 | $3,608.00 | |
| 7/5/2006 | $35,281.19 | |
| 7/6/2006 | $1,138.00 | |
| 7/6/2006 | $20,000.00 | |
| 7/11/2006 | $50,000.00 | |
| 7/11/2006 | $5,006.00 | |
| 7/14/2006 | $2,008.00 | |
| 7/21/2006 | $2,284.00 | |
| 7/21/2006 | $1,883.00 | |
| 7/21/2006 | $10,000.00 | |
| 7/27/2006 | $100,025.00 | |
| | | $300,358.14 |
| 8/1/2006 | $4,008.00 | |
| 8/1/2006 | $8,008.00 | |
| 8/1/2006 | $11,015.00 | |
| 8/1/2006 | $5,809.03 | |
| 8/1/2006 | $28,020.00 | |
| 8/1/2006 | $587.27 | |
| 8/1/2006 | $3,008.00 | |
| 8/1/2006 | $6,008.00 | |
| 8/2/2006 | $10,010.00 | |
| 8/4/2006 | $20,000.00 | |
| 8/4/2006 | $1,000.00 | |
| 8/7/2006 | $37,770.19 | |
| 8/15/2006 | $50,000.00 | |
| 8/16/2006 | $20,000.00 | |
| 8/21/2006 | $100,000.00 | |
| 8/25/2006 | $3,008.00 | |
| 8/28/2006 | $38,624.01 | |
| 8/29/2006 | $2,284.00 | |
| 8/29/2006 | $18,333.90 | |
| 8/31/2006 | $20,000.00 | |

01721

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| | | $387,493.40 |
| 9/1/2006 | $567.27 | |
| 9/1/2006 | $28,020.00 | |
| 9/1/2006 | $6,008.00 | |
| 9/1/2006 | $3,808.00 | |
| 9/1/2006 | $15,015.00 | |
| 9/1/2006 | $5,533.29 | |
| 9/1/2006 | $6,008.00 | |
| 9/4/2006 | $1,059.00 | |
| 9/5/2006 | $37,616.19 | |
| 9/13/2006 | $958.00 | |
| 9/13/2006 | $2,678.00 | |
| 9/14/2006 | $3,008.00 | |
| 9/19/2006 | $5,008.00 | |
| 9/25/2006 | $1,300.00 | |
| 9/28/2006 | $2,254.00 | |
| 9/29/2006 | $688.00 | |
| 9/29/2006 | $50,000.00 | |
| | | $169,528.75 |
| 10/2/2006 | $6,008.00 | |
| 10/2/2006 | $15,015.00 | |
| 10/2/2006 | $28,020.00 | |
| 10/2/2006 | $3,608.00 | |
| 10/2/2006 | $10,010.00 | |
| 10/2/2006 | $5,597.74 | |
| 10/2/2006 | $4,985.48 | |
| 10/5/2006 | $16,628.19 | |
| 10/5/2006 | $20,604.00 | |
| 10/6/2006 | $20,879.00 | |
| 10/17/2006 | $68,000.00 | |
| 10/19/2006 | $100,000.00 | |
| 10/25/2006 | $1,000.00 | |
| 10/25/2006 | $100,000.00 | |
| 10/27/2006 | $2,008.00 | |
| 10/31/2006 | $2,264.00 | |
| | | $404,627.41 |
| 11/1/2006 | $6,000.00 | |
| 11/1/2006 | $15,000.00 | |
| 11/1/2006 | $6,008.00 | |
| 11/1/2006 | $28,020.00 | |
| 11/1/2006 | $786.30 | |
| 11/1/2006 | $5,424.98 | |
| 11/1/2006 | $3,608.00 | |

01722

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 11/6/2006 | $20,764.00 | |
| 11/6/2006 | $16,618.19 | |
| 11/6/2006 | $22.00 | |
| 11/7/2006 | $20,000.00 | |
| 11/7/2006 | $555.00 | |
| 11/8/2006 | $50,000.00 | |
| 11/9/2006 | $2,058.00 | |
| 11/9/2006 | $164.35 | |
| 11/10/2006 | $100,000.00 | |
| 11/14/2006 | $2,797.00 | |
| 11/28/2006 | $6,008.00 | |
| 11/29/2006 | $2,234.00 | |
| 11/29/2006 | $18,633.90 | |
| | | $304,701.72 |
| 12/4/2006 | $6,000.00 | |
| 12/4/2006 | $15,000.00 | |
| 12/4/2006 | $3,608.00 | |
| 12/4/2006 | $6,008.00 | |
| 12/4/2006 | $28,020.00 | |
| 12/4/2006 | $786.30 | |
| 12/4/2006 | $5,568.61 | |
| 12/6/2006 | $10,618.19 | |
| 12/6/2006 | $10.00 | |
| 12/7/2006 | $20,000.00 | |
| 12/7/2006 | $513.00 | |
| 12/7/2006 | $20,661.00 | |
| 12/7/2006 | $12.00 | |
| 12/7/2006 | $20,661.00 | |
| 12/11/2006 | $30,010.00 | |
| 12/13/2006 | $22,602.00 | |
| 12/15/2006 | $161,338.00 | |
| 12/18/2006 | $100,015.00 | |
| 12/18/2006 | $4,008.00 | |
| 12/20/2006 | $30,047.47 | |
| 12/21/2006 | $2,264.00 | |
| 12/22/2006 | $9,208.00 | |
| | | $496,958.57 |
| | | STATEMENT IS |
| 1/2/2007 | $6,008.00 | INCOMPLETE |
| | | STATEMENT IS |
| 1/2/2007 | $3,608.00 | INCOMPLETE |
| | | STATEMENT IS |
| 1/2/2007 | $786.30 | INCOMPLETE |

01723

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | | Monthly Totals |
|---|---|---|---|
| 1/2/2007 | $28,020.00 | STATEMENT IS INCOMPLETE | |
| 1/5/2007 | $16,628.19 | STATEMENT IS INCOMPLETE | |
| 1/8/2007 | $20,000.00 | STATEMENT IS INCOMPLETE | |
| 1/9/2007 | $30,000.00 | STATEMENT IS INCOMPLETE | |
| 1/23/2007 | $7,530.00 | STATEMENT IS INCOMPLETE | |
| 1/24/2007 | $3,590.00 | STATEMENT IS INCOMPLETE | |
| 1/30/2007 | $2,264.00 | STATEMENT IS INCOMPLETE | |
| | | | $118,434.49 |
| 2/2/2007 | $6,008.00 | | |
| 2/2/2007 | $28,020.00 | | |
| 2/2/2007 | $786.30 | | |
| 2/2/2007 | $4,459.69 | | |
| 2/2/2007 | $3,608.00 | | |
| 2/7/2007 | $16,628.19 | | |
| 2/8/2007 | $20,000.00 | | |
| 2/12/2007 | $285.00 | | |
| 2/13/2007 | $3,000.00 | | |
| 2/16/2007 | $30,020.00 | | |
| 2/18/2007 | $80,000.00 | | |
| 2/23/2007 | $10,000.00 | | |
| 2/28/2007 | $50,000.00 | | |
| 2/28/2007 | $50,000.00 | | |
| 2/28/2007 | $100,000.00 | | |
| 2/28/2007 | $18,633.90 | | |
| 2/28/2007 | $2,264.00 | | |
| | | | $423,713.08 |
| 3/1/2007 | $6,008.00 | | |
| 3/1/2007 | $3,608.00 | | |
| 3/1/2007 | $786.30 | | |
| 3/1/2007 | $28,020.00 | | |
| 3/5/2007 | $5,134.98 | | |
| 3/5/2007 | $15,010.00 | | |
| 3/6/2007 | $50,000.00 | | |
| 3/8/2007 | $50,000.00 | | |
| 3/15/2007 | $15,000.00 | | |
| 3/16/2007 | $15,000.00 | | |

01724

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 3/22/2007 | $57,020.00 | |
| 3/23/2007 | $672.45 | |
| 3/27/2007 | $3,008.00 | |
| 3/27/2007 | $2,264.00 | |
| | | $251,531.73 |
| 4/2/2007 | $15,810.00 | |
| 4/2/2007 | $6,008.00 | |
| 4/2/2007 | $3,608.00 | |
| 4/12/2007 | $3,418.00 | |
| 4/17/2007 | $1,813.00 | |
| 4/27/2007 | $2,264.00 | |
| | | $32,921.00 |
| 5/2/2007 | $15,810.00 | |
| 5/2/2007 | $6,008.00 | |
| 5/2/2007 | $3,608.00 | |
| 5/21/2007 | $1,008.00 | |
| 5/30/2007 | $18,633.90 | |
| 5/30/2007 | $2,264.00 | |
| 5/31/2007 | $850.00 | |
| | | $48,181.90 |
| 6/1/2007 | $15,800.00 | |
| 6/1/2007 | $10.00 | |
| 6/1/2007 | $6,008.00 | |
| 6/1/2007 | $3,608.00 | |
| 6/5/2007 | $5,008.00 | |
| 6/13/2007 | $2,008.00 | |
| 6/15/2007 | $2,158.00 | |
| 6/26/2007 | $2,264.00 | |
| 6/26/2007 | $2,008.00 | |
| | | $38,872.00 |
| 7/5/2007 | $15,800.00 | |
| 7/5/2007 | $10.00 | |
| 7/5/2007 | $8,008.00 | |
| 7/5/2007 | $3,608.00 | |
| 7/11/2007 | $4,337.20 | |
| 7/31/2007 | $2,264.00 | |
| | | $34,027.20 |
| 8/1/2007 | $2,000.00 | |
| 8/1/2007 | $2,153.00 | |
| 8/1/2007 | $3,008.00 | |
| 8/1/2007 | $15,810.00 | |
| 8/1/2007 | $3,608.00 | |
| 8/1/2007 | $8,008.00 | |

01725

| Date | Withdrawals (Dollars) | | Monthly Totals |
|---|---|---|---|
| 8/6/2007 | $2,000.00 | | |
| 8/8/2007 | $5,100.00 | | |
| 8/10/2007 | $214.39 | | |
| 8/10/2007 | $400.00 | | |
| 8/21/2007 | $10,000.00 | | |
| 8/30/2007 | $19,633.90 | | |
| 8/30/2007 | $2,264.00 | | |
| | | | $74,199.29 |
| 9/4/2007 | $15,800.00 | STATEMENT IS INCOMPLETE | |
| 9/4/2007 | $10.00 | STATEMENT IS INCOMPLETE | |
| 9/4/2007 | $3,608.00 | STATEMENT IS INCOMPLETE | |
| 9/4/2007 | $8,008.00 | STATEMENT IS INCOMPLETE | |
| 9/4/2007 | $1,500.00 | STATEMENT IS INCOMPLETE | |
| 9/5/2007 | $28,773.30 | STATEMENT IS INCOMPLETE | |
| 9/5/2007 | $28,773.30 | STATEMENT IS INCOMPLETE | |
| 9/5/2007 | $28,773.30 | STATEMENT IS INCOMPLETE | |
| 9/5/2007 | $12,000.00 | STATEMENT IS INCOMPLETE | |
| 9/5/2007 | $12,000.00 | STATEMENT IS INCOMPLETE | |
| 9/5/2007 | $1,500.00 | STATEMENT IS INCOMPLETE | |
| 9/5/2007 | $12,000.00 | STATEMENT IS INCOMPLETE | |
| 9/12/2007 | $295.00 | STATEMENT IS INCOMPLETE | |
| 9/17/2007 | $2,879.00 | STATEMENT IS INCOMPLETE | |
| 9/17/2007 | $735.00 | STATEMENT IS INCOMPLETE | |
| 9/17/2007 | $3,008.00 | STATEMENT IS INCOMPLETE | |
| | | | $159,662.90 |
| 10/2/2007 | $15,810.00 | | |
| 10/2/2007 | $3,608.00 | | |

01726

BANAMEX ACCOUNT NO.  REDACTED

| Date | Withdrawals (Dollars) | | Monthly Totals |
|---|---|---|---|
| 10/2/2007 | $8,008.00 | | |
| 10/10/2007 | $80,000.00 | | |
| 10/15/2007 | $12,000.00 | | |
| | | | $119,426.00 |
| | | Missing daily | |
| | | transactions part of | |
| 11/*/2007 | $120,029.00 | this statement | |
| | | | $120,029.00 |
| 12/3/2007 | $8,008.00 | | |
| 12/3/2007 | $3,608.00 | | |
| 12/3/2007 | $15,810.00 | | |
| 12/19/2007 | $20,012.00 | | |
| 12/19/2007 | $2,264.00 | | |
| 12/20/2007 | $3,408.00 | | |
| 12/20/2007 | $7,545.50 | | |
| | | | $60,655.50 |
| 1/2/2008 | $3,608.00 | | |
| 1/2/2008 | $8,008.00 | | |
| 1/3/2008 | $15,800.00 | | |
| 1/3/2008 | $10.00 | | |
| 1/4/2008 | $3,508.00 | | |
| 1/4/2008 | $180,025.00 | | |
| 1/11/2008 | $2,008.00 | | |
| 1/11/2008 | $7,545.50 | | |
| 1/22/2008 | $1,908.00 | | |
| 1/28/2008 | $2,008.00 | | |
| 1/28/2008 | $2,358.00 | | |
| | | | $226,786.50 |
| 2/1/2008 | $15,810.00 | | |
| 2/1/2008 | $3,608.00 | | |
| 2/1/2008 | $8,008.00 | | |
| 2/7/2008 | $10,008.00 | | |
| 2/11/2008 | $8,000.00 | | |
| 2/11/2008 | $8.00 | | |
| 2/18/2008 | $50,000.00 | | |
| 2/29/2008 | $18,633.90 | | |
| | | | $114,075.90 |
| 3/4/2008 | $15,810.00 | | |
| 3/4/2008 | $3,608.00 | | |
| 3/4/2008 | $8,008.00 | | |
| 3/13/2008 | $60,000.00 | | |
| 3/25/2008 | $3,008.00 | | |
| 3/27/2008 | $25,000.00 | | $115,434.00 |

01727

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 4/1/2008 | $15,810.00 | |
| 4/1/2008 | $3,608.00 | |
| 4/1/2008 | $8,008.00 | |
| 4/1/2008 | $95,000.00 | |
| 4/7/2008 | $5,006.00 | |
| 4/17/2008 | $3,419.00 | |
| 4/25/2008 | $100,000.00 | |
| 4/29/2008 | $633.00 | |
| 4/29/2008 | $2,359.00 | |
| | | $233,843.00 |
| 5/2/2008 | $3,608.00 | |
| 5/2/2008 | $8,008.00 | |
| 5/2/2008 | $15,810.00 | |
| 5/7/2008 | $7,000.00 | |
| 5/7/2008 | $8,300.00 | |
| 5/14/2008 | $7,000.00 | |
| 5/14/2008 | $13,825.00 | |
| 5/19/2008 | $3,000.00 | |
| 5/30/2008 | $8,000.00 | |
| 5/30/2008 | $18,631.90 | |
| | | $93,182.90 |
| 6/2/2008 | $15,810.00 | |
| 6/2/2008 | $8,008.00 | |
| 6/2/2008 | $3,608.00 | |
| 6/5/2008 | $17,435.50 | |
| 6/11/2008 | $100,025.00 | |
| 6/16/2008 | $1,508.00 | |
| 6/17/2008 | $10,008.00 | |
| | | $156,402.50 |
| 7/1/2008 | $15,810.00 | |
| 7/1/2008 | $400.00 | |
| 7/1/2008 | $7,608.00 | |
| 7/1/2008 | $3,608.00 | |
| 7/4/2008 | $60,000.00 | |
| 7/14/2008 | $7,700.00 | |
| 7/28/2008 | $75,000.00 | |
| | | $170,126.00 |
| 8/4/2008 | $15,800.00 | |
| 8/4/2008 | $10.00 | |
| 8/4/2008 | $3,608.00 | |
| 8/4/2008 | $7,608.00 | |
| 8/4/2008 | $400.00 | |

01728

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 8/4/2008 | $35,000.00 | |
| 8/13/2008 | $14,700.00 | |
| 8/18/2008 | $104,020.00 | |
| 8/19/2008 | $35,000.00 | |
| 8/28/2008 | $18,633.90 | |
| | | $234,779.90 |
| 9/1/2008 | $161,032.00 | |
| 9/2/2008 | $3,608.00 | |
| 9/2/2008 | $7,608.00 | |
| 9/2/2008 | $15,810.00 | |
| 9/2/2008 | $400.00 | |
| 9/5/2008 | $1,609.26 | |
| 9/8/2008 | $260.00 | |
| 9/15/2008 | $55,000.00 | |
| 9/24/2008 | $2,408.00 | |
| 9/24/2008 | $50,000.00 | |
| 9/30/2008 | $383.00 | |
| | | $298,118.26 |
| 10/1/2008 | $15,810.00 | |
| 10/1/2008 | $7,608.00 | |
| 10/1/2008 | $3,608.00 | |
| 10/1/2008 | $400.00 | |
| 10/1/2008 | $16,350.00 | |
| 10/3/2008 | $5,008.00 | |
| 10/14/2008 | $3,930.00 | |
| 10/16/2008 | $5,000.00 | |
| 10/20/2008 | $341.45 | |
| 10/21/2008 | $45,000.00 | |
| 10/23/2008 | $651.50 | |
| 10/30/2008 | $4,683.00 | |
| 10/31/2008 | $50,000.00 | |
| | | $158,389.95 |
| 11/3/2008 | $15,810.00 | |
| 11/3/2008 | $400.00 | |
| 11/3/2008 | $3,608.00 | |
| 11/3/2008 | $7,608.00 | |
| 11/3/2008 | $2,008.00 | |
| 11/14/2008 | $3,391.00 | |
| 11/25/2008 | $2,092.00 | |
| 11/26/2008 | $18,633.90 | |
| 11/26/2008 | $500.00 | |
| | | $54,050.90 |
| 12/1/2008 | $15,810.00 | |

01729

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 12/1/2008 | $400.00 | |
| 12/1/2008 | $7,608.00 | |
| 12/1/2008 | $3,608.00 | |
| 12/8/2008 | $20,595.00 | |
| 12/10/2008 | $50,000.00 | |
| 12/15/2008 | $3,311.00 | |
| 12/16/2008 | $4,032.00 | |
| 12/22/2008 | $34,903.65 | |
| | | $140,267.65 |
| 1/5/2009 | $15,810.00 | |
| 1/5/2009 | $400.00 | |
| 1/5/2009 | $7,608.00 | |
| 1/5/2009 | $3,608.00 | |
| 1/14/2009 | $35,000.00 | |
| 1/27/2009 | $3,508.00 | |
| 1/29/2009 | $2,468.00 | |
| 1/29/2009 | $990.00 | |
| 1/30/2009 | $9,529.34 | |
| 1/30/2009 | $4,571.29 | |
| | | $83,492.63 |
| 2/3/2009 | $3,608.00 | |
| 2/3/2009 | $7,608.00 | |
| 2/3/2009 | $400.00 | |
| 2/3/2009 | $15,810.00 | |
| 2/4/2009 | $1,008.00 | |
| 2/5/2009 | $8,500.00 | |
| 2/10/2009 | $14,241.98 | |
| 2/19/2009 | $38,203.00 | |
| 2/26/2009 | $2,468.00 | |
| 2/26/2009 | $18,633.90 | |
| 2/26/2009 | $10,000.00 | |
| | | $120,480.88 |
| 3/2/2009 | $3,008.00 | |
| 3/2/2009 | $15,810.00 | |
| 3/2/2009 | $400.00 | |
| 3/2/2009 | $3,608.00 | |
| 3/2/2009 | $7,608.00 | |
| 3/19/2009 | $4,719.00 | |
| 3/30/2009 | $2,468.00 | |
| | | $37,621.00 |
| 4/1/2009 | $15,810.00 | |
| 4/1/2009 | $3,608.00 | |
| 4/1/2009 | $7,608.00 | |

01730

| Date | Withdrawals (Dollars) | | Monthly Totals |
|---|---|---|---|
| 4/1/2009 | $400.00 | | |
| 4/3/2009 | $2,000.00 | | |
| 4/13/2009 | $24,892.00 | | |
| 4/15/2009 | $30,000.00 | | |
| 4/17/2009 | $3,418.00 | | |
| 4/21/2009 | $8,879.00 | | |
| 4/29/2009 | $2,468.00 | | |
| | | | $99,083.00 |
| 5/4/2009 | $15,810.00 | | |
| 5/4/2009 | $3,608.00 | | |
| 5/4/2009 | $7,608.00 | | |
| 5/4/2009 | $400.00 | | |
| 5/22/2009 | $4,554.00 | | |
| 5/27/2009 | $18,633.90 | | |
| 5/27/2009 | $2,468.00 | | |
| 5/29/2009 | $600.00 | | |
| | | | $53,681.90 |
| 6/1/2009 | $15,800.00 | | |
| 6/1/2009 | $10.00 | | |
| 6/1/2009 | $400.00 | | |
| 6/1/2009 | $7,608.00 | | |
| 6/1/2009 | $3,608.00 | | |
| 6/9/2009 | $2,383.00 | | |
| 6/9/2009 | $3,983.00 | | |
| 6/25/2009 | $2,468.00 | | |
| 6/26/2009 | $16,000.00 | | |
| 6/26/2009 | $2,000.00 | | |
| 6/29/2009 | $15,800.00 | | |
| | $10.00 | | |
| | | | $70,070.00 |
| | | Missing daily transactions part of | |
| 7/*/2009 | $19,124.00 | this statement | |
| 7/30/2009 | $2,468.00 | | |
| 7/31/2009 | $20,000.00 | | |
| | | | $41,592.00 |
| 8/4/2009 | $15,800.00 | | |
| 8/4/2009 | $10.00 | | |
| 8/4/2009 | $7,608.00 | | |
| 8/4/2009 | $400.00 | | |
| 8/4/2009 | $3,608.00 | | |
| 8/28/2009 | $900.00 | | |
| 8/28/2009 | $21,093.90 | | |

**01731**

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 8/31/2009 | $29,000.00 | |
| | | $78,419.90 |
| 9/1/2009 | $260.00 | |
| 9/1/2009 | $15,800.00 | |
| 9/1/2009 | $10.00 | |
| 9/1/2009 | $3,608.00 | |
| 9/1/2009 | $7,608.00 | |
| 9/1/2009 | $400.00 | |
| 9/22/2009 | $2,515.00 | |
| 9/30/2009 | $2,468.00 | |
| | | $32,669.00 |
| 10/1/2009 | $15,800.00 | |
| 10/1/2009 | $10.00 | |
| 10/1/2009 | $7,608.00 | |
| 10/1/2009 | $400.00 | |
| 10/1/2009 | $3,608.00 | |
| 10/7/2009 | $50,000.00 | |
| 10/13/2009 | $1,051.00 | |
| 10/19/2009 | $15,479.00 | |
| 10/29/2009 | $2,468.00 | |
| | | $96,424.00 |
| 11/3/2009 | $15,800.00 | |
| 11/3/2009 | $10.00 | |
| 11/3/2009 | $400.00 | |
| 11/4/2009 | $3,608.00 | |
| 11/4/2009 | $7,608.00 | |
| 11/12/2009 | $40,000.00 | |
| 11/17/2009 | $1,008.00 | |
| 11/20/2009 | $20,000.00 | |
| 11/20/2009 | $12.00 | |
| 11/26/2009 | $1,000.00 | |
| 11/27/2009 | $2,468.00 | |
| 11/27/2009 | $15,036.81 | |
| 11/30/2009 | $25,000.00 | |
| | | $131,950.81 |
| 12/2/2009 | $7,608.00 | |
| 12/2/2009 | $400.00 | |
| 12/2/2009 | $3,608.00 | |
| 12/3/2009 | $15,800.00 | |
| 12/3/2009 | $10.00 | |
| 12/11/2009 | $8,381.58 | |
| 12/16/2009 | $226.30 | |
| 12/18/2009 | $2,758.00 | |

01732

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 12/18/2009 | $1,027.00 | |
| 12/18/2009 | $2,468.00 | |
| 12/18/2009 | $3,983.00 | |
| 12/18/2009 | $34,912.00 | |
| | | $81,181.88 |
| 1/4/2010 | $7,608.00 | |
| 1/4/2010 | $3,608.00 | |
| 1/4/2010 | $400.00 | |
| 1/6/2010 | $15,810.00 | |
| 1/6/2010 | $10.00 | |
| 1/14/2010 | $1,608.00 | |
| 1/29/2010 | $2,468.00 | |
| | | $31,512.00 |
| 2/2/2010 | $3,608.00 | |
| 2/2/2010 | $7,608.00 | |
| 2/2/2010 | $400.00 | |
| 2/2/2010 | $15,810.00 | |
| 2/8/2010 | $20,010.00 | |
| 2/9/2010 | $800.00 | |
| 2/10/2010 | $10,000.00 | |
| 2/26/2010 | $2,558.00 | |
| | | $60,794.00 |
| 3/1/2010 | $7,608.00 | |
| 3/1/2010 | $3,608.00 | |
| 3/1/2010 | $400.00 | |
| 3/8/2010 | $15,810.00 | |
| 3/10/2010 | $46,000.00 | |
| 3/12/2010 | $300.00 | |
| 3/26/2010 | $20,000.00 | |
| 3/26/2010 | $2,558.00 | |
| | | $96,284.00 |
| 4/5/2010 | $400.00 | |
| 4/5/2010 | $15,810.00 | |
| 4/5/2010 | $6,841.00 | |
| 4/5/2010 | $3,608.00 | |
| 4/6/2010 | $5,000.00 | |
| 4/9/2010 | $1,000.00 | |
| 4/13/1940 | $3,410.00 | |
| 4/14/2010 | $50,000.00 | |
| 4/19/2010 | $1,200.00 | |
| 4/28/2010 | $2,558.00 | |
| | | $89,827.00 |
| 5/4/2010 | $15,810.00 | |

01733

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 5/4/2010 | $400.00 | |
| 5/4/2010 | $7,608.00 | |
| 5/4/2010 | $3,608.00 | |
| 5/5/2010 | $24,000.00 | |
| 5/7/2010 | $2,008.00 | |
| 5/11/2010 | $4,000.00 | |
| 5/28/2010 | $2,608.00 | |
| | | $60,042.00 |
| 6/1/2010 | $15,810.00 | |
| 6/1/2010 | $400.00 | |
| 6/1/2010 | $7,608.00 | |
| 6/1/2010 | $3,608.00 | |
| 6/21/2010 | $32,000.00 | |
| | | $59,426.00 |
| 7/1/2010 | $3,608.00 | |
| 7/1/2010 | $7,608.00 | |
| 7/1/2010 | $400.00 | |
| 7/5/2010 | $15,810.00 | |
| 7/28/2010 | $2,608.00 | |
| | | $30,034.00 |
| 8/2/2010 | $15,810.00 | |
| 8/2/2010 | $7,608.00 | |
| 8/2/2010 | $3,608.00 | |
| 8/2/2010 | $400.00 | |
| 8/18/2010 | $66,000.00 | |
| 8/30/2010 | $2,608.00 | |
| | | $96,034.00 |
| 9/1/2010 | $7,608.00 | |
| 9/1/2010 | $400.00 | |
| 9/1/2010 | $3,608.00 | |
| 9/6/2010 | $500.00 | |
| 9/7/2010 | $15,810.00 | |
| 9/9/2010 | $3,692.31 | |
| 9/10/2010 | $41,000.00 | |
| 9/30/2010 | $2,608.00 | |
| | | $75,226.31 |
| 10/1/2010 | $3,608.00 | |
| 10/1/2010 | $7,608.00 | |
| 10/1/2010 | $400.00 | |
| 10/27/2010 | $2,608.00 | |
| | | $14,224.00 |
| 11/1/2010 | $400.00 | |
| 11/1/2010 | $3,608.00 | |

01734

BANAMEX ACCOUNT NO. REDACTED

| Date | Withdrawals (Dollars) | Monthly Totals |
|---|---|---|
| 11/1/2010 | $7,608.00 | |
| 11/1/2010 | $600.00 | |
| 11/4/2010 | $70,000.00 | |
| 11/17/2010 | $16,285.00 | |
| 11/18/2010 | $50.00 | |
| 11/18/2010 | $2,307.69 | |
| 11/29/2010 | $2,608.00 | |
| | | $103,466.69 |
| 12/1/2010 | $3,608.00 | |
| 12/1/2010 | $7,608.00 | |
| 12/1/2010 | $400.00 | |
| 12/3/2010 | $1,500.00 | |
| 12/6/2010 | $2,258.00 | |
| 12/6/2010 | $3,988.00 | |
| 12/6/2010 | $34,912.00 | |
| 12/17/2010 | $1,000.00 | |
| 12/17/2010 | $20,000.00 | |
| 12/17/2010 | $275.00 | |
| 12/20/2010 | $2,608.00 | |
| | | $78,157.00 |
| TOTAL | $11,875,165.59 | $11,875,165.59 |

**01735**

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 2/28/2007 | $15.00 | 0.089626167 | $1.34 |
| 2/28/2007 | $1.50 | 0.089626167 | $0.13 |
| | | | |
| 3/30/2007 | $200.00 | 0.09053237 | $18.11 |
| 3/30/2007 | $20.00 | 0.09053237 | $1.81 |
| 3/30/2007 | $15.00 | 0.09053237 | $1.36 |
| 3/30/2007 | $1.50 | 0.09053237 | $0.14 |
| | | | |
| 4/30/2007 | $200.00 | 0.091515002 | $18.30 |
| 4/30/2007 | $20.00 | 0.091515002 | $1.83 |
| 4/30/2007 | $15.00 | 0.091515002 | $1.37 |
| 4/30/2007 | $1.50 | 0.091515002 | $0.14 |
| | | | |
| 5/31/2007 | $200.00 | 0.093122836 | $18.62 |
| 5/31/2007 | $20.00 | 0.093122836 | $1.86 |
| 5/31/2007 | $15.00 | 0.093122836 | $1.40 |
| 5/31/2007 | $1.50 | 0.093122836 | $0.14 |
| | | | |
| 6/29/2007 | $200.00 | 0.092667499 | $18.53 |
| 6/29/2007 | $20.00 | 0.092667499 | $1.85 |
| 6/29/2007 | $15.00 | 0.092667499 | $1.39 |
| 6/29/2007 | $1.50 | 0.092667499 | $0.14 |
| | | | |
| 7/*/07 | | | STATEMENT MISSING |
| | | | |
| 8/30/2007 | $5,500.00 | 0.090199364 | $496.10 |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 9/11/2007 | $42,831.25 | 0.090019825 | $3,855.66 |
| 9/11/2007 | $17,466.25 | 0.090019825 | $1,572.31 |
| 9/25/2007 | $31,305.08 | 0.091379949 | $2,860.66 |
| 9/27/2007 | $24,669.36 | 0.091512317 | $2,257.55 |
| 9/28/2007 | $5,500.00 | 0.091471989 | $503.10 |
| | | | |
| 10/29/2007 | $5,500.00 | 0.093333548 | $513.33 |
| 10/29/2007 | $24,240.72 | 0.093333548 | $2,262.47 |
| | | | |
| 11/15/2007 | $5,500.00 | 0.091567365 | $503.62 |
| 11/27/2007 | $24,804.72 | 0.091117673 | $2,260.15 |
| 11/27/2007 | $204,747.79 | 0.091117673 | $18,656.14 |
| | | | |
| 12/14/2007 | $5,500.00 | 0.092368839 | $508.03 |
| 12/14/2007 | $50.00 | 0.092368839 | $4.62 |
| 12/14/2007 | $5.00 | 0.092368839 | $0.46 |
| 12/17/2007 | $50.00 | 0.092129131 | $4.61 |
| 12/17/2007 | $5.00 | 0.092129131 | $0.46 |
| 12/17/2007 | $31,384.00 | 0.092129131 | $2,891.38 |
| 12/17/2007 | $38,402.00 | 0.092129131 | $3,537.94 |
| 12/17/2007 | $46,326.00 | 0.092129131 | $4,267.97 |
| 12/17/2007 | $45,490.00 | 0.092129131 | $4,190.95 |
| 12/19/2007 | $93,080.68 | 0.092196736 | $8,581.73 |
| 12/31/2007 | $15.00 | 0.091594524 | $1.37 |
| 12/31/2007 | $1.50 | 0.091594524 | $0.14 |



| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 1/31/2008 | $15.00 | 0.092425223 | $1.39 |
| 1/31/2008 | $1.50 | 0.092425223 | $0.14 |
| 1/31/2008 | $5,500.00 | 0.092425223 | $508.34 |
| 1/31/2008 | $9,815.00 | 0.092425223 | $907.15 |
| 2/18/2008 | $17,539.00 | 0.093172318 | $1,634.15 |
| 2/21/2008 | $5,500.00 | 0.092606633 | $509.34 |
| 2/28/2008 | $25,156.75 | 0.09367407 | $2,356.54 |
| 2/28/2008 | $15.00 | 0.09367407 | $1.41 |
| 2/28/2008 | $1.50 | 0.09367407 | $0.14 |
| 3/*/08 | | | STATEMENT MISSING |
| 4/2/2008 | $24,839.50 | 0.093388121 | $2,319.71 |
| 4/11/2008 | $5,500.00 | 0.092583897 | $509.21 |
| 4/17/2008 | $17,939.00 | 0.09274403 | $1,663.74 |
| 4/30/2008 | $15.00 | 0.093506008 | $1.40 |
| 4/30/2008 | $1.50 | 0.093506008 | $0.14 |
| 5/14/2008 | $9,539.00 | 0.095342972 | $909.48 |
| 5/16/2008 | $5,500.00 | 0.095900327 | $527.45 |
| 5/19/2008 | $1,210.00 | 0.096375589 | $116.61 |
| 5/20/2008 | $36,000.00 | 0.09616552 | $3,461.96 |
| 5/30/2008 | $15.00 | 0.096816649 | $1.45 |



| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 5/30/2008 | $1.50 | 0.096816649 | $0.15 |
| 5/30/2008 | $24,310.75 | 0.096816649 | $2,353.69 |
| | | | |
| 6/13/2008 | $13,739.00 | 0.096467006 | $1,325.36 |
| 6/30/2008 | $5,500.00 | 0.097046713 | $533.76 |
| 6/30/2008 | $15.00 | 0.097046713 | $1.46 |
| 6/30/2008 | $1.50 | 0.097046713 | $0.15 |
| | | | |
| 7/10/2008 | $13,738.00 | 0.097057071 | $1,333.37 |
| 7/11/2008 | $24,287.25 | 0.097016537 | $2,356.26 |
| 7/17/2008 | $5,500.00 | 0.097765111 | $537.71 |
| 7/29/2008 | $23,711.50 | 0.099451034 | $2,358.13 |
| 7/31/2008 | $15.00 | 0.09959284 | $1.49 |
| 7/31/2008 | $1.50 | 0.09959284 | $0.15 |
| | | | |
| 8/13/2008 | $5,500.00 | 0.098006452 | $539.04 |
| 8/15/2008 | $13,740.00 | 0.097984901 | $1,346.31 |
| 8/28/2008 | $23,946.50 | 0.097999057 | $2,346.73 |
| 8/29/2008 | $15.00 | 0.097093475 | $1.46 |
| 8/29/2008 | $1.50 | 0.097093475 | $0.15 |
| | | | |
| 9/12/2008 | $13,739.00 | 0.094576737 | $1,299.39 |
| 9/18/2008 | $5,500.00 | 0.092151537 | $506.83 |
| 9/25/2008 | $25,356.50 | 0.092851989 | $2,354.40 |
| 9/30/2008 | $15.00 | 0.091119841 | $1.37 |
| 9/30/2008 | $1.50 | 0.091119841 | $0.14 |



| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 10/17/2008 | $13,739.00 | 0.077937694 | $1,070.79 |
| 10/22/2008 | $5,500.00 | 0.073557361 | $404.57 |
| 10/29/2008 | $30,467.75 | 0.077388457 | $2,357.85 |
| 10/31/2008 | $15.00 | 0.078904629 | $1.18 |
| 10/31/2008 | $1.50 | 0.078904629 | $0.12 |
| | | | |
| 11/14/2008 | $13,739.00 | 0.0769487 | $1,057.20 |
| 11/25/2008 | $5,500.00 | 0.075334653 | $414.34 |
| 11/26/2008 | $31,149.25 | 0.075627291 | $2,355.73 |
| 11/28/2008 | $15.00 | 0.074666107 | $1.12 |
| 11/28/2008 | $1.50 | 0.074666107 | $0.11 |
| | | | |
| 12/10/2008 | $5,500.00 | 0.074245405 | $408.35 |
| 12/15/2008 | $13,739.00 | 0.075147692 | $1,032.45 |
| 12/16/2008 | $15,924.00 | 0.075665004 | $1,204.89 |
| 12/16/2008 | $32,551.31 | 0.075665004 | $2,462.99 |
| 12/31/2008 | $15.00 | 0.072282233 | $1.08 |
| 12/31/2008 | $1.50 | 0.072282233 | $0.11 |
| | | | |
| 1/15/2009 | $85,000.00 | 0.070625161 | $6,003.14 |
| 1/15/2009 | $11.00 | 0.070625161 | $0.78 |
| 1/15/2009 | $1.10 | 0.070625161 | $0.08 |
| 1/30/2009 | $15.00 | 0.06979577 | $1.05 |
| 1/30/2009 | $1.50 | 0.06979577 | $0.10 |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 2/5/2009 | $14,049.00 | 0.069847645 | $981.29 |
| 2/27/2009 | $15.00 | 0.066259906 | $0.99 |
| 2/27/2009 | $1.50 | 0.066259906 | $0.10 |
| 3/31/2009 | $15.00 | 0.070393833 | $1.06 |
| 3/31/2009 | $1.50 | 0.070393833 | $0.11 |
| 4/30/2009 | $15.00 | 0.0724446 | $1.09 |
| 4/30/2009 | $1.50 | 0.0724446 | $0.11 |
| 5/29/2009 | $15.00 | 0.075825963 | $1.14 |
| 5/29/2009 | $1.50 | 0.075825963 | $0.11 |
| 6/30/2009 | $15.00 | 0.075919646 | $1.14 |
| 6/30/2009 | $1.50 | 0.075919646 | $0.11 |
| 7/31/2009 | $15.00 | 0.075703378 | $1.14 |
| 7/31/2009 | $1.50 | 0.075703378 | $0.11 |
| 8/31/2009 | $15.00 | 0.074977588 | $1.12 |
| 8/31/2009 | $1.50 | 0.074977588 | $0.11 |
| 9/30/2009 | $15.00 | 0.074170889 | $1.11 |
| 9/30/2009 | $1.50 | 0.074170889 | $0.11 |
| 10/30/2009 | $15.00 | 0.076007132 | $1.14 |

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 10/30/2009 | $1.50 | 0.076007132 | $0.11 |
| 11/30/2009 | $15.00 | 0.077408228 | $1.16 |
| 11/30/2009 | $1.50 | 0.077408228 | $0.12 |
| 12/31/2009 | $15.00 | 0.076557568 | $1.15 |
| 12/31/2009 | $1.50 | 0.076557568 | $0.11 |
| 1/29/2010 | $15.00 | 0.076769436 | $1.15 |
| 1/29/2010 | $1.50 | 0.076769436 | $0.12 |
| 2/26/2010 | $15.00 | 0.078376193 | $1.18 |
| 2/26/2010 | $1.50 | 0.078376193 | $0.12 |
| 3/31/2010 | $20.00 | 0.081293487 | $1.63 |
| 3/31/2010 | $2.20 | 0.081293487 | $0.18 |
| 4/30/2010 | $50.00 | 0.081769228 | $4.09 |
| 4/30/2010 | $5.50 | 0.081769228 | $0.45 |
| 5/31/2010 | $30.00 | 0.077413066 | $2.32 |
| 5/31/2010 | $3.30 | 0.077413066 | $0.26 |
| 6/30/2010 | $30.00 | 0.077947941 | $2.34 |
| 6/30/2010 | $3.30 | 0.077947941 | $0.26 |

BANREGIO ACCOUNT NO. REDACTED

| Date | Withdrawals (Pesos) | Exchange Rate | Withdrawals (Dollars) |
|---|---|---|---|
| 7/30/2010 | $30.00 | 0.079072507 | $2.37 |
| 7/30/2010 | $3.30 | 0.079072507 | $0.26 |
| | | | |
| 8/31/2010 | $30.00 | 0.075940725 | $2.28 |
| 8/31/2010 | $3.30 | 0.075940725 | $0.25 |
| | | | |
| 9/30/2010 | $30.00 | 0.07917369 | $2.38 |
| 9/30/2010 | $3.30 | 0.07917369 | $0.26 |
| | | | |
| 10/29/2010 | $30.00 | 0.081016027 | $2.43 |
| 10/29/2010 | $3.30 | 0.081016027 | $0.27 |
| | | | |
| 11/30/2010 | $30.00 | 0.080285916 | $2.41 |
| 11/30/2010 | $3.30 | 0.080285916 | $0.26 |
| 11/30/2010 | $200.00 | 0.080285916 | $16.06 |
| 11/30/2010 | $22.00 | 0.080285916 | $1.77 |
| | | | |
| 12/31/2010 | $30.00 | 0.081018186 | $2.43 |
| 12/31/2010 | $3.30 | 0.081018186 | $0.27 |
| 12/31/2010 | $200.00 | 0.081018186 | $16.20 |
| 12/31/2010 | $22.00 | 0.081018186 | $1.78 |
| | | | |
| TOTALS | $1,284,014.61 | | $114,284.99 |